## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **VIVIAN BERT, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO. C-1-02-467** |
| | ) | **Judge Beckwith** |
| **AK STEEL CORPORATION,** | ) | **Magistrate Judge Hogan** |
| | ) | |
| **Defendant.** | ) | |

## <u>PLAINTIFFS' MEMORANDUM IN SUPPORT</u>
## <u>OF MOTION FOR CLASS CERTIFICATION</u>

# TABLE OF CONTENTS

I.    Factual and Procedural Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.    AK Steel's Laborer Vacancy Hiring Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.    Effect of Laborer Selection Process Upon Black Applicants . . . . . . . . . . . . . . . 5

    C.    Named Plaintiffs Were Affected by the Discriminatory Laborer Selection Process
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

II.   Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    A.    The Class is Sufficiently Numerous to Make Joinder Impracticable . . . . . . . . . 17

    B.    Common Questions of Law and Fact Unite the Claims of the Class Representatives
and the Class . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    C.    The Claims of the Putative Class Representatives are Typical of the Claims of the
Putative Class . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

    D.    The Named Plaintiffs are Adequate Representatives of the Putative Class . . . . . 26

    E.    The Proposed Class Satisfies the Requirements of Rule 23(b)(2) . . . . . . . . . . . 27

    F.    The Proposed Class Satisfies the Requirements of Rule 23(b)(3) . . . . . . . . . . . 29

    G.    Plaintiffs Request Subclasses In the Event One Class is Not Certifiable . . . . . . 31

III.  Application for Appointment as Class Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

## LIST OF EXHIBITS

Ex. 1        Edwin L. Bradley Supplemental Expert Report Regarding Hiring Into Laborer Positions at the Middletown Works and Ashland Works of AK Steel

Ex. 2        Edwin L. Bradley Rebuttal Expert Report Regarding Hiring Into Laborer Positions at the Middletown Works and Ashland Works of AK Steel

Ex. 3        Phyllis Short Deposition excerpts

Ex. 4        Susan R. Lester Deposition excerpts

Ex. 5        Donald Edwards Declaration

Ex. 6        Thaddeus Freeman Declaration

Ex. 7        Dwight Lewis Declaration

Ex. 8        Timothy Oliphant Declaration

Ex. 9        Darrell Carter Declaration

Ex. 10       **Darlene Carter Decl**aration

Ex. 11       Marnie Carter Declaration

Ex. 12       Tiffany Jackson Declaration

Ex. 13       **Kay Jackson Decl**aration

Plaintiffs, through undersigned counsel, move for class certification on behalf of themselves and a class consisting of all black individuals who failed the test administered by the defendant AK Steel's Middletown, Ohio and Ashland, Kentucky facilities for Laborer vacancies and further advancement within the company.

Plaintiffs have satisfied each of the elements of Rules 23(a) and 23(b), Federal Rules of Civil Procedure. There are numerous questions of law and fact common to the class. The challenge to the defendant AK Steel's qualifying test for Laborer vacancies and further advancement will involve a common method of proof and evidence at trial regarding whether the test is racially discriminatory, both as to the putative class and the individual class representatives. Each class representative has been injured by the challenged selection process in the same way as the class they seek to represent, and thus, have claims that are typical of those of the putative class. The class representatives have no conflicts of interest and can provide adequate representation through counsel who have successfully prosecuted similar class actions for many years. The named plaintiffs and class representatives seek the same relief for themselves as they do for the class. The putative class is too numerous and impracticable to join. Because the class seeks injunctive and declaratory relief that predominates over any monetary relief, certification under Rules 23(b)(2) and 23(b)(3) is appropriate. In the event the Court finds that one class is not maintainable, then plaintiffs request that the Court certify two subclasses based upon AK Steel's Middletown Works and Ashland Works, respectively.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

AK Steel is a corporation with steel plants in Middletown, Ohio and Ashland, Kentucky. The Middletown Works ("Middletown") is the largest facility within AK Steel and processes raw

materials into finished coils of steel.  Phyllis Short Dep., at 45 (deposition excerpts attached as Ex. 3).  Middletown has 16 departments which currently employs approximately 3,000 employees.  Id. at 46, 49.  The entry-level position at Middletown is the Laborer classification, which is also called Employment Reserve and Production Employee.  Id. at 46-47.

The Ashland Works ("Ashland") contains a coke making facility, which produces coke from coal, and the primary steel plant, which processes coke into steel.  Susan R. Lester Dep., at 7-8 (deposition excerpts attached as Ex. 4).  Ashland employs approximately 1,200 employees, and entry-level positions are called Heat Relief Laborer at the coke making facility and Laborer at the main facility.  Id. at 8-9.[1]

### A.    AK Steel's Laborer Vacancy Hiring Process

Phyllis Short has been AK Steel's General Manager of Human Resources since early 2004.[2] Short Dep. at 4.  Before obtaining her present position, Ms. Short served as the Manager of Human Resources at Middletown for ten years.  Id.  Ms. Short supervised the hiring process for Laborers at Middletown when she was Manager of Human Resources.  Id.  at 8-9.  Tracy White conducted hourly hiring from January 2000 until 2001, and Jessica Hicks performed the same functions from 2001 through 2004.  Id. at 8-9, 20.

Susan R. Lester has been the Manager of Human Resources at AK Steel's Ashland facility

---

[1] Hereafter, plaintiffs will refer to entry-level positions at both Middletown and Ashland as "Laborer" positions.

[2] Phyllis Short was the Fed. R. Civ. P. 30(b)(6) designee of AK Steel for the hiring process for Laborers at the Middletown, Ohio facility.

since 1993.[3]  Lester Dep. at 4.  Ms. Lester supervised and conducted the hiring process for Laborer positions at Ashland.  Id. at 8.  Ms. Lester does not have any person who assists her in conducting the hiring process for Laborer vacancies.  Id. at 5.

AK Steel uses a similar process to select individuals for Laborer vacancies at its Middletown and Ashland facilities.  Generally, candidates for Laborer vacancies submit applications at either the Ohio Bureau of Employment Services for Middletown positions or the Bureau of Employment Services for Kentucky for Ashland positions.  The state agencies conduct an initial screen of the applications for minimum qualifications ("MQs"): age restriction (18 years or older); high school graduate or GED; and for Middletown, two years of prior manufacturing experience.  Short Dep. at 7-8, 107; Lester Dep. at 26-27, 45.  AK Steel personnel do not accept applications at AK Steel facilities (Short Dep.  at 56-57, 60; Lester Dep. at 29-30, 34-35), although Ms. Lester accepted resumes of minority candidates at job fairs and from Rodney Cosby, Civil Rights Committee Chairman at Ashland.  Lester Dep. at 21-22, 36-37.  The state agencies are instructed not to forward applications of candidates who do not satisfy the initial screening.  Short Dep. at 8; Lester Dep. at 42.

Once received at the Middletown or Ashland facilities, the applications are reviewed again for MQs as well as for any prior criminal convictions and previous work history problems.  Short Dep. at 9-10; Lester Dep. at 49-50.  Ms. Short and the hourly hiring coordinator performed the reviews for the Middletown facility, whereas Ms. Lester solely performed the reviews for Ashland.  Short Dep. at 9-10; Lester Dep. 51-52, 56.

---

[3] Susan Lester was the Fed. R. Civ. P. 30(b)(6) designee of AK Steel for the hiring process for Laborers at the Ashland, Kentucky facility.

3

Those applicants passing the second stage of screening are then scheduled by telephone calls for testing. Short Dep. at 11; Lester Dep. at 57. Neither Ms. Short nor Ms. Lester use any set procedures regarding the number of attempts that must be made to telephone applicants to schedule testing. In addition, they do not attempt to reach applicants by mail to schedule them for testing. Short Dep. at 11-12, 25-26; Lester Dep. at 59-60.[4] AK Steel administers the tests, and subsequently the completed exams are sent to Resource Associates of Knoxville, Tennessee for scoring on a pass/fail basis. Short Dep. at 27-30; Lester Dep. at 68-71.

The applicants who pass the exam are then interviewed. Short Dep. at 32; Lester Dep. at 78-79. Ms. Short's hourly hiring coordinator and an individual from operations management conduct interviews in Middletown. Short Dep. at 32. In the interviews at Middletown, the interviewers verified past work experience, educational background, and lack of criminal convictions, and, ascertained the applicant's willingness to rotate shifts, experience with safety equipment, motivation, and decision-making skills. Id. at 32-37. The hourly hiring coordinator and the operations management representative assessed candidates on a scale of 1 to 3 (id. at 36-37) for the following categories: safety, work drive/initiative, productivity, reliability, work experience, communication, education and training, and fit/overall stability. Id. at 106. The interview is not structured; thus, the interviewers may use any questions in any order. Id. at 105. Ms. Short conceded that interviewers make subjective considerations when scoring the interviews. Id. at 40.

At Ashland, Ms. Lester and Jerry Davis, a senior industrial engineer, conduct interviews of the passing candidates for Laborer vacancies. On occasion, supervisors from different areas observe

---

[4] Ms. Lester testified that she sometimes attempted to contact individuals Mr. Cosby had referred by mail; such occasions were special exceptions. Lester Dep. at 59-60.

the interviews to assess the skills of candidates.  Lester Dep. at 80.  Interviews are structured and scored on a scale of 1 to 10 for the following categories: conscientiousness, positive attitude, safety, teamwork, motivational fit, problem solving, and adaptability.  Id. at 82-85.  Ms. Lester also conceded that she and Mr. Davis make subjective considerations when scoring the interviews.  Id. at 85.

Candidates who advance after the interviews are subjected to background checks and physical examinations, and if those steps are surpassed, then they are hired.  Short Dep. at 43; Lester Dep. at 89, 117.

### B.    Effect of Laborer Selection Process Upon Black Applicants

Plaintiffs' statistical expert, Dr. Edwin L. Bradley, conducted statistical analyses of AK Steel's Laborer vacancy selection process and determined that the qualifying test used by Middletown and Ashland has had an adverse impact against black applicants.  To prove disparate impact, a plaintiff must proffer "a statistical analysis demonstrating that the challenged practice has an adverse impact on a protected group."  Isabel v. City of Memphis, 404 F.3d 404, 411 (6th Cir. 2005) (citations omitted).

As Dr. Bradley noted, adverse impact may be determined either by calculating the statistical significance in the disparity between the expected and actual results of a selection process, or by use of the "80%" or "four-fifths" rule originally promulgated by the Equal Employment Opportunity Commission in the Uniform Guidelines on Employee Selection Procedures.  Statistical significance means that results are not due to chance, and thus, are related to race at a certain confidence level.  Statistical significance occurs at the 95% confidence level (no more than 5% probability that results are due to chance) when the difference is 1.65 or more standard deviations, at the 99% confidence

5

level (no more than 1% probability that results are due to chance) when the difference is 2.33 or more standard deviations, and at the 99.9% confidence level (no more than 0.1% probability that results are due to chance) when the difference is 3.09 or more standard deviations. See Edwin L. Bradley Supplemental Expert Report Regarding Hiring Into Laborer Positions at the Middletown Works and Ashland Works of AK Steel, at 3-4 (attached as Ex. 1) (hereinafter "Bradley Suppl. Rep."); c.f., Engineering Contractors Ass'n of South Florida v. Metropolitan Dade County, 122 F.3d 895, 914 (11th Cir. 1997) ("Social scientists consider a finding of two standard deviations significant, meaning there is about one chance in 20 that the explanation for the deviation could be random and the deviation must be accounted for by some factor other than chance.") (citing Peightal v. Metropolitan Dade County, 26 F.3d 1545, 1556 n. 16 (11th Cir. 1994)); Smith v. Xerox Corp., 196 F.3d 358, 365 (2[d] Cir. 1999) (identifying two standard deviations as the measure of statistically significant disparity).

The Uniform Guidelines provide as follows:

Adverse impact and the "four-fifths rule". A selection rate for any race, sex, or ethnic group which is less than four-fifths (4/5) (or eighty percent) of the rate for the group with the highest rate will generally be regarded by the Federal enforcement agencies as evidence of adverse impact, while a greater than four-fifths rate will generally not be regarded by Federal enforcement agencies as evidence of adverse impact. Smaller differences in selection rate may nevertheless constitute adverse impact, where they are significant in both statistical and practical terms or where a user's actions have discouraged applicants disproportionately on grounds of race, sex, or ethnic group.

29 C.F.R. § 1607.4(D).

Dr. Bradley initially analyzed Laborer selection information provided to him by plaintiffs' counsel for the period January 2000 to October 29, 2003. Bradley Suppl. Rep., at 6 (hereinafter "Bradley Suppl. Rep."). Pursuant to the data provided, AK Steel hired 840 Laborers at Middletown

during this period (id.), for which there existed 7,086 unique applicants (i.e., excluding duplicate applicants).  Id. at 7, n. 23.  The data available to Dr. Bradley did not contain race information for 295 individuals, or 4.2% of these applicants.  Id.  Based upon the data, the black applicants comprised 8.76% of the applicant pool for Laborer positions, which serves as the benchmark for the statistical analysis.  Id. at 8.  Therefore, the expected black representation for the group of 804 hires is approximately 74 individuals.  The actual black hires were 44 individuals, which demonstrates a shortfall of approximately 30 individuals.  This difference was statistically significant at -3.85 standard deviations and a 57.6% adverse impact ratio.  Id.

At Ashland, AK Steel hired 77 Laborers during the period October 24, 2000, through November 18, 2002 (id. at 7), for which there existed 624 unique applicants.  Id. at 7, n. 26.  Race information was not provided for 40 individuals, or 6.4% of the applicants.  Id.  Based upon the data, the black applicants comprised 8.56% of the applicant pool for laborer positions, which serves as the benchmark for the statistical analysis.  Id. at 8.  Therefore, the expected black hires for the group is approximately 7 individuals.  The actual black hires were 2 individuals, which demonstrates a shortfall of approximately 5 individuals.  This difference was statistically significant at -2.00 standard deviations and a 28.5% adverse impact ratio.

When looking at both locations overall, the benchmark for black applicants is 8.74% of the 917 total applicants.  Using this benchmark, the expected black hires overall is approximately 80 individuals, yet, the actual number of black hires were 46 individuals, demonstrating a shortfall of approximately 34 individuals.  This difference was statistically significant at -4.26 standard deviations with a 55.1% adverse impact ratio.  Id. at 8.  As Dr. Bradley noted, the data he was provided was incomplete because Ms. Short and Ms. Lester testified that they did not retain

information that would be pertinent to his analysis.  Id. at 8-9.[5]

Dr. Bradley was provided supplemental data via the production of the report by the defendant's statistical expert, Dr. Mary Baker.  Utilizing the Baker data and its benchmark of 9.01% black applicants for 844 hires at Middletown, Dr. Bradley calculated that the hiring of 47 black individuals for Laborer vacancies from January 1, 2000, to December 31, 2003, was 29 individuals fewer than the expected result of 76 individuals.  Edwin L. Bradley Rebuttal Expert Report Regarding Hiring Into Laborer Positions at the Middletown Works and Ashland Works of AK Steel, at 7-8 (attached as Ex. 2) (hereafter "Bradley Rebut. Rep.").  This difference was statistically significant at -3.71 standard deviations and an adverse impact ratio of 59.5%.  Id.[6]

Moreover, Dr. Bradley concluded that the Middletown "hiring shortfall is explained by the fact that African-Americans were more likely than others to fail the written test and, as a result, to become eligible for hire."  Id. at 5.  Using the Baker data and its benchmark of 8.99% black applicants for 1,896 individuals qualified to take the hiring exam at Middletown, the 114 black

---

[5] The incomplete information included the applicant log; race of applicants; results of the minimum qualifications screening process; telephone records for scheduling candidates to take tests; reasons applicants may have failed to take a test; telephone records for scheduling interviews; records of who failed to accept offers of employments; and records of who failed background checks and physical examinations. See Short Dep. at 22-25, 86-88, 91-92, 107-09, 111-13, 130; Lester Dep. at 10-12, 16-18, 52-56, 59-60, 79, 108, 120-23.

[6] Indeed, the defendant's expert, Dr. Baker, found a shortfall in black applicant hiring at Middletown.  Bradley Rebut. Rep. at 12-13.  Dr. Baker calculated a 9% benchmark of black applicants for the period August 12, 2001, through December 31, 2003.  Id. at 13.  Of the 417 Laborer hires during that period, 25 were black individuals, which were approximately 12 individuals fewer than the 37 black individuals expected to be hired.  Id.  This difference was statistically significant at -2.14 standard deviations and an adverse impact ratio of 64.6%.  Id.  The difference in the shortfall calculated by Dr. Baker as compared to the shortfall calculated by Dr. Bradley is explained by the exclusion from her analysis of applicants who purportedly withdrew voluntarily from the selection process.  Id. at 6-7.  Dr. Bradley criticizes Dr. Baker for her exclusion because she has no evidence of such voluntary withdrawal.  Id.

candidates who passed the test were 56 individuals fewer than the expected result of 170 individuals. Id. at 8. This difference was statistically significant at -6.10 standard deviations with an adverse impact ratio of 64.8%. Id. The defendant maintained no data on any of the individual components of the Ashland hiring process for Laborer vacancies; thus, Dr. Bradley could not perform a statistical analysis of the testing process at Ashland. Id. at 11. Dr. Bradley surmised, however, that because the defendant used the same test at Middletown and Ashland, the results of the Middletown testing analysis should apply with equal force to Ashland testing. Id.[7]

The shortfall in testing at Ashland is reflected in an analysis of the total selection process at Ashland using the Baker data. The Baker data is missing racial information for 28.4% of the applicants. Id. at 8-9. This missing info yields a benchmark of 3.20% black applicants for Dr. Baker's analysis. Id. at 9. Dr. Bradley applied the 8.56% black applicant benchmark he found in the Ashland electronic data he received – which lacked racial information for only 6.4% of the applicants – to perform a statistical analysis on the Baker data. Id. at 9-10. For the 289 hires during the period covered by the Baker data for Ashland (January 1, 2000, to December 31, 2003), the hiring of 12 black applicants for Laborer vacancies was 13 applicants fewer than the expected result of 25 individuals. Id. at 10. This difference resulted in a statistical significance of -2.81 standard deviations and a 46.3% adverse impact ratio. Id.

When looking at both locations overall using the Baker data, the black applicant benchmark is 8.9% for the 1,133 hires during the period January 1, 2000, through December 31, 2003. Id. at 11. The expected black hires overall is approximately 101 individuals, yet the actual hires were 59

---

[7] Indeed, as demonstrated below most of the named plaintiffs who applied for Laborer positions at Ashland did not pass the qualifying exam.

9

individuals, demonstrating a shortfall of approximately 42 individuals, or 41.5% fewer black applicants than expected. This difference was statistically significant at -4.62 standard deviations with a 56.3% adverse impact ratio. Id. at 11-12.

### C.   Named Plaintiffs Were Affected by the Discriminatory Laborer Selection Process

Named plaintiffs Donald Edwards, Thaddeus Freeman, Dwight Lewis, Timothy Oliphant, Darrell Carter, Darlene Carter, Marnie Carter, Tiffany Jackson, and Kay Jackson each suffered the discriminatory impact of the defendant's qualifying test when they applied for Laborer vacancies.

*Donald Edwards*

In August 2001, plaintiff Donald Edwards completed an application for Laborer positions at AK Steel's Middletown facility. Subsequently, Mr. Edwards completed a fairly easy qualifying test and was told that he would receive word whether his application was approved or rejected. Mr. Edwards never heard anything from AK Steel after his August 2001 application, however. Donald Edwards Decl. at 2 (attached as Ex. 5).

*Thaddeus Freeman*

In a 1999 job application for a Laborer position at Middletown, plaintiff Thaddeus Freeman was contacted by AK Steel to take a test. When he returned to AK Steel to inquire about his performance on the test, Mr. Freeman was dismissed and told that somebody would call him regarding the test. Mr. Freeman never heard from AK Steel again. Thaddeus Freeman Decl. at 2 (attached as Ex. 6).

*Dwight Lewis*

In May 2002, plaintiff Dwight Lewis attended a career fair in Portsmouth, Ohio at which AK

10

Steel had a booth regarding employment at Ashland. An AK Steel representative gave Mr. Lewis an application and scheduled him to take a test two weeks later. Mr. Lewis applied for a Laborer position. AK Steel gave Mr. Lewis two tests. The first, a test of general aptitude, asked basic science, math, reading comprehension, and pattern recognition questions. The second, a personality test, posed questions regarding one's work preferences and the way in which one would deal with potential problems. Approximately one week later, Mr. Lewis spoke via telephone with Ms. Lester, who informed Mr. Lewis that he had failed the test. When Mr. Lewis inquired whether he had failed the general exam or the personality test, Ms. Lester refused to answer his questions. Dwight Lewis Decl. at 2 (attached as Ex. 7).

### *Timothy Oliphant*

Plaintiff Timothy Oliphant applied for employment with AK Steel in Ashland in April 2002. Mr. Oliphant visited the AK Steel booth at a job fair at a local shopping mall, where Rodney Cosby instructed Mr. Oliphant to fax his resume to him. Mr. Oliphant applied for a Laborer position. Ms. Lester subsequently contacted Mr. Oliphant via email to schedule a time for Mr. Oliphant to take AK Steel's qualifying exam. Approximately three days after taking the test, Mr. Oliphant contacted Ms. Lester via telephone to inquire into his performance. Ms. Lester told he that him had not passed. Ms. Lester did not inform Mr. Oliphant of his score or offer any other information regarding the examination. Timothy Oliphant Decl. at 2 (attached as Ex. 8).

### *Darrell Carter*

In April 2002, plaintiff Darrell Carter completed an application with Ms. Lester for employment at Ashland. Mr. Carter applied for a Laborer position. Ms. Lester scheduled a time for Mr. Carter to take the AK Steel entrance examination. With approximately a dozen other AK Steel

applicants, Mr. Carter took the qualifying test. Mr. Carter found the examination to be relatively easy and, after having completed it, anticipated that he had performed well. When Mr. Carter contacted Ms. Lester via telephone two to three weeks later, however, Ms. Lester informed him that he had not passed the test. She offered no further information regarding Mr. Carter's performance and refused to answer Mr. Carter's questions. Darrell Carter Decl. at 2 (attached as Ex. 9).

### Darlene Carter

In January 2002, plaintiff Darlene Carter attended a career fair in Portsmouth, Ohio at which AK Steel had a booth regarding employment at Ashland. An AK Steel representative gave Ms. Carter an application, which Ms. Carter submitted at AK Steel. Ms. Carter applied for a Laborer position. A week later, an AK Steel representative contacted Ms. Carter via telephone to schedule her for a test given in the basement of the AK Steel plant. With approximately a dozen other AK Steel applicants, Ms. Carter took the qualifying exam. Approximately a week and a half later, Ms. Carter spoke via telephone with Ms. Lester, who informed Ms. Carter that she had failed the test. Ms. Lester refused to answer Ms. Carter's questions regarding her performance. Darlene Carter Decl. at 2 (attached as Ex. 10).

### Marnie Carter

In January 2002, plaintiff Marnie Carter attended a career fair in Portsmouth, Ohio at which AK Steel had a booth regarding employment at Ashland. An AK Steel representative gave Ms. Carter an application, which she submitted at the AK Steel plant. Ms. Carter applied for a Laborer position. A week later, an AK Steel representative contacted Ms. Carter via telephone to schedule her for a test given in the basement of the AK Steel plant. With approximately a dozen other AK Steel applicants, Ms. Carter took the qualifying exam. Approximately a week and a half later, Ms.

12

Carter spoke via telephone with Ms. Lester, who informed Ms. Carter that she had failed the test. Ms. Lester refused to answer Ms. Carter's questions regarding her performance. Marnie Carter Decl. at 2 (attached as Ex. 11).

### *Tiffany Jackson*

In October 2001, plaintiff Tiffany Jackson attended a career fair in Portsmouth, Ohio at which AK Steel had a booth regarding employment at Ashland. There, Ms. Jackson picked up an application and spoke with Susan Lester about current job openings. Although Ms. Jackson had been hoping to obtain an office position, Ms. Lester told Ms. Jackson that no office positions were available. Along with her resume, Jackson mailed the application to AK Steel in approximately December 2001. Ms. Jackson applied for any available position, including Laborer. In May 2002, Ms. Lester contacted Ms. Jackson via telephone to schedule a time for her to come in and take AK Steel's qualifying exam.

AK Steel gave Ms. Jackson two tests. The first, a test of general aptitude, asked basic science, math, reading comprehension and pattern recognition questions. The second, a personality test, posed questions regarding one's work preferences and the way in which one would deal with potential problems. Ms. Jackson had taken the tests as part of an earlier application, in approximately June 2001, that she filed with AK Steel. In preparation for taking AK Steel's test a second time, Ms. Jackson had consulted study guides for standardized tests such as the SAT and ACT. In addition, she studied an introductory math textbook. Approximately one week later, Ms. Lester informed Ms. Jackson via telephone that she had failed the test. Ms. Lester offered no further information. Tiffany Jackson Decl. at 2 (attached as Ex. 12).

*Kay Jackson*

In 1999, 2001, and on approximately May 9, 2002, plaintiff Kay Jackson applied for a general laborer or clerical position at Ashland. During each application process, Ms. Jackson was called in to take AK Steel's qualifying exam. After taking the test in 1999, an AK Steel representative told Ms. Jackson that she had failed the test. In 2001, Ms. Jackson took the exam for a second time. Ms. Jackson was neither informed of her performance nor contacted for an interview. Since taking the exam on approximately May 9, 2002, Ms. Jackson has not been contacted by AK Steel. Kay Jackson Decl. at 2 (attached as Ex. 13).

## II.    DISCUSSION

Fed. R. Civ. P. 23, which governs class certification, requires that: (1) the class be so numerous that joinder of all members is impracticable; (2) questions of law or fact be common to the class; (3) the claims or defenses of the representative parties be typical of the class; and (4) the representative parties fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). In addition to the Rule 23(a) requirements, plaintiffs must also demonstrate that certification is appropriate under one of the sections of Rule 23(b). Plaintiffs seek certification under Rule 23(b)(2) and (b)(3), which permits certification for actions seeking injunctive or declaratory relief.

Rule 23 serves two principal purposes: (1) to promote efficiency and economy of litigation through the avoidance of a multiplicity of suits and cumulative evidence; and (2) to protect the rights of aggrieved individuals who might be afraid to take the affirmative step of presenting claims on an individual basis. See Crown Cork & Seal Co. v. Parker, 462 U.S. 345, 350 (1983); Jenkins v. Raymark Indus., Inc., 782 F.2d 468, 471-73, reh'g denied, 785 F.2d 1034 (5th Cir. 1986). District courts are afforded wide discretion in determining whether to certify a class. See Bittinger v.

14

Tecumseh Prods. Co., 123 F.3d 877, 884 (6th Cir. 1997).

As stated by the Supreme Court in General Telephone Company of the Southwest v. Falcon, 457 U.S. 147 (1982), the judicial economy and efficiency in cases such as this, where class members are adversely affected by a common procedure, make certification under Rule 23(b)(2) particularly compelling:

> Class relief is "peculiarly appropriate" when the "issues involved are common to the class as a whole" and when they "turn on questions of law applicable in the same manner to each member of the class." For in such cases, "the class-action device saves the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion under Rule 23."

Falcon, 457 U.S. at 155 (internal citations omitted).

Plaintiffs are seeking certification of a class, or two subclasses, challenging the disparate impact upon black individuals of AK Steel's qualifying exam for Laborer vacancies and further advancement at its Middletown and Ashland facilities. Discrimination occurs when an employer "uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin and fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity . . . ." 42 U.S.C. § 2000e-2(k)(1)(A)(I). "[D]isparate impact analysis is intended to make sure that employers do not use 'neutral' decision-making mechanisms that in fact work to eliminate a greater portion of otherwise-qualified protected group members than they do members of other groups." Phillips v. Cohen, 400 F.3d 388, 397 (6th Cir. 2005). A plaintiff establishes a prima face case of disparate impact discrimination by: (1) identifying a specific employment practice to be challenged; and (2) proffering a statistical analysis demonstrating that the challenged practice has an adverse impact on

15

a protected group.  Isabel v. City of Memphis, 404 F.3d 404, 411 (6th Cir. 2005) (citations omitted).[8]

The plaintiffs' burden at class certification is to demonstrate that the requirements of Rule 23 have been met, a showing which is less burdensome than proving a prima facie case of disparate impact liability.  See Nelson v. U. S. Steel Corp., 709 F.2d 675, 680 (11th Cir. 1983) (plaintiffs' burden on class certification is "'less than a *prima facie* showing of liability'") (quoting Gilchrist v. Bulger, 89 F.R.D. 402, 406 (S.D. Ga. 1981)).  Therefore, for purposes of class certification, the named plaintiffs need only show that they individually availed themselves of the facially neutral employment practice underlying their adverse impact claim and that they suffered an adverse action upon doing so.  Furthermore, examination of expert statistical analyses for class certification purposes should only focus upon whether the analyses "comport with basic principles," "have any probative value," and "primarily use evidence that is common to all members of the proposed class." In re Polypropylene Carpet Antitrust Litigation, 996 F. Supp. 18, 26 (N.D. Ga.1997); see also Bacon v. Honda of America Mfg., Inc., 205 F.R.D. 466, 470-71 (S.D. Ohio 2001) ("'For common questions to exist, plaintiffs' statistical evidence must logically support the inference of discrimination against the class asserted.'") (citation omitted).  Therefore, "nothing in either the language or history of Rule 23 . . . gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action."  Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177-78 (1974); see also Weathers v. Peters Realty Corp., 499 F.2d 1197, 1201 (6th Cir. 1974) ("when determining the maintainability of a class action, the district court must confine itself

---

[8] If a plaintiff establishes a prima facie case of disparate impact discrimination, "the employer must show that the protocol in question has 'a manifest relationship to the employment'--the so-called 'business justification.'"  Isabel, 404 F.3d at 411 (citation omitted).  " If the employer succeeds, the plaintiff must then show that other tests or selection protocols would serve the employer's interest without creating the undesirable discriminatory effect."  Id. (citation omitted).

to the requirements of Rule 23 and not assess the likelihood of success on the merits").

### A.    The Class is Sufficiently Numerous to Make Joinder Impracticable

Rule 23(a)(1) requires that the "class [be] so numerous that joinder of all members is impracticable . . . ." Fed. R. Civ. P. 23(a)(1). "Only when joinder is impracticable is there a need for a class action device." 1 Herbert B. Newberg & Alba Conte, Newberg on Class Actions, § 3.01, at 3-4 (3d ed. 1992). There exists no strict numerical test for determining impracticability of joinder. In re Am. Med. Sys., Inc., 75 F.3d 1069, 1079 (6th Cir. 1996) (citing Senter v. Gen. Motors Corp., 532 F.2d 511, 523 n.24 (6th Cir. 1976)). "Rather, 'the numerosity requirement requires examination of the specific facts of each case and imposes no absolute limitations.'" Id. (quoting Gen. Tel. Co. v. EEOC, 446 U.S. 318, 330 (1980)). "In general, 'courts have not required evidence of exact class size or identity of class members to satisfy the numerosity requirement.'" McGee v. E. Ohio Gas Co., 200 F.R.D. 382, 389 (S.D. Ohio 2001) (quoting Robidoux v. Celani, 987 F.2d 931, 935 (2d Cir. 1993)).

In the instant case, the putative class, or subclasses, include black applicants who satisfied AK Steel's minimum qualifications and yet failed the qualifying exam for Laborer vacancies at the Middletown and Ashland facilities, as well as future black applicants for Laborer vacancies. The defendant's expert's data revealed 56 black applicants who failed the qualifying exam for Middletown Laborer vacancies. See Ex. 2 at 8. Comparable data for the black applicants who failed the exam for Ashland Laborer vacancies is not available. Therefore, the plaintiffs may analyze the entire decisionmaking process at Ashland to determine the impact upon black applicants. See 42

17

U.S.C. § 2000e-2(k)(1)(B)(i),[9] cited in, Phillips, 400 F.3d at 398.  Using the defendant's expert's data, plaintiffs' expert Dr. Bradley determined that 13 black applicants for Laborer vacancies were affected by the decisionmaking process at Ashland.  See Ex. 2 at 10.

Addition of future applicants, although presently unidentifiable, is warranted because the plaintiffs seek prospective remedial relief against the illegal policies and practices to which all black individuals are subject.  See Cross v. Nat'l Trust Life Ins. Co., 553 F.2d 1026, 1028, 1030 (6th Cir. 1977) (numerosity satisfied when class consisted of present and unidentified prospective black employees); Afro Am. Patrolmens League v. Duck, 503 F.2d 294, 298 (6th Cir. 1974) (numerosity satisfied when class consisted of 17 identified black applicants and unidentified future black employees); Nash v. City of Oakwood, Ohio, 94 F.R.D. 83, 88-89 (S.D. Ohio 1982) (numerosity satisfied when class consisted of 33 female applicants and unidentified future female applicants); see also Kilgo v. Bowman Transp., Inc., 789 F.2d 859, 878 (11th Cir. 1986) (numerosity satisfied where class consisted of 31 individual members as well as future and deterred job applicants "which of necessity cannot be identified").

Plaintiffs submit that the liability period underlying Dr. Bradley's statistical analyses extends back at least as far as 1999.  Although the statute of limitations for discrete Title VII claims is 300 days before the date of a charge filed with the Equal Employment Opportunity Commission, this

_____

[9] 42 U.S.C. § 2000e-2(k)(1)(B)(i) provides as follows:

> With respect to demonstrating that a particular employment practice causes a disparate impact . . . , the complaining party shall demonstrate that each particular challenged employment practice causes a disparate impact, except that if the complaining party can demonstrate to the court that the elements of a respondent's decisionmaking process are not capable of separation for analysis, the decisionmaking process may be analyzed as one employment practice.

limitations period may be extended by the continuing violations doctrine.  The Sixth Circuit "has long recognized that an ongoing, continuous series of discriminatory acts may be challenged if one of those discriminatory acts occurred within the limitations period."  Alexander v. Local 96, Laborers' International Union of N.A., 177 F.3d 394, 408 (6th Cir. 1999) (citation omitted).  "'If a continuing violation is shown, a plaintiff is entitled to have a court consider all relevant actions allegedly taken pursuant to the employer's discriminatory policy or practice, including those that would otherwise be time barred.'"  Id. (citations omitted).

The Sixth Circuit formerly viewed continuing violations as falling into two categories: (1) "where there is some evidence of present discriminatory activity giving rise to a claim of a continuing violation; that is where an employer continues presently to impose disparate work assignments or pay rates between similarly situated groups"; and (2) "where there has occurred a longstanding and demonstrable policy of discrimination. . . .  Unrelated incidents of discrimination will not suffice to invoke this exception;  rather there must be a continuing over-arching policy of discrimination."  Id. (citations and internal quotation marks omitted) (alteration in original). Although the Supreme Court case National Railroad Passenger Corp. v. Morgan, 536 U.S. 101 (2002), abrogated the first category of the continuing violations doctrine, the Sixth Circuit has held that the "second category of continuing violations, involving a longstanding and demonstrable policy of discrimination, is not implicated by Morgan."  Sharpe v. Cureton, 319 F.3d 259, 268 (6th Cir.), cert. denied, 540 U.S. 876 (2003); see also Reeb v. Ohio Dept. of Rehab. & Correct., 221 F.R.D. 464, 471 (S.D. Ohio 2004) (same).  Because disparate impact discrimination constitutes a 'policy' of discrimination, one may apply the continuing violations doctrine to acts emanating from that policy that do not fall within the limitations period for discrete violations of Title VII.  See Huguley

19

v. General Motors Corp., 52 F.3d 1364, 1370 (6th Cir. 1995) ("disparate impact . . . claim is based on statistical evidence of systematic discrimination (i.e., a pattern or practice which results in discrimination)") (citing International Bhd. of Teamsters, 431 U.S. 324, 335-36 n. 15 (1977); Griggs v. Duke Power Co., 401 U.S. 424, 430-32 (1971))[10]; c.f., EEOC v. Autozone, Inc., 258 F. Supp. 2d 822, 830 (W.D. Tenn. 2003) (permitting discovery of data up to five years preceding E.E.O.C. charge of discrimination because "[c]ourts typically will permit discovery in employment discrimination cases to cover a reasonable number of years before and after the alleged discrimination") (citation omitted).  Therefore, the limitations period in this case stretches at least as far back as 1999 because AK Steel has used the same qualifying exam from that period to the present, thus, evincing a common policy of discrimination.

      **B.**      **Common Questions of Law and Fact Unite the Claims of the Class Representatives and the Class**

Rule 23(a)(2) requires the existence of "common questions of law or fact among the members of the class."  Commonality is satisfied if there exists "a single issue common to all members of the class." In re Am. Med., 75 F.3d at 1069 (6th Cir. 1996) (citations omitted); Sprague v. Gen. Motors Corp., 133 F.3d 388, 397 (6th Cir. 1998); see also Fallick v. Nationwide Mut. Ins. Co., 162 F.3d 410, 424 (6th Cir. 1998) ("commonality test is met where there is at least one issue

---

[10] See also Robinson v. Metro-North Commuter R.R. Co., 267 F.3d 147, 160 (2d Cir. 2001) ("Like pattern-or-practice disparate treatment claims, disparate impact claims 'are attacks on the systemic results of employment practices.'") (quoting Segar v. Smith, 738 F.2d 1249, 1267 (D.C.Cir.1984)); Anderson v. Boeing Co., 222 F.R.D. 521, 547 (N.D. Okla. 2004) (continuing violation doctrine applied to plaintiffs' Title VII class action claims "because plaintiffs' class claims for disparate treatment and disparate impact are pattern or practice claims").

whose resolution will affect all or a significant number of putative class members").[11] Commonality is likewise "satisfied by a common course of conduct" where the class members are similarly victimized by the same practices or patterns. Adams v. Pinole Steel Co., No. 92-1962, 1994 WL 515347, *9 (N.D. Cal. May 18, 1994) (citation omitted).

The putative class representatives in the case at bar, both in their individual claims and the claims brought on behalf of the putative class, challenge the discriminatory impact of the qualifying exam AK Steel uses for Laborer vacancies and further advancement at its Middletown and Ashland facilities. As demonstrated in the Factual and Procedural Background, each of the putative class representatives failed AK Steel's qualifying exam for Laborer vacancies. Thus, the claim proffered by plaintiffs is common to both the class representatives and all class members – the testing process for Laborer vacancies and further advancement at AK Steel's Middletown and Ashland facilities disproportionately eliminates black candidates.

Common questions of law and fact are presented with respect to the common component set forth above. Specifically, three factual questions arise: (i) does AK Steel use the same qualifying exam for all Laborer vacancies and further advancement at its Middletown and Ashland facilities; (ii) does AK Steel's qualifying exam have an adverse impact upon black applicants for Laborer positions and further advancement at the Middletown and Ashland facilities; and (iii) have the putative class representatives and putative class members failed to advance past the qualifying exam?

---

[11] The "mere fact that the questions peculiar to each individual member of the class remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible." Sterling v. Velsicol Chem. Corp., 855 F.2d 1188, 1197 (6th Cir. 1988); see also Cox v. American Cast Iron Pipe Co., 784 F.2d 1546, 1557 (11th Cir.), cert. denied, 479 U.S. 883 (1986); Adams v. Pinole Steel Co., No. 92-1962, 1994 WL 515347, *9 (N.D. Cal. May 18, 1994) (if "claims arise out of the same legal or remedial theory, factual variation is not enough to defeat commonality") (citations omitted).

There also exists two common questions of law: (i) does the qualifying exam violate Title VII because it has a disparate impact upon black candidates that is not justified by business necessity; and (ii) is there an alternative selection practice that would decrease or eliminate the impact upon black candidates?

The same questions of law and fact will be answered in this case whether it continues as a class trial or as a trial on the individual plaintiffs' disparate impact claims. A trial on behalf of the putative class and the class representatives will involve a common set of witnesses and documents, a common set of disputed subsidiary facts that must be resolved, and a common set of subsidiary legal issues. The class representatives will testify regarding specific instances in which the challenged qualifying exam has illegally prevented them from obtaining Laborer positions and further advancement at the Middletown and Ashland facilities. Common statistical evidence will then be used to prove their individual claims as well as the claims of the class. See Staton v. Boeing, 327 F.3d 938, 954-56 (9th Cir. 2003); Caridad v. Metro North Commuter R.R., 191 F.3d 283, 291-93 (2d Cir. 1999); Shipes v. Trinity Industries, 987 F.2d 311, 316-17 (5th Cir. 1993); Cox v. Amer. Cast Iron Pipe Co., 784 F.2d 1546, 1557 (11th Cir. 1986); Carpenter v. Stephen F. Austin State University, 706 F.2d 608, 623 (5th Cir. 1983).

Plaintiffs' statistical expert, Dr. Bradley, analyzed the effect of the defendant's qualifying exam process and found that it caused an adverse impact against qualified black applicants. Qualified black applicants for Laborer vacancies at Middletown did not surpass the qualifying exam at the statistically significant level of -6.10 standard deviations and an adverse impact ratio of 64.8%. See Ex. 2 at 8. The shortfall underlying these statistical aberrations totaled 56 black applicants affected by the defendant's exam for Laborer vacancies. Because comparable data was not available

22

for the Ashland facility, plaintiffs may rely upon Dr. Bradley's statistical analysis of the total hiring process for Laborer vacancies to demonstrate the effect of the exam. See n. 9, supra. As revealed, the process at Ashland resulted in a shortfall of 13 black applicants, which yielded a statistical significance of -2.81 standard deviations and a 46.3% adverse impact ratio. See Ex. 2 at 10. Dr. Bradley's statistical analyses amply portray the disparate impact caused by the defendant's qualifying exam for Laborer vacancies.

A disparate impact method of proof and trial is particularly suited for class certification as it does not depend upon individualized evidence from the members of the putative class so as to establish classwide liability or a judgment for injunctive relief. See Falcon, 457 U.S. at 159 n. 15 (disparate impact cases necessarily "satisfy the commonality and typicality requirements of Rule 23(a)"); McClain v. Lufkin Industries, Inc., 187 F.R.D. 267, 280 (E.D. Tex. 1999) ("[r]aced-based disparate impact claims necessarily imply a class consisting of plaintiffs with common questions of fact."). The United States Supreme Court in Falcon held that "[c]lass relief is 'peculiarly appropriate' when the issues are common to the class as a whole' and when they 'turn on questions of law applicable in the same manner to each member of the class.'" 457 U.S. at 155. The Court then provided the following example: "If petitioner used a biased testing procedure to evaluate both applicants for employment and incumbent employees, a class action on behalf of every applicant or employee who might have been prejudiced by the test would satisfy the commonality and typicality requirements of Rule 23(a)." Id. at 159 n. 15. This exemplar provided by the Supreme Court mirrors precisely the disparate impact claim advanced by plaintiffs.

Therefore, the challenge presented by plaintiffs in this case falls squarely within the Rule 23 commonality context. The proof of this adverse impact case is not dependent upon individualized

evidence varying from one plaintiff or class member to another.  Rather, the plaintiffs will present

the type of statistical evidence which has consistently been found to raise an inference of class-wide

race discrimination.  This statistical, disparate impact data will then be brought "convincingly to life"

by the use of anecdotal evidence of plaintiffs and class members who have failed the defendant's

exam.  In sum, the trial on behalf of the class and the named plaintiffs/class representatives will

involve common witnesses, common proof, and common documents.

### C.    The Claims of the Putative Class Representatives are Typical of the Claims of the Putative Class

Pursuant to Rule 23(a)(3), the named plaintiffs must establish that their claims are typical of

the claims of the other members of the class:

> 'Typicality determines whether a sufficient relationship exists between the injury to
> the named plaintiff and the conduct affecting the class, so that the court may properly
> attribute a collective nature to the challenged conduct.  In other words, when such a
> relationship is shown, a plaintiff's injury arises from or is directly related to a wrong
> to a class, and that wrong includes the wrong to the plaintiff.  Thus, a plaintiff's
> claim is typical if it arises from the same event or practice or course of conduct that
> gives rise to the claims of other class members, and if his or her claims are based on
> the same legal theory.'

In re Am. Med., 75 F.3d at 1082 (quoting 1 Newberg, supra, § 3-13, at 3-76 (footnote omitted)).  "To

be typical, a representative's claim need not always involve the same facts or law, provided there is

a common element of fact or law."  Senter, 532 F.2d at 525 n. 31.

The putative class representatives' claims in the case at bar are typical of those of the putative

class.  This case is predicated on the common issue of the adverse impact of the defendant's

qualifying exam for Laborer vacancies.  Dr. Bradley's statistical analyses reveal that at least 69 black

candidates have been affected by AK Steel's qualifying exam.  See Ex. 2 at 8, 10.  As provided

above, it has long been held that disparate impact cases necessarily "satisfy the commonality and

24

typicality requirements of Rule 23(a)."  Falcon, 457 U.S. at 159 n. 15.  The putative class representatives in the case met the defendant's minimum qualifications for Laborer vacancies, yet, they failed to advance past the qualifying exam.  Thus, their claims arise from the "same event or course of conduct as the class claims" of the putative class, and those claims will proceed under the same legal theory.  Indeed, although unnecessary,[12] the putative class representatives' claims in this case are not only typical, but identical, to the claims brought on behalf of the putative class.

The putative class representatives will also seek the same relief for themselves as they do for the putative class, including injunctive and declaratory relief and backpay.  Moreover, the plaintiffs intend to present exactly the same evidence at trial on the merits whether there is one class trial or hundreds of individual trials, principally the same statistical and business necessity evidence.  Proposed modifications of the defendant's qualifying exam further require class certification, involving one trial on the merits for the class representatives and the putative class.  Class certification and one trial will lead to less of a chance for inconsistent remedies and relief than would numerous individual trials.

---

[12] See Murray v. Auslander, 244 F.3d 807, 811 (11th Cir. 2001) ("The typicality requirement may be satisfied despite substantial factual differences, however, when there is a "strong similarity of legal theories."); Piazza v. EBSCO Ind., Inc., 273 F.3d 1341, 1351 (11th Cir. 2001) (" However, there is no similar requirement that 'all putative class members share identical claims.' * ** In making this determination, we have concluded that "a strong similarity of legal theories will satisfy the typicality requirement despite substantial factual differences."); Senter v. General Motors Corp., 532 F.2d 511 (6th Cir. 1976); Anderson v. Garner, 22 F. Supp. 2d 1379, 1385 (N.D. Ga. 1997) ("The [typicality] requirement may be satisfied 'even though varying fact patterns support the claims or defenses of individual class members.'"); see also Kornberg v. Carnival Cruise Lines, Inc., 741 F.2d 1332, 1337 (11th Cir.1984) (stating that "a sufficient nexus is established if the claims or defenses of the class and the class representative arise from the same . . . pattern or practice and are based on the same legal theory"); Caridad, 191 F.3d at 293 (typicality "does not require that the factual background of each named plaintiff's claim be identical to that of all class members."); 7A Wright, Miller & Kane, Federal Practice and Procedure § 1764, at 235-41.

Such an analysis was the central concern of the Supreme Court in <u>Falcon</u>. There, the Court held that certification was appropriate where a common method of trial would 'advance the efficiency and economy of litigation which is a principal purpose of the procedure', but certification was inappropriate where "the individual and class claims might as well have been tried separately." <u>Falcon</u>, 457 U.S. at 159.  In <u>Falcon</u>, the individual claim was one of intentional disparate treatment in failing to promote the named plaintiff, while the class claim was one of disparate impact relying upon class-wide, statistical disparities.  Such a disjunction of the class and individual claims is not present here; the putative class representatives and the class they seek to represent assert a common, disparate impact claim.  Hence, there exists a single unified theory and method of trial in the case at bar.  Both the individual claims and the class claims will follow the same proof of disparate impact, the same proof of business necessity or other justification, and the same proof of alternatives in the typical three-part minuet applicable to disparate impact cases, whether tried as a class or individual action.

### D.    The Named Plaintiffs are Adequate Representatives of the Putative Class

Rule 23(a)(4) permits certification of a class only if "the representative parties will fairly and adequately protect the interests of the class."  The Sixth Circuit has identified two criteria for evaluating the adequacy of representation:  "'1) the representative must have common interests with unnamed members of the class, and 2) it must appear that the representative will vigorously prosecute the interests of the class through qualified counsel.'" <u>In re Am. Med.</u>, 75 F.3d at 1083 (quoting <u>Senter</u>, 532 F.2d at 525); <u>see also</u> <u>Cross</u>, 553 F.2d at 1031 ("In making the determination of adequacy of representation the district court should consider the experience and ability of counsel for the plaintiffs and whether there is any antagonism between the interests of the plaintiffs and other

26

members of the class they seek to represent.") (citation omitted).

Antagonism or conflict cannot be presumed, but must be proven.  See e.g., Payne v. Travenol Laboratories, Inc., 673 F.2d 798, 811 (5th Cir. 1982) ("A Court should not lightly reject a black female's claim to represent all blacks and females in a sex and race discrimination suit.  Rather than determine the question of conflict abstractly, the Court must examine the interlacing allegations of race and sex discrimination to determine whether an actual conflict exits."); Social Services Union, Local 535 v. County of Santa Clara, 609 F.2d 944, 948 (5th Cir. 1979) ("[M]ere speculation as to conflicts that may develop in the remedy stage is insufficient to support denial of initial class certification.").

The named plaintiffs possess common interests with the putative class members, and they have no interests antagonistic to those of the class.  Should any actual conflict or antagonism be proven in the future, the Court has a full range of powers in Rule 23(d) for remedying the problem at that time.  Included in such powers are decertification, notice to the class, structuring of subclasses, and replacement of the class representatives.  At the current time, however, there is no reason to suspect or believe that the representation of the putative class would be anything other than vigorous and adequate.  When all the available factors concerning the class representatives and their attorneys are considered, it must be held that they satisfy the adequacy of representation requirements set forth in Rule 23(a)(4).

### E.    The Proposed Class Satisfies the Requirements of Rule 23(b)(2)

Once the requirements of Rule 23(a) have been satisfied, the party seeking class certification must still demonstrate that certification is proper under one of the provisions of Rule 23(b).  Under Rule 23(b)(2), a class action may be maintained where "the party opposing the class has acted or

refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed. R. Civ. P. 23(b)(2). The drafters of the rule contemplated that money damages may be recoverable by the members of a Rule 23(b)(2) class, so long as "the appropriate final relief [does not] relate[] exclusively or predominately to money damages." Fed. R. Civ. P. 23(b)(2) Advisory Committee's Note. "Lawsuits alleging class-wide discrimination are particularly well suited for 23(b)(2) treatment since the common claim is susceptible to a single proof and subject to a single injunctive remedy." Senter, 532 F.2d at 525 (citation omitted). Indeed, the "Advisory Committee for the 1966 revision of Rule 23 offered as an illustration of a 23(b)(2) class action a civil rights case 'where a party is charged with discriminating unlawfully against a class, usually one whose members are incapable of specific enumeration.'" Id. at 525-26 (citation omitted).

This case falls squarely within the denomination of a Rule 23(b)(2) class action. The putative class representatives bring a civil rights action charging the defendant with discrimination against black individuals who are incapable of specific identification, particularly the future black candidates. The named plaintiffs' claim of class-wide discrimination perpetrated by the defendant against past, present, and future black candidates for selection is susceptible to the proof of discriminatory effects upon black applicants of AK Steel's qualifying exam. Furthermore, the claim of class-wide discrimination is subject to a single injunctive remedy granting relief from the testing practice. Such injunctive relief necessarily predominates over the monetary relief sought by the putative class because it is the culmination of proof of class-wide liability for class-wide discrimination. Furthermore, because the plaintiffs seek certification of a disparate impact class action, compensatory and punitive damages are unavailable and thus, there exists no need for

28

individualized determinations of damages.  See 42 U.S.C. § 1981A.  Hence, the concerns of

Coleman v. Gen. Motors Acceptance Corp., 296 F.3d 443 (6th Cir. 2002), are not implicated.

Therefore, Rule 23(b)(2) class certification is warranted in this case.

     **F.**    **The Proposed Class Satisfies the Requirements of Rule 23(b)(3)**

    A class may be certified under Rule 23(b)(3) in conjunction with, or as an alternative to, a

Rule 23(b)(2) class.  A class action can be maintained under Rule 23(b)(3) if:

> The court finds that the questions of law or fact common to the members of
> the class predominate over any questions affecting only individual members,
> and that a class action is superior to the other available methods for the fair
> and efficient adjudication of the controversy.

Fed. R. Civ. P.23(b)(3).  A "Rule 23(b)(3) action is appropriate whenever the actual interests of the

parties can be served best by settling their disputes in a single action."  Craft v. Vanderbilt Univ.,

174 F.R.D. 396, 407 (M.D. Tenn. 1996)(citations omitted).

    **Predominance**:  The Sixth Circuit has held that Rule 23(b)(3) "parallels subdivision

(a)(2) in that both require that common questions exist, but subdivision (b)(3) contains the more

stringent requirement that common issues 'predominate' over individual issues."  In re Am. Med.,

75 F.3d at 1069.  Importantly, the "predominance requirement of Rule 23(b)(3) does not mandate

that every issue in the case be common to all class members, but only that there exist substantial

common issues which predominate over individual issues . . . . Predominance is usually decided on

the question of liability, so that if the liability issue is common to the class, common questions are

held to predominate over individual ones."  Weinberg v. Insituform Tech., Inc., No. 93-2742, 1995

WL 368002, 1, 7 (W.D. Tenn. April 7, 1995); see also In re Inter-op Hip Prosthesis Liab. Lit., 204

F.R.D. 330, 345 (N.D. Ohio 2001).

Plaintiffs here easily satisfy this requirement. The common question of whether AK Steel's qualifying exam for Laborer vacancies and further advancement has an adverse impact upon black candidates predominates. This common question is **the** fundamental issue in the case because the existence of a disparate impact upon black candidates demonstrates a *prima facie* case for every member of the class and creates a burden shift in favor of every member of the class. There are no individualized issues of liability as plaintiffs are *not* seeking compensatory and punitive damages as relief for the class. The disparate impact question predominates not only because of its legal significance, but because a single, class-wide resolution of the question will create substantial judicial and economic efficiencies. Class adjudication of the disparate impact question would eliminate the need for each class member (1) to conduct duplicative discovery of AK Steel's qualifying exam for Laborer vacancies and further advancement; (2) to assume the cost of experts to prepare statistical analyses and reports and conduct validity studies; and (3) to waste judicial resources by repeatedly presenting the same statistical and validation evidence in order to demonstrate adverse impact.

**Superiority:** "The procedural device of a Rule 23(b)(3) class action was designed not solely as a means for assuring legal assistance in the vindication of small claims, but, rather, to achieve the economies of time, effort, and expense." Sterling v. Velsicol Chem. Corp., 855 F.2d 1188, 1196-97 (6th Cir. 1988). Judicial economy and efficiency are enhanced where potential class members seek relief on essentially the same issues. Castillo v. Envoy Corp., 206 F.R.D. 464 (M.D. Tenn 2002) (citation omitted); see also Craft, 174 F.R.D. at 407 ("there is no reason to force similarly situated plaintiffs [to] go through repetitive separate trials trying common issues" because it would "merely waste valuable judicial time and resources"); Weinberg, WL 368002 at *8 (superiority satisfied

where many of the class members likely suffered small losses, reducing the likelihood that they could afford to litigate individually claims against the defendant, and certifying the class would promote judicial economy and prevent inconsistent judgments).

Here, because of the numerosity of the class, there is a large gain of efficiency in adjudicating common issues in a single forum. See Section II.A, supra. Further, because there is one predominant issue, whether the qualifying exam has an adverse impact against black applicants, it would be a waste of judicial resources not to try this case as a class action. Finally, a class action is superior because it will allow class members to adjudicate claims which, because of a lack of resources, they otherwise would not be able to assert. Standing alone and proceeding individually, many persons -- especially unsuccessful job seekers for entry level Laborer positions and further advancement within the company -- lack the time and resources necessary to litigate against a corporation that can devote far greater resources to the case. See, e.g., Deposit Guar. Nat'l Bank v. Roper, 445 U.S. 326 (1980) (when economically infeasible for claimants to file individual suits, aggrieved persons may be without effective relief without class action device). Thus, Rule 23(b)(3) certification is superior to other available methods of adjudication.

## G.    Plaintiffs Request Subclasses In the Event One Class is Not Certifiable

Federal Rules of Civil Procedure 23(c)(4)[13] and 23(d) provide the Court with flexibility in managing and defining class action cases. Because Rule 23(c)(4) "is designed to give the Court maximum flexibility in handling class actions, its proper utilization will allow a Rule 23 action to

---

[13] Rule 23(c)(4)(A) states that "an action may be brought or maintained as a class action with respect to particular issues[.]" Rule 23(c)(4)(B) provides that "a class may be divided into subclasses and each subclass treated as a class, and the provisions of this rule shall then be construed and applied accordingly."

be adjudicated that otherwise might have to be dismissed or reduced to a nonrepresentative proceeding because it appears to be unmanageable." C. Wright & A. Miller, Federal Practice and Procedure § 1790 (2d ed.) (citing, inter alia, Korn v. Franchard Corp., 456 F.2d 1206 (2d Cir. 1972); Dore v. Kleppe, 522 F.2d 1369 (5th Cir. 1975); Chisolm v. TranSouth Financial Corp., 194 F.R.D. 538 (E.D. Va. 2000)).[14]  Rule 23(c)(4)(B) has been employed to create sub-classes in civil rights class actions. C. Wright & A. Miller, § 1790 (citing, inter alia, Jones v. Goord, 190 F.R.D. 103 (S.D.N.Y. 1999); Majeske v. City of Chicago, 740 F. Supp. 1350 (N.D. Ill. 1990)).

The party seeking subclassification bears the burden of showing that the proposed subclassification is permissible. See U.S. Parole Comm'n v. Geraghty, 445 U.S. 388 (1980); Hawkins v. Fulton County, 95 F.R.D. 88, 94 (N.D. Ga. 1982). Rule 23(c)(4) provides that if a class action is subdivided or maintained with respect to specific issues, the provisions of Rule 23 apply. Thus, "each subclass must independently meet the requirements of Rule 23 for maintenance of a class action." C. Wright & A. Miller, § 1790  (citing, inter alia, Twelve John Does v. District of Columbia, 117 F.3d 571 (C.A.D.C. 1997)); see also Buford v. H &R Block, Inc., 168 F.R.D. 340 (S.D. Ga. 1996).

Dismissal of class allegations is appropriate only when the disadvantages of complexity or the possible prejudice outweighs the advantage of common treatment. C. Wright & A. Miller, § 1790. "But neither of these drastic steps should be taken whenever the court can profitably isolate

---

[14]  See also Marcelo v. Regan, 574 F. Supp. 586, 591 (D. R.I. 1983) ("'The underlying theme [of class certification] is flexibility; different cases call for different approaches.'") (quoting Lamphere v. Brown University, 553 F.2d 714, 719 (1st Cir. 1977)).

the class issues under Rule 23(c)(4)(A)."[15] Id.; see also Cross, 553 F.2d at 1031( vacating the district

court's order denying class certification and stating, *inter alia*, that the district court could instead

"limit the action to issues related to assignment and transfer of black sales agents . . . ."); Woe v.

Cuomo, 729 F.2d 96, 107 (2d Cir. 1984) ("It is an extreme step to dismiss a suit simply by

decertifying a class, where a 'potentially proper class' exists and can be created."); Pickett v. IBP,

Inc., 197 F.R.D. 510, 516 (M.D. Ala. 2000) ("The Court, under Rule 23, can certify subclasses rather

than deny a request for class certification.").  Moreover, there exists a strong presumption against

denying class certification based on management reasons.  Buford, 168 F.R.D. at 363.

In the case at bar, the plaintiffs have clearly demonstrated above that subclasses may be

maintained for, respectively, black applicants for Middletown Laborer vacancies who failed the

qualifying exam and their counterpart class for Ashland Laborer vacancies.  All of the requirements

for Rule 23(a) have been proven for putative subclasses: the putative subclasses are sufficiently

numerous, especially with the addition of future applicants; the common issues of law and fact,

principally the disparate impact of the qualifying exams, apply with equal force to both subclasses;

the putative class representatives of both subclasses failed the qualifying exam; and the named

plaintiffs that would represent the subclasses would be adequate class representatives.  Furthermore,

either subclass is certifiable under Rule 23(b)(2) because the appropriate injunctive relief for both

---

[15]  "It is proper for the court to consider the 'inability of the poor or uninformed to enforce
their rights, and the improbability that large numbers of class members would possess the initiative
to litigate individually.'"  Chisolm, 194 F.R.D. at 546 (quoting Talbott v. GC Servs. Ltd. Partnership,
191 F.R.D. 99, 106 (W.D. Va. 2000) (citations omitted)).  "Understandably, if the Court were to
deny class certification, many of the proposed class would more than likely neglect to file individual
actions, a result which would obviously conserve judicial resources, but would do little to enhance
justice."  Chisolm, 194 F.R.D. at 546 (quoting Pruitt v. Allied Chem. Corp., 85 F.R.D. 100, 115
(E.D. Va 1980)).

facilities would outweigh any desired monetary relief.  Finally, the subclasses also satisfy Rule 23(b)(3) because a disparate impact claim arising from the testing practices at both facilities would outweigh any individual claims, and a class action case is the superior method of proof to adjudicate the common disparate impact issues efficiently.

Therefore, in the event the Court finds that one class action is not certifiable, the plaintiffs request that the Court certify two subclasses: (1) the black applicants who successfully met AK Steel's minimum qualifications yet failed to advance beyond the exam for Laborer vacancies at Middletown; and (2) the black applicants who successfully met AK Steel's minimum qualifications yet failed to advance beyond the exam for Laborer vacancies at Ashland.

## III.    APPLICATION FOR APPOINTMENT AS CLASS COUNSEL

Pursuant to Rule 23(g), Federal Rules of Civil Procedure, attorneys of record for the law firms of Wiggins, Childs, Quinn & Pantazis, L.L.C., and Tobias, Kraus & Torchia, LLP, hereby apply for appointment as class counsel in this case.  The factors the Court must consider in appointing class counsel include the work counsel has done in identifying or investigating potential claims in the action, counsel's experience in handling class actions and other complex litigation, counsel's knowledge of the applicable law, and the resources counsel will commit to representing the class.  Rule 23(g)(1)(C).

"In the absence of proof to the contrary, courts presume that class counsel is competent and sufficiently experienced to vigorously prosecute the class action." Morgan v. United Parcel Service of America, Inc., 169 F.R.D. 349, 357 (E.D. Mo. 1996) (citing Zapata v. IBP, Inc., 167 F.R.D. 147, 161 (D. Kan. 1996)).  Plaintiffs' counsel in the case at bar have significant experience in litigating employment discrimination class actions and are highly qualified to prosecute the claims of the class.

For years, they have successfully represented other classes in both the employment discrimination field and in other areas of federal litigation. The attorneys involved have sufficient time and skill to vigorously prosecute the class claims in the case at bar. Plaintiffs' counsel have expended significant time and effort to identify and conduct discovery regarding the claims in this action. The defendant will not be able to proffer proof to the contrary. Therefore, plaintiffs request the appointment of Wiggins, Childs, Quinn & Pantazis, L.L.C., and Tobias, Kraus & Torchia, LLP, as class counsel in this case if the Court certifies a class.

## CONCLUSION

WHEREFORE, PREMISES CONSIDERED, plaintiffs respectfully request the Court to grant their Motion for Class Certification.

Respectfully Submitted,

*/s/ Herman N. Johnson, Jr.*
Robert F. Childs, Jr. (ASB-2223-C-60R)
Herman N. Johnson, Jr.(ASB-3607-R50J)
**WIGGINS, CHILDS, QUINN & PANTAZIS**
The Kress Building
301 19th Street North
Birmingham, Alabama 35203
(205) 328-0640
(205) 254-1500 (facsimile)

Tobias, Kraus & Torchia, LLP
414 Walnut Street
Suite 911
Cincinnati, Ohio 45202
(513) 241-8137
(513) 241-7863 (facsimile)

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that on October 31, 2005, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:


Gregory Parker Rogers
Lawrence James Barty
Patricia Anderson Pryor
Taft, Stettinius & Hollister, LLP
1800 First Star Tower
425 Walnut Street
Cincinnati, OH 45202
Fax: (513) 381-0205


*/s/ Herman N. Johnson, Jr.*
OF COUNSEL