UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| VIVIAN BERT, et al. | **:** | Case No. C-1-02-467 |
| | **:** | |
| Plaintiffs, | **:** | Judge Beckwith |
| | **:** | |
| v. | **:** | Magistrate Judge Hogan |
| | **:** | |
| AK STEEL CORPORATION | **:** | MEMORANDUM OF DEFENDANT |
| | **:** | AK STEEL CORPORATION IN |
| Defendant. | **:** | OPPOSITION TO PLAINTIFFS' |
| | **:** | MOTION FOR CLASS |
| | **:** | CERTIFICATION |
| | **:** | |
| | **:** | ORAL ARGUMENT REQUESTED |

TABLE OF CONTENTS

I.      INTRODUCTION                                                          1

II.     FACTS                                                                 1
        A.      AK Steel                                                      1
        B.      The Importance of Labor Reserve Jobs to AK Steel's
                Targets for Safety, Quality, and Productivity                 2
        C.      AK Steel's Hiring Processes                                   3
                1.      The Ashland Works and the Middletown Works have
                        Different Hiring Processes                            3
                2.      AK Steel Hires More African-Americans than is
                        Reasonably Expected from Each of its Recruitment Areas 5
        D.      Procedural Background                                         6
        E.      The Erroneous Dates/Proposed Class(es) in the Plaintiffs' Motion 7

III.    ARGUMENT                                                             9
        A.      Ashland and Middletown Applicants Cannot be
                Combined into One Class                                      9
        B.      There is No Basis for a Separate Class at Ashland            12
        C.      A Separate Middletown Class is not Appropriate               14
                1.      The Middletown Plaintiffs Lack Standing to Pursue
                        the Claims                                           14
                2.      Plaintiffs Have Not Demonstrated the Rule 23(a)
                        Required Elements                                    15
                        a.      The Proper Temporal Scope of the Middletown
                                Class is September 12, 2001                  16
                        b.      Plaintiffs Have Not Established Numerosity   20
                        c.      Plaintiffs Have Not Established Commonality  23
                        d.      The Named Plaintiffs' Claims Are Not Typical
                                of Those of the Class                        25
                        e.      There is No Adequate Class Representative
                                for Middletown                              26
        D.      Certification Under 23(b) is Inappropriate                   27
                1.      Certification Under 23(b)(2) is Inappropriate; Any
                        Request for Prospective Relief is Moot               27
                2.      Certification Under 23(b)(3) is Inappropriate         28

IV.     CONCLUSION                                                           29

# I.  <u>INTRODUCTION</u>

Plaintiffs' Motion for Class Certification is meritless and should be denied.  Plaintiffs'

motion that a class should be certified consisting of African-American applicants for labor

reserve positions who did not pass pre-employment written tests at two of the Defendant's seven

steel mills -- those mills in Ashland, Kentucky and Middletown, Ohio located 177 miles apart --

is flawed both factually and legally.

# II.  <u>FACTS</u>

### A.    <u>AK Steel.</u>

AK Steel ("AK Steel" or "the Company") is an integrated steel manufacturer

headquartered in Middletown, Ohio – an OFCCP-approved, affirmative action employer who

employs African-Americans well in excess of their populations in the geographic employment

areas where these plants are located.  (Short Dec., ¶ 2)  AK Steel operates steel making and

finishing plants located in Ashland, Kentucky; Coschocton, Mansfield, Middletown, and

Zanesville, Ohio; Butler, Pennsylvania; and Rockport, Indiana.  (*Id*.)  AK Steel produces flat-

rolled carbon, stainless and electrical steel products, as well as carbon and stainless tubular steel

products, for automotive, appliance, construction and manufacturing markets.  (*Id*.)  This is a

demanding, competitive and high technology industry subject to continued productivity

improvement demands and where safety is a foremost concern.  (*Id.*)

With its high quality workforce, AK Steel is listed as one of "America's Most Admired

Companies" in *Fortune* magazine, rating such factors as innovation, employee talent, use of

corporate assets and social responsibility.  (*Fortune*, March 7, 2005)  The Company's goal is to

lead the integrated steel industry in safety, quality and productivity, which it regularly does.

(Short Dec., ¶ 3)  AK Steel is far and away the leader in the integrated steel industry in safety – lost work hours due to injury is less than half of what other integrated steel companies report. (*Id*.)  AK Steel believes that a top flight hourly workforce is a key component to further these safety, quality and productivity goals.  (*Id*., ¶ 4)

AK Steel operates with certain huge cost disadvantages relative to its competitors, nearly all of whom have filed for bankruptcy.  As a result of the bankruptcy process, its competitors have eliminated legacy costs in pensions and retiree health costs (that AK Steel continues to pay).  The bankruptcy process also allowed AK's competitors to shed other major costs resulting from collective bargaining agreements that pre-dated their bankruptcies.  (*Id*., ¶ 7)  In late 2003, AK Steel, in an effort to become more cost competitive in this new industry environment, implemented a hiring freeze on laborer positions at Middletown.  (*Id.*)  AK Steel has reduced its bargaining unit workforce in Middletown, which had more than 3,100 hourly employees in 2002, to less than 2,700 active hourly employees.  (*Id.*)  AK has no plans to resume hiring.  No hourly hiring is expected to occur in 2006 and there are no plans to resume hiring at any point in the foreseeable future.  (*Id.*)

        B.     The Importance of Labor Reserve Jobs To AK Steel's Targets For Safety, Quality, and Productivity.

Although the parties both use the term "laborer" to refer to the employment position in question, the proper title for this position is "Labor Reserve."  Plaintiffs' motion fails to mention the importance of hiring well-qualified individuals into Labor Reserve jobs in order to meet the Company's safety, quality, and productivity goals.  Labor Reserve jobs are not "laborer" jobs in the traditional sense.  (Short Dec., ¶ 8)  These "laborer" jobs are the safety sensitive entry level job for every job in each steel mill – there are no outside hires into any of the scores of hourly

steel mill jobs other than into laborer positions.  (*Id*.)  Labor Reserve employees are assigned

throughout the mills and, by virtue of the seniority these employees accumulate under their

respective collective bargaining agreements, they go on to fill the many highly demanding,

complicated steel-making jobs.  (*Id*.)

About 40% of the employees at each plant are highly skilled trade and craft repair

personnel.  Many of the other jobs "laborers" fill require the skill and knowledge necessary to

make and pour molten steel at several thousand degrees into slabs, which are then rolled into hot

bands of steel of varying thicknesses.  (*Id*., ¶ 9)  Employees cold roll these 20 to 30 ton bands of

steel in the cold mill and then finish them in a variety of high technology different ways – such

as annealing, pickling, electrogalvanizing, and other types of finishes, before the steel is shipped

to customers.  (*Id*.)  All of this must be done by employees in a manner that will meet the

Company's goal to lead the industry in safety, quality and productivity.  (*Id*.)


      C.     <u>AK Steel's Hiring Processes.</u>

AK Steel hires employees with the expectation that an individual must be able to succeed

not only as an entry-level "laborer," but also in the many other safety sensitive, demanding,

technical, skilled and leadership positions into which an individual is assigned pursuant to the

seniority provisions of AK Steel's collective bargaining agreements with the respective unions at

its facilities.  (*Id.*, ¶ 10)  The Company's hiring processes are designed to achieve this goal.

            1.     The Ashland Works And The Middletown Works Have Different <u>Hiring Processes.</u>

The Ashland Works and the Middletown Works are approximately 177 miles apart,

located in different states.  Middletown's work force comes from an urbanized area that is

densely populated with manufacturing plants of all types.  (Short Dec., ¶ 11)  Ashland draws its

work force from what is essentially the rural, agricultural hill country of eastern Kentucky.  (*Id.*)
Bureau of Labor Statistics data indicate that 2.0% of the Ashland, Kentucky MSA (Metropolitan
Statistical Area) workforce is African-American and that 4.09% of the available applicants in the
Middletown-Hamilton, Ohio MSA workforce are African-Americans.  (Baker Report, p. 9,
Appx. B and C) (attached)

The hiring processes at Ashland and Middletown differ significantly.  At Ashland,
applicants may apply at the Kentucky Bureau of Employment Services.  African-American
prospects, however, may (and in fact do) apply directly with the Ashland Works Human
Resources Manager.  (Lester Dep. 38-45)  In addition, the Chair of the Ashland Works Civil
Rights Committee identifies African-American applicants and supplies applications and resumes
from these candidates directly to the Ashland HR manager.  (*Id.*)  Unlike Middletown, the
Ashland Works does not require applicants to have minimum qualifications in order to be
permitted to take the written test, although some are screened by the Kentucky Bureau of
Employment Services to determine whether they have a high school degree or GED.  (*Id.*)  No
industrial experience is required at any point in the Ashland hiring process.  For example, named
Plaintiff Timothy Oliphant stated he did not have to pass any initial screening and did not even
complete an application before testing.  (Doc. #71, Exh. 8, Oliphant Aff.)  Named Plaintiff
Tiffany Jackson stated that her experience was office/clerical, not manufacturing, yet she also
was permitted to take the test.  (Doc. #71, Exh. 12, T. Jackson Aff.)  Applicants who pass the
written test (the same test used in Middletown) and who then meet other minimum qualifications
are given a structured interview.  (Lester Dep. 68-71, 78, 80-85, 117)  Successful interviewees
undergo a background check.  (*Id.* at 89)  Finally, those who pass the background check are
given an offer of employment, conditioned upon passing a physical examination.  (*Id.* at 117)

The Middletown hiring process requires that in order to be considered, one *must* file an application through the Ohio Department of Job and Family Services ("ODJFS").  (Short Dec., ¶ 12)  Those applications are then forwarded by ODJFS to the Middletown Works Human Resources Department, where applications are screened for (a) a high school degree or GED, (b) two years manufacturing experience, (c) no criminal history and (d) no prior employment by AK Steel (or its predecessor, Armco).  (*Id.*)  Those whose applications indicate possession of these minimum qualifications and who are not otherwise deemed unsuitable for employment for a wide variety of reasons are invited to take a written test.  (*Id.*)  During the period of September 12, 2001 to date, over 30% of applicants were screened out and not permitted to test.  (*Id.*)  Those who pass the written test are interviewed in a non-structured interview process.  (*Id.*)  Those selected through the interview process will undergo a background check.  (*Id.*)  Finally, those who pass the background check are given an offer of employment, conditioned upon passing a physical examination.  (*Id.*)

> 2.    AK Steel Hires More African-Americans Than Is Reasonably Expected From Each Of Its Recruitment Areas.

When AK Steel is hiring, it receives thousands of applications.  (Baker Report, Table 1.a) (attached)  For example, during the relevant period involved, September 12, 2001 to December 31, 2003, AK Steel received over 4,000 applications at Middletown and over 1,000 at Ashland. (*Id.*)  Only about ten percent of all applicants are eventually hired in the rigorous, but different procedures used at the different plants.  (*Id.*)  During this period, over 3,300 *Caucasian* applicants were not chosen for employment in Middletown and over 900 *Caucasian* applicants were not chosen for employment in Ashland.  (*Id.*)  These statistics show that the overwhelming number of applicants -- irrespective of race -- are not hired.  (*Id.*)

AK Steel's hiring process does not discriminate against African-Americans. As a result of AK Steel's efforts to employ a diverse work force, AK Steel recruits and hires more African-Americans than would be reasonably expected from the applicable recruitment areas. Even Plaintiffs' expert concluded (notwithstanding his flawed analysis and flawed time period, as described in more detail below) that the Company hired 5.2% African-Americans (versus the available 4.09% in the area) in Middletown and 2.6% African-Americans (versus the available 2.0% in the area) in Ashland. (Bradley Supp. Report p. 8, attached to Doc. # 71, p. 8 of 43)

D.    Procedural Background.

The Complaint, amended two times, now alleges that AK Steel discriminates against African-Americans in hiring for "laborer" positions at the Middletown Works and the Ashland Works, allegedly in violation of Title VII and 42 U.S.C. § 1981. (2d Am. Compl., Doc. # 45, ¶¶ 1, 3, 27, 30, 32, 37, 47, 48) The original Complaint named 17 Plaintiffs, some of whom applied at Ashland and others who applied at Middletown. The Second Amended Complaint stated that nine Plaintiffs sought to represent a Middletown class – Vivian Bert, Thaddeus Freeman, Edward Lewis, Mary Harris, Roderique Russell, Michael Miller, Ronald Sloan, Donald Edwards and Shawn Pryor. Seven other Plaintiffs sought to represent an Ashland class – Darrell Carter, Timothy Oliphant, Kay Jackson, Marnie Carter, Darlene Carter, Dwight Lewis and Tiffany Jackson. The remaining Plaintiff, former AK Steel employee Allen Roberts, also brought his own individual claims of discrimination, but he does not seek to be part of any class.[1]

---

[1] Roberts is well known to this Court, his lawsuit against the Corporation alleging race discrimination having been previously adjudicated as meritless. (Case No. C-1-02-656) AK Steel has filed a separate motion for summary judgment on his similar claims of race discrimination brought here, which is briefed and pending decision by the Court. (Doc. # 47)

No mention is given why Plaintiffs try to combine the Ashland and Middletown plants – facilities that are 177 miles apart, draw from different hiring areas, and have differing minimum qualification criteria.  There is no logical reason to combine the two plants.

The theory espoused in Plaintiffs' initial Complaint, Amended Complaint and Second Amended Complaint was that the Company's hiring process sought to scare African-Americans away from applying.  (Complaint, Doc. # 1, ¶¶ 27, 29, 32, 37, 48)  Confronted with adverse facts developed during discovery, Plaintiffs changed course.  Plaintiffs' motion seeks to certify "a class consisting of all black individuals who failed the test" at Ashland and Middletown that would be represented by only nine of the 17 originally named Plaintiffs (Doc. # 70 at 1)  (The other eight named Plaintiffs do not claim to have failed the test.)  Plaintiffs alternatively seek to certify separate classes at Ashland and Middletown, each class having its own group of named Plaintiffs as class representatives.

Plaintiffs have journeyed from asserting a challenge to the entire hiring process and the alleged deterrent effect the process had on African-Americans in the initial Complaint to now limiting their assertion to the much more narrow challenge of only a single aspect of the process. They now limit their class claim to the single contention that a written test has a disparate impact upon African-Americans, *i.e.*, that African-Americans do not pass the test in sufficiently high numbers.

E.      <u>The Erroneous Dates/Proposed Class(es) In The Plaintiffs' Motion.</u>

While Plaintiffs are not explicit about whether they seek to have a class certified under Title VII, 42 U.S.C. § 1981 or both, they are explicit that they seek to present a disparate impact claim on behalf of the class(es).  Disparate impact claims, however, are not permissible under Section 1981.  *See General Bldg. Contractors Ass'n v. Pennsylvania United Eng. And*

*Constructors*, 458 U.S. 375, 391 (1982).  This must mean that Plaintiffs can only seek to certify a class under Title VII.

Given that this can be only a Title VII case, Plaintiffs must satisfy Title VII's procedural requirements.  *City of Hialeah v. Rojas*, 311 F.3d 1096, 1101 (11th Cir. 2002).  Plaintiffs' expert, Dr. Bradley, performed his analysis on the putative class based on the following premise:  "It is my understanding that the class in this case consists of all African-Americans potentially affected by the Laborer hiring process from June 30, 1999 (300 days prior to the filing of the earliest EEOC charge on April 25, 2000) to the present."  (Bradley Supp. Report, attached to Doc. # 71, p. 2 of 43 n.3)

Dr. Bradley was evidently supplied with the wrong date.  (Bradley Rebuttal Report, attached to Doc. 71, p. 2 of 15 n.2)  The only EEOC charge filed by one of the named Plaintiffs on April 25, 2000 was Charge No. 221A00442, filed by Vivian Bert.  (Rogers Dec., Exh. 1)  EEOC issued Bert a Notice of Right to Sue on March 28, 2001.  (*Id.*, Exh. 2)  Suit must be filed within 90 days of receipt of a Notice of Right to Sue or  the claim becomes stale.  42 U.S.C. § 2000e-5(f)(1).  This action was not filed until June 26, 2002, which is more than fifteen months after Bert's Notice of Right to Sue was issued.  Bert's charge, which did not attack the test as she was never tested, is stale and cannot be a basis for this lawsuit.

Although there are 16 named class Plaintiffs in the Second Amended Complaint, only nine of them claim to have failed the test – Donald Edwards and Thaddeus Freeman at Middletown, and Dwight Lewis, Timothy Oliphant, Darrell Carter, Darlene Carter, Marnie Carter, Tiffany Jackson and Kay Jackson at Ashland.  (Doc. #71 at 10-14)

The earliest of the charges filed by the unsuccessful tested Plaintiffs that is not stale is the charge filed by Ashland plaintiff Darrell Carter on June 8, 2002.  (Rogers Dec., Exh. 3)  The first

valid charge filed by any Middletown unsuccessful test taker was the charge of Donald Edwards

filed July 9, 2002.  (Rogers Dec., Exh. 4)  Using Dr. Bradley's methodology identified above to

begin the class analysis, 300 days prior to the earliest (non-stale) EEOC Ashland charge is

*August 12, 2001* and 300 days prior to the earliest (non-stale) EEOC Middletown charge is

*September 12, 2001*.  Applying the correct facts, any proposed class may not begin prior to those

dates.


### III.  ARGUMENT

A.    Ashland and Middletown Applicants Cannot Be Combined Into One
      Class.

The effort made by Plaintiffs to have a single class certified consisting of a combination

of Ashland and Middletown applicants fails for multiple reasons.  Most importantly, this

combined class would consist of two disparate groups whose characteristics are radically

dissimilar.  The Middletown applicants proposed by Plaintiffs consist solely of African-

American individuals who passed the preliminary screening and then took and failed the written

test.  The Ashland applicants are those African-Americans who were not hired.  ***Plaintiffs admit***

***they cannot identify any Ashland proposed class member who failed the test other than the***

***named Plaintiffs themselves***.  (Pl. Mem. in Support, Doc. #71, p. 20)  For all Plaintiffs know,

each of the other African-American Ashland applicants passed the written test and then were not

hired because they failed one of the succeeding steps (*i.e.*, structured interview, background

check, pre-employment physical).  Plaintiffs' own expert analyses, which were done differently

for each facility, establish the insurmountable differences between the two facilities.  For

Middletown, Plaintiffs analyze only the impact of the test.  (Doc. # 71 at 22)  For Ashland,

Plaintiffs analyze the entire hiring process.  (Doc. # 71 at 23)  It would be nonsensical to include

Ashland class members when it cannot be known whether any Ashland applicant even meets the definition of the class.

Plaintiffs speculate that some African-American applicants failed the test and then attempt to ascertain the number of such Ashland applicants by applying the Middletown African-American failure rate to the Ashland African-American applicants.  The result of such an extrapolation, however, is fiction because the Middletown failure rate is derived from a group of test takers that comes from a different part of the country and was arrived at through a screening process not utilized in Ashland.

Assuming *arguendo* that some Ashland applicants did fail the test, such a group should still not be combined with Middletown applicants because of the differences in how the groups are composed.  The test takers at the two facilities were screened differently, as the plants have different minimum qualifications.  AK Steel screened out over 30% of Middletown applicants before testing, but did not screen out any Ashland applicant before testing them.  (Short Dec., ¶ 12; Lester Dep. 39-43)  The backgrounds and work experiences of the tested groups differed radically, notably because Middletown requires industrial experience and other qualifications before testing while Ashland does not.  Ashland also had different Human Resource employees making employee selections than did Middletown and Ashland used a different interview system than Middletown.  (*Id*.)

In Ashland, because qualifications for the job are not reviewed by the Company before the applicant tests, any analysis of the impact of the test, even if available, or the hiring process itself, would have little probative value.  *See Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 308 n.13 (1977) ("When special qualifications are required to fill particular jobs, comparisons to the general population (rather than to the smaller group of individuals who

possess the necessary qualifications) may have little probative value"). The two plants draw from different groups as well – they are 177 miles apart in two different states. As noted in the report of Mary Dunn Baker, Ph.D., an analysis that compares two groups that are not similarly situated is ineffective because "statistically significant differences may be caused by non-racial factors for which the analysis did not account. This will occur when the demographic groups whose outcomes are compared are not similarly situated." (Baker Report, p. 6, n.12) (attached) *See also Raskin v. Wyatt Co.*, 125 F.3d 55, 65 (2d Cir. 1997) (court excluded expert report that did not account for the presence of people who were not similarly situated in the comparison group); *Baker v. Ogden Service Corp.*, 74 F.3d 1248 (Table) (10th Cir. 1996) (to be relevant, statistics must compare similarly situated individuals and take into account relevant factors including qualifications); *Rhodes v. Cracker Barrel Old Country Store*, 2002 WL 32058462, at *61 (N.D. Ga. 2002), *report and rec. adopted by* 213 F.R.D. 619 (N.D. Ga. 2003) (with statistics, court must be mindful of proper comparisons and use of proper qualified applicant pools).

The 1991 Amendments to Title VII directly address the case before this Court. Title 42 U.S.C. § 2000e-2(k)(1)(B)(i), entitled "Burden of proof in disparate impact cases," provides that only if the plaintiff can establish that the decision making process is not capable of separation for analysis can the entire decision making process be analyzed as one employment practice. This section states:

> With respect to demonstrating that a particular employment practice causes a disparate impact as described in sub-paragraph (A)(i), the complaining party shall demonstrate that each particular challenged employment practice causes a disparate impact, except that if the complaining party can demonstrate to the Court that the elements of a respondent's decision-making process are not capable of separation for analysis, the decision-making process must be analyzed as one employment practice.

42 U.S.C. § 2000e-2(k)(1)(B)(i). Concerning Ashland, Plaintiffs effectively concede this issue:

> [D]ata for the black applicants who failed the exam for Ashland
> laborer vacancies is not available.  Therefore, the plaintiffs may
> analyze the entire decision-making process at Ashland to determine
> the impact upon black applicants.

(Doc. #71, p. 17)   So, the reality is that while Plaintiffs are seeking certification of unsuccessful

Ashland test takers, the Ashland analysis they presented deals exclusively with the hiring process

as a whole, whereas in Middletown they limited their presentation to the effects of the test.  It

makes no sense to combine unsuccessful Middletown test takers with Ashland applicants who

were unsuccessful in the totality of the Ashland hiring process, as there can be no common issues

between the groups.  Indeed, Plaintiffs effectively concede the insurmountable differences

between the claims at Ashland and those at Middletown by suggesting that there could be two

classes.

### B.    There Is No Basis For A Separate Class At Ashland.

Plaintiffs seek to certify a class of African-Americans who failed the test at Ashland,

even though they admit at page 17 of their memorandum that they cannot identify anyone at

Ashland who failed the test other than seven named Ashland Plaintiffs.  (Doc. #71, p. 17)  In

other words, the Plaintiffs cannot identify even the proposed class members, let alone tell the

Court how many of them exist.  The Ashland applicants do not have a class claim.

In addition, Plaintiffs cannot establish that there was a disparate impact at Ashland at all,

let alone an impact relating to the test.  Their analysis relates to the entire hiring process and

even that analysis is flawed.  Plaintiffs' expert failed properly to analyze the entire Ashland

hiring process.  As described fully in the Report of Mary Dunn Baker, Ph.D., Plaintiffs' expert

Dr. Bradley (a) analyzed the wrong time period (as described above), (b) failed to use one year's

worth of data, (c) did not count as hired some of the Ashland applicants who were hired during

the relevant time period and (d) included as laborer applicants those who were hired into non-

laborer jobs.  (Baker Report at 8-11) (attached)  Dr. Bradley's conclusion -- after ignoring relevant data -- that 8.65% of applicants at Ashland were African-American is not reasonable, particularly given that there is only a 2.0% African-American availability in the Ashland MSA. (Baker Report, p. 9) (attached)  Dr. Bradley's attempt in his rebuttal report to correct some of the many problems with his failure to use all of the relevant data (and to exclude seven African-American hires) is described fully in Dr. Baker's Response to Dr. Bradley.  (attached)

Using the correct data and correctly identifying applicants and laborers hired, Dr. Baker found that at Ashland, from August 12, 2001 to December 31, 2003 (the relevant period for purposes of Ashland), there were 1,080 applicants of known race, of which 49 were African-American.  (Baker Report, Table 1.a) (attached) ***Assuming all other qualifications were equal, one would expect that 5.22 of the applicants hired would be African-American; however, nine African-American applicants in fact were hired.  (Id.)  In other words, more African-Americans were hired than would be expected statistically***.

Dr. Bradley erroneously limited his hiring analysis to the period of October 24, 2000 to November 18, 2002; that is, he both started too early (before August 12, 2001 as described above) and quit too soon (at December 31, 2002 instead of December 31, 2003).  As Dr. Baker explains, Dr. Bradley thereby deliberately excluded from his analysis more than 75% of the African-Americans who were hired in Ashland during the relevant time period (he counts only two and ignores seven).  (Baker Report at 8, 10-11; Bradley Supp. Report, attached to Doc. # 71, p. 8 of 43)  He also ignored one full year's worth of data.  Irrespective of what motivated Dr. Bradley to carve out a limited period of time in order to present numbers favorable to Plaintiffs' position, his report regarding Ashland is simply not worthy of credence, as described fully in Dr.

Baker's Response to Dr. Bradley.[2] (attached)  Dr. Bradley had to ignore seven African-American

hires at Ashland to reach his result.  His report, properly analyzed, provides no support for any

Ashland class.

When the Court considers that the Ashland Works hired more African-Americans than

statistically expected during the relevant period, no class concerning Ashland can be appropriate.

The motion to certify class claims for applicants at Ashland must be denied.

> C.     A Separate Middletown Class Is Not Appropriate.

> 1.     The Middletown Plaintiffs Lack Standing To Pursue The Claims.

Before certifying a class, a court must first determine whether the named Plaintiffs have

standing to bring the proposed class claims.  Only two of the nine Middletown named Plaintiffs

claim to have failed the test:  Thaddeus Freeman and Donald Edwards.  To have standing to

represent this alleged class, Mr. Freeman or Mr. Edwards must have filed a charge with the

EEOC within 300 days of the alleged unlawful employment practice (i.e., failing the test) and

must have filed suit within 90 days of receiving their respective Notices of Right to Sue.  *Rojas,*

311 F.3d at 1101.  *See also* 42 U.S.C. § 2000e-5(e).  Neither did; therefore, neither of these two

named Plaintiffs has standing.  Both of their claims with respect to a failure to pass the test are

time-barred.  Neither is eligible to represent a class.

Freeman unsuccessfully completed the test in 1999.  He filed a charge challenging this

action on August 28, 2000 and received a notice of right to sue on March 28, 2001.  (Rogers

Dec. Exhs. 8 and 9)  This lawsuit was not filed until June 26, 2002, more than one year later.

---

[2] Even if Dr. Bradley's improperly structured analysis were accepted, Plaintiffs nevertheless assert there were only 13 African-Americans in the class in Ashland, seven of whom are already named plaintiffs.  (Doc. # 71 at 18)  Even if there were some evidence on which to base a class claim, Plaintiffs cannot satisfy the numerosity requirement to certify a class.  Joinder of six additional applicants is obviously practicable.

Any claim that Freeman has challenging the test is time-barred.  He does not have standing to pursue this action.

Similarly, Donald Edwards claims to have taken the test in August, 2001.  (In fact, he never took the test, as described in more detail below.)  He did not file a charge until July 9, 2002, more than 300 days after the alleged employment action.  (Rogers Dec. Exh. 4)  He too lacks standing to bring these claims.

In sum, no named class member with standing to bring this claim challenging the test in Middletown exists.  The class claims must be dismissed for this reason alone.

> 2.    Plaintiffs Have Not Demonstrated The Rule 23(a) Required Elements.

Even were there a named Plaintiff who had standing to bring this case on behalf of Middletown applicants (and there is not), this case is not appropriate for class certification because the requirements for a proper class are not present here.  Before certifying a class, a court must engage in a "rigorous analysis" of the plaintiff's ability to meet the requirements of Rule 23.  *General Telephone Company v. Falcon*, 457 U.S. 147, 161 (1982); *Bacon v. Honda of Am. Manufacturing*, 370 F.3d 565, 569 (6th Cir. 2004), *cert. denied*, 125 S. Ct. 1334 (2005).  As the moving party, Plaintiffs have the burden of proof and may not rely on speculation to satisfy the requirements of Rule 23.  *Golden v. City of Columbus*, 404 F.3d 950, 965-66 (6th Cir. 2005), *petition for cert. filed*, 74 USLW 3162 (9/15/05); *Reeb v. Ohio Dept. of Rehab.*, 221 F.R.D. 464, 473 (S.D. Ohio 2004).   "No class that fails to satisfy all four of the prerequisites of Rule 23(a) may be certified." *Ball v. Union Carbide Corp.*, 385 F.3d 713, 727 (6th Cir. 2004).

In this case, Plaintiffs are unable to establish any, let alone all, of the four prerequisites of Rule 23(a).  As demonstrated below (1) the class is not so numerous that joinder of all members is impracticable; (2) there are not questions of law or fact common to the class; (3) the claims or

defenses of the named Plaintiffs are not typical of the claims or defenses of the class; and (4) the Plaintiffs cannot fairly and adequately represent the interests of the class. *See Bacon*, 370 F.3d at 569. In addition, they do not establish that injunctive relief predominates or that a class action is a superior method to proceed as required under Rule 23(b)(2) or (3). The Advisory Committee notes to the 1998 amendments to Rule 23 recognize the substantial harm and prejudice that can result from certifying a class where none should be. Those notes state in pertinent part that: "An order granting certification, on the other hand, may force a defendant to settle rather than incur the costs of defending a class action and run the risk of potentially ruinous liability." We submit that certifying a class in this case "gains nothing 'except the blackmail value of a class certification that can aid the plaintiffs in coercing the defendant into a settlement.'" *Rhodes*, 2002 WL 32058462 at *53 (quoting *Rutstein v. Avis Rent-A-Car Sys.*, 211 F.3d 1228, 1241 n.21 (11th Cir. 2000)).

> a.    The Proper Temporal Scope Of The Middletown Class Is
> September 12, 2001.

Plaintiffs failed to identify the temporal scope of their proposed class other than in Dr. Bradley's Supplemental Report (attached to Doc. #71, p. 2 of 43 n.3). "[A] class may only include those members whose claims are not barred by the applicable statute of limitations." *Lanning v. Southeastern Pa. Transp. Auth.*, 176 F.R.D. 132, 148 (E.D. Pa. 1997). The Supreme Court has made clear that: "A discriminatory act which is not made the basis of a timely charge is the legal equivalent of a discriminatory act which occurred before the statute was passed. It may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue, but separately considered, *it is merely an unfortunate event in history which has no present legal consequences.*" *United Air Lines v. Evans,* 431 U.S. 553, 558 (1977) (emphasis added). The earliest active charge filed by the two named Middletown Plaintiffs who

seek to represent the Middletown class was Donald Edwards's charge filed July 9, 2002.

Therefore, using Dr. Bradley's methodology, the proposed Middletown class would begin with

African-Americans who failed the written test no further back in time than three hundred days

prior to that charge – September 12, 2001.  *See Lumpkin v. Coca-Cola Bottling Co.*, 216 F.R.D.

380, 386 (S.D. Miss. 2003) (denying motion for class certification where number of

African-American employees who worked for company during 180 days before named

Plaintiffs' charges were filed were not so numerous that joinder would be impracticable).

Plaintiffs' attempt to avoid the statute of limitations by claiming a continuing violation

fails.  The continuing violation theory does not exist to give a second chance to an employee who

has allowed a legitimate Title VII claim to lapse.  *Lumpkin*, 216 F.R.D. at 385.  The alleged

failures to hire in this case are discrete acts.  Under *National Railroad Passenger Corp. v.

Morgan*, 536 U.S. 101 (2002), the continuing violation theory is not available for discrete acts

such as promotions, terminations and hires.

Although the Supreme Court left open the question of whether the continuing violation

doctrine was available for a pattern or practice case, Plaintiffs are not seeking to certify a pattern

or practice class.  Pattern or practice cases are cases involving "intentional discrimination."  The

continuing violation doctrine is not appropriate here where the only class allegation is that of

disparate impact.  *Cf. Reeb v. Ohio Department of Rehabilitation and Correction,* 221 F.R.D.

464, 471 (S.D. Ohio 2004) (a continuing violation theory might apply in a *disparate treatment*

case where the plaintiff established some form of *intentional* discrimination against the class of

which plaintiff was a member).

Courts, both before and after *Morgan*, have routinely rejected claims similar to Plaintiffs,

in which plaintiffs attempt to invoke the continuing violation doctrine in order to revive stale

claims and increase the size of the class.  In fact, it has been repeatedly recognized that "a class action complaint cannot revive claims which were already time-barred when the original charge was filed."  *Lumpkin*, 216 F.R.D. at 385.  *See also Vinson v. Seven Seventeen HB Philadelphia Corp.*, 2001 WL 1774073, at *12 (E.D. Pa. 2001).  As the Eleventh Circuit stated in *Hipp v. Liberty Nat. Life Ins. Co.*, 252 F.3d 1208, 1221-22 (11th Cir. 2001), *cert. denied*, 534 U.S. 1127 (2002), where the plaintiffs sought to expand the temporal scope of the class by use of the continuing violation:  "We can find no authority . . . for allowing one plaintiff to revive a stale claim simply because the allegedly discriminatory policy still exists and is being enforced against others."

Courts have recognized that even where there is an allegation of a pattern or practice of discrimination, an individual class member may only take advantage of the continuing violation doctrine if there has been a pattern and practice of discrimination against the particular class member individually, including a discriminatory act against him during the relevant limitations period.  *See Hipp*, 252 F.3d at 1221-22.  In *Lanning v. Southeastern Pa. Transp. Auth.*, 176 F.R.D. 132, 150 (E.D. Pa. 1997), the court rejected an argument similar to that made by Plaintiffs here.  In that case, the plaintiffs tried to certify a class of female applicants who were denied employment based on a physical fitness test.  The plaintiffs attempted to include individuals in the class who failed the same test and who were denied employment two years earlier, outside the statute of limitations, by relying on the continuing violation doctrine.  The court determined they could not be included:

> . . .the Court finds that the continuing violations theory does not apply here.  To begin, the act of discrimination that plaintiffs claim the 1991 applicants were subjected to was the 1991 administration of the allegedly discriminatory physical fitness test.  Plaintiffs do not allege that these 1991 applicants were discriminated against in any other way by SEPTA.  Thus, the only act of discrimination that

allegedly occurred **against the 1991 applicants** was the administration of the 1991 physical fitness test. Clearly, the administration of the 1991 test was a discrete act and does not demonstrate that SEPTA was engaged in a "persistent, on-going pattern" of discrimination **with respect to the 1991 applicants**. Thus, even if the Court finds that the physical fitness test is an ongoing discriminatory policy, the Court could not apply the continuing violations theory to save the 1991 applicants' claim because the 1991 applicants' rights were not violated by this policy on an ongoing basis. **Indeed, the only time that the 1991 applicants' rights were allegedly violated was when they took the 1991 test. The continuing violations theory was simply not intended to cover cases where there is no continuing violation.**

*Id.* (emphasis added). *See also Williams v. Giant Food, Inc.*, 370 F.3d 423, 429 (4th Cir. 2004) (even if failure to promote plaintiff during applicable limitations period were part of broader pattern or practice of discrimination, those failures remain discrete acts of discrimination under *Morgan*); *Claybrook v. Primus Automotive Fin. Services, Inc.*, 363 F. Supp. 2d 969, 983 (M.D. Tenn. 2005) (in order to establish a continuing violation, a plaintiff must show not only a longstanding overarching policy of discrimination but also a specific allegedly discriminatory act against her within the relevant limitations period; plaintiffs could not base their claims on timely discriminatory actions taken against others)(citing *Dixon v. Anderson*, 928 F.2d 212 (6th Cir. 1991)).

In addition, the continuing violation doctrine is an equitable doctrine premised on the notion that the statute of limitations should not begin to run until facts supportive of the cause of action are known or should be known. *Hipp*, 252 F.3d at 1222. That premise is lacking here because both of the named Middletown plaintiffs, Donald Edwards and Thaddeus Freeman, **knowingly** failed to seek relief. Both of them had filed earlier EEOC charges of discrimination in 2000, both received notices of rights to sue in March, 2001, and both then allowed those claims to lapse. (Rogers Dec. Exhs. 6-9) They voluntarily chose not to prosecute their claims. Allowing a party to save a knowingly lapsed claim under the continuing violation theory in this

case would eliminate the statute of limitations for disparate impact claims without any legitimate

justification.  In deciding that the timely filing of an EEOC charge by one member of a class

"[could not] revive claims which are no longer viable at the time of the filing," the court in

*Laffey v. Northwest Airlines, Inc.*, 567 F.2d 429 (D.C. Cir. 1976) stated:

> Any other result would produce an anomaly.  Time-barred
> members could not press their claims individually either before the
> Commission or judicial tribunals; and surely the employer's
> liability to them cannot be made to depend upon whether they
> come into court in a different character.  True it is that class actions
> are liberally permitted in the federal courts, but that procedural
> device cannot be used to expand substantive rights.  Not
> surprisingly, then, courts which have considered the question
> directly have uniformly held that only those employees who could
> have filed charges with the Commission individually when the
> class filing was made are properly members of the litigating class.

*Id.* at 472 (citations omitted).

### b.    Plaintiffs Have Not Established Numerosity.

Even if Plaintiffs had established the existence of a Middletown class, Rule 23(a)(1)

requires that the purported class be so numerous that joinder of all members is impracticable.

Factors relevant to joinder impracticability include the number of class members, the ease of

identifying its members and determining their addresses, judicial economy arising from

avoidance of a multiplicity of actions, geographic dispersement of class members, size of

individual claims, financial resources of class members, ability of claimants to institute

individual suits and requests for prospective injunctive relief which would involve future class

members.  *Levels v. Akzo Nobel Salt, Inc.*, 178 F.R.D. 171, 175 (N.D. Ohio 1998); *Reeb*, 221

F.R.D. at 473 (quoting *Robidoux v. Celani*, 987 F.2d 931, 936 (2nd Cir. 1993)); *Rhodes*, 2002

WL 32058462 at *54.  None of these factors support class certification here.

The proposed class members in this case are not so numerous that they cannot be joined.

Plaintiffs claim that their class consists of 56 individuals who did not pass the test at

Middletown.  (Doc. # 71 at 17)  However, Plaintiffs' headcount is derived from the incorrect

timeframe of January 1, 2000 to December 31, 2003 – a period more than twice as long as the

possible temporal scope of the class based on the applicable statute of limitations.[3]  Plaintiffs

have not told the Court how many of these 56 unsuccessful test takers were unsuccessful during

the September 12, 2001 date to present.  Thus, although the putative class is surely smaller than

56 members, the Plaintiffs claim fails because they have not presented any valid evidence as to

numerosity.

In addition, the class members in Middletown are all identifiable, as are their addresses.

They were also, at least as of the time of their application, all located in the Middletown, Ohio

area.  "Knowledge of names and existence of members has been called the 'most important'

factor, precisely because it renders joinder practicable." *Primavera Familienstiftung v. Askin*

*Capital Mgmt.*, 178 F.R.D. 405, 410 (S.D.N.Y. 1998) (38 to 40 potential plaintiffs not sufficient

for class.).  *See also General Telephone Co. v. EEOC*, 446 U.S. 318, 330 n.14 (1980) (approving

denial of certification of classes with 37 members and 39 to 45 members); *Andrews v. Bechtel*

*Power Corp.*, 780 F.2d 124, 131 (1st Cir. 1985) (subclass of 49 persons, most of whom lived in

same general area of southeastern Massachusetts did not satisfy numerosity requirement); *Garcia*

*v. Gloor*, 618 F.2d 264, 267 (5th Cir. 1980) (proposed class of 31 persons not sufficiently

numerous where identity and addresses were readily ascertainable and all lived in compact

geographical area:  "The suggested class therefore failed to meet the elementary requirement that

supports the whole theory of class actions, representation by one person of a group so numerous

that joinder in one suit would be impracticable."); *Levels*, 178 F.R.D. at 176 (proposed class of

---

[3]  Plaintiffs claim that the timeframe continues to the present, but AK stopped hiring in
Middletown in 2003; there are no additional class members who applied after October, 2003.
(Short Dec., ¶ 7)

32 where all resided in Cleveland area were not so numerous to make joinder not feasible);

*Roundtree v. Cincinnati Bell, Inc.*, 90 F.R.D. 7, 9 (S.D. Ohio 1979) (even if class were 36 it was

not so numerous, where there was a lack of geographic diversity and there was an individual

nature to the relief sought); *Mitchell v. Major Federal Savings & Loan Assoc.*, 1986 WL 6376

(S.D. Ohio 1986) (proposed class of 63 was not so numerous that joinder was impracticable

where there was no geographic dispersion); *Christiana Mortgage Corp. v. Delaware Mortgage*

*Bankers Assoc.*, 136 F.R.D. 372 (D. Del. 1991) (proposed class of 28 members who were all

located either in State of Delaware or within 100 miles could seek joinder).  As in the above

cited cases, putative class members in this case could easily be joined in one action.  Judicial

economy in this case can be served by joinder of the parties.

     In addition, there is no other bar to the proposed class members' ability to join the suit or

bring their own action.  There is no risk of retaliation, as there was in *Reeb*, preventing individual

class members from vindicating their own interests.  None of the proposed class members are

employed by AK Steel where retaliation could be a concern.  The financial resources of the

Plaintiffs are also not a concern as Title VII allows for the recovery of attorney fees.  *See*

*Coleman v. Gen. Motors Acceptance Corp.*, 296 F.3d 443, 449 (6th Cir. 2002) (the primary

justification for class treatment is largely absent in a case where the statutory provision provides

for an award of attorneys' fees and costs to successful plaintiffs, thereby eliminating any

potential financial bar to pursue individual claims.); *Mitchell v. Major Federal Savings & Loan*

*Assn.*, 1986 WL 6376, at *3 (S.D. Ohio 1986).

     Finally, although Plaintiffs claim to be seeking prospective relief, such request is moot

because the Middletown Works has stopped hiring.  Due to the cessation of hiring in late 2003,

there is no alleged ongoing violation to enjoin.  The Middletown Works is not hiring, has not

hired for laborer positions for over two years, has no plans to hire in 2006, is shrinking its work force, and does not know when it may resume hiring. Plaintiffs have not established the existence of any factor in support of a claim that the class in this case is so numerous that joinder is impracticable. Class certification should be denied for this reason alone.

c.    <u>Plaintiffs Have Not Established Commonality.</u>

Plaintiffs also failed to establish commonality. Case law applying Rule 23(a)(2) in this kind of case requires proof that there is "a common issue the resolution of which will advance the litigation." *Reeb v. Ohio Dept. of Rehab. and Correction*, 81 Fed. Appx. 550, 557 (6th Cir. 2003); *Sprague v General Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998). "Not every common question will suffice because 'at a sufficiently  abstract level of generalization, almost any set of claims … could display commonality." *Reeb*, 81 Fed. Appx. at 557 (citations omitted). In this alleged disparate impact case, commonality is dependent upon the existence of evidence of a disparate impact affecting a class of individuals. Plaintiffs have not satisfied their burden of establishing the existence of a class of individuals who have been subjected to a common means of discrimination.

For purposes of certifying a class, courts must look at whether there is a basis for a claim in connection with the "rigorous analysis" required by the Rule 23 elements. Statistical analyses by both parties' experts are relevant to a class action determination. The Court cannot merely accept the assertions of Plaintiffs' expert as true: "Blind acceptance of a plaintiff's statistical evidence is not warranted." *Rhodes*, 2002 WL 32058462 at *62. The appropriate standard is as follows:

> Although on a class certification motion this court should not conduct a preliminary inquiry into the merits of the suit, inquiries into whether plaintiffs have met their burden of showing that class certification is appropriate often becomes intertwined with a limited discussion of the merits.  As the Eleventh Circuit has

noted, the principle that the court may not reach the merits of the claim "should not be talismanically invoked to artificially limit a trial court's examination of the factors necessary to a reasoned determination of whether a plaintiff has met [the] . . .burden of establishing each of the Rule 23 class action requirements." For that reason, an examination of what the statistical evidence shows and does not show, and preliminary judgments regarding the credibility of the showing made by the plaintiff in support of the motion for class certification are necessary in order for the court to undertake a sifting examination of the Rule 23 requirements.

*Cullens v. Ga. Dept. of Transp.*, 1985 WL 307, at *14 (M.D. Ga. 1985) (citations omitted). *See also Reid v. Lockheed Martin Aeronautics Co.,* 205 F.R.D. 655, 661-62 (N.D. Ga. 2001) (statistical evidence reviewed and weighed); *Cooper v. Southern Co.*, 390 F.3d 695 (11th Cir. 2004) (district court obliged to make assessment of plaintiff's evidence to determine whether plaintiff is claiming discrimination that is common to class), *cert. denied*, 126 S. Ct. 478 (2005).

In a disparate impact claim such as this, a careful examination of the evidence is particularly applicable because the very existence of any class of individuals who have been harmed is dependent upon evidence that a selection process has actually created a disparate impact. "To answer the procedural questions of commonality, typicality and adequacy of representation in effect requires answering the substantive question of whether, under disparate impact, there exists the requisite pattern or practice sufficiently and comparably affecting an identifiable class of protected employees." *Rowe v. Philadelphia Coca Cola Bottling Co.*, 2003 WL 22594252, at *8 (E.D. Pa. 2001) (when plaintiff seeks to certify a class based on disparate impact, class action and merit inquiries essentially coincide).

Because Ashland applicants cannot be included in a class in this case for the reasons discussed above, Plaintiffs' sole claim in their motion is a disparate impact claim based on the effect of the written test on African-American Middletown applicants. Plaintiffs have presented no statistical analysis of the impact on the class during the relevant time period, September 12,

2001 forward.  Although Plaintiffs' expert admits that the relevant period to consider for analysis is 300 days before the charge (Bradley Supp. Report, attached to Doc. # 71, p. 2 of 43 n.3), he then evidently miscalculated the date and used a date a year and one-half earlier than the appropriate date.  Consequently, the Plaintiffs have presented no evidence of discrimination during the relevant period (September 12, 2001 to present) on which to base a class claim.

Moreover, even putting aside the erroneous time frame of Dr. Bradley's analysis, the structure of Dr. Bradley's analysis is badly flawed.  After admitting in his initial Report that he "cannot analyze separately the components of the selection procedure used for hiring into the Laborer positions at AK Steel,"[4]  he then later inexplicably presented an analysis (albeit incorrect) of the effect of one of the specific components – the written test.  (*Compare* Bradley Supp. Report, p. 9 *to* Bradley Rebuttal Report p. 6)  In addition to the fatal time period flaw in his analysis of the data, Dr. Bradley's analysis for the entire hiring process at Middletown was flawed in that it included applicants who could not have been hired by AK Steel into laborer positions because they withdrew from the hiring process.  (Baker Report, p. 2-3) (attached)

        d.        The Named Plaintiffs' Claims Are Not Typical Of Those Of The Class.

Plaintiffs also fail the third prong of the Rule 23(a) analysis – typicality.  A named plaintiff's claim must be typical of those in the class that the Plaintiff would represent.  *See Bacon*, 370 F.3d at 573.  None of the named Middletown Plaintiffs have claims typical of the proposed class.  Only two of the nine named unsuccessful applicant Middletown Plaintiffs even claim to have failed the test:  Thaddeus Freeman and Donald Edwards.

---

[4] Dr. Bradley inaccurately states that Ms. Lester and Ms. Short testified that the documentation regarding the various stages of the hiring process were incomplete.  Both testified only that they could not say with absolute certainty that some piece of information for one of the thousands of applications they received may have been misfiled or otherwise lost.  (Short Dep. 22-25, attached to Doc. # 71; Lester Dep. 16-18.  *See also* Baker Report, p. 2, n.4.)

Freeman claims to have failed the test in 1999. (Doc. # 71, Exh. 6, Freeman Aff.) His claim is therefore unquestionably time-barred and therefore is not typical of the class; he cannot represent the class.

The remaining Middletown Plaintiff who claims to have failed the test is Donald Edwards, who claims he failed a test given by Palmer Temps (not AK) in August, 2001. His claim is also time-barred. His own charge was not filed until July 9, 2002, more than 300 days after he claims to have failed the test. In addition, there is no evidence he even took the AK Steel test in August 2001 or at any time. According to AK Steel's records, Edwards applied in 1999 and August, 2000, but in neither case was he tested. (Short Dec., ¶ 13) He was screened out in 1999 and 2000 because he lacked two years of manufacturing experience. (*Id.*) AK Steel has no evidence that Edwards even applied, let alone was tested, in 2001. Even if his claim were not time-barred, Edwards cannot be an appropriate representative for a class of individuals who took and failed the test. Moreover, because there may be an issue of disputed fact as to whether he took and failed the test, this disputed issue makes his claim atypical of those in the proposed class.

> e.  There Is No Adequate Class Representative For Middletown.

Plaintiffs similarly fail the fourth prong of the Rule 23(a) analysis. Plaintiffs are not adequate representatives of the class. An individual is not an adequate representative if he is subject to unique defenses that place him in a position that is antagonistic to the interests of the class. *Levels v. Akzo Nobel Salt, Inc.*, 178 F.R.D. 171, 179 (N.D. Ohio 1998) ("Also, the named class representative must himself satisfy all jurisdictional prerequisites before a class action can go forward."); *Hardin v. Harshbarger*, 814 F. Supp. 703, 707 (N.D. Ill. 1993) ("Further, it is settled law that the presence of even an arguable defense against the named plaintiff that is not

applicable to the proposed class, or in this case subclass, can vitiate the adequacy of named

plaintiff's representation.").  As discussed above, the claims of both Freeman and Edwards – the

only Plaintiffs who are even arguably situated so as to be class representatives – are subject to

unique defenses, leaving no named Plaintiff in Middletown who can adequately represent the

class.  Class certification is inappropriate for this reason alone.

The adequacy requirement also raises additional concerns of whether the representatives

will vigorously prosecute the interests of the class through qualified counsel.  This case has been

pending for three years.  The theory has significantly changed during that time.  Seven of the

named Plaintiffs are now not even included in the proposed class(es).  There is, therefore, a

conflict between the class and the individual Plaintiffs who are not in the class.  Plaintiffs are not

adequate representatives of the class.

> D.    <u>Certification Under 23(b) Is Inappropriate.</u>
>
> 1.    Certification Under 23(b)(2) Is Inappropriate; Any Request For
>        Prospective Relief Is Moot.

In order to certify a class under Rule 23(b)(2), the court must consider whether the party

opposing the class has acted or refused to act on grounds generally applicable to the class,

making appropriate final injunctive relief or corresponding declaratory relief.  *See* Fed. R. Civ. P.

23(b)(2).  As described above, all Middletown hiring stopped in 2003 and it is not known

whether or when it will resume.  There is no ongoing hiring or alleged discriminatory action to

enjoin in this case, demonstrating that this case is therefore not predominantly about injunctive

relief.  *See Levels v. Akzo Nobel Salt, Inc.*, 178 F.R.D. 171, 180 (N.D. Ohio 1998) (case could

not be maintained under Rule 23(b)(2) where Defendant was no longer in position to provide any

injunctive relief).  Class certification is not appropriate under Rule 23(b)(2).

## 2.     Certification Under 23(b)(3) Is Inappropriate.

Certification under Rule 23(b)(3) is also inappropriate.  To certify a class under Rule 23(b)(3), common issues must predominate and the class action must be superior to other available methods for a fair and efficient adjudication of the controversy.  *See* Fed. R. Civ. P. 23(b)(3).  Here, eight of the 17 named Plaintiffs are not proposed class members.  There is no "common question."  Moreover, because AK Steel only hires approximately 42% of those who pass the written test, even if there were evidence of a proposed class who did not pass the test, it would require an individualized inquiry as to each of the members of the class as to whether they would have been hired even if the test was taken out of the equation. (Short Dec., ¶ 12)   The numerous individualized, factual determinations that would be required at this stage counsel against class certification.  *See Rhodes*, 2002 WL 32058462 at *62.  For this reason and those discussed above, common issues do not predominate as required by Rule 23(b)(3), making certification under 23(b)(3) inappropriate.

## IV.  CONCLUSION

For each and all of the foregoing reasons, Defendant AK Steel Corporation respectfully

requests that Plaintiffs' Motion for Class Certification be denied.

Respectfully submitted,


/s/ Gregory Parker Rogers          _____
Lawrence J. Barty (0016002)
Patricia Anderson Pryor (0069545)
Gregory Parker Rogers  (0042323)
Roger A. Weber (0001257)
Taft, Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, OH   45202
(513) 381-2838
(513) 38l-0205 (fax)

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was electronically filed on November 30, 2005 using the Court's CM/ECF system, which will send notice of this filing to Robert Childs, Wiggins, Childs, Quinn & Pantazis, P.C., The Kress Building, 301 19th Street North, Birmingham, Alabama  35203, Paul H. Tobias and David Kammer, Kraus & Torchia, 911 Mercantile Library Building, 414 Walnut Street, Cincinnati, Ohio 45202 and David Sanford, Sanford, Wittels & Heisler, L.L.P., 2121 K Street, N.W., Suite 700, Washington, D.C.  20037

/s/ Gregory Parker Rogers