**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **VIVIAN BERT, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO. C-1-02-467** |
| | ) | **Judge Beckwith** |
| **AK STEEL CORPORATION,** | ) | **Magistrate Judge Hogan** |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFFS' REPLY IN SUPPORT**
**OF MOTION FOR CLASS CERTIFICATION**

# TABLE OF CONTENTS

I.      ONE CLASS ACTION MAY BE MAINTAINED FOR AFRICAN-AMERICAN APPLICANTS WHO FAILED THE TEST AT MIDDLETOWN AND ASHLAND . . . 1

II.      THE PROPER TEMPORAL SCOPE OF A COMBINED CLASS OR SUBCLASSES EXTENDS BACK TO AT LEAST JANUARY 1, 2000, DUE TO CONTINUING VIOLATIONS DOCTRINE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III.      PLAINTIFFS HAVE DEMONSTRATED THAT THE RULE 23 REQUIREMENTS FOR ONE CLASS ACTION OR A CLASS AT MIDDLETOWN HAVE BEEN MET . . . . 11

     A.      Plaintiffs Edwards and Freeman Have Standing to Maintain a Class . . . . . . . . . 12

     B.      Plaintiffs Have Established Numerosity for a Middletown Subclass . . . . . . . . . 16

     C.      Plaintiffs Have Demonstrated Commonality for a Middletown Subclass . . . . . . 18

     D.      Putative Class Representatives are Typical of Middletown Subclass . . . . . . . . . 20

     E.      Plaintiffs Have Adequate Class Representatives . . . . . . . . . . . . . . . . . . . . . . . . . 21

     F.      Certification Under Rule 23(b)(2) is Appropriate . . . . . . . . . . . . . . . . . . . . . . . . 22

     G.      Certification Under Rule 23(b)(3) is Appropriate . . . . . . . . . . . . . . . . . . . . . . . . 22

IV.      IF THE COURT DOES NOT CERTIFY ONE CLASS, THEN A SEPARATE CLASS MAY BE MAINTAINED AT ASHLAND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

I.    **ONE CLASS ACTION MAY BE MAINTAINED FOR AFRICAN-AMERICAN APPLICANTS WHO FAILED THE TEST AT MIDDLETOWN AND ASHLAND**

The defendant advances several reasons in support of its argument that the putative class representatives may not maintain a combined class action regarding the testing utilized at the Middletown and Ashland facilities. AK Steel's arguments falter, however, upon the application of precedent and close analysis.

First, it is beyond dispute that a test used at multiple facilities of a company may be challenged on a class basis if it has a disparate impact against a protected group. *See, e.g., Williams v. Ford Motor Co.*, 187 F.3d 533, 535-36 (6th Cir. 1999) (in a class action covering seven Ford Motor Company plants in Ohio, the Sixth Circuit examined the validity of a pre-employment test used for the hiring of unskilled, hourly laborers); *Bacon v. Honda of America Mfg., Inc.*, 205 F.R.D. 466, 471-72, 477-78 (S.D. Ohio 2001) (finding commonality regarding a disparate impact claim challenging facially neutral criteria used at four Honda plants in central Ohio), *affm'd by*, 370 F.3d 565 (6th Cir. 2001); *Dothard v. Rawlinson*, 433 U.S. 321 (1977) (disparate impact claim upheld for neutral height and weight policy used for multiple prison facilities); *c.f.*, *General Telephone Company of the Southwest v. Falcon*, 457 U.S. 147, 159 n. 15 (1982) ("If petitioner used a biased testing procedure to evaluate both applicants for employment and incumbent employees, a class action on behalf of every applicant or employee who might have been prejudiced by the test would satisfy the commonality and typicality requirements of Rule 23(a)." Disparate impact cases necessarily "satisfy the commonality and typicality requirements of Rule 23(a)"); *Stastny v. Southern Bell Tel. & Telegraph Co.*, 628 F.2d 267, 274 n. 10 (4th Cir. 1980) (it is "well recognized" that "class action commonality criteria are, in general, more easily met when a disparate impact rather than a disparate treatment theory underlies a class action"). As AK Steel uses the same test at both Middletown and

Ashland,[1] a disparate impact class action may be properly maintained across both facilities.

Second, the maintenance of one class action for both facilities is not affected by the lack of data regarding the test results at Ashland. To accede to the defendant's argument in this regard would allow it to benefit from its impropriety and escape possible class liability for the use of a discriminatory test. Such actions on the defendant's part should not be permitted. Indeed, the Sixth Circuit allows the use of a statistical analysis finding disparate impact in one group of decisions to serve as evidence of discrimination in a comparable group of decisions. *See U.S. v. City of Warren,* 138 F.3d 1083 (6th Cir. 1998).

In *Warren*, the Sixth Circuit reviewed a district court's decision holding that the defendant's recruiting practices for police and firefighter vacancies had a disparate impact on potential black applicants. *Id*. at 1083. The district court found a disparate impact claim regarding the police and firefighter vacancies because the U.S. had presented statistical evidence of the discriminatory effect of the city's recruiting practices regarding those positions. Contrarily, the district court denied the disparate impact claim as to other municipal vacancies because no statistical evidence was presented regarding the impact of the recruiting practices on those positions. *Id.* at 1089. The Sixth Circuit, noting that the district court had determined that the recruiting practices for all municipal positions were substantially similar, held that "[b]ecause the recruitment practices for all municipal positions were identical, . . . the district court clearly erred in holding that the United States did not meet its burden with regard to municipal positions other than police and firefighter positions." *Id.* at 1093.

The implications of *Warren* for this case are clear. AK Steel uses the same pre-employment practice, and in fact the same test, for its Laborer hiring at both Middletown and Ashland. However,

---

[1]Lester at 73-74 (attached as Ex. 17).

it has only maintained data for one facility, Middletown.  As depicted in plaintiffs' class certification memorandum, the available data for Middletown demonstrates that this test has a disparate impact upon African-American applicants.  Based on these facts, *Warren* clearly permits extrapolation of the results of the Middletown data onto the identical practice at Ashland, and thus, one class action may be maintained for both facilities.

Furthermore, the supposed differences noted by the defendant between Middletown and Ashland do not defeat the maintenance of one class action.  First, as noted above and contrary to the defendant's arguments, the Laborer hiring process is the same at both Middletown and Ashland.  The defendant identified only two purported differences between the hiring practices at these two facilities, and both of those differences are controverted by deposition testimony from AK Steel's Fed. R. Civ. P. 30(b)(6) corporate designees.  To wit, contrary to the defendant's Opposition and its attendant Phyllis Short Declaration (*see* Doc. 73 at 5, 9), Ms. Short testified on more than one occasion that the two-year manufacturing experience for Middletown was waived for women and minorities:

> Okay.  Let me try this again.  We do prefer at Middletown Works to have two years of manufacturing experience.  But, as I previously said, we were trying to get more females and minorities into our work force.  Therefore, if we had female or minority candidates going through our process who did not have the two years of manufacturing experience, we would probably move them into the next step as far as the employment process was concerned. * * *

> Again, we prefer two years of manufacturing experience.  Do we deviate from that based upon the needs, based upon our desire to get more minorities and females into the work force?  Yes, we do. * * *

> Q.  . . .  Did I understand you to say, Ms. Short, that AK Steel in Middletown has waived the requirement of two years of manufacturing experience for minorities and females at any point in time from January of 2000 to the present?
> A.  What I said was, if we had minority and female candidates, we're much more

3

> willing to consider them without the two years of manufacturing experience than we
> would other candidates.

Short Dep. at 78, 79-80, 136-37 (attached as Ex. 18).  Similarly, the defendant's statement that

Ashland does not screen out applicants before the test is given (*see* Doc. 73 at 4), is directly

contravened by Susan Lester in her deposition testimony:

> Q.    All right.  Once you go through this -- so basically we got a screen that's
> conducted by the employment service for high school education, GED and 18 years
> of age.  Then you get the applications in hand and you screen them for both of those
> two items, plus convictions for crimes other than minor employment -- I'm sorry,
> minor traffic citation, work history problems and attendance problems, is that
> correct?
> A.    That's correct.
> Q.    Once you go through those two screens, the next step in the process is a test?
>
> A.    That's correct.

Lester Dep. at 56-57 (attached as Ex. 17).  Therefore, the purported differences in the Laborer hiring

practices at Ashland and Middletown, as identified by the defendant in its Opposition, are inaccurate.

Finally, the other differences between Ashland and Middletown highlighted by the defendant

– i.e., geographical differences, regional variations, urban vs. rural (*see* Doc. 73 at 9-11) – do not

merit much consideration.  Indeed, it is hard to fathom what effect these supposed differences could

possibly have upon African Americans who fail the same Laborer hiring test offered at both

facilities.  Moreover, binding precedent in the Sixth Circuit does not even require the plaintiffs to

account for such differences.  *See Warren*, 138 F.3d at 1094 ("[p]laintiffs who present a statistical

analysis of some challenged practice need not rule out all other variables to prevail") (citing *Scales*

*v. J.C. Bradford & Co.*, 925 F.2d 901, 908-09 (6th Cir. 1991); *see also Alexander v. Local 96,*

*Laborers' Int'l. Union of N.A.*, 177 F.3d 394, 406 (6th Cir. 1999) (same).[2] The defendant's failure to identify any possible statistical effects that these supposed differences would cause for African Americans in neighboring states results in a less than useful excursion for the Court and the parties.

## II. THE PROPER TEMPORAL SCOPE OF A COMBINED CLASS OR SUBCLASSES EXTENDS BACK TO AT LEAST JANUARY 1, 2000, DUE TO CONTINUING VIOLATIONS DOCTRINE

Notwithstanding its acknowledgment that the pre-employment test for Laborer vacancies has been used since at least 1999 (*see* Lester at 76 (Ex. 17)) and that the parties have data available for the period January 1, 2000, through December 31, 2003, AK Steel argues that the continuing violations doctrine may not be used to extend the liability period for plaintiffs' disparate impact claim.[3] As plaintiffs argued in their class certification memorandum, the Sixth Circuit "has long recognized that an ongoing, continuous series of discriminatory acts may be challenged if one of those discriminatory acts occurred within the limitations period." *Alexander v. Local 96, Laborers' Int'l. Union of N.A.*, 177 F.3d 394, 408 (6th Cir. 1999) (citation omitted). "'If a continuing violation is shown, a plaintiff is entitled to have a court consider all relevant actions allegedly taken pursuant to the employer's discriminatory policy or practice, including those that would otherwise be time barred.'" *Id.* (citations omitted).

---

[2] *C.f.*, *Bazemore v. Friday*, 478 U.S. 385, 400 (1986) (per curiam) ("While the omission of variables from a regression analysis may render the analysis less probative than it otherwise might be, it can hardly be said, absent some other infirmity, that an analysis which accounts for the major factors 'must be considered unacceptable as evidence of discrimination.' Normally, failure to include variables will affect the analysis' probativeness, not its admissibility."); *Dothard v. Rawlinson*, 433 U.S. 321, 331 (1977) ("The plaintiffs in a case such as this are not required to exhaust every possible source of evidence, if the evidence actually presented on its face conspicuously demonstrates a job requirement's grossly discriminatory impact. If the employer discerns fallacies or deficiencies in the data offered by the plaintiff, he is free to adduce countervailing evidence of his own.").

[3] Contrary to defendant's arguments, plaintiffs discussed the temporal scope of the proposed class at pages 18 through 20 of their class certification memorandum.

The defendant initially contends that the continuing violation doctrine does not apply to disparate impact claims. However, its argument in this regard flies squarely in the face of Sixth Circuit precedent. As plaintiffs argued in their class certification memorandum, the Sixth Circuit formerly viewed continuing violations as falling into two categories: (1) "where there is some evidence of present discriminatory activity giving rise to a claim of a continuing violation; that is where an employer continues presently to impose disparate work assignments or pay rates between similarly situated groups"; and (2) "where there has occurred a longstanding and demonstrable policy of discrimination. . . . Unrelated incidents of discrimination will not suffice to invoke this exception; rather there must be a continuing over-arching policy of discrimination." *Id*. (citations and internal quotation marks omitted) (alteration in original). Although *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002) abrogated the first category of the continuing violations doctrine, the Sixth Circuit has held that the "second category of continuing violations, involving a longstanding and demonstrable policy of discrimination, is not implicated by Morgan." *Sharpe v. Cureton*, 319 F.3d 259, 268 (6th Cir.), *cert. denied*, 540 U.S. 876 (2003); *see also Reeb v. Ohio Dept. of Rehab. & Correct.*, 221 F.R.D. 464, 471 (S.D. Ohio 2004) (same).

Most pertinent for the issues at bar, the Court in *Alexander* applied the second category of the continuing violations doctrine to a disparate impact claim. In *Alexander*, the plaintiffs challenged a union's 'working-in-the-calling' and referral practices, which had a disparate impact upon African-American applicants for positions at a nuclear plant. 177 F.3d at 405-07. After finding that those practices had a disparate impact upon African-American applicants, the Sixth Circuit proceeded to hold that the union "committed both types of continuing violations recognized by this court: a series of related discriminatory acts and an established policy of discrimination." *Id*. at 408 (footnote and

6

citations omitted).  As revealed, the Sixth Circuit applied the continuing violations doctrine to extend the liability period for the plaintiffs' disparate impact claim.  This ruling is consistent with Sixth Circuit precedent holding that disparate impact discrimination constitutes a 'policy' of systemic discrimination similar to pattern and practice claims.  *See Huguley v. General Motors Corp.*, 52 F.3d 1364, 1370 (6th Cir. 1995) ("disparate impact . . . claim is based on statistical evidence of systematic discrimination (i.e., a pattern or practice which results in discrimination)") (citing *Int'l. Bhd. of Teamsters*, 431 U.S. 324, 335-36 n. 15 (1977); *Griggs v. Duke Power Co.*, 401 U.S. 424, 430-32 (1971)).[4] Here, the failing test scores of the putative class representatives and class members are not discrete acts of discrimination; rather, they are part of a systemic practice by the defendant of using a test that adversely impacts African-American applicants.

In an additional effort to prevent the extension of the liability period, the defendant argues circuitously that "stale" claims should not be revived by the continuing violations doctrine.  Doc. 73 at 17.  Of course, if the continuing violations doctrine properly pertains to the disparate impact claim at bar, then the plaintiffs' claims are not "stale."  By arguing otherwise, the defendant engages in impermissible question-begging, i.e., by first designating plaintiffs' claims as "stale" and then arguing that the continuing violations doctrine does not apply for this reason.  That is, plaintiffs' claims are only "stale" if the continuing violations doctrine does not apply to their disparate impact allegations.

Furthermore, the defendant's "staleness" contention contradicts Supreme Court authority by

---

[4] *See also Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 160 (2d Cir. 2001) ("Like pattern-or-practice disparate treatment claims, disparate impact claims 'are attacks on the systemic results of employment practices.'") (quoting *Segar v. Smith*, 738 F.2d 1249, 1267 (D.C.Cir.1984)); *Anderson v. Boeing Co.*, 222 F.R.D. 521, 547 (N.D. Okla. 2004) (continuing violation doctrine applied to plaintiffs' Title VII class action claims "because plaintiffs' class claims for disparate treatment and disparate impact are pattern or practice claims").

arguing that plaintiffs must have a claim that falls within the standard liability period to meet the continuing violations doctrine.[5]  *See Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982).  *Havens* addressed a lawsuit under the Fair Housing Act of 1968 which requires that a civil suit be filed within 180 days after an alleged discriminatory housing practice occurs.  *See* 42 U.S.C. §§ 3601 *et seq.*  The lawsuit alleged five specific acts of discrimination, four that had occurred more than 180 days before the complaint was filed, and the fifth, although within the 180-day period, involved a person whose claims had been resolved by a consent decree.  Nonetheless, the Supreme Court held that the plaintiffs' lawsuit was timely filed: "Statutes of limitation . . . are intended to keep stale claims out of the courts.  Where the challenged violation is a continuing one, the staleness concern disappears."  *Havens Realty*, 455 U.S. at 30 (citation omitted).  The Court continued with its holding that

> where a plaintiff, pursuant to the Fair Housing Act, challenges not just one incident of conduct violative of that Act, but an unlawful practice that continues into the limitations period, the complaint is timely filed within 180 days of the last asserted occurrence of the practice.

*Id.* at 380-81.[6]  As reflected in *Havens Realty*, the 'last asserted occurrence" of a discriminatory practice under the continuing violations theory need not have been asserted against a named plaintiff. As long as the occurrence resulted from a systemic policy or practice, then a claim which falls within the extended liability period, not just the standard liability period, is timely.  Policies and practices

---

[5]  As plaintiffs will demonstrate *infra*, there are putative class representatives who were harmed by the challenged practice within the standard liability period, i.e., they failed the pre-employment test within 300 days of filing an E.E.O.C. charge. Moreover, as will be discussed later in this brief, precedent allows the continuing violations theory to apply to a disparate impact claim even if a named plaintiff was not harmed by the challenged practice within the standard liability period.

[6] Although *Havens Realty* was not decided under Title VII, the Court's holding is broad enough to apply to employment discrimination claims under Title VII.

having a disparate impact may be challenged at anytime within 180 or 300 days of their discontinuance, depending upon the forum. *Accord Beavers v. Amer. Cast Iron Pipe Co.*, 975 F.2d 792 (11th Cir. 1992); *Gomes v. Avco Corp.*, 964 F.2d 330 (2d Cir. 1992).

The primary cases cited by the defendant in support of its argument against the application of the continuing violations doctrine do not refute the cases cited above. In *Hipp v. Liberty Nat'l. Life Ins. Co.*, 252 F3d 1208 (11th Cir. 2001), the court addressed the proper rearward, temporal scope of an Age Discrimination in Employment Action collective action for piggybacking purposes and held that a plaintiff's claims, which had accrued more than a year before the representative charge was filed, could not be revived by the continuing violations doctrine. *Id.* at 1220-22. Not only does *Hipp* contravene *Havens Realty*, it also conflicts with *Howlett v. Holiday Inns, Inc.*, 49 F.3d 189 (6th Cir. 1995), a Sixth Circuit case, discussed *infra*, which holds that a claimant who files an untimely E.E.O.C. charge may piggyback upon a timely-filed representative charge to maintain his or her claims. Furthermore, the facts of *Hipp* are inapposite to the facts of the case at bar. Whereas the litigant in *Hipp* sought to piggyback upon a charge that was filed more than a year after he was aggrieved by the alleged unlawful practice, putative class representative Donald Edwards's allegations arose within the temporal scope of plaintiff Darrel Carter's charge challenging the use of the same discriminatory test as part of the same discriminatory hiring practices.[7]

As for *Lanning v. Southeastern Pa. Transp. Auth.*, 176 F.R.D. 132 (E.D. Pa. 1997), it contradicts *Alexander*, *supra*, a Sixth Circuit case where the continuing violations doctrine was

---

[7] As the defendant implicitly demonstrated in its brief, plaintiff Darrel Carter's representative charge creates a standard liability period back to August 12, 2001. Doc. 73 at 8. Although plaintiffs will discuss, *infra*, that plaintiff Edward's failure of the test probably did not occur until a much later point in time, a general allegation that he failed the test in August 2001 will still be covered by plaintiff Darrel Carter's representative charge.

applied to a disparate impact class action involving discrete applications for union membership or employment vacancies. *See Alexander*, 177 F.3d at 400-02. Indeed, in *Alexander*, the Sixth Circuit noted that the challenged practices, which denied African-American membership in the union on a continual basis, satisfied both categories of the continuing violations theory, "a series of related discriminatory acts and an established policy of discrimination," thus, evincing that separate acts implementing a practice of discrimination may still constitute one policy under the continuing violations doctrine. *Id*. at 408.[8] In addition, *Lanning*, which was a decision rendered at the class certification and Fed. R. Civ. P. 12 stage, was subsequently reversed and remanded at the summary judgment stage. *See Lanning v. Southeastern Pa. Transp. Auth.*, 181 F.3d 478 (3d Cir. 1999).[9]

In any event, even if this Court were to decline no to apply the continuing violations doctrine to the disparate impact claims in this case, the defendant's test still had a disparate impact upon African-American applicants during the standard liability period for Title VII causes of action. As reflected in the attached declaration by plaintiffs' expert, limiting the statistical analysis to the period of August 12, 2001, to December 31, 2003, yields a statistical significance of -2.63 standard deviations and an adverse impact ratio of 78.7%. *See* Ex. 14 at ¶ 7. Likewise, limiting the statistical

---

[8] The *Lanning* court mentioned that its application of the continuing violations theory may have been different if the aggrieved plaintiffs had continually applied for and been denied the disputed vacancies because of the allegedly discriminatory practice. *Lanning*, 176 F.R.D. at 150 n. 16. This observation by the court, however, totally disregards Supreme Court precedent providing that individuals who are deterred from applying for a position due to the spectre of discrimination may still maintain a cause of action against the wrongdoer. *See Int'l Bhd. of Teamsters v. U.S.*, 431 U.S. 324, 365-66 (1977) ("The effects of and the injuries suffered from discriminatory employment practices are not always confined to those who were expressly denied a requested employment opportunity. A consistently enforced discriminatory policy can surely deter job applications from those who are aware of it and are unwilling to subject themselves to the humiliation of explicit and certain rejection. . . . When a person's desire for a job is not translated into a formal application solely because of his unwillingness to engage in a futile gesture he is as much a victim of discrimination as is he who goes through the motions of submitting an application.").

[9] In reversing the district court's summary judgment decision regarding the employer's business justification burden in a disparate impact challenge, the Third Circuit declined to reach the parties' other assertions of error. *Id*. at 481.

analysis to the period of September 9, 2001, to December 31, 2003, yields a statistical significance of -2.84 standard deviations and an adverse impact ration of 76.3%. *See id.* at ¶ 8.

## III.    PLAINTIFFS HAVE DEMONSTRATED THAT THE RULE 23 REQUIREMENTS FOR ONE CLASS ACTION OR A CLASS AT MIDDLETOWN HAVE BEEN MET

The defendant argues that the plaintiffs here may not maintain a single class action for Middletown and Ashland or a Middletown subclass.  As set forth in section I, *supra*, plaintiffs have met the requirements to maintain a single class action for the discriminatory test that is used at Middletown and Ashland.  Therefore, the putative class representatives at Ashland and Middletown may represent the class members for both facilities.   Indeed, notwithstanding the continuing violations discussion above, there exists putative class representatives who were adversely affected within the standard liability period for purposes of maintaining such a class action.  Darrell Carter, who worked at Ashland and did not pass the test, filed a charge within 300 days of failing the test (*see* Doc. 73 at 8-9), as did other putative class representatives. Therefore, he is a proper class representative for those African-American applicants who failed the test at Middletown.

Furthermore, even if the Court were to decline to certify a single class action for both Ashland and Middletown because of the lack of testing data at Ashland, the plaintiffs who failed the test at Ashland should still be a part of the testing class certified for Middletown.  The Ashland putative class representatives took and failed the same test  as the Middletown plaintiffs and putative class members, and the test was used for the same purpose, Laborer hiring , and under similar conditions.  Therefore, the Ashland plaintiffs who failed the test may serve as putative class representatives for a class of African-American applicants and future applicants who took and failed AK Steel's qualifying test for Laborer vacancies at Middletown.  This fact renders the defendant's

standing argument of no consequence.

Finally, if the Court declines to allow the Ashland plaintiffs to serve as putative class representatives for a Middletown subclass, there exists viable putative class representatives who took and failed the test for employment as a Laborer at Middletown.

### A.    Plaintiffs Edwards and Freeman Have Standing to Maintain a Class

The defendant argues that Donald Edwards and Thaddeus Freeman, the named plaintiffs who took and failed the qualifying test at Middletown, do not have standing to serve as putative class representatives of a Middletown class because they did not file an E.E.O.C. charge within 300 days of failing their tests. *See* Doc. 73 at 14-15.  As discussed previously in section II, the Supreme Court has held that the continuing violations doctrine allows a plaintiff to bring a claim for discriminatory conduct even if he or she was not aggrieved within the standard liability period. *See Havens Realty*, 455 U.S. at 380-81. Rather, the plaintiff only needs to produce evidence that other individuals were affected by the challenged practice during the appropriate time frame. *Id.* Here, plaintiffs Edwards and Freeman have produced such evidence via the Middletown data and statistical analysis demonstrating the existence of African-American applicants who failed the test within the standard liability period. *See* Bradley Rebut. Rep., at 5-8 & Table 1.[10] Therefore, plaintiffs Edwards and Freeman have standing to serve as class representatives pursuant to the dictates of *Havens Realty*.

Furthermore, plaintiff Edwards has standing to bring his disparate impact claim for discriminatory testing without relying upon *Havens Realty*.  The defendant calculates the rearward

---

[10] Moreover, defendant's expert found statistically significant adverse impact (-2.09 standard deviations) against African-Americans in the hiring of Laborers at Middletown during the standard liability period. Baker Rep. at 11 (attached to Def.'s Opp.).

temporal scope for plaintiff Edwards's charge as September 9, 2001, and argues that plaintiff Edwards's claim is untimely because he presumably failed the hiring test in August 2001. *See* Doc. 73 at 16-17. However, plaintiff Edwards <u>has never alleged that he failed the qualifying test in August 2001</u>. As reflected in plaintiff Edwards's declaration (attached as Ex. 5 to plaintiffs' Class Cert. Memo.), he merely stated, "In previous applications, such as one in August 2001, I took an aptitude test and was interviewed by a white male Palmer Temp representative." Ex. 5 at 1. Plaintiff Edwards's statement does not state that he submitted an application in August 2001 and immediately took the test. Rather, he indicates that he submitted an application in August 2001 and subsequently was tested. Indeed, Middletown's hiring official and Rule 30(b)(6) designee, Ms. Short, testified that candidates may be tested up to a year after submitting applications:

> Q.  Was there a certain limited amount of time that an applicant had to be tested before he was taken out of the process?
> A.  No, sir.
> Q.  Okay.  So if you got an application back for an employee, say January of 2002, he could have been tested all the way up until December of that year?
> A.  Sure.
> Q.  So there was no time frame?
> A.  There was no time frame, no.

Short. Dep. at 90-91 (attached as Ex. 14). In addition, as defendant admitted in its Opposition, Middletown receives "thousands" of applications for Laborer vacancies. *See* Doc. 73 at 5. Such a large number of applications cannot possibly be screened for minimum qualifications in a short period of time. Based on the facts currently before the Court, the defendant's argument that plaintiff Edwards took and failed the qualifying test in August 2001 is incorrect, and thus, his claim was filed within 300 days of failing the test.

Further, even if plaintiff Edwards's charge were ultimately found to be untimely, he could

still piggyback upon the charge of Ashland plaintiff Darrel Carter – with a rearward temporal scope back to August 12, 2001, for the standard liability period – to demonstrate that his claim properly fell within the standard liability period.  *See Howlett v. Holiday Inns, Inc.*, 49 F.3d 189 (6th Cir. 1995).  The piggyback, or single filing rule, "allows the administrative charge of one plaintiff to satisfy the charge filing obligations of other plaintiffs."  *Id.* at 194 (citing *Equal Employment Opportunity Comm'n v. Wilson Metal Casket Co.*, 24 F.3d 836 (6th Cir.1994)).  A "charge will be adequate to support piggybacking under the single filing rule if it contains sufficient information to notify prospective defendants of their potential liability and permit the EEOC to attempt informal conciliation of the claims before a lawsuit if filed."  *Id.* at 195.  The *Howlett* Court also favorably cited a Second Circuit decision for the proposition that for large work units, the representative charge must sufficiently indicate violations against a group of individuals for a plaintiff to piggyback on the charge for class action purposes.  *Id.* at 195-96 (discussing *Tolliver v. Xerox Corp.*, 918 F.2d 1052 (2d Cir.1990)).

Plaintiff Darrell Carter's charge is clearly sufficient for plaintiff Edwards to piggyback on for his individual and class action disparate impact claims.  *See* Ex. 9 to Pls.' Class Cert. Memo.  In his charge, plaintiff Carter describes his failure of the test and prefaces his narrative with the statement that "AK Steel Corporation's actions are part of a continuing pattern and practice of discrimination against African-American applicants for employment . . . ."  *Id.* at 1.  Plaintiff Carter concludes his charge with the following declaration:

> I have been adversely affected by these discriminatory practices by being deprived of the equal opportunity to be hired.  Such discrimination denies me and other African-Americans the right to be hired for positions for which we are qualified. . . .  Based on my experiences, I believe that AK Steel Corporation has engaged and continues to engage in a pattern and practice of discrimination against its African-

14

> American applicants for employment . . . . I believe this policy has effected a class of black persons comprised of all past, present and future black applicants for employment with AK Steel. *I believe that these discriminatory practices occur throughout AK Steel Corporation. I make this charge on behalf of myself and all similarly situated African-American applicants for employment and employees.*

*Id.* at 2 (emphasis added). As portrayed, plaintiff Carter's charge was clearly sufficient to inform the E.E.O.C. and AK Steel that he was alleging discrimination against the defendant for its Laborer hiring practices throughout the company, including its discriminatory qualifying test, and that these allegations were made on behalf of a class of African-Americans. Because plaintiff Carter's charge was filed along with at least 15 other E.E.O.C. charges alleging discrimination in AK Steel's hiring practices, all alleging class claims, the E.E.O.C. and the defendant were sufficiently notified of a class action so that plaintiff Edwards may piggyback on plaintiff Carter's charge.

Even if plaintiff Edwards had filed an untimely E.E.O.C. charge, under binding Sixth Circuit precedent he could still be an adequate class representative for Middletown and a single class. In *Howlett*, the Sixth Circuit stated:

> The single filing rule serves to prevent a wooden application of the administrative charge requirement where the ends of the requirement have already been satisfied. The purpose of the single filing rule is no less well served in application to a potential plaintiff who has filed an untimely EEOC charge than to one who has never filed an administrative charge. A potential plaintiff who has filed an untimely EEOC charge is not given any more of a 'second bite at the apple' than any plaintiff who brings a civil action . . . after filing an EEOC charge.

*Howlett*, 49 F.3d at 196-97; *see also Smith v. Healthsouth Rehab. Center of Memphis, Ltd.*, 234 F. Supp. 2d 812, 816 (W.D. Tenn. 2002) ("Based on its review of the case law and the pleadings [including *Howlett*], the court finds that [plaintiff] may benefit from the single filing rule only if she did not file an EEOC charge at all *or if she filed a charge that was untimely.*") (emphasis added); *c.f., Binion v. Metropolitan Pier and Expos. Auth.*, 163 F.R.D. 117 (N.D. Ill. 1995) (class representatives

are allowed to establish an earlier limitations period based upon the earlier charge of another complainant). Therefore, plaintiff Edwards may rely upon the standard liability period established by plaintiff Carter's charge – back to August 12, 2001 – to demonstrate that his claim fell within the liability period and that he has standing based on this fact.

Finally, even if the Court determines that the current plaintiffs may not serve as class representatives for a testing class, clearly reasoned legal authority permits the Court to substitute another individual to serve as a proper class representative. *See Anderson v. Westinghouse*, 406 F.2d 248, 275 (4th Cir. 2005) (remanding case for consideration of class issue and instructing district court to consider whether a substitute plaintiff may satisfy Rule 23 prerequisites); *Little Caesar Enterprises, Inc. v. Smith*, 172 F.R.D. 236, 244 & n. 3 (E.D. Mich. 1997) (suggesting that plaintiffs will be allowed to substitute class representatives because "[a]ffording plaintiffs the opportunity to provide such substitutes is the common practice in cases where, although the current named representatives are inadequate, adequate representatives are known and available as substitutes").[11]

## B.    Plaintiffs Have Established Numerosity for a Middletown Subclass

The defendant's arguments regarding numerosity result from cases that do not follow Sixth Circuit precedent. *See* Doc. 73 at 20-22. Setting aside the fact that the defendant ignores the continuing violations doctrine in arguing that the proposed Middletown subclass is less than 56 individuals, its argument directly contravenes Sixth Circuit precedent providing that there exists no

---

[11] *See also Simmons v. Brown*, 611 F.2d 65 (4th Cir. 1979) (same); *Goodman v. Scheslinger*, 584 F.2d 1325, 1332-33 (4th Cir. 1978) (same); *c.f., Carpenter v. Stephen F. Austin St. Univ.*, 706 F.2d 608, 617-18 (5th Cir. 1983) ("if after the class has been certified and its claims heard and the representatives are found to be inadequate for some reason during the course of the class claims or during a bifurcated hearing with respect to individual claims, the appropriate step is appointment of new representatives from the existing class, not decertification") (citation omitted); *Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 572 (2d Cir. 1982) (same) (citing *East Texas Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 406 n.12 (1977)).

strict numerical test for determining impracticability of joinder. *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996) (citing *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 523 n.24 (6th Cir. 1976)). Even if the class action, or a Middletown subclass, is restricted to a liability period of September 9, 2001, or August 12, 2001, forward, there exists at least 17 identifiable members who have been harmed by the test (*see* Ex. 14), as well as the unknown number of future applicants that may be aggrieved by AK Steel's discriminatory qualifying exam.[12]

The defendant argues that numerosity may not be found on the basis of future applicants in the case at bar because of its cessation of Laborer hiring. *See* Doc. 73 at 21, 22-23. The defendant's argument in this regard fails to meet its burden of proving that injunctive relief is not required here. As the Supreme Court declared years ago, a case is moot for the purposes of awarding injunctive relief only "if the defendant can demonstrate that 'there is no reasonable expectation that the wrong will be repeated.' The burden is a heavy one." *U.S. v. WT Grant Co.*, 345 U.S. 629, 633 (1953) (citation omitted); *see also Weeks v. Chaboudy*, 984 F.2d 185, 189-90 (6th Cir. 1993) ("'although voluntary cessation of wrongful conduct does not automatically render a case moot, the case may nevertheless may be moot if the defendant can demonstrate that 'there is no reasonable expectation that the wrong will be repeated'") (quoting *Mosley v. Hairston*, 920 F.2d 409, 415) (6th Cir.1990)); *In re Southdown, Inc.*, 104 F. Supp. 2d 765, 769-770 (S.D. Ohio 1999) (same); *E.E.O.C. v. Alton Packaging Corp.*, 901 F.2d 920, 926 (11th Cir. 1990) ("If there is abundant evidence of past

---

[12] *See* D. Wright Affd. (Ex. 15); *see also Cross v. Nat'l Trust Life Ins. Co.*, 553 F.2d 1026, 1028, 1030 (6th Cir. 1977) (numerosity satisfied when class consisted of present and unidentified prospective black employees); *Afro Am. Patrolmens League v. Duck*, 503 F.2d 294, 298 (6th Cir. 1974) (numerosity satisfied when class consisted of 17 identified black applicants and unidentified future black employees); *Nash v. City of Oakwood, Ohio*, 94 F.R.D. 83, 88-89 (S.D. Ohio 1982) (numerosity satisfied when class consisted of 33 female applicants and unidentified future female applicants); *see also Kilgo v. Bowman Transp., Inc.*, 789 F.2d 859, 878 (11th Cir. 1986) (numerosity satisfied where class consisted of 31 individual members as well as future and deterred job applicants "which of necessity cannot be identified").

discrimination 'injunctive relief is *mandatory* absent clear and convincing proof that there is no reasonable probability of further noncompliance with the law.'") (citations omitted) (emphasis in original).  As the Supreme Court proceeded to declare:

> Along with its power to hear the case, the court's power to grant injunctive relief survives discontinuance of the illegal conduct. . . .  The purpose of an injunction is to prevent future violations, . . . and, of course, it can be utilized even without a showing of past wrongs.  . . .  The necessary determination is that there exists some cognizable danger of recurrent violation . . . .

*W.T. Grant*, 345 U.S. at 897-98.

Here, the defendant has not satisfied its "heavy burden" of demonstrating that there 'is no reasonable expectation that the wrong will not be repeated.'  AK Steel merely asserts that it has not hired in two years, has no plans to hire in 2006, is shrinking its workforce, and does not know when it may resume hiring.  Doc. 73 at 23.  Conspicuously absent is any declaration from the defendant that it will never use the test again for hiring purposes or for promotional opportunities within the company.  Indeed, AK Steel is currently in litigation against the Armco Employees Independent Federation ("AEIF") because it is currently employing approximately 2,700 hourly, bargaining unit employees instead of its contractual obligation of approximately 3,100 hourly, bargaining unit employees.  *See* Dennis D. Wright Affd. (attached as Ex. 15).  If the AEIF prevails in its litigation, AK Steel will be compelled to hire over 400 additional hourly, bargaining unit employees in the future.  *Id*.  Therefore, injunctive relief is still needed in this case as it is not beyond reason that the defendant will use its discriminatory, qualifying test again in the future.

## C.    Plaintiffs Have Demonstrated Commonality for a Middletown Subclass

The defendant's arguments against commonality for a Middletown subclass are minor and meritless.  *See* Doc. 73 at 23-25.  First, the defendant argues that the plaintiffs have not presented

any statistical analysis regarding the Middletown test class for the restricted time period of September 9, 2001, forward. As reflected previously in this Reply, plaintiffs have produced a statistical analysis during the restricted liability period proposed by the defendant (*see* Ex. 14), and plaintiffs' expert Dr. Bradley found that the defendant's test had a statistically significant impact during that period. *See* Ex. 14 at ¶¶ 6-8.[13] Moreover, the defendant's argument that plaintiffs' expert miscalculated the liability period is inconsequential due to the continuing violations doctrine discussed earlier in this Reply and the fact that defendant's critique addresses only Dr. Bradley's Supplemental Report, which was superceded by his Rebuttal Report after acquiring updated data.

Indeed, the defendant does not lodge any substantive critique against Dr. Bradley's finding that its test has a statistically significant impact upon African-American applicants, and neither does its expert, Dr. Baker.  The defendant characterizes as "flawed" Dr. Bradley's analysis of the testing component in the Rebuttal Report solely because he stated in the Supplemental Report that he could not perform such an analysis.  Doc. 73 at 25.  Dr. Bradley's analysis in the Rebuttal Report, however, is not flawed: Dr. Bradley merely used the data produced to defendant's expert (which Dr. Bradley did not have when he drafted his Supplemental Report) to analyze the impact of the hiring process components at Middletown.  Dr. Bradley's decision to analyze the components upon receiving the new data was not a "flaw"; it was sound expert practice given the new variables he had received. Likewise, the defendant's argument that Dr. Bradley included in his analysis applicants who withdrew from the hiring process is of no consequence.  *Id*.  Those particular applicants did not take the qualifying test, so their withdrawal has no bearing upon the analysis of the test's impact.  The

---

[13] Moreover, defendant's expert found statistically significant adverse impact (-2.09 standard deviations) against African-Americans in the hiring of Laborers at Middletown during the standard liability period.  Baker Rep. at 11 (attached to Def.'s Opp.).

plaintiffs have clearly met the commonality requirements of Rule 23 for a Middletown subclass by presenting evidence of a common practice and procedure used by the defendant at its Middletown facility – a test – that has had an adverse impact against African-American applicants.

**D.     Putative Class Representatives are Typical of Middletown Subclass**

AK Steel's arguments against typicality (Doc. 73 at 26) have been largely addressed previously in this memorandum.  Regarding the argument that plaintiff Edwards filed an untimely charge, and thus, is not typical of the class, the arguments in section III (*supra*, at pp. ___) regarding standing clearly demonstrate that not only does plaintiff Edwards have a timely claim, the Ashland plaintiffs who failed the test may also serve as class representatives for a single class covering both Ashland and Middletown or solely a Middletown subclass.

Further, the defendant's contention that plaintiff Edwards may not serve as a class representative because it has no record that he applied and took a test in 2001 does not preclude him from being typical of the putative class.  Individual defenses, such as whether plaintiff Edwards actually took and failed a test in 2001, do not defeat class certification at this stage.  *Wagner v. Nutrasweet Co.*, 95 F.3d 527, 534 (7th Cir. 1997) ("Typicality under Rule 23(a)(3) should be determined with reference to the company's actions, not with respect to particularized defenses it might have against certain class members.") (citation omitted); *Jeffreys v. Communication Workers of America*, 212 F.R.D. 320, 322 (E.D. Va. 2003) ("differences in the availability of certain defenses against the representative plaintiffs[] does not prohibit a finding of typicality as long as the claims are based on the same legal or remedial theory") (citations omitted); *Dietrich v. Bauer*, 192 F.R.D. 119, 125 (S.D.N.Y. 2000) ("a representative may satisfy the typicality requirement even though that party may later be barred from recovery by a defense particular to him that would not impact other

class members") (citations omitted); *Cook v. Rockwell Intl. Corp.*, 151 F.R.D. 378, 386 (D. Colo. 1993) ("a [statute of limitations] contention cannot serve to bar a class certification [because] an inquiry into a claimed affirmative defense impermissibly allows an issue going to the merits of the litigation to intrude upon the class certification analysis required by Rule 23").[14]  Inquiries into individualized defenses are merits determinations that should not be considered at this stage.[15] Moreover, as plaintiffs argued previously, if plaintiff Edwards's claim in invalid, then the Court may substitute a class member to serve as a class representative.

### E.    Plaintiffs Have Adequate Class Representatives

The defendant rehashes its argument about unique statute of limitation defenses against plaintiffs Edward and Freeman in its discussion of adequacy.  Plaintiffs have refuted the defendant's arguments in detail previously (*see* pp. 12-16), and thus, will rely upon those refutations to demonstrate that plaintiffs Edwards and Freeman are adequate class representative.  Regarding the defendant's argument that the named plaintiffs are not adequate representatives because they have not vigorously prosecuted this class action, plaintiffs will only proffer that this case has not occasioned any undue delay, and if so, plaintiffs are not to blame for such.  Finally, the defendant's statement that there is a conflict between the class and the named plaintiffs is a mere conclusion without any basis in fact.  Indeed, allegations of conflicts cannot be presumed, but must be proven

---

[14] *See also Lawson v. Metropol. Sanitary Distr. of Greater Chicago*, 102 F.R.D. 783, 793 (N.D. Ill. 1983) ("a class representative need not prove that his or her claim will succeed as a condition of representation");

[15] *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78 (1974) ("nothing in either the language or history of Rule 23 . . . gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action"); *see also Weathers v. Peters Realty Corp.*, 499 F.2d 1197, 1201 (6th Cir. 1974) ("when determining the maintainability of a class action, the district court must confine itself to the requirements of Rule 23 and not assess the likelihood of success on the merits").

to in fact exist.[16]  The defendant has not met its burden in this regard.

### F.    Certification Under Rule 23(b)(2) is Appropriate

AK Steel argues that because "hiring stopped in 2003 and it is not known whether or when

it will resume," there is no need here for injunctive relief and thus, certification under Rule 23(b)(2)

is inappropriate.  As plaintiffs addressed previously, the standard for mooting injunctive relief, which

is a "heavy burden" for the defendant, is that "there is no reasonable expectation that the wrong will

be repeated."  *See U.S. v. WT Grant Co.*, 345 U.S. 629, 633 (1953); *Weeks v. Chaboudy*, 984 F.2d

185, 189-90 (6th Cir. 1993).  Plaintiffs have already demonstrated previously (*supra*, at pp. 17-19)

that the defendant cannot meet this "heavy burden."  Therefore, their argument as to Rule 23(b)(2)

certification is without merit.

### G.    Certification Under Rule 23(b)(3) is Appropriate

The defendant argues that certification under Rule 23(b)(3) is also inappropriate because 8

of the 17 named plaintiffs are not proposed class members regarding the testing claim, and thus,

there is no "common question" in the case at bar.  Plaintiffs fail to comprehend the relevance of the

defendant's observation.  All the class needs is one class representative; the fact that 8 of 17 named

plaintiffs are not putative class members is wholly irrelevant.

Similarly, the defendant's concerns with individualized determinations regarding who should

be hired are unfounded.  In *In re: Allstate Insurance Co.*, 400 F.3d 505 (7th Cir. 2005), the Seventh

Circuit ruled that the determination of liability regarding each class member's ERISA claim may be

---

[16] *See e.g., Payne v. Travenol Laboratories, Inc.*, 673 F.2d 798, 811 (5th Cir. 1982) ("A Court should not lightly reject a black female's claim to represent all blacks and females in a sex and race discrimination suit.  Rather than determine the question of conflict abstractly, the Court must examine the interlacing allegations of race and sex discrimination to determine whether an actual conflict exits."); *Social Services Union, Local 535 v. County of Santa Clara*, 609 F.2d 944, 948 (5th Cir. 1979) ("[M]ere speculation as to conflicts that may develop in the remedy stage is insufficient to support denial of initial class certification.").

individualized because it had to be determined if they compelled to quit or had voluntarily terminated their employment. Nevertheless, the Seventh Circuit sanctioned a class adjudication structure where the lower court first determines whether the employer had a policy affecting a class, rather than litigating that issue in a "thousand separate lawsuits," and then holding individual hearings to determine which class members were actually affected by the policy. *Id*. at 508.

More importantly, there exists ample authority sanctioning the use of a class award distributed among class members pursuant to a formula when the determination of which putative class members were actually deserving of selections will be speculative at best. *See McClain v. Lufkin Industries*, No. 9:97-CV-063, at 16-18, 31-33 (E.D. Tex. Jan. 13, 2005) (attached as Ex. 16) (citing precedent and authority and therewith awarding backpay to a class on a disparate impact claim based upon a formula approach). For a case of this scope, the backpay award to the putative class members based upon a formula would not be onerous nor prejudicial.

## IV.    IF THE COURT DOES NOT CERTIFY ONE CLASS, THEN A SEPARATE CLASS MAY BE MAINTAINED AT ASHLAND

Contrary to the defendant's arguments (*see* Doc. 73 at 12-14), a separate class may be maintained for Ashland applicants if the Court determines that subclasses are appropriate. First and foremost, plaintiffs demonstrated previously that the statistical analysis finding the disparate impact of the Middletown test may serve as evidence of discriminatory impact at Ashland due to the defendant's failure to maintain adequate data that would reflect his impact. *See U.S. v. City of Warren*, 138 F.3d 1083 (6th Cir. 1998). Moreover, numerosity for such a class will be satisfied when one includes future applicants in the impracticability of joinder analysis. The presence of future applicants also make injunctive relief appropriate, as argued previously.

As the defendant conceded (Doc. 73 at 12), because Ashland failed to retain adequate data the plaintiffs may maintain a challenge against the impact of the total hiring process at Ashland.[17] Plaintiffs' expert Dr. Bradley demonstrated the statistically significant impact of this total hiring process in his Rebuttal Report, which relied upon data produced by defendant's expert Dr. Baker. *See* Ex. 2 at 10-11. The defendant attempted to attack Dr. Bradley's findings in its Opposition (*see* Doc. 73 at 12-14), yet, its critique relied upon Dr. Baker's response to Dr. Bradley's Supplemental Report, not the subsequently produced Rebuttal Report. The defendant's only references to Dr. Bradley's Rebuttal Report is that Dr. Baker responded to it in a document attached to its Opposition. Doc. 73 at 13, 14. The defendant fails, however, to present in its Opposition any of the details of Dr. Baker's refutation. The plaintiffs should not be required to guess what the defendant's arguments are in this regard.

Nonetheless, Dr. Bradley's Rebuttal Report, as shown in plaintiffs' Class Certification Memorandum, properly answered Dr. Baker's concerns and still demonstrated impact in the total hiring process at Ashland. Moreover, Dr. Bradley highlighted significant flaws in Dr. Baker's statistical analysis, notably that she modeled her analysis on data where 28.6% of the applicants were of unknown race (and thus could not be counted). Even more damaging, Dr. Baker used a binomial methodology for her analysis, which is only proper in circumstances (unlike here) where "there is a proxy estimate of the racial composition of the applicant pool from an independent source (such

---

[17] 42 U.S.C. § 2000e-2(k)(1)(B)(i) provides as follows:

With respect to demonstrating that a particular employment practice causes a disparate impact . . . , the complaining party shall demonstrate that each particular challenged employment practice causes a disparate impact, except that if the complaining party can demonstrate to the court that the elements of a respondent's decisionmaking process are not capable of separation for analysis, the decisionmaking process may be analyzed as one employment practice.

as Census data), and the size of the applicant pool is unknown."  Ex. 2 at 4-5, 8-9.

In any event, contentions between experts should not be considered at the class certification stage.  *See Caridad v. Metro-North Commuter Railroad*, 191 F.3d 283, 292 (2d Cir. 1999) ("'statistical dueling' is not relevant to the certification determination") (citing *Krueger v. New York Telephone Co.*, 163 F.R.D. 433, 440-41 (S.D.N.Y. 1995)).  Because this 'statistical dueling' and the numerosity consideration are the only contentions the defendant raises as to the maintenance of a separate Ashland class action, both of which have been effectively refuted by plaintiffs, the Court should certify separate subclasses for Ashland and Middletown if such are warranted in this case.

## CONCLUSION

WHEREFORE, PREMISES CONSIDERED, plaintiffs respectfully request the Court to grant their Motion for Class Certification.

Respectfully Submitted,

*/s/ Herman N. Johnson, Jr.*
Robert F. Childs, Jr. (ASB-2223-C-60R)
Herman N. Johnson, Jr.(ASB-3607-R50J)
**WIGGINS, CHILDS, QUINN & PANTAZIS**
The Kress Building
301 19th Street North
Birmingham, Alabama 35203
(205) 328-0640
(205) 254-1500 (facsimile)

Tobias, Kraus & Torchia, LLP
414 Walnut Street
Suite 911
Cincinnati, Ohio 45202
(513) 241-8137
(513) 241-7863 (facsimile)

25

## CERTIFICATE OF SERVICE

I do hereby certify that on December 21, 2005, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:


Gregory Parker Rogers
Lawrence James Barty
Patricia Anderson Pryor
Taft, Stettinius & Hollister, LLP
1800 First Star Tower
425 Walnut Street
Cincinnati, OH 45202
Fax: (513) 381-0205



*/s/ Herman N. Johnson, Jr.*
OF COUNSEL

26

## <u>LIST OF EXHIBITS</u>

Ex. 14:          Declaration of Dr. Edwin L. Bradley

Ex. 15:          Affidavit of Dennis D. Wright

Ex. 16           *McClain v. Lufkin Industries*, No. 9:97-CV-063, at 16-18, 31-33 (E.D. Tex. Jan. 13, 2005)

Ex. 17           Susan Lester Deposition Excerpts

Ex. 18           Phyllis Short Deposition Excerpts