*EXHIBIT NO. 16*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION

| | | |
|---|---|---|
| SYLVESTER MCCLAIN, on his own behalf and on behalf of a class of similarly situated persons, et al.<br>　　　　Plaintiff<br><br>V.<br><br>LUFKIN INDUSTRIES,<br><br>　　　　Defendant | § § § § § § § § § § | Case No. 9:97-CV-063<br>Judge Howell Cobb |

## MEMORANDUM AND ORDER

### I. Introduction

Plaintiff class members sued Lufkin Industries, alleging disparate impact employment discrimination in Lufkin's initial assignments to jobs, promotions, and compensation. After reviewing the anecdotal and statistical evidence presented by both sides, the court concludes that plaintiffs have proven their case and are entitled to back pay and injunctive relief. Having received suggested findings of fact and conclusions of law from both parties, the court will not file a separate findings of fact. In lieu thereof, the following memorandum and order will serve as findings of fact and conclusions of law.

### II. Factual Scenario

#### A. Background

Several ago, plaintiffs Sylvester McClain and Buford Thomas sued Lufkin Industries for employment discrimination. The plaintiffs' claims were certified as a class action in 1999. *McClain v. Lufkin Indus.*, 187 F.R.D 267 (E.D.Tx 1999). The court also designated eleven

additional class representatives.  The case was closed from 2001-2003 while the parties

attempted mediation, but that mediation failed.  Between filing and trial, a number of claims

were dropped with prejudice, including plaintiffs' general claim of disparate treatment.  Only

the claims of discrimination in initial assignments, promotions, and compensation went to trial.[1]

---

[1]In its proposed pretrial order, Lufkin submitted a list of 96 witnesses that it intended to call before the court.  Because the court was of the opinion that the testimony of so many witnesses would be duplicative, redundant, and largely irrelevant to the issues raised by a claim of disparate impact, it limited each party to 20 hours each in which to present its case.  Lufkin protested the limitations when they were imposed and renewed its objection numerous times thereafter.  After the close of trial, Lufkin submitted offers of proof on behalf of more than a dozen witnesses that it stated it would have called but for the court's time constraints.  The court, having reviewed those offers of proof, finds that they contained no probative information and would not have affected the court's ruling even if the witnesses had testified.

With one exception, the offers can be divided into two groups: those on behalf of Lufkin management and those on behalf of class members.  Lufkin called most of its representatives at trial and elicited testimony on Lufkin's formal policies and procedures.  The offers of proof did not contradict that testimony, nor did they supplement it in any meaningful form.  The offers from Richard Gilley, David Jinkins, Larry Long, and Steve Reynolds all included the same information and followed the same format, reiterating the statements Lufkin made at trial.  The different individual information offered, such as which jobs are supposed to be posted and which jobs are awarded on the basis of ability, is not new evidence to the issues before the court.

The offers on behalf of the class members would have been probative, had the plaintiffs retained their claim for disparate treatment.  After reviewing those offers of proof, the court remains satisfied that many Lufkin managers and supervisors are not racists, that blacks have the opportunity to advance (at least to a certain level) at Lufkin Industries, and that many of the class members appreciate the jobs they hold at Lufkin.  Similar statements were offered at the class certification hearing and at trial.  The court was convinced of those facts before reading the offers of proof and none of the proposed testimony contained therein is particularly probative to a claim of disparate impact.

The one exception to those two categories is the offer of proof for Lisa Dungan, an employee of plaintiffs' counsel who supervised a review of the first database used by Dr. Baker.  That database was riddled with flaws and inaccuracies and Lufkin produced a second, revised database on the eve of trial.  The court accepts *arguendo* the proposition that Lufkin's new database is more accurate than the initial database it produced.  Ms. Dungan, however, never saw the second database.  As that would be the extent of her testimony, the court does not consider it particularly relevant that Lufkin "lacked the time" to recall Ms. Dungan to say so.

Lufkin Industries is a publicly traded corporation headquartered in Lufkin, Texas. It is headed by Chief Executive Officer Doug Smith. Smith is also Chairman of the eight-member Board of Directors. The company is divided into four production divisions: Foundry, Trailer, Oilfield, and Power Transmission. Each division is run by a vice-president and/or general manager with considerable policy-setting authority. The corporate sector manages the general affairs and internal workings of the company. In the more than 100 years that Lufkin Industries has been in business, no woman or person of color has ever been on the Board of Directors or headed a division.

Each production division performs different tasks. The Foundry takes molten metal and shapes it into castings for commercial sale and use in Lufkin's other divisions. The Trailer division's products - freight vans, flatbeds, and floats - can be seen throughout the nation's highways. The Oilfield division makes oil pumping units and services and repairs those units. The Power Transmission division uses high-tolerance machines to produce heavy industrial gearing; some of its equipment can hold tolerances of a few microns.[2]

The working conditions in the various divisions differ greatly. The Foundry's work environment combines sweltering heat, deafening sound, and a thick layer of dirt and soot. The work is heavy and physically demanding. In contrast, workers in the Power Transmission division use sophisticated machinery in a clean, air-conditioned environment. The workers in the Foundry are disproportionately black and Hispanic; the workers in Power Transmission are disproportionately white. The Oilfield and Trailer divisions constitute a middle ground of desirability between the Foundry and Power Transmission. Every division offers career

---

[2]A micron is 1/1000th of a milimeter

3

opportunities and the potential for advancement, but there is a general hierarchy of pay that corresponds to working conditions.

**B. Initial Assignments**

Entry-level jobs in Lufkin's workforce are available solely through the Texas Workforce Commission ("TWC"). The TWC maintains a database of job applicants, which it consults when Lufkin submits a job requisition. After the TWC receives a job requisition, it creates a work order for the requested positions. The TWC checks its database and selects applicants who meet the stated minimum eligibility requirements for a job (such as a high school diploma or prior industrial experience). Some of Lufkin's entry-level positions, particularly in the Power Transmission and Oilfield divisions, now require a high school-level education.[3] Approximately 91% of blacks and 90% of whites hired by Lufkin meet that minimum qualification. In the Foundry, 90% of blacks and 85% of whites have a GED, high school diploma, and/or some post-high school education.

Once the TWC has assembled a group of qualified applicants, it refers them to the Lufkin personnel assigned to make the hiring decision. Once a TWC client is referred to Lufkin, the TWC steps out of the picture. The TWC has no input as to whether an individual applicant is hired for any given position.

Hiring decisions are made by Lufkin representatives, usually Viron Barbay, who travel to the TWC's offices to interview job applicants. Mr. Barbay interviews the applicants in the order in which they submit their application forms to the TWC reception. At the beginning of the class period, Barbay would make a first cut of the applicants, referring selected candidates to the

---

[3]Lufkin defines this as a high school diploma or GED.

4

Lufkin production managers for a second and decisive interview.  But for some time now, Mr. Barbay has had sole authority to make the hiring decisions.  At various times during the class period, Barbay was assisted or supplemented by other Lufkin HR employees, but Barbay testified that he was responsible for most of the hiring decisions during the class period.  When Barbay did receive assistance, the other Lufkin HR personnel were invariably white.  In theory, each applicant was always referred by the TWC for the specific job for which he or she applied

### C. Promotions

#### 1. Hourly Jobs

Advancement through the ranks of hourly workers at Lufkin Industries is putatively governed by the Collective Bargaining Agreement ("CBA") between Lufkin and the three unions that represent the hourly workers.  Seniority is the main criterion, but ability is also a necessary qualification.  Once a worker moves past the entry-level unskilled jobs, that  worker usually needs training to get the skills needed for more advanced positions.  That training often comes on the job, when as workers are assigned daily tasks that developed skills and abilities.  Lufkin also makes additional training available outside the work day and reimburses tuition  for employees who choose to attend Angelina College.

All qualified employees[4] are eligible to bid on new job openings.  The company must post bid sheets for each new hourly opening, then give interested workers several days to sign their name.  After two to three days (depending on the division), the bid sheets are taken down and the job is to be awarded to the most senior bidder.  According to the CBA, Lufkin need not

---

[4]"Qualified" employees must have, at a minimum, satisfactory attendance/discipline record and at least 90 days working for Lufkin.

award the job to the most senior bidder, if the new job would constitute a lateral move or demotion. In theory, the posting process is a rigid and inflexible system that ensures the promotion of the most senior qualified person interested in the job.

Although seniority is the paramount qualification listed in the CBA, Lufkin has established several other rules that affect promotions. For some positions, Lufkin requires an "objective" test that generally involves a demonstration of basic math, literacy, and competence with the relevant machinery. Some of the criteria are objectively verifiable, such as math skills or reading ability. Other criteria are left to the satisfaction of individual managers.

To ensure that competent workers occupy all positions, the company has also inserted an "ability" clause in the CBA that allows Lufkin to fill positions on the basis of ability and regardless of seniority. The ability clause appears to trump all other considerations.

The "bypass" rule is an exception to the seniority rule. It states that an employee will not receive a position on first shift (i.e., the most-desired daytime shift) unless that employee has spent at least two years on a nighttime shift or has twice been "bypassed" for promotion by less-senior employees with the nighttime shift qualification.

### 2. Salaried positions

Salaried jobs are sometimes posted, but they are not governed by the CBA and can be filled by anyone deemed suitable by Lufkin management. Lufkin has complete discretion to promote from within or hire from outside the company. Salaried positions do not necessarily pay more than hourly positions; in some cases, a worker at the top of the pay range for an hourly position would be taking a pay cut to accept a salaried position. However, salaried positions are

6

often less physically demanding and offer the potential for advancement up the corporate ladder to the lucrative positions in management.

## III. Legal Issues

### A. Maintaining Class Standing

To maintain their class certification, plaintiffs had the burden to show that they met the four requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. Fed. R. Civ. P. 23(a). Because the case has gone forward under Rule 23(b)(2), the plaintiffs must also show that Lufkin has acted on grounds generally applicable to the class. For the same reasons discussed in the class certification motion, the court finds that each requirement has been satisfied. *McClain*, 187 F.R.D. at 277-82. The plaintiffs' decision not to pursue individual damages ensures that injunctive relief - rather than monetary relief - predominates. *See Allison v. Citgo*, 151 F.3d 402, 413 (5th Cir. 1998).

Lufkin has entered a motion challenging the adequacy of representation by each of the class members other than Sylvester McClain and Buford Thomas. The court is of the opinion that, given the length of the trial, the court's decision to proceed in Beaumont rather than Lufkin, and the demands of the representatives' respective jobs at Lufkin's facility in Angelina County, all named class members have maintained themselves as adequate representatives.

### B. Exhaustion of administrative remedies

As this court has already decided, Sylvester McClain's January 29, 1995 letter to the EEOC was sufficient to exhaust administrative remedies on the class claims of discrimination in initial assignments, promotions, and compensation. *See McClain*, 187 F.R.D. at 271; Orders entered 3/31/1999, Dkt #309 (denying Lufkin's motion for summary judgment on plaintiffs'

7

initial assignment claim as being outside the scope of McClain's EEOC charge). As long as an

EEOC investigation could reasonably be expected to grow out of the initial charge, the

requirement for exhaustion of administrative remedies is satisfied. *Fine v. GAF Chem. Corp.*,

995 F.2d 576, 578 (5th Cir. 1993). An EEOC charge is to be construed liberally, particularly

when it is prepared by a layperson. *See Clark v. Kraft Foods, Inc.*, 18 F.3d 1278 (5th Cir. 1994)

("[L]iberal construction [is] accorded EEOC charges, especially those by unlawyered

complainants." Id. at 1280 n.7, quoting *Fellows* at 451; *Price v. Southwestern Bell Tel. Co.*, 687

F.2d 74, 78 (5th Cir. 1982) ("Consistent with the remedial purposes underlying Title VII, we

construe employment discrimination charges with the 'utmost liberality,' bearing in mind that

such charges are generally prepared by laymen untutored in the rules of pleading."), quoting

*Terrell v. U.S. Pipe & Foundry Co.*, 644 F.2d 1112 (5th Cir. 1981); *see also Anjelino v. New*

*York Times Co.*, 200 F.3d 73, 93-95 (3d Cir. 1999) (allowing sexual harassment claims to

proceed even  though the allegations were not specifically pled in the EEOC charges; plaintiffs'

use of the term "abusive atmosphere" was sufficient to put defendant on notice). When the

EEOC charge complains of systemic or widespread abuses, as McClain's 1995 charge did, it can

reasonably be expected to produce a class-wide investigation. *See Richardson v. Byrd*, 709 F.2d

1016, 1020 n.4 (5th Cir. 1983) (rejecting argument that the class claim was barred because of

failure to complain of class-wide discrimination in the EEOC complaint, and holding, "a class

action may be based upon an EEOC complaint of individual discrimination as long as an 'EEOC

investigation of class discrimination . . . could reasonably be expected to grow out of [the]

allegations in [the] initial EEOC charge.' ") *quoting Fellows v. Universal Restaurants*, 701 F.2d

447, 451-52 (5th Cir. 1983)). EEOC procedural regulations provide that a "charge is sufficient"

8

when it "identif[ies] the parties and ... describe[s] the action or practices complained of." *See*

*Foster v. Ruhrpumpen*, 365 F.3d 1191, 1196 (10th Cir. 2004) ("Because the charges as filed

'identify the parties' and 'describe generally the action or practices complained of,' 29 C.F.R. §

1601.12(b), they satisfy the requirements set forth in the EEOC regulations.").

 The administrative exhaustion requirement also exists to help the EEOC act effectively as

an investigator and mediator. *Clayton v. Rumsfeld*, 2004 WL 1739465, *3 (5th Cir. 2004)

(unpublished). If the EEOC is given no reason to investigate particular claims, it has no chance

to resolve the underlying problems *Id.* In Lufkin's case, however, McClain's EEOC's charge

was written while the OFCCP was investigating claims similar to those now before the court.

The EEOC and OFCCP share overlapping enforcement responsibilities, *see* 64 Fed. Reg. 17664

(1999), and it seems only reasonable to take into account on-going federal investigations when

considering what an agency might have known. Given the broad scope of McClain's claims and

the obvious facial disparities in initial assignments, promotions, and compensation, it would be

reasonable to expect an investigation into those issues to arise out of McClain's initial EEOC

charge.

 The court, having heard and considered all of the evidence presented at trial, reaffirms its

previous finding that McClain successfully stated a charge that went beyond his own personal

grievances and encompassed the claims now before the court. McClain therefore exhausted his

administrative remedies before filing suit. There is no need for other class members to do so;

they may "piggyback" onto McClain's efforts. *Albemarle Paper Co. v. Moody*, 422 U.S. 405,

414 n.8 (1975).

**C. Satisfying the Legal Requirements for a Claim of Title VII Disparate Impact**

Plaintiffs have the burden to identify an employment practice that is facially fair but produces discriminatory results. *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971). "[T]he necessary premise of the disparate impact approach is that some employment practice, adopted without a deliberately discriminatory motive, may in operation be functionally equivalent to intentional discrimination." *Watson v. Fort Worth Bank & Trust Co.*, 487 U.S. 977, 987 (1985). Plaintiffs establish a *prima facie* case of disparate impact by (1) identifying the specific employment practices being challenged, (2) establishing the disparate impact of the practices on the protected group, and (3) demonstrating that the disparity is the result of one or more of the employment practices identified. *Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 656-57 (1989).

Plaintiffs are generally required to show that each challenged employment practice "causes" a disparate impact. 42 U.S.C. § 2000e-2(k)(I)(B)(I). However, if plaintiffs can demonstrate that the elements of an employer's decision making process are not capable of separation for analysis, then the entire decision making process may be analyzed as a single employment practice. *Id.*; *see also McClain*, 187 F.R.D. at 273; *Munoz v. Orr*, 200 F.3d 291, 304 (5th Cir. 2000) ("where a promotion system uses tightly integrated and overlapping criteria, it may be difficult as a practical matter for plaintiffs to isolate the particular step responsible for observed discrimination."); *Malave v. Potter*, 320 F.3d 321, 327 (2d Cir. 2003) ("a decision making process may be analyzed as a single employment practice if the complaining party can demonstrate to the court that the elements of [the employer's] decision making process are not capable of separation for analysis.") (internal quotation marks and citation omitted); *Bannister v.*

10

*Dal-Tile Int'l, Inc.*, No. Civ. A. 3:02-CV-2498, 2003 WL 21145739, at *2 (N.D. Tex. 2003)

(plaintiff can bypass the requirement of pinpointing the specific employment practice or

practices that caused the alleged disparate impact by showing that "the factors of [a defendant's]

decision-making process are so interwoven that they are incapable of separation."); *Stender v.*

*Lucky Stores, Inc.*, 803 F. Supp. 259, 335 (N.D.Cal. 1992) ("[w]here the system of promotion is

pervaded by a lack of uniform criteria, criteria that are subjective as well as variable,

discretionary placements and promotions, the failure to follow set procedures and the absence of

written policies or justifications for promotional decisions, the court is not required to 'pinpoint

particular aspects of [the system]' that are unfavorable to women," and finding "that the

elements of [the employer's] subjective and ambiguous decision making processes are not

separable for the purposes of analysis, and therefore may be analyzed as one employment

practice."); *Butler v. Home Depot, Inc.*, 984 F. Supp. 1257, 1264 (N.D. Cal. 1997); *Schallop v.*

*New York State Dept. of Law,* 20 F. Supp. 2d 384, 402 (N.D. N.Y. 1998) ("[Plaintiff] contends

that because it would be impossible to isolate one particular aspect of the reappointment process,

the entire process may be characterized as a single employment practice. When employment

decisions are made based on variable, subjective criteria, this approach is appropriate under Title

VII."); 137 Cong. Rec. S15276 (daily ed. Oct. 25, 1991) (explanation of § 2000e-2(k)(1)(B)(i) in

the legislative history, that "When a decision-making process includes particular, functionally-

integrated practices which are components of the same criterion, standard, method of

administration, or test … the particular, functionally-integrated practices may be analyzed as one

employment practice."), *quoted in Appleton v. Deloitte & Touche L.L.P.*, 168 F.R.D. 221, 226

(M.D. Tenn. 1996).

The causal element is satisfied with respect to discretionary and subjective employment decision making practices where an employer lacks objective criteria or guidelines for making those decisions, and leaves the decision making to the discretion of members of the majority group. *See Stender*, 803 F. Supp. at 320-21 (listing cases supporting that proposition). The mere presence of subjectivity does not raise an inference of discrimination. *Watson*, 487 U.S. at 990. But when discretionary, subjective decision making is supplemented by evidence that subconscious stereotypes and prejudice operate in a vacuum created by the absence of objective, validated criteria, causation can be found. *See Id.*; *Stender*, 803 F. Supp. at 321; *Butler*, 984 F. Supp. at 1264

Once plaintiffs establish a *prima facie* case of disparate impact, the burden shifts to the employer to show that the challenged employment practice is job related for the position(s) in question and consistent with business necessity. 42 U.S.C. § 2000e-2(k)(1)(A)(i); *see Carpenter v. Stephen F. Austin State Univ.*, 706 F.2d 608, 621 (5th Cir. 1983); *EEOC v. Premier Operator Servs, Inc.*, 113 F. Supp. 2d 1066, 1075 (N.D. Tex. 2000). Under *Griggs*, in order to prove business necessity, an employer must show that its selection criteria bears "a manifest relationship to the employment in question." *Griggs*, 401 U.S. at 432. In *Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 650 (1989), the Supreme Court lowered this standard, requiring only the employer show that the challenged practice, "serves, in a significant way, the legitimate employment goals of the employer." *Id.* at 659. The 1991 Civil Rights Act overruled this aspect of *Wards Cove*, *see Stender*, 803 F. Supp. at 321 & n. 20, underscoring the principle that the business necessity standard is once again an exacting one. *See Watkins v. Scott Paper Co.*, 530 F.2d 1159, 1168 (5th Cir. 1976) (business necessity requires that the employment

12

practices "must not only directly foster safety and efficiency ... but also be essential to those goals.").

Even if an employer successfully mounts a business necessity defense, a plaintiff may overcome that defense by demonstrating the existence of an alternative employment practice which serves the employer's business necessity without causing the adverse impact, and which the employer had refused to adopt, 42 U.S.C. § 2000(e)(k)(1)(B)(ii); *see also Premier Operating Servs.*, 113 F. Supp. 2d at 1075; *Stender*, 803 F. Supp. at 322.

### D. Supporting a claim of disparate impact with statistical evidence

Anecdotal evidence of discrimination against individuals brings the cold statistics to life and may buttress the showing of class wide discriminatory practice. *See Int'l Bhd. of Teamsters*, 431 U.S. 324, 339 (1977). However, plaintiffs need not prove any individual case of discrimination to prevail on a pattern or practice disparate impact claim. *Id.* at 342, n. 24; *Bernard v. Gulf Oil Corp.*, 841 F.2d 547, 568 (5th Cir. 1988). The essence of a pattern or practice claim lies in the absence of evidence; while no individual has a clear-cut claim, the group as a whole has presented evidence establishing the unquestioned presence of discrimination.

Statistical proof alone can make out a *prima facie* case of disparate impact. *Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 650 (1989); *Teamsters*, 431 U.S. at 339. To establish causation, statistics must be "of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group." *Watson*, 487 U.S. at 994. However, "[a] plaintiff in a Title VII suit need not prove discrimination with scientific certainty; rather, his or her burden is to prove discrimination

13

by a preponderance of the evidence." *Bazemore v. Friday*, 478 U.S. 385, 400 (1986). "[A]s long as the court may fairly conclude, in light of all the evidence, that it is more likely than not that impermissible discrimination exists, the plaintiff is entitled to prevail." Id. at 400-401; *Siler-Khodr v. Univ. of Texas Health Science Ctr. San Antonio*, 261 F.3d 542, 547 (5th Cir. 2001), *quoting Bazemore*.

As this court has previously held in this case, "There are no bright-line rules regarding what degree of statistical disparity is necessary to support a disparate impact claim. Traditionally, the statistics must show a 'gross disparity' in how the different races are affected. … A deviation greater than three standard deviations is sufficient to support a prima facie case."). Class Certification Order, 187 F.R.D. at 276 (citations omitted). *See Thomas v. Deloitte Consulting LP*, No. 3-02-CV-0343-M, 2004 WL 1960097, at *5 (N.D. Tex. 2004) ("The Fifth Circuit has never adopted a 'bright line' test for statistical significance. Indeed, most courts have rejected the arbitrary application of a 5% threshold.") (internal citation omitted); *Rendon v. AT & T Technologies*, 883 F.2d 388, 397-98 (5th Cir. 1989) (rejecting argument that there is a strict legal benchmark requiring a particular number of standard deviations to demonstrate that data has statistical significance). Moreover, "[w]hether a given [test result] should be regarded as statistically significant must be determined on a case by case basis since the value signifying statistical significance is dependent upon sample size." *Overton v. City of Austin*, 871 F.2d 529, 544 (5th Cir. 1989) (Jones, J., concurring).

A disparity of 1.96 or more standard deviations is a generally accepted metric for statisticians looking to establish statistical significance. *Palmer v. Shultz*, 815 F.2d 84, 96 n.9 (D.C. Cir. 1987) (adopting a threshold of 1.96 standard deviations as sufficient to raise an

14

inference of discrimination based on the Supreme Court's language in *Castenada* and *Hazelwood*); *Albemarle Paper Co.*, 422 U.S. at 431. Even statistical disparities falling just short of the traditional standard of 2 (or 1.96) standard deviations may sometimes be meaningful, since consistent shortfalls in every category are probative of a pattern of discrimination, especially when other evidence confirms allegations of discrimination. *See e.g., E.E.O.C. v. Am. Nat'l Bank*, 652 F.2d 1176, 1192 (4th Cir. 1981), *cert. denied*, 459 U.S. 923 (1982) (rejecting employer's argument that the plaintiff's statistics were not probative unless they exceeded two or three standard deviations, holding that "well short of three standard deviations, the probability levels for chance as explanation have already dropped far below the point at which courts of law concerned with proof by the 'greater weight' or 'preponderance' of the evidence would presumably have discarded the hypothesis of chance."); *Malave v. Potter*, 320 F.3d 321, 327 (2d Cir. 2003) (courts generally consider a statistically significant disparity of two standard deviations to be sufficient to warrant an inference of discrimination in a prima facie case of disparate impact.) *See also Kadas v. MCI Systemhouse Corp.*, 255 F.3d 359, 362, 363 (7th Cir. 2001); *Thomas*, 2004 WL 1960097, at * 5; *Payne v. Travenol Laboratories, Inc.*, 673 F.2d 798, 821 (5th Cir. 1982).

Despite the necessary primacy of statistical evidence, proof of intent remains relevant to a claim of disparate impact employment discrimination. "The distinguishing features of the factual issues that typically dominate in disparate impact cases do not imply that the ultimate legal issue is different than in cases where disparate treatment analysis is used. . . . Rather, the necessary premise of the disparate impact approach is that some employment practices, adopted without a deliberately discriminatory motive, may in operation be functionally equivalent to

15

intentional discrimination." *Watson*, 487 U.S. at 987 (citation omitted). Evidence of

discriminatory intent can buttress and bolster statistical data, while also serving to rebut a

defense of business necessity.

### E. Establishing Damages

Plaintiffs who prove their claims of discrimination remain entitled to injunctive relief.

That relief includes back pay and is limited to those who can demonstrate that they were at least

"potential victims." *Teamsters*, 431 US at 367. Back pay is not automatically awarded simply

because a plaintiff has proven racial discrimination. *U.S. v. Ga. Power Co.*, 474 F.2d 906, 922

(5th Cir. 1973). It is to be awarded only when "properly owing to the plaintiffs." *Id*. However,

when it is properly owing, the court should not confuse the impossibility of precise

ascertainment with the impossibility of relief. *Pettway v. American Cast Iron Pipe Co.*, 494 F.2d

211, 260 (5th Cir. 1974). When plaintiffs have demonstrated that they are owed back pay,

relief must also be crafted to avoid a "quagmire of hypothetical judgments." *Id*. Any

uncertainty is to be settled in favor of the prevailing plaintiffs and against the discriminating

employer. *Johnson v. Goodyear Tire & Rubber Co.*, 491 F.2d 1364, 1380 n. 53 (5th Cir. 1974).

The preferred *Teamsters* method requires each class member to establish damages

individually, but a departure from that approach is justified when subjective employment

practices, including lack of objective hiring criteria and word-of-mouth recruitment, "make[] it

difficult to determine precisely which of the claimants would have been given a better job absent

discrimination, but it is clear that many should have." *Domingo II*, 727 F.2d at 1444; *Dukes v.

Wal-Mart Stores, Inc.*, 222 F.R.D. 167, 176 (N.D.Cal 2004). As the *Domingo* court further

explained: 'When the class size or the ambiguity of promotion or hiring practices or the illegal

practices continued over an extended period of time calls forth [a] quagmire of hypothetical judgment ... a class-wide approach to the measure of back pay is necessitated.'" *Id. quoting Pettway* , 494 F.2d at 261; *See also EEOC v. O & G Spring & Wire Forms Spec. Co.,* 38 F.3d 872, 879-880 & n. 9 (7th Cir.1994) (approving district court's use of formula approach); *Hameed v. Int'l_Ass'n of Bridge Workers, Local 396,* 637 F.2d 506, 520, 521 & n. 18 (8th Cir.1980) (same) (and cases cited therein); *Stewart v. Gen'l Motors Co.,* 542 F.2d 445, 452-53 (7th Cir.1976) (same) (and cases cited therein); *EEOC v. Chicago Miniature Lamp Works,* 668 F. SUPP. 1150, 1151-52 (N.D.Ill.1987); *Green v. United States Steel Corp.,* 640 F. SUPP. 1521, 1525-26 (E.D.Pa.1986), *aff'd in part and vacated in part on other grounds,* 843 F.2d 1511 (3rd Cir.1988), *vacated in part on other grounds,* 490 U.S. 1103, 109 S. Ct. 3151, 104 L. Ed.2d 1015 (1989).

The Fifth Circuit has approved the use of racially drawn, class-wide formulas, but only as a last resort. *U.S. Steel,* 520 F.2d at 1055-56. Using a formula generates a windfall for some employees who were never actually harmed by discrimination. *Stewart,* 542 F.2d at 452-453; *Pettway,* 474 F.2d at 262; *O & G Spring & Wire Forms,* 38 F.3d at 879. *Hameed,* 637 F.2d at 519-20. As a corollary, a formula  undercompensates the genuine victims of discrimination by forcing them to share their award with their undeserving brethren. *Id.* Unfortunately, that result is inevitable when an employer's specific employment decisions do not allow a precise reconstruction of the effects of discrimination. *Pettway,* 474 F.2d at 262; *see also Johnson,* 491 F.2d at 1380.

Formulas are to be used only after the court has considered and rejected all alternative methods of superior certainty. *Id.* At a minimum, the court should attempt to distinguish

17

subgroups of the class who were injured to a greater or lesser extent. *See Id.* at 1056 (rejecting approach that would have used an "indiscriminate black-white averaging approach . . . absent at least a precise breakdown of subgroups from the standpoint of plant age); *Pettway*, 474 F.2d at 262. Even when the court can not isolate the effects of discrimination on any given individual, the court may still be able to identify subgroups who were especially hard-hit by the discriminatory policy. Conversely, there may also be subgroups who suffered relatively little harm. Identifying those subgroups is one way to ensure that back pay is awarded to those who are most deserving.

A prevailing plaintiff is also entitled to pre-judgment interest in most cases. Pre-judgment interest "should" be included in back pay, absent good reasons not to award it. *Gloria v. Valley Grain Prod., Inc.* 72 F.3d 497, 499 (5th Cir. 1996). The Fifth Circuit has consistently approved awards of pre-judgment interest in Title VII cases so as to make whole the injured party. *Sellers v. Delgado Cmty. Coll.,* 839 F.2d 1132, 1140 (5th Cir. 1988); *Thomas v. Tex. Dep't of Criminal Justice* (5th Cir. 2002). The federal rate of interest set by 28 U.S.C. § 1961 is appropriate, but is not the only acceptable rate. *Williams v. Trader Pub. Co.*, 218 F.3d 481, 488 (5th Cir. 2000). The decision as to where to set the rate of interest is generally left to the sound discretion of the trial court. *Valdez v. Church's Fried Chicken*, 683 F. SUPP. 596, 636 (W.D. Tex. 1988); *Odom v. Frank*, 782 F. SUPP. 50, 52 (N.D. Tex. 1991).

## IV. Factual Application

### A. Initial Assignments

Lufkin's subjective practices and policies disparately impacted its black employees. If Lufkin's claims were to be believed, there is no way for racism to influence any aspect of its

initial assignment process or promotions. According to Lufkin's description of its practices and procedures, the TWC controls the flow of applicants to each division; there is thus no way for an applicant to find work in a position other than one he himself selected. Lufkin also claims that its promotions process is entirely governed by the CBA and objective tests of ability and skill, with no significant subjective component. Lufkin's official policies describe lay out a color-blind process with no room for individual bias. Unfortunately, the evidence and testimony given before the court do not support Lufkin's claims.

The testimony of Tami Poulan satisfies the court that Lufkin's account of its process for initial assignments is not entirely accurate. Ms. Poulan is an employee of the TWC and an uninterested witness not affiliated with either party; the court thus gives substantial weight to her testimony and the business records produced by the TWC. Those records show that the TWC sometimes receives job requisitions from Lufkin that may lack a specific job title or department location. In those circumstances, there is no way that the TWC could refer applicants for a specific job.

Even when Lufkin's requisition does specify a specific job position, there are instances of applicants who are willing to accept "any work" or "industrial work." The records list almost 400 workers who were hired for positions other than the ones for which they were referred. When Lufkin is looking to fill multiple positions at the same time, nothing prevents it from picking and choosing among the applicants for all positions. Applicants who are interested in clerical jobs or positions in the Power Transmission or Oilfield divisions may nevertheless be willing to accept a position in the Foundry or Trailer divisions if that is all they are offered.

19

When Lufkin's hiring personnel are allowed to exercise their discretion, discriminatory intent becomes relevant.

Evidence of discriminatory intent was offered by class member Vivian Crain. Ms. Crain testified that Viron Barbay, the man largely responsible for initial assignments during the class period, allegedly used racial slurs, told racist jokes, and spoke poorly of minority applicants. Mr. Barbay's conduct during the actual interviews has also been called into conduct by other class members.

The testimony of class member Kelvin Pope is also probative. Mr. Pope testified at trial that he was discouraged from applying as a welder. According to Pope, he was told by Viron Barbay that if he applied as a welder and was unable to pass a stick, bend, xray, and stress test, then he would be unable to reapply as a welder for 60 days. Pope said that Barbay told him to apply as a basic helper in the trailer division, crossing out his application for a position as machinist helper or forklift operator. When Pope subsequently took the actual welding test, it was much easier than the test described by Barbay and required none of the techniques that Barbay had mentioned.

The testimony offered by class members at trial does not alone establish discrimination on Lufkin's part; it merely demonstrates the considerable discretion possessed by Viron Barbay and raises questions about his use of that discretion. However, that testimony must also be considered in light of the TWC's records showing an abundance of workers assigned to positions other than the ones for which they were referred. Thus, despite Lufkin's contentions that the TWC's rules and its own procedures make channeling impossible, black applicants can be

channeled into less-desirable positions. The statistical evidence discussed below offers more reason to believe that they have been.

## B. Promotions

### 1. Hourly positions

The evidence before the court also shows that white employees have a significant advantage in gaining the skills and abilities needed to qualify them for promotion.[5] Because workers' day-to-day assignments are not governed by the CBA, supervisors have broad latitude to schedule workers as they see fit. No one checks or oversees that process and there is no right in the CBA to a specific position within a job classification. White employees can be, and are, selected and groomed for further advancement and managerial roles. Black employees are more likely to be placed in dead-end positions and left to seek training on their own, outside of regular work hours.

Class member Leroy Garner testified at the class certification hearing that the ability clause overrode seniority for many of the better jobs. Promoted African-Americans are held to a higher standard and given just two weeks to demonstrate proficiency at a new job. In contrast, whites are given more leeway and time to learn the intricacies of their new jobs while at work.

Class member Calvin Deason testified at trial that he was bypassed for a storekeeper position even though he was the most senior bidder. Deason said that he was told by Lufkin management that "we don't want to let experienced people out of the cleaning room." The job was instead given to a white probationary employee with two weeks' tenure. Lufkin claims that

_____

[5]Although the specific claim for class-wide discrimination in training is no longer before the court, the availability of training remains relevant in assessing Lufkin's claim that its promotions are color-blind and not influenced by discriminatory policies and decision-making.

21

Deason was denied the job because it would be a demotion and he was thus not an eligible bidder, but Lufkin eventually gave the job to a probationary employee. Under the CBA, probationary employees are not eligible bidders. Lufkin notes that the CBA does not govern postings when there are no eligible bidders, but the incident demonstrates the reality of Lufkin's subjective decision-making; when confronted with a unfettered choice between a black employee and a white employee interested in the same job, it gave the job to the white employee. Even when blacks do get additional training or education (by their own initiative or otherwise), they are discouraged from applying for better positions. Plaintiffs allege that some, though by no means all, of Lufkin's managers and supervisors actively discouraged black employees who had bid on better jobs. The effects of that discouragement are a potential variable unreflected in Dr. Baker's statistics.

Lufkin has many "objective" requirements that it cites as binding rules, but the evidence before the court demonstrates that Lufkin's managers have considerable discretion in applying or ignoring those rules. Attendance bookkeeping, availability of leave time, extra job training, and preferential day-to-day job assignments are all subject to flexibility and manipulation. Those rules have direct and/or indirect effects on an employee's prospects for promotion. The unions, which are supposed to act as watchdogs, are called in only when a worker is directly disadvantaged. When a white worker receives an unfair advantage that hurts no one else, such as an absence that is not marked or a chance to train on a new machine, the unions have no leverage.

Lufkin's requirement that personnel for some jobs be "qualified" allows subjectivity and personal bias to influence the promotion process directly. As Kelvin Pope testified, class

22

members can be told that they are unlikely to pass a required test, or flunked if the components

of test are sufficiently subjective. Because managers and supervisors at Lufkin give whites

preferential treatment, blacks are less likely to gain the necessary skills. Even positions

awarded to the senior bidder regardless of qualification can be influenced when supervisors are

discouraging blacks from applying black advancement. It is thus not surprising that blacks are

hesitant to bid and may choose to withdraw their bids even if selected.

### 2. Salaried positions

The evidence shows that class members in salaried positions also face difficulties; class

members Florine Thompson and Sylvester McClain testified that they were demoted despite

taking advantage of Lufkin's education/tuition reimbursement program to further their

education. Both had expressed discontent with aspects of Lufkin's race-related policies; both

were demoted from salaried positions to hourly positions. Ms. Thompson has earned two

associate degrees, but was demoted from her salaried position and now works as a security

guard. She testified that her demotion occurred shortly after raised concerns about a hostile

working environment with Lufkin management. It took Mr. McClain years to get promoted to a

salaried position and, according to his testimony, required the direct intervention of a former

Lufkin CEO, Frank Stevenson. Shortly after Mr. Stevenson left, McClain was demoted to an

hourly position and told "You will never be able to move up in management again. This is the

only job we have for you. So don't even try."

### C. Statistical Evidence

Though anecdotal evidence is useful to provide a context, a lawsuit based on a theory of

disparate impact generally requires statistical evidence to document and substantiate claims of

discrimination. Both sides presented voluminous data supporting their points. The plaintiffs' statistical case was presented by Dr. Richard Drogin, while Lufkin's rebuttal was offered by Dr. Mary Baker. Dr. Drogin found evidence of significant statistical disparities in both the initial assignment of blacks to the Foundry as well as promotion of blacks throughout Lufkin Industries.

### 1. Statistical Evidence on Initial Assignments

During the class period, blacks were disproportionately assigned to the Foundry. Of all African-Americans hired for entry-level jobs at Lufkin, 51.8% were assigned to the Foundry. In contrast, only 24.3% of similarly situated whites were assigned to the Foundry. As a necessary corollary, black employees are far less likely to be assigned to positions in the other divisions.

As a result of this pattern of initial assignments, African-Americans make up more than a quarter of the Foundry's workers and a slightly smaller proportion of the employees in the Trailer and Oilfield division, but in the Power Transmission division and Corporate sector, black employees make up just 7% to 10% of the workforce. In contrast, white employees constitute more than 70% of the Trailer and Oil Field divisions and almost 90% of the Power Transmission division and Corporate sector. In the Foundry, where the hottest, dirtiest, noisiest, and most physically demanding jobs are to be found, whites make up little more than a third of the workforce.[6]

If the rate of initial assignment of black workers to the Foundry had mirrored the representation of black employees throughout the company, Dr. Drogin testified that he would have expected 65 fewer black employees being assigned to the foundry. The actual outcome was

---

[6]Hispanic workers make up the remainder of the Foundry's employees.

24

statistically significant at almost nine standard deviations; in other words, the possibility that the pattern of initial assignments occurred by random chance was less than one in 100,000,000,000. That figure is well beyond the widely accepted standard of three standard deviations. *See McClain,* 187 F.R.D. at 276. Dr. Drogin also testified that 44 black workers would be expected in the other divisions. Their absence is statistically significant at more than five standard deviations. The explanation that random chance allowed resulted in that pattern is less than one in one million.

Not surprisingly, Lufkin has attacked Dr. Drogin's methodology and results. Lufkin claims that Dr. Drogin's assumptions were flawed, that his statistical models were poorly constructed, and that his results are therefore useless in describing the actual situation at Lufkin Industries. Lufkin claims that it hires only those individuals referred to it by the TWC, and that those individuals are referred for specific positions only. As such, Lufkin claims that there is no way for it to channel black employees into the Foundry or away from other divisions. Lufkin also criticized Dr. Drogin's decision not to control for the possibility that Lufkin's high school degree requirement had a disparate impact on blacks. However, Lufkin's own data indicate that its black employees are *more* likely to possess a high school diploma or GED equivalent and *more* likely to possess additional schooling beyond the high school level. Over 90% of the African-Americans hired by Lufkin have a high school education, meaning that almost all of Lufkin's black employees meet the minimum criteria for Lufkin's entry-level jobs. Lufkin has offered no evidence that individual qualifications explain any of the disparities.

As part of Lufkin's defense, Dr. Baker also testified that her statistical analysis showed that Lufkin's initial assignments to the Foundry correlate closely with the pools of actual

applicants available to Lufkin, and that Lufkin's decisions are statistically race-neutral given the actual people who applied. Dr. Baker claimed that Dr. Drogin's statistical models did not match the actual processes used by Lufkin, that her models were based on the actual processes used, and that her analyses were thus more relevant to the issues before the court. For the reasons discussed above, the court has already found that Lufkin's initial assignment processes may or may not have matched their claims. Dr. Drogin's statistical models are reasonably valid, given the uncertainty about the actual processes and the actual makeup of the applicant pools.

Dr. Baker's statistical claims are also undercut by her curious decision not to analyze the assignment of workers to any division other than the Foundry. Her decision not to do so, in light of the plaintiffs' Second (and final) Amended Complaint makes little sense. In their complaint," plaintiffs alleged that "Defendant, Lufkin Industries, has assigned disproportionately more black African American class members to difficult and unpleasant jobs and disproportionately fewer black African American class members to less strenuous and more desirable positions." Plas. Second Amended Compl. ¶113. The court's March 31, 1999 Order certifying the case as a class action also included the underassignment claim. *McClain*, 187 F.R.D. at 273 ("Plaintiffs assert (and their statistics support) that African-Americans are over represented in difficult and unpleasant jobs, and under represented in less strenuous positions. This channeling process is not guided by any objective standards or procedures of reviewing them."). At trial, Dr. Baker's testimony and attempted defense of her methodology was singularly unconvincing and offered little additional credence to her rationale. Even if the court chose to accept Dr. Baker's contention that the actual applicant pools do not show any overassignment of black new hires to the Foundry, the court would of necessity accept the corollary presented by Dr. Drogin: that

Lufkin underassigns black workers to all other divisions.

Since Lufkin claims that there are no objective criteria that would disproportionately disadvantage African-Americans, the logical conclusion to be drawn from the testimony and evidence presented to the court is that Lufkin's subjective procedures are responsible for the concentration of black employees in the Foundry. After considering the expert testimony of both sides, the court sees no alternative to the conclusion that Lufkin is discriminating in its initial hiring.

### 2. Promotion Statistics

### a. Hourly Promotion Statistics

Plaintiffs have also provided statistical evidence of discrimination in promotions. Overall, Dr. Drogin found that from March 6, 1994 through 2002, there were 2,326 promotions within the hourly wage (EEO-6 to -8) levels; 1,325 of which went to whites and 476 to African Americans. African Americans received 127 fewer promotions than expected from their representation in the availability pools in each year during 1994-2002. This disparity has a Z-value of $-7.61$, indicating a statistically significant under-promotion of African Americans with a one in one hundred million chance of occurrence by random fluctuation.

The pattern of African American shortfalls in promotions is consistent across years. The disparities found by Dr. Drogin are statistically significant in 5 out of the 8 years for which complete year data is shown. The total shortfall of African American promotions would occur by chance less than one time in ten trillion.

Dr. Drogin also analyzed rates of promotions of African Americans in each of the EEO categories 6, 7 and 8 separately, noting that these three categories include the jobs held by 90%

27

of Lufkin's African American employees. African Americans received 77.84 fewer promotions then expected out of EEO-8 positions, 24.51 fewer promotions than expected from EEO-7 jobs, and 24.80 fewer promotions than expected from EEO-6 jobs. The shortfall was statistically significant for all these categories, with levels of significance ranging from -2.68 to -6.17 standard deviations.

Dr. Drogin found that for the ten hourly jobs with at least 50 promotions into them, there was a shortfall in African American promotions into 9 out of the 10 jobs, and the shortfall is statistically significant for 5 of the 10 jobs.

Dr. Baker's rebuttal was unpersuasive. Her promotion analysis relies, as her initial assignment analysis relies, on the information she was given by Lufkin's management. The court is not persuaded that the information is accurate or reliable. Dr. Baker claims that her use of the actual bid sheets is a superior metric, but that argument ignores a substantial part of the plaintiffs' argument. Because African-Americans are systematically discouraged from bidding on jobs, are discouraged from taking promotions awarded through the bid process, and have difficulty getting assignments that will help them acquire the skills needed for further promotions, analyzing the actual bid sheets merely incorporates several tainted variables. The parties have also debated whether all bid sheets have been produced and whether Lufkin's resulting database is accurate. Though there is some dispute as to whether so-called "automatic" promotions listed in the CBA should be counted, there is sufficient evidence to find discrimination in promotions regardless. After considering the evidence in its totality, the court finds Dr. Baker's reliance on tainted data in support of questionable conclusions unconvincing.

### b. Salaried Promotion Statistics

In addition to the promotion disparity in the hourly ranks, a statistically significant shortfall in promotions to the salaried workforce also exists. Between 1994 and 2002, Lufkin awarded 386 promotions from hourly positions to salaried jobs. Based solely on the proportion of African-Americans in the workforce, blacks would be expected to have received 42.85 promotions. In actuality, Black workers received only 34 promotions. The shortfall of 8.85 promotions is statistically significant at the .05 level. Drs. Drogin and Baker again disagreed with the appropriate model; Dr. Drogin looked at all salaried workers, while Dr. Baker looked at each division separately. The statistical significance is not as robust here, but that is in part an artifact of the smaller sample size. Dr. Drogin's decision to aggregate the data serves his ends, just as Dr. Baker's decision to refine the data serves hers. After hearing the testimony offered at trial, the court finds Dr. Drogin's analysis more persuasive.

### 3. Compensation (Income) Statistics

The net result of Lufkin's discriminatory practices is a significant shortfall in income for black employees. According to Dr. Drogin, the average pay of blacks for every EEO category and almost every year is below the relevant average pay of whites. That pattern holds true even after controlling for seniority, EEO category, part-time/full-time status, and shift. Given the court's finding above that Lufkin discriminates in its initial assignment and promotion processes, any other conclusion would be surprising. As an example, blacks in skilled craftsman positions[7] are disproportionately concentrated in the lower-paying jobs. They hold 24% of the positions

---

[7]EEO category 6, the highest level of blue-collar production jobs at Lufkin

29

that pay less than the category average of $13.31 an hour, but only 7.8% of the positions paying more than $13.31 an hour.

Dr. Drogin found shortcomings in most every time period, EEO category, and division, but even after controlling for year, time in job, shift, full-time/part-time status, EEO category, and end-of-year employment status. Those numbers were 21 cents/hour in both 1994 and 1995; 23 cents/hour in 1996; 28 cents/hour in 1997; 34 cents/hour in 1998; 38 cents/hour in 1999; 42 cents/hour in 2000; 45 cents/hour in 2001; and 54 cents/hour in 2002.

Dr. Baker criticized Dr. Drogin's decision not to control for job classification. According to Lufkin, once job classification is considered, the compensation disparity disappears. That finding is absolutely correct and fundamentally meaningless. Essentially, Lufkin claims that workers in the same job classification get the same pay.

That conclusion is utterly unsurprising; it simply means that employees performing exactly the same job were paid exactly the same wage. Plaintiffs have never claimed nor suggested otherwise. What plaintiffs actually argue, and what this court finds, is that Lufkin's discrimination in initial assignments and promotions has concentrated blacks in lower-paying jobs. Job classification is thus a variable that is tainted by the discrimination already found in initial assignments and promotions. Dr. Baker's criticism is not relevant to that finding, much less dispositive. Dr. Baker's decision to incorporate job classification into her analysis renders her results largely irrelevant to the claims before the court.

**D. Calculating Back Pay**

**1. Relevant Considerations**

In order to maintain their class status under Rule 23(b)(2), plaintiffs have abandoned all individual claims and compensatory damages. Plaintiffs have not addressed, and the court need not consider, individual claims for damages. However, because plaintiffs proved their claim of disparate impact employment discrimination, class members are entitled to back pay. Although the court is convinced that Lufkin discriminated against black employees with regard to initial assignments and promotions, there is no way for the court to identify individual employees deserving of back pay. It is impossible for this court to say which Foundry employees should have been assigned to a better division, or whether an employee assigned to the Trailer division actually deserved a spot in Power Transmission. There is no practical way to separate the employees who were discouraged from bidding on a job from those who were simply not interested. There is no efficient way to decide which employees were encouraged not to accept a promotion from the employees who decided that they did not want a new job. There is no way at all to determine which employees were harmed by a lack of promotion-enhancing on-the-job training

The court is mindful of the Fifth Circuit's admonition to avoid uniform class-wide remedies whenever possible. But in this case, given the facts before it, the court finds that a formula-driven approach is necessary. The number of class members and the inherent uncertainty of the individual claims contraindicates the use of a special master or "mini-hearings." However, the court need not resort to a single per-capita award for all class members.

31

There are a few objective qualifications that will serve to increase or decrease each class member's award of back pay.

The plaintiffs' claim based on initial assignment states that workers in the Foundry were injured by being channeled away from the more lucrative opportunities in the Trailer, Oilfield, and Power Transmission production divisions. Obviously, those black employees who were assigned to the Power Transmission division (which holds the highest-paying jobs with the best general working conditions) can have no cause for complaint. The statistical evidence does not support a claim that workers were channeled into the Trailer or Oilfield divisions (nor do plaintiffs make such a claim). Black employees assigned to the Foundry are thus a distinct subgroup of the class, and their back pay should reflect the fact that they were harmed by discrimination in both initial assignments and promotions. More than 90% of Lufkin's black Foundry workers met the "minimum" qualifications to work in other divisions and the court will not attempt to differentiate workers who were qualified to work in other divisions; the evidence produced at trial indicates that the requirements to work in the other divisions have been flexible over the class period. The court thus cannot say with any reasonable degree of certainty whether or not any given individual would have been suitable for employment in another division.

Just as Foundry workers were particularly harmed, some employees could not have been injured during the class period. Some workers presumably reached the absolute top of the pay scale for their respective division for their entire tenure during the class period. The court wishes to make clear that it suspects the group of affected employees is relatively small. It is not sufficient that the worker was merely at the top of the pay scale for a given job classification; the evidence suggests that many promotions resulted in a temporary pay cut, as employees at the

32

top of a classification's pay range to take jobs with lower immediate pay but higher maximum

pay. The court is referring to those workers making more than any other hourly worker in each

division, regardless of category. For those employees, there was nowhere higher to go. Even

after the effects of discrimination, those employees had reached the pinnacle of the ladder; for

the period in which they occupied those positions and that pay grade, they could not have been

harmed by discrimination within the hourly ranks. Those employees were affected by

discrimination in promotion to salaried positions. Sylvester McClain is an example; according to

the court's perusal of the CBA,[8] the position of Inspector pays as much as any other position in

the Trailer division. McClain in particular has been harmed by being demoted from a salaried

position, but plaintiffs' theory of disparate impact does not allow the court to make special

allowances for individual plaintiffs. The court can only include McClain in the group of

employees entitled to receive some recompense for discrimination in promotions to salaried

positions.

### 2. Numerical data

The court is of the opinion that some of the disparities in hourly compensation are the

result of discrimination in initial assignment, while others are the result of discrimination in

promotions. The income disparities found by Dr. Drogin after controlling for EEO category,

time in job, shift, full-time/part-time status, and active/non-active status represent suitable

calculations for the effects of discrimination. Because there is no data on the period after 2002,

the court chooses to use the 2002 numbers. This decision may be unfair to the plaintiffs, since

---

[8] The court's reading of the CBA may be incomplete or inaccurate and is not meant as an authoritative statement.

the trend of disparities was uniformly upwards, but the court sees no alternative given the data before it. There is also a probability that Lufkin cleaned up its act in 2003 and there is no longer any income disparity, but the court considers that conclusion unlikely.

Pre-judgment interest is included in the following numbers in the amount of 10%, compounded annually. The court chooses this number, which is somewhat higher than the comparable rate prescribed under 28 U.S.C. § 1961, to reflect Texas state law. The court is also mindful that, over the past ten years, Lufkin's stock has averaged returns of over 11%. *See* http://quicktake.morningstar.com/Stock/stockperformance.asp?Country=USA&Symbol=LUFK &TimeFrame=AL#chartgrph.[9] The court makes this decision in part to respect the law of the state in which it sits, in part to ensure that Lufkin does not profit from its decisions discriminating against blacks, and in part because it is unable to give precise values for the effects of discrimination in promotions to salaried positions.

The court orders that back pay is to be awarded in the following manner: Foundry workers, who constitute about a third of the class members, are entitled to back pay equal to 133% of the disparities found by Dr. Drogin, as listed below. That sum will compensate them for discrimination in both initial assignments and promotions. All other employees will receive 83 1/3% of the disparities found by Dr. Drogin. That sum will compensate them for discrimination in hourly promotions.

---

[9]The court also notes that Lufkin's CEO Doug Smith was paid almost three times as much as the President of the United States in 2002 and had the use of Lufkin's corporate jet and pilot as well. While Lufkin Industries does have an international presence and facilities on several continents, it is not as great as that of the President.

The disparity in salaried promotions resulted in an absence of one such promotion per year. The average salaried workers earns more money than the average hourly worker, with greater potential for advancement and different working conditions. There is no way to say which workers should have been promoted into which positions; a promotion to secretary might be worth nothing in monetary terms, but at least one white hourly worker received a promotion to a position that paid a six-figure salary. Since the court can not value the missing promotions with any significant precision, it finds that each missing salaried promotion was worth 2 cents/hour to each class member who worked during the year that the promotion was not awarded.

Class members with salaried positions will receive $ 600 per year. Salaried class members receive a smaller percentage of the relevant income disparity and a single value for each year to reflect the lesser statistical significance of the relevant regression analysis. The court is less certain that it can gauge the effects of discrimination on salaried employees. Although the court is convinced that discrimination occurred in both the hourly and salaried ranks, that compensation disparity may result in part from independent variables other than racism such as education, training, and prior experience. In the absence of evidence that those variables are not partially responsible for the compensation disparity, the court chooses to limit the award made to salaried employees to an amount roughly comparable to that received by the hourly employees.

The court offers these numbers as its calculations of the formulas described above (these numbers do not include interest).

35