UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION


- - - - - - - - - - - - - - - -
VIVIAN BERT, et al.,              :
                                  :
        Plaintiffs,               :
   vs.                            :    Case No. C-1-02-467
                                  :     (Mag. Judge Hogan)
AK STEEL CORPORATION,             :
                                  :
        Defendant.                :
- - - - - - - - - - - - - - - -


        Deposition of:   RONALD E. SLOAN, JR.

        Taken:           By the Defendant

        Date:            Tuesday, April 24, 2007

        Time:            Commencing at 11:00 AM

        Place:           Taft, Stettinius & Hollister
                         1800 US Bank Center
                         425 Walnut Street
                         Cincinnati, Ohio  45202-3957

        Before:          Tracy L. Allen, RPR
                         Notary Public - State of Ohio

```
 1    APPEARANCES:

 2        On behalf of the Plaintiffs:

 3            Susan Donahue, Esq.
              Wiggins, Childs, Quinn & Pantazis
 4            The Kress Building
              301 Nineteenth Street North
 5            Birmingham, Alabama  35203
              Phone:  (205) 314-0592
 6
              David D. Kammer, Esq.
 7            Tobias, Kraus & Torchia
              911 Mercantile Library Building
 8            414 Walnut Street
              Cincinnati, Ohio  45202
 9            Phone:  (513) 241-8137

10        On behalf of the Defendant:

11            Patricia Anderson Pryor, Esq.
              Taft, Stettinius & Hollister
12            1800 US Bank Center
              425 Walnut Street
13            Cincinnati, Ohio  45202-3957
              Phone:  (513) 381-2838
14
      Also present:
15
      Tracy White - AK Steel.
16

17                     - - -

18

19                 I N D E X

20        Cross-Examination by Ms. Pryor.....Page   4

21

22               E X H I B I T S

23            Exhibit No.          Marked

24        Defendant's Exhibit 1 ......   12

25
```

3

```
 1              Exhibit No.           Marked
 2         Defendant's Exhibit 2 ......   37
 3         Defendant's Exhibit 3 ......   39
 4         Defendant's Exhibit 4 ......   44
 5         Defendant's Exhibit 5 ......   55
 6         Defendant's Exhibit 6 ......   57
 7         Defendant's Exhibit 7 ......   60
 8         Defendant's Exhibit 8 ......   63
 9         Defendant's Exhibit 9 ......   71
10         Defendant's Exhibit 10 .....   75
11         Defendant's Exhibit 11 .....   79
12         Defendant's Exhibit 12 .....   87
13
14                    - - -
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    RONALD E. SLOAN, JR.
 2   being by me  first duly  cautioned and sworn, deposes
 3   and says as follows:
 4                    CROSS-EXAMINATION
 5   BY MS. PRYOR:
 6           Q.    Mr. Sloan, could you state your full
 7   name for the record, please.
 8           A.    Ronald E., Eugene, Sloan, Junior.
 9           Q.    And is your wife named Tricia Sloan?
10           A.    Trica.  No I.  No second I.
11           Q.    No second I.  T-r-i-c-a then?
12           A.    Correct.
13           Q.    And have you taken any medications
14   today?
15           A.    No.
16           Q.    Have you not taken any medications
17   that you should have that you normally would take?
18           A.    (Shaking head.)
19           Q.    Is there any reason that your
20   testimony today would not be truthful or that would
21   prevent you from recalling or remembering things
22   today?
23           A.    No.
24           Q.    Okay.  Your current address, is that
25   206 Webster Street?
```

```
 1                A.    Apartment 2A.

 2                Q.    That's Middletown, Ohio?

 3                A.    Correct.

 4                Q.    Okay.  What is your highest level of

 5     education?

 6                A.    I have a year plus of college.

 7                Q.    A year plus of college?

 8                A.    Uh-huh.

 9                Q.    What did you study in college?

10                A.    I was in the engineering program, but

11     I never got into engineering studies obviously by the

12     amount of time I was there.  Direct engineering

13     studies I should say, but I was in the electrical

14     engineering program.

15                Q.    And you do not hold a degree from

16     college?

17                A.    No, I do not.

18                Q.    Okay.  Could you just take me through

19     kind of your employment history prior to August 2001.

20                A.    I worked for Procter and Gamble for

21     five years.  Started working with them in October of

22     '96.  During that time I also worked part time for

23     Bachrack Men's Clothing for about a year and a few

24     months from 10/96 until -- was it '98 I believe?

25     But, again, it was just part-time employment.  And
```

6

1   prior to that I'd been in the U.S. Navy for six years

2   from 1990 to 1996.

3           Q.    And what did you do in the navy?

4           A.    I was an electronics technician.

5           Q.    What does that mean?

6           A.    I am responsible for the maintenance,

7   both preventative and corrective, of communications

8   equipment and encryption equipment.

9           Q.    And from there you went -- you were

10  honorably discharged?

11          A.    Correct.

12          Q.    And did you go right to P and G after

13  the navy?

14          A.    There was about a two-month stint that

15  I was unemployed.

16          Q.    Okay.  What did you do for P and G?

17          A.    I initially worked as a -- I was a

18  research associate.  I initially worked in a facility

19  that was what we called downstream research and

20  development.  We qualified upgrades to diaper

21  converters in the diaper plants.

22                I did that assignment for about two

23  and a half, two and three-quarters years.  And then I

24  took a position that was actually titled quality

25  control technician but what I was was basically a

7

1    general manager in a prototype design facility.  And

2    we made limited base consumer testing diapers.

3              Q.    You say you were the general manager.

4    What did you do that was --

5              A.    I interacted with Procter and Gamble

6    researchers who were assigned to actually produce a

7    certain number of these diapers.  I was responsible

8    for setting up the job, allotting the personnel, cost

9    control, quality.  Basically the entire scope of the

10   project from start to finish within our design

11   center.

12             Q.    Did you have supervisory authority?

13             A.    Yes, I did.  I was in charge of the

14   contractors that were allotted to me or that I deem

15   necessary to complete the job as well as I was the

16   safety manager for that entire facility for both P

17   and G and contract personnel.

18             Q.    Did employees report to you?

19             A.    The only employees, P and G employees,

20   that reported to me were those of under the

21   guidelines of the safety program.

22             Q.    Okay.  Why did you leave P and G?

23             A.    I accepted a separation during a

24   downsizing of the company in 2001.

25             Q.    It was a voluntary separation?

1        A.   Yes, it was.

2        Q.   Did you -- I assume you received some

3   kind of severance package?

4        A.   Correct.

5        Q.   What was the package?

6        A.   The total amount I believe was between

7   15 and 20,000.  I can't remember exact number.

8        Q.   Was that cash?  Was it benefits?  Was

9   it --

10        A.   No.  I had that year reached my

11   vestment period with regard to my stock and that

12   20,000 was actual lump sum payment.

13        Q.   Okay.

14        A.   Or, again, 15 to 20.  I can't remember

15   exact number, but that was lump sum payment.  And we

16   received benefits coverage I believe for 90 days

17   after we left.  And that was the extent of any

18   coverages that I had.

19        Q.   Did you get any outplacement services

20   or --

21        A.   No.

22        Q.   Why did you choose to accept that

23   separation instead of staying?  I assume you could

24   have stayed?

25        A.   Yes.

1          Q.    Why did you choose to separate?

2          A.    I just thought it was going to be best

3     for my career goals at that point to separate from

4     the company.  I felt like I was going to be somewhat

5     limited in the position I was in.

6          Q.    What were your career goals?

7          A.    Just to move up higher in management.

8     I felt that I had reached a level that I should have

9     been promoted to the next technical level, a level of

10    performance that I should have been promoted to the

11    next technical level.  And I had been passed by for a

12    couple of years so I just thought it was in my best

13    interest.

14         Q.    Okay.  Did you receive any tuition

15    retraining allowance?

16         A.    No.

17         Q.    Did you sign up with the company

18    called RL Stevens and Associates?

19         A.    Yes, I did.

20         Q.    And that was in August of 2001?

21         A.    Uh-huh.

22         Q.    What did you sign up with them to do?

23         A.    They were a career search management

24    firm.  Basically, they worked with individuals on

25    trying to find them the position that they would

1    really like based on their skill set, based on

2    individuals that they know.  Effectively show you how

3    to network within your own microcosm, if you will, to

4    attain the information to get interviews with the

5    companies you're interested in.

6           Q.    Did they help set up interviews with

7    companies?

8           A.    No.  They do not set up interviews.

9    In a nutshell, they arm you to be prepared for the

10   interview.  It's your responsibility to set up the

11   interview.

12          Q.    Okay.  And that was not connected at

13   all with the severance package you received from P

14   and G?

15          A.    Only in the sense that I paid for the

16   fee, if you will, with RL Stevens with money from

17   that package.

18          Q.    Did they move you toward a particular

19   career?  Do they help you decide on a --

20          A.    No.  What you do is you basically

21   state what category fields you're interested in.  And

22   they try to help you focus in on what would be best

23   to get a position within those fields.

24          Q.    You ended up suing RL Stevens?

25          A.    That's correct.

1        Q.    Why did you do that?

2        A.    Toward the -- what they offer are a

3   few different packages.  I elected to go with a five-

4   year package, which includes initially getting you

5   into a company or assisting you in getting into a

6   company.  And they will also help you with regard to

7   methods of progressing within that company.

8             I had never, during the duration that

9   I had been working with them, really reached a

10  position that I felt I was interested in and that I

11  indicated to them in the initial discussions.

12            So as a result, I had been working

13  some part-time jobs in the meantime just to make ends

14  meet.  And I would contact them periodically when I

15  was ready to resume my search when I had some new

16  ideas that I felt were in line with what we were

17  doing.

18            We reached a point where I was

19  contacting them and I wasn't getting any responses

20  back from the people that had been assigned to me.  I

21  had called back and tried to speak to managers about

22  that and hadn't been receiving return calls.

23            And it just got to a point where I

24  didn't feel I was receiving the service for the fee

25  that I had paid for the duration that I had paid.

```
 1                Q.   Did you obtain a judgement against
 2      them?
 3                A.   The small claims court judge, she made
 4      a decision if that's what you're asking.
 5                Q.   Did you receive some money as a result
 6      of that?
 7                A.   Yes.  A portion of the remaining -- a
 8      prorated portion of the fee.
 9                Q.   Okay.  Now, you applied for a position
10      at AK Steel.  Correct?
11                A.   Uh-huh.
12                               (Defendant's Exhibit 1
                                 was marked for identi-
13                               fication.)
14                Q.   You've been handed what's been marked
15      as Sloan Deposition Exhibit Number 1.
16                A.   Okay.
17                Q.   Is that a copy of the application that
18      you used to apply?
19                A.   Yes, it is.
20                Q.   Did you only apply one time?
21                A.   Yes.
22                Q.   This is the only application you
23      completed?
24                A.   Correct.
25                Q.   And is that your handwriting
```

```
 1   throughout the document?

 2           A.   Yes, it is.

 3           Q.   Is that your signature at the bottom

 4   of the last page?

 5           A.   Yes, it is.

 6           Q.   Is August 28th, 2001 the date that you

 7   applied?

 8           A.   Yes.

 9           Q.   And you understood when you made this

10   application, you signed it, that you were certifying

11   that everything on it was true?

12           A.   Correct.

13           Q.   You understood that if anything were

14   found to be incomplete or incorrect, you might not be

15   hired or you might be terminated if you were already

16   employed?

17           A.   Correct.

18           Q.   Was everything on here true?

19           MS. DONAHUE:  Look at it carefully.

20           A.   I don't recall the tuition retraining

21   allowance, but if I wrote it, I guess there was, but,

22   by memory, I don't recall one.  But, again, that was

23   2001.  Six years ago.

24                I'm going to assume that must have

25   been something that was a repayment type benefit if
```

1    used because I never used it for any retraining.

2              Q.    You talking about the tuition --

3              A.    Yeah.

4              Q.    -- retraining allowance?

5              A.    Yeah.  On the second page where it

6    says "Describe any definite plans for further study."

7              Q.    You don't recall receiving that, but

8    you're assuming you did if it's on here?

9              A.    As a benefit, yeah.  If I wrote it

10   down, I'm assuming that it was available, but I

11   don't -- there was no retraining that I did that I

12   would have actually used those monies, that I could

13   think of.

14             Q.    Were you planning on using it?  I

15   mean, why did you write that?

16                   MS. DONAHUE:  Object to the form.

17             Compound sentence.

18             A.    I may have if I thought it would have

19   been applicable for the position that I was going

20   for, but outside of that, I don't remember any plans

21   to specifically use it.

22             Q.    Okay.  Everything else --

23             A.    Everything else appears to be correct,

24   as I remember.

25             Q.    Okay.  Now one of the positions on

15

1  here is Arlington National Mortgage, which you didn't

2  mention earlier.  Is that another part-time position

3  that you had?

4          A.   Yes.  And more or less, I was just

5  learning the mortgage industry from a loan officer

6  perspective.  The entire time I was there I only

7  closed one loan.

8          Q.   And it says Rate of earnings, not

9  applicable.  Only commission.

10         A.   Correct.  It's commission only.

11         Q.   Okay.  And you were applying for a

12 management position at AK?

13         A.   Correct.  Management or production.

14         Q.   Or technical?

15         A.   Correct.

16         Q.   Your preference was management, but

17 you state you will accept labor or technical?

18         A.   Correct.

19         Q.   Who told you to apply at AK Steel?

20         A.   I have three personal friends who told

21 me that they were hiring.

22         Q.   Who are they?

23         A.   Gardner Sorrell, Aaron Burgess, Rodney

24 Heard, H-e-a-r-d.  All three were employees at the

25 time.

1          Q.    What race are they?

2          A.    Gardner is white.  The other two are

3     black.

4          Q.    They told you that AK was hiring?

5          A.    Yes.

6          Q.    Did they tell you what potions they

7     were hiring for?

8          A.    They didn't say specifically.  They

9     just asked me what was I interested in, and I told

10    them.

11         Q.    How did you apply?  Where did you go

12    to get the application?

13              MS. DONAHUE:  Object to the form.

14         Compound.

15         A.    They actually brought me applications

16    after me giving them my resume.  From that point

17    forward I don't know what happened.  I just entrusted

18    they handed them to the appropriate personnel.

19         Q.    Who's "they"?

20         A.    Those three gentlemen.

21         Q.    You handed your application to all

22    three of these gentlemen?

23         A.    To Gardner, actually.

24         Q.    Okay.

25         A.    Gardner is a manager.  The other two

1    are laborers.

2         Q.    So Gardner brought you an application.

3    You filled it out and gave it back to him?

4         A.    I believe so.

5         Q.    Why did you not provide Richard

6    Moore's phone number on the reference list?

7         A.    At the time I probably just didn't

8    have it.  That's all.  He's been a personal friend my

9    entire life, so there's no specific reason not to

10   include it if that's what you're saying.

11        Q.    After you applied did someone call you

12   from AK Steel and ask you to come in and take the

13   test?

14        A.    Yes.

15        Q.    And you came in and took the test on

16   October 20th, 2001?

17        A.    Correct.

18        Q.    Do you know who called you in to take

19   the test?

20        A.    No.

21        Q.    What did they tell you when they

22   called?

23        A.    That they were going to be giving a

24   test on a Saturday morning.  I had made it that far

25   into the process.  That I really needed to show up

1    with nothing.  Everything would be provided.

2              Q.    And you showed up?

3              A.    Correct.

4              Q.    Where did you go to take the test?

5              A.    At the AK Steel facility.  There are

6    three small buildings.  I don't know the gate names,

7    but it's the gate that's nearest the MidFirst Credit

8    Union branch.

9                    I went in and went around, went across

10   the tracks.  There are three similar buildings next

11   to each other.  And took it in the basement of one of

12   them.

13             Q.    Do you know about how many people took

14   the test with you?

15             A.    If I had to estimate, somewhere

16   between 25 and 30.

17             Q.    Were you told anything at the test?

18             A.    Basically, the biggest thing that I

19   remember is that once the results were completed,

20   we'd be contacted if there was additional interest.

21   And under no circumstances were we to contact AK

22   Steel.

23             Q.    Do you know who -- was there someone

24   there kind of proctoring the test?

25             A.    Yes.

1          Q.    Do you know who that person was.

2          A.    No, I don't.  White, older gentleman.

3          Q.    Were you contacted after taking the

4    test?

5          A.    Yes.

6          Q.    What were you told?

7          A.    They wanted to set up an initial

8    interview.

9          Q.    Do you know who contacted you?

10         A.    I believe that was Jessica Hicks.

11   That's who I had the interview with.  I believe it

12   was with her.

13         Q.    And the test that you took you

14   understood was kind of the general test for the

15   production position, the entry level positions?

16         A.    I understood by description the type

17   of test that it would be.

18         Q.    Okay.  Did you find it to be

19   straightforward?

20         A.    The test itself was straightforward,

21   but I thought it was extremely detailed, involved for

22   a production position of that caliber.

23         Q.    Did you have any problems with it?

24         A.    I don't believe so.

25         Q.    And were you told that you passed the

```
 1   test?
 2              A.   Yes.
 3              Q.   You said that you were called in to
 4   set up an initial interview?
 5              A.   Correct.
 6              Q.   And you met with Jessica Hicks?
 7              A.   Yes.
 8              Q.   And that was about November 27th,
 9   2001?
10              A.   I believe it was in November.  I don't
11   know the specific date.
12              Q.   Okay.  What did she tell you at that
13   interview?
14              A.   She mostly discussed my background,
15   gave me an idea of the schedule, the expectations
16   that they were looking for in the position.  Some
17   basic information sharing session.
18              Q.   What position did she talk to you
19   about?
20              A.   At that time, just a production/
21   laborer position.
22              Q.   Did she tell you that there was a
23   freeze on hiring management?
24              A.   Yes, because I had asked her about
25   that at the tail end of our discussion.  Up until
```

1    that point we had had no discussion about management.

2    I just waited till the end to see if she would bring

3    any issues up, and she didn't.  And I asked her

4    specifically.  And she said there was a freeze on

5    hiring for management and they were only looking for

6    degreed personnel.  Engineering degreed personnel at

7    that.

8              Q.   And you don't have any reason to

9    believe that was false, do you?

10             A.   That it was false?

11             Q.   Yes.  That her statement.

12             A.   I don't know.  I just took it at face

13   value.

14             Q.   Okay.  Did she tell you that you might

15   qualify for a maintenance or a production position?

16             A.   Not during that interview.  She

17   actually called me a second time and said that there

18   was a possibility that that would be a route for me

19   to go, and that when we met that second time that she

20   would have a person from maintenance present.

21             Q.   So during this first interview she

22   talked to you about your background.  She gave you

23   some idea about the hours that were required for the

24   job.  How did you think the meeting went?

25             A.   Great.

```
 1              Q.    You felt good about the interaction
 2       you had with Ms. Hicks?
 3              A.    Uh-huh.
 4              Q.    And you said that then she called you
 5       on the phone a second time?
 6              A.    Yes.
 7              Q.    And what did she tell you then?
 8              A.    That they wanted to set up a second
 9       interview, which was in December.
10              Q.    And that was because she was thinking
11       you might be interested in a maintenance position?
12              A.    No.  She didn't specify that she
13       thought I was interested in any position.  She just
14       said that because of my background she would have a
15       maintenance person available to have a discussion
16       with me as well.
17              Q.    So did you report for a second
18       interview in December?
19              A.    Yes.
20              Q.    And who was at that interview?
21              A.    Jessica, and I don't remember the
22       gentleman's name.  I believe he identified himself as
23       the assistant maintenance supervisor.  Red hair,
24       strawberry blond hair, younger gentleman with a
25       beard.
```

```
 1              Q.    What did they say?
 2              A.    We had the initial -- well, I had the
 3      initial interview with Jessica and we basically just
 4      went back over what we had talked about during the
 5      initial interview.
 6                    And she told me, she said, Well,
 7      there's a possibility that maintenance may be
 8      interested in you.
 9                    The gentleman came in.  We had a very
10      brief discussion about the maintenance schedule.  And
11      he told me -- well, he and Jessica collectively told
12      me at the end of the discussion they'd like for me to
13      take a test.  And I told them I wasn't prepared to
14      take a test that day.
15              Q.    What kind of test did they tell you?
16              A.    They just said it would be an
17      assessment of my electronic/electrical skills.  And I
18      knew from my lack of being involved in theory/
19      formula type work since I basically left my schooling
20      in the navy, that I would not be prepared for that.
21      I would need to brush back up.
22                    I asked them for a couple weeks, an
23      opportunity to go back into my books and study and
24      rememorize the formulas and whatnot, and they said
25      that that wouldn't be possible.  They wanted me to
```

1    take it right away.

2            Q.    Did they say anything else?

3            A.    At the end of the meeting I had --

4    well, after those discussions I had indicated to

5    Jessica if that was the route that they wish to

6    progress, that I would prefer to go into the

7    production role because I felt it more of an

8    opportunity for success.

9            And she said okay.  She said well, we

10   still have urinalysis and a background check remain.

11   And because the holidays were about to -- holiday

12   period was about to begin, she said you can probably

13   expect to hear from them toward the first of the

14   year.

15           Q.    So it was your understanding they were

16   still interested in you?

17           A.    It was my understanding they were

18   still interested in me.  And, actually, the

19   impression that I got from her was that I was pretty

20   much going to be offered a position after successful

21   completion of those last two steps.

22           Q.    Okay.  So you understood that AK Steel

23   was going to conduct a background check?

24           A.    Yes.

25           Q.    You understood they were going to

1    verify everything on your application?

2            A.    Yes.

3            Q.    Including your education, your

4    employment, and your criminal and driving records?

5            A.    Uh-huh.

6            Q.    Okay.  Did you ever hear anything back

7    from AK?

8            A.    Not from AK.

9            Q.    Did you hear back from anybody?

10            A.    I heard from the background

11    investigation group.  There was a young lady who

12    called.  Was kind of laughing on the phone when she

13    called.  She said I just simply need to verify your

14    first name and your Social Security number, which I

15    thought was kind of odd given that those two pieces

16    of data were pretty much on every document that I had

17    submitted, but I went ahead and stated the

18    information for her.  And that was the last time I

19    heard from anyone even related to the application

20    process.

21            Q.    Do you know the name of the person

22    that called you?

23            A.    No, I don't.

24            Q.    And you say she was from the

25    background check?

1          A.    She identified herself as performing a

2    background check for AK.

3          Q.    Okay.  Did you ever call anybody at AK

4    to find out what happened with the application?

5          A.    No, because we were told specifically,

6    when we took the test, at no time were we supposed to

7    contact any representatives with AK.

8          Q.    Do you know why you were not hired?

9          A.    No, I do not.  Specifically.

10          Q.    Do you know generally why you were not

11    hired?

12          A.    Generally, I don't know why I wasn't

13    hired.  I can only speculate.

14          Q.    What would you speculate?

15          A.    I would have to believe that it would

16    have something to do with my race, because quali-

17    fication-wise I think I met all the criteria.

18                In fact, I think I even exceeded some

19    of it as far as general applicants.  I know personal

20    friends that I have that work there.  I'm more

21    qualified than they are.

22          Q.    Who are these personal friends?

23          A.    Well, just some of the men I listed.

24    Well, Gardner has a college degree, but the other two

25    I think I'm just as qualified, if not more qualified,

```
 1    than them.
 2              Q.    The other two African Americans?
 3              A.    Yes.
 4              Q.    You don't know of any Caucasian
 5    applicants that you are more qualified than?
 6              A.    By name?  There's a gentleman that
 7    works there named Dale Barnett that I formerly worked
 8    with at a company called Swallen's in the mid to late
 9    '80s.  I would say I'm just as qualified, if not more
10    qualified, than him.
11              Q.    Do you know when he was hired at AK?
12              A.    No, ma'am, I don't.
13              Q.    And just to confirm, no one at AK
14    Steel ever said anything to you about your
15    application after your meeting with Jessica and the
16    manager from maintenance.
17              A.    That is correct.
18              MS. DONAHUE:  Object to the form.  I
19              think it mischaracterizes.
20              Q.    Is that correct?
21              MS. DONAHUE:  Didn't the person call
22              on background checks?
23              Q.    I'm asking from AK Steel.
24              A.    No one from AK Steel, no.
25              Q.    And no one from AK Steel ever told you
```

1    why you were not hired?

2            A.    That is correct.

3            Q.    And did you ever hear from anybody

4    else why you might not have been hired?

5            A.    No.

6            Q.    Okay.  And I'm assuming that no one at

7    AK Steel ever said anything to you about your race?

8            A.    Not as far as that being a reason not

9    to be hired.

10           Q.    Did they say anything about your race

11   at all?

12           A.    Not that I can recall.

13           Q.    Okay.  Did anyone at AK Steel ever say

14   anything that was discriminatory, that you felt was

15   discriminatory?

16               MS. DONAHUE:  Object to the form.

17           Calls for a legal conclusion.

18           A.    No.

19           Q.    What evidence do you have to support

20   your claim that you were discriminated against

21   because of your race?

22           A.    The statistical report that was

23   compounded by our statistical expert.

24           Q.    Is that it?

25           A.    At this point, yes.

```
 1              Q.    I assume you've seen that report?
 2              A.    Yes.
 3              Q.    Did you do anything to help create
 4     that report?
 5              A.    No, not specifically.
 6              Q.    Okay.
 7              A.    Other than being part of the suit,
 8     plaintiff in the suit.  I had nothing to do with
 9     compounding the information.
10              Q.    Okay.  And do you know who AK Steel
11     hired, if anyone, besides you at the same time when
12     you were applying?  Do you know if AK Steel hired
13     someone else instead of you?
14              A.    No.  I don't know of any individuals
15     who were hired.
16              Q.    Okay.  Do you know who at AK Steel
17     made the decision not to hire you?
18              A.    Not at all.
19              Q.    When did you first learn or believe
20     that you were discriminated against?
21              MS. DONAHUE:  I'd object to the form.
22              That calls for a legal conclusion, but you
23              can answer.
24              A.    I had thought about that after I would
25     say maybe March of '02 when I hadn't heard anything
```

30

1    back.  Again, I felt both interviews went well.
2    There was nothing that had happened that would lead
3    me to believe that I was going to be disqualified.
4              I knew there was nothing as far as
5    background search that was going to disqualify me.
6    And I knew I could pass the physical and the
7    urinalysis if given that opportunity.  So there was
8    no reason in my mind that I should have been
9    disqualified as a candidate.
10             Q.   Is that the only reason you believed
11   it must be because of your race?
12             A.   General sentiment over the years.  I
13   mean, I've had relatives and friends that have worked
14   there that said that there is a hostile racial
15   atmosphere, you know, out at the plant sometimes.
16   But I'm the type of person, you know, I may listen to
17   what people say, but I prefer to have my own
18   experience, make my own conclusion.  So that's why I
19   continued to apply for a position.
20             Q.   Who did you hear this from, this
21   general sentiment?
22             A.   To name specific people, I mean I've
23   heard it all the way back from my grandfather who was
24   an employee to just various people over the years.  I
25   can't even begin to give you a list of people.

```
 1              Q.   Who was your grandfather?
 2              A.   Jesse Jemison.
 3              Q.   How do you spell the last name?
 4              A.   J-e-m-i-s-o-n.  He's a retired
 5    employee.
 6              Q.   I'm assuming he's African American?
 7              A.   Yes.  He's deceased.
 8              Q.   Anyone else that's ever given you --
 9              A.   Great uncle, Doc Kindred, D-o-c
10    K-i-n-d-r-e-d.  Deceased as well.
11              Q.   And he also worked at AK?
12              A.   Uh-huh.  Also African American.
13              Q.   Anyone else?
14              A.   Those are just some of the older
15    people that I've, you know -- again, just giving you
16    a starting point of people that I've heard stories of
17    the discrimination from.
18              Q.   How long ago did -- I'm sorry.
19              A.   How long ago have I heard those
20    stories?
21              Q.   No.  How long ago -- when did your
22    grandfather retire?
23              A.   Oh, it would have been early to
24    mid-'70s.
25              Q.   So he retired actually from Armco?
```

```
1              A.    Uh-huh.
2              Q.    What about your Uncle Doc?
3              A.    Same.  I don't know the specific time
4     he would have retired, but it would have been from
5     Armco as well.
6              Q.    Okay.  Anyone give you that same
7     general sentiment in recent years?
8              A.    Terry Million, an employee that
9     retired from AK.  I have an aunt who just recently
10    retired, Marsha Jemison.  Richard Moore, Cheryl Pratt
11    also worked there for I believe ten years.  And they
12    all told me, you know, when you apply, you know what
13    you're getting into, so.
14             Q.    You listed --
15             A.    With regard to the racial climate.
16             Q.    You listed Terry, did you say --
17             A.    Million as in a million dollars.
18             Q.    He's African American?
19             A.    Yes.
20             Q.    He was an employee or is an employee?
21             A.    Was.  I believe he retired six or
22    seven years ago.
23             Q.    And your aunt?
24             A.    Marsha Jemison.  And she just retired
25    this year.
```

```
 1              Q.    And she's also African American?

 2              A.    Uh-huh.

 3              Q.    And Richard Moore.

 4              A.    Uh-huh.

 5              Q.    Is he African American?

 6              A.    Yes.

 7              Q.    Is he still there or is he --

 8              A.    No.  I believe he retired in late

 9    '80s.

10              Q.    And Cheryl Pratt.

11              A.    And she was also an employee when it

12    was Armco.  She did not retire.

13              Q.    Is she still there?

14              A.    No.

15              Q.    Did she quit?

16              A.    She left for another position actually

17    with Procter and Gamble.

18              Q.    And she's African American?

19              A.    No.

20              Q.    No.  What did she tell you about

21    working at AK?

22              A.    She just -- basically, the same thing.

23    She said, you know, you know what the environment

24    that you're about to get into.  You have to watch out

25    for yourself.
```

1          Q.    Is that all she said?

2          A.    I mean, that's a synopsis.

3          Q.    Okay.  What about Richard Moore, what

4     did he say?

5          A.    Pretty much the same thing.  Pretty

6     much the same thing from all of those individuals.

7          Q.    What were their exact words?

8          A.    I couldn't begin to give you exact

9     words.  I mean those discussions were held over the

10    span of several years.  Again, I couldn't give you

11    exact words.

12         Q.    When were the discussions held?

13         A.    Again, over the span of several years.

14    I couldn't give you exact times.

15         Q.    What years?

16         A.    The last --

17               THE WITNESS:  I'm sorry.

18               MS. DONAHUE:  Just don't talk over

19         each other.  Both of you I mean.

20         A.    The last 20.

21         Q.    So sometime --

22         A.    Well, I wouldn't even say the last 20.

23    The last -- let's see.  First time I ever even

24    mentioned interest would have probably been about --

25    well, yeah, about the last 20.  About '88 was the

1    first time I even talked to them about the
2    possibility of working.  I never applied, though.
3              Q.    So sometime after the last 20 years
4    these four individuals said something to the effect
5    that, "Well, you know what type of environment it is.
6    You need to watch out for yourself."
7              A.    Yes.
8              Q.    Did they say anything else?
9              A.    Not that I specifically can name.
10             Q.    Did they give you any specific
11   examples of problems?
12             A.    Of racially-related problems?
13             Q.    Whatever environment they're talking
14   about.
15             A.    Specifics, not that I can remember,
16   no.
17             Q.    Okay.
18             A.    That I could recite at this time.
19             Q.    Okay.  So in about March 2002, that's
20   when you started thinking that you had been
21   discriminated against?
22             A.    That's when I really thought that,
23   because I hadn't heard anything back, what are the
24   possibilities, and that was the lead possibility in
25   my mind.

1          Q.    Why was that the lead?

2          A.    Because, again, I felt that I was an

3  ideal applicant.  I'd already worked for a Fortune 50

4  company for five years without incident.  I'd been an

5  exemplary sailor in the navy.  Never had any problems

6  with any of my previous employers.

7            As far as the qualifications that Ms.

8  Hicks expressed that they were looking for in the way

9  of personnel, I felt I met that profile as well, so I

10  did not see any specific reason to disqualify me

11  other than race.

12          Q.  What were the specific qualifications

13  she said she was looking for?

14          A.  They were looking for people with

15  mechanical and/or technical aptitude who would be

16  willing to work rotating shifts in the conditions,

17  the environmental conditions that exist in that steel

18  mill.

19          Q.  Have you ever applied anywhere else

20  and not been hired?

21          A.    Yes.

22          Q.    Was that because of your race?

23          A.    I don't know.

24          Q.    Did you --

25          A.    There are times that I speculated

1    that, yes, though, if that's -- after defining your

2    question.

3            Q.    Have you ever applied somewhere and

4    not been hired and thought it was because of a reason

5    not related to your race?

6            A.    Yes.  I'm sure I have.

7            Q.    Why weren't you hired there?

8            A.    I have to take a moment to think of a

9    specific job.

10           I don't know.  I guess they just

11   didn't feel I was a qualified applicant.

12           Q.    Okay.

13           A.    But I'd also like to add to that that

14   the majority of those, the vast majority of those

15   places I never even interviewed one time with.

16           Q.    Why do you point that out?

17           A.    I think it's a very rare opportunity

18   that a company would invest two interviews, verbally

19   state that they're going to do a background check,

20   and acknowledge that the following step would be a

21   urinalysis/physical if there wasn't a serious intent

22   to consider this individual for employment.

23                              (Defendant's Exhibit 2
                                 was marked for identi-
24                              fication.)

25           Q.    Okay.  You've been handed what's been

1    marked as Exhibit Number 2.  Is that your signature?

2          A.    Yes, it is.

3          Q.    And you signed this on August 28th,

4    2001?

5          A.    Correct.

6          Q.    And this was a waiver and release to

7    have a reference and background check done?

8          A.    Okay.

9          Q.    Is that right?

10         A.    I believe so, yes.

11         Q.    Is that your handwriting in the parens

12   near the bottom?

13         A.    Yes.

14         Q.    What does that say?

15         A.    It says, "I authorize it.  However, it

16   is against P and G policy to provide such

17   information."

18         Q.    What did you mean by that?

19         A.    As part of my background investigation

20   I assumed that my most previous employer would be one

21   of the first places to check for reference.  And at

22   the time of our separation we were told, again, we

23   were told, that the company would not provide any

24   details with regard to employment other than dates of

25   hire, and dates of separation in my case.

```
1            Q.   So they wouldn't provide any kind of
2     reference or --
3            A.   That's what I was told.
4            Q.   Okay.  You pointed that out because
5     you were concerned by that or --
6            A.   No.  I pointed that out because if
7     there was a potential roadblock there of sorts, I
8     wanted them to know why, or at least to my knowledge
9     why they may be facing a roadblock.
10                              (Defendant's Exhibit 3
                                was marked for identi-
11                              fication.)
12           Q.   You've been handed what's been marked
13    as Exhibit Number 3.  Is that your handwriting on
14    Exhibit 3?
15           A.   Yes, it is.
16           Q.   Is that your name at the top?
17           A.   Yes, it is.
18           Q.   And is this something you also filled
19    out on August 28th, 2001?
20           A.   That's correct.
21           Q.   Okay.  It asks you "How many times
22    have you been without employment for more than six
23    weeks?"  And you say none.  Didn't you tell me that
24    it was about two months in between the navy and
25    Procter and Gamble?
```

1          A.    Yes.  It says other than exiting the

2     military.  And when I exited the military, that's

3     when I began working for Procter and Gamble.

4          Q.    Okay.  And then number ten it asks how

5     many years of assembly, heavy machinery and/or

6     manufacturing experience you had.  You list five.

7     Where was that five at?

8          A.    There was a position I had back in the

9     '80s with a company called Hamilton Fixture.  We

10    assembled -- basically, they're the desks, if you

11    will, that they put cash registers on in retail

12    establishments.

13          That's not going to be listed.  It was

14    just a summer job before I went to college.  We

15    assembled equipment as well while I was in the

16    military.  Let's see.

17          Q.    So how many months -- how long did you

18    work for Hamilton Fixtures?

19          A.    Three months maybe.

20          Q.    Any place --

21          A.    And, again, I was in the service for

22    six years.  I mean, we assembled equipment,

23    cabinetry.  We assist with the contractors with the

24    installs regularly.  So, I mean, just that alone.  I

25    was in the service for six years.  I mean, that's

```
 1   above the five years alone.
 2              Q.    Why did you write five years?  Where
 3   do you get the five years from?
 4              A.    Duration that I was in the military.
 5   I was in the military for six years.  There was five
 6   years of me actually helping with the contractors and
 7   assembling equipment as part of the roles of my job.
 8              I mean, we assembled damage control
 9   equipment.  There's -- within the navy there's a lot
10   more work and responsibility other than your specific
11   job.
12              So, I mean, I had mechanical work with
13   regard to valves and hoses, and, you know, the full
14   array of damage control equipment we would use aboard
15   a ship.
16              Q.    And you would consider that assembly
17   experience?
18              A.    Pumps.  Yes.  We had to disassemble
19   them for preventive maintenance and put them back
20   together.
21              Q.    What did you do for the other year of
22   your military?
23              A.    Mostly schooling.
24              Q.    How long were you in school in the
25   military?
```

1          A.    It was just over a year if you -- my

2    initial school.  Just over a year if you compounded

3    it all together, school time.  But I had some

4    additional schools afterward that if you added it all

5    together, it would be close to a year and a half.

6          Q.    You say that was during your time in

7    the military?

8          A.    Correct.

9          Q.    So about a year and a half of your

10   time in the military was spent in schooling?

11         A.    Correct.

12         Q.    And the rest of your time in the

13   military was spent doing what?

14         A.    My job, but, I mean, when you're in

15   school -- there's an initial phase of schooling.

16   It's called A school.  Think of it as a strict

17   technical school where basically you just get up, you

18   go to school, you stand watches, and basically

19   everything is geared around your initial education.

20              Once you finish A school they have

21   what they call C schools.  They're more specialty

22   schools for particular subsystems.  You can have C

23   schools where you go to school during the day but

24   you're still attached to your ship, meaning you still

25   have duties specific to your ship or your command.

```
 1              And then you can have C schools where
 2   you're actually temporarily dis-- or unattached, and
 3   then you go specifically to school, and then once
 4   you're finished with the school you get re-attached
 5   to the ship.
 6              So I only -- during that duration I
 7   only had one school where I was temporary
 8   unattachment.  The rest of the time I was still
 9   attached to the ship and I was still coming back and
10   doing my PMS duties with regard to damage control,
11   standing my watches, and standing duty.
12         Q.   So when you responded to question
13   number ten, you were referring to the military
14   service and the three months at Hamilton Fixture?
15         A.   Primarily the military service.  I was
16   just stating the three months in Hamilton Fixture as
17   additional time.
18         Q.   Okay.  And when was it, again, that
19   you went to Hamilton Fixture?
20         A.   It had been June of '85 through August
21   of '85.
22         Q.   When did you go into the military?
23         A.   1990.
24         Q.   What did you do between '85 and '90?
25         A.   Worked a few different part-time jobs.
```

```
 1    Well, obviously I went to Penn State when I came back

 2    from school.  Was actually going to go to school here

 3    in Ohio.  And I started working a job and got several

 4    part-time jobs at one point.  Just continued on that

 5    path until I decided to go into the military because

 6    it wasn't leading me down the direction I wanted to

 7    go.

 8                         (Defendant's Exhibit 4
                           was marked for identi-
 9                         fication.)

10         Q.   You've been handed what's been marked

11    as Sloan Exhibit 4.

12         A.   Uh-huh.

13         Q.   Do you recognize this document?

14         A.   Yes, I do.

15         Q.   What is it?

16         A.   Charge of Discrimination filed with

17    the Equal Employment Opportunity Commission.

18         Q.   Is that your signature on the bottom

19    of page one?

20         A.   Yes, it is.

21         Q.   And is that your signature on the last

22    page?

23         A.   Yes, it is.

24         Q.   And you filed this sometime on or

25    after June 17th, 2002?
```

 1          A.    That's correct.

 2          Q.    Did you prepare this document?

 3          A.    I gave the data that is listed in

 4    section two, Statement of Personal Harm, and the

 5    background data that's listed on the first page.

 6          Q.    Did you review it before you signed

 7    it?

 8          A.    Yes, I did.

 9          Q.    Did you agree that everything was true

10    and correct?

11          A.    Yes.

12          Q.    And that includes not only what's in

13    paragraph two, but paragraphs one, three and -- one,

14    three and two again?

15          A.    Paragraphs or the sections?

16          Q.    Sections.  I'm sorry.  Sections.

17          A.    That is correct.

18          Q.    Okay.  Who told you to file a charge?

19          MS. DONAHUE:  Let's be cautious here,

20          because this might involve attorney-client

21          privilege material, but you can answer.

22          A.    I had been made aware that there were

23    other individuals who had filed a charge who had what

24    they believed to be similar experiences with AK.  And

25    in an effort to have something permanently done to

1  resolve what we thought was an unfair hiring

2  practice, it would be in my best interest to file a

3  charge.

4          Q.   Who told you that?

5          A.   Specifically, I believe Allen Roberts

6  and I had a discussion.  He was aware of other

7  individuals who had filed charges.

8          Q.   How did you get in to contact with

9  Allen Roberts?

10         A.   Actually, we came across each other in

11  the course of me working as a bartender.  He and his

12  wife had come into the restaurant.  We hadn't seen

13  each other in a few years.  And we had a discussion,

14  and that was part of that discussion.

15         Q.   Did you tell him you had applied at

16  AK?

17         A.   Yes, I had.

18         Q.   And what did he tell you?

19         A.   I had told him, basically, all the

20  information in a synopsis form that's listed as far

21  as my statement within this charge.  And he said,

22  "There's a number that I need to give you of some

23  attorneys you may like to call."  He said, "And I

24  would also recommend that you seriously consider

25  filing a charge of discrimination with the EEOC."

1          Q.    So this meeting was before you filed
2     the charge with the EEOC?
3          A.    Correct.
4          Q.    Was it after March of 2002 when you
5     decided that you thought it was because of your race?
6          A.    Yes.  As a matter of fact, he and I
7     did meet after that point.
8          Q.    So you had already concluded this in
9     your own mind at that point?
10         A.    Yes.  I strongly believed it, yes.
11         Q.    So you did then contact the attorneys
12    that he -- numbers that he gave?  I don't want to
13    know what you told the attorneys.
14         A.    Yes.
15         Q.    And as a result you filed a charge?
16         A.    Yes.
17         Q.    Now, in your charge you say that in
18    September 2001 you put in an application.  Now,
19    that's not correct, is it?
20         A.    Yeah.  We're off by, what, three days.
21         Q.    And you state that you submitted an
22    application by a way of State of Ohio's Unemployment
23    Services?
24         A.    That is correct.
25         Q.    You state that you initially submitted

1    my application by giving it to friends and then

2    submitted it.  How many times did you fill out the

3    application?

4              A.   Well, I filled out the application, as

5    I said, with Gardner.  I stated that earlier.  And

6    then this time here, so that would be twice.

7              Q.   So earlier when I asked you how many

8    times you filled out the application, you were

9    mistaken when you said once?

10             A.   You said how many times had I

11   submitted.  I thought you said how many times had I

12   submitted an application to AK.  And I only submitted

13   one.  I gave one to Gardner.  And I can't say for

14   sure that it was submitted.  I know that I physically

15   gave this to the bureau of employment services, so

16   I'm pretty sure that one did make it to the company.

17             Q.   And this is Exhibit 1?

18             A.   That is correct.

19             Q.   Okay.  And just so I'm clear, is this

20   a different copy?  In other words, did you fill out

21   two different times an application, or did you have a

22   copy of the one you'd already given to Gardner?

23                  MS. DONAHUE:  Object to the form.

24                  Compound.  Let's just ask one thing at a

25                  time.

1          A.    Restate your first question, please.

2          Q.    Is Exhibit 1 a different --

3          A.    Copy than what I gave Gardner, yes.

4          Q.    Okay.

5          A.    Yes.

6          Q.    So you did actually complete the

7     application two times?

8          A.    Yes.  But I don't believe -- matter of

9     fact, I'm sure it didn't have all the pages that this

10    application does.

11         Q.    The one that you submitted with

12    Gardner?

13         A.    Correct.

14         Q.    Did not have all the pages as Exhibit

15    1?

16         A.    I don't believe so, no.

17         Q.    Okay.  And you don't have a copy of

18    whatever it is that you submitted to Gardner.

19         A.    No.

20         Q.    And you don't know when you submitted

21    that?

22         A.    That would have been before this one.

23    Specifically, no.

24         Q.    Okay.

25         A.    But it was before that.  I do know

```
 1    that.
 2            Q.    So sometime after August 28th?
 3            A.    Correct.
 4            Q.    Okay.  You know how long -- I'm sorry.
 5    Go ahead.
 6            A.    Give me just a moment.  No.  I'm
 7    trying to actually isolate a little smaller timeframe
 8    for you, and I can't.
 9            Q.    Okay.  Why did you go to the State of
10    Ohio's Unemployment Services to submit your
11    application?
12            A.    I had been told, and I can't remember
13    by whom, I believe it was a family member, that they
14    were accepting applications for AK Steel employment.
15    I believe it was my grandmother.  I can't say for
16    sure.
17            Q.    When you say that they were accepting,
18    you mean the --
19            A.    The company.  AK Steel was accepting
20    applications through the Bureau of Unemployment
21    Services.
22            Q.    Okay.  In your last paragraph of the
23    first -- actually, I guess it's the second page of
24    the charge.
25            A.    Okay.
```

1          Q.    Yes.  Last paragraph there you talk

2    about taking a qualifying exam in November 2001.

3          A.    I thought it was November.  You said

4    it was October 20th.

5          Q.    Somewhere around that time.

6          A.    A couple weeks.

7          Q.    Okay.  You say that "At this time, an

8    AK Steel representative told me that, in order to be

9    considered for a management position, the requirement

10   was a test score above a certain level."  Who told

11   you that?

12         A.    There was a phone call that I had

13   with -- I don't have the name with me.  I do have it

14   at home.  Female that worked actually in the

15   administrative buildings.  I can't remember her name

16   at this time, but I know I've got it written down at

17   home.

18         Q.    Why do you have it written down at

19   home?

20         A.    When she and I had that phone

21   discussion I actually wrote it down on a little

22   scratch pad the details of what we talked about.

23         Q.    And you still have that?

24         A.    Yeah.  I have a little file with that

25   pad.

© **Ace-Merit, LLC**   **(513) 241-3200**
**30 Garfield Place, Suite 620   Cincinnati, Ohio  45202**

```
 1              Q.    What else is in that file?

 2              A.    Just information that I've compiled

 3    for my attorneys over the duration of the suit.

 4              Q.    Any other notes that you've taken?

 5              A.    Nothing outside of what I've discussed

 6    with my attorneys.

 7                    MS. PRYOR:  I'm sure that document was

 8                    part of our request that we've previously

 9                    made.

10                    MS. DONAHUE:  I really don't know.

11                    I'll have to look at it.

12              Q.    What did this -- you said there was a

13    telephone call.  When did this telephone call occur?

14              A.    Off the top of my head, I can't

15    remember.  It was during that time, but it was prior

16    to taking the test, because, again, we were told to

17    not contact anyone after taking the test.

18              Q.    Did you contact this person?

19              A.    I got the administrative number from

20    the phone book and I called HR and this individual

21    worked within HR.  And I asked the question so I knew

22    if they were actually hiring for management and labor

23    positions both.

24              Q.    Okay.

25              A.    Because I had listed that on my
```

1    application, but general feeling that I had gotten

2    when I submitted the application from the folks at

3    the bureau is that they were looking for labor

4    persons only.

5         Q.   So you called someone in HR.

6         A.   Correct.

7         Q.   And asked them if they were hiring for

8    labor and management positions?

9         A.   Correct.

10        Q.   And what did she say?

11        A.   She said they were, and there would be

12   a test taken and there was a cut-off score for the

13   labor position, and there was another cut-off score

14   for management.  So depending upon how well you did

15   on that test, it would dictate if you were even

16   eligible for a management position.

17             And I also asked her if they extended

18   employment in a management position to individuals

19   without degrees.  And she said that would be based

20   upon initially the score and then your background,

21   your experience, and general feel through the

22   interview process.

23        Q.   I'm sorry.  You asked her if it was

24   based on degree?

25        A.   Correct.  Having or not having.

```
 1              Q.   And what did she say?
 2              A.   She said it would initially be based
 3     off of the score.  That would be the first criteria
 4     that you would have to pass.  Then it would be based
 5     upon your interview, your experience, and the general
 6     feel of your attributes.
 7                   So, in essence, there was a
 8     possibility if you did not have a four-year degree,
 9     that you could get into a management type position.
10                   She did confirm to me that there were
11     people working in the mill in management positions
12     who did not have degrees.
13              Q.   Did she say anything else?
14              A.   No.
15              Q.   And you say "The questions tested
16     basic math and English, as well as mechanical
17     reasoning."  Is that correct?
18              A.   Correct.
19              Q.   That was like any kind of standardized
20     test?
21              A.   Similar to.
22              Q.   Okay.  You say that when you talked to
23     Jessica Hicks, she said that people only receive a
24     pass/fail grade on the test.  Is that correct?
25              A.   Yes.
```

```
 1              Q.   Did you see a copy of the complaint
 2    before it was filed?
 3              A.    The complaint?
 4              Q.    The complaint that initiated the
 5    lawsuit.
 6              A.    I believe so.  Do you have a copy so I
 7    can confirm that?
 8                  MS. PRYOR:  Do you need a break?
 9                  MS. DONAHUE:  It's been more than an
10            hour.
11                  MR. KAMMER:  If you don't mind just
12            taking a short break.
13                  MS. PRYOR:  That's fine.  Okay.
14                  (Recess taken:   12:09 PM - 12:18 PM.)
15    BY MS. PRYOR:
16                            (Defendant's Exhibit 5
                              was marked for identi-
17                            fication.)
18              Q.   You've been handed what's been marked
19    as Exhibit 5.  Have you seen Exhibit 5 before?
20              A.   Yes, I have.
21              Q.   This is a copy of the complaint that
22    was filed on your behalf?
23              A.   Yes.
24              Q.   Okay.  Did you review it before it was
25    filed?
```

```
 1              A.   Yes.
 2              Q.   Did you verify that the parts relating
 3    to you were accurate?
 4              A.   Yes.  It looks correct.
 5              Q.   Initially, you were seeking to be a
 6    class representative.  Is that correct?
 7              A.   Yes.
 8              Q.   You intended to represent a class of
 9    people?
10              A.   Correct.
11              Q.   As part of that role, were you keeping
12    abreast of what was going on with the lawsuit?
13              A.   Through information shared with me
14    with my attorneys.
15              Q.   Was there ever a period of time when
16    you were not kept abreast or you felt like you were
17    not kept abreast?
18              A.   Yes.
19              Q.   When was that?
20              MS. DONAHUE:  I think we're going to
21              object to this on the grounds that it
22              relates to communications with attorneys
23              and his characterizations of them.
24              Q.   And I don't want characterizations of
25    your -- what I want to know is whether you as a, at
```

1    the time, individual seeking to be a class

2    representative were keeping abreast of the matters

3    going on in the lawsuit.

4              A.    Yes.   There was a period of time when

5    Mr. Sanford I believe was the lead, or at least had

6    been indicated as lead, that I didn't feel I was

7    getting as much information as I would have liked.

8              Q.    And do you know when that period of

9    time was?

10             A.    I believe the year was actually 2003,

11   but I can't say definitively.

12             Q.    Sometime around -- throughout that

13   period of time you knew the lawsuit was still going

14   on.

15             A.    Meaning?

16             Q.    You said that you were not receiving

17   as much information.

18             A.    Yes.   I knew we were still continuing,

19   but I hadn't been receiving the amount of detail that

20   I would have liked with regard to progression.

21                             (Defendant's Exhibit 6
                               was marked for identi-
22                             fication.)

23             Q.    Okay.   You've been handed what's been

24   marked as Exhibit 6.   Have you ever seen Exhibit 6

25   before?

```
 1              A.   I don't believe so.
 2              Q.   You never have?
 3              MS. DONAHUE:  Look through the whole
 4         document first.
 5              A.   I can't say that I specifically
 6    remember seeing this specific document, no.
 7              Q.   Have you ever -- were you aware that
 8    defendant, being AK Steel, had asked that you produce
 9    certain documents?
10              A.   Yes.
11              Q.   When did you become aware of that?
12              A.   There was a period earlier where we
13    had been asked to provide tax information.  And I
14    had.  I don't know if that information was actually
15    requested by AK or simply by our attorneys.  And
16    there was the period most recently.
17              Q.   Well, could it have been back around
18    November 2002 when you were asked to provide
19    information?
20              A.   Can you point out exactly where you're
21    referring?
22              Q.   That's the last page.
23              MS. DONAHUE:  Do you understand --
24         maybe I can just help this.  This is the
25         date.  She's asking that this is the date
```

```
 1              that this was submitted.
 2                   THE WITNESS:  Okay.
 3                   MS. DONAHUE:  That's the significance
 4              of the date.
 5    BY MS. PRYOR:
 6              Q.   Yes.  Your attorney submitted that to
 7    us around November 27th.  Could it have been back in
 8    November/December of 2002 when you were first asked
 9    to provide documents?
10              A.   I'm assuming that I saw it, but I
11    don't -- again, I don't specifically remember seeing
12    the document.
13              Q.   Were you asked to gather anything
14    other than tax records?
15              A.   The only other thing they asked us to
16    do is if we had any planners that had dates indicated
17    in there or information in our planners, to provide
18    those as well.  Any detailed notes of conversations,
19    things of that nature.
20              Q.   Did they ask for those?
21              A.   Detailed.  Yeah.  Asked for anything
22    with actual details on them.
23              Q.   And you already testified about one
24    note that you made about a conversation you had with
25    someone in HR.
```

1          A.    What I said is I wrote down her name

2     and number on a notepad.

3          Q.    Okay.

4          A.    There may be a couple other words on

5     there.  I mean, I don't really consider that

6     detailed.

7          Q.    But you kept it?

8          A.    I do believe I have it, because I

9     wanted to maintain that name if it was ever an issue.

10          Q.    Is there any other note or document

11     that you kept, maintained?

12          A.    Not that I can think of, no.

13                        (Defendant's Exhibit 7
                          was marked for identi-
14                        fication.)

15          Q.    Okay.  You've been handed what's been

16     marked as Exhibit 7.  Have you ever seen that before?

17          A.    No.  I don't think I've seen this

18     document.

19                MS. DONAHUE:  This part (indicating).

20          A.    Well, I saw where it's listed what

21     information I provided, but I don't think I've ever

22     seen this complete document, no.

23          Q.    Were you asked to provide information

24     about what witnesses you thought you had and what

25     documents you had?

1         A.    Yes.  I believe so, yes.

2         Q.    Would it have been roughly around

3    February 2003?

4         A.    Honestly, I don't remember a date.

5         Q.    Could have been?

6         A.    Could have been, yes.

7         Q.    All right.  And you've, at least

8    according to this document, your witness is listed as

9    Jessica Hicks?

10        A.    Yes, because of our face-to-face

11   interaction.

12        Q.    Is that the only person you believe is

13   a witness to?

14        A.    At that time, yes.

15        Q.    Has that changed?

16        A.    Per our discussion now I guess the

17   lady I'm referring to on this note could potentially

18   be a witness, but I didn't know without us having

19   face-to-face interaction if that was a possibility at

20   that time.

21        Q.    Okay.  And documents you've listed

22   your tax returns, your EEOC charge, resumes.  What

23   resumes do you have?

24        A.    The resume that I had submitted along

25   with the application.

1         Q.    Do you have any other resumes?

2         A.    My current resumes.  I mean, that list

3    all my employment since this period.

4         Q.    Okay.

5         A.    I don't have them with me if that's

6    what you're asking.

7         Q.    No.  I'm not.  You do have a current

8    resume?

9         A.    Yes.

10        Q.    You say cover letter.  What cover

11   letter are you talking about?

12        A.    Again, the cover letter I would have

13   submitted with the application.

14        Q.    Do you have a copy of this cover

15   letter?

16        A.    I may have at home.  I don't remember

17   for sure if I've kept it on file.

18        Q.    You have electronics certificate.

19   What is that?

20        A.    Completion of electronics schooling.

21        Q.    Was that with the navy?

22        A.    Uh-huh.

23        Q.    Are you aware that you moved to amend

24   the complaint on April 30th, 2003?

25        A.    I don't remember specifically with

1    what intent.

2                    MS. DONAHUE:  I object to this.  These

3            are things his lawyers do on his behalf.

4            Go ahead.

5            MS. PRYOR:  Well, he's represented he

6            kept abreast of the proceedings as class

7            representative at the time.

8    A.    Attempted to.

9                    MS. DONAHUE:  He's no longer a class

10            representative.

11            MS. PRYOR:  I understand that.

12            MS. DONAHUE:  And, also, these call

13            for legal conclusions.  These are

14            testifying about legal matters, and he's

15            not --

16            MS. PRYOR:  I'm not asking him to

17            testify about legal matters.  I'm asking

18            him to testify about what he knew about.

19            MS. DONAHUE:  Okay.

20                                    (Defendant's Exhibit 8
                                    was marked for identi-
21                                    fication.)

22    BY MS. PRYOR:

23            Q.  Have you ever seen Deposition Number 8

24    before?

25            MR. KAMMER:  Just want to throw a

```
 1              point of clarification.  Tobias, Kraus and
 2              Torchia is not an LLP as listed on this
 3              document.  It's neither here nor there as
 4              far as your question, but I noticed that.
 5                   MS. PRYOR:  Worried about your
 6              liability there?
 7                   MR. KAMMER:  You never know.
 8    BY MS. PRYOR:
 9         A.   I don't recall seeing the document.
10         Q.   Have you ever seen another complaint
11    other than the initial one filed?
12         A.   I've seen -- our attorneys have given
13    us updates as far as the specific documents.  There
14    have been some that have been shared with us, but
15    most --
16         Q.   And I don't need specifics.
17                   MS. DONAHUE:  I think I object to this
18              whole line of questioning about, you know,
19              which legal documents he saw and which ones
20              he didn't see.
21                   His lawyers prepare these on his
22              behalf.  That's a common thing that's done.
23              He's -- I think that this question is
24              getting very close to probing in to the
25              attorney work product doctrine.
```

```
 1              MS. PRYOR:  And I'm not meaning to do
 2          that.  All I'm asking is at the time he was
 3          a class representative I'm asking what he
 4          had knowledge about and what things he was
 5          keeping abreast about.  That's all.
 6              MS. DONAHUE:  That's fine.  And that
 7          can be questioned without looking at
 8          documents as a matter of fact, but go
 9          ahead.
10   BY MS. PRYOR:
11          A.   Well, what I was about to summarize is
12   that there were issues that we had knowledge of that
13   we didn't necessarily see the document.
14          Q.   Okay.
15          A.   There were summarizing letters that
16   were sent to us with regard to progress.
17              MS. DONAHUE:  Again, I object to any
18          characterization of anything your attorneys
19          have done on your behalf.  That is really
20          out of the bounds and I'll instruct you not
21          to answer further questions.  Okay?
22              MS. PRYOR:  That's fine.  All I was
23          asking is what he thinks.
24              MS. DONAHUE:  Just listen to her
25          question and just answer her question.
```

```
 1                    THE WITNESS:  Okay.
 2      BY MS. PRYOR:
 3              Q.   What damages are you seeking in this
 4      lawsuit?
 5              A.   All that the court would allow.
 6              Q.   Money damages?
 7              A.   What the court deems appropriate.
 8              Q.   Do you think you're entitled to money
 9      damages?
10              A.   Yes.
11              Q.   Do you have a figure for how much
12      you're entitled to?
13              A.   What the court deems appropriate.
14              Q.   If the court deems $5 is appropriate,
15      is that acceptable?
16                   MS. DONAHUE:  Object.  Object.  That's
17              argumentative.
18                   MS. PRYOR:  No, it's not.  I'm
19              asking -- he said what the court deems
20              appropriate.  I'm asking what those
21              boundaries are.
22                   MS. DONAHUE:  Objection.
23      BY MS. PRYOR:
24              A.   I haven't established boundaries.
25      I've gone with the premise that what the court deems
```

```
 1    appropriate would be what we go with.
 2             Q.   So you have no figure in mind in terms
 3    of what your damages are?
 4                  MS. DONAHUE:  Objection.  Objection.
 5             Argumentative.
 6             Q.   Do you have any figure in mind?
 7                  MS. DONAHUE:  Objection.  Asked and
 8             answered.
 9             Q.   You can answer again.
10             A.   What the court deems appropriate.
11             Q.   So you do not have any figure in mind.
12                  MS. DONAHUE:  Objection to the form.
13             Asked and answered.  Argumentative.
14             A.   Again, what the court deems
15    appropriate.
16             Q.   It's a yes or no question.
17             A.   And that's my answer.
18             Q.   Okay.  That's fine.
19                  You think you're entitled to money
20    damages.  What is money damages for?
21             A.   The discrimination charge pretty much
22    states I think everything that we feel we were
23    deprived of.
24             Q.   You understand you no longer are part
25    of the class.  Correct?
```

1          A.    Yes.

2          Q.    You currently are kind of proceeding

3    as an individual.  Correct?

4          A.    Yes.

5          Q.    So when you talk about "we," I'm

6    asking what you as an individual now are seeking.

7          A.    Again, what the court allows.  I

8    believe once all the evidence is presented, then we

9    will see what the court deems appropriate.

10          Q.    You, sitting here today, can't tell me

11    anything you've been damaged?  Can you give me any

12    amount you've been damaged?

13              MS. DONAHUE:  Object to the form.

14          Asked and answered.  Argumentative.

15          Q.    Answer it.

16          A.    I believe that's something for the

17    court to decide.  Again, once all the evidence is

18    produced.

19          Q.    Let me ask you this.  Let me ask you a

20    different way.  What evidence do you have of how

21    you've been damaged?

22          A.    The lack of having that job

23    opportunity.

24          Q.    So you're seeking compensation for not

25    having that job opportunity.

1          A.    That would be part.

2          Q.    What's the other part?

3          A.    Whatever else the court deems
4     necessary in the case I present.

5          Q.    That's what I'm asking about, the case
6     you're going to present.  What other evidence are you
7     going to present about what your damages are?

8               MS. DONAHUE:  Object to the form.
9               This calls for a legal conclusion and legal
10              analysis.  That is completely beyond what
11              he does as a plaintiff.

12              MS. PRYOR:  That's fine.

13         Q.    But what do you have -- if I asked you
14    how can you prove your damages, what can you prove?

15         A.    With the assistance of my attorneys,
16    everything that we've stated thus far in the suit.

17         Q.    And what is that?

18         A.    Just that there was statistical data
19    that shows there is a racial disparity in the hiring
20    process within AK.  And I feel that I was damaged
21    with regard to having an opportunity to work with AK
22    because of that.

23         Q.    Okay.  Have you always been seeking
24    the same damages?

25              MS. DONAHUE:  Object to the form.

1          A.    Since we've separated or separated the

2     class and individuals, I believe everything is pretty

3     much still the same, yes.

4          Q.    Prior to the separation did you

5     believe you were entitled to damages when you filed

6     your EEOC charge?

7          A.    The case, I don't think -- I don't

8     know if the actual case was filed at that point, that

9     just the EEOC charge was filed.  I'm trying to get an

10    idea of what you mean by timeline here.

11         Q.    Let's say when the initial case was

12    filed, you believe you were entitled to damages at

13    that time?

14         A.    I believe the court will determine

15    what would be appropriate if it got that far.

16         Q.    And you're asking the court to

17    determine what the damages are.

18         A.    If we got that far, yes.

19         Q.    Okay.  So at least since June 26th,

20    2002 you believe that you've been entitled to damages

21    from AK Steel.

22              MS. DONAHUE:  Object to the form.

23              Asked and answered.  Argumentative.

24              This is -- you know, you asked this

25              same question several times.

1          MS. PRYOR:  I'm not getting much of a

2          response but --

3          A.  Yes.

4          MS. DONAHUE:  He is responding to your

5          question.  You just don't like the answer.

6          MS. PRYOR:  No.  I like the answer

7          fine.  I want the question answered.

8          Q.  Have you ever been convicted of a

9    crime?

10         A.  No.

11         Q.  You ever been convicted of -- I know

12   in the complaint you say you've never been convicted

13   of a felony.  Have you ever been convicted of a

14   misdemeanor?

15         A.  No.

16         Q.  Never?

17         A.  Speeding ticket.

18         Q.  When was the speeding ticket?

19         A.  I've had a few.  I can't give you

20   specific dates, but I'll acknowledge I've had some.

21         Q.  Those are just basic speeding tickets,

22   going over the speed limit?

23         A.  Yes.

24                         (Defendant's Exhibit 9
                           was marked for identi-
25                         fication.)

1          Q.    You've been handed what's been marked

2     as Exhibit Number 9.  Have you seen this document

3     before?

4          A.    I provided all the information that's

5     summarized in the document.

6          Q.    Have you ever seen the document

7     before?

8          A.    I have not seen the typed document.

9          Q.    Okay.  The last page, is that your

10    signature?

11         A.    Yes, it is.

12         Q.    What were you signing?

13         A.    To the information that I provided,

14    because what I did is I actually provided my

15    information on a separate form.  I had seen the

16    questions that had been listed as interrogatory

17    questions.

18         Q.    Okay.  So --

19         A.    And I --

20         Q.    Go ahead.

21         A.    And once I saw those questions, I

22    answered the questions on a separate document.  And

23    this page was part of the verification of my answers

24    to those interrogatories, which I'm verifying that it

25    was, and that is summarized from, it looks like page

1    four -- well, actual questions -- yeah, page four

2    through page eight.

3            Q.    So this verification really does not

4    pertain to this actual document then.  Is that what

5    you're telling me?

6            MS. DONAHUE:  Object to the form.

7            A.    The complete document I have not seen.

8    The interrogatory questions, yes.

9            Q.    Okay.  The interrogatory answers that

10    are on the document before you.

11            A.    Yes.

12            Q.    Exhibit 7.

13            A.    Those are my answers.

14            Q.    Those are the answers that you wrote?

15            A.    Yes.

16            Q.    And they are true and correct?

17            A.    Yes.

18            Q.    Okay.  On page four, response to

19    number one, Identify all litigation or legal

20    proceedings in which you've been a witness or party.

21    What's the first one, Capital One Bank v. you?

22            A.    That was part of -- or prior to my

23    bankruptcy.  Capital One Bank was suing me for unpaid

24    debt.

25            Q.    What was the unpaid debt?

```
 1              A.    The balance of a credit card.

 2              Q.    How much was that?

 3              A.    I don't remember specifically.

 4              Q.    Okay.  What about the next one, Ronald

 5     E. Sloan, Junior v. Kevin Watts?

 6              A.    That was a civil suit.  Collection of

 7     personal debt.  I had actually paid for him to use a

 8     party room at my apartment building.  He never paid

 9     me back for it, which we'd agreed upon ahead of time.

10     And I had to take it to civil court.  And his wages

11     were garnished as a way of repaying me.

12              Q.    Is he a friend of yours?

13              A.    Yes.

14              Q.    You have roughly what year that might

15     have been?

16              A.    I don't, actually.

17              Q.    Was it before 2003?

18              A.    I honestly don't remember.

19              Q.    Don't remember.  The next one I think

20     we've talked about already.  That's the one against

21     RL Stevens.

22              A.    Uh-huh.

23              Q.    And then the last one is In re:

24     Ronald and Trica Sloan.  That's a bankruptcy?

25              A.    Correct.
```

1        Q.    You filed a bankruptcy in, it looks

2    like, 2003?

3        A.    That is correct.

4        Q.    That was discharged in 2003?

5        A.    Correct as well.

6        Q.    Was that a no asset bankruptcy

7    discharge?

8        A.    I'm not sure what you mean by no

9    asset.

10        Q.    Okay.  That's fine.

11                        (Defendant's Exhibit 10
                          was marked for identi-
12                        fication.)

13        You've been handed what's been marked

14    as Exhibit 9?

15            MS. DONAHUE:  No.  This is Exhibit 10.

16        Q.    Exhibit 10.  Sorry.  Thank you.

17        Is this a copy of the bankruptcy

18    filings that you made?

19        A.    Yes.  That appears to be all of them.

20        Q.    On the second page is that your

21    signature?  The Signature of Debtor, Ronald E. Sloan,

22    Junior?

23        A.    That is correct.

24        Q.    And the second to last page starts

25    with a number 22, Former partners, that page.

```
 1              A.   Okay.
 2              Q.   Is that your signature?
 3              A.   At the bottom, yes.
 4              Q.   Yes.  I'm assuming that's your wife's
 5     signature --
 6              A.   Yes, it is.
 7              Q.   -- below yours.  There's another page
 8     about somewhat in the middle of the document.  It's
 9     called Declaration Concerning Debtor's Schedules.  It
10     looks like this (indicating).  Is that your signature
11     on that page?
12              A.   Yes, it is.
13              Q.   You certified that everything was true
14     and correct in this petition and the schedules?
15              A.   As I understood it.
16              Q.   Did you have an attorney doing your
17     bankruptcy?
18              A.   Yes.  Richard West, who's listed on
19     the front page.
20              Q.   And you reviewed the forms before you
21     signed them?
22              A.   Yes.
23              Q.   Did you ever seek to amend your
24     bankruptcy petition?
25                   MS. DONAHUE:  Well, I'll specify now
```

```
 1              that we are seeking to amend it at this
 2              point.
 3              Q.   Prior to this point have you ever
 4      sought to amend it?
 5              A.   No.
 6              Q.   And your bankruptcy has been closed
 7      now for almost four years?
 8              A.   Correct.
 9              Q.   Okay.  And throughout the bankruptcy
10      you did not disclose your claim against AK Steel and
11      when it was asked for.
12              A.   I did not know that I needed to
13      because I didn't realize that was an asset.
14              Q.   When they asked you to list other
15      suits that you were involved in the prior year, you
16      did not list it there, either.  Correct?
17              A.   I listed it as in suits that were
18      actively pending against me because that was my
19      understanding of the question.
20              Q.   And I'm looking at page two of the
21      Statement Of Financial Affairs, which is in the
22      middle of the section.
23                   MR. KAMMER:  Middle of what?
24                   MS. PRYOR:  Middle of the packet.
25                   MR. KAMMER:  What's it called?
```

```
 1              MS. DONAHUE:  Schedule what?
 2              MS. PRYOR:  It's Statement Of
 3         Financial Affairs and it's the second page
 4         of it.
 5              MS. DONAHUE:  Is it a particular
 6         schedule?
 7              MS. PRYOR:  It looks like this
 8         (indicating), Statement Of Financial
 9         Affairs.
10              MS. DONAHUE:  Oh.
11    BY MS. PRYOR:
12         A.   Listed page two at the top?
13         Q.   Yes.  It starts with actually number
14    three, Payments to creditors.
15         A.   Right.
16              MS. DONAHUE:  Here it is.
17         Q.   Number four requests you to list all
18    suits and administrative proceedings to which you
19    were a party within one year.
20         A.   Right.
21         Q.   You did not list AK Steel.
22         A.   Right.  For the reason I just made.
23         Q.   Okay.  And what was that reason?
24         A.   Because I did not know that I needed
25    to list anything that was pending -- or I thought I
```

1       was listing only things that were pending against me.

2       I didn't know that that suit needed to be listed as

3       part of this.  I only became aware of that recently

4       and that's why there has been no motion prior to to

5       amend.

6              Q.    Okay.  And you didn't list it as an

7       asset because?

8              A.    Did not know it was.

9              Q.    You didn't think it was an asset.

10             A.    None of this was clarified by the

11      attorney.

12             Q.    But you did have an attorney

13      throughout the proceedings.

14             A.    Yes.

15                              (Defendant's Exhibit 11
                                was marked for identi-
16                              fication.)

17             Q.    You've been handed what's been marked

18      as Exhibit 11.  Is that the discharge that you

19      received from the bankruptcy?

20             A.    Yes, I believe it is.

21             Q.    And you had your debts cleared as a

22      result of this?

23             A.    A portion.

24             Q.    What portion did you have cleared?

25             A.    Approximately 50 percent of what was

 1    listed and 50 percent I reaffirmed.

 2            Q.   How much was the amount that you were

 3    released from?

 4            A.   I think it was on the order of 30 or

 5    31,000.

 6            Q.   Okay.

 7            A.   Again, that's an approximation.

 8            Q.   What employment have you had since

 9    August 2001?

10            A.   I worked --

11            Q.   And you can go -- since you just did

12    these interrogatories, Exhibit 9, if you want to

13    refer to those.  I think question number two lists --

14            MS. DONAHUE:  Page five.

15            Q.   Yes, page five.  Is this an accurate

16    list of --

17            A.   Uh-huh.

18            Q.   -- your employment?  Okay.

19            A.   December 2001 to February '02 I worked

20    for Gwin Mortgage, again as a part-time loan officer.

21            In February of '02 to October '02 Ohio

22    Heritage Mortgage.  And from March of '02 to July of

23    '06 I worked for Red Lobster, primarily as a

24    bartender and as a back-up server.

25            From July '03 to May '04 I worked for

1    New York, New York Cabaret as floor security.  From

2    October '02 to December '03 ACF Mortgage, part-time

3    loan officer again.

4              November '04 to January '05 Peerless

5    Mill Inn.  Again as a bartender and back-up server.

6    And from March of '05 to December '05 Cognis Chemical

7    as a chemical operator.  And from April '06 to

8    present Cargill, Incorporated as a process

9    technician.

10         Q.   Okay.  Just ask you a couple questions

11    about this.

12         A.   Sure.

13         Q.   The Gwin Mortgage.  That was a

14    part-time position?

15         A.   Uh-huh.

16         Q.   And you've got listed zero dollars per

17    week.

18         A.   Right.  Didn't close any loans.

19    Again, commission only.  In fact, all of the mortgage

20    positions were commission only.

21         Q.   What did you do for money between

22    December 2001 and February 2002?

23         A.   I had part of my severance from

24    Procter and Gamble still available.

25         Q.   Okay.

1          A.    I had stocks that I had as well.  And
2     my wife maintained a full-time job.
3          Q.    Okay.  And you resigned.  Why did you
4     resign?
5          A.    Because I didn't think that that
6     position was going to be ideal for me.  The office
7     was in quite a state of chaos.
8          Q.    And you I guess moved over to Ohio
9     Heritage Mortgage.
10         A.    Correct.
11         Q.    Did you have that position lined up
12    before you resigned from Gwin?
13         A.    The same day, as a matter of fact.
14         Q.    Again, that was a part-time position?
15         A.    Yes.
16         Q.    And so you averaged about $196 a week?
17         A.    Over the duration of those, I believe
18    it's ten months.
19         Q.    Okay.  And why --
20         A.    Eight months.
21         Q.    Why did you resign from there?
22         A.    To go to ACF Mortgage, which was just
23    going to be a better position.  They had a better
24    opportunity for me to make money.  Plus it was a few
25    miles from my home versus driving to Dayton.

1          Q.    Okay.  During the same time you were
2     also working at Red Lobster.
3          A.    Correct.
4          Q.    Did you receive tips for that
5     position?
6          A.    Yes.  They're claimed on our
7     paychecks.  That's included in the amount that you --
8          Q.    Why were you terminated from there?
9          A.    Because my position with Cargill
10    involved me working rotating shifts.  In that
11    timeframe they received a new manager.  That manager
12    wanted me to commit to two regular days per week,
13    which because of my rotation I could not do.
14              The managers prior to that were
15    willing to work with my schedule and this particular
16    gentleman was not.
17         Q.    Okay.  And you say you made $176 a
18    week.
19         A.    Over the span of four and a half
20    years, that's the average.
21         Q.    That's the average.  Okay.  And New
22    York New, York.  That was floor security?
23         A.    Uh-huh.
24         Q.    This was part time as well?
25         A.    Uh-huh.

```
 1              Q.   This was again while you were also
 2   working at --
 3              A.   ACF and Red Lobster.
 4              Q.   -- Red Lobster.  Okay.  Why did you
 5   resign from there?
 6              A.   The hours, really.  They were just
 7   getting to be a little too much.
 8              Q.   How many hours a week did you work at
 9   New York, New York?
10              A.   Let's see.  It was on average about
11   three days and 20 to 24.
12              Q.   How many hours a week did you work for
13   Red Lobster?
14              A.   About the same.
15              Q.   How many hours a week did you work for
16   ACF Mortgage?
17              A.   About 30, 32.
18              Q.   Were you working for all three of
19   those at the same time for a period of time?
20              A.   Correct.
21              Q.   And why did you leave ACF Mortgage?
22              A.   There was a change in the mortgage
23   industry as far as how business was being done and
24   just a shift back away from the refinance market to
25   the purchase market.  And to get myself some
```

1    additional stability I elected to go back in to

2    manufacturing.

3              Q.    You did not yet have a job lined up?

4              A.    No, I didn't.

5              Q.    Why did you resign from Peerless Mill?

6              A.    I was basically just seasonal.

7              Q.    And why did you resign from Cognis?

8              A.    There was a situation that one of the

9    co-workers was breaking rules.  I brought that to the

10   attention of our manager.  Several employees.  And

11   nothing was done.  I just thought it was in my best

12   interest to leave that position.

13             Q.    Other than Red Lobster have you ever

14   been terminated from a position?

15             A.    No.

16             Q.    Then you responded to a question about

17   other places you applied.  You said you applied at

18   Miller Brewing Company.

19             A.    Correct.

20             Q.    Did you receive any call back on that?

21             A.    No call back.  Received a postcard

22   that they had received my resume.

23             Q.    And you said you applied for Circuit

24   City as a manager.

25             A.    Uh-huh.

1          Q.    And you were interviewed?

2          A.    Uh-huh.

3          Q.    Why were you not offered that

4  position?

5          A.    Because they needed me to go to

6  Virginia for an extended amount of time for training,

7  and I couldn't commit to that because of my son's age

8  and my wife's work schedule.

9          Q.    How old is your son?

10         A.    He's seven and a half now.  He'll be

11  eight in September.

12         Q.    It says you applied at Wausau Paper?

13         A.    Wausau, yeah.

14         Q.    Why did you not get hired there?

15         A.    Never received any information back

16  from them.

17         Q.    Okay.  You list your wife as an

18  individual who has knowledge about information about

19  allegations in the complaint.

20         A.    Uh-huh.

21         Q.    What knowledge does she have?

22         A.    Just my involvement in the suit.  The

23  fact that there was a charge of discrimination filed.

24  She knows no particulars.  She knows that I've left

25  for meetings with my attorneys, this meeting today.

1          Q.    Everything she knows is just from you
2     telling her?
3          A.    Just whereabouts.  Correct.
4          Q.    Is that right?
5          A.    Correct.
6                              (Defendant's Exhibit 12
                               was marked for identi-
7                              fication.)
8          Q.    You've been handed what's been marked
9     as Exhibit 12.  Are these copies of your tax returns
10    and related documents?
11         A.    Yes.
12         Q.    Do you have copies of your 2005 and
13    2006 tax return?
14         A.    Yes.  And they were provided.
15              MS. PRYOR:  We do not have those.  If
16         we could get that updated, please.
17              MS. DONAHUE:  Okay.
18         Q.    What is GMRI on your W-2s?
19         A.    That is the parent company for Red
20    Lobster.
21         Q.    I thought it might be.  What about
22    Bell South?
23         A.    That's my wife's employer.
24         Q.    Okay.
25         A.    Or was.

88

1          Q.    Other than your wife, Allen Roberts,
2    have you talked to anyone else about your application
3    at AK Steel?
4          A.    Just the three gentlemen we mentioned
5    earlier.
6          Q.    What did you talk to them about?
7          A.    During the time that I wasn't really
8    hearing anything back I asked two of them, Rodney and
9    Aaron, if they had heard anything with regard to a
10   freeze on hiring.
11         Q.    Did they tell you?
12         A.    Any specifics.  Nothing that they knew
13   of.
14         Q.    Anyone else that you've talked to
15   about your application at AK Steel?
16         A.    Not that I can recall.
17         Q.    Do you ever have conversations and
18   meetings with the other plaintiffs outside of
19   anything you have with your attorneys?
20         A.    No.
21         Q.    You ever sent e-mails to the other
22   plaintiffs?
23         A.    No.
24         Q.    Do you know any of the other
25   plaintiffs?

```
 1              A.   I know them.  I know Allen and
 2    Roderique from school.  Edward was actually out of
 3    school.  I knew his family.  Middletown is relatively
 4    small.  And the black community is obviously even
 5    smaller.
 6              So if we don't know each other
 7    personally, we know of each other's families, that
 8    type of situation.
 9         Q.   Do you know anything about the other
10    individual plaintiff's claims about why they believe
11    they were not hired?
12         A.   Other than what's listed in the class.
13    I haven't looked into their individual claims if
14    that's what you're asking me.
15         Q.   Other than what's listed in the
16    complaint?
17         A.   Right.
18              MS. PRYOR:  Let's take a little short
19         break here.  I think we're about done.
20              (Recess taken:  1:00 PM - 1:03 PM.)
21         Q.   I just have a quick follow-up.
22              When you talked about talking to them
23    about a management position, were you specific about
24    what kind of management position you were looking
25    for?
```

```
 1            A.    No.
 2            Q.    You just asked about a management
 3     position?
 4            A.    Opportunity.  Right.
 5            MS. PRYOR:  Okay.  I have nothing
 6            further at this time.  I do want, because
 7            it sounds like he has some documents that
 8            we have not been provided, I do want to
 9            hold it open in the event that something
10            comes out of those documents.
11            MS. DONAHUE:  Well, we spoke.  We have
12            the note and the taxes.
13            MS. PRYOR:  Note, the taxes, the
14            resumes, cover letter is what I have
15            listed.  I don't expect there's going to be
16            anything, but just in case that note turns
17            out to be more than --
18            THE WITNESS:  I believe you guys
19            should have my resume from that timeframe.
20            I doubt that I still have it.
21            MS. PRYOR:  And I would like the
22            resumes up through current.
23            THE WITNESS:  Okay.
24            MS. PRYOR:  Okay.
25            MS. DONAHUE:  That's it then.  We have
```

1          no questions.

2              THE REPORTER:  Signature to the

3          deposition?

4              MS. DONAHUE:  We'll read and sign.

5          Thank you.

6

7                    _____

                     Ronald E. Sloan, Jr.

8

9                      - - -

10

      (Deposition concluded at 1:04 PM.)

11

12                     - - -

13

14

15

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T E

2    STATE   OF   OHIO  :
                          SS:
3    COUNTY OF HAMILTON  :

4        I, Tracy L. Allen, a duly qualified and commis-

5    sioned  notary  public  in  and  for  the  State of Ohio,

6    do  hereby  certify  that  prior  to  the  giving of his

7    deposition, the within named Ronald E. Sloan, Jr. was

8    by me first duly sworn to testify the truth; that the

9    foregoing   pages   constitute   a   true   and   correct

10   transcript of  testimony given at said time and place

11   by  said  deponent; that said deposition was taken by

12   me in stenotypy and transcribed under my supervision;

13   that I  am neither a relative of nor attorney for any

14   of  the  parties  to this litigation, nor relative of

15   nor  employee  of  any  of their counsel, and have no

16   interest whatsoever in the result of this litigation.

17   I further  certify  that  I  am not, nor is the court

18   reporting  firm  with  which I am affiliated, under a

19   contract as defined in Civil Rule 28 (D).

20       IN WITNESS WHEREOF, I  hereunto set  my hand and

21   official seal of  office, at  Cincinnati, Ohio, this

22   7th day of May, 2007.

23

24                        _____

25   MY COMMISSION EXPIRES:      TRACY L. ALLEN, RPR
     JULY 29, 2008.         NOTARY PUBLIC, STATE OF OHIO