UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

FOR THE WESTERN DIVISION


VIVIAN BERT, et al.,          : CASE NO. 1:02CV00467

          Plaintiffs,        : Judge Beckwith

v.                            :

AK STEEL CORPORATION,         :

          Defendant.          :

_____

          Deposition of MARY L. HARRIS, taken on

Tuesday, June 5, 2007, commencing at 2:04 p.m., at

the offices of Taft, Stettinius & Hollister LLP,

425 Walnut Street, Suite 1800, Cincinnati, Ohio,

before Susan M. Barhorst, Notary Public.


AROUND-THE-CLOCK REPORTING SERVICES
P. O. BOX 11008
CINCINNATI, OHIO 45211
513-481-5200

**Page 2**

1　APPEARANCES:
2　On behalf of Plaintiffs:
3　　Susan Donahue, Esq.
　　　Wiggins, Childs, Quinn & Pantazis, PC
4　　The Kress Building
　　　301 19th Street North
5　　Birmingham, Alabama 35203
6　On behalf of Defendant AK Steel Corporation:
7　　Patricia A. Pryor, Esq.
　　　Taft, Stettinius & Hollister LLP
8　　425 Walnut Street, Suite 1800
　　　Cincinnati, Ohio 45202-3957
9

Cross-Examination
10
　　by Ms. Pryor　　　　　3
11
　　by Ms. Donahue　　　　81
12　　　　　　　　　* * *
13　HARRIS DEPOSITION EXHIBITS　MARKED/IDENTIFIED
14　　1　　　　　　8
15　　2　　　　　　18
16　　3　　　　　　43
17　　4　　　　　　43
18　　5　　　　　　51
19　　6　　　　　　53
20　　7　　　　　　55
21　　8　　　　　　55
22　　9　　　　　　60
23　　10　　　　　　60
24　　11　　　　　　76

**Page 3**

1　　　　　　MARY L. HARRIS
2　being first duly sworn, testified as follows:
3　　　　　CROSS-EXAMINATION
4　BY MS. PRYOR:
5　　Q.　Ms. Harris, as I mentioned, I'm Patty
6　Pryor and I represent the AK Steel Corporation in
7　the lawsuit you brought against them.
8　　　　Have you ever been involved in civil
9　litigation before as a party or as a witness?
10　**A.　Civil --**
11　　Q.　Civil litigation.
12　**A.　I don't -- I don't understand what you**
13　**mean --**
14　　Q.　Okay.
15　**A.　-- as far as --**
16　　Q.　Have you ever testified under oath
17　before like you're doing here today?
18　**A.　No.**
19　　Q.　No?  Okay.  Let me give you a few
20　ground rules.
21　**A.　Oh, let me back that up.  Yes, I have.**
22　　Q.　When was that?
23　**A.　Okay.  Which I wasn't really**
24　**understanding, but when I had a bankruptcy, okay?**

**Page 4**

1　So I met -- yeah, during that time.
2　　Q.　Okay.
3　**A.　But other than that, no.**
4　　Q.　Okay.  Let me give you some ground
5　rules for the deposition so we can hopefully make
6　it go smoothly.
7　**A.　Okay.**
8　　Q.　If you don't hear a question I ask,
9　please ask me to repeat it.
10　**A.　Okay.**
11　　Q.　If you don't understand a question
12　like you just did --
13　**A.　Okay.**
14　　Q.　-- please ask me to rephrase or tell
15　me you don't understand.
16　**A.　Okay.**
17　　Q.　Because otherwise, I'm going to assume
18　you're understanding the question if you're --
19　**A.　Okay.**
20　　Q.　-- answering my question.  It's
21　important that we don't talk over each other, so
22　let me finish my question before you answer and
23　I'll try to do the same when you're answering a
24　question, that way the court reporter doesn't get

**Page 5**

1　mad at us for talking too much.
2　**A.　Mm-hmm.**
3　　Q.　No shaking of your head.  You can
4　answer verbally "yes" or "no," no "na-huh's" or
5　"ah-huh's" or shaking her head because it is hard,
6　again, for the court reporter to take it down.
7　　　　If you need a break at any time, we
8　can stop, okay?
9　**A.　Okay.**
10　　Q.　Can you state your full name for the
11　record?
12　**A.　Mary L. Harris.**
13　　Q.　Do you have any medical condition or
14　other problem that would prevent you from
15　truthfully and completely testifying today?
16　**A.　No.**
17　　Q.　Have you taken any medication today?
18　**A.　Yes.**
19　　Q.　What medication do you take?
20　**A.　I take medication for diabetes,**
21　**cholesterol and blood pressure.**
22　　Q.　Did you take your normal amounts of
23　these medications for today?
24　**A.　Yes.**

**2 (Pages 2 to 5)**

**Page 6**

1  Q.  Do any of these medication prevent you
2  from recalling events?
3  A.  No.
4  Q.  Have you ever been convicted of a
5  crime?
6  A.  No.
7  Q.  What's your current address?
8  A.  **5576 Montgomery Road.**
9  Q.  How long have you lived there?
10  A.  **Four years.**
11  Q.  Okay.  So roughly 2003 you moved
12  there?
13  A.  **Yes.**
14  Q.  Was your prior address 11716 Elkwood?
15  A.  **Correct, yes.**
16  Q.  Okay.  What's your educational
17  background?
18  A.  **High school graduate.**
19  Q.  Where did you go to high school?
20  A.  **Robert A. Taft.**
21  Q.  Do you have any college?
22  A.  **No.**
23  Q.  Have you taken any other courses or
24  training?

**Page 7**

1  A.  **Yes.**
2  Q.  What are those?
3  A.  **Computer.**
4  Q.  Where did you take those at?
5  A.  **Scarlet Oaks.**
6  Q.  And when did you take those?
7  A.  **Don't -- I don't really -- don't**
8  **recall that year, exact year.**
9  Q.  How long ago, roughly?
10  A.  **About 20 years ago.**
11  Q.  Okay.  How many courses did you take
12  there?
13  A.  **Just the one.**
14  Q.  Just one?  And it was just with basic
15  computers or --
16  A.  **Mm-hmm, yes.**
17  Q.  Thank you.  Okay.  What year did you
18  graduate from high school?
19  A.  **1966.**
20  Q.  And what's your date of birth?
21  A.  **9/27/48.**
22  Q.  And are you married?
23  A.  **Yes.**
24  Q.  Is your husband's name Frederick?

**Page 8**

1  A.  **Yes.**
2  Q.  How long have you been married?
3  A.  **38 years.**
4  Q.  Congratulations.  I've handed you
5  what's been marked as Exhibit Number 1.  Have you
6  seen this document before?
7  A.  **Yes.**
8  Q.  Okay.  Is that your signature on the
9  last page?
10  A.  **Yes.**
11  Q.  And you were verifying that your
12  answers to these questions were true and correct?
13  A.  **Yes.**
14  Q.  Okay.  And interrogatory number one,
15  you were asked to identify all litigation or legal
16  proceedings.  You did not identify your bankruptcy,
17  correct?
18  A.  **Yes.**
19  Q.  Do you currently work at RDI?
20  A.  **Yes.**
21  Q.  What do you do there?
22  A.  **Telephone sales representative.**
23  Q.  That's over there in Blue Ash?
24  A.  **Yes.**

**Page 9**

1  Q.  Who's your manager over there?
2  A.  **See, who is it?  Josh Bridges.  We**
3  **have -- actually we have two, Josh Bridges and --**
4  **let's see.  Well, Josh Bridges, he's my manager.**
5  Q.  He's your manager?
6  A.  **Mm-hmm.**
7  Q.  And you've worked there since May
8  1998?
9  A.  **Yes.**
10  Q.  Have you gotten any raises while
11  you've been there?
12  A.  **Yes.**
13  Q.  Do you remember what you started out
14  at?
15  A.  **Yes.**
16  Q.  What did you start out at?
17  A.  **$9 an hour.**
18  Q.  And you're currently at $9.50?
19  A.  **No.**
20  Q.  What's your current rate?
21  A.  **$12.95.**
22  Q.  Currently you make $12.95?
23  A.  **Yes.**
24  Q.  In response to interrogatory number

**Page 10**

1 two, what is the $9.50 per hour referring to?
2    A.   Which one is that?
3       MS. DONAHUE:  Sorry.
4    A.   I don't recall that.  I'm -- I don't
5 recall that.  I know I started off with $9 an hour,
6 and then I got a raise at 9.50.  But I started off
7 at $9.
8    Q.   Okay.  Do you get a raise once a year
9 or --
10    A.   No, not necessarily.
11    Q.   How frequently have you gotten raises?
12    A.   Usually -- well, I've gotten one this
13 past year twice because of my performance.
14    Q.   When did you receive the raises this
15 past year?
16    A.   May of 2006 and six months later,
17 which would have been, I think, October.
18    Q.   November, October somewhere in there?
19    A.   Yeah, let me see.  May, June, July,
20 August, September, October, November.
21    Q.   November?
22    A.   Because it was six months after the
23 May one.  That was my evaluation.
24    Q.   Okay.  Is that typical that you

**Page 11**

1 received two in a year?
2    A.   No, it's not.  It was because of my
3 performance.
4    Q.   Okay.  In prior years, have you
5 received one raise or --
6    A.   Usually, yes.
7    Q.   Okay.  How much is your raise
8 normally?
9    A.   Anywhere from 35 cents to 50 cents per
10 hour.
11    Q.   How many hours do you work?
12    A.   Vary.  I try to get at least 80 hours,
13 two weeks.  Sometime I do and sometimes I don't.
14    Q.   What's the lowest amount of hours you
15 ever had or --
16    A.   I would say about 60 for two weeks.
17    Q.   For two weeks?
18    A.   Mm-hmm.
19    Q.   Is that often or is that uncommon?
20    A.   It varies.  I couldn't say it's often.
21 It varies according to the work.
22    Q.   Okay.  Do you know Allen Roberts?
23    A.   Allen, yes.
24    Q.   How do you know him?

**Page 12**

1    A.   I know him through a girlfriend I used
2 to work with at GE.
3    Q.   Who's that?
4    A.   Vivian Bert.
5    Q.   Are you related to any of the other
6 plaintiffs in this lawsuit?
7    A.   No.
8    Q.   You worked with Vivian Bert at GE?
9    A.   Yes.
10    Q.   For how long?
11    A.   Oh, let's see.  About -- I would say
12 about six years.  Well, actually I worked there,
13 but I wasn't working with her.  I knew her -- I met
14 her after we had been there about six years, so I
15 knew her then.
16    Q.   You remained friends with her since
17 you left GE?
18    A.   Yeah, we had -- we are friends.
19    Q.   Has she told you what anything -- what
20 I'm asking you is for outside the presence of your
21 counsel.  I don't want to know about conversations
22 you've had with your counsel present.
23       Has Vivian Bert told you anything
24 about her claim in this lawsuit?

**Page 13**

1    A.   I don't recall.  I don't understand
2 what you're saying.
3    Q.   Have you ever had a conversation with
4 Vivian Bert outside the presence of your
5 attorneys -- in other words, they're not there --
6 where you talking about either your claims or her
7 claims?
8    A.   Oh, no.
9    Q.   Did she tell you to file a charge?
10    A.   No, I -- no, she didn't.
11    Q.   Did anyone tell you -- other than your
12 attorneys, did anyone tell you to file a charge?
13    A.   No.
14    Q.   Look at interrogatory number three.
15 Asks you to identify all employers for whom you've
16 applied for employment since January 2001 and
17 include the dates.  You replied AK Steel in
18 November 2001.  You say it was the second time you
19 applied.  When was the first time you applied?
20    A.   The first time I applied at AK Steel,
21 19 -- I'm trying -- I don't recall dates real well,
22 but I know that was the second time.  I don't
23 recall that.
24    Q.   Rough estimate of when it was?

**4 (Pages 10 to 13)**

Page 14

1   A.   It was before 2001.
2   Q.   Before 2001?
3   A.   Mm-hmm.
4   Q.   Was it six months before?  Was it a
5 year before?  Was it several years before?
6   A.   I can't recall that date.  I can't
7 recall then.
8   Q.   Okay.  Well, you only applied to AK
9 Steel two times?
10   A.   Yes.
11   Q.   Okay.  Have you worked anywhere
12 besides RDI since May 1998?
13   A.   At a company?  You mean like a
14 company?
15   Q.   Anywhere where you got paid.
16   A.   Oh, I did like a floral design.  I had
17 my own business, like a -- I only did it for about
18 four months, but I did that for a little bit.
19   Q.   You said it was a floral design?
20   A.   Yeah, I do it -- did like for
21 weddings.  I did that like on a part-time job.
22   Q.   And that was your own business?
23   A.   Well, it was something that I did.
24 I -- it wasn't established as a business, but it's

Page 15

1 something I did mainly for friends and relatives.
2   Q.   Okay.  Did you report your earnings to
3 the IRS?
4   A.   I didn't have enough of that, no.
5   Q.   And you say you only did it for about
6 four months?
7   A.   About four months.  Other than that, I
8 did no other work.
9   Q.   Okay.  Interrogatory number four,
10 you've listed some amounts per week by year.
11 That's roughly what you were paid at RDI during
12 those years?
13   A.   Yes.
14   Q.   And you list in -- interrogatory five,
15 you list people who have knowledge or information
16 about the allegations of the complaint.
17       What does Allen Roberts know about the
18 allegations in the complaint?
19   A.   What does he know?
20   Q.   Mm-hmm.  Why did you list him?
21   A.   Because he was a friend of mine, of
22 Vivian's and I knew their -- I know their family.
23 I know Shawn, her son, and I know him and I knew
24 her.

Page 16

1   Q.   What do they know about the claims in
2 the complaint?
3   A.   I think they have -- aren't they on
4 this claim here?  Didn't they file this?
5   Q.   You've got an individual -- you've got
6 an individual claim.  Do they know anything about
7 your individual claim?
8   A.   No, not that I know of.  I never
9 discussed it with them.
10   Q.   Okay.  And that goes for both,
11 Allen -- or all three, Allen, Vivian Bert and Shawn
12 Pryor?
13   A.   Exactly.
14   Q.   Okay.  You also claim that you applied
15 to GE in July -- this is -- I'm sorry.
16       Back on page 5, in response to
17 interrogatory three, you claim you applied to GE in
18 July, August and November of 2006?
19   A.   Yeah.
20   Q.   Were you offered or contacted for that
21 job?
22   A.   No.
23   Q.   Okay.  Is it only -- only four times
24 that you made any applications since January 1,

Page 17

1 2001?
2   A.   Are those the only applications I made
3 at places --
4   Q.   Yeah.
5   A.   -- different companies?
6   Q.   Yeah.
7   A.   No, it's not.
8   Q.   Where else have you applied since
9 January 1, 2001?
10   A.   Oh, since 2001, yes, mm-hmm.
11   Q.   Okay.
12   A.   Yeah.
13   Q.   On page 6, why did your pay go down in
14 2004?
15   A.   From what?
16   Q.   You report that in 2003, you made 425
17 per week, and then in 2004 you state 402 per week.
18   A.   I don't recall.  The only thing I can
19 think of -- well, I don't really recall, so I
20 wouldn't want to say that.
21   Q.   Okay.
22   A.   Like I said, the hours vary, so --
23   Q.   Like it's been a slower year?
24   A.   Yeah.

**5 (Pages 14 to 17)**

Page 18

1    Q.    Okay.
2    A.    That's the only thing I can recall.
3  Other than that, I don't recall why it would have
4  went down.
5    Q.    Okay.  You've been handed what's been
6  marked as Exhibit Number 2.  Is that your
7  handwriting?
8    A.    It is.
9    Q.    And is it your signature on the last
10 page at the bottom?
11   A.    Yes.
12   Q.    Okay.  And does this refresh your
13 memory that your application in 2001 was made in
14 May 2001 instead of November as listed in your
15 interrogatories?
16   A.    Okay.  I didn't -- yeah, that's the
17 date that's on there.
18   Q.    Is that when you applied in 2001?
19   A.    I really don't recall.  I know that's
20 the date that's on there, but to actually say when
21 it was, I don't recall that.
22   Q.    Okay.  You don't know when you
23 submitted this?
24   A.    I know it was in 2001.  Now, I have

Page 19

1  that date on there, but I can't recall the exact
2  date.  I know I applied twice, and that I do know.
3  One time was before this date and this date.  What
4  the other date was, I can't recall that.
5    Q.    So one time was before May 2001?
6    A.    Mm-hmm.
7    Q.    And then the second time was May 2001?
8    A.    Mm-hmm.
9    Q.    Okay.  Where did you --
10   A.    I tried to put -- I don't know if I
11 put this down here.  I tried to put the date that
12 was closest to what I thought it was.  I didn't
13 have this on hand.
14   Q.    Sure.  That's --
15   A.    So that's what I -- you know, I knew
16 it was in 2001 --
17   Q.    Okay.
18   A.    -- so that's what I put.
19   Q.    And you'd applied previous to 2001 at
20 some point, but --
21   A.    The exact --
22   Q.    -- you're not sure?
23   A.    -- what the exact date, I don't know.
24   Q.    Okay.  That's fine.  Where did you

Page 20

1  apply at?
2    A.    It was at the career center there on
3  University.  That's when I took -- I just put my
4  application in.  The lady was at the desk there.
5    Q.    Is that connected with the Bureau of
6  Unemployment?
7    A.    Yes, mm-hmm.  Both times I applied
8  there.
9    Q.    Both times you applied there?
10   A.    Mm-hmm.
11   Q.    And did you talk to anyone when you
12 applied?
13   A.    No, I just gave it -- it was a lady
14 there that was sitting there and I gave her my
15 application.  So I actually didn't speak to anyone
16 except her.
17   Q.    Okay.
18   A.    Not about the application, per se.
19   Q.    Did anyone go with you when you
20 applied?
21   A.    No.
22   Q.    Did you ever physically go to AK
23 Steel?
24   A.    No.

Page 21

1    Q.    Did anyone from AK Steel ever talk to
2  you about your application?
3    A.    No.
4    Q.    I assume, then, that you never heard
5  back from AK Steel about your application?
6    A.    No, I didn't.
7    Q.    Did you make a copy of your
8  application?
9    A.    No.
10   Q.    Do you know why -- how your attorneys
11 would have gotten a copy of this application?
12       MS. DONAHUE:  Object to the form.
13 Calls for speculation and I -- and you shouldn't
14 answer if it involves anything about what your
15 attorneys may have -- might have told you or what
16 you know about what they've done or anything like
17 that.
18   Q.    Let me rephrase the question for you.
19 You did not keep a copy of the application,
20 correct?
21   A.    The copy of the blank application or
22 the application --
23   Q.    The filled out, Exhibit Number 2.
24   A.    I don't recall that.  I can't recall

**6 (Pages 18 to 21)**

**Page 22**

1  **if I did or not, but I know I didn't make a**
2  **application -- copy of a blank application.**
3      Q.    Okay.
4      **A.    I didn't do that.**
5      Q.    You may or may not have made a copy of
6  your completed application?
7      **A.    I don't recall.**
8      Q.    Okay.  That's fine.  Was anyone
9  hostile to you when you made your application?
10     **A.    No.**
11     Q.    Was the application process hostile in
12 any way?
13     **A.    No.**
14     Q.    Do you know whether AK Steel ever
15 received either of your applications?
16     **A.    No, I don't.**
17     Q.    You listed Allen Roberts as a
18 reference?
19     **A.    Yes.**
20     Q.    Did you think he was a good reference?
21     **A.    Well, I thought so.**
22     Q.    Do you know that he's been fired from
23 AK Steel?
24     **A.    No, he hasn't, has he?**

**Page 23**

1      Q.    You don't know that he's been fired
2  from AK Steel?
3      **A.    No.**
4      Q.    Who is Shirley Daniels?
5      **A.    A friend.**
6      Q.    And you list your employment, talked
7  about RDI.  You've got here -- actually you've got
8  from May '99 that you started at RDI?
9      **A.    I think it was -- yeah, I do have that**
10 **down.**
11     Q.    Was it '99 or '98 that you recall?
12     **A.    I can't recall.  I'm --**
13     Q.    That's okay.
14     **A.    I can't recall.  I know I been there**
15 **eight years.  I'll put it like that.**
16     Q.    I understand.  Then you've got
17 Creations by Mary.  That's the floral design you
18 were talking about?
19     **A.    Mm-hmm.**
20     Q.    And you say that you had that from
21 August '98 to present.  Now, that's longer than
22 four months.
23     **A.    To the present?**
24     Q.    Which, yeah -- which is May.  And

**Page 24**

1  present was when you filled this out in May 2001, I
2  assume.  It's three years.  Is that a true
3  statement?
4      **A.    Well, not actually because I only did**
5  **it for about four months.  And like I told you, it**
6  **was for friends and family.**
7      Q.    So when you say rate of earnings, you
8  say "Excellent."  Was it excellent earnings?
9      **A.    Well, I mean, I -- rate of earnings, I**
10 **think so.  Where are you looking at that?  Oh,**
11 **okay.  I mean, what's the question?**
12     Q.    Were they excellent earnings that you
13 got doing that business?
14     **A.    Well, it wasn't bad.  It wasn't good,**
15 **but it was -- it was okay, yeah.  It was good.**
16     Q.    And you say that you're still doing
17 the business.  Were you still doing the business in
18 2001?
19     **A.    No, I didn't say that.**
20     Q.    It says, "Give exact reason for
21 leaving."  You said "Still Doing Business - Praise
22 the Lord."  Were you still doing this business in
23 2001?
24     **A.    In 2001, no.**

**Page 25**

1      Q.    Okay.  Your next --
2      **A.    I can't -- wait a minute.  Wait a**
3  **minute.  Hold up.  Let me -- let me back up.  I did**
4  **it -- see, I started doing it in '98.  Okay.  I**
5  **don't recall that.  I can't -- I can't back -- I**
6  **can't backtrack those dates like that.  I know it**
7  **was only like four months that I did it.**
8      Q.    Okay.
9      **A.    I didn't do it for over -- I didn't do**
10 **it for a year.  I know that.**
11     Q.    Okay.  And you've got -- your next
12 employer, you've got Kelly Services.  What did you
13 do for Kelly Services?
14     **A.    I was assembler there.**
15     Q.    Where did you work at?
16     **A.    Various -- well, Johnson and Johnson's**
17 **product.**
18     Q.    Did you work at Johnson and Johnson?
19     **A.    Well, it was a part of -- what's the**
20 **name of that company?  I can't recall the name of**
21 **it, the company.  It was Ethicon.  That's what it**
22 **was.**
23     Q.    Ethicon?
24     **A.    Yes.**

**7 (Pages 22 to 25)**

**Page 26**

1  Q.   What were you assembling?
2  **A.   Surgical instruments.**
3  Q.   Do you do that by hand or by machine?
4  **A.   Hand and machine.**
5  Q.   And did you from January '97 to August
6  '98, were you working the entire time for Ethicon?
7  **A.   I can't -- let me see.  No, I can't**
8  **recall that because I had other assignments.**
9  Q.   You had other assignments from Kelly
10  Services?
11  **A.   Mm-hmm.  It was just through Kelly**
12  **that I did those assignments.**
13  Q.   Okay.  Do you know how long you worked
14  for Ethicon through Kelly, couple months?
15  **A.   I can't recall it.  Pardon me.  I**
16  **think it was -- I'm not -- I can't -- I'd rather**
17  **not say if I don't know.**
18  Q.   Okay.  Then your employment before
19  that says "Marketing Programs."  What is Marketing
20  Programs?
21  **A.   It's a temporary agency.**
22  Q.   It's another temporary agency?
23  **A.   Mm-hmm.**
24  Q.   Okay.  Did you do anything between

**Page 27**

1  August '96 and January '97?
2  **A.   August?  What -- what --**
3  Q.   I'm looking at Marketing Programs, you
4  list period of employment February '96 to August
5  '96, and then Kelly Services, you list employment
6  January '97 to August '98.  I'm trying to figure
7  between August '96 and January '97, if you were
8  employed anywhere.
9  **A.   I'm trying to think.  Yes.  No, I**
10  **didn't -- I didn't work in between that.  I was**
11  **getting unemployment.**
12  Q.   Okay.  And how about August '98 and
13  May '99, did you work anywhere during that time
14  between Kelly Services and RDI?
15  **A.   August and where?**
16  Q.   August '98 when you left Kelly
17  Services and May '99 when you started with RDI.
18  **A.   No, I wasn't.**
19  Q.   No?
20  **A.   I can't recall that.  I do not know.**
21  **I don't recall that.**
22  Q.   Okay.  You don't recall one way or the
23  other?
24  **A.   Na-huh.**

**Page 28**

1  Q.   Okay.  You're asked how much time
2  you've lost from work in the past two years and you
3  answer two months for major surgery.  When was
4  that?
5  **A.   I knew I had a -- I had some surgery**
6  **done.  I can't recall.  Let's see.  What month?**
7  **What are you -- what's the question?**
8  Q.   When did you have the major surgery
9  that caused you to miss work for two months?
10  **A.   I can't recall exactly, but I know I**
11  **did have surgery.**
12  Q.   Okay.
13  **A.   I can't remember the years.**
14  Q.   Okay.  What type of position were you
15  applying for?
16  **A.   Manufacturing, whatever they have**
17  **available that I was qualified for.  I had quite a**
18  **bit of experience from -- from previous jobs.  GE**
19  **the main one, but I had applied for manufacturing,**
20  **labor, assembler, spot welder, punch press,**
21  **whatever.  Whenever I got to the interview, I was**
22  **going to explain to them my qualifications, but I**
23  **never had the interview.**
24  Q.   You didn't list GE on your application

**Page 29**

1  as one of your employers.
2  **A.   I didn't?  That was the main one.  GE**
3  **was my main one to get -- to be able to get the job**
4  **there 'cause I worked with GE for almost nine**
5  **years.**
6  Q.   You worked --
7  **A.   Almost 10 years, I should say.**
8  Q.   Almost 10 years at GE?
9  **A.   Mm-hmm.**
10  Q.   But you didn't list it on this
11  application, correct?
12  **A.   Well, that was -- the way I**
13  **understood, too, doing the application, you**
14  **should -- whatever was within the last 10 years.**
15  **And so that was not within the last 10 years --**
16  Q.   Okay.
17  **A.   -- that I had worked at GE.  It's been**
18  **20 years since I worked at GE.  But I had other**
19  **experience at different -- other companies also.**
20  **They would have given me the qualifications to work**
21  **at AK Steel.**
22  Q.   What were those other --
23  **A.   It wasn't listed.**
24  Q.   Those weren't listed, either?

**8 (Pages 26 to 29)**

**Page 30**

1    A.    No, because they was before the 10
2  years.
3    Q.    Okay.  In the 10 years prior to your
4  application, you hadn't worked in a company
5  comparable to AK Steel, correct?
6    A.    Well, I had done assembly with --
7    Q.    The temporary work?
8    A.    Yeah, and through P&G and through
9  Kelly Services and Marketing Services.
10    Q.    Okay.
11    A.    Assembling and other things that
12  was -- qualified me for that.
13    Q.    Okay.  And the -- whatever work you
14  just mentioned, you said you did something at P&G.
15  What was that?
16    A.    We had prototyping, assembling,
17  packaging, et cetera.
18    Q.    And did you work for P&G or did you
19  work through a temporary --
20    A.    I worked through an agency.
21    Q.    What agency was that?
22    A.    I worked through Kelly and I worked
23  through Marketing -- well, actually it was through
24  Lois Dixon, Marketing Programs.  That was her

**Page 31**

1  business.
2    Q.    And that's not listed on this
3  application, either, correct?
4    A.    Yes, it is.
5    Q.    Where is that at?
6    A.    Marketing Programs?
7    Q.    Marketing Programs.
8    A.    Mm-hmm, prototypes.
9    Q.    Okay.  I see where you're saying.
10  Describe in your position you say health care
11  prototype, working on new --
12    A.    Products.
13    Q.    Products?
14    A.    Mm-hmm, that we wasn't allowed to
15  discuss because of the privacy act of P&G.
16    Q.    Okay.  You didn't describe it as
17  assembly or manufacturing or --
18    A.    Well, that's the only -- well, that
19  was the only way.  You couldn't go into detail
20  about what product you worked on.
21    Q.    I understand.
22    A.    That's what I was saying, like the
23  privacy act.  But that's when we did assembling and
24  labor work.

**Page 32**

1    Q.    Okay.  You said that -- you testified
2  that you applied one other time before May 2001.
3  Would the information that you provided been
4  similar, in terms of you provided similar
5  information about your employment history?
6        MS. DONAHUE:  Object to the form.
7  Call for speculation.  Answer as well as you can.
8    A.    Repeat the question, please.
9    Q.    Sure.  When you applied the previous
10  time, would you have provided the same employment
11  history that you provided here?
12        MS. DONAHUE:  Same objection.
13    A.    I can't recall if I did or not.
14  I'm -- I can't recall.
15    Q.    Would you have still gone by your kind
16  of rule of thumb over the last 10 years?
17        MS. DONAHUE:  Object to the form.
18  Calls for speculation.
19    A.    Repeat that.
20    Q.    Sure.  When you applied the previous
21  time, would you have -- you testified, I believe,
22  that your understanding of when you applied, that
23  you only provided information in the last 10 years
24  of your employment.

**Page 33**

1        Would you have had that same belief
2  when you applied the first time?
3        MS. DONAHUE:  Object to the form.
4  Calls for speculation.
5    A.    I don't recall.
6    Q.    Okay.  Do you know whether you put GE
7  on the -- on the first time?
8    A.    I don't recall.
9    Q.    Okay.  And you don't have a copy of
10  that initial application, do you?
11    A.    I don't know.  No, I don't think I do.
12  I don't recall that, either.
13    Q.    Have you looked for documents related
14  to your claims against AK Steel?
15    A.    No.
16    Q.    You have not?
17    A.    Have I looked for them?
18    Q.    Yes, among your -- whatever documents
19  you keep, have you looked to see if you have any
20  documents related to AK Steel?
21    A.    Oh, I know I haven't gotten any
22  application -- you know, work.  What are you -- I
23  mean, I don't understand the question.
24    Q.    I'm asking if you've got a copy of

Page 34

1  your application, whether you've looked for a copy
2  of that application?
3      A.  I don't recall that.  I know I haven't
4  looked.
5      Q.  You have not looked?
6      A.  I said I know I haven't looked, but I
7  don't recall if I have it.  It could be at home.
8      Q.  Okay.
9      A.  If I kept a copy -- I had to keep a
10  copy of it for you to have it, though, wouldn't I?
11      MS. PRYOR:  I would ask that all of
12  your clients look for records that we've asked to
13  have produced back in 2002 and look for them and
14  produce them, please.
15      A.  Did you want -- what do you -- what do
16  you need?
17      Q.  I'm looking for any documents that you
18  have related to your claim against AK Steel,
19  whether it be applications that you submitted to AK
20  Steel, correspondence between you and AK Steel,
21  notes that you took of any conversations or events
22  that you did in connection with your claims.
23      A.  I don't recall having that.  I don't
24  have that.

Page 35

1      Q.  What manufacturing experience did you
2  have?
3      A.  Well, I mean, explain.  What do you
4  mean, as far as where?
5      Q.  Yeah.  Do you have any manufacturing
6  experience?
7      A.  Where -- yes, I have manufacturing
8  experience.
9      Q.  I know you mentioned GE.  Would you
10  consider that manufacturing experience?
11      A.  Yes.
12      Q.  And you worked there how long?
13      A.  From 1985 to 1993.
14      Q.  Okay.  Where else?
15      A.  I worked at Cincinnati Time Recorder.
16  That was before -- Cincinnati Time Recorder
17  Company.
18      Q.  Okay.  When did you work there?
19      A.  From -- I don't have the dates.  Let
20  me try to think.  I know I started in '79, but I
21  can't recall 'cause we were back and forth -- you
22  know, being laid off.  So I can't -- I can't recall
23  that.
24      Q.  Roughly, how long -- did you go from

Page 36

1  there --
2      A.  I worked there for about three years.
3      Q.  For three years?
4      A.  Mm-hmm.
5      Q.  Okay.  Anywhere else where you had
6  manufacturing experience?
7      A.  Okay.  Let's see.  That was way -- I
8  can't tell you the year, but I know I had quite a
9  bit of experience.  Jergens.  I don't know if you
10  remember Jergens.
11      Q.  Mm-hmm.
12      A.  Okay.  It's been a long time.  Let's
13  see.  Oh, Revlon.  These were short periods of
14  time, but they added up -- you know, to give me the
15  experience that I needed.  Kenner, you remember
16  Kenner?
17      Q.  Kenner, the toy --
18      A.  Yeah.
19      Q.  Yeah.
20      A.  Okay.  I worked there.
21      Q.  Is that around?
22      A.  No, no.  That's really taking my mind
23  back, I tell you.  Kenner Toys, do they -- they
24  don't even have that anymore, do they?

Page 37

1      Q.  I don't think so.  Yeah, I think they
2  went out.  Wasn't Kenner the Barbie doll, or not?
3      A.  Kenner's had all kinds of toys they
4  made there.  We made, I should say, on assembly
5  line.
6      Q.  Where was that at?
7      A.  Assembly --
8      Q.  Where was Kenner located at?
9      A.  It was in Madisonville --
10      Q.  Okay.
11      A.  -- on Madison Road.
12      Q.  Okay, yeah.  I do remember that.  Any
13  other place?
14      A.  I think that's it, that I can
15  remember --
16      Q.  Okay.
17      A.  -- as far as that because I -- yeah.
18      Q.  When did you work at Jergens, was that
19  before Cincinnati Time?
20      A.  That was before.  All that was way
21  back in the day.
22      Q.  Okay.  But --
23      A.  That's been awhile.
24      Q.  -- Jergens, Revlon and Kenner were all

**10 (Pages 34 to 37)**

Page 38

1  before '79?
2      A.  Yes.
3      Q.  Okay.  And how long did you work for
4  Kenner?
5      A.  I couldn't tell you that now.  I
6  can't -- don't recall.  I can't --
7      Q.  Couple months, couple years?
8      A.  I would say at least -- I can't recall
9  and I hate to give the wrong information.
10     Q.  I'm just asking for a rough estimate.
11     A.  Okay.
12     Q.  I'm not going to hold it -- I just --
13     A.  I don't recall.  I would say --
14     Q.  Is it months?  Is it weeks?  Is it
15  years?
16     A.  Years, maybe a couple years.
17     Q.  Okay.  Same question for Revlon,
18  roughly how long?
19     A.  Maybe --
20     Q.  Months, years?
21     A.  Months --
22     Q.  Okay.
23     A.  -- but I couldn't tell you the
24  exact --

Page 39

1      Q.  That's okay.
2      A.  I don't recall that.
3      Q.  Jergens, same thing, months, years?
4      A.  Mm-hmm, about roughly years.
5      Q.  "Roughly years" or "roughly year"?
6      A.  Years.
7      Q.  All right.  And why did you leave
8  Kenner?
9      A.  They went -- they had -- they went
10  out.
11     Q.  Okay.  Went out of business?
12     A.  They went -- they have like seasonal
13  work.  It was only like seasonal.
14     Q.  Okay.
15     A.  You would go back, and then you'd find
16  something in between -- you know, working.
17     Q.  What about Revlon, why did you leave
18  there?
19     A.  It was just temporary.
20     Q.  Was that through a temporary service
21  or were you actually employed by Revlon?
22     A.  I was employed -- well, it was a
23  temporary service.
24     Q.  Okay.  What about Jergens?

Page 40

1      A.  It was a temporary service also.
2      Q.  Have you ever been fired from a job?
3      A.  Nope, I have not been fired.  I was
4  asked to resign.
5      Q.  Who was that?
6      A.  Please?
7      Q.  Who asked you to resign?
8      A.  The one at Johnson and Johnson.
9      Q.  Is that when you worked for them
10  through Kelly Services?
11     A.  Mm-hmm.
12     Q.  Why did they ask you to resign, do you
13  know?
14     A.  Because of some mistakes that were
15  made and it was not my fault.  They thought it was
16  my fault.  It wasn't my fault and I applied for
17  unemployment and I -- I won that because it wasn't
18  my fault.
19          Yes, I got my unemployment.  If I
20  hadn't -- if I hadn't got -- if I I hadn't got
21  unemployment -- I wouldn't got unemployment if it
22  hadn't been my fault.
23     Q.  Okay.
24     A.  It was not -- it was not my fault.  It

Page 41

1  was a mistake, but they were getting ready to end
2  the assignment anyway.
3      Q.  What was the mistake?
4      A.  Badge numbers.
5      Q.  Did you miss a badge --
6      A.  It was three of us actually and it
7  was -- I had nothing to do with it.  And by me
8  working on the line with them, I was part of it.
9      Q.  Did you have experience as a welder
10  anywhere?
11     A.  Yes.
12     Q.  Where was that at?
13     A.  Oh, boy.  I worked at Cincinnati Time
14  Recorder, spot welder.
15     Q.  Did you ever work for the U.S. Postal
16  Service?
17     A.  Yes, I did.
18     Q.  Was that roughly November '96 to
19  December '96?
20     A.  Yes.  I'm thinking it was about a
21  month.
22     Q.  What did you do for them?
23     A.  I'm thinking -- what did I do?  Mail
24  handler.

**11 (Pages 38 to 41)**

**Page 42**

1    Q.   You did not list that on your
2  employment application at AK Steel.
3    **A.   Of '96?**
4    Q.   Mm-hmm.
5    **A.   I went back to August of '96.  It was**
6  **before then.**
7    Q.   It was November '96 to December '96,
8  wasn't it?
9    **A.   Yeah, so that was August -- November**
10  **is after August.**
11    Q.   Right.
12    **A.   So it wasn't listed.**
13    Q.   You did that after working for
14  Marketing Services, correct or Marketing Programs,
15  correct?
16    **A.   Oh, dates I'm not good with.  What's**
17  **your name, Patty?  Patty, now you know these dates**
18  **I'm not good with.**
19    Q.   The last employer you list is
20  Marketing Programs and that employment ended,
21  according to application, in August '96.  After
22  that, you worked at U.S. Postal Services before you
23  worked at Kelly Services, but you did not list it.
24    **A.   Okay.  What's the question?**

**Page 43**

1    Q.   Why did you not list it?
2    **A.   I don't recall why I didn't list that.**
3    Q.   Okay.  When you applied at AK Steel,
4  did you submit a resume with your application?
5    **A.   I think I did.  I -- I don't recall,**
6  **but I'm -- so I say I don't recall because I don't.**
7    Q.   You've been handed what's been marked
8  as Exhibit 3.  Is that your handwriting?
9    **A.   Yes.**
10    Q.   Did you complete this form?
11    **A.   Yes.**
12    Q.   You list that you worked Creations by
13  Mary for two years.  That's not correct, though, is
14  it?
15    **A.   No, that's not correct.**
16    Q.   Your response to question one says,
17  "How many times have you been without employment
18  for more than six weeks" and you say "2 times."  Is
19  that the only times you've been out of -- without
20  employment for more than six weeks?
21    **A.   I don't recall that.**
22    Q.   Okay.  All right.  You've been handed
23  what's been marked as Exhibit 4.  Is this a copy of
24  your resume?

**Page 44**

1    **A.   It is, yes.**
2    Q.   Have you updated it at any time
3  recently?
4    **A.   I haven't, no.**
5    Q.   To the best of your recollection, are
6  these the dates and employment places that you list
7  here, are those accurate?
8    **A.   As far -- yes.**
9    Q.   I apologize.  I may have asked you
10  this already.  Why did you leave GE?
11    **A.   No, you didn't ask me.**
12    Q.   Okay.  End of the day, I start asking
13  the same --
14    **A.   You didn't ask me that, no.**
15    Q.   Okay.  Why did you leave GE?
16    **A.   Okay.  Why?**
17    Q.   Mm-hmm.
18    **A.   There was no reason.  It was not -- a**
19  **well, the reason I left is because they laid off**
20  **about 5,000 people and I was amongst those.**
21    Q.   You were laid off?
22    **A.   Lack of work.**
23    Q.   Were you ever re-called to employment
24  there?

**Page 45**

1    **A.   No.**
2    Q.   Why did you leave Marketing Programs,
3  Inc.?
4    **A.   Lack of work.**
5    Q.   How about Kelly Services?
6    **A.   I explained to you that --**
7    Q.   I'm sorry.
8    **A.   -- I thought.  I thought I did.**
9    Q.   That was Ethicon?
10    **A.   Yes, when I was asked to resign.**
11    Q.   Okay.
12    **A.   I was there actually twice.  First**
13  **time they called me back to work there because of**
14  **my work performance.  Then I worked there again,**
15  **and then at no fault of mine, I was asked to**
16  **resign --**
17    Q.   Okay.
18    **A.   -- and I collected the unemployment.**
19    Q.   And what all did you do at GE?
20    **A.   Quite a bit.**
21    Q.   Were you union?  Are they unionized?
22    **A.   Yes.**
23    Q.   Were you a union employee?
24    **A.   Yes.  I started off as a laborer, and**

**12 (Pages 42 to 45)**

**Page 46**

1 **from there, I went to bench assembly, assembly,**
2 **assembler, I should say.  And then as a -- as the**
3 **work became slow or we was headed out the door, I**
4 **should say, I started doing maintenance.  I mean,**
5 **housekeeping.**
6 **      Mm-hmm, that was before I was laid**
7 **off.  They were doing like a bumping system -- you**
8 **know, according to seniority type thing.**
9   Q.   Okay.  All right.  Do you know why you
10 were not hired at AK Steel?
11   **A.   Do I know why?**
12   Q.   Mm-hmm.
13       MS. DONAHUE:  Object.  The form calls
14 for speculation, but answer as best you can.
15   **A.   No, I have -- no, I don't.**
16   Q.   Okay.  Has anyone at AK Steel ever
17 said anything to you about your application, either
18 one of them?
19   **A.   No.  From AK Steel?**
20   Q.   Mm-hmm.
21   **A.   No.**
22   Q.   Anyone at AK Steel ever said anything
23 to you about why you were not hired?
24   **A.   No.  I never spoke to anyone from AK**

**Page 47**

1 **Steel.**
2   Q.   Did anyone from AK Steel ever say
3 anything to you about your race?
4   **A.   About my rates?**
5   Q.   Race.
6   **A.   Race?**
7   Q.   Race.
8   **A.   I never spoke to anyone from there.**
9   Q.   Okay.  So I assume, then, no one at AK
10 Steel ever said anything to you that you believe
11 was discriminatory?
12       MS. DONAHUE:  Object to the form.
13 Calls for a legal conclusion.
14   **A.   I never spoke to anyone from there.**
15   Q.   Have you heard from anyone else that
16 anyone at AK Steel ever said or did anything that
17 was discriminatory in any way?
18   **A.   Have I heard that?**
19   Q.   Yes.
20       MS. DONAHUE:  Object to the form.
21 Calls for legal conclusion, but you can answer.
22   **A.   No.**
23   Q.   Okay.  When did you make the
24 determination that you thought that you were not

**Page 48**

1 hired because of your race?
2   **A.   When did I?**
3   Q.   Did you make -- did you at some point
4 decide you were not hired because of your race?
5   **A.   Well, I saw the advertisement on TV --**
6 **you know, to apply.  And I applied and I know I was**
7 **qualified, well qualified for the job.  And they**
8 **never called me.  I never heard from anyone.  I**
9 **applied two different times.**
10   Q.   Your application doesn't have all
11 these qualifications.
12       MS. DONAHUE:  Object to the form.
13 That mischaracterizes the evidence, but you can
14 answer.
15   **A.   They never received my resume?**
16   Q.   You told me you didn't know if you
17 submitted it or not.  I don't know.
18   **A.   I'm asking you now.**
19   Q.   I don't know.  I'm asking you.
20   **A.   I think I did.  I can't really recall,**
21 **but this had -- I -- I can't recall.  I can't**
22 **recall.**
23   Q.   Okay.
24   **A.   I'm not going to say anything else**

**Page 49**

1 **about it because --**
2   Q.   You don't know?
3   **A.   -- I just don't recall.**
4   Q.   That's fine.
5   **A.   I just -- okay.  I won't say anything.**
6   Q.   Okay.  Do you know whether anyone who
7 was hired was less qualified than you?
8   **A.   I have no idea.  I don't recall.  I**
9 **don't know.**
10   Q.   Okay.  Do you know who at AK Steel
11 decided not to hire you?
12   **A.   No.**
13   Q.   Do you know who AK Steel hired instead
14 of you?
15   **A.   No.**
16   Q.   What evidence do you have to support
17 your claim that you were discriminated against?
18       MS. DONAHUE:  Object to the form.  Go
19 ahead.  You can answer.
20   **A.   I don't understand the question.**
21   Q.   Do you have any basis, other than the
22 fact that you applied and you think you were
23 qualified, do you have any other basis do you
24 believe that it was because of your race?

Page 50

1    A.   Well, I don't think that I was
2  qualified.  I know I was qualified.
3    Q.   Okay.
4    A.   I know that.
5    Q.   Any other reason to believe that it
6  was because of your race?
7    A.   Well, what other reason would it be?
8    Q.   Thousands of people don't get hired
9  every year.
10   A.   But when they need people -- well,
11 okay.  No, I don't.
12   Q.   Do you have any other reason?
13   A.   No, I don't.
14   Q.   At what point did you decide it must
15 be because of your race?  When did you come to that
16 conclusion?
17   A.   Because I knew they were hiring.  I
18 knew they were hiring.  I knew that.  That's why I
19 applied for the job --
20   Q.   Okay.
21   A.   -- but I never was called.
22   Q.   So when did -- if you applied in May
23 2001, roughly when would you have decided it must
24 be because of my race?

Page 51

1    A.   I can't tell you that.  I don't know.
2    Q.   Okay.  You've been handed what's been
3  marked as Exhibit 5.  Is that the charge of
4  discrimination you filed with the EEOC?
5    A.   Yes, it is.
6    Q.   Is that your signature at the bottom
7  of the first page?
8    A.   Yes, it is.
9    Q.   And your signature at the -- on the
10 last page?
11   A.   Yes.
12       MS. DONAHUE:  Be sure to read it
13 before you answer questions about it.
14       THE WITNESS:  She asked me about my
15 signature.
16       MS. DONAHUE:  Yeah, I know.
17   Q.   Would you like to take a chance to
18 read it at this time?
19   A.   To read what?
20       MS. DONAHUE:  Read the document,
21 especially this part.
22   A.   Okay.
23   Q.   Okay.  You filed -- looking at the
24 first page, it looks like you filed this on June

Page 52

1  21st, 2002.  Does that sound right?
2    A.   I don't recall.  You know, I can't --
3  I'm not very good with dates.
4    Q.   Okay.  You have no reason to believe
5  that it was filed on a different date, do you?
6    A.   I don't recall that.
7    Q.   Okay.  Earlier you testified that you
8  applied to AK two times.  Your interrogatory
9  responses mentioned the time in 2001 and a previous
10 time.
11       Is your statement here incorrect where
12 you say you applied three times?  Isn't it true
13 that it was only two times?
14   A.   What is your question?
15   Q.   Did you only apply two times to AK
16 Steel?
17   A.   Twice, two times.
18   Q.   Okay.  And that was -- was it in late
19 2000 and mid 2001, May 2001 that we already
20 looked at?  Does that sound right?
21   A.   I don't recall that.  I don't recall
22 this.
23   Q.   You don't recall the dates listed in
24 this document?

Page 53

1    A.   No I don't recall, no, I don't.
2    Q.   Okay.  That's fine.  You've been
3  handed what's been marked as Exhibit Number 6.  Did
4  you receive a copy of this document prior to today?
5    A.   I don't recall it.
6    Q.   You don't recall receiving it?
7    A.   Na-huh, no.
8    Q.   Could you have received it?
9    A.   I don't recall it.
10   Q.   Is that -- was that your address in
11 2003, 1176 Elkwood?
12   A.   I don't recall that.
13   Q.   You don't know if it was or not?
14   A.   Na-huh.
15   Q.   You decided to participate in a
16 lawsuit that was filed in this case, correct?
17   A.   Yes.
18   Q.   And you understand that that lawsuit
19 was filed roughly in June of 2002?
20   A.   I don't recall, but I -- I think it
21 was before then.
22   Q.   You think it was filed before June?
23   A.   I can't recall.  I'll just --
24   Q.   Okay.

Page 54

1    A.   -- leave it like that.  I can't recall
2  'cause, like I said, I'm not really good with the
3  dates.
4    Q.   I understand.  Did -- initially you
5  were seeking to be a class representative in this
6  lawsuit; is that correct?
7    A.   Say it -- repeat that.
8    Q.   Initially, were you seeking to be a
9  class representative in this lawsuit?
10    A.   Explain that, please.
11    Q.   Were you seeking to represent a class
12  of individuals, be a spokesperson for a class of
13  individuals?
14    A.   Yes.
15    Q.   Okay.  And as part of that, the duty
16  and responsibility of the class representative, you
17  were keeping abreast of what was going on in the
18  litigation?
19    A.   I don't understand what you're saying.
20    Q.   Did you keep in touch with your
21  attorneys?  Did you keep in touch with what was
22  going on in the litigation?
23    A.   Yes.
24    Q.   Okay.  Have you ever seen Exhibit

Page 55

1  Number 7 before?
2    A.   Can't recall that I have.
3    Q.   You don't recall that you have?
4    A.   I said I can't recall.
5    Q.   Okay.  You could have, might not have?
6         MS. DONAHUE:  Is that a question?
7         MS. PRYOR:  Yeah.
8    A.   What was the question?
9    Q.   You could have received it, you might
10  not have received it; is that your --
11    A.   I said I didn't recall if I received
12  it or not --
13    Q.   Okay.
14    A.   -- or if I've seen this before.
15    Q.   Okay.  Have you seen Exhibit 8 before?
16    A.   I don't recall seeing this, either.
17    Q.   You don't recall seeing this, either?
18    A.   Na-huh, no, I don't.
19    Q.   Do you have any documents related to
20  your claims in this case, other than tax returns,
21  your EEOC charge and your resume?
22    A.   Do I have documents?
23    Q.   Mm-hmm, that you believe would help.
24    A.   Correspondence.

Page 56

1    Q.   What kind of correspondence?  Not
2  correspondence between your attorneys.
3    A.   Yeah, that's it.
4    Q.   Other than correspondence between you
5  and your attorneys, do you have other
6  correspondence?
7    A.   No, no.
8    Q.   And I think I may have asked you this
9  and I did apologize if I did.  Do you have any
10  notes?  Did you keep any notes or journal of
11  events?
12    A.   (Witness nodded.)
13    Q.   Is that a "no"?
14    A.   No.
15    Q.   Are you asking for damages in this
16  lawsuit?
17    A.   Well, I can't remember the year.  I
18  I'm just asking for whatever is -- the law allows.
19  You know, when you been discriminated against.  And
20  I know I was qualified for these jobs.  And I
21  wanted the job, but because of the job, I didn't
22  get the job.  I took a lower-paying job.  That's
23  what I'm asking for, whatever is due to me by the
24  law.  You know, whatever -- that I'm due for being

Page 57

1  discriminated against and not getting the job.
2         I had a bankruptcy and I wasn't really
3  aware of some things that happened.  I wasn't
4  explained about that.  But I think if I had gotten
5  that job at AK Steel, I wouldn't loss my home; I
6  wouldn't loss my -- I wouldn't had to do a
7  bankruptcy.  I took a lower-paying job to keep from
8  being homeless.  I took that job because that's
9  what I -- that's what I could do at the time.
10        So that's all I ask for, whatever is
11  due to me for not being able to get the job.  And I
12  know I was well qualified for it.
13    Q.   Okay.
14    A.   And I lost what I had.  And never had
15  but one dream in my life is to have my own home.
16  And I did have my home.  And at the time I was
17  making money where I could afford to take care of
18  it.
19        But then once I didn't have that
20  job -- you know, where I was working at GE, and
21  then I applied for another job and I didn't get
22  that.  And as far as AK Steel, I know I was
23  qualified and GE wasn't hiring anymore up until
24  about a couple -- maybe a year or so ago.

**15 (Pages 54 to 57)**

**Page 58**

1    Q.    Was there no other business that you
2  could have applied for during this time?
3       **A.    From making the kind of money that I**
4  **was qualified to do, I didn't.**
5    Q.    No other manufacturer?
6       **A.    I didn't know of any.**
7    Q.    You didn't apply to any other?
8       **A.    I didn't know of any.  But I did -- I**
9  **know that's the only -- and I did a bankruptcy**
10 **because I couldn't afford to pay my debts and keep**
11 **up with what I owe.**
12   Q.    Who suggested that you apply at AK
13 Steel?
14      **A.    I saw it on the news, on the TV.**
15 **Nobody suggested I do it.  I saw it and I -- and I**
16 **applied.  And that's what I did.  I was looking to**
17 **get the job and was hoping that I could get the job**
18 **and be able to -- you know, hold on to what I had**
19 **and had -- you know, accumulated in my life.**
20   Q.    Did you ever call anyone at AK Steel
21 to find out what happened with your --
22      **A.    I didn't --**
23   Q.    -- application?
24      **A.    -- have their number.  I went back up**

**Page 59**

1  **there, put another application -- I did remember**
2  **putting two applications up there at the same -- on**
3  **University, but I never heard anything from them.**
4    Q.    Okay.
5       **A.    Is that too much?  I'm talking too**
6  **much?**
7    Q.    She's just waiting for you to take a
8  break so she can mark my exhibit.
9       **A.    I just -- you know, so that's what I**
10 **can say about that.  That's the only thing I'm**
11 **looking for.  I did -- I'm not going to repeat that**
12 **and I think you heard everything I said --**
13   Q.    Okay.
14      **A.    -- you know, with this, what happened**
15 **to me.**
16      MS. PRYOR:  Take a break for just a
17 second, so she can mark this.
18      THE WITNESS:  And that's the end of my
19 story.  Can I get some water.
20      MS. DONAHUE:  Let's take a break.
21      MS. PRYOR:  Want to take a quick
22 break?  That's fine.
23      (Off the record:  3:11 p.m. - 3:23 p.m.)
24   Q.    Okay.  Ms. Harris, you've been handed

**Page 60**

1  what's been marked as Exhibit 9 and Exhibit 10.
2  Exhibit 9, is that a copy of the documents you
3  filed for bankruptcy?
4       **A.    Can you repeat the question?**
5    Q.    Sure.  Exhibit 9, are those the
6  documents you filed for bankruptcy -- when you
7  filed your bankruptcy, petition for bankruptcy?
8       **A.    Yes.**
9    Q.    Okay.  And I'm going to ask you, at
10 the very top, right-hand corner of each page, I've
11 hand written numbers, just -- page numbers for ease
12 of going through it here today.  If you turn to
13 page 27 of my hand marked pages, are you there?
14      **A.    Yes.**
15   Q.    Is that your signature on page 27?
16      **A.    Yes.**
17   Q.    And if you'll turn to page 31.  You
18 have that?
19      **A.    31?**
20   Q.    31.  Is that your signature?
21      **A.    Yes.**
22   Q.    Okay.  And on page 33, is that your
23 signature?  Is that your signature on page 33?
24      **A.    That don't look like my signature**

**Page 61**

1  **there, but the other ones that you asked me about**
2  **does.**
3    Q.    Page 33 does not look like your
4  signature?
5       **A.    No, and it also doesn't look like my**
6  **husband's signature.**
7    Q.    Okay.  Do you know who would have
8  signed this?
9       **A.    No.**
10   Q.    Okay.  What about on page 43, are
11 those your signatures?  I should say your signature
12 and your husband's signature.
13      **A.    You say -- 40 --**
14   Q.    Page 43 --
15      **A.    What page?**
16   Q.    -- the very last page.
17      **A.    43?**
18   Q.    Yes, the very last page.
19      **A.    Yes.**
20   Q.    Okay.  Were you represented by an
21 attorney during the bankruptcy proceedings?
22      **A.    Yes.**
23   Q.    Okay.  You understood that this was a
24 legal proceeding, bankruptcy is a legal proceeding?

**16 (Pages 58 to 61)**

Page 62

1   A.   Yes.
2   Q.   You understood that you were signing
3 these documents, the ones that you signed under
4 penalty of perjury?
5   A.   I don't -- make me -- I don't
6 understand your question.  What do you mean?  I
7 don't understand the question.
8   Q.   If you look at page 27.  Okay.  Are
9 you on page 27?
10   A.   Yes.
11   Q.   Right above your and your husband's
12 signature, it says, "I declare under penalty of
13 perjury that I have read the foregoing summary and
14 schedules, consisting of 26 sheets, and that they
15 are true and correct to the best of my knowledge,
16 information, and belief."  You saw that and signed
17 it, correct?
18   A.   I saw it and I signed it, yes.
19   Q.   Okay.  And you did not disclose to the
20 bankruptcy court or to the bankruptcy trustee that
21 you had a lawsuit filed against AK Steel, correct?
22   A.   I didn't know.  I -- I wasn't aware
23 that I was supposed to.  I -- I didn't know.
24 That's the only thing I can say.  I didn't do it

Page 63

1 intentionally.  I didn't know.  I didn't know that
2 was considered.  I didn't know that.
3   Q.   And on page 29, number four says --
4 this is at the very top, "List all suits and
5 administrative proceedings to which the debtor,"
6 which is you, "is or was a party within one year
7 immediately preceding the filing of this bankruptcy
8 case."
9       And there's two lawsuits filed there,
10 listed there, but the one against AK Steel is not
11 listed, correct?
12   A.   It's not listed, that's correct --
13   Q.   Okay.
14   A.   -- because I didn't know that that
15 should have been listed.
16   Q.   But you knew these other two should?
17   A.   Well, I didn't list that.  The
18 attorney did that.
19   Q.   Well, how did he know about these
20 other two lawsuits?
21   A.   I didn't think the Cincinnati Gas and
22 Electric was a lawsuit.  But I -- I -- the only
23 thing I knew was -- that I knew was Wells Fargo.  I
24 knew I was losing my home.  I knew that.  So I -- I

Page 64

1 just didn't know.  I just didn't -- I didn't.
2 Being honest about it, I just didn't know that that
3 should have been listed.
4   Q.   You didn't --
5   A.   If I had known it, it would have been
6 listed there.  I didn't know.
7   Q.   Did you ask your attorney what it
8 meant by legal -- "administrative proceedings" or
9 lawsuits that --
10   A.   I did not.  I did not ask him.  I
11 trusted him, but I didn't know.
12   Q.   Did you pay attention to this when you
13 signed it?
14   A.   Not every -- every -- no.
15   Q.   You just wanted to get a discharge of
16 your debts?
17   A.   Well, I just wanted to -- I knew I
18 wasn't able to pay them.
19   Q.   So you wanted the benefit of the
20 bankruptcy to discharge those debts?
21       MS. DONAHUE:  Object to the form.
22 It's argumentative.
23   A.   I didn't know.  That's the only thing
24 I can say.  I didn't know.

Page 65

1   Q.   Did you receive a discharge of your
2 debts?
3   A.   Some of them; some of them I paid.
4   Q.   Which ones did you pay?
5   A.   I can't recall them right now.
6   Q.   If you look at Exhibit 10, is that the
7 order from the bankruptcy court discharging your
8 debts?
9   A.   What was the question?
10   Q.   Exhibit 10, is that a copy of the
11 order from the bankruptcy court discharging your
12 debts?
13   A.   That's what it states.
14   Q.   Do you have any reason to believe it's
15 anything else?
16   A.   I don't know.
17   Q.   Did you ever tell your bankruptcy
18 attorney about your lawsuit against AK Steel?
19       MS. DONAHUE:  Object to the form.
20 That's a privileged conversation, so I'm going to
21 instruct you not to answer.
22   A.   I can't recall.
23       MS. DONAHUE:  Well, I've instructed
24 you not to answer.

**17 (Pages 62 to 65)**

Page 66

1  MS. PRYOR: Is she going to be relying
2  on her bankruptcy attorney's advice to defend
3  against the judicial estoppel claim?
4  MS. DONAHUE: I don't think I need to
5  answer that.
6  MS. PRYOR: If she is, I'm entitled to
7  ask her questions about it --
8  MS. DONAHUE: Well --
9  MS. PRYOR: -- and it's --
10  MS. DONAHUE: -- it's a privileged
11  conversation and she is entitled to keep that
12  privilege. It's her privilege to keep and --
13  MS. PRYOR: That's fine, unless she's
14  going to raise it and assert it in a judicial
15  estoppel proceeding, if she is, I'm entitled to ask
16  about it.
17  MS. DONAHUE: Well, you know --
18  MS. PRYOR: You can't say I relied on
19  someone's advice and not let me ask about it,
20  absolutely. So I guess if she's not, that's fine.
21  I don't care. I won't ask. But if she is, I am
22  entitled to know about it.
23  MS. DONAHUE: Well, I'm instructing
24  her not to answer that question.

Page 67

1  MS. PRYOR: Okay. I won't expect to
2  see that in any filings.
3  THE WITNESS: What's that?
4  MS. DONAHUE: This is between the
5  lawyers.
6  THE WITNESS: Oh, okay. I'm sorry.
7  Q. Did you receive any benefits at RDI?
8  A. When you say "benefits," meaning what?
9  Q. Health insurance, dental insurance,
10  life insurance.
11  A. I have dental.
12  Q. You have dental?
13  A. Mm-hmm.
14  Q. Do you have health insurance?
15  A. No.
16  Q. Do you have health insurance through
17  some other form?
18  A. Yes.
19  Q. What do you have health insurance
20  through?
21  A. Through my husband's retirement.
22  Q. Do you have any other benefits through
23  your husband?
24  A. No.

Page 68

1  Q. Do you have any other benefits that
2  you received at RDI?
3  A. No.
4  Q. Have you ever seen a psychologist or a
5  counselor?
6  A. Yes.
7  Q. When was that?
8  A. I saw my pastor. He's considered my
9  counselor. When I was going through this
10  bankruptcy and losing my home and all of that.
11  Q. What did you talk to him about?
12  A. About the situation that I never been
13  in and losing my home and going to -- having to
14  file bankruptcy, not able to pay my bills and --
15  Q. And who was that?
16  A. -- amongst other things.
17  Q. Who was that that you talked to?
18  A. My pastor.
19  Q. What's his name?
20  A. His name -- I had -- matter of fact, I
21  talked to two of them. One of them is deceased,
22  and that's James Milton.
23  Q. Who's the other one?
24  A. See, C. Dennis Edwards.

Page 69

1  Q. Is he related to Donald Edwards?
2  A. I have no idea. I don't know that.
3  Q. When did --
4  A. Oh, from on here, would this -- no.
5  Q. When did you talk to either of these
6  two?
7  A. During the time -- I can't give you
8  years or dates, but I did speak to him. I speak to
9  my pastor on a regular -- well, he's not there
10  anymore, but I speak to him on a regular basis.
11  Q. Did you ever talk to him about AK
12  Steel?
13  A. Never.
14  Q. Have you ever seen any other kind of
15  psychologist --
16  A. No, I should --
17  Q. -- or counselor?
18  A. I should rephrase that. No.
19  Q. Have you ever talked to any other
20  psychologist or counselor?
21  A. No --
22  Q. Do you take any --
23  A. -- just counseling with my pastor.
24  Q. Just your pastor?

**18 (Pages 66 to 69)**

Page 70

1  A.  Mm-hmm.
2  Q.  Have you ever taken any medications
3  for depression or emotions or nerves?
4  A.  No.
5  Q.  Do you have any witnesses or
6  individuals who you believe have knowledge that
7  would support your claims?
8  A.  What claims?
9  Q.  Your claims in this lawsuit against AK
10  Steel.
11  A.  Do I have any witnesses?
12  Q.  Yes.
13  A.  I can't recall that.  You know, I'm
14  looking back at this I don't know if it means
15  anything to you.  See, a lot of this here, like the
16  Huntington Bank, I -- I remember that 'cause I do
17  have my van and that's what I have.  And they got
18  on here that this here was part of that and I paid
19  that.
20  Q.  What are you looking at?
21  A.  The Huntington Bank.
22  Q.  What exhibit?
23  A.  Exhibit 10.
24  Q.  Exhibit 10?  And you're looking at the

Page 71

1  last couple of pages --
2  A.  Mm-hmm.
3  Q.  -- which is the service list?
4  A.  I guess.
5  Q.  I believe that's just identifying
6  people that was served with this notice.
7  A.  I thought it was the people that was
8  on the bankruptcy.
9  Q.  They were probably people that were
10  listed by you for some reason, but I think this is
11  a certificate of service.
12  But you're saying the Huntington, you
13  paid off?
14  A.  Mm-hmm.  I can -- I can regulate that,
15  yeah.  I remember that.
16  Q.  Are there any other ones that you see
17  that you paid off?
18  A.  Na-huh.  I was just scanning through
19  them.  I don't remember that, but I do remember
20  that one specifically.
21  Q.  Okay.  Any witnesses or individuals
22  that have knowledge that would support your claims?
23  A.  I can't remember that.
24  Q.  Is there anyone who knows about your

Page 72

1  application to AK Steel?
2  A.  That knows about -- I put them in?
3  Q.  Mm-hmm.
4  A.  I'm quite sure the people that's on
5  this claim knows, but I don't know them personally.
6  Q.  You don't know the other --
7  A.  The only ones I know -- I don't know
8  them personally, but I do know some people that's
9  on here.
10  Q.  Okay.  And I think we talked about
11  that.  It was Vivian Bert --
12  A.  Exactly.  So the others --
13  Q.  -- Allen Roberts?
14  A.  -- I don't know these people.  I don't
15  know them.  I never knew them.
16  Q.  Okay.
17  A.  I don't know.
18  Q.  Other than in the presence of your
19  counsel, have you talked to any of the other
20  plaintiffs besides Vivian Bert, Allen Roberts and
21  Shawn Pryor?
22  A.  No, only at the meetings --
23  Q.  Okay.
24  A.  -- at the different meetings we had

Page 73

1  with the attorneys.
2  Q.  I've heard about an initial meeting
3  where fliers were sent out and everyone was invited
4  to a group meeting.  Were you part of that, before
5  the lawsuit started?
6  A.  I don't recall that.
7  Q.  How did you find out about the
8  lawsuit?
9  A.  I'm trying to think.  Let me see.  How
10  did I find out about it?  I can't recall it.  I
11  can't recall it.
12  Q.  And the three people that you say do
13  have knowledge -- or at least you've talked to are
14  Allen Roberts, Vivian Bert and Shawn Pryor; is that
15  correct?
16  A.  I didn't understand the question.
17  Q.  I'm sorry.  Who has knowledge about
18  your applying -- I think that -- did you tell me
19  that Vivian Bert knows about you applying?
20  A.  I don't think I told you that.
21  Q.  Okay.  I'm sorry.  Does anyone know
22  about you applying to AK Steel?
23  A.  I can't recall that, either.
24  Q.  Okay.  Have you talked to anyone about

**19 (Pages 70 to 73)**

Page 74

1  applying to AK Steel?
2  **A.    Sure.  When we had our meetings here.**
3  Q.    Besides --
4  **A.    Yeah.**
5  Q.    -- other than in the presence of your
6  counsel, have you talked to anyone else about --
7  **A.    Yes.**
8  Q.    When have you talked to other people
9  about you applying?
10  **A.    About me applying, about what's going**
11  **on?**
12  Q.    Either one.
13  **A.    I've talked to -- let's see.  You kind**
14  **of tricking me up on that.  You know what I'm**
15  **saying?  And I feel like you tricking me, you know?**
16  **Different questions, you asking me contradicting**
17  **each other.  I don't know.  I don't know.  Don't do**
18  **that.  I feel confused.**
19  Q.    I'm not trying to trick you.  So
20  let's --
21  **A.    I feel like that.**
22  Q.    Okay.  Well, let's --
23  **A.    I do.  I really feel like that.**
24  Q.    Let's back up and try to --

Page 75

1  **A.    'Cause I want to --**
2  Q.    -- understand.
3  **A.    -- give you the truth.  You know, I**
4  **want to tell you the answer.  I want to tell you,**
5  **but I feel like you saying one thing, and then you**
6  **turn around and say something different.**
7  Q.    Okay.
8  **A.    I don't know.**
9  Q.    Have you talked to anyone about your
10  application?
11  **A.    Of course I have --**
12  Q.    Who?
13  **A.    Yes, yes.**
14  Q.    Who?
15  **A.    We talked when we had our meeting.**
16  Q.    Okay.  And that was with counsel
17  present?
18  **A.    Yes.**
19  Q.    Have you talked to anyone besides
20  those times when counsel was present?
21  **A.    No.**
22  Q.    Okay.  Have you talked to anyone about
23  your claims besides when counsel was present?
24  **A.    No.**

Page 76

1  Q.    Okay.  Now we're cleared up.
2  **A.    Okay.  'Cause I was getting confused.**
3  **And were you?**
4  Q.    All right.
5  **A.    I was getting confused.  I was like, I**
6  **know she asked me something, but -- okay.**
7  Q.    And I apologize.
8  **A.    That's okay.**
9  Q.    I think I did ask you this already.
10  **A.    That's okay.  You don't keep a diary**
11  **or a journal or --**
12  **A.    No, I don't do that.**
13  Q.    Okay.  All right.  One last exhibit.
14  This is Exhibit Number 11.  Are these your tax
15  returns from 2001 to 2006?
16  **A.    Yes.**
17  Q.    Yes?
18  **A.    Yes.**
19  Q.    And how long has your husband been
20  retired?
21  **A.    Now, that I don't recall.  Seemed like**
22  **when we got into '99 to 2000, the years start kind**
23  **of -- you know, getting confused about the years.**
24  **I can't recall.**

Page 77

1  Q.    Is it -- let's see here.  On these tax
2  returns, is the income all yours?
3  **A.    Where?**
4  Q.    On the tax returns.  For example, on
5  2001, the top page, number seven is wages,
6  salaries, et cetera.  It's 20,000.  Is that all
7  your income or is your husband still earning income
8  at that time?
9  **A.    Yeah, he was getting retirement.**
10  Q.    Okay.  So that income would have been
11  all yours?
12  **A.    I can't -- let me see.  I think it was**
13  **a combination, I think, if I'm not -- if I'm not**
14  **mistaken.  I'm thinking -- I'm thinking -- I can't**
15  **recall.  I'll just put it out on the carpet because**
16  **the way I'm looking at it --**
17  Q.    Well, actually?
18  **A.    I'll just say I can't recall on that.**
19  Q.    If you look down at number 16B --
20  **A.    Mm-hmm.**
21  Q.    -- which is the total pension.  Do you
22  receive a pension from anyone?
23  **A.    No.**
24  Q.    Did he start receiving a pension

**20 (Pages 74 to 77)**

**Page 78**

1  before he retired?
2    **A.   No.**
3    Q.   So if there's pension listed here that
4  would be his, correct, 16B?
5    **A.   Yes, I'm looking at that.**
6    Q.   That would be your husband's pension?
7    **A.   Yes.**
8    Q.   Okay.  And that would mean the wages
9  are yours, then?  Does that make sense?
10    **A.   Not necessarily.  Well, let me take**
11  **that back.  No, it doesn't mean that.**
12    Q.   Okay.  Where is the wages coming from,
13  then?
14    **A.   Okay.  The wages -- well, he was**
15  **working like a part-time job.  So that would**
16  **probably -- well, you don't want that word used.**
17  **It was a combination, I guess.**
18    Q.   Okay.
19    **A.   I -- I -- that's what I'm thinking.  I**
20  **don't --**
21    Q.   Do you have your --
22    **A.   I should just said I don't know, okay?**
23    Q.   Do you have your --
24    **A.   I'll put it like that.**

**Page 79**

1    Q.   -- your W-2's?
2    **A.   Do I have them?**
3    Q.   Yes.
4    **A.   With me?**
5    Q.   Do you have them at home?
6    **A.   Yes.**
7    Q.   Okay.  I request your W-2's, please.
8    **A.   That would be this.  This is the --**
9    Q.   These are your tax returns.  I'm
10  looking for your actual W-2's from your employer.
11    **A.   I don't have that, no.**
12    Q.   You don't have those?
13    **A.   No.**
14    Q.   What have you done with them?
15    **A.   I can get them.  I mean, if you need**
16  **them.  I mean, as far as what, from -- from my --**
17  **my job?**
18    Q.   Mm-hmm.
19    **A.   I guess I could request them.**
20    Q.   From 2001 to the present, please.
21    **A.   I can request them.  I guess that**
22  **they would have a copy of them there, wouldn't**
23  **they?**
24    Q.   I don't know.

**Page 80**

1    **A.   Or would they?  What do you think?**
2    Q.   I don't know.  Normally you'd keep
3  them with your tax returns.  You don't -- you do
4  not keep them?  Is that what you're telling me?
5    **A.   Well, I got them.  I got them.  I**
6  **should.  I don't know.  I don't know if I have them**
7  **or not.**
8    Q.   I'd ask that you look for them.
9    **A.   I'll request them if you -- you need**
10  **those?**
11    Q.   I'd like your W-2's and any other
12  documents that we requested earlier.
13    **A.   Okay.  I'll get those.**
14    Q.   Do you know anything about the claims
15  of any of the other plaintiffs?
16    **A.   Only what we -- only what we discussed**
17  **in the --**
18    Q.   With counsel?
19    **A.   With the attorney.**
20    MS. PRYOR:  Okay.  I have no further
21  questions, but obviously, like the other ones,
22  we'll leave it open till we get all the documents
23  we requested.
24    MS. DONAHUE:  Okay.

**Page 81**

1    THE WITNESS:  And the documents that
2  you requested is my W-2's from 2001 up to 2006?
3    MS. PRYOR:  Yeah, and those -- there's
4  a document request out there which your attorney
5  can go over with you if there's other documents.
6    EXAMINATION
7  BY MS. DONAHUE:
8    Q.   All right.  I have a question about --
9  if you look at Exhibit 1, Exhibit 1.  Your
10  interrogatory answers and if you will look on page
11  5 at your answer to interrogatory number three --
12    **A.   Page 5?**
13    Q.   Mm-hmm.
14    **A.   Mm-hmm.**
15    Q.   You say that you applied to General
16  Electric Company in July, August and November of
17  2006; is that correct?
18    **A.   Yes.**
19    Q.   And do you have any idea why you have
20  not heard back from General Electric Company for
21  those applications?
22    **A.   Why I haven't heard from them?**
23    Q.   Yes.
24    **A.   Well, seniority -- they had -- they**

**21 (Pages 78 to 81)**

Page 82

1  laid off 5,000 people.  So my seniority -- and I
2  was one of the first that went out the door.  And
3  my re-call rights, you only have five years of
4  re-call.
5           So they -- and not only that, they
6  have satellite plants.  I even inquired about that.
7  They have satellite plants that they were closing,
8  so they -- they placed those first before they
9  would take the ones that they were calling back.
10  You know, I don't have any re-call rights with GE.
11  My re-call rights were up after five years.
12     Q.   Okay.  So do you believe that the
13  reason that you haven't heard back from General
14  Electric is related to your -- to the re-call
15  rights, the expiration of your re-call rights?
16     A.   Not only that -- yes, that's true,
17  yes.  But the satellite plants, they're replacing
18  them first.
19     Q.   All right.
20     A.   They're giving them first priority.
21     Q.   Okay.
22     A.   They get first priority over the ones
23  that -- that work there, even though my five years
24  of re-call rights are up.

Page 83

1     Q.   Okay.
2     A.   They gave them first priority.
3     Q.   All right.  I also want to ask you a
4  question about Exhibit 2.  Exhibit 2 is your
5  application that you submitted on May 15th, 2001;
6  is that correct?
7     A.   The date, I'm not really sure about.
8     Q.   Okay.
9     A.   I -- I don't really know the date,
10  but --
11     Q.   Well, exhibit --
12     A.   I could -- well, go ahead.
13     Q.   Exhibit 2 has the date on it of May
14  15th, 2001; is that correct?
15     A.   Mm-hmm, mm-hmm, that's true, yes
16     Q.   Okay.  Look on page -- I guess it's
17  the third page.  And you were asked whether or not
18  you submitted your resume with this application.
19  Does this -- look on page -- the next page.
20           Does this page refresh your
21  recollection about whether you submitted your
22  resume or not?
23     A.   Where it says "See Resume"?
24     Q.   Mm-hmm.

Page 84

1     A.   Yes, it does because I was thinking
2  why would I put "See Resume" on there if I didn't
3  send it?
4     Q.   Okay.
5     A.   I had to be -- I'm -- I'm thinking I
6  did because that's the only way -- you know, what I
7  did -- I'm going to tell you exactly what I did.
8  As I think about it with me seeing that and I
9  hadn't even paid any attention to that when I saw
10  "See Resume."
11           I went just like 10 years back on my
12  application -- you know, as far as the work I've
13  done for the past 10 years.  Again, that was past
14  10 years and that will be the reason why I did put
15  "See Resume" because that would have given me the
16  experience that I needed in order to work at AK
17  Steel.  And I know -- and it had other jobs on
18  there, Cincinnati Time Recorder, et cetera.
19     Q.   Okay.  Did you write "See Resume"
20  twice on this page?
21     A.   Yes --
22     Q.   Okay.
23     A.   -- that's my handwriting.
24           MS. DONAHUE:  Okay.  Those are all the

Page 85

1  questions I have.
2           MS. PRYOR:  Nothing further.
3           MS. DONAHUE:  Okay.
4     (Deposition concluded at 3:53 p.m.)
5
6
7
                    Mary L. Harris
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**22 (Pages 82 to 85)**

**Page 86**

```
 1        C E R T I F I C A T E
 2
 3  STATE OF OHIO        :
 4                       :  SS
 5  COUNTY OF HAMILTON   :
 6
 7        I, Susan M. Barhorst, a Notary Public in
 8  and for the State of Ohio, duly commissioned and
 9  qualified, do hereby certify that prior to the
10  giving of this deposition the within-named
11  Mary L. Harris was by me first duly sworn to
12  testify the truth, the whole truth, and nothing but
13  the truth; that the foregoing pages constitute a
14  true, correct, and complete transcript of the
15  testimony of said deponent, which was recorded in
16  stenotypy by me, and on the 18th day of June
17  2007 was submitted to counsel for deponent's
18  signature.
19        I further certify the within deposition was
20  duly taken before me at the time and place stated,
21  pursuant to the Federal Rules of Civil Procedure;
22  that I am not counsel, attorney, relative or
23  employee of any of the parties hereto, or their
24  counsel, or financially or in any way interested in
```

**Page 87**

```
 1  the within action, and that I was at the time of
 2  taking said deposition a Notary Public in and for
 3  the State of Ohio.
 4        IN WITNESS WHEREOF, I have hereunto set my
 5  hand and notarial seal at Cincinnati, Ohio, this
 6  18th day of June 2007.
 7
 8
 9
            Susan M. Barhorst, Notary Public
10          in and for the State of Ohio.
            My commission expires
11          February 18, 2009
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**23 (Pages 86 to 87)**