FREEDOM COURT REPORTING

Page 1

1               UNITED STATES DISTRICT COURT

2                SOUTHERN DISTRICT OF OHIO

3                    WESTERN DIVISION

4                        *   *   *

5   VIVIAN BERT,

6   et al.,

7          Plaintiffs,

8        vs.                    CASE NO. C-1-02-467

9   AK STEEL CORPORATION,

10          Defendant.

11                       *   *   *

12          Deposition of RICHARD NUNLIST, Witness

13   herein, called by the Plaintiffs for

14   cross-examination pursuant to the Rules of Civil

15   Procedure, taken before me, Karen M. Rudd, a

16   Notary Public in and for the State of Ohio, at the

17   West Chester Conference Center, 9248 Princeton

18   Glendale Road, Hamilton, Ohio, 45011, on Friday,

19   August 17, 2007, at 12:31 p.m.

20                       *   *   *

21

22

23

FREEDOM COURT REPORTING

Page 2

1          EXAMINATIONS CONDUCTED     PAGE
2     BY MS. DONAHUE:.......................    5
3     BY MR. ROGERS:.......................   91
4
5              EXHIBITS MARKED
6     (Thereupon, Plaintiffs' Exhibit 1     8
7     was marked for purposes of
8     identification.).....................
9     (Thereupon, Plaintiffs' Exhibit 2     8
10    was marked for purposes of
11    identification.).....................
12    (Thereupon, Plaintiffs' Exhibit 3     30
13    was marked for purposes of
14    identification.).....................
15    (Thereupon, Plaintiffs' Exhibit 4     38
16    was marked for purposes of
17    identification.).....................
18    (Thereupon, Plaintiffs' Exhibit 5     47
19    was marked for purposes of
20    identification.).....................
21    (Thereupon, Plaintiffs' Exhibit 6     51
22    was marked for purposes of
23    identification.).....................

Page 4

1     APPEARANCES:
2        On behalf of the Plaintiffs:
3           Wiggins, Childs, Quinn & Pantazis
4        By:  Susan Donahue
             Attorney at Law
5           The Kress Building
            301 Nineteenth Street North
6           Birmingham, Alabama  35203
7        On behalf of the Defendant and witness:
8           Taft, Stettinius & Hollister, LLP
9        By:  Gregory Parker Rogers
             Attorney at Law
10          425 Walnut Street
            Suite 1800
11          Cincinnati, Ohio  45202
12       On behalf of the Defendant:
13          AK Steel Corporation
14       By:  Stephanie Bisselberg
             Attorney at Law
15          703 Curtis Street
            Middletown, Ohio  45043
16
17                  * * *
18
19
20
21
22
23

Page 3

1
2
3     (Thereupon, Plaintiffs' Exhibit 7     55
4     was marked for purposes of
5     identification.).....................
6     (Thereupon, Plaintiffs' Exhibit 8     58
7     was marked for purposes of
8     identification.).....................
9     (Thereupon, Plaintiffs' Exhibit 9     84
10    was marked for purposes of
11    identification.).....................
12    (Thereupon, Plaintiffs' Exhibit 10    88
13    was marked for purposes of
14    identification.).....................
15    (Thereupon, Plaintiffs' Exhibit 11    89
16    was marked for purposes of
17    identification.).....................
18
19
20
21
22
23

Page 5

1                  RICHARD NUNLIST
2     of lawful age, Witness herein, having been first
3     duly cautioned and sworn, as hereinafter
4     certified, was examined and said as follows:
5                  CROSS-EXAMINATION
6     BY MS. DONAHUE:
7          Q.   Mr. Nunlist, my name is Susan
8     Donahue, and I'm a lawyer representing the
9     plaintiffs in the lawsuit Vivian Bert and
10    others versus AK Steel.  And you are here to
11    give your testimony today?
12         A.   Okay.
13         Q.   Have you ever given a deposition
14    before?
15         A.   No.
16         Q.   Let me just go over some of the
17    ground rules so that, you know, we can have
18    this go smoothly.  Do you understand that your
19    testimony is under oath and under penalty of
20    perjury?
21         A.   Yes.
22         Q.   Do you understand that it's the
23    same as if you were in a court in front of a

2 (Pages 2 to 5)

FREEDOM COURT REPORTING

Page 6

1  judge?
2      A.  If you say so, yes.
3      Q.  You don't?
4      A.  I have never done it before, so --
5      Q.  All right.  Yes, it is the same.
6      A.  Okay.  If you are telling me,
7  okay.
8      Q.  The difference is that we don't
9  have a judge here to rule on objections that
10  might be made.  Let me ask you this question,
11  are you represented by an attorney today?
12      A.  Yes.
13      Q.  Who is your attorney?
14      A.  Greg.
15      Q.  And you are indicating Greg
16  Rogers?
17      A.  Yes.
18          MS. DONAHUE:  Also in attendance is?
19          MS. BISSELBERG:  Stephanie
20  Bisselberg.
21          MS. DONAHUE:  Thank you, Stephanie.
22  I'm sorry.  Who is of counsel for AK Steel?
23          MS. BISSELBERG:  Correct, in-house

Page 7

1  counsel.
2      Q.  The difference between here and in
3  a court is we don't have a judge to rule on
4  objections that your attorney might make, and
5  so the objections are simply recorded in the
6  transcript.
7      A.  Okay.
8      Q.  Do you understand that you have
9  been subpoenaed to testify because you have
10  been named as a witness in this lawsuit?
11      A.  Yes.
12      Q.  To help the court reporter take a
13  clear record, I would just ask you to answer
14  audibly with yeses and nos rather than nodding
15  your head or saying uh-huh or uh-uh.  Is that
16  fair?
17      A.  I will do my best.
18      Q.  Thank you.  Also it will help her
19  make a record if you will wait to answer your
20  question -- wait to give your answer until I am
21  finished with my question, and, likewise, I
22  will wait to ask my next question until you
23  have completed your answer.  Is that fair?

Page 8

1      A.  Yes.
2      Q.  Okay.  You can take a break
3  whenever you would like, unless there's a
4  question on the table that needs to be answered
5  first.  Is that all right?
6      A.  Yes.
7          MS. DONAHUE:  Let's mark this as
8  Exhibit 1.
9          (Thereupon, Plaintiffs' Exhibit 1 was
10  marked for purposes of identification.)
11      Q.  Do you recognize this document?
12      A.  Yes.
13      Q.  What is this?
14      A.  The subpoena for me to be here
15  today.
16      Q.  Okay.
17      A.  Do I keep these documents?
18          MS. DONAHUE:  No, they are for her,
19  but you can stack them up in front of you, and we
20  will -- may I look at the documents from the other
21  deposition?  We will just remark them.  Let's mark
22  this as Exhibit 2 in this deposition.
23          (Thereupon, Plaintiffs' Exhibit 2 was

Page 9

1  marked for purposes of identification.)
2          MS. DONAHUE:  It's the subpoena for
3  the documents.
4      Q.  Could you please look at what we
5  have marked as Exhibit 2?  Have you seen this
6  document before?
7      A.  Yes.
8      Q.  And what is this document?
9      A.  The subpoena for documents.
10      Q.  All right.  Did you gather the
11  documents that were subpoenaed for this --
12  pursuant to this subpoena?
13      A.  Mary Jane did most of the work.  I
14  did some.
15      Q.  All right.  What work did you do
16  to collect the documents?
17      A.  The contracts.
18      Q.  What work did Mary Jane Nunlist
19  do?
20      A.  She did one, three, and four.
21      Q.  Where did you search for the
22  contracts in response to question number two?
23      A.  The contract file.

FREEDOM COURT REPORTING

Page 10

1    Q.   Where is that contract file?
2    A.   In our offices.
3    Q.   And were you present when Mary
4  Jane was gathering the documents pursuant to
5  numbers one, three, and four?
6    A.   I was in the office at the time
7  when she was doing that.  I'm not sure when she
8  all did everything.
9    Q.   And do you know when she did this?
10    A.   After we got the subpoena.
11    Q.   Okay.  Do you currently hold a
12  position with Palmer Temps?
13    A.   Yes.
14    Q.   What is your position?
15    A.   Vice president.
16    Q.   What are your duties as vice
17  president?
18    A.   A little of everything, except
19  right now we haven't been in the office much.
20  I have been in the office very little over the
21  last two years, year and a half, since Mary
22  Jane got sick.
23    Q.   Okay.

Page 11

1    A.   I do primarily the workers' comp,
2  the accounting, payables, receivables.  I still
3  am able to do those.
4    Q.   So Mary Jane Palmer Nunlist is
5  your wife; is that correct?
6    A.   Yes.
7    Q.   And she became ill around what
8  time?
9    A.   She first found the tumor in
10  August two years ago.
11    Q.   August of 2005?
12    A.   Five, yes.
13    Q.   And since then, neither you nor
14  her have been in the office much; is that what
15  you are testifying to?
16    A.   We were the first few months, but
17  she is being treated at M.D. Anderson in
18  Houston, and we go -- we are there one to four
19  weeks.  Our house burned down June 5th of 2006,
20  so we don't have a home here.  So we had a
21  condo in Florida.  So we have spent some time
22  in Florida so we would have a place to stay.
23      We came back approximately four

Page 12

1  weeks ago, and we are staying at a hotel until
2  our house is done, which they are saying
3  probably it will be October now.
4    Q.   Okay.  What hotel are you staying
5  in?
6    A.   Staybridge.
7    Q.   Where is that?
8    A.   In West Chester.
9    Q.   Is your intention to return to
10  your house after it is constructed?
11    A.   Yes.
12    Q.   What is the address of your
13  residence?
14    A.   16 Sycamore Terrace.
15    Q.   What town is that in?
16    A.   Middletown, Ohio.
17    Q.   And did you say that you expect to
18  move back in in October of this year?
19    A.   That's what we are hopeful at this
20  time.  We were told December of last year at
21  one time.
22    Q.   Okay.  I understand.
23    A.   With contractors, you are never

Page 13

1  sure.  That's what we are hoping now.
2    Q.   Who is taking care of the office
3  in your absence and in the absence of your
4  wife?
5    A.   The structure of our office was
6  each person really takes care of their area.
7  It was structured that way when we were even
8  there.  They all just pitch in.  There's no
9  manager.  We don't have someone that's a
10  manager.  They all just take care of their
11  areas and do their jobs.
12    Q.   What areas do you have?
13    A.   Well, you have the -- you go from
14  the front desk, you have the clerical, you have
15  the industrial, we have the computer tutor
16  division, we also have a division called
17  personnel solutions.
18    Q.   Are those all your areas?
19    A.   There's actually three divisions,
20  Palmer Temps, which would take in those first
21  three I gave you.  There's the three divisions,
22  Palmer Temps, computer tutor, and personnel
23  solutions.

4 (Pages 10 to 13)

FREEDOM COURT REPORTING

Page 14

1    Q.  I see.  Is the person in charge of
2  the industrial area, who is that person?
3    A.  Sandy is one of the ones that does
4  it.  Both Sandy and Amy does the industrial
5  area.
6    Q.  What is Sandy's last name?
7    A.  Huddleston.
8    Q.  And what is Amy's last name?
9    A.  Powers.
10    Q.  When you say they take care of the
11  industrial area, what are their duties in that
12  area?
13    A.  They would fill orders, interview
14  people.
15    Q.  Anything else?
16    A.  Well, Amy also does the front
17  desk, so she has the duties of the front desk.
18  She takes care of all the unemployment,
19  greeting people as they come in.  Amy does
20  backup in industrial and clerical.  She has
21  worked in both of those areas.
22    Q.  When you say fill orders, what is
23  involved in that?

Page 15

1    A.  A customer would call an order in
2  and say that they need someone in three days to
3  do a specific job or a general job.
4    Q.  When did you begin working at
5  Palmer Temps?
6    A.  September, '91.
7    Q.  What was your position when you
8  first came to Palmer?
9    A.  Vice president.
10    Q.  Where did you work before you came
11  to Palmer Temps?
12    A.  Scripts Howard.
13    Q.  Scripts what?
14    A.  Scripts Howard.
15    Q.  What is Scripts Howard?
16    A.  Channel Nine here is one of their
17  assets.  Cincinnati Post is one of theirs.
18  They are newspapers, publications.  HDTV is
19  owned by Scripts Howard.  Charlie Brown is not
20  theirs, but they -- United Media is the one
21  that distributes Charlie Brown.  That was one
22  of their products.
23    Q.  What did you do at Scripts Howard?

Page 16

1    A.  I was assistant treasurer.
2    Q.  Has AK Steel been a customer of
3  Palmer Temps?
4    A.  Have they been a customer?
5    Q.  Yes.
6    A.  Yes.
7    Q.  To your knowledge, when did they
8  start requesting services of Palmer Temps?
9    A.  Before I was there.
10    Q.  Do you know when, how long?
11    A.  I believe it was in the first year
12  she was in business.
13    Q.  Do they continue to be a customer?
14    A.  Yes.
15    Q.  What have you done for AK Steel in
16  the past?
17    A.  We have done their temporary
18  positions.  We have done some training.  We
19  have done some typing for them.  We did some --
20  helped them with their direct hiring.
21    Q.  Is there anything else that you
22  have done for AK Steel?
23    A.  There could be over, you know,

Page 17

1  that many years, but those are the main ones
2  that I can think of.
3    Q.  In regard to direct hiring, what
4  have you done?
5    A.  We did a -- in 2000, we did a
6  project where we assisted them in trying to
7  obtain qualified candidates.
8    Q.  Okay.  What positions were you
9  trying to fill for AK Steel?
10    A.  Those were going to be mill
11  positions.
12    Q.  Were these laborer positions?
13    A.  My definition of mill is the
14  laborer position, in case there's some
15  interpretation of AK.  I mean --
16    Q.  That's fine.  So these were
17  positions as entry level positions into the
18  mill to work in production?
19    A.  Yes.  It was my understanding it
20  was into the production of steel, yes.
21    Q.  Okay.  Did you -- when did this
22  project begin?
23    A.  Sometime in the middle of 2000.

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 18

1    Q.   And when did this project end?
2    A.   They notified us at the end of
3  2000 to end the project, and we carried it on.
4  We had some applicants scheduled to come in the
5  next few days, so it actually carried on into
6  the first couple of days of 2001, to January of
7  2001, the first part.
8    Q.   Have you ever done any direct
9  hiring services for AK Steel other than this?
10   A.   It's possible that there's been
11 one or two through the clerical side. I'm not
12 sure. In the back of my mind, there was some
13 special situation where there may have been one
14 or two where there was a different scenario. I
15 don't know if they maybe bought someone out
16 early on the clerical side or what, but,
17 primarily, no, but I'm just not positive.
18   Q.   That's fine. No, I'm interested
19 in what you can recall right now today. That's
20 fine.
21   A.   Okay.
22   Q.   Have you done any direct hiring
23 services for AK Steel since this project?

Page 19

1    A.   No.
2    Q.   Is there any contract that details
3  the services you are going to provide for AK
4  Steel in regard to this project?
5    A.   No.
6    Q.   How did you make the arrangement
7  to do this?
8    A.   We met with them.
9    Q.   Who did you meet with?
10   A.   I believe Phyllis Short would have
11 been one of them, and there may have been
12 someone else. I'm not sure at this point. You
13 are talking seven years ago.
14   Q.   Uh-huh. Do you recall meeting
15 with them yourself?
16   A.   I remember at times discussing
17 issues with them at the time when we are
18 talking about. Yeah, I guess I was in a
19 meeting with them. I really can't say I
20 remember sitting in a room with them.
21   Q.   Okay. But you remember having
22 discussions with them?
23   A.   I remember talking to them about

Page 20

1  what they wanted.
2    Q.   Explain to me what they actually
3  wanted you to do?
4    A.   Basically, they were having
5  problems getting qualified people at that time.
6  To the best of my memory, we are talking 2000.
7  I think that was during when there was a
8  shortage of labor a little bit, and they were
9  wanting to see if we could find additional
10 candidates for them, qualified candidates.
11   Q.   Did they -- explain to me exactly
12 how the procedure was going to go. Did they
13 give you AK Steel applications to hand out in
14 your office?
15   A.   Yes.
16   Q.   Do you have any copies of those AK
17 Steel applications in your office today?
18   A.   Not that I know of.
19   Q.   So they gave you their application
20 to hand out, and then what happened when
21 someone came in and wanted to apply?
22   A.   The way it was set up is that they
23 would send us a resume, and we would receive

Page 21

1  the resumes. A resume was required. We would
2  go through a process with the resume, call the
3  individual, and there were some -- there were
4  some requirements, I think. We have done more
5  than one of these for other companies, so it's
6  hard to remember which is what requirements.
7        I believe AK had a requirement of
8  a high school education. I don't know if a GED
9  was acceptable or not. We would verify certain
10 facts and set them up for an interview. They
11 would come in, and we had approximately -- I'm
12 not sure how many questions there were, maybe
13 an additional five or seven questions we were
14 to ask them. We would ask them those
15 questions. Based upon those answers, they
16 would receive an application or not. And then
17 we would send all files to AK indicating which
18 ones had an application and which ones didn't,
19 and they took it from there.
20   Q.   Okay. When you said that it
21 started with a resume, would individuals then
22 submit a resume to you, or did you get the
23 resumes from AK Steel?

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 22

1    A.   We ran ads in the newspaper.  We
2  did a joint ad in the newspaper that had both
3  their logo and our logo.  To the best of my
4  memory, the resumes came to us.  It's possible
5  that AK also gave us resumes that they received
6  somehow.  I don't really recall.  But the
7  primary was our ads that generated the resumes
8  that came into us.
9    Q.   Do you have a copy of any of these
10  ads?
11    A.   No, but they would be readily
12  available.
13    Q.   In what newspapers did you --
14    A.   Middletown Journal.  They were in
15  a lot of papers probably, but Middletown
16  Journal would be one.
17    Q.   What other newspapers might have
18  it?
19    A.   We generally advertise in the
20  smaller newspapers.  We could have -- I don't
21  remember the names.  There are weekly
22  newspapers that are owned by Middletown, or
23  whoever owned -- Thompson Newspapers, I

Page 23

1  believe, in 2000 owned the Middletown Journal.
2  A lot of their weeklies.  They have three or
3  four.  That is what we normally do with our
4  ads, we advertise in the smaller newspapers.
5  We feel we get more bang for our dollar in
6  doing it that way.
7    It's possible we also could have
8  done it in a larger newspaper, but I don't
9  recall doing it in the Cincinnati Enquirer, but
10  maybe we did one, or one in the Dayton paper.
11  I don't recall doing that, but it's possible.
12    Q.   Do you recall -- this application
13  that you got from AK Steel, do you recall if it
14  had a tear-off portion at the bottom of the
15  application, the first page of the application?
16    A.   I believe it did, but I'm not
17  positive.
18    Q.   Do you recall the information that
19  was on the tear-off sheet?
20    A.   No, I do not.
21    Q.   So after you would go through this
22  process of calling them to come in, calling the
23  individuals who submitted the resumes, or if AK

Page 24

1  Steel gave you the resumes, whichever way, you
2  would call the individuals and interview them?
3    A.   We would call and set up a time
4  for them to come in, and then they would be
5  interviewed by us.  I say interviewed.  It was
6  really just check the five or six, seven, I
7  don't remember exactly how many there were,
8  requirements that AK had.
9    Q.   Okay.  And this was on a separate
10  sheet of paper that you would --
11    A.   Yes.
12    Q.   -- these questions that you would
13  ask?
14    A.   The way I remember it is we had a
15  sheet that we would mark.  We would ask the
16  person.  They did not get the sheet.  We would
17  ask the person, we would mark it, put it in
18  their folder.
19    Q.   Okay.
20    A.   And then if there were any
21  additional questions -- you know, sometimes
22  they are not yes or no type answers as far as
23  what people tell you, so sometimes we would put

Page 25

1  a note on it and let them make the decision.
2    Q.   Okay.  Did you ever indicate to AK
3  Steel on these applications or these notes the
4  race of the individual?
5    A.   They never asked me to do that,
6  no.
7    Q.   Do you recall whether the race of
8  the individual was part of the information on
9  the tear-off sheet?
10    A.   No, I do not.
11    Q.   Did you ever do any testing of
12  these individuals?
13    A.   No.  Well, I never did any AK
14  testing of those individuals.  It's possible
15  those individuals had already been registered
16  with us prior or registered with us after.
17    Q.   Okay.  And what difference would
18  registering with you make?  That might be a bad
19  question, but did you have a test that you gave
20  to individuals who came in?
21    A.   We have a test that we give to
22  people applying for a temp position with Palmer
23  Temps, yes.

7 (Pages 22 to 25)

FREEDOM COURT REPORTING

Page 26

1    Q.   Would you give this test to people
2  who were applying to work at AK Steel?
3    A.   If someone came in and was
4  applying for the AK Steel positions and asked
5  us to register with us at the same time, we may
6  have done it. I'm kind of remembering that we
7  agreed not to work those people. You know, we
8  don't want to steal -- you know, we are
9  advertising for AK. We don't want to steal
10  them and use them for us.
11    So my recollection is we had some
12  sort of an agreement that we couldn't -- we
13  wouldn't use them. So from that standpoint,
14  I'm thinking no, we probably would not have
15  tested them at that particular point. If they
16  came back in a month later, two months later,
17  or if they came in two months earlier, yes,
18  definitely, if they had come in before.
19    Q.   Okay. About how many applicants
20  did you go through this process with for AK
21  Steel?
22    A.   I believe it was over a couple
23  thousand.

Page 27

1    Q.   Where are the records of these
2  applicants?
3    A.   AK. We sent them to AK.
4    Q.   Did you retain any kind of record
5  of these applicants?
6    A.   Yes.
7    Q.   How did you record the names of
8  these people, or how did you keep a record of
9  them?
10    A.   We had -- at the time, we kept a
11  copy of the information that they filled out.
12  We no longer have those. Those have been gone
13  for a long time. But we also have it in our
14  computer system.
15    Q.   Is it still in your computer
16  system?
17    A.   The majority are. I would believe
18  almost all would be.
19    Q.   Is this in the form of some kind
20  of a spreadsheet program?
21    A.   It's --
22    Q.   What form does it take?
23    A.   It's in our main system.

Page 28

1    Q.   And do you have a program in your
2  main system that takes this information in?
3    A.   We have -- there's a system for
4  temporary services that we have, and we have
5  variable prompts. We can make them to be
6  whatever we want in that system.
7    And when we did these projects for
8  corporations where we did direct hire, we would
9  use variable -- area -- certain ones for that
10  that would identify the company, the date they
11  came in.
12    Q.   And is this just -- it's like you
13  enter information into a screen, and then it
14  puts it into your database? Is that how it
15  works?
16    A.   More or less.
17    Q.   Well, if I am not saying it --
18    A.   Well, it's a centralized database
19  in the system. So it is going into the system.
20  It's part -- it's a special programming. It's
21  not like an Excel spreadsheet. It is special
22  programs that come up on your screen that you
23  fill in the information.

Page 29

1    Q.   What's the name of this program?
2    A.   Applied Systems Technology.
3    Q.   Now, you said you no longer have
4  hard copies of this information.
5    A.   No.
6    Q.   Now, why is that?
7    A.   There was no use for us to keep
8  them. We copied them at the beginning when we
9  did these projects for these customers in case
10  they got lost or if they had questions or
11  anything, we would have access to it. And then
12  after the project is done, there's no need for
13  us to maintain those files.
14    Q.   Okay. When you collected the
15  applications or the files on the individuals
16  who came in to apply, then, would AK Steel come
17  and get them, a representative?
18    A.   Sometimes they would come and get
19  them. I think sometimes we had maybe our
20  salesperson drop them off. I don't recall ever
21  mailing them to them.
22    Q.   Okay. In regard to this project
23  that you have been describing in 2000 for

8 (Pages 26 to 29)

FREEDOM COURT REPORTING

Page 30

1  direct hires for AK Steel, you had discussions
2  with Phyllis Short and perhaps someone else,
3  that was your testimony; is that correct?
4       A.   Yes, that's correct.
5       Q.   And you didn't have a formal
6  contract with them; is that your testimony?
7       A.   That's correct.
8       Q.   Did you ever memorialize your
9  agreement in any kind of letter of
10  understanding?
11       A.   It's possible.  We looked for it.
12  If there's one, we couldn't find it, or Mary
13  Jane looked for it.
14       Q.   Did you ever have any E-mail
15  exchanges with anyone regarding this project?
16       A.   Not that I recall, no.
17       MS. DONAHUE:  Let's mark this as
18  Exhibit 3.
19       (Thereupon, Plaintiffs' Exhibit 3 was
20  marked for purposes of identification.)
21       Q.   Do you recognize this document?
22       A.   I recall sending a document to
23  Rusty, yes.

Page 31

1       Q.   Do you recall if this is your
2  E-mail?
3       A.   It looks like it, yes.
4       Q.   I know it's in a different form
5  than what you have probably seen before.  At
6  the bottom of page one, the E-mail indicates
7  from Richard Nunlist to Rusty Johnson on
8  September 10th, 2006.
9       A.   Uh-huh.
10       Q.   It starts off sorry for the delay
11  in getting back to you.
12       A.   Uh-huh.
13       Q.   Do you recall that Rusty
14  Johnson -- did he call you?
15       A.   Well, I had verbal conversations
16  with him, and I believe I had other E-mails
17  from him before -- possibly before this one.  I
18  really don't -- I don't recall if it was E-mail
19  or voice.  I know I talked to him.  He had
20  left -- the very first time was he called and
21  left a message for me.  I don't know here if
22  I'm replying.
23       I assume I'm not replying to an

Page 32

1  E-mail from him on this, because I would have
2  just replied.  Since I'm not replying, I assume
3  this is probably another voice mail that he
4  left.  I believe he left a couple voice mails
5  for me.
6       Q.   Okay.  And did you -- is this
7  E-mail in response to a voice mail he sent you?
8       A.   It's either voice mail or E-mail.
9  I assume it was a voice mail.
10       Q.   Okay.  Do you know what he was
11  calling you about?
12       A.   He had called me about Don
13  Edwards, and I talked to him for maybe ten
14  minutes where he was asking me some questions
15  about Don Edwards.
16       Q.   Do you remember what questions he
17  asked you?
18       A.   I think the first question he
19  asked me was did Don Edwards, I believe it was,
20  apply for AK in August of 2001.
21       Q.   Do you remember your response?
22       A.   I know during that conversation I
23  had told him no, he had not.  In fact, no one

Page 33

1  did, because we weren't taking any positions
2  for that.  We had stopped doing that by that
3  point in time.
4       Q.   Did you check any documents in
5  order to answer Mr. Johnson's question?
6       A.   I looked at our system.
7       Q.   Is this the system you talked
8  about before, Applied Systems Technology?
9       A.   Yes.  Yes.
10       Q.   What in the system, Applied
11  Systems Technology system, would help you
12  answer this question?
13       A.   I brought up Don Edwards, and
14  looked at -- I looked just to generally see
15  what was in under Don Edwards.  There is a
16  field in that position or in there that stated
17  that he came in and applied with us in August
18  of 2000.  But there's nothing -- there was
19  nothing for 2001 and --
20       Q.   Do you recall -- go ahead.
21       A.   In that conversation, I also told
22  him that there was -- that he did come in
23  January of 2001, January 29th, and applied with

9 (Pages 30 to 33)

FREEDOM COURT REPORTING

Page 34

1  us as a temp.  I told -- he asked me at some
2  point during that conversation about did he
3  take the AK test or did he take a test.  He
4  asked me I believe AK test.
5        And I -- somehow we got in on the
6  conversation that he did take a test with us in
7  January when he came in and registered with us
8  on January 29th.  He took a Palmer Temps test.
9  He asked me for at one point a copy of the
10 test.  And I told him before I could give him
11 anything else, I really needed a release from
12 Don Edwards on his records, that there really
13 wasn't much more I could tell him at that time.
14      Q.  Okay.  Anything else in your
15 conversation that you recall?
16      A.  I can remember talking to him -- I
17 think he told me what he is saying is he came
18 in.  I said it's possible that he -- that he
19 went to another temp service.  He could have
20 gone somewhere else.
21      I think at one point he asked me
22 if am I saying he did not take the AK test, and
23 I said I'm not saying that.  I don't know if he

Page 35

1  took the test or not.  I can tell you he didn't
2  take it here.  But I don't know who is taking
3  the test and who is not.
4        Q.  Is there anything else you can
5  recall about this conversation?
6        A.  There must have been some other
7  things since the conversation in my mind lasted
8  five or ten minutes, but I do not recall what
9  they were.
10       Q.  Okay.  Is there anything else that
11 you can recall that was in your Applied Systems
12 Technology system when you pulled up the name
13 Don Edwards?  Do you recall anything else?
14       A.  Well, it was in there that he came
15 in on the 29th.  I mean, I did not tell Randy
16 [sic] at the time, but that he took -- told me
17 which test he took.
18       Q.  The screen that you brought up?
19       A.  Yeah.  There's multiple screens.
20 I mean --
21       Q.  Yeah.  The data that you brought
22 up?
23       A.  Yes, that's what I'm saying,

Page 36

1  that's all in that system.
2        Q.  Okay.  Would it be possible to
3  print out the information you have on Don
4  Edwards in your system?
5        A.  It is still possible.  The only
6  question I would still have is do I need his
7  release.
8        Q.  Okay.
9        A.  My attorney might be able to tell
10 me that.  I just --
11       Q.  But it would be -- it's physically
12 possible to do a printout command for the
13 information in that system?
14       A.  I think we can, yes.  That's not
15 something we normally do, but I do believe -- I
16 imagine there's some way I can capture that
17 screen and print it out.
18       Q.  Okay.  Now, you said earlier that
19 this project that you did for AK Steel, they
20 wanted you to end it at the end of 2000?
21       A.  Uh-huh.
22       Q.  But that you carried on into the
23 beginning of 2001 for some time?

Page 37

1        A.  What -- what we did is we stopped
2  it the day they asked us as far as getting new
3  candidates, but we had already scheduled some
4  candidates into the first couple days of
5  January.
6        Q.  I see.
7        A.  And what we asked them, I actually
8  requested it, is I didn't want to -- you know,
9  some of them applying for a job that has my
10 name on it, they apply, and I set up an
11 appointment for them to come in, and then turn
12 around and tell them forget it.  We don't like
13 doing that.
14       Q.  Right.  And AK Steel --
15       A.  It's not good for business.
16       Q.  I understand.  Did AK Steel allow
17 you, then, to carry on?
18       A.  They let us go ahead and finish
19 those that we had out there that were for a few
20 more days.
21       Q.  Do you know who Don Edwards met
22 with when he came in on January 29th?
23       A.  No.  Is Rusty Johnson still with

10 (Pages 34 to 37)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 38

1  your company?
2      Q.  Yes.  Yeah, he is.  He is home
3  taking care of his daughter today.
4      A.  Okay.
5          MS. DONAHUE:  Can we mark this for
6  this depo?  This was Exhibit 4 of Mary Jane's
7  deposition.
8          (Thereupon, Plaintiffs' Exhibit 4 was
9  marked for purposes of identification.)
10     Q.  Do you recognize the document that
11 has been marked as Exhibit 4 in your
12 deposition?
13     A.  You say do I recognize it?  I
14 don't believe I have ever seen this before that
15 I recall.
16     Q.  Okay.
17     A.  I mean, I see it's an application
18 for AK, so I assume it's their application,
19 but --
20     Q.  Disregarding the content of it,
21 have you seen this AK form before?
22     A.  The AK forms I saw, if I remember
23 correctly, are gray.  I understand this is a

Page 39

1  photocopy.  But I didn't -- I really don't know
2  their application, if that's what you are
3  asking me.  I can't tell you for sure this is
4  their application.
5      Q.  Okay.  Do you know whether this
6  was the application form that they gave you to
7  distribute?
8      A.  Not at this time.  I really -- I
9  mean, they gave us forms, if I remember right,
10 on gray paper.
11     Q.  Well, that wouldn't show up.
12     A.  I think they were four pages.
13     Q.  Okay.
14     A.  And my recollection is they were
15 folded in half.  They were not, you know, four
16 sheets.  There was a bigger sheet that folded
17 in half is my recollection of their
18 application.
19     Q.  But if you were going to make a
20 photocopy of it --
21     A.  I understand the photocopy, but
22 what I'm saying is I got their applications.
23 There were stacks of their applications.  I

Page 40

1  didn't memorize their application.
2      Q.  I understand.
3      A.  I'm just filling it out -- or I'm
4  not filling it out, the applicants were filling
5  it out, and we are sending it to them.
6      Q.  But you did see AK Steel's
7  applications when they were in your office
8  waiting to be filled out by individuals?  You
9  had seen them?
10     A.  I saw the blank ones.
11     Q.  Yeah.
12     A.  I mean, they came in packets of
13 like 50 in Saran wrap.
14     Q.  Okay.  And the date on here is?
15 Can you see?
16     A.  August 28th, 2000.
17     Q.  2000.  So this date would be
18 within that time of when you were doing this
19 direct hire project?
20     A.  Yes, it is.
21     Q.  Now, do you know if Donald Edwards
22 came into your office on 8-28 to fill out this
23 application?

Page 41

1      A.  Yes.
2      Q.  You do know?
3      A.  I don't know if he filled out this
4  application.  He came into our office in August
5  of 2000.
6      Q.  Okay.  Do you see the little
7  handwritten notation up in the upper right-hand
8  corner?
9      A.  The P?
10     Q.  The P with a checkmark.
11     A.  I see it.
12     Q.  Does that indicate anything to
13 you?
14     A.  No.
15     Q.  Do you know if your people on your
16 staff put a P up there to indicate that the
17 application came from Palmer Temps?
18     A.  Oh.  I don't recall us doing that,
19 but they may have done that when they received
20 the applications.
21     Q.  Yeah.  Okay.  But you had no
22 knowledge of --
23     A.  I had no knowledge of putting a P

11 (Pages 38 to 41)

FREEDOM COURT REPORTING

Page 42

1  for Palmer, but --
2      Q.  Okay.  Did AK Steel, other than
3  this list of questions that you asked them when
4  they came in to fill out their application, do
5  you recall what was on that list?
6      A.  I really can't recall.  I can
7  remember what I believe were a couple of the
8  things that were on it.
9      Q.  Okay.
10     A.  I believe they had a question that
11 dealt with heights.  I don't remember exactly
12 how it was worded.  I think they wanted to make
13 sure people were not scared of heights.  I
14 don't know if the question was can you work
15 over 50 feet, if you are scared of heights.  I
16 don't remember the exact question.
17         I remember there was a question I
18 think that they had that dealt with -- oh, the
19 work as far as working three shifts.  There was
20 something about maybe are you available to work
21 three shifts.  I really don't remember -- I
22 can't recall what any of the other questions
23 would be at this point.

Page 43

1          I don't think it was on there.  I
2  do think they had a requirement, I think I said
3  earlier, of the high school.  I don't know if
4  that would have been one of those questions or
5  not.  That may have been done earlier.
6      Q.  So did you ever actually sit down
7  and ask questions of an applicant using this
8  list?
9      A.  I don't think I did.
10     Q.  Okay.  Did you ever review the
11 answers that were given by anyone else?
12     A.  I don't recall ever.  I mean, I
13 may have been asked sometime -- you know, like
14 I say, sometimes there was a question as to is
15 this yes or no.  My general reply would be to
16 put -- you know, put a note on it and send it
17 to AK and let them decide.
18     Q.  Did your office do any kind of
19 screening of the applications?
20     A.  They got all applications.
21     Q.  Did you put them -- did you sort
22 them into --
23     A.  We did sort them between those

Page 44

1  that had an application and those that didn't
2  have an application.
3      Q.  The ones that didn't have an
4  application would just have the resume that was
5  submitted?
6      A.  Primarily.  No, they could have
7  had the questions.  I would assume there would
8  have been the question they answered.  Let's
9  say they were afraid of heights or something
10 like that.  We would have marked that and put
11 that in that file and sent it to them.
12     Q.  But then why would they be missing
13 their application?
14     A.  Well, they didn't get the
15 application until after they answered those
16 questions.
17     Q.  Oh, I see.  And then would you
18 deny people an application based on their
19 answers to the questions?
20     A.  I don't know if I would use the
21 word deny.  We didn't offer them an
22 application.
23     Q.  So you would then use that as a

Page 45

1  screening to give them -- actually give them
2  the application form?
3      A.  It was based upon the requirements
4  that AK said, and AK said they needed to answer
5  these questions a certain way.
6      Q.  In order to get the application
7  form?
8      A.  To go forward with the process.
9      Q.  Okay.
10     A.  Now, that doesn't mean that AK --
11 once they received them, I would have no idea
12 what they did with those.
13     Q.  I understand.  So if you -- if
14 someone came in after they submitted a resume
15 and you called them to come in, and then they
16 would sit down with one of your staff people
17 who would ask them the questions, and then that
18 person would decide whether or not to give them
19 an application form?
20     A.  Yes, based upon their answers to
21 that question.
22     Q.  Okay.  If they did not give them
23 an application form, would they -- would the

12 (Pages 42 to 45)

FREEDOM COURT REPORTING

Page 46

1 applicant or the person who came in have any
2 way of knowing that they were not being -- they
3 were being -- I guess denied is not the word
4 you want, but having it withheld?
5     A.  Sometimes they realized that there
6 seemed to be different processes, because maybe
7 two people would come in together and something
8 like that.
9     Q.  Okay.  So it would be possible,
10 then, for a person to come in and go through
11 this procedure of being interviewed and
12 answering the questions, and then your staff
13 person would decide not to give them the
14 application, and they would leave.  Would they
15 have any way of knowing that they had not, in
16 fact, applied?
17     A.  Well, again, you get tied up in
18 words.  But I know this is legal, so you say
19 they haven't applied.  In one sense I guess
20 they did kind of apply, it's just that it is
21 being stopped at that point until AK makes a
22 further decision if they want that individual
23 to come in and fill out an application.

Page 47

1          We are not offering them an
2 application at that time.  It did not mean that
3 they would never get an application from AK.
4 The assumption is in most cases they would not,
5 but --
6     Q.  Did you say to them we are not
7 giving you an application at this time?
8     A.  No.
9     Q.  So it would be possible for
10 someone who didn't understand this process to
11 have it in their mind that they had, in fact,
12 applied, when actually they had not filled out
13 an application?
14     A.  Yes, I guess -- yes.
15          MS. DONAHUE:  Okay.  Let's look at
16 this one -- mark this one.  I guess it's going to
17 be Number 6.  Well, where are we?  This will be
18 Exhibit 5.
19          (Thereupon, Plaintiffs' Exhibit 5 was
20 marked for purposes of identification.)
21     Q.  Mr. Nunlist, have you seen this
22 document before?
23     A.  I'm not sure.

Page 48

1     Q.  Okay.  Is this the form you were
2 talking about of the questions that were asked
3 to people?
4     A.  That's why I'm not sure.  I don't
5 recall this many questions, and I was looking
6 to see if there was anything on here about
7 heights.  So -- and I don't see it on here, so
8 that's why I'm thinking this is not.  And I
9 don't remember it being -- the form being this
10 neat, to be honest.
11     Q.  Can you see the date at the
12 bottom?
13     A.  Yes.
14     Q.  8-28-2000, which is the same date
15 that Donald Edwards also filled out the
16 application?
17     A.  Yes.  I mean, from that, it looks
18 like it possibly was, but --
19     Q.  However, this one has his
20 signature on it, and you were indicating before
21 that the questions that were asked by your
22 staff people were not -- it was not a form that
23 you gave to the person, it was just --

Page 49

1     A.  That's correct, I do not remember
2 us giving them that.  What I'm remembering is
3 five or six questions that they read.  Now, did
4 they -- I don't recall this, but looking at
5 this, did they ask the questions?  I don't know
6 if this is him circling this and then having
7 him sign it.  I don't remember that being part
8 of the process at this time.
9     Q.  Is it possible that this was part
10 of the process?
11     A.  I guess it is possible.
12     Q.  Are these the kind of questions
13 that you recall from the list of questions that
14 your staff asked?
15     A.  The two questions I thought that I
16 recall is the rotating shifts and the height,
17 and rotating shifts really isn't on here on
18 question 14.  The 14 is have you ever worked
19 rotating shifts for a previous employer.  I
20 don't recall that being a requirement for AK
21 that they worked rotating shifts.  The question
22 I recall is would you or do you have difficulty
23 or was there any problem working, something in

FREEDOM COURT REPORTING

Page 50

1    that type of framework.
2          Also I don't see anything on here
3    about heights.  Oh, I do see one.  Number eight
4    is about rotating, but -- so that's why I don't
5    know.
6          Q.   Okay.  Is it your belief, then,
7    that when Donald Edwards came into your office
8    in January of 2001, that he was applying to
9    register with you for temporary positions?
10         A.   That's what he was doing.
11         Q.   Is that what -- is that based on
12   the information in your data --
13         A.   Yes.
14         Q.   -- system?  Okay.  Forgive me if I
15   asked you this already.
16         A.   That's fine.
17         Q.   Does your data system or do you
18   recall that he did take a test?
19         A.   Yes.
20         Q.   Okay.  And it's your belief that
21   he took the test that Palmer Temps gives to
22   people who are registering for temporary
23   positions?

Page 51

1          A.   It's not my belief.  That is what
2    he took.
3          Q.   Okay.  That's what he took.  And
4    the data system indicates that to you?
5          A.   Yes.
6          Q.   Do you have any knowledge of
7    whether Donald Edwards ever worked for AK
8    Steel?
9          A.   No.
10         MS. DONAHUE:  I'm going to mark this.
11   This is Exhibit 3 in Mary Jane's.  We will mark it
12   as Exhibit 6 here.
13         (Thereupon, Plaintiffs' Exhibit 6 was
14   marked for purposes of identification.)
15         Q.   Do you recognize this document
16   that we have marked as Exhibit 6 to your
17   deposition?
18         A.   Uh-huh.
19         Q.   What is this?
20         A.   It's an expired contract with AK
21   Steel.
22         Q.   Okay.  And what is this contract
23   for?

Page 52

1          A.   For temps.
2          Q.   And for which positions?
3          A.   It doesn't -- well, it's really
4    for all temp positions.
5          Q.   All temp positions?
6          A.   It's for all temp and payroll
7    positions.
8          Q.   And what's the day of this
9    contract?
10         A.   It was -- the print date was
11   April 7th, '06.  The effective date was
12   April 1st, '06.
13         Q.   And when was the end date?
14         A.   April 1st, '07.
15         Q.   So this was something that was in
16   effect for one year?
17         A.   Yes, it was a one-year contract.
18         Q.   And what was -- the contract was
19   to supply temporary employees to AK Steel?
20         A.   Uh-huh.  Temporary or payrolled
21   employees.
22         Q.   What are payrolled employees?
23         A.   Payrolled employees are sometimes

Page 53

1    where they may have -- basically, they are like
2    consultants.  AK may know someone that they
3    want to come in, but they run them through us.
4    So we are not finding that individual.  That's
5    the main difference is that with a normal temp
6    position, we recruit the position.  On a
7    payrolled employee, they send them to us, and
8    they may work them for one week, one month,
9    three months.  It differs.
10         Q.   I see.  So these employees -- this
11   contract is a contract for you to do the
12   payroll for certain temporary employees that AK
13   Steel has already found, or do you find them?
14         A.   No.  No.  The temps we find.  A
15   payrolled employee they would find.  They would
16   know -- most of the times they are retirees,
17   and they need to bring someone that has retired
18   back in, and they run them through us to bring
19   them back through after they have retired.
20         Q.   When you say they run them through
21   us, do you mean you do the paperwork on them?
22         A.   They are our employee.
23         Q.   They are your employee?

14 (Pages 50 to 53)

FREEDOM COURT REPORTING

Page 54

1      A.   At that point, they are on our
2  payroll.  They are our employee.
3      Q.   Then they work on a temporary
4  basis at AK Steel?
5      A.   Yes.
6      Q.   And these could be laborer
7  positions?
8      A.   We don't do mill positions.  We do
9  people in the plant, because they have --
10  sometimes the consultants are consulting on a
11  specific -- but we don't do -- basically, we
12  don't do any of the union type jobs.  Our
13  business is mostly office and professional.  We
14  are not into heavy -- we don't do heavy
15  industrial positions.
16      Q.   But you do have a person in the
17  area called industrial?
18      A.   Yeah, because we do have some part
19  of our business that does packaging.  It's
20  light industrial is what we -- in our business,
21  there's a difference between heavy and light
22  industrial.  We don't do heavy industrial, we
23  do light industrial.

Page 55

1      Q.   Okay.
2      A.   And the AK plant would be
3  considered for most of the work that's out
4  there heavy industrial.
5      Q.   Right.  So you -- is it your
6  testimony that you do not provide temporary
7  employees to AK Steel in the mill as production
8  employees?
9      A.   I don't know of any that we have
10  as production employees.
11      Q.   Have you ever had any temporary
12  employees as production?
13      A.   Boy, you say ever.  You are going
14  back 20 years.  Not that I'm aware of.  We used
15  to do more in the industrial area, but I don't
16  recall us ever doing industrial, the heavy
17  industrial.
18      Q.   Okay.
19      A.   The people we do are engineers,
20  those type of people, you know, not laborers.
21      MS. DONAHUE:  Okay.  Let's mark this
22  one.
23      (Thereupon, Plaintiffs' Exhibit 7 was

Page 56

1  marked for purposes of identification.)
2      Q.   Do you recognize this document
3  that we have marked as Exhibit 7?
4      A.   Yes.
5      Q.   What is this?
6      A.   This was an E-mail that Mary Jane
7  sent to me to review regarding the contract.
8      Q.   What contract was it?
9      A.   This contract, Exhibit 6.
10      Q.   6.  Okay.  And you can see at the
11  bottom of the page the last paragraph, it
12  indicates that you have had AK Steel for a
13  customer for over 20 years?
14      A.   Uh-huh.
15      Q.   Is that --
16      A.   That's what I just said, I
17  thought.
18      Q.   That's right.  And -- okay.  Do
19  you have any contracts with AK Steel presently?
20      A.   No.
21      Q.   Do you expect to have any in the
22  future?
23      A.   Well, it depends what you mean by

Page 57

1  contract.  We are doing business with AK
2  presently, I don't like -- I prefer not to
3  have contracts.
4      Q.   Okay.
5      A.   We have a time slip that has some
6  verbiage on it that we consider the only
7  contract that we use with any of our customers.
8  As long as they keep -- you know, we went many
9  years without a contract with AK.  Then all of
10  a sudden someone decided they had to have a
11  contract.
12      Every time a large corporation
13  wants a contract, they want you to lower your
14  pricing, I don't like contracts.
15      Q.   They have to have a lawyer review
16  it.  Is that why?
17      A.   It's not the lawyer.  The buyer,
18  the only way he is going to get brownie points
19  is if he gets something out of you.  If he goes
20  back and says, hey, I got a new contract, the
21  price is going up, it's not going to help his
22  career.
23      Q.   It just becomes a commodity then?

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 58

1    A.  It's just always a hassle.
2    Q.  All right.  Let me --
3    A.  And most contracts my attorneys
4  say have so many loop holes in them anyway,
5  they don't do any good for us, they only help
6  the persons writing them.
7        MS. DONAHUE:  Okay.  I'm not going to
8  make general comments about lawyers and contracts.
9  Let's mark this one 8.
10       (Thereupon, Plaintiffs' Exhibit 8 was
11  marked for purposes of identification.)
12    Q.  Do you recognize this document?
13    A.  Uh-huh.  It's a time slip.
14    Q.  What is this?
15    A.  It's the front page -- it's the
16  front of our time slip.
17    Q.  And who fills out this time slip?
18  It was produced to us.  I didn't know why.
19    A.  The reason is you are missing the
20  back of it.  The back of it has the verbiage on
21  it.  That's the closest thing we come to a
22  contract.  You requested all contracts.
23        MS. DONAHUE:  Oh, I see.  I will have

Page 59

1  to look again at what was produced to us, because
2  it seems to me that that's all we got.  Maybe we
3  didn't get the back side.  Greg?
4        MR. ROGERS:  I have no idea.  I gave
5  the file that Richard gave me to my secretary and
6  said copy it.
7        THE WITNESS:  I gave them an actual
8  time slip.
9    Q.  And she made a PDF version of all
10  of the documents and sent the PDF to me, so
11  perhaps she didn't copy the back.
12        MR. ROGERS:  It could be.  I have no
13  idea.
14        MS. DONAHUE:  Okay.
15        MR. ROGERS:  None.
16        THE WITNESS:  I can tell you
17  generally what's -- there's a lot of wording, but
18  it all fits on the back in small print.
19    Q.  No, I didn't understand why we got
20  these, and now I understand.
21    A.  There's a top section that deals
22  with the employee's responsibilities and stuff,
23  and then there's another little section that

Page 60

1  deals with the customer.  I think if you read
2  here, let's see, someplace, down at the bottom
3  there it says important for customer, the
4  second kind of the bottom square right above
5  their signature, I certify that hours shown are
6  correct, work was performed satisfactorily, and
7  that the customer agrees to terms and
8  conditions on reverse side of this form.
9    Q.  Oh, okay.  But this was only used
10  for temporary employees, right?
11    A.  Payrolled.  Well, yeah, payrolled,
12  temporary.  It was not used for that special
13  project, because that had nothing to do with
14  this.
15    Q.  That's fine.  I wanted to clarify
16  why I got that document.
17    A.  That's why.  You asked for all
18  contracts.  Honestly, I forgot about this.
19  That really is our contract.  It's the closest
20  thing we have.  Believe me, as you can see,
21  there couldn't be too much on the back.  It
22  also has the employee's area.  But that's what
23  is there.

Page 61

1    Q.  If we need that, we can ask them
2  to flip it over and do the other side, but we
3  might not need it.
4        Do you complete paperwork for the
5  City of Middletown?
6    A.  Do I complete paperwork?
7    Q.  Maybe I'm not saying it in the
8  right way.  You talked about how for AK Steel,
9  you have employees, and you -- they are your
10  employees, but they are temporary employees at
11  AK Steel, and you do the paperwork for them.
12  Is that -- have I --
13    A.  Are you asking me if I do
14  payrolled employees for the City of Middletown?
15    Q.  Yes.
16        THE WITNESS:  That's getting into the
17  EEOC case.
18        MR. ROGERS:  Answer the question.
19        THE WITNESS:  Answer that question?
20  Yes.
21    Q.  Did Donald Edwards come to Palmer
22  Temps in September of 2006 to your knowledge?
23    A.  I don't know that date.  I don't

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 62

1  know the date that he came.
2      Q.  In September?
3      A.  I don't -- I don't know.  I don't
4  even know it was September.  I know -- I mean,
5  I really don't know the date.
6          MR. ROGERS:  Then you don't have to
7  answer.
8      Q.  Okay.  Do you know if Donald
9  Edwards came to Palmer Temps to ask you to
10  complete some paperwork for a job that he had
11  received from the City of Middletown?
12     A.  You said he received.  So the City
13  of Middletown gave him a job?  He wouldn't be
14  coming to us for a job if he got it from the
15  City of Middletown.
16     Q.  Well, did he come --
17     A.  I'm not trying to be difficult,
18  but there are differences.
19     Q.  I understand.  But did he come to
20  your office asking to complete paperwork for a
21  job that he had been offered at the City of
22  Middletown, either whether it was going to come
23  from your office or from the city?

Page 63

1          THE WITNESS:  Should I continue?
2          MR. ROGERS:  Answer that one.
3          THE WITNESS:  He came at some point.
4  I don't -- September, 2006, sounds reasonable.  I
5  don't know the date.  He did come to our office at
6  one point about a payrolled position at the City
7  of Middletown.
8      Q.  Okay.  And did you speak with him
9  at that time?
10     A.  I wasn't in town.
11     Q.  Okay.  Do you know who did speak
12  with him?
13     A.  Yes.
14     Q.  Who spoke with him?
15         THE WITNESS:  Do I continue to go
16  down this --
17         MS. DONAHUE:  This is part and parcel
18  of the same lawsuit.
19         MR. ROGERS:  It is not.
20         THE WITNESS:  Are you representing
21  him in the EEOC charge?
22         MS. DONAHUE:  Yeah, of course.  Yes.
23         MR. ROGERS:  We are not going to let

Page 64

1  you go fishing into the EEOC charge, which is
2  still pending.  Taking a deposition in this case
3  for that charge I don't believe to be proper.
4  Whether he came in, whether he was offered certain
5  opportunities I think are fair game, but beyond
6  that, I don't think it is fair game.
7          MS. DONAHUE:  All right.  Well, we
8  will just continue and see.
9      Q.  Who talked with him when he came?
10         MR. ROGERS:  Go ahead and answer
11  that.
12         THE WITNESS:  When he came in the
13  office, it was Amy.
14     Q.  Okay.  Do you know what Amy said
15  to him?
16         MR. ROGERS:  Yeah, this is all --
17     Q.  Do you know if he was allowed to
18  fill out paperwork for the City of
19  Middletown --
20         MR. ROGERS:  You can answer that.
21     Q.  -- job?
22     A.  I will answer it, but -- no, he
23  did not fill out paperwork.

Page 65

1      Q.  All right.  Do you know why he
2  was not --
3          MR. ROGERS:  That is -- I object.
4  That is part of the EEOC investigation.
5          MS. DONAHUE:  Well, this is part and
6  parcel of the same lawsuit.
7          MR. ROGERS:  It is not part and
8  parcel.
9          MS. BISSELBERG:  It's a different
10  lawsuit.
11         MS. DONAHUE:  Well, it's a different
12  lawsuit, but it's related to --
13         THE WITNESS:  First of all -- hold
14  it.  Do we have a lawsuit?  Is there a lawsuit
15  against us?
16         MR. ROGERS:  No, there is no lawsuit.
17         MS. DONAHUE:  There's an EEOC charge.
18         MR. ROGERS:  There is an EEOC charge.
19     Q.  If you look back at Exhibit 3 in
20  your deposition here --
21     A.  Yes.
22     Q.  -- on September 10, 2006, this
23  E-mail indicates that you knew that Donald

17 (Pages 62 to 65)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 66

1  Edwards was involved in a lawsuit against AK
2  Steel; is that correct?
3      A.  Well, your attorney told me.
4      Q.  Yeah.  So on September 10th, you
5  were aware of that based on what Rusty Johnson
6  told you?
7      A.  Yes.
8      Q.  Okay.  Did you communicate that
9  knowledge to anyone at Palmer Temps?
10      MR. ROGERS:  Again, I think that's
11  part of -- you are getting into the EEOC charge.
12      MS. DONAHUE:  I think that's a fair
13  question.
14      Q.  Did you --
15      MR. ROGERS:  No, I don't think that's
16  a proper question for this deposition.
17      MS. DONAHUE:  Are you instructing him
18  not to answer?  You can make an objection.  If you
19  are instructing him not to answer, we can call the
20  Court.  You can make an objection, but you still
21  have to answer the question.
22      MR. ROGERS:  I'm instructing him not
23  to answer.

Page 67

1      MS. DONAHUE:  On what basis?
2      MR. ROGERS:  On the basis there's a
3  pending EEOC charge, and this is the wrong
4  vehicle.  You are not allowed to take depositions
5  in EEOC charges.
6      MS. DONAHUE:  This is about his
7  involvement with Palmer Temps and AK Steel, and I
8  think it's a proper question.
9      MR. ROGERS:  It's five years after
10  the fact.
11      MS. DONAHUE:  Well, it doesn't
12  matter.
13      MR. ROGERS:  Sure it does.  This has
14  nothing to do with AK Steel.  It has to do with
15  the City of Middletown and a charge that he filed.
16      THE WITNESS:  She tells me she
17  represents him in the EEOC case.  I didn't know
18  that either.
19      Q.  In September of 2006, you had
20  knowledge of Donald Edwards' involvement with
21  AK Steel and involvement with your office; is
22  that true?
23      MR. ROGERS:  Objection.  You asked

Page 68

1  that, and he answered that.
2      Q.  Well, is that true?  You
3  understood in September of 2006 --
4      MR. ROGERS:  You can answer that.
5      THE WITNESS:  Yes.
6      Q.  -- that Donald Edwards was
7  involved in a lawsuit with AK Steel that also
8  involved Palmer Temps; is that correct?
9      A.  Hold it.  Could you read --
10      Q.  In September --
11      MS. DONAHUE:  Read back the question.
12      (Record read.)
13      THE WITNESS:  No, I didn't know that
14  it involved Palmer Temps.
15      Q.  Well, you knew that Rusty Johnson
16  was asking you for information about Donald
17  Edwards?
18      A.  Well, yeah, but that doesn't -- I
19  thought when I sent this E-mail -- in fact, I
20  thought he told me, and I don't know if it was
21  in the E-mail or voice, I thought this was a
22  done -- we weren't involved.  We weren't
23  involved in the lawsuit.

Page 69

1      I mean, yeah, he called and said
2  this guy says he came in.  I said no, he didn't
3  come in.  We never gave that test.  To me, that
4  was the end of the discussion.  So, no, I
5  didn't think we were involved in the lawsuit.
6      Q.  Well, did you understand that you
7  were a witness to an aspect of the lawsuit and
8  that's why you were being asked the question, a
9  factual question?
10      A.  I wasn't -- well, in your
11  terminology maybe I was a witness.  In my
12  thinking, we didn't give anybody the test that
13  AK -- at Palmer Temps ever.  We never -- Don
14  Edwards did not come in in August of 2001.  So,
15  you know, I guess in my mind, I wasn't part of
16  it.
17      Now, you are saying I'm a witness.
18  I guess I'm a witness to something that didn't
19  happen.
20      Q.  Well, yeah.
21      A.  But I never think of being a
22  witness to something that never happened.
23      Q.  I understand that distinction in a

18 (Pages 66 to 69)

FREEDOM COURT REPORTING

Page 70

1 layperson's mind.
2      A.   In the legal, maybe I am a
3 witness, but I didn't see me as being a
4 witness.
5      Q.   I understand.  But, in fact, you
6 had knowledge that related to the lawsuit and
7 related to Donald Edwards?
8      A.   It didn't relate to the lawsuit in
9 my opinion.
10      Q.   Well --
11      A.   I mean, obviously it does.  I'm
12 here today.
13      Q.   Right.
14      A.   But at that particular point in
15 time.
16      Q.   That's fair.  At that time in your
17 mind, you were not thinking that particular --
18 you were not thinking that you had information
19 pertaining to the lawsuit against --
20      A.   I still believe we don't.  We
21 weren't doing -- we never did that test at
22 Palmer Temps.  He didn't come in.  So, you
23 know, that's why I guess it's --

Page 71

1      Q.   If it's a disputed fact and you
2 have knowledge, then you have knowledge, right?
3      A.   I would say that is true if it was
4 an event that took place.  If it is an event
5 that didn't take place and -- again, legally, I
6 mean, you all are attorneys, I'm not, so -- but
7 in my mind, and as I told you -- another thing
8 that I did discuss, I just remembered, with
9 Rusty is the fact that so many times these
10 people are confused as -- you know, in fact, I
11 did mention that to you as to like maybe they
12 took the test somewhere else.
13           I thought -- I didn't think much
14 about it.  It was no big -- it was no big deal
15 to me.  I didn't notice in the system that
16 anybody called over this issue.
17      Q.   Okay.  Did you understand when you
18 talked to Rusty that there was -- there was
19 some factual material he wanted to -- he wanted
20 you to provide for him?
21      A.   This E-mail is all he asked for.
22 He asked -- he asked for additional
23 information, but I told him I needed a release,

Page 72

1 and he acted like to me that nothing else was
2 going to be needed.  He just needed something
3 from me so he had it that said that he did not
4 apply in August of 2001.  And that's why I sent
5 that.
6           I didn't hear anything about this
7 again really until, I guess, AK requested
8 the -- Mary Jane to do the statement or the --
9 whatever you call that document that she did.
10      Q.   Okay.  But I don't think you
11 really answered my question.  When you talked
12 to Rusty Johnson on September 10th, he was
13 asking you for information related to --
14      A.   I did not talk to him on
15 September 10th.
16      Q.   When you had this E-mail exchange
17 with him.
18      A.   Oh, Rusty.  I'm sorry.  With
19 Rusty.
20      Q.   With Rusty, right.  You understood
21 that he was asking for factual information
22 related to the lawsuit against AK Steel that
23 Donald Edwards was involved in?

Page 73

1      A.   He told me at the very beginning
2 that he was an attorney representing Donald
3 Edwards on a suit.  I assume he said with AK.
4 He didn't give me any information as to what
5 the suit was really about or anything.  He
6 asked me some questions, you know.
7      Q.   And he wanted -- he asked you some
8 factual -- some questions to which you could
9 provide some facts; is that true?
10      A.   He asked me some questions that I
11 responded to.
12      Q.   And you provided some factual
13 material to him?
14      A.   The only thing I provided to him
15 was this E-mail.
16      Q.   Right.  Okay.  Does this E-mail
17 contain factual material?
18      A.   It states that he did not come in
19 in 2001.  I guess you could say that states
20 factual information, but that's --
21      Q.   Okay.
22      A.   I did not understand why this was
23 such a big issue, because I didn't understand

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 74

1 the lawsuit.
2       Q.   Well, okay.  That's fine.
3       A.   I mean, I get calls from
4 attorneys, other attorneys, and they ask me one
5 or two questions on divorces and everything
6 else.  I don't think that I'm -- you know, I
7 have got all this information that they need.
8 I mean, they ask me -- you know husbands and
9 wives fighting, it's limited what we can say.
10 But we get subpoenas from other -- for
11 materials from divorce cases and all.  But in
12 this case, to me it was a non-event.
13      Q.   Well, I mean, the --
14      A.   Obviously, it's not.  But at the
15 time, it didn't concern me.
16      Q.   But the record shows you provided
17 factual information in regard to this lawsuit
18 that Donald Edwards had against AK Steel.
19      A.   If that's what you say.  If that's
20 the way you want to word it.
21      Q.   But you did.
22      A.   I did provide this E-mail.  I will
23 acknowledge that I did.  And in this E-mail, it

Page 75

1 states what it states.
2       Q.   Which is some factual information
3 that you provided.
4       A.   That he did not come in in August,
5 2001.  I also told him that no one did.  We
6 didn't take any applications.
7       Q.   Okay.  Okay.  Do you have any --
8 in your office, do you have any other managers
9 there or staff people there who are men?
10      A.   We have Travis Hamilton.
11      Q.   What is his position?
12      A.   He manages computer tutor, our
13 training facility.
14      Q.   Do you have any -- when Donald
15 Edwards came in in September, '02, and asked to
16 do some paperwork for his job at the City of
17 Middletown --
18           MR. ROGERS:  2002?
19      Q.   2006, I mean, in 2006 -- I believe
20 you testified that he was not allowed to
21 complete that paperwork at that time.
22      A.   I think I said he didn't complete
23 the paperwork.

Page 76

1       Q.   He asked for it, and he was not
2 allowed to complete it.  He wanted to complete
3 it; he asked for it.
4           THE WITNESS:  This is getting back to
5 the EEOC.
6           MS. DONAHUE:  That's fine.  I object
7 to you asking your attorney.  I'm asking you
8 questions.
9           THE WITNESS:  I can't ask my attorney
10 for anything?
11          MS. DONAHUE:  You cannot ask your
12 attorney.  You are answering my questions.  You
13 are here to answer my questions.
14          THE WITNESS:  All right.  I'm sorry.
15 I told you, I've never done this before.  I didn't
16 know how it works.
17          MS. DONAHUE:  That's fine.  Well,
18 this is about you.  It's not about your attorney's
19 knowledge, it's about your knowledge.
20          THE WITNESS:  In my opinion, it's a
21 conflict with EEOC.
22          MS. DONAHUE:  Well, that's not -- as
23 you said, you are not the attorney, and I'm

Page 77

1 entitled to ask you questions that are related to
2 this lawsuit.
3           THE WITNESS:  So you are refusing me
4 my right to advise with my attorney?
5           MR. ROGERS:  Listen to her lecture,
6 and then we will act appropriately.  Okay?
7           MS. DONAHUE:  Okay.
8       Q.   So I'm asking you about when
9 Donald Edwards came in in September, 2006, and
10 was not allowed to complete his paperwork for
11 his job at the City of Middletown, would that
12 have been a situation in which if he had been
13 allowed to complete that, would he then have
14 been your employee, and you would have paid him
15 as your employee?
16          MR. ROGERS:  Answer that.
17          THE WITNESS:  If we accepted his
18 application -- if he had gone through the process
19 that an employee goes through for a payrolled
20 employee and we accepted the position from the
21 mill -- from the City of Middletown to fill that
22 position, and he -- and he met our requirements,
23 then if he is a payrolled employee, he would have

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 78

1  been on our payroll and would have been an
2  employee of Palmer Temps.
3     Q.   Do you receive a fee for people
4  who are on your payroll?
5     A.   Payrolled employees, there's a
6  markup on their payroll that is billed to the
7  customer.
8     Q.   Right.  And then that's revenue
9  for your office?
10    A.   Yes.
11    Q.   Okay.  Do you know if you had a
12 contract with the -- or an agreement with the
13 City of Middletown?  I believe you did have an
14 agreement with the City of Middletown to do
15 their paperwork for their payrolled employees.
16    A.   I don't remember testifying that
17 we had a contract.  If I did --
18    Q.   You said you had an agreement,
19 that that was something you did for the City of
20 Middletown.
21    A.   I said it's something -- I
22 probably said it's something we do for the City
23 of Middletown.  I didn't say we have an

Page 79

1  agreement or a contract with the City of
2  Middletown.  There are many cases for the City
3  of Middletown I will not fill their payrolled
4  position.
5     Q.   Why would that be?
6     A.   It could be risk.  It would be --
7  we don't accept all payrolled positions.  We
8  don't like companies that have a lot of
9  payrolled positions.  Payrolled positions are
10 not profitable, or very profitable.  The
11 employees -- you sometimes get someone come in
12 to be sent in, and they don't meet your
13 qualifications.  You can't fill it for that
14 reason.  Sometimes we won't take it for the
15 risk.
16    Q.   What qualifications do you have
17 for payrolled employees?
18    A.   It depends on what the payrolled
19 job is.  We check people's history.  We check
20 their work.  We run them through our process.
21 We don't do all the steps, but we do the
22 background check.  We still want to make sure
23 they are a good employee.

Page 80

1     We are not going to just take an
2  employee that someone sends in to us that maybe
3  just committed murder or whatever or -- he
4  didn't commit murder.  He would be in jail --
5  but that has a bad work history and put them on
6  our payroll.  We are responsible for all his
7  taxes, his workers' comp, his unemployment.
8     Q.   Did you -- do you know if your
9  office made such a review of Mr. Edwards'
10 background?
11    MR. ROGERS:  Instruct the witness not
12 to answer.
13    MS. DONAHUE:  That's an improper
14 instruction.  On what basis are you instructing
15 him not to answer?
16    MR. ROGERS:  You can't take a
17 deposition on an EEOC charge, and that's what you
18 are trying to do.
19    MS. DONAHUE:  I think you can answer
20 that question.
21    MR. ROGERS:  You said you represent
22 him in his EEOC case, and that's what you are
23 trying to do.

Page 81

1     MS. DONAHUE:  No, we are asking --
2  excuse me.  You are not allowed --
3     THE WITNESS:  I can't ask him a
4  question?
5     MR. ROGERS:  You can't lecture him
6  that way.  And he is allowed to get legal advice
7  on this point.
8     MS. DONAHUE:  Yes, but he is in the
9  middle of a deposition now, and we are on the
10 record, and he cannot just turn to his attorney
11 and ask questions of his attorney in the middle of
12 a deposition.
13    MR. ROGERS:  Sure he can.
14    THE WITNESS:  I thought you said that
15 I can take a break whenever I wanted to after a
16 question.
17    MS. DONAHUE:  You can take a break.
18 Yeah, you can take a break.  If you want to take a
19 break --
20    THE WITNESS:  But I can't talk to him
21 during the break?
22    MS. DONAHUE:  Yeah, you can talk to
23 him during a break.

FREEDOM COURT REPORTING

Page 82

1    MS. BISSELBERG:  Yes, you can.
2    MS. DONAHUE:  Yeah, I agree, he can
3  talk to him during the break, and you can take a
4  break.  If you want to take a break, that's fine.
5    THE WITNESS:  Can I take a break and
6  sit here and ask my question?  I don't care if you
7  hear my question.
8    MS. BISSELBERG:  I would like to take
9  a break.
10    MR. ROGERS:  Let's take a break.
11    MS. DONAHUE:  That's fine.
12    (Recess taken.)
13  Q.  Mr. Nunlist, are you ready?
14  A.  I'm ready.  No comment.
15  Q.  All right.  Was there a time when
16  you at Palmer Temps got rid of your files that
17  were -- had been stacking up there?
18  A.  Yes.
19  Q.  When was that?
20  A.  I don't know when it would be.  We
21  do it on -- I'd like to say on a routine basis.
22  It didn't happen last year, because I wasn't
23  there.  We are out of space right now, and it

Page 83

1  needs to be done desperately.  But we go
2  through and we purge some of the files.
3  Q.  Are these the hard copies?
4  A.  Yeah, they are all -- they are
5  hard copies, yes.
6  Q.  Can you recall the last time you
7  did that?
8  A.  Probably a couple years ago.
9  Q.  Somewhere around 2005?
10  A.  Approximately, yes.
11  Q.  Did you do it any time before
12  that?
13  A.  Yes.
14  Q.  Okay.  How often do you do this?
15  A.  Well, I've got to be careful.  I
16  delete some files I won't say on a daily basis,
17  but we have a shredder in our office, so we can
18  shred.
19    When I do a larger file, like old
20  accounts payable records and those type of
21  things or old files for the direct hires, those
22  type of things, we hire one of those trucks
23  that come in, you can see as they shred it

Page 84

1  through the window, and we just bring up boxes
2  and shred the stuff.
3  Q.  Okay.  So in 2005, that was not
4  the first time that you had done that?
5  A.  No.
6  Q.  But you haven't done it since?
7  A.  I don't believe we have -- we did
8  not do it this year, and we did not do it last
9  year, so --
10  Q.  All right.  Well, I was provided
11  with a lot of contracts and contract material
12  between you and AK Steel, and I want to put
13  those into the record at this point.
14  A.  Okay.
15    MS. DONAHUE:  Let's mark this as
16  Exhibit 9.
17    (Thereupon, Plaintiffs' Exhibit 9 was
18  marked for purposes of identification.)
19  Q.  Have you seen this document that
20  we have marked as Exhibit 9?
21  A.  It's referred to as a CMA,
22  customer master agreement.
23  Q.  Is this a customer master

Page 85

1  agreement between Palmer Temps and AK Steel?
2  A.  Yes.
3  Q.  And when was it executed?
4  A.  I believe '95.  Hold on one
5  second.  There's a page in here.  That's not
6  dated.  July 14th is at the beginning of it.
7  Q.  And on page four, is that Mary
8  Jane's signature?
9  A.  Yes.
10  Q.  And she signed it Mary Jane
11  Palmer?
12  A.  Yes.
13  Q.  She was not Mary Jane Palmer
14  Nunlist?
15  A.  No.
16  Q.  When did she become Mary Jane
17  Nunlist?
18  A.  October 15th of 2005.
19  Q.  Is a -- did you call it a
20  contractor's or customer master agreement?
21  A.  Customer master agreement I
22  believe it is.  Maybe contractors.  I see the
23  word contractors.  I thought it was customer.

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 86

1 But it's a master agreement.
2      Q.  Can you tell me what a master
3 agreement is?
4      A.  It's required by AK.  It talks
5 about our insurance and some of the
6 requirements.
7      Q.  So was this done at your initial
8 association with AK Steel in providing
9 services?
10      A.  We probably had one with Armco
11 prior.  I don't know when AK -- when the names
12 changed.  I don't know when AK became -- when
13 Armco became AK, if that's when this happened.
14 There probably was an agreement prior to that
15 that was a CMA type of agreement.
16      Q.  Is this contract still in effect?
17      A.  As far as I know it is, yes.
18      Q.  So when you get --
19      A.  I'm not sure.  I guess it's a
20 contract.
21      Q.  It's an agreement.
22      A.  It's an agreement, so I sent it to
23 you.

Page 87

1      Q.  Okay.  So when you have done work
2 for AK Steel from July, 1995, forward, this
3 governs those agreements?
4      A.  It's in effect, yes.  I don't know
5 if things have changed in that time and the
6 contract didn't get changed, but yes.
7      Q.  Yes, that's fine.  It was provided
8 to me.
9      A.  Yes, I provided it to you, but I
10 haven't read it since 1995 probably.
11      Q.  But you described your direct hire
12 project with AK Steel as something that was not
13 pursuant to a contract; is that correct?
14      A.  You could argue it may have been
15 under that.  That would be up to their
16 interpretation.  We don't have -- I don't know.
17 I don't know what AK would say.  To me it's
18 different.  This is for temps that we do.
19      Q.  Okay.
20      A.  But I don't know if it specifies.
21 It could be for anything we do for them.  I
22 mean, the last page is the requirements, you
23 know, what you have to have, insurance and all

Page 88

1 of that kind of stuff.  We meet that, so -- it
2 was never referenced.  I never thought about
3 it, and they never mentioned to me that I
4 recall about this agreement when we did the
5 direct hire.  We just did it.
6      MS. DONAHUE:  Okay.  I see.  Let's
7 look at this one.  Can you mark this one?
8      (Thereupon, Plaintiffs' Exhibit 10
9 was marked for purposes of identification.)
10      Q.  This is Exhibit 10.  Do you
11 recognize this document that we have marked as
12 Exhibit 10?
13      A.  I remember pulling it out of the
14 file, yes.
15      Q.  Do you remember in 1999 when it
16 was sent to Palmer Temps?
17      A.  Truthfully, no, but I'm sure it
18 was sent to us.  It's in the file.
19      Q.  Okay.  This -- what is this
20 document providing?
21      A.  I believe it says there's two more
22 pages to it.
23      Q.  Yeah, but from the way that it was

Page 89

1 produced to me, I'm --
2      A.  It looks like it's right there.
3      Q.  This right here?
4      A.  Yeah.  Let me see this.  My guess
5 is it is this.  This says two pages, and this
6 is four.
7      Q.  That's why I wasn't certain.
8      A.  Sign the last page of both
9 originals.  So I believe this goes with this.
10      MS. DONAHUE:  All right.  Give me
11 these two back, and we will mark this as Number
12 11.
13      (Thereupon, Plaintiffs' Exhibit 11
14 was marked for purposes of identification.)
15      Q.  Do you recognize what we have
16 marked as Exhibit 11?
17      A.  I believe Exhibit 11 goes with
18 Exhibit 10.
19      Q.  And you think Exhibit 11 was
20 the --
21      A.  Attachment to Exhibit 10.
22      Q.  Okay.  Now, this is -- is this a
23 separate agreement, or what is this in your

23 (Pages 86 to 89)

FREEDOM COURT REPORTING

Page 90

1 interpretation?
2      A.   This looks like a lot of the
3 verbiage that's on purchase orders.  At one
4 point, I think they were trying to reduce the
5 paperwork, so we signed this, and then this
6 overrode the purchase order, so they didn't
7 have to send us all the verbiage on all the
8 pages of the purchase order is what I believe
9 this was for.
10      Q.   So it is -- Exhibit 11 is titled
11 CMA Approved?
12      A.   We are CMA approved, which is what
13 they are referring to.  This document, document
14 Exhibit 9, is what I assume they are saying
15 there, that we have a CMA, we are approved, and
16 it's a service order.  It's for people that are
17 CMA approved.  I assume they may sell other
18 people that don't have a CMA agreement.  I
19 don't know their workings that way.
20      Q.   Document Number 11 just sets forth
21 the terms and conditions of --
22      A.   Some additional --
23      Q.   -- particular purchasing

Page 91

1 agreements or any kind of purchasing agreements
2 that you have with AK Steel?
3      A.   It's the additional conditions to
4 sell AK Steel.
5      Q.   Okay.  That's fine.  I just wanted
6 to know what I was looking at.
7      A.   That's fine.
8      Q.   Thank you.  I'm not going to go
9 through the rest of these contracts.  I don't
10 think they are really relevant to what we are
11 doing here.
12      A.   We don't have anybody working
13 under that contract right now.
14      MS. DONAHUE:  Yeah.  Give me just a
15 couple minutes.  Just let me review this a little
16 bit and see where we are.  I may be done.
17      MR. ROGERS:  Okay.
18      MS. DONAHUE:  I think that's all the
19 questions I have.
20      MR. ROGERS:  I have a few.
21          DIRECT EXAMINATION
22 BY MR. ROGERS:
23      Q.   Mr. Nunlist, you testified earlier

Page 92

1 that Mary Jane Palmer Nunlist is your wife; is
2 that correct?
3      A.   That's correct.
4      Q.   Is she the owner of Palmer Temps
5 in Middletown, Ohio?
6      A.   Yes, she is, sole owner.
7      Q.   And is the address for Palmer
8 Temps 4302 Roosevelt Boulevard in Middletown?
9      A.   Yes, it is.
10      Q.   Has that been the address for
11 Palmer Temps during your entire 16-year
12 employment with the company?
13      A.   Yes, it has been the same address
14 for the entire time I have been there.
15      Q.   Is Palmer Temps in the staffing
16 business?
17      A.   Yes.
18      Q.   Do you provide temporary personnel
19 for companies?
20      A.   Yes.
21      Q.   Do you also assist companies with
22 their direct hires from time to time?
23      A.   Yes.

Page 93

1      Q.   Did AK Steel ask you to help it
2 with its direct hires by accepting applications
3 for labor jobs at your offices on Roosevelt
4 Boulevard?
5      A.   Yes.
6      Q.   And did they ask you to do that
7 sometime in the year 2000?
8      A.   Yes.
9      Q.   And you last performed that
10 function, I believe you testified earlier,
11 about the first week of January of 2001?
12      A.   Yes.
13      Q.   And have you performed that
14 function for AK Steel since?
15      A.   No.
16      Q.   Did Donald Edwards apply for any
17 AK Steel position with you in August of 2001 or
18 January of 2002?
19      A.   No.
20      Q.   Was Palmer Temps accepting
21 applications from anyone for any AK Steel mill
22 position in August, 2000, or thereafter?
23      A.   No.  Excuse me.  August of 2000

24 (Pages 90 to 93)

FREEDOM COURT REPORTING

Page 94

1  did you say?
2      Q.   I was wondering.  Let me ask that
3  question again.  Was Palmer Temps accepting
4  applications from anyone for any AK Steel mill
5  position in August of 2001 or at any time
6  thereafter?
7      A.   We were not accepting any
8  applications after August of 2001.
9      Q.   Okay.  On September 10, 2006, did
10  you send Rusty Johnson an E-mail confirming for
11  Mr. Johnson that Palmer had not accepted
12  applications from Donald Edwards or anyone else
13  for any AK Steel positions in August of 2001?
14      A.   What date in September did you
15  say?
16      Q.   September 10, 2006.
17      A.   Yes.
18      Q.   Have you ever -- has Palmer ever
19  administered any preemployment test that AK
20  Steel gives to applicants for hourly positions
21  at Palmer's offices?
22      A.   No.
23      Q.   Did Palmer ever administer AK

Page 95

1  Steel's tests to Donald Edwards?
2      A.   No.
3      Q.   Individuals who seek to register
4  for employment with Palmer Temps, are they
5  given Palmer Temps' own tests or evaluations?
6      A.   I'm sorry.  Repeat the question.
7      Q.   And individuals who seek to
8  register for employment with Palmer Temps, do
9  you give those people some tests or
10  evaluations?
11      A.   Yes.
12      Q.   Are those different from the AK
13  Steel preemployment test?
14      A.   Yes.
15      Q.   Do you use those tests or
16  evaluations to measure skills and identify
17  areas of strength and knowledge?
18      A.   Yes.
19      Q.   Does that assist Palmer in
20  matching workers with the various staffing
21  needs of your clients?
22      A.   Yes.
23      Q.   You checked your records on

Page 96

1  computer just before you came over here this
2  afternoon, correct?
3      A.   Yes.
4      Q.   Did they show that Donald Edwards
5  came in to register with Palmer Temps on
6  January 29th of 2001?
7      A.   Yes.
8      Q.   Do they also show that he
9  completed his registration with Palmer on
10  February 6th of 2001?
11      A.   Yes.
12      Q.   And do the records also show as
13  part of that registration that he took some of
14  your own tests and evaluations?
15      A.   Yes.
16      Q.   Your wife is quite ill as I
17  understand it.
18      A.   Yes.
19      Q.   What is the nature of her illness?
20      A.   She has unknown primary cancer,
21  squama cell.
22      Q.   And I believe you testified
23  earlier that she is being treated at the M.D.

Page 97

1  Anderson Center in Houston?
2      A.   Yes, her primary physician is at
3  M.D. Anderson Hospital in Houston, Texas.
4      Q.   And how frequently do you go down
5  to M.D. Anderson for treatment?
6      A.   Approximately every three months.
7      Q.   And does she, when she is down
8  there, receive chemo therapy treatments?
9      A.   She has received chemo.  She has
10  received chemo at other locations.  She also
11  has received radiation from them.
12      Q.   Has she received chemo here in the
13  Cincinnati area?
14      A.   Yes.
15      Q.   Have you had any observations
16  about the effect of the chemotherapy on your
17  wife's memory?
18      A.   Yes.
19      Q.   And what observations have you
20  had?
21      A.   She has had two major rounds of
22  chemo.  She is on a pill chemo currently.  And
23  after the first round, toward the end, I

25 (Pages 94 to 97)

FREEDOM COURT REPORTING

Page 98

1 noticed a difference in her memory.  And then
2 after she was off of it for a month or two, it
3 seemed to come back.  She came back pretty much
4 to her normal self.
5        And this last chemo, toward the
6 end of it, I noticed it again, but this time
7 she isn't getting better.  She is actually
8 getting worse in the last month.
9    Q.   When did the last chemo end?  I'm
10 sorry.
11    A.   Around June 1st.
12    Q.   Of 2007?
13    A.   Well, that was the IV chemo.  She
14 is currently on pill chemo, which, according to
15 her doctor here, is as strong, in fact,
16 stronger, has more worse side effects than the
17 IV chemo.  So she is currently on pill chemo
18 right now.
19        MR. ROGERS:  I don't have any further
20 questions.
21        THE WITNESS:  Okay.
22        MS. DONAHUE:  I don't have any
23 further questions.  Thank you very much.

Page 100

1        I, RICHARD NUNLIST, do hereby certify that
2 the foregoing is a true and accurate transcription
3 of my testimony.
4
5
6        _____
7
8        Dated _____
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 99

1        (Thereupon, the deposition was
2 concluded at 2:18 p.m.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 101

1 STATE OF OHIO        )
2 COUNTY OF MONTGOMERY )  SS: CERTIFICATE
3        I, Karen M. Rudd, a Notary
4 Public within and for the State of Ohio, duly
5 commissioned and qualified,
6        DO HEREBY CERTIFY that the
7 above-named RICHARD NUNLIST, was by me first duly
8 sworn to testify the truth, the whole truth and
9 nothing but the truth.
10        Said testimony was reduced to
11 writing by me stenographically in the presence
12 of the witness and thereafter reduced to
13 typewriting.
14        I FURTHER CERTIFY that I am not a
15 relative or Attorney of either party, in any
16 manner interested in the event of this action,
17 nor am I, or the court reporting firm with which
18 I am affiliated, under a contract as defined in
19 Civil Rule 28(D).
20
21
22
23

26 (Pages 98 to 101)

FREEDOM COURT REPORTING

Page 102

1        IN WITNESS WHEREOF, I have hereunto set
2   my hand and seal of office at Dayton, Ohio, on
3   this _ _ _ _ day of _ _ _ _ _ _ _ _, 2007.
4
5        _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
         KAREN M. RUDD
6        NOTARY PUBLIC, STATE OF OHIO
         My commission expires 5-21-2012
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660