FREEDOM COURT REPORTING

Page 1

1              UNITED STATES DISTRICT COURT
2                SOUTHERN DISTRICT OF OHIO
3                    WESTERN DIVISION
4                        *  *  *
5    VIVIAN BERT,
6    et al.,
7          Plaintiffs,
8       vs.                    CASE NO. C-1-02-467
9    AK STEEL CORPORATION,
10         Defendant.
11                       *  *  *
12         Deposition of MARY JANE PALMER NUNLIST,
13   Witness herein, called by the Plaintiffs for
14   cross-examination pursuant to the Rules of Civil
15   Procedure, taken before me, Karen M. Rudd, a
16   Notary Public in and for the State of Ohio, at the
17   West Chester Conference Center, 9248 Princeton
18   Glendale Road, Hamilton, Ohio, 45011, on Friday,
19   August 17, 2007, at 10:05 a.m.
20                       *  *  *
21
22
23

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 2

```
 1        EXAMINATION CONDUCTED            PAGE
 2    BY MS. DONAHUE:......................    4
 3
 4            EXHIBITS MARKED
 5    (Thereupon, Plaintiffs' Exhibit 1      5
 6    was marked for purposes of
 7    identification.).....................
 8    (Thereupon, Plaintiffs' Exhibit 2     31
 9    was marked for purposes of
10    identification.).....................
11    (Thereupon, Plaintiffs' Exhibit 3     33
12    was marked for purposes of
13    identification.).....................
14    (Thereupon, Plaintiffs' Exhibit 4     39
15    was marked for purposes of
16    identification.).....................
17    (Thereupon, Plaintiffs' Exhibit 5     43
18    was marked for purposes of
19    identification.).....................
20    (Thereupon, Plaintiffs' Exhibit 6     46
21    was marked for purposes of
22    identification.).....................
23
```

Page 3

```
 1  APPEARANCES:
 2  On behalf of the Plaintiffs:
 3      Wiggins, Childs, Quinn & Pantazis
 4  By: Susan Donahue
        Attorney at Law
 5      The Kress Building
        301 Nineteenth Street North
 6      Birmingham, Alabama  35203
 7  On behalf of the Defendant and witness:
 8      Taft, Stettinius & Hollister, LLP
 9  By: Gregory Parker Rogers
        Attorney at Law
10      425 Walnut Street
        Suite 1800
11      Cincinnati, Ohio  45202
12  On behalf of the Defendant:
13      AK Steel Corporation
14  By: Stephanie Bisselberg
        Attorney at Law
15      703 Curtis Street
        Middletown, Ohio  45043
16
17             * * *
```

Page 4

```
 1        MARY JANE PALMER NUNLIST
 2  of lawful age, Witness herein, having been first
 3  duly cautioned and sworn, as hereinafter
 4  certified, was examined and said as follows:
 5            CROSS-EXAMINATION
 6  BY MS. DONAHUE:
 7      Q.  Ms. Nunlist, my name is Susan
 8  Donahue.  I already introduced myself, but just
 9  for the record.  I'm the attorney representing
10  the plaintiffs in the lawsuit Vivian Bert and
11  others versus AK Steel.
12          Let's have -- let me just ask you
13  if you are represented by counsel?
14      A.  Yes.
15      Q.  Who is your counsel?
16      A.  Greg Rogers.
17          MS. DONAHUE:  All right.  And can
18  we just have an introduction?
19          MR. ROGERS:  And I'm Greg Rogers,
20  and this is Stephanie -- I'm with Taft,
21  Stettinius & Hollister, and this is Stephanie
22  Bisselberg, in-house with AK Steel.
23          MS. DONAHUE:  Okay.  Thank you.
```

Page 5

```
 1          THE WITNESS:  And just call me
 2  Mary Jane.
 3      Q.  All right.  Thank you.  Do you
 4  understand that you have been subpoenaed to
 5  give testimony in this case?
 6      A.  Yes.
 7          MS. DONAHUE:  Let me just mark
 8  this as Exhibit 1.
 9          (Thereupon, Plaintiffs' Exhibit 1
10  was marked for purposes of identification.)
11      Q.  Mary Jane, would you please look
12  at this document and tell me if you have seen
13  it before?
14      A.  Uh-huh.
15      Q.  Oh, you know, let me back up a
16  bit, because let me ask you a couple other
17  questions.  Have you ever had your deposition
18  taken before?
19      A.  One time.
20      Q.  And what was that for?
21      A.  It was when I left my old job,
22  started my own business.  He sued me for breach
23  of contract.
```

Page 6

1  Q. And who was this employer?
2  A. Globe Services.
3  Q. And what did Globe Services do?
4  A. Employment.
5  Q. And what was the outcome of that
6  lawsuit?
7  A. We finally settled it for 25,000.
8  Q. And about what time? What year
9  was this?
10 A. When it ended up being settled, or
11 what year was the lawsuit?
12 Q. The lawsuit or the settlement,
13 either one.
14 A. It was probably December --
15 probably December of '86.
16 Q. All right. So you have had your
17 deposition taken before several years ago, but
18 let me just go over some ground rules and just
19 how we proceed so that you are comfortable
20 here.
21        First of all, do you understand
22 that your testimony is under oath?
23 A. Yes.

Page 7

1  Q. And your testimony is as if you
2  were in a court in front of a judge. Do you
3  understand that?
4  A. Yes.
5  Q. Let me also give something -- give
6  an instruction that will help our court
7  reporter. When I ask you a question, could you
8  please answer audibly with a yes or a no,
9  because she is going to have a very hard
10 time --
11 A. You don't hear head shakes?
12 Q. She doesn't hear head shakes, and
13 uh-huh and uh-uh are very hard to transcribe.
14 A. Okay. I will do my best.
15 Q. Another thing that will help her
16 make a good record of your testimony is, and I
17 will try very hard to do this, and if you will
18 also try, then that would be good, listen to my
19 whole question and give me a chance to finish
20 my question before you answer, and I will give
21 you a chance to answer before I ask my next
22 question. Is that fair?
23 A. Sure.

Page 8

1  Q. Okay. We can take a break
2  whenever you want, as long as --
3  A. Thank you.
4  Q. -- as long as there isn't a
5  question on the table. Do you understand?
6  A. Yes.
7  Q. Okay. Have you taken any
8  medications today that would impair your
9  ability to give truthful testimony?
10 A. No.
11 Q. Have you taken any medications at
12 all today?
13 A. No.
14 Q. Have you --
15 A. I took them last night, but didn't
16 take them today. I wanted to -- I am on
17 morphine, and then I'm on the chemo again, and
18 they both can affect you, you know. So I
19 didn't think it would hurt to wait and take it
20 about 2:00 instead, 1:00 or 2.
21 Q. Do you think these medications
22 will impair your ability to recall events?
23 A. Sometimes I think they are going

Page 9

1  to permanently.
2  Q. All right.
3  A. You know, it's real funny. I have
4  no trouble -- the thing I have the most trouble
5  with is numbers.
6  Q. Okay. Well, what I'm going to ask
7  you today -- the questions I'm going to ask
8  you, I'm just asking you to give your knowledge
9  as far as you can recall today. All right?
10 A. Four years ago?
11 Q. Yes.
12 A. If somebody asked me where did I
13 go for lunch yesterday --
14 Q. Well, I'm just asking you to do
15 your best to recall to the best of your
16 ability.
17 A. I will do my very best.
18 Q. Thank you. Thank you. Let's look
19 at Exhibit 1, which was the subpoena. And I
20 think you testified that you have seen this
21 subpoena before, and this is -- is that
22 correct?
23 A. No. I'm not exactly positive if

Page 10

1  it is the very same one, but I know one where I
2  was being commanded to appear --
3      Q.  At this --
4      A.  -- in court.
5      Q.  At this conference center today to
6  take your deposition; is that correct?
7      A.  Yeah.  It's blank under where,
8  but -- everything is blank except --
9      Q.  Well, if you look on the first
10 page -- can you look on the first page?
11     A.  Uh-huh.
12     Q.  Where it says place of deposition,
13 do you see that?
14     A.  Yes.
15     Q.  Can you read where the place is
16 stated?
17     A.  Where it is dated?
18     Q.  Where the place --
19     A.  West Chester Conference Center.
20     Q.  Right.
21     A.  9248 Princeton Glendale Road,
22 Hamilton, 45011.
23     Q.  Yes.  And that is the place where

Page 11

1  we are today for your deposition; is that
2  correct?
3      A.  Right.
4      Q.  Is that correct?
5      A.  If that's where we are today?
6      Q.  Is that where we are?
7      A.  That's what we are talking about.
8      Q.  Is that where we are today?
9      A.  Yes.
10     Q.  Okay.  Thank you.  I'd like to ask
11 you some questions about your relationship to
12 Palmer Temps.  Can you tell me, please, what
13 your relationship to Palmer Temps is?
14     A.  I'm the owner.
15     Q.  And when did you start this
16 business?
17     A.  September 8, 1986.
18     Q.  Do you have any other position
19 with Palmer Temps besides owner?
20     A.  PR.
21     Q.  What do you mean by PR?
22     A.  I go out and sometimes make sales
23 calls, and I do all the marketing.

Page 12

1      Q.  Okay.
2      A.  And do the meetings, the board
3  meetings.
4      Q.  Do you have any other position
5  with Palmer Temps?
6      A.  I have cleaned the toilet before.
7  I mean, I have got every position.
8      Q.  Okay.  Is it a sole
9  proprietorship?
10     A.  No.
11         THE WITNESS:  Is it an S Corp?
12         MS. DONOVAN:  You have to answer
13 the questions.
14         MR. ROGERS:  I can't answer for
15 you.  If you don't know, say that you don't
16 know.
17         THE WITNESS:  Well, I really don't
18 know.  I get a C Corp and an S Corp mixed up.
19     Q.  Do you hold any position like
20 chairman of the board?
21     A.  No.
22     Q.  Do you hold the position of
23 president?

Page 13

1      A.  Yes.
2      Q.  What is your role as president?
3      A.  What is my will?
4      Q.  Role.
5      A.  Role.  I'm leader of the gang.
6      Q.  What are your duties?
7      A.  I'm Harry Truman.  The buck stops
8  here.  They all come to me with a problem.
9      Q.  Do you go to the office every day?
10     A.  No, not right now I'm not.
11     Q.  Now, why is that?
12     A.  Because I have been sick.
13     Q.  Okay.  I'm sorry to hear you have
14 been sick, and I hope this deposition isn't too
15 strenuous for you.
16     A.  It won't be, I've been through --
17 with what they have put me through.
18     Q.  How often do you go to the office
19 now that you are --
20     A.  I try to go a couple times a week.
21     Q.  Okay.
22     A.  If I -- it's only like a couple
23 hours those days, so minimal.

Page 14

1    Q.   And what --
2    A.   But I like to go in some.
3    Q.   What do you do while you are
4  there?
5    A.   Talk to everybody.
6    Q.   What do you talk to them about?
7    A.   Husbands, and we talk about men,
8  we talk about families.
9    Q.   Well, I appreciate that.
10   A.   I ask them to, you know, tell me
11 how things have been going and is there
12 anything I can help them with.
13   Q.   Do you ask them about the
14 business?
15   A.   Sure, I ask them how -- you know,
16 if we have been busy or, you know, how
17 recruiting was going, you know, if we are
18 keeping up on that.  I ask them everything, you
19 know, that I can.
20   Q.   All right.  How long have you been
21 going to work on this schedule of two times a
22 week?
23   A.   Well, I just got back home about a

Page 15

1  month ago, so --
2    Q.   And before that?
3    A.   When I was home, I tried to go a
4  little bit more often than that.  I tried to go
5  every day from 12 to 5, but that didn't work.
6    Q.   When was the last time that you
7  worked a full day's work at the office?
8    A.   Probably last November.
9    Q.   November of 2006?
10   A.   Yes.
11   Q.   All right.  Is that when you began
12 your treatment in November?
13   A.   No, I began it two years ago.
14   Q.   Two years ago?
15   A.   Well, let's see, it will be three
16 years in December.
17   Q.   So that was in 2004?
18   A.   Uh-huh.
19   Q.   So from December, 2004, to
20 November, 2006, you maintained a full schedule
21 at work?
22   A.   Oh, no.  I tried to come in as
23 much as I could, but, you know, it might be

Page 16

1  30 hours some weeks, 45 hours the next week.  I
2  did work quite a bit in there.
3    Q.   Before December, 2004, did you put
4  a full day's work in at the office?
5    A.   No.  Well, I have been in Houston
6  most of the time, so I haven't been in Ohio.
7  We have a condo in Florida, and our house
8  burned.
9    Q.   Your house burned in Florida?
10   A.   No, here.
11   Q.   Oh, I'm very sorry.  That's very
12 difficult.
13   A.   I'm sorry.
14   Q.   That's all right.  You just take
15 your time.  If you want to take a break, we
16 will just --
17   A.   No, that's all right.
18   Q.   I'm sorry.  Well, I was trying to
19 ask you and get an idea of when you were
20 working at the office in your regular full-time
21 capacity, and I thought you said that it was
22 before December of 2004 when you became ill.
23   A.   Yes, it was December, 2004.

Page 17

1    Q.   Okay.  And before that, then, you
2  did your regular, normal functions, jobs?
3    A.   Not normal, no.
4    Q.   Why wasn't it normal?
5    A.   Oh, before December, 2004?
6    Q.   Yes.
7    A.   Yes.
8    Q.   Okay.  That's what I wanted to
9  understand.  Thank you.
10        Your job duties at Palmer Temps as
11 the president and owner, has that been to get
12 business with different corporations, to recruit
13 employees for them?
14   A.   Yes.
15   Q.   All right.  And have you had that
16 relationship of recruiting employees for AK
17 Steel?
18   A.   Yes.
19   Q.   Okay.  And when did that
20 relationship start?
21   A.   Let's see, 1986.
22   Q.   From the very beginning?
23   A.   Probably April.

Page 18

1   Q.  Did your relationship with AK
2  Steel start at the very beginning of your
3  founding your business?
4   A.  Uh-huh.  In April.  I founded the
5  business in January.
6   Q.  I see.  So AK Steel -- do you
7  still do services for AK Steel?
8   A.  Yes.
9   Q.  Have you done services for AK
10 Steel consistently from April of 1986 to the
11 present?
12  A.  I hope so, but I don't know so.  I
13 know there's been other services in there.
14  Q.  What do you mean by other
15 services?
16  A.  Oh, CBS I know has had some people
17 in there, and an engineering company up in
18 Dayton, I think it's GFS, Account Temps.
19  Q.  Now, these companies, GFS and CBS
20 and Account Temps, are these all companies that
21 provide services to AK Steel?
22  A.  Well, they have been there, I
23 know, and worked.

Page 19

1   Q.  I see.
2   A.  I don't know anything more about
3  it.  We do keep our eye on who is out there and
4  why are they there, you know.
5   Q.  I see.
6   A.  Of course, we want it all.
7   Q.  I understand.  Okay.  Has Palmer
8  Temps ever accepted applications for employment
9  from AK Steel?
10  A.  Yes.
11  Q.  Do you know at what times Palmer
12 Temps has done this?
13  A.  I really don't.  I don't really
14 know when it was.
15  Q.  Are there any records that you
16 have in your office that would indicate at what
17 times you accepted applications from AK Steel?
18  A.  I'm sure Richard might have some.
19  Q.  What documents do you think he
20 might have?
21  A.  Probably something in the computer
22 as to when we were to stop, when they told us
23 to quit.

Page 20

1   Q.  Are you saying that AK Steel told
2  you to quit accepting applications?
3   A.  Uh-huh.
4   Q.  At what time did they --
5   A.  Well, we -- I'm sorry.  I
6  interrupted you.
7   Q.  That's okay.
8   A.  We weren't the only place
9  accepting at that time.  The library, the
10 credit union was taking applications, and there
11 was several people in town, and that just got
12 to everybody, I think, and they just decided to
13 call it off.
14  Q.  At what time --
15  A.  They had gotten pretty much what
16 they needed by then.
17  Q.  At what time are you saying that
18 AK Steel decided to call it off?  Do you know?
19  A.  I think it was -- I think she told
20 him around the beginning of the year, or she
21 wanted him to stop on January the 1st.  But we
22 already had people scheduled, and so we went
23 ahead and tested them.  So it was probably the

Page 21

1  end of the month when we actually stopped.
2   Q.  Are you talking about 2007?
3   A.  Yes.  Well --
4   Q.  That's this year.
5   A.  Yes, I think it was this year.
6  I'm not real sure.
7   Q.  Okay.
8   A.  I think it's probably 2006.  I
9  just don't know.
10  Q.  That's fine.  If you don't know, I
11 appreciate you telling me that you don't know.
12  A.  I don't.
13  Q.  I don't want you to guess or
14 speculate.  I want you to try to remember.
15  A.  No, I don't want to either.
16  Q.  Now, you said you had, on
17 January 1st of either 2006 or 2007, you had
18 people scheduled for tests.  Are you indicating
19 that you did testing for AK Steel?
20  A.  We never ever done any AK testing
21 in our office.  What we did is had like -- we
22 call it an elimination that we did for AK, and
23 it was just a one sheet of paper that had

FREEDOM COURT REPORTING

Page 22

1  several questions on it pertaining -- it could
2  pertain to any company really looking for
3  industrial people, because it was -- you know,
4  it was very generic.
5         The questions were can you work
6  three shifts, or do you have a fear of heights.
7  Just general questions.  Industrial people
8  should be able to work all three shifts, and
9  they had to be able to do that.
10        So after we asked those questions
11 or evaluation we give, you know, that's when
12 they have to pass or go through -- not really
13 pass it, but we just have to have them answer a
14 positive answer to all of those questions, or
15 they are not going to like the job and neither
16 are we going to like them as an employee.
17 Because if people don't like something, they
18 are not going to do very good on it.
19     Q.  Do you know if you have a copy of
20 this sheet of paper that asks these questions?
21     A.  No, I know we don't, because we
22 went through one of those office zaps about two
23 years ago, probably, when we got rid of

Page 23

1  everything.  We were being run out.
2      Q.  Why did you get rid of everything
3  two years ago?
4      A.  Because we had over 40,000 records
5  in there, and we ran out of room, and we
6  thought after -- since 1986, it was time to
7  clear files a little bit.
8      Q.  Okay.  Did this one sheet of paper
9  you are talking about with these several
10 questions, is this something that you wrote?
11     A.  No.
12     Q.  Is this something that AK Steel
13 provided for you?
14     A.  They provided it to me, but I
15 don't know that they wrote it even.  Like I
16 said, it was so generic.
17     Q.  Were your instructions from AK
18 Steel to ask the applicants to fill out this
19 questionnaire?
20     A.  (Witness nodding head up and
21 down.)
22     Q.  Are you saying yes with your nod?
23     A.  Well, would you repeat the

Page 24

1  question?
2      Q.  Okay.  Did AK Steel give you
3  instructions to have the applicants fill out
4  this one sheet of paper that you are
5  describing?
6      A.  They never filled it out.  We
7  asked the questions for -- you know, asked
8  them, and then we just put down the answers.
9      Q.  All right.  Where did you put down
10 the answers?
11     A.  On the paper, the evaluation
12 paper.
13     Q.  All right.  And what did you do
14 with the evaluation paper?
15     A.  We gave it to AK.
16     Q.  Okay.
17     A.  After we did that, we gave them
18 everything.  We gave them the pile of good ones
19 and the pile that didn't answer the questions
20 correctly.
21     Q.  I see.  So you separated the
22 applications out into two separate piles?
23     A.  Ones that answered the questions

Page 25

1  and ones that did not.
2      Q.  Did AK Steel tell you what kind of
3  answers they wanted to have on that
4  questionnaire?
5      A.  Well, I basically knew by reading
6  them what they were trying -- you know, those
7  were three of the actual questions that we had.
8  And, you know, I know they wouldn't work
9  anybody that can't work all three shifts.
10     Q.  So you based --
11     A.  There's no way.
12     Q.  So you based your selection on
13 your own experience of being able to understand
14 their answers and how those answers would match
15 with the job?
16     A.  Right.
17     Q.  Okay.
18     A.  They told us what they had to
19 have.  They had to be able to work all three
20 shifts, you know, and the other questions I
21 asked them.
22     Q.  Now, you are testifying that AK
23 Steel asked you to stop taking applications on

7 (Pages 22 to 25)

Page 26

1  January 1st of either 2006 or 2007.  So before
2  that, did you --
3         MR. ROGERS:  Objection.  That
4  mistates her testimony.  She said she didn't
5  know when.
6         MS. DONAHUE:  Well, she didn't
7  know when.
8     Q.   You are not sure.  It could be
9  either 2006 or 2007.
10    A.   4 or -- I know it was several
11 years ago, and I know the papers were shredded
12 before then, like a year before.
13    Q.   What papers were shredded?
14    A.   The ones that we did at our
15 office.  You know, all of our files we purged.
16    Q.   Okay.
17    A.   The files that we have on our
18 regular temporaries, everything.  You know, we
19 had papers from back in 1990 and things that we
20 certainly didn't need anymore.
21    Q.   Did you purge these files around
22 2005?  Is that what you are saying?
23    A.   It's been longer than that.  I'm

Page 27

1  thinking around 2003.
2     Q.   Now, at the time that AK Steel
3  asked you to stop taking applications, you said
4  it might be 2006, it might be 2007, but you are
5  not sure; is that correct?
6     A.   It could have been, but it could
7  have been 2003 or 4 too.  I'm just not sure.
8     Q.   Okay.
9     A.   All I remember is saying, you
10 know, we were going -- we were going to clean
11 the office up, and they had to hire -- they
12 hired someone to stand out there to make sure
13 that nobody could get into the papers or any
14 Social Security numbers.
15    Q.   All right.  So AK Steel hired
16 someone to come to your office?
17    A.   No.  To shred them, no.
18    Q.   No.  Who came to your office to
19 clean it out?  When you say they hired someone,
20 who do you mean?
21    A.   Richard and --
22    Q.   Oh, I see.
23    A.   -- the staff.  There's a company

Page 28

1  over in Loveland that does it.
2     Q.   So your office just took it upon
3  itself to clean out the files?
4     A.   Yes.
5     Q.   Okay.
6     A.   After we followed, you know,
7  whatever rules we had to follow.  And
8  apparently we -- they said it's really good to
9  get rid of files earlier now, but we had
10 already had these ten years.
11    Q.   Who said that it was good to get
12 rid of files earlier?
13    A.   Well, US Business.
14    Q.   Did anyone in particular tell you
15 that?
16    A.   No.  I just read it.  Now, Richard
17 might have talked to someone too.  He is real
18 careful about those records.  Because I have
19 always been a hog.  I want to save everything,
20 you know.  So we had everything from the day we
21 had opened in there.
22    Q.   All right.  When you took
23 applications for AK Steel, who was your contact

Page 29

1  person at AK Steel that you talked to about
2  this?
3     A.   Phyllis Short usually.
4     Q.   Phyllis Short?
5     A.   She is the person now.
6     Q.   And how did you transmit the
7  applications that you had separated into two
8  groups?  How did you transmit those to AK
9  Steel?
10    A.   I don't know.
11    Q.   Do you know if someone came from
12 AK Steel to your office to get them?
13    A.   I have no -- that I don't have any
14 idea.
15    Q.   Did you ever see anyone from AK
16 Steel come to your office to get them?
17    A.   No, I never saw anybody come and
18 get them.
19    Q.   Did you ever give instructions to
20 any of your office assistants to package these
21 up and send them?
22    A.   Yes, I'm sure we did, and Richard
23 worked with them on that too.

Page 30

1  Q. Okay. All right. Did Palmer
2  Temps ever conduct any testing of applicants
3  for employment at AK Steel?
4  A. The evaluation, and that just went
5  on to AK. We didn't do a lot of testing for
6  them. They had their own department, and this
7  was something that was just extraordinary,
8  because they were having trouble getting
9  people, they just couldn't get them, and hired
10  companies that specifically did that and even
11  stood out in malls in the kiosks. They just
12  couldn't get people to work at that time.
13  So they really felt like this was
14  a different option they had that they could try
15  and get the mill, you know, loaded like it
16  should be.
17  Q. At what time period are you
18  talking about that they were having trouble
19  hiring people?
20  A. Oh, gosh.
21  THE WITNESS: How long has Wayne
22  Cott been CEO? Do you have any idea?
23  MR. ROGERS: I can't answer the

Page 31

1  questions for you.
2  Q. Just answer to the best you can.
3  And if you want to --
4  A. I don't know.
5  Q. -- answer it in reference to a
6  certain kind of management person, that's fine
7  too.
8  A. I don't know.
9  Q. Okay. Now, you mentioned the name
10  Wayne Cott. Is Wayne Cott a manager?
11  A. He is the CEO now.
12  Q. And did he start becoming the CEO
13  at a certain point?
14  A. I don't know when.
15  Q. Okay.
16  A. You never saw him much.
17  Q. Was it in the last five years?
18  A. Probably.
19  MS. DONAHUE: Let me mark this as
20  Exhibit 2.
21  (Thereupon, Plaintiffs' Exhibit 2
22  was marked for purposes of identification.)
23  Q. Could you look at that document,

Page 32

1  please, and tell me if you have seen it before?
2  MR. ROGERS: Do you have a copy,
3  Susan?
4  MS. DONAHUE: Yes, I do. Sorry.
5  THE WITNESS: No, I don't remember
6  seeing this. I might have got them mixed up
7  even. I just remember seeing, you know, that I
8  had to be somewhere.
9  Q. Could you look at the last page of
10  this, please? Do you recognize this as a
11  subpoena for documents?
12  A. I think Richard brought what he
13  had.
14  Q. So you were aware that we had
15  asked for documents from Palmer Temps?
16  A. Uh-huh.
17  Q. Are you answering yes?
18  A. Yes.
19  Q. And is it your testimony that
20  Richard gathered the documents?
21  A. Yes.
22  Q. Did you have anything to do with
23  gathering the documents?

Page 33

1  A. Probably not.
2  Q. What do you mean, probably not?
3  A. I really don't -- I didn't help
4  him get anything really. I haven't been caring
5  much about it.
6  Q. I understand. I just want to know
7  if you did anything in regard to gathering the
8  documents.
9  A. No, not that I know of.
10  Q. All right.
11  A. They asked me for so much, I don't
12  know what I had and didn't have.
13  MS. DONAHUE: We will mark this as
14  Exhibit 3.
15  (Thereupon, Plaintiffs' Exhibit 3
16  was marked for purposes of identification.)
17  Q. Do you recognize this document?
18  A. To tell you the truth, I don't. I
19  get the purchase orders in, and I, you know,
20  read them, and I give them to another girl in
21  our office, and she processes all of these.
22  All of the invoices are contracted for people
23  to work.

FREEDOM COURT REPORTING

Page 34

1   Q.  Can you look on page three,
2  please, the last page?  It's the last page.  Is
3  that your signature on the last page?
4   A.  Yes.
5   Q.  And did you sign this document on
6  April 10, 2006?
7   A.  Well, obviously I did.
8   Q.  Okay.  Did you -- I think you
9  identified this as a purchase order?
10   A.  Yes.
11   Q.  This is a purchase order from AK
12  Steel?
13   A.  Uh-huh.
14   Q.  What are they requesting from you?
15   A.  See, when I don't look at them --
16  it's for pricing, it looks like more than
17  anything, for employees.
18   Q.  Does this contract or this
19  purchase order indicate what category of
20  employee you are providing for AK Steel?  If
21  you look on page two, that might help you.  Do
22  you see down on the lower half of that page it
23  says payroll office personnel?

Page 35

1   A.  Yes.
2   Q.  Did you provide payroll office
3  personnel to AK Steel?
4   A.  Yes.  We still do.
5   Q.  And you still do?
6   A.  (Witness nodding head up and
7  down.)
8   Q.  Did you also supply payroll plant
9  personnel?
10   A.  No.  We did not send anyone into
11  the plant in our career until this came up,
12  except we did have some guys that worked there
13  for 40 years, you know, took customers around
14  for them.  But, no, we never sent anyone to the
15  mill.
16       We got to the point where, you
17  know, when -- they did have a few safety
18  issues, and that was probably when that period
19  was that we started.  People were a little bit
20  afraid of it, and they didn't want to work at
21  AK.  And so we just decided we would take a
22  chance on it, try to help them.
23       We don't -- you know, I'm not

Page 36

1  particularly happy to send my employees
2  anywhere that might be dangerous.  We were real
3  careful with that.
4   Q.  Is it your testimony that when you
5  first started providing services for AK Steel,
6  you provided safety training for AK Steel for
7  employees?  Is that what you are saying?  I'm
8  sorry.  I don't understand quite what you are
9  saying about the safety issue.
10   A.  We just didn't like sending them
11  into the mill, because it's dangerous out
12  there.
13   Q.  I see.  Is it your testimony that
14  you have never provided employees for AK Steel
15  who worked inside the mill?
16   A.  If we did, it was eight, ten years
17  ago.
18   Q.  Okay.  So these applications that
19  you took for employees at the mill at AK Steel,
20  they were for office personnel only?
21   A.  Probably office, or sometimes we
22  sent people to help move furniture, we sent
23  people for moving file cabinets.  Just general

Page 37

1  laborer jobs.
2   Q.  Now, maybe you can help me
3  understand, because earlier you talked about an
4  applicant coming in, and you would ask them
5  questions about working, if they could work any
6  shift; is that correct?
7   A.  (Witness nodding head up and
8  down.)
9   Q.  So I'm a little confused, because
10  I don't think office workers work --
11   A.  He didn't apply for office work.
12   Q.  Who didn't?
13   A.  Now, who is -- is it Don Edwards?
14       MR. ROGERS:  I can't answer the
15  questions for you.
16       THE WITNESS:  No.  That's right.
17   Q.  My question isn't about Don
18  Edwards right now.  My question is about
19  whether Palmer Temps ever took applications for
20  any laborers in the mill.
21   A.  During the period we were hiring
22  for the mill?
23   Q.  Yes.

10 (Pages 34 to 37)

FREEDOM COURT REPORTING

Page 38
1     A.  Yes.
2     Q.  Okay. So there was a period when
3 you were hiring for the mill, and then there
4 were other periods when you were hiring office
5 workers?
6     A.  Right.
7     Q.  Okay. Were you also -- were you
8 hiring workers for the mill and office workers
9 at the same time during that period?
10     A.  Uh-uh. I don't know.
11     Q.  Okay. So there was a period of
12 time when you were hiring workers for the mill
13 for laborer positions?
14     A.  No. We sent them people that were
15 qualified. They did all the hiring aspects.
16     Q.  But -- thank you for that
17 clarification. You were taking applications
18 for laborer positions at the mill?
19     A.  Correct.
20     Q.  Do you know when -- and maybe I
21 have asked you this before, but maybe this will
22 help clarify this. There was a certain period
23 of time that you accepted applications for

Page 39
1 laborer positions at the mill; is that correct?
2     A.  Uh-huh.
3     Q.  Okay. How long was this period of
4 time? Was it a matter of years, or a matter of
5 months?
6     A.  It probably was April to January
7 of 2005.
8     Q.  Were there any other times that
9 you took applications for laborer positions at
10 the mill?
11     A.  No.
12     MS. DONAHUE: We can mark this
13 as -- I guess we are on Exhibit 4.
14     (Thereupon, Plaintiffs' Exhibit 4
15 was marked for purposes of identification.)
16     Q.  Would you look at what we have
17 marked as Exhibit 4? Do you recognize this
18 document?
19     A.  No, I really didn't -- I didn't
20 have any part in filling out the applications.
21     Q.  Well, I want to ask you not about
22 the content of the application, but just the
23 form. Do you recognize this form as a form

Page 40
1 that you gave to applicants to fill out?
2     A.  No.
3     Q.  Are you saying you didn't give
4 this form?
5     A.  I don't know.
6     Q.  You don't know. Okay.
7     A.  I don't recognize it.
8     Q.  Who in your office actually gave
9 the applications to people who came in and
10 wanted to apply?
11     A.  Well, we have different people.
12     Q.  Who are those people?
13     A.  Sandy Huddleston, Amy Powers,
14 Becky probably helped some.
15     Q.  What is Becky's last name?
16     A.  Carroll.
17     Q.  Are those the entire group of
18 office employees that you have?
19     A.  No.
20     Q.  Now, what is Sandy Huddleston's
21 position?
22     A.  She usually does the industrial,
23 and Becky the office, and Amy does both.

Page 41
1     Q.  When you say does them, do you
2 mean -- what do you mean?
3     A.  Gives them.
4     Q.  Gives the applications?
5     A.  (Witness nodding head up and
6 down.)
7     Q.  Okay. So Sandy Huddleston or Amy
8 Powers or Becky Carroll would have been people
9 who worked for you who would give out
10 application forms to people who wanted a job at
11 AK Steel; is that correct?
12     A.  Uh-huh.
13     Q.  All right. Now, if you look up in
14 the upper right-hand corner, do you see --
15     A.  Yes.
16     Q.  Do you see that handwriting?
17     A.  Yes.
18     Q.  Do you know what that indicates?
19     A.  No, I don't.
20     Q.  Do you know if anybody at your
21 office put a P on the applications to indicate
22 that the application came from Palmer?
23     A.  That I don't know. I don't know

11 (Pages 38 to 41)

Page 42

1  why we would have initialed something that --
2  anything really.  I would imagine they got it
3  from us.
4      Q.  Why would you imagine that?
5      A.  With the P and the checkmark, it
6  identified where it came from and that they
7  received it.
8      Q.  But you don't -- you don't know if
9  any of the people in your office would indicate
10 that on these applications?
11     A.  I don't -- no, I don't think so.
12     Q.  Okay.  Did AK Steel ever ask your
13 office to put a P on applications that you
14 accepted?
15     A.  No, not that ran by me, and they
16 run everything past me just about, so --
17     Q.  Would they run applications past
18 you?
19     A.  No.  It was a madhouse, you know.
20 There were a lot of people in there.  I didn't
21 have time to do that too.
22     Q.  When I say that -- I'm sorry.
23 Maybe that was not a very good question.  But

Page 43

1  when AK Steel asked you to accept applications,
2  did you ever see the actual application that
3  you were giving out to people?
4      A.  I'm sure whoever gave it saw it.
5  I never saw it.
6      Q.  You never saw it.  Okay.
7          MS. DONAHUE:  Let's mark this as
8  Exhibit 5.
9          (Thereupon, Plaintiffs' Exhibit 5
10 was marked for purposes of identification.)
11     Q.  I have given you what we have
12 marked as Exhibit 5.  Have you ever seen this
13 document before?
14     A.  No.
15     Q.  All right.  Have you ever seen
16 this form before and just ignored the content,
17 the things that have been filled in?  Have you
18 ever seen this form before?
19     A.  That I don't know.  If I didn't
20 pay any attention to it, I wouldn't have
21 remembered.  I don't remember the form or the
22 questions either.
23     Q.  Is this the one-page questionnaire

Page 44

1  form that you were talking about that you would
2  ask?
3      A.  No.
4      Q.  No?  This is not that?
5      A.  No.
6      Q.  Okay.  When -- did you ever -- I
7  think you testified before that when someone
8  came in to apply, you had a one-page
9  questionnaire that you asked them, and then you
10 filled in the answers, or whoever took the
11 application.  Did you ever personally do that?
12     A.  Sign any of the applications?
13     Q.  No.  I'm referring back to your
14 testimony when you said that someone would come
15 in and fill out an application, and then
16 someone in your office would ask them questions
17 that were written out on a one-page form, and
18 then they would write the answers in.  Is that
19 correct?
20     A.  Are you trying to find out if the
21 applicant filled in all the questions?
22     Q.  No.  I think you testified earlier
23 that you would just ask -- someone from your

Page 45

1  office --
2      A.  That was on our -- the
3  qualification.  We asked the questions.
4      Q.  Right.  I'm just asking you if you
5  personally ever asked those questions to
6  someone?
7      A.  Yes, I did.
8      Q.  Okay.  And then you would write
9  down their answers?
10     A.  Uh-huh.
11     Q.  And then you would give -- then
12 you would use that to separate out the
13 applications into two piles; is that correct?
14     A.  Uh-huh.
15     Q.  So this form that we are looking
16 at here that's Exhibit 5, this is not the --
17 this is not the set of questions that you
18 asked?
19     A.  No.  Wait a minute.  See, some of
20 these questions were on, some weren't.  One of
21 our questions is do you have a valid driver's
22 license and transportation.
23     Q.  All right.  So some of questions

Page 46

1  on what we have marked as Exhibit 4 [sic] are
2  the same questions that were questions that you
3  asked?  Is that what you are telling me?
4      A.  Two of them.
5      Q.  All right.  Just a second.  Let me
6  find something here.
7      A.  I think these are on our other one
8  too, the valid driver's license, how are you
9  going to get to work.  Some of them have to
10 take a bus.
11     MS. DONAHUE:  Well, we can put
12 that aside.  I'm not going to ask any more
13 questions about that.  Maybe we can take a
14 break for just a minute while I look for
15 something.
16     MR. ROGERS:  Okay.
17     (Thereupon, an off-the-record
18 discussion was held.)
19     MS. DONAHUE:  We will mark this
20 one.  This is going to be Exhibit 6.
21     (Thereupon, Plaintiffs' Exhibit 6
22 was marked for purposes of identification.)
23     MS. DONAHUE:  I'm going to have to

Page 47

1  ask you to look at this together.  I apologize.
2  I just can't find another copy right now.
3      MR. ROGERS:  Okay.
4      Q.  Have you seen this document before
5  that we have marked as Exhibit 6?
6      A.  Uh-huh.
7      Q.  Is that a yes?
8      A.  Yes.
9      Q.  When did you see this?
10     MS. DONAHUE:  Here is another one.
11     THE WITNESS:  I probably signed
12 it.
13     Q.  Look on the last page, the second
14 page.  Is that your signature on page two?
15     A.  That's me.
16     Q.  All right.  And does it indicate
17 that you signed this on --
18     A.  The 4th day of May 2007.
19     Q.  Is that the 4th day or the 24th
20 day?
21     A.  4th.
22     Q.  Okay.  I think it might be a
23 little bit difficult to read; do you agree?

Page 48

1      A.  No, they have just got the
2  little -- (indicating.)
3      Q.  What is this document?
4      A.  Well, testifying that I'm not
5  crazy.  That's the first it asks.
6      Q.  Where does it testify that you are
7  not crazy?
8      A.  The very first sentence says
9  truthfully declares I am competent to testify.
10     Q.  Were you competent to testify at
11 the time?
12     A.  Yes.  Those were better days.
13     Q.  This was on, you say, May 4th,
14 2007; is that correct?
15     A.  Uh-huh.
16     Q.  And why are you saying this was --
17 these were better days?
18     A.  Anything has been better than this
19 past month.
20     Q.  I see.  That's fair.  All right.
21 Do you know what this document is?
22     A.  It's where I'm being called as a
23 plaintiff in the lawsuit.

Page 49

1      Q.  Could you say that again, please?
2      A.  Where I was called as a witness --
3  or what would I be in a lawsuit?
4      Q.  Okay.  Did an attorney contact you
5  in regard to -- you can see at the top it says
6  declaration of Mary Jane Palmer Nunlist over on
7  the right.
8      A.  Yeah.
9      Q.  Do you recognize this as a
10 declaration you made?
11     A.  Yes.
12     Q.  And you signed this declaration
13 after reading through what was written here?
14     A.  Yes.
15     Q.  Were you contacted by someone to
16 make this declaration?
17     A.  They sent it to us in the mail, I
18 believe.
19     Q.  Who sent it to you?
20     A.  Your attorneys you are working
21 for.
22     Q.  My attorneys?  No.
23     A.  The attorneys in Atlanta -- or in

Page 50

1  Georgia.
2      Q.  The attorneys in Georgia?
3      A.  Well, I don't know.  There's been
4  so many lawsuits.
5      Q.  All right.
6      A.  Maybe the president sent it to me.
7  It's federal, so --
8      Q.  Do you mean that as a joke?
9      A.  I just knew when I got it that I
10 was going to have to, you know, go to -- have a
11 deposition.
12     Q.  All right.  Now, you signed this
13 declaration.  Are you testifying that it was
14 sent to you in the mail typed as it is right
15 now?
16     A.  I don't know if it was exact or
17 not.
18     Q.  Did you talk to anyone before you
19 received this in the mail, if you did receive
20 it in the mail?
21     A.  No.
22     Q.  Did you ever talk to an attorney
23 about this declaration?

Page 51

1      A.  Yes.
2      Q.  I don't want to know what you said
3  to the attorney or what the attorney said to
4  you, but tell me which attorney you talked to.
5      A.  His name is Gregory Pratt.
6      Q.  Okay.  Do you know what law firm
7  he is with?
8      A.  Pratt.
9      Q.  Pratt law firm?
10     A.  He's alone.  He has gone from a
11 four name building to a one name building.
12     Q.  Were you represented by an
13 attorney when you talked to this other attorney
14 about your declaration?
15     A.  No.  He didn't have time.
16     Q.  All right.  So did you talk on the
17 telephone to this attorney, Gregory Pratt?
18     A.  Well, when I called to ask him to
19 represent me, he told me there just wasn't any
20 way.  He just didn't have the time right now.
21     Q.  So you called Gregory Pratt to
22 represent you?
23     A.  Yes.

Page 52

1      Q.  Okay.  And he declined to
2  represent you?
3      A.  Well, yeah, he didn't -- well, he
4  didn't know this until a week ago or ten days
5  ago at the most.
6      Q.  All right.  I'm sorry if I'm not
7  asking very clear questions.  What I'm asking
8  you is what attorney talked to you about this
9  declaration, not attorney -- that's what I'm
10 asking you.  What attorney talked to you about
11 this declaration?
12     A.  Well, they pretty well ignored me.
13 But Greg talked to me about it.
14     Q.  Okay.  And you are indicating Greg
15 Rogers?
16     A.  Yes.
17     Q.  I don't want to know anything
18 about the content or how you feel about Greg
19 Rogers.  I don't want to know anything about
20 that.  I just wanted to know which lawyer
21 contacted you in regard to this declaration,
22 and you're answering that it was Greg Rogers?
23     A.  Right.

Page 53

1      Q.  All right.  So you did not type up
2  this declaration; is that true?
3      A.  No.
4      Q.  Okay.  And you received this in
5  the mail; is that true?
6      A.  Uh-huh.
7      Q.  And you read it over?
8      A.  I think it was gotten in the mail.
9  I can't think of any other way I would get it.
10     Q.  Okay.  And before you signed it,
11 did you read through the whole thing?
12     A.  Yes.
13     Q.  All right.  Thank you.  Now, let
14 me ask you some questions about what you have
15 testified.  Did you understand when you signed
16 it that this was testimony in this case, that
17 this declaration was going to be testimony in
18 this case?
19     A.  Uh-huh.
20     Q.  Did you understand that?
21     A.  Yes.
22     Q.  Okay.  Paragraph number one says
23 you are the owner of Palmer Temps.  And that is

FREEDOM COURT REPORTING

Page 54

1  true, right?  You have already told me that,
2  correct?
3      A.  Yes.
4      Q.  Okay.  Paragraph number two, could
5  you read that to me, please?
6      A.  AK Steel -- AK Steel asked us to
7  help it with its direct hires by accepting
8  applications for its labor reserve jobs at our
9  offices on Roosevelt Boulevard.  It was our
10 understanding that AK Steel needed some
11 administrative help processing applications
12 during this time.  We performed this function
13 for AK Steel for a period of time, completed
14 this form [sic] prior to January 29th, 2001,
15 and have not performed it since.
16     Q.  Okay.  Does this document refresh
17 your memory as to the time frame when you
18 accepted applications for the laborer position
19 for AK Steel?
20     A.  Uh-huh.
21     Q.  Is that a yes?
22     A.  Gosh, 2001?
23     Q.  Are you answering yes to my

Page 55

1  question?
2      A.  I'm talking to myself.  2001.
3  Yeah, I guess it was 2001.
4      Q.  Okay.  Do you have any documents
5  that would indicate when you stopped performing
6  this function for AK Steel?
7      A.  I think Richard does.
8      Q.  Do you have any documents that
9  would indicate when you started performing this
10 function for AK Steel?
11     A.  He would have them if we have got
12 them, and we probably have something.
13     Q.  All right.  When you signed this
14 declaration, did you, yourself, check any
15 documents to see if this was correct?
16     A.  Check any other documents?
17     Q.  Uh-huh, to see if this date,
18 January 29th, 2001, was correct.
19     A.  No.
20     Q.  You did not check any other
21 documents to make sure this was a correct date?
22     A.  No.
23     Q.  How did you determine that this

Page 56

1  was the correct date, then?
2      A.  I just trust everybody that it's
3  the right information.
4      Q.  Okay.
5      A.  It's a legal document.  I mean, I
6  never -- I don't question that much.
7      Q.  Okay.  Let's look at paragraph
8  number three.  Could you read that to me,
9  please?
10     A.  Donald Edwards did not apply for
11 any AK Steel position with us in August of 2001
12 or January, 2002.  In fact, Palmer Temps was
13 not accepting applications from anyone for any
14 AK Steel mill positions in August of 2001 or at
15 any time since.  We had stopped accepting
16 applications for its direct hires by this time.
17 On September 10, 2006, Richard Nunlist of our
18 organization sent Rusty Johnson an E-mail
19 confirming for him that we did not accept
20 applications from Don Edwards or anyone else
21 for any AK Steel positions.  We have never
22 administered --
23     Q.  That's enough.  That's the end of

Page 57

1  paragraph three.  I think you left out the
2  date, for any AK Steel positions in August,
3  2001; is that correct?  Is that what it says?
4      A.  Uh-huh.
5      Q.  Is that yes?
6      A.  Yes.  And I thought I said it.
7      Q.  Okay.  I'm sorry.  Maybe I
8  misheard it.
9          When you read this document and
10 signed it, did you consult any documents
11 regarding Donald Edwards' applications for
12 employment at AK -- at AK Steel?  Did you,
13 yourself, consult any documents to fill in
14 these dates in paragraph three?
15     A.  Yes, I looked -- I know I looked
16 back to see if this -- see, I had this fellow
17 work for me ten years ago.
18     Q.  You had what fellow?
19     A.  This Don Edwards work for me.
20     Q.  Okay.
21     A.  And we hired him and sent him out
22 on a job, and he worked like one day and said
23 he couldn't go back.  Then we, you know,

Page 58

1  left -- we called him, and he called in a
2  couple times.  We offered him work, and he
3  refused it.
4      So I was interested in this how
5  after the service he was never unemployed for
6  more than six weeks.  You know, I don't think
7  that's correct.
8      Q.  Let me back up a little bit.  So
9  when you read -- when you talked to your
10 attorney -- or when you read and signed this
11 document, did you -- you did check some
12 documents to check to see if these dates were
13 correct?  Is that what you are testifying that
14 you did?
15     A.  I know I checked to see if he had
16 worked any other time.
17     Q.  What documents did you check?
18     A.  The old system we used to have,
19 which was a card system.
20     Q.  Okay.  Do you still have that card
21 system?
22     A.  I don't think it's there anymore
23 either.  We quit using it in '91.  We still had

Page 59

1  it there, and it went by with the rest of it as
2  far as I know.
3      Q.  Let me say something.  You signed
4  this document in May of 2007, which was this
5  year; is that correct?
6      A.  Yes.
7      Q.  Are you telling me that --
8      A.  If I dated it May, yeah.
9      Q.  Are you telling me that before you
10 signed this document, you checked a card system
11 at your office to see when Donald Edwards had
12 applied?
13     A.  His name sounded familiar to me,
14 and I wanted to look back to see if he had ever
15 worked for us.
16     Q.  So are you testifying that this
17 card system existed in around the time of May,
18 2007?
19     A.  Oh, no.  I got it when I got this
20 out.  I wanted to see it.
21     Q.  You wanted to see what?
22     A.  I wanted to see if there was a
23 card.  I don't -- we don't look at those

Page 60

1  anymore ever.
2      Q.  Where are these cards?
3      A.  Well, I think we shredded them.  I
4  had --
5      Q.  Okay, Ms. Nunlist.  My question --
6      A.  I don't know.
7      Q.  My question is, how could you have
8  looked at it around the time of this
9  declaration?  I don't mean to be argumentative.
10 I'm just trying to understand what you are
11 testifying to.  How could you have looked at it
12 if it had already been shredded?
13     A.  I went to see if there were any
14 old cards left anywhere, and we had one section
15 that was filled with these cards, and I had his
16 in there.
17     Q.  You have one section of cards that
18 still existed?
19     A.  One section of cabinets.
20     Q.  Okay.  Do those cards still exist
21 today?
22     A.  Yes, I imagine they do.
23     Q.  When did you go look at those

Page 61

1  cards?
2      A.  When this came in, I guess.
3      Q.  Are you --
4      A.  The first I heard of this lawsuit
5  I did.
6      Q.  When was the first time you heard
7  of this lawsuit?
8      A.  That I don't know.
9      Q.  So are you testifying that when
10 you heard of this lawsuit, you went to look at
11 this one section of cards that still exists --
12     A.  I went to see if that card was
13 there, if anything existed there.
14     Q.  Did you find that card there?
15     A.  Yes, I had it.
16     Q.  Do you know where that card is
17 right now?
18     A.  Someone has it.  I think Richard
19 might have given it to AK.  I'm not sure.  But
20 it showed we hired him classified.  That's the
21 highest rating we can give an employee.  He had
22 a real clean -- a real good attitude.  He just
23 wasn't real ambitious to work at that time.

16 (Pages 58 to 61)

FREEDOM COURT REPORTING

Page 62

1  Maybe it took him ten more years to get ready,
2  but --
3     Q.  You are speculating about what he
4  was doing in the meantime; is that true?
5     A.  Yeah, I just wondered.  And there
6  might be something on that card of where he
7  worked.
8     Q.  All right.
9         MS. DONAHUE:  We would like to
10 have a copy of this card.
11    Q.  In paragraph three, if you look on
12 page two, this last sentence that starts out on
13 September 10, 2006, Richard Nunlist sent Rusty
14 Johnson an E-mail, do you know who Rusty
15 Johnson is?
16    A.  No.
17    Q.  Who told you about this E-mail?
18    A.  Richard.
19    Q.  Did you see this E-mail?
20    A.  No.
21    Q.  You never saw it?
22    A.  (Witness shaking head from side to
23 side.)

Page 63

1     Q.  Did Richard tell you that Rusty
2  Johnson had sent it to you -- sent it to him?
3     A.  Yeah, Richard told me he sent him
4  an E-mail.  I knew that.
5     Q.  Did you know what the content of
6  the E-mail was?
7     A.  No.
8     Q.  Your declaration states that --
9  states what the content of the E-mail is; is
10 that correct?
11    A.  Uh-huh.
12    Q.  It states that it confirmed that
13 you did not accept applications from Donald
14 Edwards; is that correct?
15    A.  Yes.
16    Q.  How could you have --
17    A.  Came in to register on
18 January 29th, and we were --
19    Q.  No.  Just a minute.  I'm going
20 back to paragraph three, and I'm asking you,
21 you told me just a second ago, and I just want
22 to clarify this, I just want to understand, all
23 right, you said that you did not know the

Page 64

1  content of that E-mail; is that correct?
2     A.  Yes.
3     Q.  All right.  But your declaration
4  indicates that you did know the content of the
5  E-mail; is that correct?  I'm looking on
6  paragraph three, at the top of the page, at the
7  very top of the page, the last sentence in
8  paragraph three.  Okay?
9     A.  About accepting the application?
10    Q.  No, I'm looking -- look on
11 paragraph three, the last sentence of that
12 paragraph at the top of page two.  You are on
13 the right page, right there.
14    A.  Okay.
15    Q.  The sentence that starts on
16 September 10th.  Could you read that to me,
17 please?
18    A.  On September 10th, 2006, Richard
19 Nunlist sent -- I guess I did see that.  I'm
20 not real steady right now.  But I read this, so
21 I did know it somewhere in the back of my head.
22    Q.  Did you -- so now you are changing
23 your testimony to say you did read the E-mail

Page 65

1  that Richard got --
2     A.  Well, I had to.
3     Q.  Why do you say that?
4     A.  Because I usually read everything
5  that goes out of there, number one, and, number
6  two, I just -- I have a bad memory right now.
7     Q.  Did you have a bad memory in May
8  of 2007 when you signed this declaration?
9     A.  Uh-huh.  Well, you know, at times
10 I don't, at times I do.  I have a lot of
11 trouble with numbers.
12    Q.  Okay.  In May of 2007 when you
13 signed this declaration, were you living in
14 Florida?
15    A.  Yes.  In May?
16    Q.  Yes.
17    A.  Yes.
18    Q.  And how was your health in May of
19 2007, which was earlier this year, May of this
20 year?
21    A.  Stage four.
22    Q.  I'm sorry.  I'm sorry.  I have to
23 ask you because --

17 (Pages 62 to 65)

Page 66

1   A.   I know. It just upsets me.
2   Q.   Yeah, I'm sure. And I'm sorry.
3   But I need to understand what's going on.
4   A.   My health wasn't any better then.
5   Q.   It wasn't any better then? Okay.
6   A.   It's been like this probably a
7   year and a half.
8   Q.   Okay.
9        MR. ROGERS: Let me take a break.
10  I want to see you out in the hall.
11       (Recess taken.)
12  Q.   Mary Jane, I'm really sorry.
13  Maybe I just have a couple more questions.
14  A.   That's all right. I know. It's
15  your job.
16  Q.   I'm sorry.
17  A.   You have got to ask what you have
18  got to ask.
19  Q.   I just want to ask one more
20  question, or just a couple more questions about
21  your declaration, then we will be finished, and
22  that is in paragraph five, do you see the
23  sentence that starts our records show that

Page 67

1   Donald Edwards came in to register with Palmer
2   Temps? Do you see that sentence?
3   A.   (Witness nodding head up and
4   down.)
5   Q.   Could you read that sentence for
6   me?
7   A.   That Donald Edwards came in to
8   register January 29th and completed this
9   registration on February the 6th. That's part
10  of this registration. He took the Palmer Temps
11  test or evaluation at our Roosevelt office, or
12  Roosevelt Boulevard location.
13  Q.   I have one question about that.
14  You say that he came in on January 29th and
15  completed his registration on February 6th. In
16  paragraph --
17  A.   They had to schedule him probably
18  to come in for an appointment.
19  Q.   In paragraph two of your
20  declaration, you said that you completed the
21  job of taking applications for AK Steel prior
22  to January 29th; is that correct?
23  A.   Yes.

Page 68

1   Q.   Mary Jane -- you have asked me to
2   call you Mary Jane -- I have asked your
3   attorney to withdraw this declaration from this
4   lawsuit, because I feel like when you signed
5   it, you weren't certain about these statements
6   that you made here, and I don't think you are
7   certain about them today. And you testified
8   that you were just as ill in May as you are
9   today. And you are having a difficult time
10  remembering things; is that correct?
11  A.   Yes.
12       MS. DONAHUE: So I would just make
13  my request that you withdraw this declaration
14  from this lawsuit, because Ms. Nunlist has
15  testified that she could not remember these
16  dates now, she can't -- she couldn't remember
17  them at the time she signed it.
18       MR. ROGERS: Well, I told you I
19  will take your request under consideration.
20       MS. DONAHUE: All right.
21       MR. ROGERS: She did testify that
22  back in May, she was feeling better.
23       MS. DONAHUE: I don't believe that

Page 69

1   was her testimony. I'm sorry. I don't want to
2   argue about that. We are requesting that they
3   withdraw this declaration based on your
4   testimony here, and I'm really sorry to have to
5   bring you to the deposition to ask you
6   questions about it, but we just had no idea,
7   you know, what this was about, and we needed to
8   find out.
9        THE WITNESS: I don't know either.
10       MS. DONAHUE: Okay. Then we
11  will --
12       THE WITNESS: I just don't
13  understand why this is even going on, how I
14  even got involved. You know, we have never
15  tested anybody in our office with an AK test
16  ever.
17       MS. DONAHUE: Okay. Well, I
18  appreciate you coming and making this effort,
19  and I'm sorry that it was difficult for you.
20       THE WITNESS: Heck, I ought to
21  stay while I'm here.
22       MS. DONAHUE: So we are adjourning
23  the deposition.

18 (Pages 66 to 69)

Page 70
1  MR. ROGERS: Okay.
2  (Thereupon, signature was waived.)
3  (Thereupon, the deposition was
4  adjourned at 11:21 a.m.)

Page 72
1  IN WITNESS WHEREOF, I have hereunto set
2  my hand and seal of office at Dayton, Ohio, on
3  this _ _ _ _ day of _ _ _ _ _ _ _ _, 2007.
4
5         _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
       KAREN M. RUDD
6      NOTARY PUBLIC, STATE OF OHIO
       My commission expires 5-21-2012

Page 71
1  STATE OF OHIO       )
2  COUNTY OF MONTGOMERY ) SS: CERTIFICATE
3         I, Karen M. Rudd, a Notary
4  Public within and for the State of Ohio, duly
5  commissioned and qualified,
6         DO HEREBY CERTIFY that the
7  above-named MARY JANE PALMER NUNLIST, was by me
8  first duly sworn to testify the truth, the whole
9  truth and nothing but the truth.
10        Said testimony was reduced to
11 writing by me stenographically in the presence
12 of the witness and thereafter reduced to
13 typewriting.
14        I FURTHER CERTIFY that I am not a
15 relative or Attorney of either party, in any
16 manner interested in the event of this action,
17 nor am I, or the court reporting firm with which
18 I am affiliated, under a contract as defined in
19 Civil Rule 28(D).