UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION


- - - - - - - - - - - - - - - -
VIVIAN BERT, et al.,            :
                               :
        Plaintiffs,            :
    vs.                        :    Case No. C-1-02-467
                               :     (Mag. Judge Hogan)
AK STEEL CORPORATION,          :
                               :
        Defendant.             :
- - - - - - - - - - - - - - - -


        Deposition of:   VIVIAN D. BERT

        Taken:           By the Defendant

        Date:            Tuesday, April 24, 2007

        Time:            Commencing at 1:15 PM

        Place:           Taft, Stettinius & Hollister
                         1800 US Bank Center
                         425 Walnut Street
                         Cincinnati, Ohio  45202-3957

        Before:          Tracy L. Allen, RPR
                         Notary Public - State of Ohio

```
 1    APPEARANCES:

 2        On behalf of the Plaintiffs:

 3            Susan Donahue, Esq.
             Wiggins, Childs, Quinn & Pantazis
 4            The Kress Building
             301 Nineteenth Street North
 5            Birmingham, Alabama  35203
             Phone:  (205) 314-0592
 6
             David D. Kammer, Esq.
 7            Tobias, Kraus & Torchia
             911 Mercantile Library Building
 8            414 Walnut Street
             Cincinnati, Ohio  45202
 9            Phone:  (513) 241-8137

10        On behalf of the Defendant:

11            Patricia Anderson Pryor, Esq.
             Taft, Stettinius & Hollister
12            1800 US Bank Center
             425 Walnut Street
13            Cincinnati, Ohio  45202-3957
             Phone:  (513) 381-2838
14
      Also present:
15
      Tracy White - AK Steel.
16

17                        - - -

18

19                      I N D E X

20        Cross-Examination by Ms. Pryor......Page   4

21        ReDirect Examination by Ms. Donahue.Page  99

22

23                        - - -

24

25
```

```
 1                    E X H I B I T S

 2              Exhibit No.           Marked

 3          Defendant's Exhibit 1 ......    7

 4          Defendant's Exhibit 2 ......   20

 5          Defendant's Exhibit 3 ......   37

 6          Defendant's Exhibit 4 ......   40

 7          Defendant's Exhibit 5 ......   48

 8          Defendant's Exhibit 6 ......   51

 9          Defendant's Exhibit 7 ......   53

10          Defendant's Exhibit 8 ......   69

11          Defendant's Exhibit 9 ......   70

12          Defendant's Exhibit 10 .....   70

13          Defendant's Exhibit 11 .....   83

14          Defendant's Exhibit 12 .....   97

15

16                       - - -

17

18

19

20

21

22

23

24

25
```

```
 1                      VIVIAN D. BERT
 2     being by me  first  duly cautioned and sworn, deposes
 3     and says as follows:
 4                      CROSS-EXAMINATION
 5     BY MS. PRYOR:
 6              Q.    Ms. Bert, would you state your full
 7     name for the record.
 8              A.    Vivian Delois Bert, B-e-r-t.
 9              Q.    And did you formerly go by Vivian
10     Pryor?
11              A.    Yeah.
12              Q.    And are those married names?
13              A.    Yeah.  Married names.
14              Q.    What's your maiden name?
15              A.    Vivian Delois Roberts.
16              Q.    Okay.  When were you married the first
17     time to Mr. Pryor?
18              A.    If I can recall --
19              Q.    I like that name, by the way.
20              A.    Thank you.  Let me see.  It was so
21     long ago.
22              Q.    Just roughly.
23              A.    February 1975.  I think it was
24     February 1975.  Uh-huh.
25              Q.    Until when?
```

```
 1              A.   The year 1985.
 2              Q.   How did that marriage end?
 3              A.   Divorce.
 4              Q.   And then did you get married again?
 5              A.   Yes.
 6              Q.   When did you get married again?
 7              A.   It would have been November of 1985.
 8    No, I take that back.  I'm sorry.  We were married in
 9    '88.  And that ended.  He's deceased.
10              Q.   Oh, I'm sorry to hear that.
11              A.   1997.
12              Q.   Sorry to hear that.
13              A.   Thank you.
14              Q.   Ms. Bert, do you take any medication?
15              A.   No.
16              Q.   Didn't take any today?
17              A.   No, I didn't take any today.
18              Q.   And you normally don't take any?
19              A.   No.
20              Q.   Any reason that you wouldn't be able
21    to truthfully answer my questions today?
22              A.   No reason.
23              Q.   No reason that you wouldn't be able to
24    recall or memory issues?
25              A.   No reason.
```

```
1              Q.   Okay.  You worked for Armco --
2              A.   Yeah.
3              Q.   -- at one point?
4              A.   I did.
5              Q.   That was between February 1982 through
6     about September 1984?
7              A.   Somewhere about that time.
8              Q.   What did you do for Armco?
9              A.   General laborer.  At the time when I
10    worked there, and, oh, I guess about a few months
11    later I was able to acquire a position.  It was still
12    an hourly position, but it was clerical in the same
13    department for the -- I think it was called the
14    boilerhouse or powerhouse.
15             Q.   Okay.
16             A.   Department.
17             Q.   And that was all within the, roughly,
18    two-year period.
19             A.   Yes.
20             Q.   1982 through 1984.  What happened to
21    your employment there?
22             A.   Laid off.
23             Q.   Do you know why you were laid off?
24             A.   No.  I do believe when I tried to find
25    out, I don't know if they were just, per se,
```

1    downsizing, but I think that might have been the

2    reason, that they were downsizing at the time.

3              Q.    Were a lot of other people laid off

4    about the same time?

5              A.    I didn't see them at the time.  I know

6    when I went out -- you know, when you go file for

7    unemployment, I didn't ask that question then, but

8    when I got laid off there was no one that went out

9    with me that day.

10                                  (Defendant's Exhibit 1
                                    was marked for identi-
11                                  fication.)

12             Q.    Okay.  You've been handed what's been

13   marked as Exhibit 1.  I apologize for the bad copy.

14             A.    Oh, that's all right.

15             Q.    Is this a letter you received?  It

16   looks like at the top is October 15th, 1986 date.

17             A.    Okay.  Okay.  I may have gotten it.  I

18   don't remember.

19             Q.    Okay.

20             A.    Because it's been so long.

21             Q.    Sure.  It's your understanding,

22   though, that after a two-year period beyond layoff

23   that employment was terminated?

24             A.    Yes.

25             Q.    And since 1986 have you worked for

1    either Armco or AK Steel?

2              A.    No.

3              Q.    What have you done since 1984?

4              A.    1984?

5              Q.    After you were laid off from AK Steel.

6              A.    1984.  After that I worked for myself

7    mostly.  Like I did like a laundry cleaning service.

8    And home health care.  I done that.  After 1984 I've

9    also worked at General Electric in Cincinnati.  And

10   I've also been a general manager for a dry cleaners

11   and a Laundromat.

12             Q.    What was the name of that?

13             A.    C and E Computers, but the Laundromat

14   was Chip's Laundry Service, but it was under C and E

15   Computers at that time.

16             Q.    Anything else?

17             A.    I think that's about all.  Maybe

18   baby-sitting or something like that.

19             Q.    Just kind of walk through these.  If

20   you remember something else, please let me know.

21             A.    All right.

22             Q.    You said you did kind of a laundry

23   cleaning service.

24             A.    Uh-huh.

25             Q.    That was your own business?

```
 1              A.    Yes.
 2              Q.    What did you do for that?
 3              A.    Just general cleaning of a Laundromat
 4    at night, in the evening, seven days a week, after
 5    hours.
 6              Q.    So you would clean the Laundromat?
 7              A.    Uh-huh.  After hours.
 8              Q.    Kind of an independent contractor?
 9              A.    No.
10              Q.    How would you get paid for that?
11              A.    He paid me by check.  Chip's Laundry
12    did.
13              Q.    Were you an employee of Chip's
14    Laundry?
15              A.    Well, yeah.  I guess so.  It was
16    always an employee for him.  I did it -- I tried to
17    start my own business, but that didn't work out, so I
18    basically just worked for him.
19              Q.    Do you know how much you got paid?
20              A.    Then it was like $100 a week.
21              Q.    Do you know what period of time you
22    did that?
23              A.    From maybe 2001 to sometime in 2003 or
24    '4.
25              Q.    And that was seven nights a week?
```

1       A.    Yeah.  Not a day off.

2       Q.    How long --

3       A.    Every now and then you got a day off

4    if you can get somebody to take your place.

5       Q.    How long would it take you to clean?

6       A.    Oh, just two hours.

7       Q.    And did it ever increase from $100 a

8    week?

9       A.    No.

10      Q.    Then you mentioned home health care.

11      A.    Yeah.

12      Q.    What's that?

13      A.    It was a young lady that I took care

14   of about four or five days a week.  She had multiple

15   sclerosis and so I just did in-home health care for

16   her.  It was just one individual.

17      Q.    Okay.

18      A.    That I stayed with for about three or

19   four years.

20      Q.    What period of time was that?

21      A.    That was in -- might have been around

22   2001, also, along with the Laundromat job, until

23   about 2003 or '4.

24      Q.    How much did you make for that?

25      A.    About two-twenty, two-twenty-five,

```
 1    something like that, a week.  Either a week or every
 2    two weeks.  It was one or the other.
 3               Q.    What did you do for her?
 4               A.    Just took care of her all day.  You
 5    know, medications, bathing, food, feeding.  I also
 6    went with them when they went to the doctor.  Things
 7    like that.  Just general health care.
 8               Q.    Do you have any health care
 9    experience?
10               A.    I worked in a nursing home at one
11    time, but that was way before 1984.
12               Q.    Okay.
13               A.    For a period of time.
14               Q.    Why did you stop doing the laundry
15    cleaning service?
16               A.    Because I got hired back at General
17    Electric.  After 12 years.
18               Q.    And what about the home health care?
19               A.    I didn't do that any more, either.
20               Q.    Was that also because of getting
21    hired?
22               A.    Yes.
23               Q.    And General Electric, when did you
24    work for them?
25               A.    Started in General Electric in 1984.
```

```
 1    I got laid off in 1993.
 2            Q.    What did you do for General Electric
 3    during that time?
 4            A.    Shipping and receiving, aircraft
 5    engine assembly.
 6            Q.    Are those two different jobs?
 7            A.    Uh-huh.
 8            Q.    What did you do in shipping and
 9    receiving?
10            A.    We just, generally, just shipped
11    aircraft engines and other parts to different
12    aircraft locations, like Boeing or Wilmington or
13    other places like that.
14            Q.    Did you do paperwork for that?  Did
15    you --
16            A.    Yeah, we did paperwork.
17            Q.    Did you actually box up?
18            A.    Yeah.  Packaging, correct.  Packaging.
19    We had to package all day.  We had to foam pack a lot
20    of engine parts.
21            Q.    What about the aircraft engine
22    assembly, what did you do there?
23            A.    We just assembled the engines.  All
24    general engine assembly.
25            Q.    How long did you work at the assembly
```

```
 1   part?
 2            A.   I did that, well, right before I got
 3   laid off, so I wasn't over there for very long.  For
 4   only a few months.
 5            Q.   The rest of the time you were in
 6   shipping and receiving?
 7            A.   Uh-huh.
 8            Q.   You said that you've been recently
 9   hired back?
10            A.   Uh-huh.
11            Q.   Are you still there currently?
12            A.   Yes.
13            Q.   When did you get hired back?
14            A.   July of 2005.
15            Q.   And is that a full-time position?
16            A.   Yes.
17            Q.   And how much do you make there?
18            A.   An hour?
19            Q.   Sure.
20            A.   We make now $24 an hour.
21            Q.   And you said it is full time.  Is that
22   40 hours a week?
23            A.   Sometimes if there's no overtime.
24   Well, we do get overtime sometimes.
25            Q.   Have you received any raises at
```

```
 1    General Electric since July 2005?
 2              A.    You get your cost of living.  I've
 3    gotten one since I've been there.  Like maybe five
 4    cents, something like that.
 5              Q.    What about benefits?  Do you have
 6    benefits at General Electric?
 7              A.    Yes.
 8              Q.    What kind of benefits do you have?
 9              A.    You have your health benefits.  Have
10    those.
11              Q.    How much do you pay for health
12    insurance?
13              A.    A month for me and my son, I think
14    it's $20 a month.
15              Q.    How old is your son?
16              A.    I take that back.  It's $11 a week
17    between the both us, so that's $22 a week.  That's
18    how they take that out.  They take it out every week.
19    $11 for me and $11 for him.
20              Q.    So it's $22 a week?
21              A.    Uh-huh.
22              Q.    Okay.  And how old is your son?
23              A.    13.
24              Q.    Any other benefits that you have at
25    General Electric, like life insurance?
```

1          A.    Yes, we have that.  We have life
2    insurance.
3          Q.    Do you have dental?
4          A.    We have dental.
5          Q.    Do you pay for either of those?
6          A.    Yes.  The dental is, per week, I think
7    it's 11 per week for the both of us, apiece.
8          Q.    And like a long-term disability
9    insurance?
10         A.    We have that, too.
11         Q.    Do you pay for that?
12         A.    I pay into that.  That's based on your
13   percentage of your salary.  So it could vary from
14   week to week.
15         Q.    And do you have any kind of profit
16   sharing or stock?
17         A.    They have profit sharing but I'm not
18   in it yet.
19         Q.    Anything else that you can think of?
20         A.    I can't think of anything else.
21         Q.    Then you mentioned that you were a
22   general manager for C and E Computers.
23         A.    It was for -- they at the time owned,
24   had ownership in the dry cleaners so that's who I
25   worked through.

1          Q.    So that's the same thing you were
2    already telling me about.
3          A.    Yes.
4          Q.    From 2001 to 2003.
5          A.    Uh-huh.
6          Q.    Okay.  Did you work for the Oklahoma
7    Department of Transportation at one point?
8          A.    Yes.  I lived there for about four
9    years.  That was in -- that's after I got laid off.
10   My husband and I, the one that passed away, that's
11   where we moved to.
12         Q.    That was roughly between May 1994 to
13   July 1996?
14         A.    Yeah.  I think.
15         Q.    Does that sound about right?
16         A.    Uh-huh.
17         Q.    Why did you leave there?
18         A.    I left there because my husband had
19   gotten sick.  Well, he had gotten really bad.  And at
20   the time we left there getting ready to come back to
21   Ohio, but he got too sick to do that and he passed
22   away there in Oklahoma.
23         Q.    And then did you also work at the
24   postal service?
25         A.    Uh-huh.

17

```
 1              Q.    Where was that at?
 2              A.    In Middletown.
 3              Q.    And I've got from like February '97 to
 4    February '99.
 5              A.    Yeah.
 6              Q.    Sound about right?
 7              A.    Uh-huh.
 8              Q.    You were a mail carrier?
 9              A.    Uh-huh.
10              Q.    Delivered to the houses?
11              A.    Uh-huh.
12              Q.    How much --
13              A.    Per hour?
14              Q.    How much did you make an hour there?
15              A.    Then it was about $12 an hour.
16              Q.    Why did you leave that job?
17              A.    I left -- I think at the time I left
18    that my son was younger and I -- I'm trying to
19    remember.  I think I left there to go and work in the
20    school system with him.
21                    I think he might have been in third or
22    fourth grade, something like that.  So I left to
23    spend more time with him, because he was having a lot
24    of hard problems, especially after his father passed
25    away.
```

```
 1              So to spend more time with him I went
 2    to the school system, but it was mostly on a
 3    volunteer basis.  Not a pay basis.
 4         Q.   More to spend time with him.
 5         A.   Right, right.  And I was there just
 6    about every day, helped out in school, helped out
 7    with reading with the children, but I was with him a
 8    lot.
 9         Q.   About how long was it, just that third
10    grade year?
11         A.   Yeah, it was third and fourth.
12         Q.   Third and fourth?
13         A.   Third, fourth and fifth.  I did that
14    for a few years.
15         Q.   And how old is he now?
16         A.   He's 13.
17         Q.   Did you work at Burns Security at some
18    point?
19         A.   Yes.  I did that, too.  I did that for
20    about a year or so.  That before 2001.
21         Q.   Yes.  About February '99 to May 2001?
22         A.   Yeah.  I did that for a while.  That
23    was an evening job.  And all we did was we did
24    security for -- it was just a post where you sat
25    where trucks came through at Procter and Gamble and
```

1    we just logged them in and out.

2              Q.    Now, was that before or after you did

3    the volunteering period?

4              A.    That was after.

5              Q.    Okay.  How many words can you type per

6    minute?

7              A.    Roughly, at the time, 60.

8              Q.    When you say "at the time", what time

9    was that?

10             A.    When I worked at Armco before.  When I

11   had to type it was 60 words a minute then.  I don't

12   have to do it as much now because my job doesn't

13   require me to do that, though, I do use a computer

14   every day, but I don't have to use it like that, but

15   I believe I could still do the same thing.

16             Q.    Have you had any other kind of --

17   after Armco have you had a similar typing job since

18   then?

19             A.    Burns Security we did a lot of typing

20   because we had to log the trucks in and out, so we

21   did a lot of reports and typing on that.  I don't

22   recall a whole lot of anything else.

23             Q.    Okay.

24             A.    Oh, I take that back.  When I was

25   general manager I had to do a lot of that, for the

```
 1    dry cleaners.  So a lot of reports and things and
 2    payroll, so I did a lot of that then, too.
 3              Q.    Now, are you related to Allen Roberts?
 4              A.    Yes.
 5              Q.    How are you guys related?
 6              A.    Brother.
 7              Q.    What about Shawn Pryor?
 8              A.    That's my son.
 9              Q.    Oh.  That's your 13-year-old?
10              A.    No.  That's my oldest.
11              Q.    Oh, okay.
12              A.    I have two sons.
13              Q.    Okay.  How old is Shawn, the older?
14    I'm assuming you didn't name them both Shawn.
15              A.    Shawn is 32.
16              Q.    Now, you filed a charge of
17    discrimination back in April 2000?
18              A.    Uh-huh.
19                              (Defendant's Exhibit 2
                                was marked for identi-
20                              fication.)
21              Q.    You've been handed what's been marked
22    as Exhibit 2.
23              A.    Okay.
24              Q.    Is that a copy of the charge you filed
25    back in April of 2000?
```

```
 1              MS. DONAHUE:  Look through it all
 2         before you answer.
 3              THE WITNESS:  All right.
 4         A.    This is my signature.  Yes.
 5         Q.    Is that your charge?
 6         A.    Yes.
 7         Q.    Why did you file the charge?
 8         A.    At the time I filed the charge because
 9   I could not understand why I was not rehired or hired
10   after I had worked there before with no bad job
11   record, no felony charges, I was very well qualified
12   for the job, and I could not understand why I could
13   not be rehired.
14         Q.    Any other reason why you filed the
15   charge?
16         A.    At the time, also, a lot of people
17   that I had run into were being hired.  Of course they
18   were not of my color, that I remember, that told me
19   that they were -- some of them got their jobs back.
20   But I was not one that got mine back.  But they were
21   not of color.
22         Q.    Now, who are these people that told
23   you --
24         A.    They were friends of mine that -- I
25   mean, I don't know if I have to name names or not.
```

```
 1              Q.   If you have names of people, I'd like
 2      the names of people who told you they were rehired.
 3              A.   Let me see if I can remember.  I can
 4      remember first names, but not last names.
 5              Q.   What are the first names that you
 6      remember?
 7              A.   Dan is one.
 8              Q.   I'm sorry?
 9              A.   Dan is one name.
10              Q.   Dan?
11              A.   Yes.  I can remember first name.
12      Another one is Mike.  There's some more.  I can
13      remember first name.  Dan, Mike and there's another.
14      Sam is another, but I don't remember last names.  But
15      they were hired at the time -- they had worked there
16      before and gotten rehired.  I didn't get rehired.
17              Q.   Do you know what --
18              A.   After I applied.
19              Q.   Do you know what period of time they
20      worked there?
21              A.   They must have went in -- I don't know
22      if it was after 2000.  I can't really recall since
23      it's been so long since I've seen them.  At the time
24      all I know is I was angry because I couldn't get a
25      job back, but I'm trying to remember when.  I know
```

```
 1    when I was applying in 1999.  It had to be right
 2    before 1999 when I saw them.
 3              Q.    Saw all three of them together, or --
 4              A.    No, no, no.  On different occasions,
 5    like in a grocery store or something like that.
 6              Q.    How do you know Dan?
 7              A.    Dan I met when I worked there.  I met
 8    Dan and I worked -- I met him there, but he didn't
 9    work with me.
10              Q.    Okay.
11              A.    Sam -- Sam lived -- I'm trying to
12    remember.  I worked with Sam.
13              Q.    At AK?
14              A.    Yeah.  And it was Armco then.
15              Q.    I'm sorry.
16              A.    And then Mike.  I met Mike.  I met
17    Mike when my son played baseball.  His son and my son
18    was on the same baseball team.  Now, that's how I
19    remember Mike.  But they had all worked there.  Now,
20    whether they work there now I don't know because I
21    haven't seen them in a long time.
22              Q.    Now, when you said that Dan worked
23    there when you worked there.
24              A.    Uh-huh.
25              Q.    Do you know if he was ever let go from
```

1     there?

2                A.    I don't know.  I don't know.

3                Q.    So you don't know if he was ever let

4     go and then rehired.

5                A.    I don't know.

6                Q.    What about Mike, did he ever work

7     there?

8                A.    Yes.

9                Q.    When did he work there?

10               A.    Now, Mike all I met, like I said,

11    through my son and playing baseball and his kid, but

12    I don't -- he had been there a long time.

13               Q.    Which son?

14               A.    Malique.

15               Q.    That's your younger son?

16               A.    Uh-huh.  That's the 13-year-old.

17               Q.    So that's in the last probably ten

18    years at least.

19               A.    Yeah.  Yeah.

20               Q.    And he'd been there a while when you

21    talked to him.

22               A.    Yeah.  He might have been.  I don't

23    know.  I never asked.

24               Q.    And you don't know if he was ever

25    there and let go.

```
 1              A.    Let go or not.  I don't know.
 2              Q.    What about Sam, do you know when he
 3        worked there?
 4              A.    No.
 5              Q.    Do you know if he was ever let go and
 6        then rehired?
 7              A.    I don't know.
 8              Q.    Okay.  Anyone else that you were upset
 9        about that you knew had been hired that you thought
10        somehow meant that your failure to be hired was
11        discriminatory?
12                    MS. DONAHUE:  Object to the form as
13                    insofar as it calls for a legal conclusion.
14              A.    Let me think a minute.  Nothing right
15        now.  I can't recall.
16              Q.    All right.  Is there anything that
17        would help refresh your memory?
18              A.    I don't know.
19              Q.    Do you keep any notes?
20              A.    No, I didn't keep any notes.
21              Q.    Did you keep a journal?
22              A.    No, I didn't keep a journal.
23              Q.    Do you keep a calendar of appointments
24        or anything like that?
25              A.    No.
```

1          Q.    Okay.  When you filed this charge,

2     Exhibit Number 2, did you know that your brother had

3     already filed a charge?

4          A.    No.

5          Q.    You did not?

6          A.    You talking about Allen Roberts.

7          Q.    Yes.  He didn't tell you he filed a

8     charge?

9          A.    No.  I don't remember if he did or

10    not, at the time, if he did it before me or not,

11    because when I did it, at the time when I did it I

12    said, well, I wonder what recourses could I take.  So

13    this is the only recourse I could think of to take,

14    but I can't remember if he did it before I did or

15    not.  I don't know.  I don't remember.

16         Q.    Did you ever talk to Allen about

17    filing a charge?

18         A.    Yeah.  I told him I filed a charge.

19         Q.    What did he say about --

20         A.    He said that's good.  He said that's a

21    start to maybe something being done.

22         Q.    Did he ever tell you anything that he

23    thought was discriminatory or that --

24              MS. DONAHUE:  Object to the form.

25         It's a legal conclusion.

```
 1                    Go ahead.
 2           A.    As far as him being what now?
 3           Q.    Did he ever tell you anything to
 4   support a claim of discrimination?
 5                 MS. DONAHUE:  Object to the form.
 6           Legal conclusion.
 7           A.    All I know is he's been through a lot
 8   of things, but we haven't physically just sat down
 9   and discussed them all, but I know that he filed a
10   charge.
11           Q.    You know he's been terminated from AK
12   Steel?
13           A.    Yes, I do.
14           Q.    Do you know why he was terminated?
15           A.    No, I don't know why.
16           Q.    Did you know he tried to get someone
17   to lie for him?
18                 MS. DONAHUE:  Object to the form.
19                 MR. KAMMER:  Objection.
20                 MS. DONAHUE:  That is really -- no
21           foundation for that.  It's very
22           inflammatory and argumentative.
23   BY MS. PRYOR:
24           A.    I didn't even know that.
25           Q.    Okay.  Did you know he lost his
```

```
 1    arbitration?
 2              A.    No.  I don't know anything about that.
 3              Q.    How often have you talked to him about
 4    this lawsuit?
 5              MS. DONAHUE:  Objection.
 6              Q.    Outside the presence of your counsel.
 7              MS. DONAHUE:  And also just to be
 8              careful, if you and Allen talked about
 9              anything that your lawyers discussed with
10              you, that's also protected by the
11              attorney-client privilege and the work
12              product document.
13              MS. PRYOR:  No.  I don't believe if
14              they were sharing things outside of your
15              presence if they -- they release privilege
16              when they start talking about it with
17              others.
18              MS. DONAHUE:  But if they're talking
19              about things their lawyers asked them to
20              do, things that might reveal the mental
21              impressions of their lawyers, that's work
22              product.
23    BY MS. PRYOR:
24              A.    Allen don't talk to me about those
25    matters.  He just won't.  I mean, we talk, but -- and
```

```
 1   although I don't see him that often, but when it
 2   comes to this he won't talk to me very much about it.
 3              I don't know if it's a thing where he
 4   just doesn't want me to know or doesn't what me to
 5   see the hurt that he's been through.  He just
 6   doesn't -- he doesn't talk to me.  He kind of clams
 7   up.  He doesn't talk to the family much about this at
 8   all.
 9         Q.    Okay.  Did he ask you to join the
10   lawsuit?
11         A.    No, he didn't ask me.  When I heard
12   about it I wanted to be in on the lawsuit because I
13   know I had charges myself.
14         Q.    How did you hear about the lawsuit?
15         A.    We were -- letters had went around the
16   neighborhood saying that if you wanted to come to a
17   meeting to find out your rights to get a job at AK,
18   you come to the meeting.
19              And we went.  And a lot of the
20   neighborhood, a lot of people in the neighborhood
21   came to that meeting.  There was a lot of people
22   there.  I didn't know them all, but there were a lot
23   of people if you wanted to come and find out the
24   reason why you couldn't get a job at AK.
25         Q.    Who was at that meeting?
```

```
 1              A.   It's been so long.  I can't remember
 2    that.  That was years ago.
 3              Q.   Who led the meeting?
 4              A.   I remember where the meeting was,
 5    but --
 6              Q.   Where was the meeting?
 7              A.   In Middletown at -- oh, what's the
 8    name of it?  Let me see.  Let me get it right.
 9                   I can't think of it.  I know her name
10    like the back of my hand.  It was a -- it was a -- it
11    was a hall for underprivileged people, but I can't
12    think of the name of it.  I can't recall the name
13    right now.
14              Q.   That's okay.  Do you know who led the
15    meeting?
16              A.   I can't remember that, either.  It's
17    been so long.  They were lawyers, but I can't
18    remember -- I don't remember the names of them.
19              Q.   Lawyers were there leading the
20    meeting?
21              A.   Yeah, but they weren't leading.  There
22    were some there, but they weren't leading the
23    meeting.
24              Q.   You don't know who was leading it?
25              A.   No.  Some of them worked at AK.  At
```

```
 1    Armco then it was called, if I can remember.  No, it
 2    was AK.  It would have been AK.  That's right, but I
 3    mean, lawyers were present, but lawyers didn't lead
 4    the meeting.
 5              Q.   Was that before or after you filed
 6    this charge?
 7              A.   That was before.
 8              Q.   Did they suggest at the meeting that
 9    you should apply so you can be part of the --
10              MS. DONAHUE:  Object to the form.  If
11              this was a meeting with lawyers, then
12              anything that got suggested or discussed is
13              privileged.
14              MS. PRYOR:  Lawyers were not leading
15              the meeting.
16              MS. DONAHUE:  Lawyers were there.  We
17              don't know.  They might have been seeking
18              legal advice.
19    BY MS. PRYOR:
20              Q.   Were those lawyers representing you at
21    that time?
22              MS. DONAHUE:  That's not the standard.
23              If they were seeking legal advice from
24              lawyers, then that's privileged
25              information.
```

1            A.   After the meeting was over they all

2    sat down and talked to each and every one of us

3    individually.

4            Q.   So after the meeting --

5            A.   Yes.  We all talked.

6            Q.   -- then you'd start talking to

7    lawyers.  During the meeting itself were you seeking

8    advice from the attorneys?

9            A.   They got up and gave their opinions

10   and suggestions.

11           Q.   Why did you go to the meeting?

12           A.   Because I wanted to know some more

13   about the reason why I could not have gotten a job

14   there at AK.  The reasons maybe that would have been

15   behind me not getting a job.

16           Q.   Did anyone -- I'm not asking what the

17   lawyers said, but did anyone else tell you that you

18   should apply?  During this meeting was there

19   instructions for everyone to apply at AK?

20           A.   No.

21           Q.   Was there ever a time when there was a

22   meeting, and I'm not asking what lawyers told you,

23   was there a time when there was a meeting among that

24   group of people where people said let's all go apply?

25           A.   No, I didn't go to a meeting like

```
 1    that.  No.
 2              Q.    Okay.  What did you do after that
 3    meeting?
 4              A.    I don't -- I don't -- I guess we just
 5    waited for a response from our lawyers after that,
 6    from the lawyers that were there.
 7              Q.    Did you end up hiring those lawyers?
 8              A.    No, no.  They weren't hired.
 9              Q.    Did those lawyers ever give you legal
10    advice?
11                    MS. DONAHUE:  Object.
12              A.    Like I said, we discussed things after
13    that, but we weren't given any advice as to what to
14    do.  All I know is I had my EEOC charges and I often
15    wondered what to do after that.
16              Q.    Did you file the EEOC charge after
17    that meeting?
18              A.    I already had mine.
19              Q.    Exhibit 2 was already -- you'd already
20    filed that before that meeting?
21              A.    I believe I did already had charges.
22    Or I filed mine.  I believe so.  Yeah.
23              Q.    Did you draft the language that went
24    in this charge?
25              A.    That's my statement.
```

34

```
 1              Q.   Okay.
 2              A.   Yes, it is.
 3              Q.   Did an attorney draft it for you, or
 4      did you draft that yourself?
 5              A.   No.  That's my statement.
 6              Q.   Did you have an attorney when you
 7      filed this?
 8              A.   No.
 9              Q.   Okay.  Is everything on it true and
10      correct?
11              A.   Yes, it is.
12              Q.   You claim that there was
13      discrimination on several occasions, the latest being
14      on or about August 1999 you submitted applications
15      for employment.
16              A.   Yes, I did.
17              Q.   How many times did you submit
18      applications for employment?
19              A.   I believe I did it roughly four times.
20              Q.   Okay.  And you never received a
21      response back to your applications?
22              A.   No.  I didn't get one.
23              Q.   On any of them?
24              A.   No.
25              Q.   You say that to the best of your
```

```
 1    information and belief the job openings for which you

 2    applied were filled by Caucasian applicants with the

 3    same or lesser qualifications than mine.  Do you know

 4    who filled the job openings?

 5              A.   I don't know who they were, but I had

 6    a friend that worked there in the offices that,

 7    especially on the jobs that I did apply for, and you

 8    can call it hearsay, or what you want to call it, but

 9    they weren't African American.

10              Q.   Who told you that?

11              THE WITNESS:  Do I have to give a

12         name?

13              MS. DONAHUE:  If you know it.

14         A.   Let me see who it is.  Sheila Thomas?

15         Q.   And she worked at AK Steel?

16         A.   She did.  I don't know if she does

17    now, but she did then.

18         Q.   Is she white or --

19         A.   She's black.

20         Q.   What did she tell you?

21         A.   That the jobs that they were filling

22    weren't filled by African Americans.  That they were

23    Caucasian.

24         Q.   When did she tell you that?

25         A.   That at the time, it's been so long
```

1   ago.  When I started applying, which would have been

2   in August of 1999.  I waited and didn't hear

3   anything.  I might have seen her later on in the

4   year.  Maybe in 2000, something like that.

5                   And she just told me that they

6   weren't -- that a lot of them that were coming in the

7   door weren't black.  That they were mostly Caucasian.

8   Not many of them were black, if there were any.  I

9   don't even remember telling me if there were any, but

10  like I said, she was in the -- I don't know if she

11  was in security.  So she got around quite a bit.  I

12  think she was in security.  I do believe that's what

13  she did.

14          Q.   Other than her telling you that, any

15  other way that you know who received jobs?

16          A.   No.  That would only have been through

17  word of mouth.

18          Q.   You say that "I believe AK Steel

19  favors Caucasians over minorities in its hiring

20  policies and practices."  What causes you to believe

21  that?

22          A.   I guess because, for one, I didn't get

23  a job, another job anyway, get back there.  And

24  mostly I guess from word of mouth from everyone that

25  I would have run into or talked to that either were

1    already working out there or had gotten a job there.

2                    And most of the people that I guess I

3    knew were Caucasian.  Some of the ones that had the

4    jobs there or that had gotten a job.

5                    There are some people now where I work

6    at GE who left AK to come work at GE.  They were all

7    Caucasian.  They weren't -- just about four or five

8    of them.  They left there.

9                    When we were sitting in the -- during

10   the hiring process people would sit around and they

11   talk, and some of them were saying that, I don't know

12   by name, but some of them were saying that they left

13   AK to come, but none of them were African American.

14   They were white.

15           Q.   You said that they left AK to come to

16   GE?

17           A.   Yeah.  It was about four or five of

18   them, yeah.  We were sitting in a room waiting to go

19   in and take our physicals.

20                             (Defendant's Exhibit 3
                               was marked for identi-
21                             fication.)

22           Q.   You've been handed what's been marked

23   as Exhibit 3.  Have you ever seen this document

24   before?

25           A.   It's been so long I can't remember,

```
 1    but I don't know.  I don't remember, but --
 2             Q.   If you could just read through it and
 3    let me know if --
 4             A.   Okay.
 5             Q.   -- those are correct statements that
 6    you might have told someone.
 7             A.   If I did, she messed this up here
 8    where it says I worked there before.  It was in '82
 9    and '84.  That's wrong.
10             Q.   Right.
11                  (Mr. Kammer left the deposition
12             hearing room.)
13             A.   It's true, I did replace somebody who
14    was retiring.  They have the dates wrong.
15             Q.   Which dates?
16             A.   The '87 and '88.  That's not right.
17             Q.   That's in the second paragraph there?
18             A.   Yeah.  And it's also on the back,
19    also.
20             Q.   Yeah.  Other than the dates, the
21    1987-88 dates, is everything else true to your
22    belief?
23             A.   To my belief that's the way it was
24    when I worked there, yes, but those dates aren't
25    right.
```

1          Q.    Everything else in this statement

2    true?

3          A.    Yeah.  Yeah.  It seems to be.

4          (Mr. Kammer returned to the deposition

5          hearing room.)

6          Q.    Okay.  When you applied you said you

7    applied four times?

8          A.    Yes.

9          Q.    Do you know when those four times

10   were?

11         A.    I think August of 1999, September of

12   2001, April, I believe, of 2002, and May of 2002,

13   because I did twice that year.

14         Q.    All right.  Let's talk about the

15   August 1999 --

16         A.    Okay.

17         Q.    -- one first.  According to this

18   statement here it says that you went to an employment

19   career center on University Boulevard to pick up an

20   application.  Is that correct?

21         A.    Yes.

22         Q.    Is that part of the unemployment

23   services?

24         A.    Well, I thought -- well, they had a

25   career center, because it's right directly in front

1    of where I live at, but it was an AK employment

2    career center and you can go over there and get

3    applications.  It was an office over there.  And you

4    can go get applications and bring them back and turn

5    them in there.

6              Q.    Now, is that part of the state bureau?

7              A.    I thought it was part of maybe AK.

8              Q.    Does it have an AK sign out in front?

9              A.    Yeah.  It just said AK was in the

10   window.  It didn't have an unemployment bureau

11   services sign out there.  It had the AK emblem.

12             Q.    This is on University Boulevard?

13             A.    Yeah.  It was in a little strip mall.

14                             (Defendant's Exhibit 4
                               was marked for identi-
15                             fication.)

16             Q.    You've been handed what's been marked

17   as Exhibit 4.

18             A.    Okay.

19             Q.    Is this something you filled out when

20   you went there?

21             A.    To AK?

22             Q.    To that employment career center.

23             A.    No.  They gave us an application.

24             Q.    Do you know where you filled this out

25   at?

1          A.    This one here (indicating)?

2          Q.    Let me back up.  Did you fill this

3     out, Exhibit 4?

4          A.    Let me see.  It's my handwriting.

5          Q.    Do you know where you filled this out

6     at?

7          A.    No, I don't recall where.  No.  It

8     says unemployment office at the top so I believe it's

9     the unemployment office.  That's what's at the top of

10    it.

11         Q.    You don't know when you filled this

12    out?

13         A.    No.  No.

14         Q.    Do you know why you filled this out?

15         A.    To try to get a job.  I mean, I was

16    applying for employment.

17         Q.    So when you're applying for employment

18    with AK?

19         A.    Uh-huh.

20         Q.    Under the Job Order number it says AK.

21    Is that your handwriting?  It's at the top corner.

22         A.    You mean did I fill out this whole

23    thing?

24         Q.    Did you write AK?

25         A.    Yes.

1          Q.    So is this something you filled out
2     when you were trying to apply for employment with AK?
3          A.    Yes.
4          Q.    Was this filled out when you went to
5     this employment career center?
6          A.    There were like -- you have your --
7     there were three or four sheets of paper on the
8     inside of the application.  See, I can't remember.
9     It's been so long.  I don't know if this is one of
10    the papers or not.
11         Q.    Did you retain a copy of this?
12         A.    I don't have this.
13         Q.    You don't?
14         A.    No.
15         Q.    Did you retain any applications that
16    you completed?
17         A.    If I do, I don't know where they're
18    at.  I did, but I can't find them.
19         Q.    Do you know who else would have, of
20    the plaintiffs, would have had your applications or
21    this document?
22         A.    No, I don't.  I mean, I don't have
23    this one.  No.  I mean we filled them out and turned
24    them in.
25                And I did -- and when you go over

1    there she asks, "Do you have an application?"

2             I said, "Yes."  And then you put it

3    over in the tray.  And nobody came out to talk to you

4    or give you an interview or anything.  She just said

5    put them in the tray.  So that's what we did with

6    them.

7         Q.    Okay.  The people inside there.

8         A.    Uh-huh.

9         Q.    Was it an office?

10        A.    Yeah.  It was an office and it was a

11   desk out front.  And she said, "Are you here to get

12   an AK application?"

13            I said, "No," I said, "I already have

14   one."

15            She says, "Well, if you've already

16   filled it out to the best of your ability, then you

17   put it right here."  So that's what I did.

18        Q.    Do you know if they did anything else

19   with that?

20        A.    No.  We just left.  They was a lot of

21   people in there, but I just put mine there and left.

22   And there were some people sitting in chairs.  I

23   don't know why, but she asked me if I wanted one but

24   I already had one.

25        Q.    Do you know if you could apply for

1      other jobs at this center?

2               A.    No.  I didn't ask.

3               Q.    Okay.  All right.  This career -- what

4      did you call it, an employment career center, is that

5      the place you went for all four of your applications?

6               A.    Yes.

7               Q.    Was it the same procedure for all

8      four; you'd pick up an application there?

9               A.    Yeah.  You can pick one up, yeah.

10     They were out there on the desk.  You could pick them

11     up.

12              Q.    Did you fill them out at home?

13              A.    No.  I took mine home.

14              Q.    You took yours home?

15              A.    Uh-huh.

16              Q.    Completed it and brought it back.

17              A.    And then brought it back.

18              Q.    Did you ever make copies of any of

19     those applications?

20              A.    No.  I regret I didn't do that, but I

21     didn't do that.  I guess I didn't think that I

22     would -- there was no reason to do that.  I guess I

23     didn't think about it.  You turn them in, they ought

24     to get them, but I never thought about making a copy

25     of it.

1          Q.    Do you know if your application ever
2    got to anyone outside of that career center?
3          A.    That's what I was hoping it would, but
4    I don't know if it did or not.
5          Q.    And you didn't talk to anyone from AK?
6          A.    No.
7          Q.    And you never heard anything back from
8    AK?
9          A.    No.
10          Q.    And that's on any of your
11    applications.
12          A.    Unh-unh.
13          Q.    Okay.  On the charge that you filed,
14    Exhibit 2, did you receive what's called a Notice of
15    Right to Sue as a result of that charge?
16          A.    This one here (indicating)?
17          Q.    Yes, Exhibit 2.  Do you remember?
18          A.    I can't remember.  Anything that I
19    ever got from the EEOC of any right to charge, I know
20    I would have filled it out and turned it back in.
21    Anything that I was ever given, I always filled my
22    paperwork out and turned it back in, so I can't
23    remember.  There were so many things we signed then,
24    so I couldn't -- I mean, I just can't recall.
25          Q.    When you say "we" --

```
 1              A.   If that was one of them.
 2              Q.   When you say "we" --
 3              A.   Well, you know, anybody who gets a
 4    charge or whatever, but, I mean, all I know is I
 5    meant myself, whenever I did.
 6              Q.   Were there a group of you that were
 7    filing charges?
 8              A.   I don't know about a group.  I don't
 9    know if anybody else received theirs or not.  I mean,
10    there's other people in the lawsuit, so I'm just
11    imagining and thinking that they would have if they
12    got them.  I mean, if I got anything from the EEOC or
13    anybody, I always filled it out and turned it back
14    in.
15              Q.   Why didn't you file a lawsuit based on
16    this discrimination charge, Exhibit 2?
17              A.   Why did I?
18              Q.   Why did you not?
19              A.   I didn't?  You're saying I didn't?
20              Q.   On Exhibit 2.
21              A.   Yeah.
22              Q.   Yes.  Complained about it in August
23    '99.  Why did you not --
24              A.   This one here (indicating)?
25              Q.   Yes.  Why did you not file a lawsuit
```

```
 1    over the alleged discrimination in August 1999?
 2            A.   No lawyer.  I didn't have a lawyer and
 3    I couldn't afford one, for one thing.
 4            Q.   When did you first get a lawyer?
 5            A.   Well, that would be hard to remember.
 6    I don't know if it was in the year 2000.  It may have
 7    been in the year 2000, but I can't remember.  It may
 8    have been in the year 2000, but I'm not sure.
 9            Q.   Okay.  Why did you continue to apply
10    at AK Steel?
11            A.   I continued to apply for the simple
12    fact I knew I was qualified for a job there.  And I
13    wanted a job there because the money was good.  And
14    it wasn't far from where I lived, also.
15                 So I knew that I could -- I knew that
16    I could get a job there, because I had worked there
17    before.  And I guess with persistence I guess I
18    figured I'd finally get one, but that didn't happen.
19            Q.   I think you said you applied in both
20    April and May of 2002?
21            A.   Uh-huh.
22            Q.   Why did you apply one month after the
23    other?
24            A.   Because I thought if I got as many in
25    there at one time that somebody would eventually get
```

1    one of them.  If I did them back to back, if someone

2    would get it and figure that I was serious about

3    getting a job, that's the reason why I did it back to

4    back.

5                        First thing, then I thought well,

6    maybe they didn't get it.  Maybe it got lost.  So

7    then I went and filled another one out.

8              Q.    And each of those, I may have already

9    asked this, and I apologize, and each of those

10   applications that you testified about you did at this

11   employment place on University Boulevard.

12             A.    Yes.

13                              (Defendant's Exhibit 5
                                was marked for identi-
14                              fication.)

15             Q.    Okay.  You've been handed what's been

16   marked as Exhibit Number 5.  Is that your signature

17   at the bottom?

18             A.    Yes, it is.

19             Q.    And is that your signature on the last

20   page?

21             A.    Yes.

22             Q.    Why did you file this second charge?

23             A.    I filed a second charge because

24   nothing was ever done about me getting a job there,

25   and I felt we had the right to do that with the

```
 1    attorneys that we had.
 2            Q.    Did you have attorneys by the time the
 3    second charge?
 4            A.    Yes.
 5            Q.    Did the attorneys draft the document?
 6            A.    This here?
 7            Q.    Yes.  Exhibit 5.
 8            A.    They're my statements.
 9            Q.    Did you type them?
10            A.    I didn't type them, but they're my
11    statements, but I didn't type them.
12            Q.    And did you sign this on about June
13    10th, 2002?
14            A.    Yes.  Right around there sometime I
15    remember.  I know it was in June.  June or July.
16            Q.    There's the date (indicating).
17            A.    Oh, yeah.  Okay.  I see it.
18            Q.    Is that your date?
19            A.    Yeah.
20            Q.    In section two you state that most
21    recently you applied for a clerical position in April
22    2002.  Now, why didn't you list the May 2002 one?
23            A.    I guess at the time when they were
24    asking when I did this, that was the most recent time
25    I had done it, because it was before May.  So this
```

1    was in April, but they didn't ask for how many.  I

2    had just recently applied.

3              Q.   But you signed this in June, which is

4    after May.

5              A.   I don't know why it wasn't put in

6    here, but I guess that was my most recent time that I

7    applied.  So I just gave them the day.

8              Q.   Does that mean that May is not most

9    recent or -- I'm confused.

10             A.   No.  It might have been an oversight

11   on my part.

12             Q.   Okay.  But you did apply, you're

13   telling me, in April 2002 and May 2002?

14             A.   Yes, I did.

15             Q.   You saw job postings in the newspaper

16   and on TV?

17             A.   They had newspaper and television.

18             Q.   And you were applying for a clerical

19   position?

20             A.   They had clerical and general laborer.

21   So I applied for clerical this time to see if I could

22   get in the office since I, even though my first job

23   there was hourly, but it was a clerical status but it

24   was an hourly position.

25             Q.   Now, you say that "I have no felony

```
 1    convictions."
 2              A.    No.
 3              Q.    You've never been convicted of a
 4    crime?
 5              A.    No.
 6              Q.    What about a misdemeanor?
 7              A.    No.
 8              Q.    Okay.  You say They, "they" being AK
 9    Steel, did not acknowledge receipt of your
10    application materials, schedule you for an interview
11    or test you or notify you of rejection.  Is that
12    correct?
13              A.    No, they did not.
14              Q.    You never heard anything back from
15    them.
16              A.    No, I didn't.
17                                (Defendant's Exhibit 6
                                  was marked for identi-
18                                fication.)
19              Q.    You've been handed what's been marked
20    as Exhibit 6.  Is that your handwriting?
21              A.    Yes, it is.
22              Q.    Now, down at the bottom corner there's
23    a big number 0286 and then it says Plaintiff's first
24    production defendant.  Do you know if that was --
25    this was produced by you in response to some document
```

1  requests?

2          A.   I couldn't tell you.  I don't know.

3          Q.   Do you have a copy of this application

4  at home --

5          A.   No.

6          Q.   -- that you produced to your

7  attorneys?

8          A.   If I do, I don't know where it is

9  because I've moved too many times.  I'm quite sure I

10  can't find it.

11          Q.   Did you ever give a copy of an

12  application to your attorneys?

13          A.   I've given the attorneys everything I

14  had, I'm quite sure.  Maybe I did, but I just don't

15  remember.

16          Q.   Do you know, is it possible you would

17  have given this to any other plaintiff?

18          A.   No.  No.  I didn't have no reason to

19  give it to them.

20          Q.   So if your attorneys got it, they

21  would have gotten it from you?

22          A.   Yes.

23          Q.   And do you know why you would have

24  kept this document?

25          A.   I don't know if maybe I was able to

```
 1    find it because I had it at the time.  Maybe it
 2    hadn't been that long, and I probably hadn't moved
 3    around as much as I have, but I can't -- I don't have
 4    any of them now.  That I do know, because I can't
 5    find them because I looked.  I can't find them.
 6                              (Defendant's Exhibit 7
                                was marked for identi-
 7                              fication.)
 8            Q.   You've been handed what's been marked
 9    as Exhibit 7.
10            A.   Uh-huh.
11            Q.   Is that your handwriting?
12            A.   Yes.
13            Q.   Is that your handwriting on the date
14    5-23-01, at the very top?
15            A.   Oh, yes.
16            Q.   That's your handwriting?
17            A.   Yes.
18            Q.   Is that the date that you would have
19    completed this document?
20            A.   Yes.  That's what I have up there,
21    that's the day I did it.
22            Q.   Did --
23            A.   Or completed it.
24            Q.   Does that refresh your memory that it
25    wasn't September 2001, but maybe it was May 2001 when
```

1     you applied?

2            A.   No.  I know I did in September, also.

3     This might have been one I've forgotten, but I know I

4     did in September because it was in the fall of the

5     year.  And I remember that.

6                 This might have been one that I might

7     have overlooked, but I know I applied quite a few

8     times.  Maybe even more than the four times I said,

9     but I know I did in September, also, of 2001.

10           Q.   Why do you know it was September 2001?

11           A.   Because at that time my son had -- he

12    was in a bad accident.  And right before that I

13    filled out an application because I was trying to get

14    a job there, and he was in a bad accident and I'll

15    never forget it.

16                And I was going to take that

17    application over and something happened.  I was on my

18    way and I got called by the school and I had to leave

19    and go.  So I'll never forget that.  And that was in

20    September, because school had just started.

21           Q.   This is your younger son?

22           A.   Yes.

23           Q.   He was in an accident at school?

24           A.   Yeah.

25           Q.   And it was while you were on your way

 1    to turn in the application?

 2            A.    Yeah.  I was going to go do that and I

 3    got a phone call from the school.

 4            Q.    Do you know if you ever maybe forgot

 5    then to turn it in at the time since the accident?

 6            A.    No.  I turned it in.

 7            Q.    When did you turn it in then?

 8            A.    It might have been a day or two later,

 9    but I turned it in, because I left it sitting right

10    there on the table before I was getting ready to

11    leave because I knew what I had to do with it.  And I

12    turned it in maybe the next day.  Might not have been

13    the next day, but the next couple days.  But I did

14    turn it in.

15            Q.    But you don't have a copy of that?

16            A.    No, I don't have it.

17            Q.    Let me ask you.  If you look at

18    Exhibit 7 and Exhibit 6.  In Exhibit 6 I'm going to

19    represent to you, and I think your attorneys will

20    agree, that this was produced by your attorneys.

21            A.    Uh-huh.

22            Q.    The handwriting looks identical to me

23    throughout.  I mean, if you look at the pages,

24    obviously the bottom tear-off sheet is missing from

25    the Exhibit 7, but if you look at everything else

1    between Exhibit 6 and Exhibit 7, if you compare the
2    two, it looks to be the same document.
3              A.    These two here (indicating)?
4              Q.    Yes.  It looks to be a copy of the
5    same document.
6              A.    No.
7              Q.    No?  What's different?  On the part
8    that you filled out.
9              A.    No, it's not -- I don't know what's
10   different, but it's not the same.
11             Q.    You don't think that's the same?
12             A.    There's no date here.
13             Q.    I know there's a date missing on the
14   one that you had and the pages are stapled in a
15   different order, the one I gave you, but --
16             A.    I mean, I always basically write the
17   same.
18             Q.    Well, if you look at under Position,
19   when you list your positions, you've got, on both of
20   them, the Oklahoma Department of Transportation, you
21   wrote Department of Transportation and then you wrote
22   Oklahoma up on top of name of employer.
23             A.    Right.
24             Q.    You also then have OKC and OK
25   underneath the line in exactly the same spot.

```
 1              A.   Well, a lot of the ones I did do, all
 2    I ever did was just copy down what I had, because
 3    that's all I had to do, and just turned it in.
 4              Q.   So you're saying --
 5              A.   I didn't have to redo them.
 6              Q.   Are you saying these are not the exact
 7    same written document?  Your handwriting is in
 8    exactly the same spot on both of them.  I understand
 9    the information is going to be the same, but your
10    handwriting is in exactly the same spot, it looks to
11    me.  Do you disagree?
12              A.   I guess I see what you're talking
13    about, but I guess I don't see it.  I mean, it's the
14    same information.
15              Q.   You're saying the handwriting is not
16    the exactly the same in the exact same spots?
17              A.   Yeah, but on a lot of my applications
18    even where I'm at now, all I do is make a copy and
19    just turn them in so I don't have to rewrite them.  I
20    always did that.
21              Q.   So you would have made a copy.
22              A.   Oh, yeah.  I always did that.  That
23    way I never had to keep writing the same thing all
24    the time.  I just made copies and turn in the same
25    thing.
```

```
 1              Q.    Okay.  Okay.
 2              A.    Because it's basically always the
 3      same.
 4              Q.    So when you started applying at AK,
 5      you made a copy of your application.
 6              A.    Yeah.
 7              Q.    Didn't put the date at the top.
 8              A.    No.
 9              Q.    And then every time you went --
10              A.    Yeah.  That's all you have to do,
11      because it's basically the same thing.
12              Q.    Just resubmit the new document and put
13      a new date on there.
14              A.    Right.  Right.  Right.
15              Q.    Okay.  That makes sense.
16              A.    I always did that so I didn't have to
17      write all that over and over and over again.
18              Q.    Sure.  So Exhibit 6, which was
19      produced by your attorneys, that would be then your
20      original document that you were making copies of.
21              A.    Yes.  Yes.
22              Q.    That was not something that was turned
23      in --
24              A.    No.
25              Q.    -- separate from the other ones.
```

```
 1              A.    No.
 2              Q.    Okay.  And is everything on your
 3     application, is that true and correct?
 4              A.    Yes, it is.  You mean right here
 5     (indicating)?
 6              Q.    Throughout the entire application.
 7              A.    Yes, it's correct.
 8              Q.    Were there other places that you had
 9     applied multiple times where you would make a copy of
10     something of your application so you could apply
11     multiple times?
12              A.    Well, I did for General Electric
13     because when they were rehiring I wanted to make sure
14     they got it.  So I know I did that five times.  And I
15     made a copy.  I've always done that.  Even when I
16     lived in Oklahoma, a lot of jobs.  Because it's
17     easier to do that, just make a copy, then you just
18     staple it in.  That's it.
19              Q.    Sure.  So then it was not unusual for
20     you to apply somewhere four or five times?
21              A.    No.
22              Q.    I'm going to look at, on the first
23     page, I'm going to look at Exhibit 7.
24              A.    Okay.
25              Q.    The first page it asks you "Have you
```

```
 1    previously applied at Armco or AK Steel?"  You say

 2    yes.  Then it says, "If yes, when and where?"  And

 3    you just say September 1999.

 4              A.   Yes.

 5              Q.   That was not a complete answer, was

 6    it?

 7              A.   When you say "complete", what do you

 8    mean?

 9              Q.   Well, you told me you applied in

10    August 1999.  Did you apply in August or did you

11    apply in September?

12              A.   Well, at that time maybe it was an

13    oversight of a month or so, or a day, but it's

14    basically close to the same thing.

15              Q.   You think it was the same?

16              A.   Yeah.  It might have meant August and

17    put September, but they're basically either September

18    or August.  It wouldn't have made much difference.

19    Just a month.

20              Q.   Do you know today which month you did

21    apply in?

22              A.   I believe it was August of 1999.

23              Q.   Okay.

24              A.   I believe it may have been.  I'm not

25    quite sure, but I know it was around that time
```

```
 1      sometime, September or August.
 2            Q.    Now, on this application you said that
 3      you left the postal service because your husband was
 4      terminally ill.
 5            A.    Right.  Right.
 6            Q.    Earlier you testified that it was the
 7      Oklahoma Department of Transportation that you left
 8      because of your husband.
 9            A.    Yeah.
10            Q.    Which one was it?
11            A.    Well, both, because he stayed sick all
12      the time.
13            Q.    So he did make it back from Oklahoma?
14            A.    Yes.  We made it back, but he
15      didn't -- we went back to visit, basically, but we
16      couldn't get the dialysis set up like we wanted to.
17      And his mother was sick, also, at the time.  And she
18      was terminal.
19                  So we went back to be with her, and
20      then not much longer after we got back she passed
21      away, and then not much longer after that he did.
22            Q.    What year did he pass away?
23            A.    He passed away, I believe it was 1997.
24            Q.    And I got some confusion.
25            A.    I think it's 1997.
```

```
 1                    Q.    On the postal service it says you

 2         resigned, and you resigned in February 1999.

 3                    A.    Right.

 4                    Q.    To take care of your husband.

 5                    A.    Yes.  February 1997.

 6                    Q.    That's when you started the employment

 7         at the postal service.

 8                    A.    Yes.

 9                    Q.    And it says you resigned in February

10         1999.

11                    A.    Well, see, I was here, but he was not.

12         I traveled back and forth.

13                    Q.    So he stayed in Oklahoma?

14                    A.    Yes.  He was here.  I came back here

15         to try to get a job for when he, if we decided to

16         move him back here, I'd have employment.  Because

17         nobody could work but me.

18                          So when I came back and got the job

19         they gave me the job, but I traveled back and forth.

20         I would go home maybe once a month back to Oklahoma

21         and come back.  See, he died in August of 1997.

22                    Q.    Okay.  So why would you resign from

23         the postal service in February of 1999, a year and a

24         half later, to take care of him?

25                    A.    I might have got my dates mixed up on
```

```
 1    here.  Unless I'm thinking -- when did he pass away?
 2    You have to forgive me.  That's a hard time for me.
 3              Q.   I understand that.  I apologize.
 4              A.   That's all right.  Just let me
 5    remember.  Maybe I didn't write it down right or tell
 6    you right because it's so long.
 7                   He died in August, but it was -- I
 8    can't remember if it was -- it was '97 or '99.  I
 9    might be getting it mixed up, but all I know is I
10    worked at the post office and I traveled back and
11    forth.  And then finally I had to quit because I
12    couldn't keep that up and he was terminally ill and I
13    finally just resigned.  But I can't remember.
14              Q.   How old was your son when your husband
15    passed away?
16              A.   He was three or four.  No.  He was
17    five.  He was five, five-years-old.
18              Q.   What year was he born?
19              A.   Malique was born in 1995?  No, not
20    '95.  I'm sorry.
21              Q.   '94?
22              A.   Hold on.  Hold on.  No.  Malique was
23    born in '93.  '92.  I'm sorry.  June of '92.  That's
24    when Malique was born.  He was born before I got laid
25    off from General Electric.
```

1     Q.    Okay.  So he would have been five in

2   '97?

3     A.    Yes.  So I know he was older.  So all

4   I know is maybe, like I said, maybe I had the date

5   wrong.  I know it was August.  And it must have been

6   '99, because that's what I got down here.  I thought

7   it was '97.

8     Q.    But it also said that you took a job

9   position at Burns Security in February 1999.

10    A.    Yes.

11    Q.    Were you working there when your

12  husband passed away?

13    A.    No.  I got the job, but when I got the

14  job they held that job open for me.  I think they

15  held that job for -- because, see, it wasn't

16  something that I had to be at and they had a great

17  supply of people, but they held that job for me for

18  about three months.  So I really didn't go right to

19  work, but when I decided to come, they said just let

20  us know.  And that's what I did.  I took I guess it

21  was about three months, four months later before I

22  went there.

23    Q.    So when you said that you started in

24  February 1999, that was when you were hired but not

25  when you started.

 1              A.    Right, but not when I started, no.

 2              Q.    Got you.  Okay.  And just so I'm kind

 3     of clear on this.  Exhibit 7, the information on

 4     Exhibit 7, other than the initial date on it, would

 5     be the exact same information on each of your

 6     applications because it was a copy of it.

 7              A.    Right.  Yes.

 8              Q.    Okay.  Now, did you know if AK was

 9     hiring at each of the times you applied?

10              A.    Apparently they were, because they

11     were giving out applications.  You were able to get

12     one.  They didn't tell us that they weren't when I

13     picked them up.

14              Q.    This was at the employment career

15     center?

16              A.    Right.

17              Q.    And no one at AK Steel ever said

18     anything to you about your application.  Is that

19     correct?

20              A.    No, they did not.

21              Q.    No one ever told you why you were not

22     hired.

23              A.    No, they did not.

24              Q.    No one at AK ever said anything to you

25     about your race?

```
 1              A.    No.   They never talked to me.
 2              Q.    And I'm assuming no one at AK Steel
 3      ever said anything that you would feel is
 4      discriminatory or offensive?
 5              A.    The only time something was said to
 6      me, but it wasn't by an -- well, it was by an AK
 7      Steel employee, but it was someone on the same level
 8      as I was as far as hourly.
 9                    But we were all sitting in the lunch
10      area.  And I don't know if it was a statement to hurt
11      my feelings or what it was.  And the guy made a
12      statement and all he said was, "Well, you know why
13      you were hired?"
14                    And I said, "Why?"  I said, "Yeah, I
15      know why."
16                    And he said, "Do you really know why?"
17                    I said, "What do you mean, do I really
18      know why?"
19                    And he said, "Well, you're a double
20      minority."
21                    I said, "A double minority?"  Like
22      that.  We were all just sitting in the little break
23      area.
24                    And he said, "Yeah.  You're black and
25      you're female."  And he laughed.  Maybe it was a
```

1    joke.  I don't know, but that's just the way he put

2    it.  And everybody kind of laughed it off.  I didn't

3    take any stock in it at the time.  I just didn't say

4    anything.

5            Q.    Is that the only comment that you

6    think was offensive or --

7            A.    Yeah.  That's the only one that I can

8    remember.

9            Q.    Was that when you were actually

10   employed by Armco?

11           A.    Yes.

12           Q.    And this was a co-worker of yours at

13   Armco?

14           A.    I didn't know him.  He was just

15   sitting over there at the table.

16           Q.    Do you know his name?

17           A.    I don't know who he was, no.

18           Q.    Okay.  Do you have any idea why you

19   were not hired?

20           A.    No, I don't.

21           Q.    Have you ever heard from anyone why

22   you were not hired?

23           A.    No, I didn't any hear anything.

24           Q.    And you never met with anyone at AK

25   Steel about a position?

```
 1              A.    No, I didn't.
 2              Q.    You never took a test at AK Steel for
 3   a position?
 4              A.    No.  They didn't give me a test.
 5              Q.    And you were never interviewed?
 6              A.    No.
 7              Q.    Okay.  Now, back in what's Exhibit 3,
 8   which says Affidavit at the top.
 9              A.    Okay.
10              Q.    It says that you filled out an
11   application and it asked for your age and race.
12              A.    Uh-huh.
13              Q.    Where did the application ask for your
14   age and race?
15              A.    It was on a separate piece of paper on
16   the back, toward the back.  It was on a separate
17   piece of paper that was sitting inside the
18   application.
19              Q.    Okay.  Do you know what else was on
20   that separate piece of paper?
21              A.    Age and race, and have you ever been
22   convicted of a felony or whatever, if I can remember.
23   It was just age and race.
24              Q.    Is that Exhibit 4?
25              A.    This here (indicating)?
```

1          Q.    Yes.

2          A.    No.  It was on a separate piece of

3    paper.  It didn't have a lot of words on it.  There

4    wasn't a lot of writing on it.  Not like this, no.

5          Q.    How many pieces of paper did you fill

6    out when you applied?

7          A.    You had your regular form, and then

8    you have, I'm trying to remember, two or three pieces

9    of paper on the inside, but I can't remember or

10   recall what they were, but you had your regular

11   application and then there were papers on the inside

12   of the application.

13                              (Defendant's Exhibit 8
                                was marked for identi-
14                              fication.)

15         Q.    You've been handed what's been marked

16   as Exhibit 8.  Is that one of the forms that was in

17   the application packet?

18         A.    Yes.  I remember the being able to

19   work rotating shifts.

20         Q.    Is that your signature on the second

21   page?

22         A.    Yes, it is.

23         Q.    I notice it's not dated.  I'm assuming

24   that's because you copied the stuff as well?

25         A.    Yeah.

70

```
 1              Q.    And this document does not ask for age

 2       or race.

 3              A.    No, this one doesn't, no.

 4                              (Defendant's Exhibit 9
                                was marked for identi-
 5                              fication.)

 6              Q.    Okay.  You've been handed what's been

 7       marked as Exhibit 9.  Is this also a document that

 8       was part of the application?

 9              A.    Yes, it is.

10              Q.    Is that your handwriting?

11              A.    Yes, it is.

12              Q.    And your signature?

13              A.    Yes.

14              Q.    Again, it's not dated.

15              A.    No.

16              Q.    Because you would have copied this.

17              A.    Right.

18              Q.    And this also does not ask for your --

19              A.    No, it does not.

20                              (Defendant's Exhibit 10
                                was marked for identi-
21                              fication.)

22              Q.    You've been handed what's been marked

23       as Exhibit 10.  Is that your handwriting?

24              A.    Yes.

25              Q.    Was this also part of the AK Steel
```

1    application package?

2         A.    This one I don't remember.  I don't

3    know.  I don't remember.  It's my handwriting, but I

4    don't remember if it was part of that or not.

5         Q.    Do you know when else you would have

6    filled this out?

7         A.    Unemployment office?  I'm not sure.

8    Maybe.

9         Q.    Did you ever fill out anything at the

10   unemployment office about AK Steel?

11        A.    When I first got hired, the first time

12   I got a job.

13        Q.    I'm talking --

14        A.    The first time, you know, like in

15   1982.

16        Q.    After Burns Security, which is listed

17   on Exhibit 10, would you have gone to unemployment?

18        A.    No.

19        Q.    Where is the unemployment office

20   located at?

21        A.    In Hamilton, Ohio.  I do believe

22   that's where it is now.  I think it's in Hamilton.

23   This might have been a part of it, but I don't

24   remember.  Like I say, there was two or three pieces

25   of paper maybe, you know, like on the inside of the

```
 1    application, but I don't know if this was one of them
 2    or not.
 3              Q.    But that is your handwriting?
 4              A.    Yes.
 5              Q.    Is everything on it true and correct?
 6              A.    Yes.
 7              Q.    Okay.
 8              A.    Yes.  That's correct.
 9              Q.    You don't know the identities of any
10    of the white applicants that were hired instead of
11    you?
12              A.    I don't know.  No.  I don't know
13    anybody personally, no.
14              Q.    Do you know the names of anybody?
15              A.    No.
16              Q.    And you were not denied the right to
17    apply to work at AK Steel, were you?
18              A.    No, I was not denied the right.
19              Q.    Okay.  The application process itself
20    in terms of filling out these applications, whatever
21    process you went through, was there anything hostile
22    about that?
23              A.    No, they were not hostile.
24              Q.    You said Shawn Pryor is your son?
25              A.    Yes.
```

1          Q.   Do you know if he's applied at AK

2     Steel?

3          A.   Shawn, he applied there, but I don't

4     know when.  I couldn't tell you when.

5          Q.   Do you know why he wasn't hired?

6          A.   I do not know.  Very well qualified,

7     but I do not know.

8          Q.   Do you know how many times he applied?

9          A.   No, I do not.

10         Q.   Do you know whether he has any

11    manufacturing experience?

12         A.   I don't know if he has any

13    manufacturing experience or not.  He's worked in a

14    factory, but I don't know what he did there.

15         Q.   Okay.  Do you know why any of the

16    other plaintiffs named in this lawsuit were not

17    hired?

18         A.   No, I do not.

19         Q.   Do you know anything about their

20    applications or their qualifications?

21         A.   No, I don't.

22         Q.   Do you know any of the underlying

23    facts for any of these other plaintiffs' claims?

24         A.   No, I don't.

25         Q.   Okay.  Do you have a resume?

1          A.    I may have one somewhere, uh-huh.

2          Q.    Have you ever put together a resume?

3          A.    I did when I first got laid off from

4     General Electric, but I haven't since then.  When I

5     first got laid off then I -- I don't know if I put

6     one in with -- I did.  There was a resume in with my

7     application.

8          Q.    Do you have that resume still today?

9          A.    I don't know if I do or not.  I might

10    have had it at one time, but I don't know if I could

11    find it or ot.

12         Q.    Would you have still had it in May of

13    2002 when you last applied?

14         A.    Yes.  I would believe I would have.

15         Q.    Would you still have had it a month

16    later when you filed this lawsuit?

17         A.    Yes.

18         Q.    And you think it's gone since then?

19         A.    If it's not in my computer, it

20    probably is, because that's where I would have stored

21    it at, in my computer.  I had it, but I've long

22    gotten another computer since then, so I'm not -- if

23    I have one, it's an updated one.

24         Q.    In Exhibit 3, which again is the

25    affidavit -- I'm sorry to keep switching on you.

```
 1              A.    That's all right.  Okay.
 2              Q.    The bottom of the first page, that
 3      last paragraph, "The office where I was doing
 4      payroll"...  Is that referring to when you worked at
 5      Armco?
 6              A.    Yes.  I was in the -- there was a
 7      clerical part of my hourly job.
 8              Q.    And it says that you kept records
 9      identifying the race and age of the employees.  What
10      records were those?
11              A.    They were payroll records.
12              Q.    Those weren't the application records?
13              A.    No.
14              Q.    You don't know what those records were
15      used for, do you?
16              A.    No.
17              Q.    And the numbers of -- you say in 1987.
18      And actually that should be 1982 to 1984.
19              A.    The dates are wrong.
20              Q.    You say there were about 1200
21      laborers?
22              A.    At the time.
23              Q.    How did you know that?
24              A.    Let me see if I can remember.  The
25      overtime sheet, you get a -- what's it called?  Oh, I
```

```
 1    don't know if it's called an overtime sheet, but it's
 2    called a seniority sheet and it has the number of --
 3    a lot of times it has the number of applicants that
 4    work there.  And maybe at the time I think it was
 5    about a total of 1200.  At that time.
 6              Q.   And you said there may have been about
 7    200 black laborers.  How would you get that number?
 8              A.   From the -- that could have been from
 9    the ones maybe that I added up on my own from the
10    seniority list that I had that was my own.
11              Q.   You did that back during '82-'84?
12              A.   Yes.  That was my own observation of
13    the seniority list.
14              Q.   Did you know everybody?
15              A.   I knew a majority of them.
16              Q.   You knew 1200 --
17              A.   Some of them I might have probably
18    been asked, do you know so and so or something like
19    that at the time, but a lot of them I knew.
20              Q.   You knew 1200 laborers?
21              A.   No.  I'm talking about of the black.
22    That was my -- from the overtime, from the seniority
23    list, if you go down and, you know, see the names of
24    the people on there, maybe some that I picked out
25    that I knew.  It may be somewhere around that figure.
```

```
 1    Maybe then.
 2              Q.    There would have been plenty of names
 3    that you didn't know at all.
 4              A.    Yeah, there were plenty.
 5              Q.    You didn't know if they were white or
 6    black?
 7              A.    No.
 8              Q.    Then you say that I believe there may
 9    be about 89 to 90 black laborers that -- at this time
10    I believe there may --
11              A.    Skilled.   Right.
12              Q.    Where did you get that number from?
13              A.    From when I worked down in the plant
14    before I went to the office I was a general laborer
15    so you worked three different shifts and you could --
16    you would see the people, you know, on the floor.
17              Q.    So the 89 to 90 again is referring
18    back to that '82 to '84 time period?
19              A.    Yes.
20              Q.    And the next paragraph you talk about
21    your brother Allen Roberts.  Near the end of that
22    paragraph you say, "I heard it was no more than five
23    blacks, if that many," who were hired last year.
24              A.    During that time.   Yes, but that was
25    hearsay.
```

```
 1              Q.    Okay.

 2              A.    That was only hearsay.

 3              Q.    Who did you hear that from?

 4              A.    From him.

 5              Q.    You also say that, "I've also heard

 6      that this matter is going to arbitration either now

 7      or in the near future."

 8              A.    Yes.  At that time that's what he told

 9      me.

10              Q.    He told you he was bringing something

11      about this and --

12              A.    Uh-huh.  Or somebody was.  I don't

13      know if it was him, but it was somebody at the time.

14              Q.    Okay.  Do you have a notebook?

15              A.    No.

16              Q.    Of anything that you kept.

17              A.    As far as?

18              Q.    Some kind of notebook that would have

19      kept notes or anything relevant to this case?

20              A.    No.  Maybe only thing maybe, you know,

21      letters from your lawyer or something like that where

22      you had to be, or if you were going to have a

23      meeting, or something like that, but other than that,

24      nothing.

25              Q.    You've been shown what's been marked
```

1    as Ronald Sloan's Deposition Exhibit Number 7.  Have
2    you ever seen this document before?
3                  A.   This is Sloan's name on it or mine?
4                  MS. DONAHUE:  It was just an exhibit
5              in his deposition.
6                  THE WITNESS:  Oh, okay.
7                  MS. DONAHUE:  But she's asking if
8              you've ever seen this, so look through it
9              and see if you've ever seen it.
10                 THE WITNESS:  Oh.  Okay.
11   BY MS. PRYOR:
12                 A.   I don't remember ever seeing it.  I
13   can't remember.
14                 Q.   Were you ever asked what documents you
15   might have that might be responsive or relevant to
16   the disputed facts in this case?
17                 You're looking at page four?
18                 A.   Yes.
19                 Q.   Did you identify Donna Phillips and
20   Clyde Thomas?
21                 A.   Yeah.  They were my bosses.
22                 Q.   They were your bosses.  Okay.  Why did
23   you identify them as people that would have
24   knowledge?
25                 A.   Because I worked directly for them and

1   as to my qualifications and my level of experience in

2   the office, in the office setting.  And that's why I

3   put them there, because they would be honest if they

4   were ever asked, and they would do that for me.

5           Q.   Why didn't you list someone from one

6   of the more recent employers like Burns Security

7   or --

8           A.   I don't know.  I guess at the time

9   they were -- they always keep in touch.  We talk all

10  the time.  I still talk with them today.

11          Q.   Okay.

12          A.   I'm very close to them.

13          Q.   If you look at page 11.

14          A.   Okay.

15          Q.   Your name was there again.  And it's

16  attachment B, which is previously on page two,

17  represented to be the copy of description of category

18  and location of all documents, data, compilations, et

19  cetera that are relevant to disputed facts.  Under

20  your name it says Notebook.  What is that?

21          A.   Probably just the things that -- I

22  don't know what that is, to tell you the truth.  The

23  only thing I can think of is it might be a copy of

24  all the things.  I have all my -- a lot of, some of

25  the copies from where the lawyers sent you, you know,

```
 1    information about what you need to know, or what
 2    we're doing at the time.  But that's basically it.
 3    That's the only thing I can think of notebook means.
 4    I don't have a written notebook of any kind.
 5                    MS. PRYOR:  Whatever the notebook
 6            refers to, we need a copy of.
 7                    MS. DONAHUE:  Okay.  If it's
 8            privileged, we won't produce it.
 9                    MS. PRYOR:  Well, if it's privileged,
10            it shouldn't have been identified as a
11            disclosure.
12                    THE WITNESS:  I don't even know how
13            that got in there.
14                    MS. PRYOR:  Then you need to amend.
15                    THE WITNESS:  Okay.
16                    MS. PRYOR:  Currently you're listing a
17            notebook.  I just need to know what that
18            is.  I don't care what it is.  I just want
19            to know what it is.
20                    THE WITNESS:  All right.
21    BY MS. PRYOR:
22            Q.  Are there any other witnesses or
23    individuals who have knowledge about the facts
24    underlying your claims?
25            A.  You mean witnesses, you mean --
```

```
 1                 Q.    Anyone who would support your claims
 2      would be able to testify about either why you weren't
 3      hired or your application process.
 4                 A.    At AK?
 5                 Q.    Yes.
 6                 A.    No.
 7                 Q.    Do you ever talk to any of the other
 8      plaintiffs?  I may have asked you that already.  I'm
 9      sorry.  Did you?
10                 A.    I mean, we talk when we are in
11      meetings with the lawyers.
12                 Q.    Other than those meetings, do you ever
13      talk with the other plaintiffs?
14                 A.    No, because I don't get a chance to --
15      I don't see them.
16                 Q.    Do you know the other plaintiffs?
17                 A.    I know some of them, but not
18      personally.
19                 Q.    Did you know them before this lawsuit?
20                 A.    No, not personally, no.  Maybe in
21      seeing them or something like that, but not by name,
22      really.
23                 MS. PRYOR:  You want a break?
24                 MR. KAMMER:  Yes.
25                 MS. PRYOR:  Okay.
```

```
 1                    (Recess taken:   2:45 PM - 2:55 PM.)

 2                              (Defendant's Exhibit 11
                                was marked for identi-
 3                              fication.)

 4    BY MS. PRYOR:

 5          Q.   Ms. Bert, you've been handed what's

 6    been marked as Exhibit 11.  Have you ever seen

 7    Exhibit 11 before?

 8          A.   Yes, I have.

 9          Q.   And is that your signature on the last

10    page?

11          A.   Yes.

12          Q.   Did you sign that on April 2nd?

13          A.   Yes.

14          Q.   Did you read through the answers --

15          A.   Yes, I did.

16          Q.   -- in here?  And are they all true and

17    correct?

18          A.   Yes, it is.

19          Q.   And in response to question two about

20    all your employers, I think -- have we talked about

21    each of those?

22          A.   Yes.

23          Q.   Here you say that the reason you left

24    the laundry cleaning service was to perform home

25    care?
```

1           A.    Yes.

2           Q.    That was the home --

3           A.    Well, I mean, I was doing them both,

4     you know.  Really kind of doing them both, really.

5           Q.    So you did not leave there to go to GE

6     as you earlier testified?

7           A.    Leave where now?

8           Q.    Stopped doing the laundry cleaning

9     service.

10          A.    Yes.  I left them all to go to GE.

11          Q.    Here it says you stopped doing the

12    self-employed laundry cleaning service in January

13    2003.

14          A.    Yeah, but I went to GE in July of

15    2005.

16          Q.    Right.  So you didn't stop doing that

17    two years before you went to GE, did you, in order to

18    go to GE?

19                MS. DONAHUE:  Object to the form.  I

20          think that mischaracterizes her testimony.

21          Q.    Why did you leave the laundry cleaning

22    service?

23                MS. DONAHUE:  Which one are you

24          referring to?

25          Q.    Self-employed laundry cleaning

```
 1    service.
 2              A.   Oh, I just -- I did them both for
 3    quite sometime, but it wasn't, per se, you call
 4    yourself leaving it.  It was my own service.  I
 5    worked for them, but I did the home health care,
 6    basically, for the few years, and then I did -- for
 7    the laundry service, then I did the home health care
 8    for a few years.
 9              And then I did the same thing at
10    the -- then I went to the dry cleaners.  And I didn't
11    do either one then.  I just worked at the dry
12    cleaners.  And then I left the dry cleaners and went
13    to GE.
14              Q.   Did you leave Burns Security in
15    January 2001?
16              A.   Yeah.
17              Q.   Okay.
18              A.   Yeah.  I wasn't working there anymore.
19    And I wasn't hardly working there that much.  Maybe
20    one or two days a week even before then.  I didn't
21    keep a running record with them.  I just would go
22    whenever I -- if they needed somebody, they'd call,
23    but I didn't have a running record with them.
24              Q.   With Burns Security?
25              A.   As far as like -- no.  It wasn't
```

1    steady employment five days a week, 40 hours.  It
2    wasn't like that with them.
3              Q.    How often did you work for them?
4              A.    Maybe for a few years.  For a year or
5    so.  It wasn't very long.  And then when I did it
6    wasn't a thing where I worked every day.  Maybe once
7    a month or maybe a couple days a month or something
8    like that.  On the side, but that was it.
9              Q.    Did you leave them in January 2001
10   because the company was bought out?
11             A.    Yeah.  They were bought out by
12   Pinkerton, I do believe, and they didn't hire me as
13   far as -- no.
14             Q.    Okay.  So on your employment
15   application, Exhibit Number 7, on the third page when
16   it asks about your most recent position.
17             A.    Right.
18             Q.    And you said Burns Security.  And you
19   said period of employment from February 1999 to now.
20   That would have been incorrect in your subsequent
21   applications in May of 2001.
22             A.    Right.  Right.  Because I didn't -- I
23   wasn't working there.  I just put -- at the time when
24   I filled this out I wasn't working there, no.
25             Q.    You didn't revise it the subsequent

87

```
 1    times; you just copied the same application?
 2              A.    No.
 3              Q.    Okay.
 4              A.    I didn't even see that, probably.  I
 5    didn't fix it, no.
 6              Q.    Okay.  And both the laundry cleaning
 7    service, when you worked at that, did you do that
 8    every week throughout that period?
 9              A.    Yeah.  We did it every week.
10              Q.    And the home aide thing, did you do
11    that every week during that period?
12              A.    Yes.
13              Q.    And the C and E Computers.  It says
14    you worked there from April 2004 to January 2005.
15              A.    Right.
16              Q.    Was that different than the laundry
17    cleaning service?
18              A.    Yes, because I was general manager of
19    the dry-cleaners.
20              Q.    And you made $250 a week for that?
21              A.    Yes.
22              Q.    It says here you were laid off.
23              A.    Yeah.  They were bought out by
24    somebody else.  So I didn't -- they didn't take me
25    with them.
```

```
 1              Q.    Okay.
 2              A.    And I think they were -- I don't know
 3    if they were going to make it something different
 4    other than a dry cleaners.  I wasn't sure what they
 5    were going to do, but they didn't -- they didn't take
 6    a lot of us with them.
 7              Q.    And you talk about July 2005 to, I
 8    guess, current.
 9              A.    Yes.
10              Q.    You're working at GE.
11              A.    Yes.
12              Q.    You're back in the shipping and
13    receiving department.
14              A.    Uh-huh.
15              Q.    And you're making $583 a week.
16              A.    Yes.
17              Q.    And I guess with overtime you'd make a
18    little more than that?
19              A.    Yes.
20              Q.    And earlier you testified about a
21    conversation you had when you were sitting --
22              A.    Oh.
23              Q.    -- I think waiting to have a physical
24    with GE.  Was that the first time you applied at GE
25    or the subsequent?
```

```
1              A.    No.  That was the second time.
2              Q.    This in 2005.
3              A.    Right.
4              Q.    Okay.  And do you have W-2s from all
5     these employers listed in response to interrogatory
6     two?
7              A.    Yes.  I think I -- yeah.  I have them.
8              Q.    You have those?
9              A.    I don't have them with me, but --
10             MS. PRYOR:  We need those produced as
11        well, please.
12             Q.    And then in response to interrogatory
13    number three, which the answer ends up on page six,
14    interrogatory three asks you to identify all
15    employers with whom you applied for employment,
16    including the date you submitted written
17    applications.  You list September 2001 - AK Steel and
18    May 6, 2002 - AK Steel.  Why didn't you list the
19    other ones that you told me about?
20             A.    I think it said --
21             Q.    April 2002.
22             A.    Because it said -- I don't remember.
23    I can't remember the question.
24             MS. DONAHUE:  If I can just draw your
25        attention to page five.
```

1          A.    It said 2001, so that's what I did.  I

2    just started there.  It said 2001, starting at 2001.

3          Q.    Okay.

4          A.    So that's how I answered it.

5          Q.    Well, why didn't you include April of

6    2002 that you testified about today?

7          A.    I don't know why I didn't.  I guess

8    they just wanted to know the jobs that you applied

9    for.  And I already had it down twice.  I didn't know

10   if you needed that many or not.  I didn't know if

11   that made a difference since it was already down

12   there twice.  I didn't think I had to do it all for

13   all the times.  Just from 2001.  So I just put down

14   one in 2001 and one in 2002 and then whatever I did

15   after that.

16         Q.    These other places that you applied

17   other than AK Steel, did you apply to any of those

18   more than once?

19         A.    Yes, I did, the Middletown City School

20   District.  They weren't really hiring.  They gave you

21   an application.  So I kept applying there just in

22   case when they started hiring I'd have one in there.

23   So I did that quite a few times.  Miller Brewery.  I

24   did that probably six or seven times, but they

25   weren't hiring.

```
 1            Q.    And do you have the dates of those
 2      other times?
 3            A.    For Miller Brewery?
 4            Q.    For any of these other ones that you
 5      said you applied for.
 6            A.    I don't have them, no, I don't
 7      remember.  I know I did, but I don't have copies of
 8      them or anything like that.
 9            Q.    Why do you have for the May 2002
10      application to AK Steel, you've got May 6, 2002.  Why
11      do you have that specific date?
12            A.    Because that one there I found it
13      while I was looking through my papers and things.  I
14      found that one.  I found -- then, again, I don't know
15      if that was one that -- I filled out a couple of them
16      and I messed up on it, because I seen where I messed
17      it up, so I went and got another one.  And that was
18      the date that was on the top of it so I figured that
19      was the same day of the one that I had put in because
20      I had messed it up.  So I kept it and turned in the
21      corrected one.
22            Q.    So you've got a copy of an application
23      at home from AK Steel dated May 6, 2002?
24            A.    It was dated that but I messed it up
25      so I didn't turn it in.
```

1    Q.    I thought you were copying them.

2    A.    No.  When I was writing on the front

3    part of it I messed the -- something I messed up on

4    the front of it because I didn't turn it in.  I

5    spilled some ink on it.  It was something that I

6    spilled on it.  It was a big old spot on it about

7    that big (indicating) and I had to get another one,

8    but right in the corner it said May 6.  So I know I

9    had to get another application.  So I just took that

10   date off of that figuring that was the same one.  I

11   had to have filled out another one.

12   Q.    So you don't remember specifically

13   doing that; you're just assuming you would have done

14   that.

15   A.    That's what I assume.

16   Q.    When you -- you say you got another

17   one.  Is that you got another one of your copies of

18   it?

19   A.    No.  I had to get another application

20   because I didn't have another one.  So I just go

21   across the street.  I just live across the street

22   from that place.

23   Q.    I guess I'm confused again.  Earlier I

24   thought you testified that you had a copy of the

25   application.

```
 1              A.    Yeah.

 2              Q.    And you'd just redate it and turn it

 3    in, that copy that you had.

 4              A.    Right, but I spilled something on it

 5    and it went all the way through.

 6              Q.    That was your only copy?

 7              A.    Right.  At that time.  So I had to go

 8    get me another one.

 9              Q.    So in May -- assuming you did go back

10    and apply in May 2002.

11              A.    Right.

12              Q.    You would have actually gone and

13    gotten a new application then.

14              A.    Right.

15              Q.    And that would have been -- you would

16    have actually completed the whole application at that

17    time as opposed to previous times when you copied it?

18              A.    It would have been just the next day

19    or so.  It wouldn't have been any later than that.

20              Q.    Previously it was my understanding

21    that when -- the four application times you applied

22    you had an application that you already completed,

23    you copied it, and you turned it in each of those

24    four times.

25              A.    Right.
```

1              Q.    Same document.  Just made copies.

2              A.    Yeah.

3              Q.    In May of 2002 are you telling me on

4    that one you ruined the copy you had and you actually

5    got a new application and recompleted it, actually

6    filled it in?

7              A.    That's just the front page.  It was

8    just the front page.  It wouldn't have been any of

9    the rest of it.  I could have used the rest of it,

10   but I had gotten something on the front.

11             Q.    And tell me what the front page is, if

12   you could show me.

13             A.    Yeah.  The front page is this

14   (indicating).

15             Q.    Okay.

16             A.    It's that.

17             Q.    The page one of Exhibit 7?

18             A.    Right.  Right.  Right.  Right.

19             Q.    So that part you say you messed up.

20             A.    It was something on it in the corner

21   there and I spilled something on it so I just

22   probably had to get another copy.  And that's all I

23   did.  And I just took the date that was in the

24   corner, because I just redid it.  Just put a

25   different date there.

1          Q.   Do you --
2          A.   Or the same date that I had on the one
3    that I had there.
4          Q.   Okay.  Did you get another, a blank
5    application from the career center, or did you get
6    another copy that you had and just redated it?
7          A.   No.  I had another copy that I had and
8    I just put that date right on that corner right
9    there.  Just put the May 6th on there is all I did.
10         Q.   You're telling me that you think you
11   got this still, this May 6 document?
12         A.   Yeah.
13         Q.   You think that you would have then
14   applied at that time --
15         A.   Yes.
16         Q.   -- with another document.  The
17   document that you submitted to the career center, was
18   that a copy that you already had that you then fixed
19   the top part --
20         A.   Yes.
21         Q.   -- or was it you went over and got a
22   new application?
23         A.   No.  I fixed that.  And so all I did
24   was just take that date and just put it right back
25   there.  That's all I did.  That's how I got the May

```
 1    6.  So that's what I had on there.
 2              Q.    So you do have a May 6 document at
 3    home?
 4              A.    Yes.
 5              MS. PRYOR:  That has not been produced
 6         to us.
 7              MS. DONAHUE:  Okay.
 8              Q.    Do you have any other applications at
 9    home?
10              A.    No.  That's the only one.
11              Q.    Do you have any other documents
12    relating to AK Steel at home?
13              A.    No.  Just that one.
14              Q.    Okay.  Has Allen Roberts ever talked
15    to you about issues he had at AK Steel?
16              MS. DONAHUE:  Object to the form.
17         Asked and answered.
18              A.    Like I said before, he doesn't talk to
19    us about that.
20              Q.    Do you know about any of his
21    discipline?
22              MS. DONAHUE:  Object to the form.
23         Asked and answered.
24              A.    No.  He doesn't talk to us about it.
25              Q.    I may have already asked this and I
```

1    apologize, but did he ever tell you why he was

2    terminated?

3                    MS. DONAHUE:  Object to the form.

4              Asked and answered.

5              A.   No.  I don't know.

6              Q.   Did he ever tell you anything that he

7    thought was discriminatory?

8                    MS. DONAHUE:  Object to the form.

9              Calls for a legal conclusion.  Asked and

10             answered.

11             A.   He will not talk to us.  He told me

12   that.  And I don't press it.

13                                (Defendant's Exhibit 12
                                  was marked for identi-
14                                fication.)

15             Q.   I'm going to hand you what's been

16   marked as Exhibit 12.  Is Exhibit 12 copies of your

17   tax returns?

18             A.   Uh-huh.

19             Q.   And you said that you do have copies

20   of W-2s at home?

21             A.   I don't have W-2s.  I just have these.

22             Q.   You don't have W-2s?

23             A.   No.

24             Q.   Where are your W-2s at?

25             A.   I don't know where they are.  I mean

```
 1   it's -- I don't have W-2s.  A lot of this --
 2             Q.   Do you have W-2s from last year?
 3             A.   But I got -- yeah.  For GE I do, yes.
 4             Q.   Do you have W-2s from the year before?
 5             A.   2005?
 6             Q.   Yes.
 7             A.   Yes.  I should have for GE.  Yes.
 8             Q.   I'd certainly like copies of whatever
 9   W-2s you have.
10             A.   For GE?
11             Q.   For any employer.
12             A.   I just copy the tax returns because
13   that's all I had, but I do have them for GE, W-2s for
14   them.
15             Q.   Did you receive benefits at any of
16   your other jobs?
17             A.   No, I did not.  Just GE I did.
18             MS. PRYOR:  I think that's all the
19             questions I have, subject to recall based
20             on whatever documents that haven't been
21             produced.
22             MS. DONAHUE:  Okay.  We just have a
23             couple of questions just to clear up
24             something on Exhibit 7.
25                       REDIRECT EXAMINATION
```

```
 1   BY MS. DONAHUE:
 2          Q.   And if you look at Exhibit 7 where
 3   you -- I think the testimony is a little confusing.
 4   I think we can easily clear it up so that we have a
 5   clean record.
 6               If you look on page three, the postal
 7   service job, you say you were employed there from
 8   February 1997 to February 1999?
 9          A.   Uh-huh.
10          Q.   And then you left because your husband
11   was terminally ill?
12          A.   Right.  Right.
13          Q.   Okay.  What year do you think your
14   husband died?
15          A.   It was nineteen-- it was August.  I
16   know it was August of 1999.
17          Q.   Okay.
18          A.   I might have said it wrong, but
19   thinking I said '97, but he died in August of 1999.
20          Q.   And when was your son born?
21          A.   June 18th, 1993.
22          Q.   Okay.  So your son was six-years-old
23   when your husband died.
24          A.   Yes.
25          Q.   And your son is 13-years-old now.
```

1          A.    Yeah.

2               MS. DONAHUE:  Okay.  I just thought

3        I'd clear that up.  Okay.  We have no other

4        questions.

5               MS. PRYOR:  Great.

6               THE WITNESS:  Thank you.

7               MS. PRYOR:  Thank you.  Sorry for the

8        long day.

9               THE WITNESS:  Oh, that's all right.

10       That's all right.

11

12                    _____

13                      Vivian D. Bert

14                    -  -  -

15

16       (Deposition concluded at 3:15 PM.)

17                    -  -  -

18

19

20

21

22

23

24

25

```
 1              C E R T I F I C A T E
 2    STATE   OF   OHIO  :
                         SS:
 3    COUNTY OF HAMILTON  :
 4        I, Tracy L. Allen, a duly qualified and commis-
 5    sioned  notary  public in and for the  State of Ohio,
 6    do  hereby  certify  that prior to the  giving of her
 7    deposition, the within named Vivian D. Bert was by me
 8    first  duly  sworn  to  testify  the  truth; that the
 9    foregoing  pages  constitute  a  true  and  correct
10    transcript of  testimony given at said time and place
11    by said deponent; that  said  deposition was taken by
12    me in stenotypy and transcribed under my supervision;
13    that I am neither  a relative of nor attorney for any
14    of the parties  to  this  litigation, nor relative of
15    nor employee of  any  of  their  counsel, and have no
16    interest whatsoever in the result of this litigation.
17    I further  certify  that  I  am not, nor is the court
18    reporting  firm  with  which I am affiliated, under a
19    contract as defined in Civil Rule 28 (D).
20        IN WITNESS WHEREOF, I  hereunto set  my hand and
21    official seal of  office, at  Cincinnati,  Ohio, this
22    7th day of May, 2007.
23
24                          _____
                                  TRACY L. ALLEN, RPR
25    MY COMMISSION EXPIRES:
      JULY 29, 2008.          NOTARY PUBLIC, STATE OF OHIO
```