UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

FOR THE WESTERN DIVISION


VIVIAN BERT, et al.,          : CASE NO. 1:02CV00467

        Plaintiffs,           : Judge Beckwith

v.                            :

AK STEEL CORPORATION,         :

        Defendant.            :

_____

        Deposition of EDWARD J. LEWIS, JR., taken

on Tuesday, June 5, 2007, commencing at 10:53 a.m.,

at the offices of Taft, Stettinius & Hollister LLP,

425 Walnut Street, Suite 1800, Cincinnati, Ohio,

before Susan M. Barhorst, Notary Public.


AROUND-THE-CLOCK REPORTING SERVICES
P. O. BOX 11008
CINCINNATI, OHIO 45211
513-481-5200

 1    APPEARANCES:

 2    On behalf of Plaintiffs:

 3        Susan Donahue, Esq.
          Wiggins, Childs, Quinn & Pantazis, PC
 4        The Kress Building
          301 19th Street North
 5        Birmingham, Alabama 35203

 6    On behalf of Defendant AK Steel Corporation:

 7        Patricia A. Pryor, Esq.
          Taft, Stettinius & Hollister LLP
 8        425 Walnut Street, Suite 1800
          Cincinnati, Ohio 45202-3957

 9
      Cross-Examination
10
          by Ms. Pryor                    3
11
                              *   *   *
12
      LEWIS DEPOSITION EXHIBITS       MARKED/IDENTIFIED
13
              1                          11
14
              2                          41
15
              3                          57
16
              4                          60
17
              5                          65
18
              6                          72
19

20

21

22

23

24

```
 1                    EDWARD J. LEWIS, JR.

 2   being first duly sworn, testified as follows:

 3                    CROSS-EXAMINATION

 4   BY MS. PRYOR:

 5       Q.    Mr. Lewis, as you know, I'm Patty

 6   Pryor and I represent AK Steel --

 7       A.    Mm-hmm.

 8       Q.    -- in a lawsuit you filed against

 9   them.  Could you state your full name for the

10   record, please?

11       A.    It's Edward James Lewis, Junior.

12       Q.    And have you ever been involved in

13   civil litigation before?

14       A.    No, not that I can remember.  No, no

15   civil.

16       Q.    Okay.  Let me give you a few ground

17   rules for the deposition.

18       A.    Mm-hmm.

19       Q.    One thing, you are going to have to

20   speak up, answer questions verbally "yes" or "no,"

21   instead of nodding or shaking your head or

22   "ah-huh's" or "na-huh's" --

23       A.    Okay.

24       Q.    -- only because the court reporter is
```

1    taking down everything you say.  It's very hard for

2    her to do that if she's trying to hear and watch

3    what we're doing, okay?

4            A.    (Witness nodded.)

5            Q.    If you don't hear a question, please

6    ask me to repeat it.  If you don't understand a

7    question, please ask me to rephrase or to explain

8    it.  It is important that you're answering what I'm

9    asking.

10                If you need to take a break at any

11    time, let me know.  We can do that.  And I think

12    that's good.  If at any time you remember that an

13    answer to your previous question was incomplete --

14            A.    Mm-hmm.

15            Q.    -- and you want to complete it, feel

16    free to let me know that as well, okay?

17            A.    Okay.

18            Q.    Is there any reason that you are not

19    able to testify today?

20            A.    No.

21            Q.    Do you take any medication?

22            A.    No.

23            Q.    Okay.  Are you -- do you normally take

24    medication that you didn't take for any reason

1    today?

2        A.    No.

3        Q.    Have you ever filed for bankruptcy?

4        A.    No.

5        Q.    Have you ever been convicted of a

6    crime?

7        A.    Depending on what kind of crime,

8    misdemeanor?  What are you --

9        Q.    Any kind of crime, yeah.  Misdemeanor,

10   felony, any --

11       A.    Convicted?  Yes, yes.

12       Q.    Okay.  What --

13       A.    As far as I can remember, maybe a

14   traffic violation, nothing -- nothing -- basically

15   all just traffic violations.

16       Q.    You're talking speeding tickets?

17       A.    Speeding tickets --

18       Q.    Okay.

19       A.    -- parking tickets, stuff like that.

20       Q.    Okay.  Anything --

21       A.    Nothing criminal.

22       Q.    And that includes misdemeanors?

23       A.    At this moment, I can't remember way

24   back from the time I was 18 everything that I have.

1    So, at this time, I couldn't -- I couldn't answer

2    that.  I couldn't say "yeah" or "no" on that one.

3         Q.    You don't know if you've ever been

4    convicted of a misdemeanor?

5         A.    No, not that I can -- no, not at this

6    time 'cause I don't know -- as far as traffic

7    violations, yes.  But as far as criminal -- you

8    know, I don't -- I can't remember, but I can't say

9    I have; I can't say I haven't.

10        Q.    Have you ever been arrested for

11   anything criminal, other than a traffic violation?

12        A.    I might have been -- I think I've been

13   arrested, but I haven't been -- I've been arrested

14   a couple times, but it was from -- I don't know

15   what the big deal -- I don't think anything

16   criminal that I can remember, like hearsay.

17   Somebody said you did something.  They arrest you.

18   But go to court and they throw it out, but it's

19   still sitting on the record, you know.

20        Q.    Have you ever plead guilty to

21   anything?

22        A.    Minor misdemeanor.

23        Q.    Like what?

24        A.    Traffic violations.

1    Q.    Anything other than a traffic

2    violation?

3    A.    Not that I remember.

4    Q.    What were you arrested for?

5    A.    Traffic -- you talking about as of

6    when?  Of what?

7    Q.    Anytime.

8    A.    Well, there's traffic, like driving

9    under suspension and basically that's what mine

10    was, like driving under suspension and bench

11    warrant for not paying the fines.

12    Q.    Okay.  And were you convicted of those

13    driving without -- under suspension?

14    A.    Yeah, yes.

15    Q.    When was that?

16    A.    It's been a couple times, but I can't

17    remember the exact dates.  Probably between 2000

18    and like 2005, in between there.

19    Q.    Okay.  Anything else that you've

20    either plead guilty to or been convicted of that

21    you can recall?

22    A.    No, not at this moment.

23    Q.    Anything else that you were arrested

24    for that you can recall?

8

```
 1        A.    No, not --
 2              MS. DONAHUE:  Be sure to speak up.
 3              THE WITNESS:  I been trying to.  This
 4   morning, my voice be like -- as I wake up, it comes
 5   up.
 6        Q.    Okay.  What's your current address?
 7        A.    2713 Regina Avenue, Columbus, Ohio.
 8        Q.    How long have you been there?
 9        A.    Been there a year and a half.
10        Q.    What was your previous address?
11        A.    614 Twentieth Street in Middletown,
12   Ohio.
13        Q.    And how long were you there?
14        A.    Five years.
15        Q.    And do you remember what your address
16   was before that?
17        A.    2241 Sullivan Avenue, Columbus, Ohio.
18        Q.    Why did you move down to Middletown?
19        A.    My kids.
20        Q.    Kids?
21        A.    Yes.
22        Q.    How many kids do you have?
23        A.    Four.
24        Q.    What are their ages?
```

```
 1        A.    18, 19, 20 and 22.

 2        Q.    Are you married?

 3        A.    Single.

 4        Q.    Okay.  Were you married at one time?

 5        A.    No.

 6        Q.    What's your current phone number?

 7        A.    (614) 308-0869.

 8        Q.    And have you had that as long as

 9  you've lived in Columbus?

10        A.    Yes, at that address.

11        Q.    What was your phone number at the

12  Middletown address?

13        A.    (513) 705-9759.

14        Q.    And did you -- how long have you had

15  that phone number?

16        A.    What, that one, 705?

17        Q.    The 705 number.

18        A.    Maybe about a year, year and a half.

19        Q.    Did you ever have the phone number of

20  422-8651?

21        A.    422-86 --

22        Q.    51.

23        A.    Sound familiar.  I might have, but I

24  can't recall where I was residing at that time, if
```

1    I had that number.

2         Q.    Okay.  Did you have a number of

3    different phone numbers when you lived at the

4    Middletown address?  Did you change numbers a

5    couple times?

6         A.    Yes, I have, yeah, a couple times.

7         Q.    Why did you change numbers?

8         A.    Why?

9         Q.    Mm-hmm.

10        A.    Well, people call your phone late

11   night and you're trying to rest -- you know, phone

12   don't -- so change my number.

13        Q.    Okay.  Do you know when you changed

14   your number?

15        A.    No, I couldn't even recall that, not

16   at this moment.

17        Q.    But you know you changed it -- was it

18   a couple times?

19        A.    Yes.

20        Q.    Two times, three times?

21        A.    Approximately -- approximately two or

22   three times.

23        Q.    Okay.  All right.  Did you ever have

24   the phone number 705-6398?

1        A.    6398, yes.

2        Q.    Okay.

3        A.    Trying to remember which house that

4   was, but I remember that number.

5        Q.    And what about 705-5110?

6        A.    I can't recall that number.

7        Q.    Okay.  What's your educational

8   background?

9        A.    Ninth, ninth grade.

10       Q.    Ninth grade?

11       A.    Yes, and I attended GED classes.

12       Q.    Did you get your GED?

13       A.    No, I didn't complete it.

14       Q.    Have you had any other degrees,

15   courses or training?

16       A.    No, none that I can recall.

17       Q.    Where did you get your -- where did

18   you go to ninth grade at?

19       A.    Middletown High School.

20       Q.    You've been handed what's been marked

21   as Exhibit Number 1.  Is this your application to

22   AK Steel?

23            MS. DONAHUE:  Look -- look over the

24   whole thing first before you answer.

1      A.     Yes, it is.

2      Q.     And did you apply -- it looks like

3  April 30th, 2001?  Top of the front page.

4      A.     Yes, yes.

5      Q.     And is it your handwriting throughout?

6      A.     Yes, it looks -- appear to be.

7      Q.     And your signature at the bottom of

8  the last page?

9      A.     Appear to be.

10     Q.     Okay.  Where did you submit this

11 application?

12     A.     I can't recall.  I submitted it --

13 maybe three or four approximately applications.

14 Some of them made it through the unemployment

15 office, most of them.

16     Q.     Did you submit any any other way?

17     A.     I submitted one through -- I guess

18 used to be executive through AK.  It was Choppy

19 Sanders.  And he said they would pull my ap, so I

20 remember that.  So I don't remember what happened

21 to that one.

22     Q.     And who was that you gave it to?

23     A.     Choppy Sanders.  I don't know his --

24     Q.     Choppy?

1      A.     Yeah, everybody know him that works at

2   AK.   That's all I ever knowed him by was Choppy

3   Sanders.

4      Q.     And what was his position at AK, do

5   you know?

6      A.     He was -- he was executive.  He was

7   somewhere on the board.

8      Q.     And how do you know him?

9      A.     From the neighborhood.  I done work

10  for him before.

11     Q.     What race is Choppy?

12     A.     He's African-American.

13     Q.     So you gave an application to him at

14  some point.  Do you know when?

15     A.     I can't recall exactly when I gave him

16  an ap.  I can't recall at this moment exactly when

17  I gave him the ap.

18     Q.     And what did he tell you?

19     A.     What did he tell me?

20     Q.     Yes, when you gave it to him, did he

21  tell you anything?

22     A.     No.  Basically he said give him the

23  application, see what he can do.

24     Q.     And did you ever hear back from him on

1  that?

2       A.    No, I did not.

3       Q.    Did you ever call him and ask him

4  about --

5       A.    No.  I think I started another job at

6  that time.

7            MS. DONAHUE:  Wait till she finishes

8  the question.

9            MS. PRYOR:  Yeah, ditto.  One of the

10  things we both need to try to do is not talk over

11  each other because it does make it hard on the

12  court reporter.

13       Q.    Okay.  What year did you move to

14  Middletown?

15       A.    I been in Middletown on and off all my

16  life 'cause --

17       Q.    Okay.

18       A.    -- my kids.  See, I been back and

19  forth.  I work here in Middletown and until the

20  job -- get laid off or something, then I'll go to

21  Columbus and work.  So I'm back and forth

22  basically.

23       Q.    Okay.  You said you submitted -- you

24  said maybe three or four applications to AK Steel?

1         A.      Yes, or more.

2         Q.      Okay.  Do you know when any of those

3    other applications were?

4         A.      Excuse me?

5         Q.      Do you know when you submitted any of

6    those other applications?

7         A.      I couldn't tell the dates 'cause --

8    you know, the reason I put an application in, I

9    been working at the mill.  Then they had it posted

10   that they was hiring through the unemployment

11   office.  So when they posted that, that's when I

12   went and put in more aps or updated my aps.

13        Q.      Okay.  Sitting here today, you

14   couldn't tell me when any of those applications

15   are, other than the ones sitting in front of you?

16              MS. DONAHUE:  Object to the form,

17   asked and answered.  Go ahead and answer as best

18   you can.

19        A.      Basically between I think like 2000, I

20   said I think I put in one in like -- I put in this

21   one in '01.  I put another one in like '03 and --

22              MS. DONAHUE:  Don't make guesses.  You

23   can give estimates --

24              THE WITNESS:  No.

```
 1              MS. DONAHUE:  -- but don't make

 2    guesses.

 3         A.    I believe around '03 -- between '02,

 4    '03 and I sent one in in 2006.  But I can't tell

 5    you the exact date, but it was 2006.

 6         Q.    Okay.  So roughly you've got one in

 7    2000, the one in front of you, Exhibit 1, in 2001?

 8         A.    Mm-hmm.

 9         Q.    The one in -- you say between 2002 and

10    2003?

11         A.    Approximately.

12         Q.    And you think one in 2006?

13         A.    Yes.

14         Q.    In 2006, was that for a temporary

15    placement position?

16         A.    Yes.

17         Q.    Okay.  All right.  Any others that you

18    can think of?

19         A.    No, not that I can recall at this

20    moment.

21         Q.    Okay.  And other than the one that you

22    gave to Choppy Sanders, the rest of them, did you

23    apply through the --

24         A.    At the --
```

1     Q.     -- at the unemployment office?

2     A.     -- unemployment office, yes, I did.

3     Q.     Okay.  And when you gave the one to

4  Choppy Sanders, where did you physically see him?

5  Did you go see him at AK Steel?  Did you see him

6  at --

7     A.     At his residence.

8     Q.     At his residence?

9     A.     Yes.

10     Q.     Okay.  And you still don't know which

11  one of the applications that might have been that

12  you gave to him?

13     A.     No, ma'am.

14     Q.     Okay.  All right.  When you submitted

15  each of the different applications, did you ever

16  speak to anyone about the applications?

17     A.     At the unemployment office?

18     Q.     Yes.

19     A.     Yes.

20     Q.     What was this conversation?

21     A.     That they was setting up meetings, try

22  to set up an interview with them.

23     Q.     The unemployment --

24     A.     Yeah, they said they was going to go

1    ahead and submit my applications to the human

2    resources over there and try to set up an interview

3    with them --

4              Q.    Okay.

5              A.    -- but I never heard from them.

6              Q.    You never heard from anyone at AK --

7              A.    No.

8              Q.    -- Steel?

9              A.    No.

10             Q.    Did anyone at AK Steel ever say

11   anything to you about any of your applications?

12             A.    Not that I can recall.

13             Q.    Okay.  And did you ever go, physically

14   go to AK Steel and apply?

15             A.    No.

16             Q.    And other than talking to Choppy

17   Sanders in that conversation we've talked about,

18   did you ever talk to anyone else at AK Steel about

19   your application or applying to become employed --

20             MS. DONAHUE:  Object to form, asked

21   and answered.

22             A.    I talked to one other person about a

23   job position at AK.

24             Q.    Who's that?

```
 1        A.    His name was Simon Brooks.

 2        Q.    Simon Brooks?

 3        A.    Yes.

 4        Q.    And when did you talk to him?

 5        A.    On and off from like 2004 to 2006, on

 6   and off.

 7        Q.    Okay.  And what did you talk to him

 8   about?

 9        A.    About trying to get me on at AK --

10        Q.    What --

11        A.    -- see if he can talk to anybody.

12        Q.    And what did he say?

13        A.    He said he'll try.

14        Q.    And is he -- what race is he?

15        A.    He's African-American.

16        Q.    And what's his position at AK Steel,

17   do you know?

18        A.    I think he just retired.  Now he's a

19   contractor through AK.

20        Q.    What was his position, do you know?

21        A.    No, ma'am.

22        Q.    Okay.

23        A.    It was in the office, so whatever he

24   did in the office.  He didn't do -- he wasn't out
```

1    in the mill.

2        Q.    Okay.  Now, Exhibit 1 was produced

3    to -- to me by your attorney.  Did you keep a copy

4    of this application?

5        A.    Which one, this one?

6        Q.    Yes, the one in front of you.

7        A.    No, I don't.  The unemployment office

8    don't give you copies.

9        Q.    You never made a copy of an

10   application?

11       A.    No, no, ma'am.

12       Q.    Do you know how your attorneys would

13   have gotten this application?

14           MS. DONAHUE:  Object to the form.

15   That's -- I'm going to instruct you not to answer.

16   That's privileged information.

17           MS. PRYOR:  The whereabouts of this

18   form is not privileged information.

19           MS. DONAHUE:  Whether an -- what his

20   attorneys had to do with it is privileged.

21           THE WITNESS:  Right.

22       Q.    You did not keep a copy of Exhibit 1?

23       A.    No, I did not keep of --

24       Q.    When you went to the unemployment

1   office to apply, did anyone ever go with you?

2        A.    Yes, one time.

3        Q.    Who?

4        A.    Allen Keith Roberts, he applied.

5   He -- Roberts, R-O-B-E-R-T-S, Allen Roberts.

6        Q.    Allen Roberts went with you?

7        A.    Yes.

8        Q.    Why did he go with you?

9        A.    Because I didn't know where it was,

10  unemployment office was.  And it was located at

11  Hamilton, Ohio at that moment, at that time.  And I

12  was doing -- he was doing work with me, so we went

13  by there.

14       Q.    Was he still employed at AK Steel at

15  that time?

16       A.    I believe so.

17       Q.    He was employed?

18       A.    Yes, yes, he was.

19       Q.    Do you know when -- which application

20  that was?

21       A.    I can't recall the exact date of that

22  application.

23       Q.    Was it the first time you applied, the

24  last time you applied?

1         MS. DONAHUE:  Object to the form as

2    compound, but separate them out and answer them.

3         A.    Approximately -- think I might have

4    been second or third ap.

5         Q.    Why did you not know where it was if

6    you'd already applied?

7         A.    'Cause I think they had took them to

8    Middletown, I think.  I think I applied one time I

9    think in Middletown unemployment office when it was

10   in Middletown, but they moved it from Middletown,

11   Ohio to Hamilton.

12        Q.    Okay.  Did he help you fill out the

13   application?

14        A.    No, he didn't.

15        Q.    When you applied, was anyone hostile

16   to you when you applied?

17        A.    No.

18        Q.    Was the application process itself

19   hostile at all?

20        A.    No.

21        Q.    Do you know whether AK Steel ever

22   received any of your applications?

23        A.    No, not that I -- can't recall they

24   received them or not.  Like I said, I was referred

1  by the unemployment office to AK.  I talked to

2  someone inside the unemployment office.

3       Q.    I'm sorry.  You --

4       A.    Someone in the unemployment office

5  said that he going to refer me to AK, send my ap

6  over to AK --

7       Q.    Okay.

8       A.    -- and I never heard from him or AK.

9       Q.    So you don't know whether he actually

10  did send it over or not?

11       A.    Right, I do not know.

12       Q.    Okay.

13       A.    Cannot answer.

14       Q.    When you completed the applications,

15  did you complete them similar to what we see on

16  Exhibit Number 1?

17            MS. DONAHUE:  Object to the form.

18  That's vague.

19       Q.    Would you have completed it in the

20  same manner, meaning the answers would have been

21  the same to the questions?

22            MS. DONAHUE:  Object to the form.

23  That's speculative.

24       A.    Repeat that again.

1      Q.    Sure.   When -- the only application I

2  think I have for you is what I see here as Exhibit

3  Number 1.

4      A.    Mm-hmm.

5      Q.    What I'm trying to ask you is, you

6  said you completed an application three or four

7  other times?

8      A.    Correct.

9      Q.    The information that you would have

10  filled out on those applications, would it have

11  been the same information you filled out on Exhibit

12  Number 1?

13          MS. DONAHUE:  Object to the form.

14  That's speculative and it's vague.

15      A.   I couldn't -- couldn't answer

16  'cause -- 'cause there could have been changes of

17  anything, application could have been filled out

18  differently.

19      Q.    And would the information have

20  changed?

21          MS. DONAHUE:  Object to the form,

22  speculative and vague.

23      Q.    What information would have changed?

24      A.    I couldn't tell you.  I don't see the

1    application in front of me to explain that, so --

2         Q.    Well, let's get through it.

3         A.    I can't explain it.  If anything had

4    changed because of the dates and the time, I

5    don't -- and my employment, so I couldn't --

6    there's no way I could tell you that better without

7    me looking at the application.

8         Q.    Okay.  Well, let's get to the

9    application.  You said you applied between 2000 and

10   2006.  The first line, your name, that would not

11   have changed, I assume, correct?

12        A.    Correct.

13        Q.    Okay.

14        A.    It would have stayed the same.

15        Q.    When you were living in Middletown

16   between 2000 and 2006, was your address the same?

17        A.    At the time I filled out this

18   application, yes.

19        Q.    Did you have a different address in

20   Middletown between 2000 and 2006?

21        A.    Between 2000 and 2006, yes.

22        Q.    What was the other address?

23        A.    They should be already on record, my

24   other addresses -- the -- wait a minute.  The

1  614 -- 614 Twentieth.  And I can't remember -- what

2  was that address?  It was on Sixth Street.  I can't

3  remember the address at this moment.  600 Sixth

4  Street, that's what it was.

5      Q.    Was that before or after you lived on

6  Twentieth Street?

7      A.    That was after Twentieth.

8      Q.    After Twentieth?

9      A.    Yes.

10     Q.    Okay.

11     A.    That was just temporary, like three

12  months total.

13     Q.    So you went from Twentieth Street to

14  Sixth Street --

15     A.    Mm-hmm.

16     Q.    -- and then to --

17     A.    That was in 2006.

18     Q.    2006 you were on Sixth Street?

19     A.    Yeah, I was on Sixth Street at the

20  end, I believe, if I'm on like November -- November

21  to like January, somewhere around in there.

22     Q.    Okay.  And when did you move to Regina

23  Avenue?

24     A.    I was -- previously used to live on

```
 1   Regina and I moved back.  My sister owned a home --
 2   home on Regina.
 3        Q.    Okay.
 4        A.    And I rented it previously for 400
 5   before then, then come back to Middletown for work.
 6   Then I recently just moved back up there to Regina.
 7        Q.    Okay.  So I must have written down --
 8   I had written down that you moved to Regina for a
 9   year and a half; is that not right?
10        A.    Before, yes, I have.  You asked me
11   where I lived at.  Regina, I reside on Regina
12   Avenue now.
13        Q.    Okay.  Have you lived at Regina Avenue
14   for the last year and a half or have you been at
15   Middletown --
16        A.    I been at --
17        Q.    -- part of the time?
18        A.    -- Middletown.  I lived in Regina
19   Avenue in January.
20        Q.    Okay.
21        A.    After January of this year, moved back
22   to Regina Avenue.
23        Q.    Okay.  When was the previous time that
24   you lived at Regina Avenue?
```

```
 1          A.    Before I lived in -- on Twentieth.

 2          Q.    So sometime prior to 2001?

 3          A.    Yes, yes, yes.

 4          Q.    Okay.  So between 2001 and the

 5   beginning of this year when you moved to Regina

 6   Avenue, you lived in Middletown?

 7          A.    Yeah, I -- I lived in Middletown 2006.

 8          Q.    Okay.  Going back to the application,

 9   would you consider a -- about the -- sorry.

10               Little bit down the page, it asks,

11   "Have you been convicted of a crime other than a

12   minor traffic violation?"  Did you write "NA"?

13          A.    Where's that at now?

14               MS. DONAHUE:  It's right here.

15          A.    Have you ever been convicted of a

16   crime other than a minor violation?  Yes, in '05

17   'cause I didn't have -- not that I can recall that

18   I been convicted of a crime than a minor

19   misdemeanor.

20          Q.    It doesn't ask for minor misdemeanor.

21          A.    Minor traffic.

22          Q.    It asks for minor traffic violations.

23          A.    Yes.

24          Q.    Do you consider driving without -- or
```

1    suspended license to be a minor traffic violation?

2         A.    Under the circumstances of what had

3    happened, doing -- you know, all that was dealing

4    with child support and most of them was thrown out.

5         Q.    So you had some child support claims

6    against you, too?

7         A.    Yes.  That's what my suspension --

8    that's why on my driving before -- about child

9    support.  And they go to pick me up.  You don't

10   know your license suspended.  You go to jail, call

11   child support, pay your money, you get your license

12   back, take them to the judge, throw it out, explain

13   it.  That's the way it worked.

14        Q.    Wait.  What court was this in?

15        A.    Butler County.

16        Q.    Butler County?

17        A.    Yes, it was.

18        Q.    And how many times did that happen?

19        A.    Maybe -- maybe approximately two or

20   three times.  A lot of it is due because the system

21   is slow.  You may make a payment and -- you may

22   make a payment today and the system may not record

23   till 10 days later and you get stopped before then.

24   And that's all you have to do is bring proof to the

1    court that you took care of that and that's

2    basically what happens with child support when your

3    license gets suspended.

4        Q.    Would you have changed that answer on

5    any of your other applications?

6            MS. DONAHUE:  Object to the form.

7    Calls for speculation.

8        A.    I couldn't -- I don't have them in

9    front of me.  I cannot answer it.

10       Q.    You may have put "yes"?

11       A.    I don't know.

12           MS. DONAHUE:  Object to the form.

13       Q.    You don't know?

14       A.    I don't know at the moment.

15       Q.    Okay.

16       A.    It's not in front of me.  I can't say

17   what's on something else that's not here with me.

18       Q.    I'm asking, would you have put "yes"?

19   Why would you have put "yes"?

20           MS. DONAHUE:  That calls for

21   speculation, but you can answer.

22       A.    I did not put "yes" on it.

23       Q.    Please?

24       A.    I would not put "yes" on it.

1    Q.    That was my question.  Thanks.

2    A.    Would I put "yes" on it?

3    Q.    Yeah, would you have answered that

4  question "yes"?

5    A.    I don't answer that question 'cause I

6  don't know what's on that.  And at this time, I

7  can't recall.

8    Q.    Okay.

9    A.    Maybe later I can probably, but not at

10  this moment.

11    Q.    Okay.  So it's possible that you would

12  have written "yes" to that question?

13          MS. DONAHUE:  Object to the form.

14  That mischaracterizes his testimony.

15    A.    I will not answer that 'cause at the

16  moment I told you I cannot tell you "yes" or "nay."

17    Q.    Okay.  That's fine.  If you don't

18  know, "yes" or "no," that's fine.  Okay.

19          In response to the question, "Have you

20  previously applied at Armco AK Steel," again, you

21  write "NA."  What does "NA" mean to you?

22    A.    Usually not acceptable or I can't

23  remember if I did or if I didn't, so I don't know

24  yeah or no.

```
 1        Q.    So --

 2        A.    At that time, I couldn't remember,

 3   so --

 4        Q.    So in April 2001, you didn't know

 5   whether you applied there before or not?

 6        A.    Before that date?

 7        Q.    Yes.

 8        A.    I don't know at that time.  I can't

 9   answer that.  I don't know at the time.

10        Q.    If you turn the page --

11        A.    To what?

12        Q.    -- to page 2, you list Middletown High

13   School and you say you graduated.  That's false, is

14   it not?

15        A.    Yes, it's false.

16        Q.    Okay.  You understood that you would

17   not be hired if you falsely or inaccurately or

18   incompletely filled out this application, did you

19   not?

20        A.    No, I do not.  I didn't --

21        Q.    Didn't understand that?

22        A.    It -- it was not done in purpose -- on

23   purpose.  Might have looked it over and misread it

24   wrong, but I didn't graduate 'cause all my aps
```

```
 1  state I did not graduate.
 2       Q.    You think all of your other aps would
 3  have stated that you did not graduate?
 4       A.    Yes.
 5       Q.    Okay.  And your -- on page 3, you list
 6  employers.  What's S --
 7       A.    S and K Construction.
 8       Q.    Is it S and K Construction?
 9       A.    Yes.
10       Q.    And what is that?
11       A.    It's a construction company out of --
12  located in Middletown, Ohio.
13       Q.    And what did you do for them?
14       A.    I was a laborer.
15       Q.    Meaning?  What do you do?
16       A.    Hard work, labor.
17       Q.    Pretty much everything?
18       A.    Pretty much everything --
19       Q.    Okay.
20       A.    -- from shoveling to raking,
21  whatever -- whatever is consist of, for you to do,
22  you do it as a general laborer.
23       Q.    Okay.  And according to this
24  application, you worked there from January '97 to
```

1    February 2001?

2         A.    Correct.

3         Q.    Is that correct?

4         A.    Yes.

5         Q.    Have you worked there any other time?

6         A.    No, not for S and K.

7         Q.    Okay.  Now, why did you leave S and K?

8         A.    It was a -- they -- they laid you off,

9    lack of work.  Basically I worked in the mill when

10   I worked for S and K.

11        Q.    You worked what?

12        A.    In the mill at AK, through a

13   contractor, subscontractor.  SK is a subcontractor

14   and basically when they have shutdowns or anything,

15   S and K was one of the major contractors inside the

16   mill.

17        Q.    What did you do inside the mill?

18        A.    From descaling to grouting to

19   drilling, worked in the blast furnace, shoveling

20   the tar pits, anything that consist -- that I had

21   to do inside the mill.

22        Q.    Okay.  And what -- the other employer

23   that you've got listed there --

24        A.    Graycor.

1      Q.    Is that a "G"?

2      A.    G, Graycor.

3      Q.    Graycor?  And what is that?

4      A.    That's a construction company.  They

5 had -- they are based out of the mill as a

6 subcontractor.

7      Q.    And you worked for them from January

8 '96 to January '97?

9      A.    Correct.

10      Q.    And why did you stop working there?

11      A.    Laid off, end of the project.

12      Q.    Have you ever applied back for

13 employment with either Graycor or S and K?

14      A.    No, they're subcontractors.  I'm a

15 member of the Local 534 union hall and --

16      Q.    Okay.  Does that mean that you did not

17 apply to them, that you were just picked up by them

18 as part of the union?

19      A.    Yes --

20      Q.    Okay.

21      A.    -- yes, part of the union.

22      Q.    Okay.  Anyplace else that you've been

23 sent from that union hall?

24      A.    No, ma'am, no.

1    Q.    Are you still a member of that union?

2    A.    Yes.

3    Q.    How long have you been a member of

4    that union?

5    A.    Since probably '95, 1995.

6    Q.    And these are the only two places

7    they've sent you?

8    A.    Yeah.  You just don't do shutdown.

9    You work as long as you want to work till the

10   company lay you off or lack of work.  If there

11   ain't no work, the company, then you go back to the

12   hall and they send you out to another company if

13   somebody need help.

14   Q.    But they haven't sent you to any other

15   company, is what I'm asking?

16   A.    No, I haven't been going back to the

17   hall, yeah, to the hall to look for work.

18   Q.    Okay.

19   A.    I haven't been looking for work

20   through the hall.

21   Q.    Okay.  What year did you go to ninth

22   grade at Middletown?

23   A.    I can't recall that.  That's been --

24   that's too long for me to try to remember that.

1     Q.    What's your date of birth?

2     A.    3/23/63.

3     Q.    Have you worked anywhere besides

4     Graycor and S and K Construction?

5     A.    Have I worked any other places?

6     Q.    Yes.

7     A.    Yes, I worked.

8     Q.    Where else have you worked?

9     A.    Since what date?

10    Q.    Since ninth grade.

11    A.    I don't -- I can't even start to

12    recall them because I can't remember the dates and

13    I don't work -- I worked a lot of places since high

14    school.

15    Q.    Well, just give me a list of --

16    A.    I work through a lot of temp services.

17    I work for Adecco, CBS.  I can just tell you some

18    of -- I used to take a lot of work for them, but I

19    can't tell you the dates and where I worked it at.

20    Q.    That's okay.  Let's just start with

21    where -- who you've worked for.

22    A.    I told you Adecco.

23    Q.    Adecco?

24    A.    Adecco --

```
 1        Q.    How do you spell that?
 2        A.    -- temp service.  I think it's
 3   A-D-D -- A-D-D -- is it E-C-O?  A-D-D-E-C-C-O
 4   (sic).
 5        Q.    That's a temp service?
 6        A.    Yes, it is.
 7        Q.    Okay.  And you said CBS?
 8        A.    CBS temp service.  I work for Palmer
 9   temp, through Palmer temp service.  And I worked at
10   a company called Tiger Poly in Columbus, Ohio.
11   Tiger, Tiger Poly.
12        Q.    Tiger Poly?
13        A.    Yes, okay.  I'm trying to remember the
14   names of some of these companies I worked for.  I'm
15   working for Spears in Mason.  I worked for M and M
16   Towing.  I work for Williams Auto Sales.  You know,
17   I can name every car lot, but I ain't going to do
18   that.  I used to repossess cars, so that's what I
19   did for a living.  I worked for every -- mostly
20   every car lot in Middletown, Ohio that was buy
21   here, pay here, repossessing cars.  I worked for
22   AKR Enterprise.
23        Q.    I'm sorry, what?
24        A.    AKR Enterprise.
```

1      Q.    AKR?

2      A.    Yeah, AKR Enterprise.  You want to

3  know everybody I worked for?

4      Q.    (Ms. Pryor nodded.)

5      A.    Innovative Body Shop.  And I'm trying

6  to figure out -- that's all I can recall at the

7  moment, but I know I worked for a lot more places.

8  I just got to sit down and think about it.

9      Q.    Okay.  CBS temp service, how many

10 times have you worked with them or through them?

11     A.    I only worked for them one time.

12     Q.    Just one time?

13     A.    Yes.

14     Q.    And roughly when was that?

15     A.    I couldn't even -- I couldn't even

16 tell you.

17     Q.    Was it before 2001?

18     A.    Yes, it was.

19     Q.    What kind of job did they send you out

20 for?

21     A.    I can't even -- I went through two or

22 three different jobs.  I can't even -- I can't

23 remember where.  I just know I worked for their

24 services.

1      Q.     Okay.  And you don't know where you --

2      A.     No.  They may send you somewhere three

3   or four days a week, and then they send you

4   somewhere else --

5      Q.     Okay.

6      A.     -- just to fill in.  So I can't even

7   recall all the places worked for them.

8      Q.     What about Adecco, was that before

9   2001?

10      A.     Can I see something?

11             MS. DONAHUE:  You have to answer her

12   questions.  You can't really ask me.

13             THE WITNESS:  I'm trying to -- I'm

14   trying -- I'm not  asking you.  I just wanted to

15   see that paper.

16             MS. DONAHUE:  You can ask her.

17      Q.     Is there something that would help you

18   remember?

19      A.     Yes, on my -- I just submitted that.

20      Q.     Interrogatory responses?

21      A.     Yes.

22      Q.     All right.

23      A.     That will tell me if I worked at --

24   for Adecco before 2001.

```
 1              MS. DONAHUE:  That's fine.
 2         Q.    You've been handed what's been marked
 3    as Exhibit Number 2.  Are these the responses that
 4    you asked for?
 5         A.    Yes, it is.
 6              MS. DONAHUE:  I don't mean to
 7    interrupt, but he read and signed and I gave you
 8    the signature paper.
 9              MS. PRYOR:  Mm-hmm.
10              MS. DONAHUE:  Sorry.
11              MS. PRYOR:  I think on page 5 might be
12    what you're looking for.
13              THE WITNESS:  It's not on page 5.
14              MS. DONAHUE:  I think right here.
15              THE WITNESS:  Not what I'm looking
16    for.  It might say about my --
17              MS. DONAHUE:  On page 6, right here.
18              THE WITNESS:  That's about my lawsuit,
19    so -- that's what I'm talking about.
20              MS. DONAHUE:  That is on page 4.
21              THE WITNESS:  Page 4 is what I'm
22    talking about.
23              MS. DONAHUE:  Right down here.
24              THE WITNESS:  Okay.  Now repeat your
```

1    question, please.

2         Q.    Yeah.  Adecco, did you work for them

3    before 2001?

4         A.    Before 2001, yes.

5         Q.    Okay.  Yeah.  I notice you're looking

6    at page 4 is work -- you listed as a workers comp'

7    claim.  Is that with Adecco?

8         A.    Yes, it is.

9         Q.    What was that injury?

10        A.    A knee injury.

11        Q.    Were you off work for a period of

12   time?

13        A.    Yes, I was.

14        Q.    How long were you off?

15        A.    Approximately six to -- six to eight

16   months.

17        Q.    Okay.  You received workers' comp

18   during that time?

19        A.    Yes, I did.

20        Q.    You got another workers' comp claim

21   there, ARRN --

22        A.    It's AKR.

23        Q.    AKR?

24        A.    Yes, it is.

```
 1        Q.    AKR Enterprises?

 2        A.    Yes.

 3        Q.    Okay.  And what was that injury?

 4        A.    A knee injury.

 5        Q.    Were you off work for a period of

 6   time?

 7        A.    Yes.

 8        Q.    How long were you off that time?

 9        A.    From him, from that company?

10        Q.    Yes.

11        A.    Maybe two months.

12        Q.    And did you receive workers' comp

13   benefits during that time?

14        A.     No, he did not have that.  That

15   company -- he did not carry it.  That's why we got

16   a suit going.

17        Q.    You filed a lawsuit against them?

18        A.     Well, I don't know what my attorney is

19   doing.  I don't -- I haven't updated on that yet,

20   so I don't know what they're doing.

21        Q.    Okay.

22        A.     I know it's a claim against them

23   because of that.

24        Q.    Okay.
```

1    A.    I couldn't tell you nothing else about

2    that case.

3    Q.    Okay.  All right.  So Adecco was

4    before 2001?

5    A.    Yes, yes.

6    Q.    What about Palmer temp, was that

7    before 2001?

8    A.    Yes.  All them other temp services was

9    approximately before then.

10    Q.    What about Tiger Poly, was that before

11    2001?

12    A.    Yes.

13    Q.    And what did you do for Tiger Poly?

14    A.    I was a machine operator.

15    Q.    And roughly how long did you work for

16    them, do you know?

17    A.    Maybe a year and a half, a year, year

18    and a half between.

19    Q.    Why did you leave there?

20    A.    They changed my shifts, had to change

21    shifts around.  I changed shifts.

22    Q.    Why wouldn't you change shifts?

23    A.    'Cause third shift, I can't work third

24    shift.

1      Q.    You can't work third shift?

2      A.    No.

3      Q.    Why not?

4      A.    'Cause my body -- my body ain't

5  designed to stay up late and unless I have to work

6  it, but basically I will not -- I will not accept a

7  job, just third shifts alone.

8      Q.    Okay.  All right.  Then you mentioned

9  Spears?

10     A.    Spears.

11     Q.    When did you work for them?

12     A.    I can't remember exact dates, but that

13 was -- Spears was about -- between 2002 and I think

14 2004.

15     Q.    So what did you do for them?

16     A.    I was a maintenance tech.  But see --

17 well, okay.  Let me rephrase that.

18     Q.    Sure.

19     A.    Spears was through -- what temp

20 service was they through?  On-Site, Spears was

21 through On-Site.

22     Q.    Okay.

23     A.    Okay.

24     Q.    Why did you leave that --

1        A.    I worked there almost -- and I know I

2   worked there over a year, plus I don't know exactly

3   how many months after a year.  And then they're

4   supposed to hire on, kept giving me runaround, then

5   they hiring off the streets, people just coming in

6   the door, so that's why I left.

7        Q.    So you left?

8        A.    Yeah.  I went through a temp service.

9   It's not -- I didn't have no benefits.  It's not

10  going to benefit me to stay with a company that's

11  hiring from the outside and I been there a year,

12  somebody walk in the door and they hire them.

13       Q.    Okay.  Did you have another job lined

14  up?

15       A.    Who, me?  I was self-employed.

16       Q.    What was your self-employment?

17       A.    Auto mechanic, auto service and home

18  improvement.

19       Q.    When did you do that self-employment?

20       A.    My self-employment, I been doing

21  self-employment when I don't work and I can't find

22  a job, that's what I do in between time to support

23  my family.

24       Q.    And you do -- you said auto mechanic,

1  home repair?

2      A.    Mm-hmm.

3      Q.    Was there something else?

4      A.    Just auto mechanic.

5      Q.    Is that kind of a word-by-mouth,

6  friends need --

7      A.    No, I had a -- I had a shop.

8      Q.    You had a shop?

9      A.    Yeah, I had a building in there,

10  licensed business.  It's not no --

11      Q.    Okay.

12      A.    -- sidewalk, whatever they want to

13  call it.

14      Q.    How long have you had that licensed

15  business?

16      A.    I had two businesses, B and S

17  automotive and the Louis Group, okay?  And the

18  Louis Group I think was established in 2003, 2003

19  or -- approximately 2003 to 2004.  I can't remember

20  exact date.  And B and S was established between

21  2005 and 2006.

22      Q.    Okay.  And do you operate either one

23  of those anymore?

24      A.    No.

1      Q.    You said it was a -- was it a

2    corporation?  Was it --

3      A.    Yeah, incorp (sic), yeah, yeah.

4      Q.    Okay.  Did you employ anyone besides

5    yourself?

6      A.    Who me?  No.

7      Q.    Okay.  So back in -- okay.  What is M

8    and M Towing?

9      A.    It's a towing service, a junkyard and

10   a towing service.

11     Q.    Roughly when did you work for them?

12     A.    On and off, I drove the tow truck.  I

13   said on and off I drove the tow truck when I didn't

14   have work to do.  You know, my job -- when my

15   business was slow, I go help them out and drive the

16   tow truck.

17     Q.    Was that before 2001 or after 2001?

18     A.    That's some before, some after.  I

19   can't tell you the exact year because when you need

20   help, I go in and help them.

21     Q.    What about Williams Auto Sales?

22     A.    That's before 2001.

23     Q.    And what did you do for them?

24     A.    Auto detailing, lock man and that's

```
 1   about it.
 2        Q.    Okay.  You said that you repossessed
 3   cars --
 4        A.    Yes.
 5        Q.    -- for a period of time?
 6        A.    Yes.
 7        Q.    What period of time was that?
 8        A.    Probably from like '96 to like 2003,
 9   2004.
10        Q.    Is that something they would pay you
11   on a per-car basis?
12        A.    Yes.
13        Q.    You weren't an employee of any of the
14   lots, but they kind of pay you as a contractor?
15        A.    I was employed at Williams.
16        Q.    You were -- okay.
17        A.    Yeah, I was employed at Williams at
18   the time.
19        Q.    Okay.  All right.  And then AKR
20   Enterprise, looks like that's after 2001?
21        A.    Yes, yes.
22        Q.    And what did you do for them?
23        A.    I worked at -- it's a long story,
24   trying to get it worded right.  He's a
```

1   subcontractor for Excel, which is a subcontractor

2   for Sears appliance -- home appliance, Sears, yes.

3        Q.    What did you do?

4        A.    Who, me?  I was the driver-installer.

5        Q.    And why did you leave that job?

6        A.    Because of injury.

7        Q.    Okay.  And you said Innovative Body

8   Shop?

9        A.    Correct.

10       Q.    What did you do for them?

11       A.    I was a auto mechanic and a body tech.

12       Q.    And why did you leave that job?

13       A.    Why did I leave the job, because

14  it's -- half the time, was not getting paid.  So

15  basically it was monetary reasons why.

16       Q.    What do you mean, you weren't getting

17  paid?

18       A.    He wasn't paying me on time, get paid

19  on Friday.  He'd say wait till next Friday, so I

20  kept going through problems about getting my --

21  getting my money.  So I couldn't no longer keep

22  doing it.

23       Q.    Okay.  And then what about Columbus

24  Steel --

```
 1          A.     Columbus Steel --

 2          Q.     -- did you work for them?

 3          A.     -- Casting.  Yes, I did.

 4          Q.     When did you work for them?

 5          A.     I worked from -- I can't say -- I

 6    can't tell you the exact date, but I believe

 7    it's -- I know it's 2006 to 2007, at the end of

 8    2006 to February 2007.

 9          Q.     Okay.  What did you do there?

10          A.     I was a burner.

11          Q.     Burner?

12          A.     Yes, ma'am.

13          Q.     And why did you leave that position?

14          A.     Because I went to school to drive

15    trucks, for my CDL's, for a better job.

16          Q.     Oh, is that what you're currently

17    doing?

18          A.     Yes.

19          Q.     Do you work for somebody?

20          A.     Yes.

21          Q.     Who do you work for?

22          A.     Decker.

23          Q.     D-E-C-K --

24          A.     D-E-C-K-E-R, Decker Transportation for
```

1    transport.

2          Q.    And you drive trucks for them?

3          A.    Yes.

4          Q.    When did you start doing that?

5          A.    I went to school in -- well, I went

6    solo -- I became a solo driver March the 14th.

7          Q.    And how much did you get paid for

8    that?

9          A.    You get paid by -- per mile.

10          Q.    And what do you get paid per mile?

11          A.    28 cents per mile, but eight cents per

12    diem.

13          Q.    Eight cents per diem?

14          A.    Mm-hmm.  It comes off the 28.  It's

15    not total, together.

16          Q.    Okay.  Roughly how much do you bring

17    home a week, then?

18          A.    As of now, bring home anywhere from --

19    see, this is a little twist to that because if I

20    base it on what I bring home or what I get advance

21    or what I have to pay, it could -- it could base

22    from three to 600 per week.  It all depends how

23    many miles you run.

24          Q.    You get a paycheck?

1      A.      Yes.

2      Q.      Paid weekly?

3      A.      Yes.

4      Q.      Do you have any benefits?

5      A.      Yes.

6      Q.      What kind of benefits do you have?

7      A.      Life, health, dental, all vision.

8      Q.      Do you pay for any of that?

9      A.      Yes.

10     Q.      How much do you pay for your benefits?

11     A.      I think I have it.

12             MS. DONAHUE:  Do you want to make a --

13     keep copy of this?

14             THE WITNESS:  I don't know what this

15     one is.

16             MS. DONAHUE:  Let me see.

17             THE WITNESS:  This is just the stub.

18     It don't -- it don't have my benefits on here.

19             MS. DONAHUE:  Okay.

20             THE WITNESS:  No, it don't have it.

21     It ain't on this one, so --

22     Q.      It shows up on your check stubs?

23     A.      Yes.  It's on the one in the car.

24             MS. PRYOR:  We're going to need check

1  stubs.  I'm sure it's requested in my original

2  request.

3           THE WITNESS:  This is a stub.  This is

4  one stub right there.

5      Q.    Do you get paid weekly --

6      A.    Weekly.

7      Q.    -- or do you get paid every two weeks?

8      A.    Yeah, that's a stub.  I got more

9  stubs.  I got -- you get two forms.  One of them is

10  in the car.  The one you want a copy of is in the

11  car that shows my total deductions for everything

12  they take out for.

13           MS. PRYOR:  Okay.  We can get that

14  later if you request --

15           MS. DONAHUE:  Okay.

16           THE WITNESS:  If we take a break, I

17  could go out to the car and get it, if you need it.

18           MS. PRYOR:  You can probably just send

19  it, send it to the attorneys and they can send it

20  to us and that would be fine.

21           THE WITNESS:  Okay.

22      Q.    Okay.  Any other employers that you

23  can think of that we haven't talked about?

24      A.    No, not that I can recall.

1      Q.     Okay.  Why did you not list any of

2    your other employers on your application, Exhibit

3    Number 1?

4      A.     Why?  Because most of them was before

5    2001 and before 2001, they say list from -- I

6    believe if I'm correct, I think it said list all

7    employees (sic) from '99 and up.  And AKR

8    Enterprise -- which employee (sic) are you

9    specifically talking about?

10     Q.     I'm talking about any of them in this.

11     A.     Which one?

12     Q.     There's two spaces asking for previous

13   positions and they're not completed.

14     A.     Two spaces?

15     Q.     On your application, page 2.

16     A.     'Cause this position I was applying

17   for, I believe what I did previously wouldn't -- I

18   just list down the two that was dealing with the

19   work I did then and would benefit me working for

20   that company.

21     Q.     On the last page, you say you've been

22   working in construction for four years?

23     A.     Yes.

24     Q.     Where was that at?

1      A.    On the last page?  Working --

2      Q.    In the --

3      A.    That was with the -- with that

4  company.

5      Q.    S and K and Graycor?

6      A.    Yes, possibly longer.  That's all I

7  can recall at that moment.

8      Q.    Why did you list Allen Roberts as a

9  reference?

10      A.    At that time, I was working for him

11  and he was a -- I been growed up with him since

12  high school, went to high school together.

13      Q.    Okay.

14      A.    And I did a lot of work for him and --

15  you know, he know how I work.

16      Q.    What kind of work did you do for him?

17      A.    Home improvements and that's what I

18  do, home improvement and -- what else?  Sears

19  had -- that everything?  AKR Enterprise -- repeat

20  that question again.

21      Q.    AKR Enterprise, is that Allen Roberts'

22  company?

23      A.    Yeah, Allen K. Roberts, that's his

24  company.

1       Q.    Okay.  And you're currently suing him?

2       A.    I ain't going to say.  I can't -- I

3   can't answer that because of my attorney.  I don't

4   know --

5       Q.    Okay.  That's fine.

6       A.    -- what they're doing at this moment.

7   I haven't been updated, so I don't know.

8       Q.    Okay.  And who is Jack Kenner?

9       A.    Childhood friend I grew up with.

10      Q.    Okay.  How about Monn Moore?

11      A.    Monn, that's M and M Towing.  He's the

12  owner of M and M Towing.

13      Q.    Okay.  And Exhibit Number 2, which is

14  your responses to interrogatories, is that your

15  signature on the third-to-the-last page?

16      A.    Yes, it is.

17      Q.    Okay.  And then you've been handed

18  what's been marked as Exhibit 3.  Is that your

19  signature?

20      A.    Yes, it is.

21      Q.    And what is that, are you verifying

22  again the answers on interrogatory number two?  Is

23  that why you signed that?

24      A.    Excuse me?

1        Q.    Why did you sign number three?

2        A.    Why did I sign it?

3        Q.    Mm-hmm.

4              MS. DONAHUE:  I'll just represent

5    that --

6              THE WITNESS:  I can tell her that.

7              MS. DONAHUE:  Well, no.  I'd rather do

8    it since it had to do with something I requested.

9    I just requested that you sign it because I,

10   frankly, wasn't aware that he had already signed

11   it.  We were mistaken about whether or not he

12   signed it.  We wanted to be sure to give you a

13   signed and verified copy.

14             MS. PRYOR:  Okay.

15             MS. DONAHUE:  So that's just a --

16   something --

17       Q.    And really my question is, when you

18   signed Exhibit Number 3, you were, again, verifying

19   the answers to Exhibit Number 2; is that correct?

20       A.    Yes, that's correct.

21       Q.    Did you know that Allen Roberts was

22   terminated from AK Steel?

23       A.    Yes.

24       Q.    How did you hear that?

```
 1              MS. DONAHUE:  Outside of -- and let --
 2    if you heard it from your attorneys --
 3              THE WITNESS:  No.
 4              MS. DONAHUE:  -- don't divulge
 5    anything your attorneys told you.
 6         A.    No, I did not.
 7         Q.    You did not hear it other than
 8    from communications with your attorney?
 9         A.    I did not hear if from my attorneys.
10         Q.    Okay.  Did you -- how did you hear
11    that?
12         A.    From him.
13         Q.    Okay.  What did he tell you?
14         A.    I can't recall exact words, word for
15    word.  You know, he said he's -- he's not working
16    for AK Steel.
17         Q.    Okay.  He didn't tell you why?
18         A.    He said they caught him sleeping, but
19    you -- he wasn't.  So that's all I know.  You know,
20    he don't -- he didn't discuss too much, so --
21         Q.    Okay.  Did he tell you that he tried
22    to get someone to lie for him?
23         A.    That he what now?
24              MS. DONAHUE:  Object to the form.
```

1   There's no foundation for that and answer as best

2   you can.

3        Q.    Did he ever tell you that he tried to

4   get someone to lie for him, to cover for him when

5   he was sleeping?

6        A.    No.  I don't know nothing.  I don't

7   know nothing about his --

8        Q.    Okay.

9        A.    -- situation, what went on with him.

10       Q.    Do you know anything about his

11   employment at AK Steel?

12       A.    Just as far as I know, he was

13   unemployed (sic) at AK Steel.  That's the only

14   thing I know.

15       Q.    You've been handed what's been marked

16   as Exhibit Number 4.  Is that your handwriting on

17   Exhibit 4?

18       A.    Appear to be.

19       Q.    Did you complete this as part of your

20   application to AK Steel in April 2001?

21       A.    Yes.

22       Q.    Looks like there's three other

23   employers that you've listed on this form?

24       A.    I told you I couldn't remember them

1    all.  That's why --

2         Q.    That's okay.  I'm not trying to hang

3    you up on it.  Let's just go through them.  What's

4    Mount Carmel -- is it medical?

5         A.    Mount Carmel Medical Center, yes.  I

6    worked there.

7         Q.    What did you do for them?

8         A.    I had two positions.  I was

9    housekeeping and a biohazard tech.

10        Q.    Okay.  And you say you worked for them

11   two years; is that right?

12        A.    Yeah.

13        Q.    Do you know roughly when that was?

14        A.    I can't remember the date.  It was

15   before -- I think it was before -- I can't remember

16   the exact dates.

17        Q.    Okay.

18        A.    But I'm quite sure it was before 2000,

19   before 2000.

20        Q.    Was it before you worked at S and K

21   and Graycor?

22        A.    I don't think so.  No, I think it was

23   after.  That was after, I believe.  It was after.

24   I can't remember exactly exact dates.

1       Q.     Okay.

2       A.     Been so long.

3       Q.     That's all right.  What about Klean

4    Rite Detail, what is that?

5       A.     That was a shop.  It was a automotive

6    and a detail shop in a car lot.  My father owned

7    that.  Well, he operated it.  He didn't own it.  It

8    was owned by Williams Auto Sales.

9       Q.     And what about Big Ten Auto Sales?

10       A.     That's another one.  That's another

11    car lot.

12       Q.     Did you -- were you repossessing cars?

13    Is that what you did for them?

14       A.     No, I didn't repossess for them.  I

15    was a lot man and a detail man.

16       Q.     Okay.  And those estimates of how long

17    you worked for each of those, is that accurate to

18    the best of your knowledge today?

19       A.     To the best of my knowledge.

20       Q.     Okay.  Have you ever been terminated

21    from any employer?

22       A.     Not that I can recall at this moment.

23       Q.     All right.  And number four asks, "Do

24    you have a high school diploma or a GED?" and you

1  said yes.  That's false, is it not?

2      A.    Correct.

3      Q.    Number 10 asks, How many years of

4  assembly, heavy machinery or heavy manufacturing

5  experience do you have?  Did you write three?

6      A.    How many years of assembly, heavy

7  machinery and -- or manufacturing experience do you

8  have, I did -- yes, that's --

9      Q.    Okay.  Where did you have those years

10  of experience at?

11      A.    As far as what, S and K Construction,

12  as far as -- it says for heavy machinery or

13  manufacturing experience, yes.  Factory --

14  experience with factory, Tiger Poly was a factory

15  machine operator.

16      Q.    What were you referring to when you

17  wrote three?

18      A.    Huh?

19      Q.    What employers were you referring to

20  when you wrote three?

21      A.    At what, at three?

22      Q.    In response to question number 10, you

23  wrote three.

24      A.    It says heavy -- assemble -- assembly

1  heavy machinery and/or manufacturing experience do

2  you have?  That was Spears, Tiger Poly, S and K,

3  Graycor, ran machines for them.

4        Q.    Well, Graycor and S and K, added to

5  five years, according to your list.

6        A.    Well, at that time, I put three, you

7  know.  I --

8        Q.    Were you just guessing?

9        A.    Basically.

10       Q.    Okay.

11       A.    You know, just trying to --

12       Q.    Okay.

13       A.    Yeah.

14       Q.    You said that working on a rotating

15  shift is preferred.  Was it preferred or --

16       A.    Excuse me?

17       Q.    Did you prefer to work on a rotating

18  shift where you worked third?

19       A.    Depending on -- yeah, I think I -- I

20  answered that depending on what the job was, what

21  the job consist of.  I ain't -- I'm not going to

22  work on a rotating shift making five, $6 out of an

23  hour.  There's no way.  If I'm making like $21 an

24  hour, yes.  If I have to work it, I'll work it.

1   But not for five, $6 an hour.  I'm not going to

2   work no rotating shift.

3        Q.    Who did you work rotating shifts for?

4   Have you ever worked them before?

5        A.    I can't -- I'm trying to remember.  At

6   this moment, I can't remember.  But I believe I

7   have worked at one job rotating, but I can't

8   remember exactly what job it was or where I was at

9   at that time.

10        Q.    Okay.

11        A.    Can't remember at this time.

12        Q.    You've been handed what's been marked

13   as Exhibit Number 5.  Is this a copy of the EEOC

14   charge you filed?

15        A.    Mm-hmm.

16        Q.    Is that your signature at the bottom

17   of page 1?

18        A.    Yes, ma'am.

19        Q.    Is that your signature on the last

20   page?

21        A.    Yes, it is.

22        Q.    And you filed this with the EEOC, it

23   looks like July 16th, 2002; is that correct?

24        A.    July the what?

1      Q.     July 16th, 2002.

2      A.     Yes.

3      Q.     And at the time you filed this, it

4  looks like your home phone number was 705-6398.

5  Would that be correct?

6      A.     Yes, it could be, yeah.  Number sounds

7  familiar.

8      Q.     Okay.

9             MS. DONAHUE:  Read the document all

10  the way through before you answer any questions.

11            THE WITNESS:  Okay.

12            MS. PRYOR:  Are you ready?

13            THE WITNESS:  Yes.

14            MS. PRYOR:  Okay.

15            MS. DONAHUE:  Did you read it?

16            THE WITNESS:  I read over it.

17            MS. DONAHUE:  Well, read it.  I mean,

18  actually read it.  This part.

19            THE WITNESS:  Oh, okay.  Okay.

20      Q.     Are you ready?

21      A.     Yes.

22      Q.     Who typed up Exhibit Number 5?  Did

23  you type this or did someone else?

24            MS. DONAHUE:  Object to the form,

1   compound.

2          A.     I can't -- I can't recall.

3          Q.     Okay.  Under the "Statement of Facts,"

4   you say, "I applied three times to AK Steel."  Do

5   you believe that to be correct at this time?

6          A.     Yes, approximately.

7          Q.     Okay.  And we saw one was in April

8   2001.  Here you say the most recent was November

9   2001.  Would you have reapplied that close

10  together?

11         A.     Yes.  Yeah, it's possible.  It's

12  possible.

13         Q.     Do you remember today whether you

14  applied in November 2001 or not?

15         A.     I can't recall.

16         Q.     And you say that you submitted your

17  applications by giving them to current AK Steel

18  maintenance employee Allen Roberts.  Did you ever

19  submit applications that way?

20         A.     No, not that I can recall.

21         Q.     You did not?

22         A.     Not that I can recall.  All mine was

23  done through the unemployment office, except for

24  one --

1      Q.     Okay.

2      A.     -- was done through Choppy.

3      Q.     Okay.  You state that the general

4   labor position required basic skills, such as

5   ability to do construction work.  Who told you that

6   that was the skill set required?

7      A.     That's what a labor position is.

8      Q.     Who told you that?

9      A.     Just general labor, basic skills,

10  labor, hard work.  That's really what laborers do,

11  just work.  You know, it's not required to be a

12  machine operator or -- you know, just a laborer,

13  just a laborer, like a helper.

14     Q.     So that was just your own intuition?

15     A.     That's what a laborer is basically,

16  just do labor work.  You don't really operate

17  machines, not when you're union 'cause unions, you

18  got machines.  Laborer is just help.

19     Q.     Did anyone explain that to you that

20  that's how it was at AK or is that your assumption?

21            MS. DONAHUE:  Object to the form,

22  asked and answered.  Mischaracterizes his

23  testimony.  Go ahead.

24     A.     Repeat that again.

```
 1        Q.    Did anyone at AK Steel explain to you
 2   that that's what their laborers did, or was that
 3   your assumption?
 4        A.    I don't want to answer that.
 5        Q.    I'm sorry?
 6        A.    I can't answer that one at the moment
 7   'cause I can't remember.  I worked -- put it this
 8   way.  I assumed --
 9        Q.    I what?
10        A.    I basically assumed that's what it
11   consist of, by me having experience in working in
12   the mill around them, doing the same thing they
13   doing, what I was doing, so --
14        Q.    You say I have more than 12 years'
15   experience as a construction worker.  Where were
16   those 12 years' experience as a construction worker
17   at?
18        A.    Construction consist of -- I used -- I
19   used to do blacktop sealing for my father -- you
20   know, and all of that.  So I have years of
21   experience doing that.
22        Q.    When did you do that blacktop sealing
23   for your father?
24        A.    That was after high school.  I can't
```

1    remember the exact date.  That was another job.  I

2    can't remember, but it -- you know, was something

3    he did on the side.

4         Q.    How long did you do that?

5         A.    I can't remember.  Can't answer.

6    Can't even recall how long.

7         Q.    Couple years, couple months?

8         A.    Basically it's on and off only when

9    you got the job.  It wasn't consistent year after

10   year or a stretch of a period.  May have a job this

11   a week; may have another one to do for three or

12   four months.

13        Q.    Anyplace else besides S and K

14   Construction, Graycor and this blacktopping that

15   you did for your father?

16        A.    I worked for another company out at

17   the mill, but I cannot remember their name for --

18   nothing before Graycor, but I cannot remember their

19   name.

20        Q.    How long did you work for them?

21        A.    It was during shutdown, maybe six

22   months' shutdown.

23        Q.    And you've never been terminated from

24   any of these positions?

```
 1          A.     No, not that I can recall.

 2          Q.     You say you've got --

 3          A.     Not to my knowledge.

 4          Q.     You say you've got excellent

 5    references, including that of current employee

 6    Allen Roberts.  Did you believe him to be an

 7    excellent reference?

 8          A.     At that time.

 9          Q.     Do you still believe him to be an

10    excellent reference?

11          A.     No, I can't really -- I don't -- I

12    don't really want to answer that.  I don't have to

13    answer that one, do I?

14          Q.     Do you still consider him to be an

15    excellent reference?

16          A.     I don't really want to answer that.

17          Q.     Is that because the answer is, no, you

18    do not consider him to be an excellent --

19          A.     I don't want --

20          Q.     -- reference?

21          A.     -- to answer that question.

22          Q.     Well, I'm asking you to answer the

23    question.  You're here for a deposition.

24          A.     No.
```

 1        Q.    No?  Why do you not consider him to be
 2   an excellent reference?
 3        A.    Depended on when.  You talking about
 4   before, before this or after this?  So after 2006,
 5   no, I do not.  Before then, yes.
 6        Q.    Okay.  Is that because whatever you've
 7   got going on between you and his business?
 8        A.    Yes.
 9        Q.    And you claim you never heard anything
10   back from AK Steel; is that correct?
11        A.    Correct.
12        Q.    And to your knowledge, AK Steel never
13   acknowledged they didn't receive the application;
14   is that correct?
15        A.    As far as my knowledge, yes.
16        Q.    You've been handed what's been marked
17   as Exhibit Number 6.  Is this a copy of the notice
18   of right to sue that you received from the EEOC?
19        A.    Excuse me.  Was you talking to me?
20        Q.    I'm sorry.  Did you receive a copy of
21   Exhibit Number 6 --
22        A.    Yes, I believe so.
23        Q.    -- roughly around January 9th, 2003?
24        A.    Correct.

1       Q.    Did anyone at AK Steel ever say

2    anything to you about your applications?

3             MS. DONAHUE:  Object to the form,

4    asked and answered.

5       A.    No.

6       Q.    Did anyone at AK Steel ever say

7    anything to you about why you were not hired?

8       A.    No.

9       Q.    Do you know why you were not hired?

10            MS. DONAHUE:  Calls for -- I object to

11   the form.  Calls for speculation.

12      A.    Say that again.

13      Q.    Do you know why you were not hired?

14            MS. DONAHUE:  Same objection.

15      A.    I don't -- I don't want to answer the

16   question 'cause I don't --

17      Q.    I'm sorry?

18      A.    Why was I not hired --

19      Q.    Yeah.

20      A.    -- by AK?

21      Q.    Do you know why you were not hired?

22      A.    Basically because -- I assumed that

23   because of color of my skin 'cause I'm

24   African-American was why I was not hired.

1    Q.    Why did you assume that?

2    A.    I didn't -- work for them, worked in

3    there, subcontracting right next to them, do the

4    same thing they do every day.  And why -- and I was

5    trained by AK to work in there.  Why was I not good

6    enough, that I got looked over, that I couldn't get

7    hired?  I worked with the masons.  I worked with

8    the carpenters.  I worked with everybody side by

9    side with them.

10    Q.    Any other reason why you think it was

11   because of your race?

12    A.    Huh?

13    Q.    Is there any other reason why you

14   think it was because of your race?

15    A.    Yes, in a way because it's -- I worked

16   beside AK with 21, 22-year-old, young white males,

17   quote, unquote, that I don't want to work here.

18   Reason I working here is because my daddy got me

19   the job and making me work, okay?  And don't have

20   no dependents, no kids or nothing.  They just there

21   because who they know.  And not -- they could work

22   a year at McDonald's and I could have five years of

23   construction and they would look over me because of

24   color of my skin and hire a white male because who

1    he know.

2         Q.    Who are these white 21-year-olds that

3    you talked about?

4         A.    The people I work beside.  I can't --

5         Q.    Do you remember their name?

6         A.    I can't remember any names at this

7    moment.

8         Q.    Do you know any of their

9    qualifications?

10        A.    Probably -- probably slim to none.

11   Probably don't have no qualifications.

12        Q.    Do you know any of their

13   qualifications?

14        A.    No.  I know one said he worked at

15   McDonald's and AK called him.

16        Q.    And you said they knew people --

17        A.    Yes.

18        Q.    Did they -- their parents?

19        A.    Yes, yes.  Said they knew people

20   that --

21        Q.    Okay.

22        A.    -- that worked there in higher places.

23   Their whole family -- well, one -- I can

24   remember -- I can recall the last name, Spivey, but

1    I can't tell you which one.

2        Q.    Spivey?

3        A.    Yes, that his whole family worked

4    there and that's why he working there, okay?

5        Q.    Mm-hmm.

6        A.    So --

7        Q.    Okay.  Anything else?  Any other

8    reason why you think it was because of your race?

9        A.    Yeah, because the application states

10    your race.  And AK, I believe -- and my tendency

11    when they see your application and they say black,

12    they automatic move it -- move it to the side and

13    look at white applicants' race -- white applicants'

14    application before they would look at a

15    African-American application.

16        Q.    Do you have any basis for that belief?

17        A.    They did it because the percentage --

18    they weren't hiring us and -- and I feel like half

19    the people I work beside, by my work experience, I

20    was more qualified to work AK than they was.

21        Q.    Do you know anyone who AK Steel hired

22    who did not have either a high school diploma or a

23    GED?

24        A.    Well, can't recall that.  Can't

1    recall, but --

2        Q.    Do you know anyone --

3        A.    If I can --

4        Q.    Please?

5        A.    I can't recall, can't recall.

6        Q.    Do you know anyone who AK Steel hired

7    who lied on their application?

8        A.    I can't recall.

9        Q.    Anything that would help you recall?

10       A.    I can't -- I can't recall because it's

11   been so long since I was -- well, what I was told

12   from someone at AK, as long as in -- I'm attending

13   my GED classes, I cannot be -- what you call it?  I

14   cannot be looked over.  I was in class,

15   attending -- trying to get my GED.

16       Q.    Who told you that?

17       A.    I can't remember.  I can't recall.

18       Q.    When were you in classes for your GED?

19       A.    I think it was in '97, '98, somewhere

20   in that time at Middletown Community Center that's

21   offering GED classes.

22       Q.    Have you been in classes since then?

23       A.    No, I have not.

24       Q.    Okay.  Has anyone at AK Steel ever

1   said anything to you about your race?

2        A.    At AK Steel?  I've not worked at AK

3   Steel, so there's no way nobody could have said

4   anything --

5        Q.    Okay.

6        A.    -- about my race.

7        Q.    Okay.  Has anyone at AK Steel ever

8   said anything that you believe is discriminatory?

9             MS. DONAHUE:  Object to the form.

10  That calls for a legal conclusion.

11       A.    Not that I can recall at this moment.

12       Q.    Is there anything that would help you

13  recall?

14       A.    Not at this time.

15       Q.    Have you ever heard from anyone else

16  that -- anyone at AK Steel ever said or did

17  anything that was discriminatory?

18            MS. DONAHUE:  Object to the form.

19  Calls for a legal conclusion.

20       A.    Not that I can recall.  Maybe they

21  did, maybe they didn't.

22       Q.    You don't recall?

23       A.    Not that I can recall at this moment.

24       Q.    Do you know who AK Steel hired instead

1   of you?

2        A.    Not at this time.  Many people that

3   got hired at AK since I done put in aps, so --

4        Q.    Do you know anyone who was hired with

5   less qualifications than you, less qualified than

6   you?

7        A.    I don't know his name.  There have

8   been people --

9        Q.    Who?

10       A.    -- of their race.  I don't -- I

11  don't -- I can't recall their names at the moment

12  that I worked beside, so --

13       Q.    How do you know what their

14  qualifications were?

15       A.    'Cause this is about what they told

16  me.

17       Q.    Is that what they told you?

18       A.    Yes, person that worked there.

19       Q.    You don't know their names?

20       A.    I can't remember now.

21       Q.    Do you know when they were hired?

22       A.    No.  Roughly anytime between the time

23  I was inside working for Graycor, S and K, working

24  beside some of them.

1    Q.    So that was -- it was '97, 2001 range?

2    A.    Basically.

3    Q.    And do you know who -- are these the

4    people that you said knew people?

5    A.    Yeah.

6    Q.    Have you ever seen a psychologist or

7    counselor?

8    A.    No.

9    Q.    No?

10    A.    No.

11    Q.    Ever take any medications for emotions

12    or nerves or --

13    A.    No.

14    Q.    Have you applied for any other

15    position that you've not received?

16    A.    Have I applied?

17    Q.    Have you applied at any other job and

18    not received it?

19    A.    Yes, I believe so.

20    Q.    Can you think of any of those places?

21    A.    I know I probably applied for some

22    jobs that didn't get -- didn't get called on.  So

23    during my time putting applications at the places

24    that was hiring.  So I can't recall all of them --

1      Q.     Okay.

2      A.     -- at the moment, I can't, no.

3      Q.     Do you have any witness or other

4  individual who you believe has information that

5  will support your claims?

6      A.     Claims on what, the discrimination or

7  what?

8      Q.     Yeah, the claims that you've brought

9  in this lawsuit.

10     A.     Yes, I -- a couple.

11     Q.     Who?

12     A.     Some people that can probably say --

13  depends on what grounds you talking about.  But as

14  far as discrimination, discriminate me about not

15  being hired by the color of my skin, working there.

16            You know, like I can name a lot of

17  people can tell -- know how I work and know that I

18  should have been hired inside that plant before a

19  lot of white males that they got in there or was

20  working at the time.  I can go -- I can give you a

21  list of people that probably tell you --

22     Q.     Who thinks that you should have been

23  hired over the white male?

24     A.     Simon Brooks before -- that far as my

1    qualifications, the way I work, should have been in

2    there before a lot of people that was working

3    beside them.

4         Q.    Not your qualifications on paper

5    necessarily?

6         A.    Yes, yes.  The way I work and they

7    know my work ethic, the way I work.

8         Q.    Okay.

9         A.    They know I should have been there and

10   I worked in the mill on the shutdown, so I know

11   what hard work is.

12        Q.    Anyone besides Simon Brooks?

13        A.    Derrick Williams.

14        Q.    Who is Derrick Williams?

15        A.    He's a AK employee.

16        Q.    Is he white or black?

17        A.    He's black.  He's African-American.

18   Kenneth -- Kenneth Dorns is an employee of AK.

19        Q.    Kenneth what?

20        A.    Kenneth Dorns.

21        Q.    How do you spell his last name?

22        A.    D-O-R-N-S.

23        Q.    Is he an AK employee?

24        A.    Yes, he is.

1    Q.    And what color is he?

2    A.    He's African-American.  And I forget

3  Dave's name.  I'll probably get with my attorney

4  and find out what -- I'll find out his last name.

5  He's worked there, too.  He's a white male.

6    Q.    Anyone else?

7    A.    He's no longer employed there.

8    Q.    Who?

9    A.    He's no longer employed there, so --

10    Q.    Well, who is he?

11    A.    Is it necessary to know who he is and

12  he's not employed there anymore?

13    Q.    If you think he supports your claim

14  somehow.

15    A.    No, he won't.

16    Q.    Please?

17    A.    No, he's not -- he's no longer an

18  employee there.

19    Q.    Why do you think he would support your

20  claim?

21    A.    Say what now?  He wouldn't support my

22  my claim.

23    Q.    Well, what's his name?

24    A.    It's irrelevant right now 'cause I

```
 1   don't -- I don't want to say his name because he's

 2   no longer an employee there.

 3        Q.   What's the person's name that you're

 4   thinking of?

 5        A.   I can -- he's no longer employed

 6   there.  He cannot support my claims, so why would I

 7   tell you his name?

 8        Q.   Because I've asked you for his name

 9   and we're in a deposition.

10        A.   Excuse me?

11        Q.   I've asked you for his name and we're

12   in a deposition.  What is the name of the

13   individual who used to work at AK Steel?

14        A.   Jeff Gregory.

15        Q.   Is that the one you were just thinking

16   of?

17        A.   Yes.

18        Q.   Why do you think he would not support

19   your claims?

20        A.   That's -- I don't want to -- I don't

21   want to answer that.

22        Q.   Why do you think he would not support

23   your claims?

24        A.   I'm just saying I don't want to answer
```

1  that.

2        Q.    We're in a deposition and I'm asking

3  questions.  And you're here and required to answer

4  the questions.  Why do you think he would not

5  support your claims?

6        A.    Personal matters.

7        Q.    What kind of personal matters?

8        A.    I don't -- I don't really have to

9  explain to you personal matters, do I?

10             MS. DONAHUE:  You have to answer her

11  questions unless I instruct you not to answer.

12        Q.    What are the personal matters?

13        A.    Oh, involving his fiance and me, so

14  that's -- you know.

15        Q.    Did any of these individuals ever say

16  that they thought you should have been hired?

17        A.    Yes, basically all of them.  And

18  there's some more, but I just can't think of them

19  at this moment, but --

20        Q.    Jeff Gregory said you should have been

21  hired?

22        A.    At that time, yes.

23        Q.    He's African-American?

24        A.    Yes, he is.  He's deceased as of now.

```
 1          Q.     He's deceased?

 2          A.     Yes.

 3          Q.     When did he die?

 4          A.     I believe last year or year before

 5     last.

 6          Q.     How is that a personal matter between

 7     his fiance and you, then?

 8          A.     That was way before his death.

 9          Q.     But he did work at AK Steel?

10          A.     Retired.

11          Q.     And he retired from AK Steel?

12          A.     Mm-hmm.

13          Q.     And he was African-American?

14          A.     Yes, he was.

15          Q.     Anyone else?  Is there anyone who

16     knows about your applications, other than you

17     telling them you applied?

18          A.     Not that I can recall.

19          Q.     Did you talk to anyone about your

20     application at AK Steel?

21                 MS. DONAHUE:  Object to the form,

22     asked and answered.

23          A.     Did I talk -- repeat that.

24          Q.     Did you talk to anyone about your
```

1   application at AK Steel?  You talk to anyone, say

2   hey, I applied at AK Steel?

3        A.    I talked to the unemployment service.

4   Yeah, I talk to the people at the unemployment

5   office, yeah.

6        Q.    Anyone else?

7        A.    No, not that I can recall.

8        Q.    Do you have any documents which

9   support your claim?

10       A.    Documents on what?

11       Q.    Do you keep notes of anything?

12       A.    If I have, I don't -- I couldn't tell

13  you where they at -- where they at or anything at

14  this moment.

15       Q.    Do you remember taking notes when you

16  applied or about people you talked to or --

17       A.    No, no, I can't recall.

18       Q.    Do you keep a journal?

19       A.    No, I do not.

20       Q.    Did you ever receive any

21  communications from AK Steel?

22       A.    Did I receive any communications from

23  AK Steel?

24       Q.    Yes.

 1          A.     No, not that I can recall.

 2          Q.     Do you know anything about any of the

 3    claims of any of the other individual plaintiffs in

 4    this case?

 5          A.     No, I do not.

 6          Q.     Do you know anything about Allen

 7    Roberts' claims, other than what your attorneys may

 8    have told you?

 9          A.     No, I do not know nothing about his

10    claims.  I said, no, I do not know nothing about

11    his claims.

12          Q.     Are you related to any of the other

13    plaintiffs in this case?

14          A.     No, I am not.

15          Q.     Why did you decide to sue AK Steel?

16          A.     Why did I decide to sue them?

17          Q.     Mm-hmm.

18          A.     'Cause I felt like I was discriminated

19    against.  I did like four, five years in there

20    right beside them and put in applications and they

21    wouldn't even consider hiring me or look at me

22    because -- maybe 'cause it was the color of my

23    skin, so we believe it.

24          Q.     Have you told me everything that forms

1  the basis for that belief?

2      A.    That I can think of right now.

3      Q.    Is there anything that would help you

4  recall anything else?

5      A.    Not at this time.

6      Q.    Do you think there's any other reason?

7      A.    It's possible.

8      Q.    Do you have any documents that would

9  help you recall any other reason?

10     A.    No, I do not.

11           MS. PRYOR:  We would certainly like

12 the documents produced that we previously

13 requested, including pay stubs, W-2's, tax records.

14     Q.    Do you -- on your individual company

15 that you created, did you have tax forms?

16     A.    Yes, I did.

17     Q.    Do you still have those?

18     A.    No, I do not.

19     Q.    Do you have any of the tax records?

20     A.    I don't have no -- I don't have no

21 legal documents on anything 'cause my ex-fiance

22 destroyed -- when we broke up, she destroyed

23 everything I had that was left there.

24     Q.    When did you break up?

1          A.      2000 -- 2005, late part of 2005, 2006.

2                  MS. PRYOR:  Well, whatever he's got,

3     including current pay stubs, we request.

4                  MS. DONAHUE:  Okay.

5                  MS. PRYOR:  That's it.

6                  MS. DONAHUE:  Okay.  We will take a

7     little break and see if we're done.

8          (Off the record:  12:27 p.m. - 12:32 p.m.)

9                  MS. DONAHUE:  All right.  We have no

10    questions.

11                 (Deposition concluded at 12:32 p.m.)

12

13         _____

                      Edward J. Lewis, Jr.

14

15

16

17

18

19

20

21

22

23

24

```
1           C E R T I F I C A T E

2

3   STATE OF OHIO           :

4                           :    SS

5   COUNTY OF HAMILTON      :

6

7           I, Susan M. Barhorst, a Notary Public in

8   and for the State of Ohio, duly commissioned and

9   qualified, do hereby certify that prior to the

10  giving of this deposition the within-named

11  EDWARD J. LEWIS, JR., was by me first duly sworn to

12  testify the truth, the whole truth, and nothing but

13  the truth; that the foregoing pages constitute a

14  true, correct, and complete transcript of the

15  testimony of said deponent, which was recorded in

16  stenotypy by me, and on the 27th day of June

17  2007 was submitted to counsel for deponent's

18  signature.

19          I further certify the within deposition was

20  duly taken before me at the time and place stated,

21  pursuant to the Federal Rules of Civil Procedure;

22  that I am not counsel, attorney, relative or

23  employee of any of the parties hereto, or their

24  counsel, or financially or in any way interested in
```

1   the within action, and that I was at the time of

2   taking said deposition a Notary Public in and for

3   the State of Ohio.

4           IN WITNESS WHEREOF, I have hereunto set my

5   hand and notarial seal at Cincinnati, Ohio, this

6   27th day of June 2007.

7

8

9
                    Susan M. Barhorst, Notary Public
10                  in and for the State of Ohio.
                    My commission expires
11                  February 18, 2009

12

13

14

15

16

17

18

19

20

21

22

23

24