UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

FOR THE WESTERN DIVISION


VIVIAN BERT, et al.,          : CASE NO. 1:02CV00467

        Plaintiffs,          : Judge Beckwith

v.                            :

AK STEEL CORPORATION,         :

        Defendant.           :

_____

        Deposition of SHAWN R. PRYOR, taken on

Wednesday, June 6, 2007, commencing at 2:05 p.m.,

at the offices of Taft, Stettinius & Hollister LLP,

425 Walnut Street, Suite 1800, Cincinnati, Ohio,

before Susan M. Barhorst, Notary Public.


AROUND-THE-CLOCK REPORTING SERVICES
P. O. BOX 11008
CINCINNATI, OHIO 45211
513-481-5200

```
 1    APPEARANCES:

 2    On behalf of Plaintiffs:

 3        Susan Donahue, Esq.
          Wiggins, Childs, Quinn & Pantazis, PC
 4        The Kress Building
          301 19th Street North
 5        Birmingham, Alabama 35203

 6    On behalf of Defendant AK Steel Corporation:

 7        Patricia A. Pryor, Esq.
          Taft, Stettinius & Hollister LLP
 8        425 Walnut Street, Suite 1800
          Cincinnati, Ohio 45202-3957

 9
      Cross-Examination
10
          by Ms. Pryor                    3
11

12                          *  *  *

13    MILLER DEPOSITION EXHIBITS      MARKED/IDENTIFIED

14          1                         28

15          2                         43

16          3                         44

17          4                         58

18          5                         58

19          6                         59

20          7                         65

21          8                         68

22

23

24
```

```
 1                    SHAWN R. PRYOR
 2   being first duly sworn, testified as follows:
 3                   CROSS-EXAMINATION
 4   BY MS. PRYOR:
 5       Q.    Mr. Pryor, my name is Patty Pryor and
 6   I represent AK Steel Corporation in a lawsuit you
 7   filed against them.
 8       A.    Yes.
 9       Q.    Can you state your full name for the
10   record, please?
11       A.    Shawn Ramone Pryor.
12       Q.    And have you ever been involved in
13   litigation before?
14       A.    Not -- the only litigation I have been
15   involved in is with this situation here.
16       Q.    Okay.  Have you ever testified under
17   oath before?
18       A.    No.
19       Q.    Okay.  Let me just give you a few
20   ground rules for the deposition.  If you don't hear
21   a question I ask, please ask me to repeat it.  If
22   you don't understand what I'm asking, please ask me
23   to rephrase or tell me that you don't understand.
24   Otherwise, I'm going to assume that you're
```

1    answering the question I'm asking.

2        A.    Okay.

3        Q.    The other thing that's important is

4    that you answer verbally.  No nodding, shaking of

5    the head 'cause it's hard for the court reporter to

6    take it down.

7        A.    Gotcha.

8        Q.    Also, the "na-huh's" and "ah-huh's"

9    are sometimes hard, too.  So, again, "yes" and

10   "no's."  And also, if we don't talk over each

11   other.  It's another pet peeve, I know, of the

12   court reporter.

13             So let me finish my question, and then

14   I'll try to let you finish your question (sic) --

15       A.    I understand.

16       Q.    -- okay?  Any reason you would not be

17   able to testify today?

18       A.    No.

19       Q.    Do you have any -- take any drugs,

20   alcohol, medication today?

21       A.    No, I -- no, I did not.

22       Q.    Do you normally take any medication?

23       A.    No, I do not.

24       Q.    Okay.  Have you ever filed for

1  bankruptcy?

2      A.    No, I have not.

3      Q.    Have you ever been convicted of a

4  crime?

5      A.    No, I have not.

6      Q.    What's your current address?

7      A.    My current address is 35 Aspen,

8  A-S-P-E-N, Court, Cincinnati, Ohio 45246.

9      Q.    How long have you lived there?

10      A.    I have lived there since -- one moment

11  please.  January of 2007.

12      Q.    Where did you reside before that?

13      A.    Before that, I resided at 7807 John

14  Adams Lane, Dayton, Ohio 45459.

15      Q.    And how long did you live there?

16      A.    I lived there from -- if I remember

17  correctly, my memory best serves me, July 2005 till

18  January 2007.

19      Q.    And where did you reside before that?

20      A.    Before that, I resided at -- one

21  moment please.  9333 Swaying, S-W-A-Y-I-N-G, Court,

22  Apartment D, Miamisburg, Ohio.

23      Q.    Did anyone live with you at any of

24  these addresses?

```
 1        A.    I live with my fiance at 35 Aspen

 2   Court.  I lived with my friend at 7807 John Adams

 3   Lane and I lived with a friend at 9333 Swaying Pine

 4   Court.

 5        Q.    How long did you live at Swaying Pine?

 6        A.    Swaying Pine Court, that was a year.

 7        Q.    So roughly sometime in 2004 to July

 8   2005?

 9        A.    Yes, that is correct.

10        Q.    I want to keep going.  At some point,

11   did you live at 1101 Young Street?

12        A.    Yes, I did.

13        Q.    Did you live there with anyone?

14        A.    I lived there with my father.

15        Q.    And how long did you live there?

16        A.    See, that was from --

17              (Off-the-record discussion.)

18              MS. DONAHUE:  Say them out loud or

19   don't say them at all.

20        A.    I lived there from 1993, all the way

21   to 2002.  And between '93 and '94, I also lived

22   with my mother as well.

23        Q.    Okay.  Give me a little bit of your

24   educational background.
```

```
 1        A.    My --

 2        Q.    Did you graduate high school?

 3        A.    Yes, I did.

 4        Q.    What high school?

 5        A.    Middletown High School.

 6        Q.    And what year did you graduate?

 7        A.    1992.

 8        Q.    And growing up, did you live with your

 9   mother or your father?

10        A.    My parents were divorced.  I think

11   they divorced at the age of -- at my -- well, I was

12   six or seven.  I split time between both

13   residences.

14        Q.    And did you go to college?

15        A.    Yes, I did.

16        Q.    Where did you go?

17        A.    Miami of Ohio.

18        Q.    And did you graduate?

19        A.    Yes, I did.

20        Q.    And what year did you graduate?

21        A.    December of 1999.

22        Q.    Did you go right from high school to

23   college?

24        A.    Actually, yes, I did.  I went from
```

1  Middletown High School to Miami University's branch

2  campus in Middletown between 1992 and '93.

3      Q.    And then did you go right from the

4  Middletown branch to the main branch?

5      A.    No.  From '92 -- after that, '93, '94,

6  I had taken a year off.  And '94 through '95, I

7  went to Miami University Middletown.  And from

8  there on out, I split time between both, between

9  both schools.

10      Q.    Okay.  And what was your degree in?

11      A.    My degree, a BA in Arts and Sciences,

12  English with a focus on creative writing.

13      Q.    Sounds like my background.  Doesn't

14  get you very far.  You said you have a fiance?

15      A.    Yes.

16      Q.    What's her name?

17      A.    My fiance's name is Lee, L-E-E, Oder,

18  O-D-E-R.  It's okay.  We have to go through this

19  all the time.

20          (Off-the-record discussion.)

21      Q.    Okay.  Let's go through your

22  employment history.

23      A.    Yes.

24      Q.    Did you work anywhere after high

1    school?

2         A.    After high school, actually I

3    didn't -- I did not work until after my first year

4    of college.  I worked for a company called J.

5    Riggins.

6         Q.    And what did you do for them?

7         A.    I sold clothing.

8         Q.    How long did you do that?

9         A.    I did that for about a year.

10        Q.    So this was roughly --

11        A.    That was between --

12        Q.    -- '93, '94?

13        A.    -- '93, '94, yes.

14        Q.    Why did you leave that?

15        A.    I left that because I was also working

16   for -- I was actually -- I left that because I went

17   to work for Toys R Us.

18        Q.    Okay.  And what did you do at Toys R

19   Us?

20        A.    I was a stock clerk.

21        Q.    And how long did you hold that

22   position?

23        A.    I held that, if I remember correctly,

24   for one year, less than a year.  It was less than a

1    year.

2         Q.    So is it roughly in the '95 range?

3         A.    That was in the '95 range.

4         Q.    And why did you leave that position?

5         A.    Better opportunity and I went to Comp

6    USA.

7         Q.    Did you go directly from Toys R Us to

8    Comp USA?

9         A.    Yes, I did.

10        Q.    Okay.  And how long did you work at

11   Comp USA?

12        A.    On and off for a few years.

13        Q.    What do you mean by "on and off"?

14        A.    Let's see.  I started in Comp USA, if

15   I remember correctly, of March -- I'm saying March

16   of '95.

17        Q.    Okay.

18        A.    And I worked with Comp USA -- worked

19   with Comp USA for about a year, year or two.  And

20   then I spent like two months with a company called

21   Furcotech.  That didn't -- that did not pan out the

22   way I wanted it to, so I went back to Comp USA.

23        Q.    Okay.  What is Furcotech?

24        A.    Furcotech is a manufacturing company

1  located in Franklin, Ohio.

2      Q.    What did you did do for them?

3      A.    I did computer repair.

4      Q.    And why didn't it work out?

5      A.    The hours didn't balance out with my

6  collegiate career, so I went back to Comp USA.

7      Q.    In other words, you were having

8  trouble doing college and that, Furco because of

9  the hours?

10     A.    Yes, that is correct.  That is

11 correct.

12     Q.    And I'm sorry.  How long did you work

13 for Comp USA the second time?

14     A.    I worked at Comp USA -- I ended my

15 career at Comp USA, if I remember correctly, in

16 1998.

17     Q.    Why did you leave there?

18     A.    I left there because I had an

19 opportunity to work with PC Review Media Group.

20     Q.    And what is that?

21     A.    PC Review Media Group was a company

22 that produced a free magazine dealing with

23 information technology every month.  They also had

24 a radio show on an AM radio station.  And we also

1    worked at the radio station.  So we provided IT

2    service for the radio station.

3        Q.    What did you do?

4        A.    I wrote articles for the magazine.  I

5    did research work for my boss.  I did information

6    technology repair and service.  And from time to

7    time, I was a co-host of their radio show.

8        Q.    Where is that located?

9        A.    It was located in Kettering, Ohio, but

10   since -- they been out of business for a few years.

11       Q.    Okay.  Why did you leave that

12   position?

13       A.    I left that position 'cause I had

14   graduated from -- I graduated from Miami in

15   December of '99.  I thought I was going to graduate

16   school, so I left Brick House Publishing -- it used

17   to be called Brick House Publishing.

18            I left PC Review Media Group probably,

19   if I remember correctly, February of 2000 because I

20   thought I was going to graduate school in Miami,

21   Florida.  That did not happen.  And also at the

22   same time, there were no benefits.  There was no

23   health care plan.

24       Q.    Did you apply to go to graduate school

```
 1   in Miami of Florida?

 2        A.     Yes, I did.

 3        Q.     What happened?

 4        A.     They got my application, they reviewed

 5   my application and I was not accepted.

 6        Q.     What were you going to -- what did you

 7   want to go to graduate school for?

 8        A.     Film school for film.

 9        Q.     Did you apply anywhere else for

10   graduate school?

11        A.     To my knowledge, no.

12        Q.     All right.  So what was your next job

13   after PC Review Media Group?

14        A.     After PC Review Media Group, I worked

15   for a company called Signs Now.

16        Q.     What did you do for them?

17        A.     I built signs.

18        Q.     What kind of signs?

19        A.     Say, for instance, outside this --

20   outside this door -- outside this room there is a

21   sign that says "Gamble Room," those types of signs,

22   we design those --

23        Q.     Okay.

24        A.     -- as well as signs for rental
```

1    companies, leasing companies, construction

2    companies that want to sell property.

3        Q.    Okay.  And when did you work?  What

4    dates did you work at Signs Now?

5        A.    To the best of my knowledge, I would

6    probably have to say from March -- it was only for

7    a few months.  It was only for a few months.

8    Started in March or April and I think it only

9    lasted two or three months, top, if that.  It was

10   not a long-term job.

11       Q.    And why did it end?

12       A.    It ended because it didn't pay enough.

13       Q.    Where did you go next?

14       A.    I worked for Trader Publishing in

15   Miamisburg, Ohio.

16       Q.    When did you start at Trader

17   Publishing?

18       A.    I started at Trader Publishing -- I

19   really want to say -- one moment.  I have to think

20   about this for a second -- for a moment.  I would

21   like to say the summer of 2000.

22       Q.    Did you do anything between Signs Now

23   and Trader Publishing?

24       A.    At this time, I can't think of

1  anything at this general time.

2      Q.    Okay.  Were you unemployed for a

3  period of time?

4      A.    A short period of time, very short

5  period of time.

6      Q.    Okay.  What was your position at

7  Trader Publishing?

8      A.    At Trader Publishing, I began there as

9  a graphic artist.

10     Q.    Did you change jobs at some point?

11     A.    Yes.  I was promoted to systems

12  manager.

13     Q.    And what does a system manager do?

14     A.    A system -- systems manager oversees

15  computers for our company that design the ads, puts

16  the workers on a set schedule so we can build books

17  and give them to the publishers so they can publish

18  them, print them out on time.

19     Q.    You oversee people working on the

20  computers or did you --

21     A.    Oversaw the computers, as well as the

22  employees.

23     Q.    Okay.  Did you actually do the work on

24  the computers?

1      A.     Yes.

2      Q.     What was your pay at Trader

3  Publishing?

4      A.     Let's see.  If I remember correctly,

5  it started off when I was a graphic artist, it

6  wasn't that much.  Probably was around $8 an hour,

7  eight or nine bucks an hour.  When I became a

8  systems manager, my wage was 30,000 -- 30,000 a

9  year.

10     Q.     Okay.  Do you have benefits there?

11     A.     Yes.

12     Q.     Health insurance?

13     A.     Health insurance.

14     Q.     Dental?

15     A.     I can't recall if I had dental.

16     Q.     Why did you leave Trader Publishing?

17     A.     My position was downsized.

18     Q.     Was yours the only position that was

19  downsized or were there others?

20     A.     Just mine.

21     Q.     They explain anything other than just

22  downsizing?

23     A.     From what I was told, I made things

24  run a little too smoothly, so my services weren't

1    needed.  And if I wanted to stay, I would have to

2    take a pay cut and become a graphic artist again.

3         Q.    Okay.  What was your next position

4    after that?

5         A.    My next position after that there --

6    for a period of time, I did spot work.  I did a

7    little bit of computer contracting work for a

8    company called Regent Systems.

9         Q.    Okay.  What did you do?

10        A.    If they needed me to run network cable

11   or fix a computer for a client, pretty much any

12   type of standard IT job that any of their clients

13   needed, I would go do.

14        Q.    Okay.  Did you get paid by the hour or

15   did you get paid --

16        A.    I got paid by the hour.

17        Q.    Did you get paid by Regent Systems or

18   by the client?

19        A.    By Regent Systems.

20        Q.    And how much did you get paid by the

21   hour?

22        A.    If I remember correctly, between nine

23   to $10 an hour.

24        Q.    And was that roughly between October

1  2001 and January 2002?

2      A.    Yes.

3      Q.    And why did you leave that?

4      A.    I left that because there was simply

5  no more work left to do at that time and I found a

6  full-time job.

7      Q.    Did you -- what were your hours

8  roughly for Regent Systems?

9      A.    For Regent Systems, it was part-time

10  work.  Every -- every now and then, you may have a

11  moment where it would become full time for like a

12  week or two, but it was part time, basically.

13      Q.    Where was the full-time employment

14  that you found after that?

15      A.    The full-time employment that I found

16  after that -- that I found after that was at Dalco

17  Electronics, located in Springboro, Ohio.

18      Q.    And what did you do for them?

19      A.    I sold computer parts and did computer

20  repair.

21      Q.    Is that for home computers, business

22  computers?

23      A.    Home and business.

24      Q.    And how long did you work for Dalco?

1        A.    I worked for Dalco between January,

2   February 2002 to November 2002.

3        Q.    Okay.  And what was your pay there?

4        A.    My pay -- my pay there was around $8

5   an hour, if I remember correctly.

6        Q.    Did you get any raises?

7        A.    To my knowledge, I may have received

8   one raise.

9        Q.    Do you know how much that was for?

10       A.    No.

11       Q.    Did you have any benefits?

12       A.    There was medical.

13       Q.    Did you have to pay for that?

14       A.    It was taken out of your pay.

15       Q.    Do you remember how much that was?

16       A.    No, I do not.

17       Q.    Why did you leave there?

18       A.    I left there because I found a better

19   job.

20       Q.    And where was that?

21       A.    Northwest Local School District.

22       Q.    And what did you do for him?

23       A.    I was a computer technician/systems

24   analyst for the company -- or not for the company,

1    for the school district.

2        Q.    Were you the only one or were there

3    more than one of you that did that?

4        A.    It was a team.

5        Q.    How many were on the team?

6        A.    There were four to five employees --

7    four or five employees on the team and we had our

8    boss.

9        Q.    Who was your boss?

10       A.    My boss, I had two actually.  My first

11   boss was Renita, R-E-N-I-T-A, Heideman,

12   H-E-I-D-E-M-A-N.  My second boss was LaDonna

13   Stouder.

14       Q.    How do you spell the last name?

15       A.    S-T-O-U-D-E-R.

16       Q.    What was your pay at Northwest

17   Schools?

18       A.    My pay at Northwest Schools, to the

19   best of my knowledge when I started out, I started

20   out at roughly $25,000 a year.  And by the time I

21   left, it was around 31,000.

22       Q.    And when did you leave?

23       A.    I left there in 2005, between June or

24   July.  That's when I left Northwest Local Schools.

1       Q.    And why did you leave?

2       A.    I left for a better opportunity.  I

3   worked -- went to work for RWD Technologies.

4       Q.    Did you receive benefits at the

5   Northwest Schools?

6       A.    Yes.

7       Q.    What were the benefits?

8       A.    Health care and they had a retirement

9   plan.

10      Q.    Health care, did you pay for part of

11  that?

12      A.    Yes.

13      Q.    Do you remember how much you paid?

14      A.    To the best of my knowledge, 30 to $40

15  a paycheck.

16      Q.    How about retirement, did you pay for

17  any of that?

18      A.    A small percentage.  I can't remember

19  the actual numbers, though, for retirement.

20      Q.    And you said you went to RWD --

21      A.    Yes --

22      Q.    -- Technologies?

23      A.    -- RWD Technologies.

24      Q.    And what did you do for them?

1      A.    I became an SAP consultant/training

2   analyst.

3      Q.    What does that mean?

4      A.    What that means is, I, with a team of

5   employees, would go to a company that just

6   purchased SAP for accounting and business purposes.

7   We go in.  We teach them how to use SAP and we

8   provide them training documentation and materials

9   in order for them to do their job.

10      Q.    And you started there roughly June

11   2005?

12      A.    Roughly June -- between June and July

13   2005, yes.

14      Q.    And when did you leave there?

15      A.    I left there November of 2006.

16      Q.    Why did you leave there?

17      A.    Or actually -- I apologize.  I would

18   like to correct myself.  I left there October 2006.

19      Q.    Why did you leave there?

20      A.    The job came with extensive travel.

21      Q.    Why was that a problem?

22      A.    I -- my life personally was changing.

23   My relationship with my now fiance played a role in

24   that.  I did not want to be on the road anymore.

1    Q.    What was your pay with RWD?

2    A.    My pay with RWD was over 40,000, over

3  40,000 a year.

4    Q.    Did you receive any raises while you

5  were there?

6    A.    We would receive bonuses and normally

7  the bonuses were contingent on how much the company

8  made and I did receive one raise.

9    Q.    What was your ending pay?

10    A.    My ending pay, to the best of my

11  knowledge, $43,000.

12    Q.    Did you have benefits there?

13    A.    Yes, medical as well as dental.

14    Q.    Do you remember how much you paid for

15  that?

16    A.    No, I do not.

17    Q.    Did you go somewhere after RWD?

18    A.    Yes.  I left RWD in October and worked

19  for Engyro Corporation -- the Engyro Corporation in

20  November of 2006.

21    Q.    And what did you do for Engyro

22  Corporation?

23    A.    I am a software developer/technical

24  writer for Engyro.

1    Q.    You currently still hold that

2    position?

3    A.    Yes, I do.

4    Q.    When you say "technical writer," what

5    does that mean?

6    A.    Technical writer takes the software

7    that is developed by a core team of developers and

8    basically builds an instruction manual so an

9    average person can look at -- can look at the

10    manual and understand how to use the software.

11    Q.    Okay.  And what's your pay there?

12    A.    My pay there is $48,000 a year.

13    Q.    And you started there in November

14    2006?

15    A.    Yes, I did.

16    Q.    And what benefits do you have?

17    A.    Full medical.

18    Q.    How much do you pay for that?

19    A.    To my knowledge, at least $50 a

20    paycheck, to my knowledge.

21    Q.    Any other benefits?

22    A.    Not that I can think of at this

23    moment.

24    Q.    Do you have retirement with them?

```
1        A.    No.

2        Q.    401K?

3        A.    No.

4        Q.    Life insurance?

5        A.    Yes.

6        Q.    Do you pay any part of that?

7        A.    No.

8        Q.    Disability plan?

9        A.    I do not recall there being a

10  disability plan.

11        Q.    Have we talked about all of your

12  employment history now?

13        A.    To the best of my personal knowledge,

14  yes.

15        Q.    Okay.  And other than when you worked

16  for two months at Furcotech, have you ever worked

17  for any other manufacturing company?

18        A.    To my knowledge, no.

19        Q.    Okay.  And when you worked at

20  Furcotech, you worked in a computer role, correct?

21        A.    I did work -- I worked in a computer

22  role.  From time to time, we would hit the

23  industrial floor to do IT and computer repair and

24  also to do -- look over machinery.
```

 1              If I had stayed with the company

 2    longer, I would have been put into training to

 3    learn how to repair a lot of machinery at Furcotech

 4    as well.

 5        Q.    Okay.  But you never did do that,

 6    correct?

 7        A.    I had a -- about one day with the

 8    training on that.

 9        Q.    Have you applied anywhere else that

10    you did not receive a position?  And let's just

11    talk about like the last five, six years, since

12    2001.

13        A.    I have applied with Miami of Ohio.

14        Q.    What did you apply to do there?

15        A.    I have for many information technology

16    jobs there.

17        Q.    Anyplace else that you've applied?

18        A.    I have applied at Anthem.

19        Q.    What kind of job did you apply for?

20        A.    Information technology.

21        Q.    Okay.  Anyplace else?

22        A.    I applied for general -- with General

23    Electric.  As far as positions there, both IT and

24    floor work.

1      Q.    When did you apply at GE?

2      A.    I applied to GE -- to the best of my

3  knowledge, I applied to GE in 2005.

4      Q.    Anyplace else you've applied?

5      A.    Wright State University.

6      Q.    What kind of job were you applying for

7  there?

8      A.    That was a IT job as well.

9      Q.    Anywhere else?

10     A.    At this time, that's all I can think

11  of.

12     Q.    Did you receive any call backs or

13  interviews on any of these jobs?

14     A.    I received call backs with Wright

15  State and I had a interview with Wright State.

16     Q.    Did you receive an offer from Wright

17  State?

18     A.    No.

19     Q.    Anywhere elsewhere you received a call

20  back or an interview from?

21     A.    To my knowledge, no.  To my knowledge,

22  no.  I received a letter saying that we thank you

23  for applying.  We looked over your resume and we

24  had a bunch of clients -- bunch of people that

1    applied for the job, and although you have a solid

2    skill set, we feel that -- we chose someone else

3    that we feel is also qualified.

4         Q.    Who did you receive that letter from?

5         A.    I received that letter from Miami of

6    Ohio.  I received it via e-mail from Anthem.  And

7    General Electric, I received that via e-mail as

8    well.

9         Q.    Do you have those still?

10        A.    No, I do not.

11        Q.    How many times did you apply at AK

12   Steel?

13        A.    Once.

14        Q.    You've been handed what's been marked

15   as Exhibit 1.  Is this your application that you

16   made to AK Steel?

17        A.    It is my application.

18        Q.    Okay.  Is it your handwriting

19   throughout?

20        A.    It is my handwriting throughout, yes,

21   it is.

22        Q.    I know it seems a little bit cut off

23   on this copy, but it looks like it's out of order.

24   But the third page, does that look like the top

1  part of your signature at the bottom?

2      A.    Yes, it does.  It does look -- it does

3  look like my signature.

4      Q.    Okay.  And do you know whether or not

5  AK Steel was hiring at this time?

6      A.    Yes.

7      Q.    How did you know they were hiring?

8      A.    I was informed from my uncle, Allen

9  Roberts, that they were hiring and he said -- he

10  knew at that time I was in and out of work and he

11  recommended that I apply because he felt, as I

12  felt, that I had a strong skill set.  I was very

13  intelligent and I could do the job, whether it be

14  technical or hard labor and I needed a job.

15      Q.    Did he tell you what positions they

16  were hiring for?

17      A.    No.

18      Q.    Is that the only way that you knew

19  that they were hiring was from Allen Roberts?

20      A.    (Witness nodded.)

21      Q.    Is that a "yes"?

22      A.    Yes.  I apologize.

23      Q.    And your mother is Vivian Bert,

24  correct?

1          A.      That is correct.

2          Q.      Did Allen Roberts ever tell you

3    anything about his employment at AK Steel?

4          A.      No, he did not.

5          Q.      Did he ever tell you about anything

6    that happened at AK Steel?

7          A.      No, he did not.

8          Q.      He encouraged you to apply?

9          A.      Yes, he did.

10         Q.      He thought you could get the job?

11         A.      He thought I -- in his mind, as in

12   mine, we both thought that I was capable of

13   employment for AK Steel.

14         Q.      Did you keep a copy of your

15   application?

16         A.      To my knowledge, I cannot remember if

17   I did or not.

18         Q.      Did you gather documents during this

19   litigation to provide to your attorneys?

20         A.      Could you rephrase --

21         Q.      Sure --

22         A.      -- the question?

23         Q.      -- yeah.  Have you looked through your

24   own documents or files or records and gathered

1   documents for purposes of this litigation?

2        A.    The only documentation that I have

3   given or been asked to give was tax records and

4   they -- and I was also asked if all the companies

5   and places I --

6                MS. DONAHUE:  Just a second.

7                THE WITNESS:  Oh.

8                MS. DONAHUE:  Anything your attorneys

9   told you is confidential information.  So listen to

10  her question and just answer the question.  She's

11  not really asking you what your attorneys told you.

12               THE WITNESS:  Oh.

13       Q.    Just asking what else you gathered.

14       A.    Oh, what else I gathered?

15       Q.    Regardless of whether your attorneys

16  told you to or not, was there anything else you

17  gathered besides your tax records?

18       A.    To my knowledge, no.

19       Q.    Do you know where this application

20  came from, this copy that's produced by plaintiffs,

21  which would be you and your group?

22       A.    To the best of my knowledge, I

23  remember going to an office at AK Steel to get this

24  application.  That was years ago, so I'm not sure

1    if that office still exists.

2         Q.    You don't remember if you kept -- you

3    don't remember making a copy of it?

4         A.    I do not remember making a -- I do not

5    remember if I made a copy of this application.

6         Q.    Did you show your application to your

7    uncle, Allen Roberts?

8         A.    No, I did not.

9         Q.    Did you show it to your mother, Vivian

10   Bert?

11        A.    No, I did not.

12        Q.    Would there be any reason why any of

13   the other plaintiffs would have a copy of your

14   application?

15             MS. DONAHUE:  Answer the question.

16   It's just -- go ahead.

17        A.    I do not know.

18        Q.    Okay.  So you don't know where this

19   copy of this application came from; is that your

20   testimony?

21        A.    Could you repeat the question, please?

22        Q.    Yes.  Here's what I'm trying to figure

23   out.  This document was produced by your attorneys

24   to us.  Therefore, I'm assuming it's coming from

```
1   one of the plaintiffs that they represent.  I'm

2   asking a question --

3             MS. DONAHUE:  I know.  I'll explain in

4   a minute.

5             MS. PRYOR:  Well, you don't need to

6   explain it.  He needs to -- he can answer a

7   question.

8             MS. DONAHUE:  That's fine.

9       Q.    What I'm trying to find out is whether

10  the document came from you.

11      A.    I remember giving this document to the

12  people at AK Steel for employment and --

13      Q.    Okay.  Have you given it to anybody

14  else?

15      A.    I did not -- to my -- to the best of

16  my knowledge, I did not give this documentation to

17  anyone else.  I turned this in in the hopes to get

18  a job with AK Steel.

19            MS. DONAHUE:  Okay.  Just let me say I

20  think -- I think AK Steel provided this.  They

21  provided tons of applications to us.  I think this

22  came from AK Steel to us.

23            MS. PRYOR:  At the bottom, it says

24  Plaintiff's First Production to Defendant.
```

1          MS. DONAHUE:  I know because --

2          MS. PRYOR:  It's your Bates number.

3    You produced documents to us?

4          MS. DONAHUE:  I think so.

5          MS. PRYOR:  I don't think so.

6          MS. DONAHUE:  I don't really know.  I

7    don't know.

8          MS. PRYOR:  I don't think so.

9          MS. DONAHUE:  Okay.  Well, I don't

10   know.  I just know that we got a lot of

11   applications from you and I was just thinking

12   perhaps --

13         MS. PRYOR:  No.

14         MS. DONAHUE:  Okay.  All right.  Never

15   mind.  It's not for me to testify.  Don't worry

16   about it, in terms of --

17         Q.   Where did you go to fill out an

18   application?

19         A.   It's been so long ago.  All I remember

20   is is that there is an office where you could pick

21   up an application, and then I took that application

22   home, I filled it out and I dropped it back off.

23         Q.   Okay.  Was it -- could it have been a

24   bureau of employment services office?

1     A.    It was not a bureau of employment

2   services office.  It was a office with AK Steel.

3     Q.    Was it on the mill property?

4     A.    I'm not 100 percent sure if it is --

5   if it was on the mill property.

6     Q.    Was it on University Boulevard?

7     A.    I honestly cannot recall.

8     Q.    How do you know it was an AK office?

9     A.    To my knowledge, it -- to my

10  knowledge, it just dealt with things dealing with

11  AK Steel, period.  There were not jobs with other

12  companies listed there, from the overall, looking

13  to fill the area.  To me, it was just for AK Steel.

14    Q.    And how did you come to that

15  conclusion?

16    A.    Because I didn't see anything else

17  that dealt with any other company but AK Steel.

18    Q.    Who told you to go there to apply?

19    A.    My Uncle Allen told me that I could

20  apply there, so that's why I went to go get the

21  application to fill out, and then give it back to

22  them.

23    Q.    He told you to go to that location,

24  wherever you went to get the application?

```
 1        A.    He told me that's where I could go to

 2   get an application, yes.

 3        Q.    And did you talk to anyone when you

 4   were there?

 5        A.    I went to the desk and asked for an

 6   application and got an application.

 7        Q.    Okay.  And did you talk to anybody

 8   else when you were there the first time?

 9        A.    Not -- not specifically, no.

10        Q.    Did you talk to anyone generally?

11        A.    I talked to -- excuse me.  When I went

12   there, I had asked someone where do I go to get an

13   application.  They pointed me to a certain area.  I

14   asked for an application and I got an application.

15        Q.    Was that someone that worked there

16   that you asked that question to or someone else

17   standing there that --

18        A.    I cannot recall.

19        Q.    When you first walked in, was there a

20   desk there?  Was there a -- what kind of office was

21   it?

22        A.    It's been so long, I couldn't recall

23   it honestly.

24        Q.    Someone directed you over to the area
```

1    where you could pick up an AK Steel application?

2        A.    Yes.

3        Q.    Do you know what they did in any other

4    area of that building?

5        A.    I cannot recall.

6        Q.    You went there specifically to look

7    for an AK Steel application?

8        A.    That is correct.

9        Q.    Did you ask for anything else?

10       A.    No, I did not.

11       Q.    When you went back the second time to

12   return the application, did you talk to anyone?

13       A.    I had asked someone where do I go to

14   return this application and they pointed me in the

15   area that it was supposed to be dropped off.  And I

16   went to that area, handed it to the person and

17   asked them before I handed it to them, is this

18   where I'm supposed to go to drop off my

19   application, and they said yes.

20       Q.    Any other conversation the second time

21   you were there?

22       A.    To my knowledge, no.

23       Q.    Do you know who these individuals were

24   that you talked to?

1        A.      No, I do not.

2        Q.      Were they wearing anything that said

3   AK Steel on it?

4        A.      They were wearing -- to the best of my

5   ability, they were wearing -- to the best of my

6   knowledge, they were wearing standard dress

7   clothes.

8        Q.      And you were able to apply, then, for

9   an AK Steel job?

10       A.      By turning in my application, yes.

11       Q.      And was the application process

12  hostile at all?

13       A.      No, it was not.

14       Q.      And do you know whether AK Steel

15  itself ever received your application?

16       A.      I received no notification that my

17  application was received.

18       Q.      Okay.  Did you ever speak with anyone

19  at AK Steel about your application?

20       A.      To the best of my knowledge, I made a

21  phone call in January of 2002 asking them on the

22  status of my application and I was told I would get

23  a call back.

24       Q.      Who did you call?

1    A.    I just remember calling -- I remember

2    calling AK Steel offices to talk with the people

3    that deal with employment and I don't remember

4    names specifically.

5    Q.    Okay.

6    A.    And I just asked them the status of my

7    application and they told me they would get back to

8    me and I never heard anything.

9    Q.    When you called and asked that, did

10   they say hang on, let me look or did they say

11   someone would get back to you if they're going to

12   pursue it?

13   A.    I cannot recall.

14   Q.    Okay.  Your mother, Vivian Bert,

15   applied at AK Steel as well.  Do you know that?

16   A.    Can you rephrase that?

17   Q.    Do you know whether your mother,

18   Vivian Bert, ever applied at AK Steel since 2000?

19   A.    Since 2000?  To my knowledge, no.

20   Q.    Okay.  Have you ever talked to your

21   mother about your application to AK Steel?

22   A.    The only time I talked to my mother

23   about my application for AK Steel was when I

24   applied.

1      Q.    What did you tell her at that time?

2            MS. DONAHUE:  This is outside the

3    presence of attorneys.

4            MS. PRYOR:  It's when he applied.

5            MS. DONAHUE:  Okay.  Go ahead.

6      A.    I called my mom and I told her I

7    applied for -- with a job with AK Steel and that

8    was it.

9      Q.    She say anything in response?

10     A.    No.

11     Q.    Okay.  Other than the phone call that

12   you said you made in January 2002, did you talk to

13   anyone else at AK Steel about your application?

14     A.    To the best of my knowledge, no.

15     Q.    Did you ever hear back from anyone at

16   AK Steel about your application?

17     A.    No, I did not.

18     Q.    When you called in January 2002, did

19   you identify who you were?

20     A.    Yes, I did.

21     Q.    Did you ask them to check on your

22   application at that time?

23     A.    Yes, I did.

24     Q.    Do you know whether they did check on

1   your application at that time?

2        A.    I cannot recall.

3        Q.    Did they indicate whether they'd

4   received it or not?

5        A.    They had told me that they would call

6   me back as soon as they had any additional

7   information.

8        Q.    You wrote on your application, which

9   is Exhibit 1, you only listed three of your

10  employers.  Why did you not list any more of your

11  employers?

12       A.    Because these jobs were full,

13  full-term jobs.  These were jobs that I had for an

14  extensive period of time.  And normally when you

15  fill out applications and when you put work

16  experience on your application, you want to show

17  employers that you have -- have had a stable line

18  of work.

19            So that's why you see that Comp USA

20  and PCU Review Media Group and Trader Publishing.

21  For me, at that period of time, those were my most

22  stable jobs.  They were the most -- in my personal

23  opinion, elongated jobs and jobs that had meat to

24  them and that's why I put them there.

1          Q.    What type of job were you applying

2    for?

3          A.    I was applying for -- I was applying

4    for either a technical position or a professional

5    position and I made it clear that I could also work

6    hard labor.

7          Q.    How did you make that clear?

8          A.    When I -- during the phone call when I

9    called -- when I called them about my applications,

10   the status of my application, I had asked them --

11   or I at least told them that if there was like a

12   labor position, a position that was labor

13   intensive, I would like for -- to have an

14   opportunity for that, if that opportunity comes.

15         Q.    On your application, you did not put

16   laborer; is that correct?

17         A.    I have listed technical or

18   professional.

19         Q.    Correct.  What kind of technical job

20   were you looking for?

21         A.    Technical could be IT.  IT repair,

22   computer repair, machine shop repair, things of --

23   things of that nature.

24         Q.    Do you know whether anyone hired a

1    computer repair person, whether AK Steel hired a

2    computer repair person anytime around your

3    application?

4         A.    To my knowledge, I have no idea.

5         Q.    Do you know whether they hired any

6    professional people around this time?

7         A.    I have no idea.

8         Q.    Do you know who, if anyone, AK Steel

9    hired instead of you?

10        A.    I do not.

11        Q.    You've been handed what's been marked

12   as Exhibit 2.  Is this a copy of your resume?

13        A.    Yes, it is.

14        Q.    Did you submit a copy of your resume

15   with your application to AK Steel?

16        A.    To the best of my knowledge, yes.

17        Q.    And would this be the resume that you

18   would have submitted?

19        A.    This would be the resume I submitted.

20        Q.    Okay.  And you state that your

21   objective is to obtain future employment in the

22   information systems market; is that correct?

23        A.    That is what is listed.

24        Q.    You've been handed what's been marked

1   as Exhibit 3.  Is that your handwriting on Exhibit

2   3?

3        A.    Yes.

4        Q.    Did you complete this as part of the

5   application process with AK Steel?

6        A.    I did.

7        Q.    Okay.  And was everything on it true

8   and correct?

9        A.    For the period of time this -- this

10  applicant survey was filled out, yes.

11       Q.    Okay.  You did not list J. Riggins,

12  Toys R Us, Furcotech, Signs Now as an employer in

13  the past 10 years, correct?

14       A.    According to the applicant survey,

15  yes.

16       Q.    Should they have been listed?

17       A.    Well, once again, I was going under

18  the assumption that when you fill out an

19  application, you put the last three jobs that

20  you've worked for.  And that's -- that's

21  probably -- that's probably -- that's probably --

22  that's the priority that you place on that.  And

23  let's see if it's 2001.  2001 is -- and, yep,

24  during that period of time, that's what I normally

1    did.

2           I would put the three most important

3    jobs that I ever worked during that period of time

4    on -- either be an application or if like another

5    company had an applicant survey, I would just put

6    the most important jobs because normally, when you

7    get an interview, you talk about your first -- you

8    talk about the first three jobs that are listed on

9    your application or survey.

10       Q.    This does not ask for your first

11   three -- your first three or most important three.

12   It asks for your employers for the past 10 years

13   and it actually has six spaces, correct?

14       A.    That is correct.

15           MS. DONAHUE:  Excuse me.  I think that

16   kind of misrepresents the question here.

17           MS. PRYOR:  The question was the

18   question.

19           MS. DONAHUE:  No.  I mean, that's not

20   fair.  It says "list your full-time employers."

21           MS. PRYOR:  That's right.

22           MS. DONAHUE:  Okay.  I just wanted to

23   make sure that was --

24           MS. PRYOR:  It's in the record, ma'am.

1          MS. DONAHUE:  Ma'am?  Well, I think

2     your question was -- was misleading.

3          MS. PRYOR:  Well, I think there were

4     full-time employers that were not listed.

5          MS. DONAHUE:  Okay.  I just wanted to

6     point that out.

7          THE WITNESS:  I would like to add that

8     Furcotech was not a full-time job.  Also, let's

9     see.  J. Riggins was not a full-time job.  So that

10    would be a reason why I would not have put them

11    there.

12    Q.    That wasn't the reason you put them

13    there.  You didn't put them there because you only

14    listed three?

15    A.    Right.  That is --

16    Q.    That is --

17    A.    -- that is correct.

18    Q.    -- what you told me.  And Toys R Us,

19    was that full time?

20    A.    No, it was not.

21    Q.    How many hours a week did you work at

22    Toys R Us?

23    A.    Between 25 and 30.

24    Q.    And how many hours a week did you work

1    at J. Riggins?

2         A.    Between 20 to 25.

3         Q.    And how many hours a week did you work

4    at Furco?

5         A.    Between 20 and 30.

6         Q.    And how many hours a week did you work

7    at Signs Now?

8         A.    Around 30.

9         Q.    What about Regent Systems, how many

10   hours a week did you work there?

11        A.    Anywhere between 20 -- anywhere

12   between 20 and maybe if like -- there were like

13   probably two occasions where I worked a full,

14   40-hour workweek.

15        Q.    What would you consider full time?

16        A.    I would consider full time being 40

17   hours a week every week for the period of time that

18   you work with a company.

19        Q.    When you worked at J. Riggins, Toys R

20   Us, Signs Now and Regent Systems, did you work at

21   any other job at the same time or was that your

22   only employment during these periods?

23        A.    When I worked for Regent Systems, that

24   was the only job I had during that period of time.

1    When I worked for J. Riggins -- when I worked for

2    J. Riggins -- yeah, that was the only -- to the

3    best of my knowledge, that was the only job I had

4    at that time.  And what was the other job that you

5    said?

6         Q.    Toys R Us.

7         A.    When I worked for Toys R Us, to the

8    best of my knowledge, that was the only job I

9    worked at for that period of time, to the best of

10    my knowledge.

11         Q.    When you worked at Furcotech, was that

12    the only job you worked at during that time?

13         A.    To the best of my knowledge, yes.

14         Q.    You state on your application, Exhibit

15    1, that you are planning to acquire a master's

16    degree starting in 2003.  Was that your intent?

17    It's the last page.

18         A.    When I filled out the application,

19    that was the intention.

20         Q.    Okay.  And you did not pursue that; is

21    that correct?

22         A.    I did not.

23         Q.    Who is Brad Proctor?

24         A.    Brad Proctor was my boss at PC Review

1  Media Group.

2      Q.    Who is Michelle Charlton?

3      A.    Michelle Charlton was my sociology

4  professor at the University of Miami.

5      Q.    Why did you list her as a reference?

6      A.    At that time, I did not have a lot of

7  references.  So it was standard for me -- normally

8  I would put one college -- collegiate professor on

9  my -- on my resume or application.

10     Q.    What about Othello Harris?

11     A.    Othello Harris was also a -- was also

12 a professor at the -- at Miami of Ohio.

13     Q.    Why did you not list your uncle, Allen

14 Roberts, as a reference?

15     A.    I was always told never put relatives

16 on an application.

17     Q.    Do you know why you were not hired by

18 AK Steel?

19     A.    No, I do not.

20     Q.    Other than that conversation that you

21 had in January 2002 where they said someone would

22 get back to you, ever talk to anyone else at AK

23 Steel or ever get called back by AK Steel?

24     A.    No, I was not.

1    Q.    Did anyone else at AK Steel ever say

2  anything else to you about your application?

3    A.    No, they did not.

4    Q.    Did anyone at AK Steel ever say

5  anything to you about why you were not hired?

6    A.    They did not.

7    Q.    Did anyone at AK Steel ever say

8  anything to you about your race?

9    A.    They did not.

10    Q.    Did anyone at AK Steel ever say

11  anything to you that you believe was either

12  hostile, offensive or discriminatory?

13          MS. DONAHUE:  Object to the form,

14  insofar as "discriminatory" is a legal conclusion.

15          THE WITNESS:  Am I supposed to answer?

16          MS. DONAHUE:  Yeah, you can answer.

17  You can still answer.

18    A.    Oh, they did not.

19    Q.    Okay.  Did you ever hear from anyone

20  else that anyone at AK Steel did or said anything

21  that was either hostile, offensive or

22  discriminatory?

23          MS. DONAHUE:  Object to the form.

24  Calls for a legal conclusion, but go ahead and

1    answer.

2              THE WITNESS:   Could you repeat the

3    question, please?

4              MS. PRYOR:   Sure.

5         Q.    Did you ever hear from anyone else

6    that anyone at AK Steel ever did or said anything

7    that was hostile, offensive or disciminatory?

8              MS. DONAHUE:   Same objection.

9         A.    I did not.

10        Q.    Why do you believe you were not hired

11   because of your race?

12        A.    I feel that I was not hired -- well, I

13   would have to look at it like this.   College

14   educated young man, continuing willingness to work

15   hard, no matter what job I've ever attained in my

16   lifetime.

17             I did have a desire to work in a

18   factory setting at that period of time.   I felt

19   that I had the mental aptitude, the fortitude, the

20   ability and the know-how to do any job that AK

21   Steel would present to me, if the opportunity

22   presented itself.   That's how I felt about it.

23        Q.    Do you know anyone who AK Steel hired

24   who had the same qualifications or less

1   qualifications than you?

2        A.    No, I do not.

3        Q.    Do you know anyone who AK Steel hired

4   who did not have any manufacturing experience?

5        A.    No, I do not.

6        Q.    Do you know who at AK Steel decided

7   not to hire you?

8        A.    No, I do not.

9        Q.    How did you become part of this

10  lawsuit?  Let me rephrase it.  I've understood

11  there's been some meetings that have taken place to

12  kind of gather people in Middletown together to

13  bring this action.  Were you part of those

14  meetings?

15       A.    I can honestly say it's been so long,

16  I do not recall.

17       Q.    Why did you decide to file a charge of

18  discrimination against AK Steel?

19       A.    Because since 1989, there have not

20  been a lot of blacks that get hired at AK Steel.

21       Q.    And how do you know that?

22       A.    It's -- Middletown is a very small --

23  is a very small town.  It is a very small town.

24  And like, as far as the black community goes, not

```
 1    saying stereotypically that we all know each other,
 2    but if someone gets a job, like, say, for instance,
 3    at AK Steel or something like that, it's pretty --
 4    known pretty quickly.  And it gets -- it gets
 5    around town.
 6              I know when like -- '88, '89 and --
 7    well, actually before that when I was in seventh
 8    and eighth grade, if -- if so-and-so's dad got a
 9    job at AK Steel -- you know, kids run up and get
10    all excited and tell all the other kids and -- you
11    know, that's awesome.  That's great.
12              It all -- it all changed.  And from --
13    once the company became AK Steel, it changed.  When
14    it was Armco, George M. Varity had a philosophy
15    of -- that Middletown is a family town.  We keep
16    people together.  We keep family together.  We keep
17    things unified.  We give jobs.  We give
18    opportunities.
19              When it became AK Steel, that changed.
20    How -- how and why, even -- you know, even I'm not
21    100 percent sure, but -- you know, you didn't hear
22    like around town anymore that -- you know,
23    so-and-so got hired or -- or like -- you know, this
24    brother, this sister.  It's just like a black
```

1    person got hired.  Those types of things stopped.

2         Q.    Did you hear when white people got

3    hired?

4         A.    Me, personally?

5         Q.    Mm-hmm.

6         A.    Me, personally, no, I did not.

7         Q.    Do you know if white people were still

8    getting hired in the same amounts as they had

9    before from Middletown --

10        A.    Well --

11        Q.    -- as opposed to from other areas?

12        A.    -- here's the thing.  We're the

13   minority in Middletown.  So common logic states

14   that if you're not getting the job -- and by

15   "you're," I mean black people, minorities in

16   general.

17             If you're not getting the job,

18   normally it has to be the majority that's getting

19   the job.  And in Middletown, the majority -- the

20   majority of race in Middletown is white.  So that's

21   the logic.  That's the logic that I have to apply

22   to that situation.

23        Q.    Do you know whether people outside

24   Middletown get hired at AK Steel?

1       A.    I'm sure they probably do.  I mean --

2       Q.    Would you know if a black person from

3   outside of Middletown got hired, would you still

4   know about that?

5       A.    If a black person got hired at AK

6   Steel, another black person that actually worked

7   for AK Steel, if that person was from Middletown,

8   would let somebody know and it would get around

9   town.  It's a small town.  Word gets around fast in

10  Middletown.  It may -- it may sound silly.  It may

11  sound immature, but it's true.

12      Q.    So you don't hear when white people

13  get hired?

14            MS. DONAHUE:  Object to the form.

15  This is argumentative.  He's already --

16            MS. PRYOR:  Well, then, he should be

17  easily able to answer it again.

18            MS. DONAHUE:  Asked and answered.

19      Q.    Do you not hear when white people get

20  hired?

21            MS. DONAHUE:  Answer it.

22      A.    Why would I worry about that?

23      Q.    Well, why would you worry about either

24  one?

1          MS. DONAHUE:  Object to the form.

2     This is argumentative.  At this point --

3          MS. PRYOR:  He's answering a question.

4     I'm trying to get an answer.

5          MS. DONAHUE:  Yeah, but it's just

6     argumentative.

7          MS. PRYOR:  I am not trying to be

8     argumentative.  I am not trying to be

9     argumentative.  My question is, he said the reason

10    he thinks is because of race because he hears when

11    black people get hired.

12          MS. DONAHUE:  Let's not have you

13    mischaracterize his testimony --

14          MS. PRYOR:  I'm not --

15          MS. DONAHUE:  -- again, all right?

16          MS. PRYOR:  Ma'am, whatever I say, the

17    testimony is what it is.  I'm not trying to

18    mischaracterize.  I'm trying to get an answer.

19          MS. DONAHUE:  All right.

20     Q.    Do you --

21          MS. DONAHUE:  Just ask the question.

22     Q.    -- hear when white people get hired?

23     A.    I do not.

24     Q.    Okay.  Do you know when white people

1    get hired?

2        A.    Personally, no.

3        Q.    Okay.  Do you know when people outside

4    of Middletown get hired?

5        A.    Personally, no.

6        Q.    Do you hear when African-Americans

7    outside of Middletown apply to be hired?

8        A.    Only by word of mouth.

9        Q.    Have you ever heard of someone from

10   outside of Middletown applying at AK Steel?

11       A.    To my knowledge, no.

12       Q.    Okay.  You said that Middletown --

13   group of African-Americans in Middletown is a small

14   community?

15       A.    I feel it's a small community, yes.

16       Q.    How would you define "small"?

17       A.    Middletown is a small town.  It's not

18   the size of Cincinnati.  It's -- Cincinnati is

19   pretty huge.  To me, and my personal opinion, I'd

20   say Middletown is a fourth of the size of

21   Cincinnati.  So, by that, it's pretty small.

22       Q.    Okay.  And when you say the black

23   community is small, what does that mean?  How many

24   people we talking?

1          A.     I cannot give numbers.

2          Q.     Do you know most of them?

3          A.     A good number.

4          Q.     You say you know the majority of them?

5          A.     Can't say -- can't say majority, but

6     in my mind, I would just say a good number.

7          Q.     You've been handed what's been marked

8     Exhibit 4.  Is this the charge of discrimination

9     that you filed with the EEOC?

10         A.     It is.

11         Q.     Okay.  Is that your signature at the

12    bottom of page 1?

13         A.     It is.

14         Q.     And when you state on the second page

15    that you applied in October 2001, is that really

16    the November 2001 application that we looked at?

17         A.     That is correct, yes.

18         Q.     Okay.  And you state that you were

19    applying for a computer technical position; is that

20    correct?

21         A.     Yes.

22         Q.     You've been handed what's been marked

23    as Exhibit 5.  Did you receive Exhibit 5 prior to

24    today?

1      A.     It has been so long, I cannot recall.

2      Q.     You can't recall one way or the other?

3      A.     One way or the other.

4      Q.     You've been handed what's been marked

5  as Exhibit 6.  Is that your handwriting on Exhibit

6  6?

7      A.     Yes, this is my handwriting.

8      Q.     Okay.  Did you complete this form in

9  connection with your AK Steel application?

10      A.     To the best of my knowledge, yes.

11      Q.     Does this refresh your recollection of

12  whether it was at a bureau office that you

13  completed the documents -- that you submitted the

14  documents?

15      A.     I cannot recall.

16      Q.     Okay.  Have you ever seen a

17  psychologist or a counselor?

18      A.     Yes, I have.

19      Q.     When?

20      A.     2006, 2007, 2005.  Let's see.  There

21  was also a stint during the nineties.

22      Q.     In the nineties, who did you see?

23      A.     It's been so long I cannot remember

24  her name.

1      Q.    Was it a psychologist or a counselor?

2      A.    It was a counselor.

3      Q.    Why were you seeing that person?

4      A.    See, that was during the nineties.

5  That was for family issues.

6      Q.    Is it related to the divorce of your

7  parents?

8      A.    No, no.

9      Q.    No?

10     A.    No.

11     Q.    What was it related to?

12     A.    Personal issues, just --

13     Q.    What kind of personal issues?  Do you

14  recall?

15     A.    I do not recall.

16     Q.    You don't recall what you talked to

17  the college -- or counselor for?

18     A.    I do not recall.  For the period of

19  time during the nineties, I do not recall.

20     Q.    All right.  What did you see one for

21  in 2005, 2006 and 2007?

22     A.    2005 dealt with relationship issues.

23     Q.    With who?

24     A.    That would be my ex-girlfriend.

1      Q.     Who did you see?

2      A.     Dr. Diana Miller.

3      Q.     Where is she located?

4      A.     She's located in Miamisburg, Ohio.

5      Q.     How often did you see her?

6      A.     2005, I may have seen her -- to the

7 best of my recollection, more than five times.

8      Q.     So once a month?  Was it every week?

9      A.     Not every week.  Probably be once

10 every few weeks, and then possibly a month later

11 after that, depending on when I had time to go.

12     Q.     Okay.  What about 2006, what did you

13 see -- did you go to the same person?

14     A.     Went to the same person.

15     Q.     What did you see her for?

16     A.     That dealt with dealing with stress.

17     Q.     Stress from what?

18     A.     Stress from work.

19     Q.     What job did you have in 2006?

20     A.     2006, that was with RWD Technologies.

21 That was before I moved to Engyro.

22     Q.     What were the stresses at work?

23     A.     Just extensive travel, dealing with

24 extensive travel, dealing with -- dealing with

1    clients, trying to meet demands and just learning

2    how to handle all of that.

3         Q.    Is Dr. Miller a psychologist or

4    psychiatrist or just a counselor?

5         A.    Did you say psychologist or

6    psychiatrist or counselor?

7         Q.    Yeah.

8         A.    My knowledge -- to the best of my

9    knowledge, I would say counselor.

10        Q.    How many times did you see her in

11   2006?

12        A.    To the best of my knowledge, I would

13   say more than five times.

14        Q.    How often were you seeing her?

15        A.    Very sporadically.  It was not a

16   weekly basis.  It was not a monthly basis, per se.

17   It was more over when I had time to go.

18        Q.    What about in 2007?

19        A.    2007, I did see that Dr. Diana Miller

20   and that's for a multitude of things.  One is just

21   learning how to alleviate stress, finding ways to

22   alleviate stress and to -- to talk about family.

23        Q.    What kind of family issues?

24        A.    Issues between myself and my father.

1      Q.    Have you ever been prescribed any

2   medications for depression, emotions, nerves,

3   anger?

4      A.    I have not.

5      Q.    I may have asked this already and I

6   apologize if I did.  Do you keep any notes or

7   diaries --

8      A.    I do not.

9      Q.    -- journals, appointment calendar?

10     A.    No, I do not.

11     Q.    Did you make any notations or notes

12  about any of your communications with AK Steel or

13  anything related to your -- your claims here?

14     A.    To the best of my knowledge, I cannot

15  recall.

16     Q.    On initial disclosures, you listed a

17  high school diploma and your diploma from Miami as

18  documents that you would use in this case.  Where

19  are those documents at?

20     A.    My diploma is at -- well, actually

21  both diplomas are located at 7807 John Adams Lane,

22  Dayton, Ohio 45459.  I have not pulled them out of

23  there yet.

24     Q.    Okay.  Have you maintained your W-2's

1    and tax returns, tax forms?

2         A.    Yes.

3         Q.    You keep those?  Do you keep copies of

4    those year after year?

5         A.    I do my best to.

6         Q.    Have you gathered all of your tax

7    returns and W-2's?

8         A.    Yes, I have.

9         Q.    You have any witnesses or other

10   individuals who support any of your claims in this

11   matter?

12        A.    Could you rephrase that question?

13        Q.    Yeah, that wasn't a very good

14   question.  Is there anyone else who knows anything

15   about your claims in this case?

16        A.    Only the -- only my -- my counsel and

17   the people involved within this case.

18        Q.    Okay.  Have you talked to any of the

19   individuals involved in this case, outside the

20   presence of counsel?

21        A.    No.

22        Q.    Do any of them know anything about

23   your claims, other than what you have told them?

24        A.    No.

1       Q.    Let me back up just a minute.  Have

2   you told me every -- all the reasons why you think

3   that it was your race, that you were not hired

4   because of your race?

5       A.    To the best of my knowledge,

6   everything that I have told you, that's all I can

7   say at this moment.

8       Q.    You've been handed what's been marked

9   as Exhibit 7.  Are these your responses to

10  interrogatories?

11      A.    They are.

12      Q.    Okay.  Is that your signature on the

13  last page?

14      A.    That is my signature.

15      Q.    On page 6, --

16      A.    Three, four, five, six.

17      Q.    -- response to interrogatory number

18  three, you're asked to identify all employers to

19  whom you've applied for employment since 2000 --

20  January 1, 2001.  You listed September 1, 2001 AK

21  Steel.  Is that referring to the November 2001

22  application?

23      A.    Yes.

24      Q.    So that should be November 2001

1   application?

2       A.    Yes.

3       Q.    You said you applied as a general

4   helper.  What does that mean?

5       A.    It's been so long since I seen or --

6   you know, done anything, as far as -- trying to

7   remember all this information, so I just put

8   general -- general help.

9       Q.    Okay.  I may have asked you this

10  already before and I apologize if I did.  But do

11  you have any written communications, either to AK

12  Steel or from AK Steel?

13      A.    No, I do not.

14      Q.    Any other documents related to AK

15  Steel?

16      A.    I do not.

17      Q.    Do you have an updated resume?

18      A.    Do I have -- sorry.  Could you repeat

19  the question, please?

20      Q.    Yeah.  Do you have an updated resume?

21      A.    I do have an updated resume.

22      Q.    Have you ever exchanged e-mail with

23  the other plaintiffs, besides e-mails that might

24  have included the attorneys?

1    A.    I have not.

2    Q.    Have you ever had an outside business,

3 operated a consulting business?

4    A.    Myself, no, I have not.

5    Q.    Have you ever operated it for someone

6 else?

7    A.    That was probably the Regent Systems

8 information that's listed on my taxes.

9    Q.    What do you mean by that?

10    A.    If you're referring to -- you had

11 asked me the question of I've -- did I ever work as

12 a consultant and I worked for Regent Systems and I

13 was listed as a consultant for them.

14    Q.    Were you employed by Regent Systems?

15 In other words, did you get a paycheck as an

16 employee?

17    A.    They gave -- they gave me a paycheck.

18    Q.    Did they take out taxes as though you

19 were an employee or were you self-employed?

20    A.    During that period of time, I was not

21 aware that -- that they were not taking out taxes.

22 So when I went to go fill out my taxes, it was

23 brought to my attention that I -- by doing that, I

24 was listing -- making myself self-employed, to

1   which I had to pay those taxes, to which I owed

2   money.

3        Q.    Okay.  That's why you filled out in

4   2001 a profit or loss from business, a tax --

5        A.    That is correct, yes.

6        Q.    You've been handed what's been marked

7   as Exhibit 8.

8        A.    Yes.

9        Q.    Is Exhibit 8 all of your tax return

10  and related information for the years 2001 to

11  present?

12       A.    Could you repeat the question, please?

13       Q.    Yeah.  Are those your tax returns and

14  related information from 2001 to present?

15       A.    They are.

16       Q.    Okay.  Are they missing any, to your

17  knowledge?

18       A.    To my knowledge, this documentation

19  right here is everything that I -- that I have

20  given.

21       Q.    Okay.  Have you requested all of your

22  tax returns from whoever does your tax forms?

23       A.    What I did because I thought that I

24  had my -- had all my records and they were

1    scattered, I contacted the IRS and had them send me

2    whatever information, additional information that

3    they could send me.

4         Q.    Did you look through your own records?

5         A.    I did look for my own records.

6         Q.    Did you find any of your own records?

7         A.    Some.

8         Q.    Some of those are?

9         A.    Some -- some of those are.  Some --

10   some of these are.  The information that -- that

11   comes directly from the IRS is further along in the

12   back.  Everything -- everything beforehand, to my

13   knowledge, is from when I went to go get my taxes

14   prepared.

15        Q.    Okay.  Do you keep your actual W-2's?

16        A.    To the best of my knowledge, yes, I

17   do.

18        Q.    Do you keep pay stubs?

19        A.    To the best of my knowledge, I keep

20   them for a period of time, and then I -- and then I

21   get rid -- get rid of them.  I trash them.  It's

22   been so long, going from job, to job, to job.

23   Normally after a period of time, I do get rid of

24   them.

1    Q.    What period of time is that that you

2    keep them, generally?

3    A.    I keep them for a few months, and then

4    I get rid of them.

5    Q.    And what pay stubs do you currently

6    have?

7    A.    The pay stubs I currently have right

8    now will be my pay stubs with Engyro.

9    Q.    And have you gathered those and

10   produced those?

11   A.    No, because I only have my current two

12   pay stubs at this time.

13   Q.    You have thrown out the -- all the

14   other ones away?

15   A.    Yes, I have.

16   Q.    Do you have anything else that -- any

17   other documents that you keep record of your pay,

18   from the years 2001 to present or benefits from the

19   years 2001 to present?

20   A.    No, I do not.

21   Q.    You've thrown away anything that you

22   have had relating to those two things?

23   A.    To the best of my knowledge, I cannot

24   recall.

1          MS. PRYOR:  Okay.  No further

2    questions at this time, subject to still the

3    documents that need to be reproduced.

4          MS. DONAHUE:  Can we have just a

5    couple seconds?

6          MS. PRYOR:  Yeah.

7       (Off the record:  3:34 p.m. - 3:38 p.m.)

8          MS. DONAHUE:  Okay.  We have no

9    questions.

10          (Deposition concluded at 3:38 p.m.)

11

12

13        _____

14                  Shawn R. Pryor

15

16

17

18

19

20

21

22

23

24

```
1              C E R T I F I C A T E

2

3   STATE OF OHIO            :

4                            :    SS

5   COUNTY OF HAMILTON       :

6

7        I, Susan M. Barhorst, a Notary Public in

8   and for the State of Ohio, duly commissioned and

9   qualified, do hereby certify that prior to the

10  giving of this deposition the within-named SHAWN R.

11  PRYOR was by me first duly sworn to testify the

12  truth, the whole truth, and nothing but the truth;

13  that the foregoing pages constitute a true,

14  correct, and complete transcript of the testimony

15  of said deponent, which was recorded in stenotypy

16  by me, and on the 7th day of July 2007 was

17  submitted to counsel for deponent's signature.

18       I further certify the within deposition was

19  duly taken before me at the time and place stated,

20  pursuant to the Federal Rules of Civil Procedure;

21  that I am not counsel, attorney, relative or

22  employee of any of the parties hereto, or their

23  counsel, or financially or in any way interested in

24  the within action, and that I was at the time of
```

1    taking said deposition a Notary Public in and for

2    the State of Ohio.

3         IN WITNESS WHEREOF, I have hereunto set my

4    hand and notarial seal at Cincinnati, Ohio, this

5    7th day of July 2007.

6

7

8

                  Susan M. Barhorst, Notary Public
9                 in and for the State of Ohio.
                  My commission expires
10                February 18, 2009

11

12

13

14

15

16

17

18

19

20

21

22

23

24