**Page 1**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

*   *   *

VIVIAN BERT,

et al.,

  Plaintiffs,

   vs.      CASE NO. C-1-02-467

AK STEEL CORPORATION,

  Defendant.

     *   *   *

   Rule 30(b)(6) deposition of JESSICA

MORRIS, Witness herein, called by the Plaintiffs

for cross-examination pursuant to the Rules of

Civil Procedure, taken before me, Karen M. Rudd, a

Notary Public in and for the State of Ohio, at the

offices of Tobias, Kraus & Torchia, 911 Mercantile

Library Building, 414 Walnut Street, Cincinnati,

Ohio, on Thursday, September 27, 2007, at 10:09

a.m.

     *   *   *

**Page 2**

```
 1        EXAMINATION CONDUCTED      PAGE
 2   BY MR. JOHNSON:.....................  6
 3
 4        EXHIBITS MARKED
 5   (Thereupon, Plaintiffs' Exhibit 1      7
 6   was marked for purposes of
 7   identification.).....................
 8   (Thereupon, Plaintiffs' Exhibits 2    74
 9   and 3 were marked for purposes of
10   identification.).....................
11   (Thereupon, Plaintiffs' Exhibit 4    76
12   was marked for purposes of
13   identification.).....................
14   (Thereupon, Plaintiffs' Exhibits 5   83
15   and 6 were marked for purposes of
16   identification.).....................
17   (Thereupon, Plaintiffs' Exhibit 7    89
18   was marked for purposes of
19   identification.).....................
20   (Thereupon, Plaintiffs' Exhibit 8    91
21   was marked for purposes of
22   identification.).....................
23   (Thereupon, Plaintiffs' Exhibit 9 ....  96
```

**Page 3**

```
 1   was marked for purposes of
 2   identification.).....................
 3   (Thereupon, Plaintiffs' Exhibit 10    101
 4   was marked for purposes of
 5   identification.).....................
 6   (Thereupon, Plaintiffs' Exhibits 11,  102
 7   12, 13, and 14 were marked for
 8   purposes of identification.)..........
 9   (Thereupon, Plaintiffs' Exhibit 15    109
10   was marked for purposes of
11   identification.).....................
12   (Thereupon, Plaintiffs' Exhibit 16    116
13   was marked for purposes of
14   identification.).....................
15   (Thereupon, Plaintiffs' Exhibit 17    121
16   was marked for purposes of
17   identification.).....................
18   (Thereupon, Plaintiffs' Exhibit 18    125
19   was marked for purposes of
20   identification.).....................
21   (Thereupon, Plaintiffs' Exhibit 19    129
22   was marked for purposes of
23   identification.).....................
```

**Page 4**

```
 1   (Thereupon, Plaintiffs' Exhibit 20    135
 2   was marked for purposes of
 3   identification.).....................
 4
 5   (Thereupon, Plaintiffs' Exhibit 21    138
 6   was marked for purposes of
 7   identification.).....................
 8   (Thereupon, Plaintiffs' Exhibit 22    138
 9   was marked for purposes of
10   identification.).....................
11   (Thereupon, Plaintiffs' Exhibits 23   145
12   and 24 were marked for purposes of
13   identification.).....................
14   (Thereupon, Plaintiffs' Exhibit 25    152
15   was marked for purposes of
16   identification.).....................
17
18
19
20
21
22
23
```

**Page 5**

```
 1   APPEARANCES:
 2   On behalf of the Plaintiffs:
 3       Wiggins, Childs, Quinn & Pantazis
 4   By: Herman N. (Rusty) Johnson, Jr.
         Susan Donahue
 5       Attorneys at Law
         The Kress Building
 6       301 Nineteenth Street North
         Birmingham, Alabama  35203
 7
     On behalf of the Defendant:
 8
     Taft, Stettinius & Hollister, LLP
 9
     By: Patricia Anderson Pryor
10       Attorney at Law
         425 Walnut Street
11       Suite 1800
         Cincinnati, Ohio  45202
12
13   and
         AK Steel Corporation
14
     By: Stephanie Bisselberg
15       Attorney at Law
         703 Curtis Street
16       Middletown, Ohio  45043
17
18           * * *
19
20
21
22
23
```

**2 (Pages 2 to 5)**

**Page 6**

1     MR. JOHNSON: My name is Herman N.
2 Johnson, Jr. We are here for a 30(b)(6)
3 deposition in the case of Bert, et al., versus AK
4 Steel Corporation. Will the witness please state
5 her name for the record, please?
6     THE WITNESS: Jessica Morris.
7     MR. JOHNSON: Okay. And do you
8 understand that you are here to serve as a
9 corporate representative for AK Steel?
10     THE WITNESS: Yes.
11     MR. JOHNSON: Why don't you swear in
12 the witness for me before we go any further.
13         JESSICA MORRIS
14 of lawful age, Witness herein, having been first
15 duly cautioned and sworn, as hereinafter
16 certified, was examined and said as follows:
17         CROSS-EXAMINATION
18 BY MR. JOHNSON:
19     Q. Have you seen the 30(b)(6) notice
20 in this case?
21     **A. No, I do not think I have.**
22     MR. JOHNSON: Will you mark this,
23 please, as an exhibit?

**Page 7**

1     (Thereupon, Plaintiffs' Exhibit 1 was
2 marked for purposes of identification.)
3     Q. Please take a look at this and
4 just in particular look at paragraph one.
5     **A. Okay.**
6     MS. PRYOR: Rusty, just for the
7 record, you received the letter from Greg
8 explaining she does not know about the Ashland
9 plaintiffs?
10     MR. JOHNSON: Yes.
11     Q. You can leave that right there.
12     **A. Okay.**
13     Q. So do you understand that you are
14 here to testify about the topics that are
15 listed in paragraph one, except for individuals
16 who applied at the Ashland facility?
17     **A. Yes.**
18     Q. Okay. Great. Have you ever been
19 deposed before?
20     **A. Yes.**
21     Q. Great. So you know about the
22 normal usual rules with respect to giving
23 testimony. I will just go over them again real

**Page 8**

1 quickly.
2     **A. Thank you.**
3     Q. Of course, I will ask the
4 questions. My name is Rusty Johnson. We met
5 before off the record.
6     **A. Uh-huh.**
7     Q. Karen will be, of course,
8 recording everything that's said here, your
9 answer to questions. Patty, your attorney, may
10 object every now and then to some questions I
11 pose. Unless she instructs you not to answer,
12 you must answer my questions. Okay?
13     **A. Uh-huh.**
14     Q. We will need yes or no answers to
15 my questions.
16     **A. Okay.**
17     Q. Shakes of the head, nods, uh-huhs,
18 uh-uhs, it's kind of hard for Karen to take
19 those down and makes the record a whole lot
20 clearer.
21         With respect to breaks, if you
22 ever need a break, just let me know. If you
23 need to step out for a few minutes, no problem.

**Page 9**

1 I only ask that if I have a question on the
2 floor or maybe if I'm talking or asking
3 questions on a topic or a series of topics, I
4 just want to finish that particular topic or
5 have you answer the question first before we go
6 on a break.
7     **A. Okay.**
8     Q. Is that cool?
9     **A. Uh-huh. Yes.**
10     Q. Great. Is there any reason -- is
11 there any medication you are on that would
12 prevent you from testifying truthfully today or
13 that would impair your testimony?
14     **A. No.**
15     Q. Okay. Excellent. What is your
16 current position with AK Steel?
17     **A. Labor relations representative.**
18     Q. Labor relations representative.
19 And how long have you held that position?
20     **A. Since October of '04.**
21     Q. How long have you been employed
22 with AK Steel?
23     **A. Since January 2001.**

**Page 10**

1    Q.   And what positions have you held
2  with the company?
3    **A.   I was hired in as an assistant**
4  **human resource representative, and then I was**
5  **promoted to an associate human resource**
6  **representative, and now my current position,**
7  **labor relations representative.**
8    Q.   When were you promoted to the
9  associate human resources representative
10  position?
11    **A.   I'm not exactly sure.  I believe**
12  **the end of 2001, beginning of 2002 time frame.**
13    Q.   Who supervised you when you were
14  an assistant HR rep?
15    **A.   Phyllis Short.**
16    Q.   And what about as an associate HR
17  rep?
18    **A.   Phyllis Short.**
19    Q.   And what about now?
20    **A.   Mike Miller.  And there was a**
21  **period at the very end of my time in employment**
22  **that John O'Connor was my supervisor in 2004.**
23    Q.   2004?  Near the end of your

**Page 11**

1  position as an associate HR rep?
2    **A.   Uh-huh.**
3    Q.   Is Mr. O'Connor still with the
4  company?
5    **A.   No, he is not.**
6    Q.   Did he retire?
7    **A.   No, he did not.**
8    Q.   Do you know where Mr. O'Connor is
9  employed currently?
10    **A.   Yes, I do.**
11    Q.   Where is that?
12    **A.   Taft.**
13    Q.   Taft?
14    **A.   (Witness nodding head up and**
15  **down.)**
16    Q.   Okay.  You are talking about the
17  law firm, correct?
18    **A.   Uh-huh.  Yes.**
19    Q.   In your current position, labor
20  relations representative, what are your job
21  duties and responsibilities?
22    **A.   We just recently got a contract**
23  **with the union, so right now we are going**

**Page 12**

1  **through the implementation, informing the**
2  **supervisors on the contract, training,**
3  **grievances, arbitrations.**
4    Q.   All union-management relations and
5  matters?
6    **A.   Correct.**
7    Q.   Let's go back to 2001 --
8    **A.   Okay.**
9    Q.   -- when you were hired in as an
10  assistant HR rep.  What were your
11  responsibilities and duties in that position?
12    **A.   The hourly hiring process.**
13    Q.   Okay.  Do you know Tracy White?
14    **A.   Yes, I do.**
15    Q.   Who is Tracy White?
16    **A.   Tracy White is currently a manager**
17  **of human resources at Rockport.**
18    Q.   How long has she had that
19  position?
20    **A.   I don't know.**
21    Q.   You don't know?  Was she working
22  at Middletown when you were hired in?
23    **A.   Yes, she was.**

**Page 13**

1    Q.   What was her position at that
2  time?
3    **A.   She was doing the hourly hiring.**
4    Q.   And did she continue with that
5  position when you were hired in or continue
6  with those responsibilities?  I'm sorry.
7    **A.   Briefly, before she left**
8  **Middletown Works.**
9    Q.   When did she leave Middletown?
10    **A.   Approximately February or March of**
11  **'01.**
12    Q.   So you did not overlap in your
13  employment tenure together?
14    **A.   For those two to three months.**
15    Q.   Just those two to three months.
16  Okay.  What were your duties and
17  responsibilities when you became an associate
18  HR rep?
19    **A.   They did not change.  There were**
20  **times I would assist in salaried hiring, but my**
21  **main goal and objective was the hourly process.**
22    Q.   What occasioned the change in the
23  name of your position from assistant HR rep to

**4 (Pages 10 to 13)**

Page 14

1  associate HR rep? Why did that occur?
2      A.  My manager felt it was necessary
3  to give me a promotion.
4      Q.  Did they hire anyone else in to
5  become the assistant HR rep?
6      A.  No, they did not.
7      Q.  Is that -- was that a unionized
8  position?
9      A.  No.
10     Q.  Great.  Let's talk about the
11  hiring process, because that's what we are here
12  to talk about with respect to certain
13  individuals.  Back during that time frame,
14  2001, what were the steps in the hiring process
15  for the laborer position?
16     A.  The applications were received at
17  the Ohio Bureau of Employment Services, the
18  OBES, as I would refer to it.  They would do
19  the initial screening process.  Then they would
20  forward on the applications to me.  They would
21  bring stacks each week to me.  I, in turn,
22  would screen them to see if they met our
23  qualifications.

Page 15

1      The ones who met the
2  qualifications would then, in turn, be
3  contacted to schedule for a preemployment test.
4  Once they took the preemployment test, the
5  individuals who qualified on the preemployment
6  test were then contacted and scheduled for an
7  interview.
8      Once the candidates were
9  interviewed, if they were successful in the
10  interview process, they would be submitted for
11  a background check.  After successful
12  completion of the background check, if they --
13  the background check came back okay, then they
14  would be contacted and offered a job offer
15  contingent on the successful completion of a
16  preemployment physical.
17      After they went through the
18  preemployment physical, if they were successful
19  at that, then they would be scheduled for a
20  start date.
21     Q.  Okay.  And let's go back through
22  that a little bit.  The applications, were
23  candidates or did candidates ever submit

Page 16

1  applications at the AK Steel -- at AK Steel's
2  Middletown facility?
3      A.  They would try.
4      Q.  They would try?
5      A.  And if they did submit them, we
6  would send them to the OBES.
7      Q.  Would you send them with the
8  application to the OBES?
9      A.  At times, if they were local.
10     Q.  Okay.  Would you ever take
11  applications from individuals who showed up at
12  the Middletown facility?
13     A.  If we did, we would have given
14  them to the OBES.
15     Q.  And then OBES would have turned
16  around and given them to you?
17     A.  They would have done their
18  screening process, and then if they met that,
19  they would have submitted them back to us.
20     Q.  Okay.  What did the OBES's
21  screening process entail?
22     A.  I do not know.
23     Q.  Do you know who would know at AK

Page 17

1  Steel?
2      A.  The screening process was in place
3  when I came on board.  I'm not sure.  Possibly
4  Phyllis Short, my manager.  I'm not sure who
5  put those in place.
6      Q.  So you don't know whether the
7  criteria that the OBES used to screen
8  candidates was the same criteria that you used?
9      A.  Generally, they had some criteria,
10  but I don't know all the specifics.  I never
11  was told exactly what they were screening for.
12     Q.  Well, what criteria do you know?
13     A.  The ones I know of were if an
14  individual had ever been terminated, if they
15  had a valid driver's license, high school
16  diploma or GED, and convictions, felonies.
17     Q.  Felony convictions?
18     A.  (Witness nodding head up and
19  down.)
20     Q.  Do you know whether --
21     A.  And I'm not sure.  Like I said, I
22  wasn't -- if they held other convictions, it
23  could be misdemeanors, as well.  I cannot say

**5 (Pages 14 to 17)**

**Page 18**

1 **one way or the other.**
2     Q.   Are you saying there may be other
3 criteria for which they screened, you are just
4 not sure one way or the other?
5     **A.   Correct.**
6     Q.   Okay.  Did OBES screen
7 applications for these particular criteria that
8 you just listed?
9     **A.   Yes.**
10     Q.   Do you know whether they
11 interviewed candidates about these particular
12 criteria upon application?
13     **A.   No.**
14     Q.   Do you know whether they had any
15 other type of form that candidates had to fill
16 out in addition to the application by which
17 they screened candidates?
18     **A.   The OBES?**
19     Q.   Yes.
20     **A.   Is that what you are referring to?**
21     Q.   Yes.
22     **A.   I have seen a form that has --**
23 **it's the OBES's form.  I have no idea what they**

**Page 19**

1 **use that for.**
2     Q.   Do you remember or know what's on
3 the form?
4     **A.   No, I do not.**
5     Q.   But to your knowledge, was it an
6 AK Steel form?
7     **A.   It was not an AK Steel form.**
8     Q.   It was a State form, an OBES form?
9     **A.   Correct.**
10     Q.   Do you believe that form was used
11 to screen employees or candidates?
12     **A.   I do not know.**
13     Q.   You stated if someone came to the
14 AK Steel facility to submit an application, you
15 would send the application over to the OBES to
16 perform the initial screening?
17     **A.   Correct.**
18     Q.   Why couldn't you have screened the
19 application there at the office for this
20 criteria?
21     **A.   It wasn't part of our process.**
22 **All applications went through the Ohio Bureau**
23 **of Employment Services prior to coming to us.**

**Page 20**

1     Q.   Why did the -- what's the reason
2 for that particular requirement?
3     **A.   I cannot answer that question.  I**
4 **don't know.**
5     Q.   You were just instructed by
6 Ms. Short to do so?
7     **A.   Tracy White.**
8     Q.   Tracy White.  Okay.
9     **A.   She trained me.**
10     Q.   She trained you?
11     **A.   Correct.**
12     Q.   So did you ever, upon receiving
13 applications at the AK Steel facility, direct
14 the candidates to go to the OBES office to
15 submit the applications?
16     **A.   Correct.**
17     Q.   Do you remember anyone in
18 particular for which you performed this
19 practice?
20     **A.   No.**
21     Q.   Okay.  These steps that you listed
22 for the hiring process, did Tracy White train
23 you on these steps?

**Page 21**

1     **A.   Yes.**
2     Q.   Did Phyllis Short also train you?
3     **A.   She was involved, but directly**
4 **training me was Tracy.**
5     Q.   Okay.  So is it your understanding
6 that these hiring steps were also in place from
7 1991 until you arrived in 2001?
8     **A.   I do not know.**
9     Q.   You just know that Tracy White
10 utilized these particular steps --
11     **A.   Yes.**
12     Q.   -- before you were hired?
13     **A.   Correct.**
14     Q.   Do you know how long Tracy White
15 was performing these responsibilities before
16 you got there?
17     **A.   No, I do not.**
18     Q.   Do you know how long she had been
19 working for AK Steel at Middletown?
20     **A.   No.**
21     Q.   Did you ever go to pick up the
22 application yourself from an OBES office?
23     **A.   Yes, I did.**

**6 (Pages 18 to 21)**

**Page 22**

1    Q.   Which offices?
2    **A.   There was one on University.**
3    Q.   In Middletown?
4    **A.   In Middletown.**
5    Q.   Okay.  At which locations could
6    candidates submit applications, at which OBES
7    locations?  I'm sorry.
8    **A.   There's locations in -- I'm not**
9    **going to be able to recall all the locations,**
10   **but the ones I can recall, Hamilton, Lebanon,**
11   **Middletown.  Those are the only ones I can**
12   **recall.  There could have been more.  Dayton.**
13   Q.   Dayton?  Cincinnati?
14   **A.   Cincinnati.**
15   Q.   Okay.  But you only went to pick
16   up applications from the one on University --
17   **A.   Correct.**
18   Q.   -- in Middletown?  The others you
19   would receive -- were they delivered manually?
20   **A.   Yes.**
21   Q.   Okay.  Did you have a primary
22   contact at the OBES facilities or offices?
23   **A.   Yes, I did.**

**Page 23**

1    Q.   Who is that person?
2    **A.   Chris Haberny.**
3    Q.   Chris -- can you spell both names?
4    **A.   C H R I S, last name H A B E R N Y.**
5    Q.   Male or female?
6    **A.   Female.**
7    Q.   And just for the record, by the
8    way, you are a Caucasian female, right?
9    **A.   Correct.**
10   Q.   What is Ms. Haberny's position?
11   **A.   Currently?**
12   Q.   Or back then, during this time,
13   2001.
14   **A.   I'm not sure.**
15   Q.   At which OBES office did she work?
16   **A.   She worked at more than one.  She**
17   **was just at Middletown maybe one or two days a**
18   **week.**
19   Q.   So upon receiving the applications
20   at Middletown, you performed another screening,
21   correct?
22   **A.   Could you repeat the question,**
23   **please?**

**Page 24**

1    Q.   Upon receiving the applications at
2    AK Steel's Middletown facility, you performed
3    another screening, correct?
4    **A.   Yes.**
5    Q.   And what criteria did you screen
6    for?
7    **A.   If someone had been terminated,**
8    **two years' manufacturing or laborer experience,**
9    **high school diploma/GED, valid driver's**
10   **license, convictions.  You have to understand,**
11   **it's been a while.**
12   Q.   I understand.
13   **A.   We would also see if they -- I**
14   **mean, I would look at their employment history,**
15   **see if they had applied before, what steps of**
16   **the process they had been through before,**
17   **information like that.**
18   Q.   When you reviewed the applications
19   for convictions, was that felony or misdemeanor
20   convictions?
21   **A.   It depended on the conviction,**
22   **what the misdemeanor would be.**
23   Q.   What type of misdemeanors would

**Page 25**

1    throw up a red flag?
2    **A.   Ones including drugs, theft.  I**
3    **mean, it was a case-by-case basis.**
4    Q.   Was there any time period for
5    convictions by which you wouldn't hold that
6    qualification against a particular candidate?
7    **A.   We did for DUIs, five years,**
8    **within the past five years.  But in regards to**
9    **anything beyond that, I mean, like I said, it**
10   **was case-by-case.**
11   Q.   Two years' manufacturing
12   experience?
13   **A.   Or labor.**
14   Q.   Or labor.  What's the distinction?
15   **A.   Someone could be a construction --**
16   **in construction.  That's not necessarily a**
17   **manufacturing setting, but it's a labor type**
18   **job that we would consider relevant experience.**
19   Q.   The same number of years for labor
20   experience, as well?
21   **A.   Correct.**
22   Q.   When you advertised -- strike
23   that.

**7 (Pages 22 to 25)**

Page 26

1    AK Steel's Middletown facility did
2  advertise for laborer positions, correct --
3    **A.  Correct.**
4    Q.  -- in newspapers?  When you
5  advertised for those positions, did you include
6  the two years' labor experience requirement in
7  those advertisements?
8    **A.  I do not recall.**
9    Q.  But you did include the two years'
10  manufacturing experience requirement in some
11  advertisements?
12    **A.  I do not recall.  I mean, I'd have**
13  **to see an ad.**
14    Q.  Did you work directly with placing
15  ads in newspapers?
16    **A.  No, I did not.**
17    Q.  Did Ms. Short do so?
18    **A.  No, she did not.  She had a little**
19  **involvement.**
20    Q.  Who was responsible for placing
21  the ads?
22    **A.  Typically Mike Lehman.**
23    Q.  Mike Lehman.  Okay.  What was his

Page 27

1  position at the time?
2    **A.  Senior -- I apologize.  Senior**
3  **human resource representative, I believe.**
4    Q.  This two years of manufacturing or
5  labor experience requirement, was that applied
6  consistently when you were involved in the
7  hiring process?
8    **A.  If I reviewed the application, I**
9  **would say generally, yes.**
10    Q.  Generally.
11    **A.  There were exceptions.  We had a**
12  **school to work program where if -- it gave --**
13  **it waived the two-year criteria.**
14    Q.  Kids coming out of high school?
15    **A.  Correct.**
16    Q.  Any other exceptions to the two
17  years' manufacturing or labor experience
18  requirement?
19    **A.  Are you just saying --**
20    Q.  Were there any other exceptions to
21  that requirement other than this high school to
22  work program?
23    **A.  There's only one other that I can**

Page 28

1  **recall.**
2    Q.  What is that?
3    **A.  It was a Dick Wardrop referral,**
4  **the CEO of the company.**
5    Q.  Dick --
6    **A.  Wardrop.**
7    Q.  Okay.  Automatic waiver?  Do you
8  know how many people were subject to the Dick
9  Wardrop referral?
10    **A.  That's the only one I recall.**
11    Q.  Just one, one person?
12    **A.  Uh-huh.**
13    Q.  Okay.  I don't know if I asked
14  this.  Did I ask you whether this requirement
15  was -- this two years manufacturing or labor
16  experience requirement, was that also
17  implemented by the OBES in their screening
18  process?
19    **A.  I believe so.**
20    Q.  Okay.  Employment history.  What
21  were you looking for when you were screening
22  for employment history?
23    **A.  The experience that we talked**

Page 29

1  **about, the two years.  You wanted -- didn't**
2  **want a lot of gaps in between employment**
3  **histories.  If there were a year here**
4  **unexplained, a year throughout the application,**
5  **job hopping, you know, here a couple months,**
6  **there a couple months, the type of work they**
7  **did at the companies they worked for.**
8    Q.  When you say type of experience or
9  type of work they performed at these other
10  companies, you were looking for the two years
11  of manufacturing or labor experience, correct?
12    **A.  Correct.**
13    Q.  Any other items you were looking
14  for under employment history?
15    **A.  It's been a long time since I have**
16  **done this, looked at an application, reviewed**
17  **it for consideration.  I mean, it really --**
18  **each application -- I mean, once you see it,**
19  **you know what you are looking for.  I mean, I**
20  **can't give you every circumstance that I would**
21  **consider without seeing the applications.**
22    **I mean, those are generally -- you**
23  **didn't want them to have too many jobs, big**

**8 (Pages 26 to 29)**

**Page 30**

1 gaps in their employment history. You wanted
2 the two years' experience. You didn't want
3 them to be terminated.
4      Q.   Did Ms. White provide you with a
5 list of criteria by which you should screen the
6 applications?
7      A.   When you say a list, what are you
8 referring to?
9      Q.   A written list.
10     A.   No.
11     Q.   She just verbally trained you --
12     A.   Yes.
13     Q.   -- with respect to the criteria?
14     A.   Yes.
15     Q.   And with respect to all of the
16 criteria we have discussed, including these
17 items under employment history, did she
18 instruct you to apply all of these criteria, or
19 over time did you also implement items that you
20 thought would be beneficial for the company?
21     A.   Could you explain your question,
22 please?
23     Q.   Sure. You have mentioned, for

**Page 31**

1 example, under employment history, you were
2 looking for job hopping, too many jobs and
3 such. And you also stated that you would have
4 to review an application, you knew what you
5 were looking for. Was this something Ms. White
6 trained you on, or was this something that you
7 developed over time upon reviewing applications
8 during this screening process?
9      A.   How to review an application, like
10 their employment history?
11     Q.   Right.
12     A.   Well, when you look at -- I have
13 looked at hundreds, hundreds of applications.
14 You can generally look -- there's four slots
15 for employment history, and you can look and
16 know -- you can see, well, they have had, you
17 know, four jobs in less than a year. I mean,
18 those types of stuff pop out at you. That's
19 what I was referring to.
20     Q.   Right. Like common sense type
21 things?
22     A.   Well, with time, you develop -- I
23 mean, I wouldn't have -- coming in off the

**Page 32**

1 street, I wouldn't. You know, I was trained.
2 And the more you do, the -- you pick up on it.
3      Q.   Too many jobs.
4      A.   Yes.
5      Q.   Did Ms. White tell you to screen
6 applications for too many jobs?
7      A.   Yes.
8      Q.   Did she tell you to screen
9 applications for job hopping?
10     A.   That's the same as too many jobs.
11     Q.   Right. Did she -- so she --
12     A.   She never -- I mean, if you are
13 saying job hopping, I don't know if she used
14 those terms, but --
15     Q.   Did she use the term too many
16 jobs?
17     A.   Yes, too many jobs.
18     Q.   Okay. But none of those criteria
19 are written down anywhere to your knowledge?
20     A.   No.
21     Q.   Are there any other items that you
22 can remember for which you screened?
23     A.   In the employment history?

**Page 33**

1      Q.   Employment history or anything
2 else other than what you have named thus far.
3      A.   Not that I can remember.
4      Q.   Okay. Did you ever have occasion
5 to call any of the candidates during the
6 screening process?
7      A.   Yes, I did.
8      Q.   For what reasons?
9      A.   If there were questions in regards
10 to their employment history, I may contact them
11 to get more information. If they listed they
12 had been convicted, but didn't put what of,
13 what for, I may have contacted them.
14 Incomplete information I may have contacted
15 them. Those type reasons.
16     Q.   Would you call them to verify job
17 history, employment history, or any of those
18 aspects?
19     A.   Just to verify what they have on
20 their application?
21     Q.   Yes.
22     A.   No.
23     Q.   So if they say that they worked

**9 (Pages 30 to 33)**

**Page 34**

1 for a particular company for four years, then
2 you would take that at face value?
3   **A.  Instead of calling the candidate**
4 **and saying you have written you have worked**
5 **here, is that accurate?**
6   Q.  Right.
7   **A.  I mean, what they have on their**
8 **application, yes.**
9   Q.  You would view that as accurate?
10   **A.  Yes.**
11   Q.  Unless it was incomplete, then you
12 would give them a call?
13   **A.  Correct.  I had too many**
14 **applicants to call everyone and say is what you**
15 **wrote on here correct.**
16   Q.  Right.  I understand.  I
17 understand.  How many applications did you
18 receive on average per week?
19   **A.  It's going to have varied**
20 **depending on if we had ran an ad or not, which**
21 **time frame you are referring to, but --**
22   Q.  2001, 2002 time frame.
23   **A.  At least a hundred a week, if not**

**Page 35**

1 **more.  And there may be a week that the OBES --**
2 **or I would not go to the OBES and she wouldn't**
3 **get them to me, and she would do it like two**
4 **weeks at a time, and it would just be double,**
5 **because I had plenty of applications to review.**
6   Q.  Right.
7   **A.  It's not like every week we -- you**
8 **know, we tried to, but we didn't -- I didn't go**
9 **there or she would bring the applications to me**
10 **every week, but we had plenty of applications.**
11   Q.  Plenty, yes.  I can imagine.  Did
12 Ms. Short screen applications?
13   **A.  Not the initial screening.**
14   Q.  What type of screening did she
15 perform?
16   **A.  She would -- once the candidates**
17 **passed the preemployment test, then she would**
18 **screen the applications.**
19   Q.  Review the applications, not
20 screen them, correct?
21   **A.  Review them.**
22   Q.  Before the background check?
23   **A.  Correct.**

**Page 36**

1   Q.  Or, I'm sorry, before the
2 interview, as well?
3   **A.  Correct.**
4   Q.  Okay.  So after the test, before
5 the interview --
6   **A.  Yes.**
7   Q.  -- she would screen the
8 applications?
9   **A.  That is correct.  Review.**
10   Q.  Review.  Sorry.  And what were the
11 aspects of her review?
12   **A.  I do not know.**
13   Q.  You don't know?
14   **A.  (Witness shaking head from side to**
15 **side.)**
16   Q.  So, generally, Ms. Short would not
17 see the applications until after the test
18 results came back?
19   **A.  You said generally?**
20   Q.  Yes.
21   **A.  Yes.**
22   Q.  Were there exceptions to that?
23   **A.  If I had a question, then I may**

**Page 37**

1 ask her.
2   Q.  Okay.  How often would you ask her
3 a question?
4   **A.  I don't know.**
5   Q.  What types of questions?
6   **A.  About a particular conviction,**
7 **employment history.**
8   Q.  Okay.
9   **A.  There could be more.  I mean,**
10 **those are the type of things I may bring to**
11 **her.**
12   Q.  Let me go back for a moment.  You
13 said that you would review applications or
14 candidates to see whether they were employed by
15 AK Steel in the past?
16   **A.  I didn't say that, but that is**
17 **true.**
18   Q.  That is true.  Did the company
19 maintain a database of past employees by which
20 you would check for candidates?  Let me know if
21 you don't understand that question.
22   **A.  Yeah, could you please --**
23   Q.  Sure.  If you received

**10 (Pages 34 to 37)**

**Page 38**

1  applications, would you check the names on the
2  applications against a list or some sort of
3  recording, database of past employees of AK
4  Steel?
5      A.  We have a Genesis system at AK
6  where you could see if they had been employed,
7  but we didn't go through and check to see if
8  everyone was employed.  There's a place on the
9  application that says have you ever worked at
10  AK Steel or Armco before, I believe.  I'm
11  not -- verbatim, I can't recall, but, I mean,
12  if they indicated yes --
13      Q.  Right.  Then would you go check
14  and see why they were coming back to reapply,
15  or why they were terminated, or if they were
16  terminated, or what have you?
17      A.  If they worked here, then they
18  worked here.  I mean, if they indicated they
19  were an employee here, then, as we talked
20  earlier, we took that as that's why they have
21  that on there.
22      Q.  Just if you don't understand a
23  question I have, feel free just to say so.

**Page 39**

1      A.  Okay.
2      Q.  Because I'm sure I will bungle a
3  lot, so just ask, ask away.
4          What about people who have applied in
5  the past?  Do you maintain any list of people who
6  have applied for AK Steel?
7      A.  Yes.
8      Q.  What type of list is this?
9      A.  It's a list of people who have
10  been through -- if they have applied, we put in
11  that information, and if they are screened out
12  why, or if they have tested, we keep track of
13  them through the hiring process.
14      Q.  So if they failed a test in 2000,
15  for example, there's a list at AK Steel that
16  would have that particular information?
17      A.  Correct.
18      Q.  And if they reapplied in 2001,
19  2002, you would disqualify that person from
20  proceeding into the hiring process because they
21  failed the test in 2000?
22      A.  If they failed the test in 2000
23  and they reapplied when?

**Page 40**

1      Q.  2001, 2002.
2      A.  If you fail it once, within a year
3  you could -- after a year time frame from
4  taking the initial test, you could retest.
5  There were requirements in order to do that.
6      Q.  What type of requirements?
7      A.  You had to submit a letter
8  requesting a retest.
9      Q.  How were people apprised that they
10  needed to submit such a letter or the criteria
11  for retesting?
12      A.  We would tell them.
13      Q.  You would tell them.  You would
14  call them?
15      A.  Correct.
16      Q.  Upon receiving the new
17  application?
18      A.  Correct.
19      Q.  If they -- if the candidate who
20  had been disqualified in the past had not
21  submitted a new application, you wouldn't call
22  them just out of the blue?
23      A.  No.

**Page 41**

1      Q.  They would have to resubmit an
2  application for you to undergo this process?
3      A.  Yes.
4      Q.  How was this list maintained of
5  people who had failed the test or who had been
6  disqualified for other reasons?
7      A.  When you say maintained, you
8  mean --
9      Q.  Was it word processing?  Was it a
10  manual list?  How did you maintain the list?
11  Was it in a file somewhere?
12      A.  Computer.
13      Q.  Is it still in existence?
14      A.  I haven't been there since '04, so
15  I do not know.
16      Q.  I want to go back to the
17  applications.  Where did you store applications
18  upon receiving them?
19      A.  Where did we store applications
20  upon receiving them?
21      Q.  What would you do with an
22  application?
23      A.  We had so many, that we tried to

1  process, you know, as we received them. There
2  was -- by my desk, there was a box of
3  applications, and there might have been some
4  other people that also had boxes of
5  applications, but generally they were kept in
6  my office.
7      Q.  Okay.  Once you were done with an
8  application, say, for example, a disqualified
9  candidate in the initial screening process or
10 because that particular person failed the test,
11 what would happen with the application at that
12 point?
13     A.  We would put it in a file.
14     Q.  In a file.  You received hundreds?
15     A.  Correct.
16     Q.  Right?  So where would you place
17 such applications?  A file in your office?
18     A.  No, it was a general location in
19 the employment area that had file cabinets.
20     Q.  Were they placed alphabetically?
21 How were they filed?
22     A.  By year alphabetically.
23     Q.  By year alphabetically.  Who had

1  the responsibility for filing away these
2  applications?
3      A.  There were numerous people who
4  would file the applications.
5      Q.  Okay.  You included?
6      A.  Yes.
7      Q.  Who else?
8      A.  Oh, my.  There were some temps we
9  had in from Palmer Temps who could have filed
10 the applications, co-workers, anyone in
11 employment.
12     Q.  Did they always stay there in the
13 employment section, in the employment office?
14 I'm sorry.
15     A.  Were they always filed in the
16 employment office or --
17     Q.  Were they ever moved off site at
18 any time?
19     A.  Did they ever leave my office from
20 the time I received them until -- I mean, I'm
21 not understanding exactly what you are asking.
22     Q.  Let me rephrase.  The applications
23 are filed by year alphabetically?

1      A.  Correct.
2      Q.  In a file cabinet in your office?
3      A.  (Witness nodding head up and
4  down.)
5      Q.  Did they stay there permanently?
6      A.  That's where they are filed, yes.
7      Q.  So they are still there?
8      A.  I would assume.  I haven't been
9  over there.
10     Q.  So they are not taken to some
11 off-site storage location or anything like
12 that?
13     A.  I don't know what they have done
14 since I have been gone.  I mean --
15     Q.  Up until you left in 2004, they
16 were still there in the office?
17     A.  (Witness nodding head up and
18 down.)
19     Q.  Okay.  Yes?
20     A.  Yes.  In the building.
21     Q.  In the building.  Excellent.  The
22 test, would you contact individuals to come in
23 to take the test?

1      A.  Yes.
2      Q.  Where were the tests administered?
3      A.  The employment building.
4      Q.  The employment building.  How
5  often?
6      A.  It varied.
7      Q.  Well, how did it vary?  Was it by
8  week, by month?
9      A.  It could be one or two tests a
10 week, three tests a week.  Some weeks it could
11 be once a week, twice a week.  It depended.
12     Q.  But did you administer tests
13 weekly, though?
14     A.  There may be some weeks we did
15 not, but generally speaking.
16     Q.  We are talking about the 2001,
17 2002 time frame?
18     A.  Generally speaking.  In the
19 beginning of 2001, we were on a hiring freeze,
20 so there wouldn't have been any testing going
21 on.  And then a time frame in 2003, as well,
22 there wouldn't have been any testing going on.
23 So that's why I said generally speaking, it

1 would be at least once a week, but it depended
2 hiring needs. There was a lot of things that
3 determined that.
4     Q.   What would you do with
5 applications during the hiring freeze?
6     A.   We would leave them in the step of
7 the process they were in.
8     Q.   Well, for example, hiring freeze
9 the beginning of 2001, you are not hiring.
10 Would you still screen the applications?
11     A.   If we had a backlog, I'm not sure.
12 I came in right at the beginning of 2001. We
13 would still have enough applications to
14 continue screening.
15     Q.   Okay. When you say enough, do you
16 mean if you had just a large amount, you
17 wouldn't want to fall behind in screening
18 applications?
19     A.   Correct.
20     Q.   And then when the time occasioned
21 to actually call, for example, for a test,
22 those who had qualified after the initial
23 screening, would you call them for the test

1 when the hiring freeze was lifted?
2     MS. PRYOR:  Are we talking
3 speculatively, or what she actually did?
4     MR. JOHNSON:  What she actually did.
5     THE WITNESS:  Me, myself?
6     MR. JOHNSON:  Yeah.
7     THE WITNESS:  You are asking what I
8 did in 2001?
9     MR. JOHNSON:  Right.
10     THE WITNESS:  I can't say one way or
11 the other.
12     Q.   Why is that?
13     A.   It was in 2001, and I had just
14 started there, they were on a hiring freeze, I
15 was being trained, so I'm not sure.
16     Q.   What occurred?
17     A.   Correct.
18     Q.   Okay. Fair enough. Who
19 administered the test?
20     A.   There were different people. I
21 have administered the test. We had employees
22 that were temp employees from Palmer Temps that
23 would come to our facility and administer the

1 test. We had two that we actually used. Some
2 of my co-workers have administered the test.
3     Q.   How many temp employees from
4 Palmer Temps -- what were these two
5 individuals' names?
6     A.   One was John Apple. The second,
7 his first name was Bill. I cannot remember --
8 John Apple we used the majority of the time.
9 Bill we would just use if John Apple was on
10 vacation or if one of the employment personnel
11 couldn't administer the test.
12     Q.   During --
13     A.   During my time there.
14     Q.   During your time frame. I was
15 going to ask you that, what time frame did
16 these Palmer Temps employees administer the
17 tests, 2001, 2002?
18     A.   Yes, they did.
19     Q.   To your knowledge, did Palmer
20 Temps ever receive applications?
21     A.   No, not to my knowledge.
22     Q.   Not to your knowledge? Where did
23 the Palmer Temps employees administer the test?

1     A.   In the employment building at AK
2 Steel.
3     Q.   Okay.
4     A.   Door nine.
5     Q.   Door nine? Office nine? Room
6 nine?
7     A.   Door nine. Every building at AK
8 has a door number.
9     Q.   And if I remember or understand
10 correctly, the tests were created by Resource
11 Associates, correct?
12     A.   Correct.
13     Q.   In Louisville, Tennessee?
14     A.   I can't remember.
15     Q.   It doesn't matter. Did they send
16 -- did Resource Associates send tests to you
17 for each testing period, or did you have a
18 stack of tests that you just administered?
19     A.   We had a stack of tests.
20     Q.   It was the same test on each
21 occasion?
22     A.   Correct.
23     Q.   Once the candidates take the test,

**Page 50**

1  you would send them off to Resource Associates?
2      **A.  Correct.**
3      Q.  How long would it take them to
4  grade the exams?
5      **A.  An estimate and generally**
6  **speaking, maybe two days, three days we would**
7  **get the results back.**
8      Q.  On what criteria did they grade?
9      **A.  I was not involved in that.  I do**
10  **not know.**
11      Q.  Was it pass/fail?  Do you know?
12  Was there a percentage?
13      **A.  What Resource Associates did?**
14      Q.  Yes.
15      **A.  I don't know what they did.**
16      Q.  What would Resource Associates
17  provide you upon grading the test?
18      **A.  They would fax me a sheet that had**
19  **the name -- had everyone's name listed who took**
20  **the test, the date, and Q or NQ beside their**
21  **name, which is qualified or not qualified.**
22      Q.  Did they fax it to Ms. Short or to
23  you?

**Page 51**

1      **A.  They faxed that to me.**
2      Q.  Resource Associates faxed the
3  results to you?
4      **A.  Correct.**
5      Q.  Not to Ms. Short?
6      **A.  Ms. Short could have received that**
7  **sheet, as well.**
8      Q.  And did you file or store away
9  this sheet anywhere?
10      **A.  Yes, I did.**
11      Q.  Where?
12      **A.  I kept them in binders.**
13      Q.  Were those binders still in
14  existence as of 2004?
15      **A.  Yes.**
16      Q.  Were these results only received
17  in hard copy form?  Did you have any electronic
18  notification of results?
19      **A.  No, I did not.**
20      Q.  Except for the fax?
21      **A.  Just the fax.**
22      MR. JOHNSON:  Right.  We have been
23  going about an hour.  Let's take a break.

**Page 52**

1      (Recess taken.)
2      MR. JOHNSON:  Back on the record.
3      Q.  Are you doing okay, Ms. Morris?
4      **A.  Yes, I am.**
5      Q.  Excellent.  I want to back up here
6  just to ask you a couple follow-up questions on
7  some things.  If someone failed the screening
8  that the OBES performed, would the OBES perform
9  or send those applications to you at AK Steel?
10      **A.  No, they would not.**
11      Q.  What would they do with those
12  applications?
13      **A.  I do not know.**
14      Q.  Okay.  Do you know whether they
15  maintained a file or a count of how many people
16  failed their screening?
17      **A.  I do not know.**
18      Q.  The criteria by which the OBES
19  screened was provided by AK Steel though,
20  correct?
21      **A.  Yes.**
22      Q.  Okay.  Do you know whether there
23  was any written instructions as to like a

**Page 53**

1  criteria that OBES was to apply in their
2  screening?
3      **A.  I do not know.**
4      Q.  Do you know if OBES ever screened
5  candidates before having them fill out an
6  application?
7      **A.  I don't know.**
8      Q.  Did you ever see any information
9  about how many candidates OBES screened out of
10  the process?
11      **A.  Not that I recall.**
12      Q.  So you don't know whether that
13  information exists one way or the other?
14      **A.  No, I don't.**
15      Q.  Did you provide OBES with a list
16  of candidates disqualified by AK Steel?
17      **A.  No, I did not.**
18      Q.  Was there anyone at AK Steel who
19  would know or who would have the best
20  information about what OBES did with rejected
21  applications?
22      **A.  Anyone at AK Steel?**
23      Q.  Yes.

**14 (Pages 50 to 53)**

1       **A.  I don't know.**
2       Q.  Okay.  During the time that you
3   were involved in the hiring process, could
4   applications be dropped off at any other point
5   other than the OBES?
6       **A.  Could you ask the question again?**
7       Q.  Sure.  Could candidates or
8   applicants submit applications or drop off
9   applications at any other places besides the
10  OBES offices?
11      **A.  No.**
12      Q.  No banks, nothing like that?
13      **A.  Not during the time I was**
14  **involved.**
15      Q.  Okay.  Now, I understand the first
16  page of these applications contained tear-off
17  sheets, correct?
18      **A.  Yes.**
19      Q.  And what was the purpose of these
20  tear-off sheets?
21      **A.  For our affirmative action plan**
22  **and reporting procedures that we had to do.**
23      Q.  And what information was contained

1   or had to be filled out on these tear-off
2   sheets?
3       **A.  Do you have one with you?**
4       Q.  Somewhere in this stack, but just
5   what you can remember at this point.  I will
6   sift through this in a little bit.
7       **A.  Name, date, race, sex, possibly**
8   **whether someone was a veteran or not, I**
9   **believe.  I'm not sure what else.**
10      Q.  What would you do with the
11  tear-off sheets upon receiving the applications
12  at AK Steel?
13      **A.  Where would we -- could you**
14  **rephrase the question, please?**
15      Q.  What would you do with the
16  tear-off sheets upon receiving the applications
17  at AK Steel, if anything?
18      **A.  We kept the tear-off sheets in a**
19  **separate -- we had boxes of them.**
20      Q.  And, I mean, did you tear off the
21  tear-off sheets at any point?
22      **A.  Yes, we did.**
23      Q.  When?

1       **A.  Generally what I did, I can only**
2   **speak for myself, is after we input the**
3   **information into our database, we would tear**
4   **them off.**
5       Q.  You would input the information
6   off of the tear-off sheets into a database?
7       **A.  The one that we had talked about**
8   **earlier that kept track if someone had applied**
9   **before --**
10      Q.  Okay.
11      **A.  -- and where they were in the**
12  **process.**
13      Q.  Right.  And whether they had been
14  disqualified.  That's the same list we are
15  talking about?
16      **A.  Uh-huh.**
17      Q.  And this database was still in
18  existence as of 2004, correct?
19      **A.  Yes.**
20      Q.  What computer program, software
21  program, was this database maintained in?
22      **A.  Excel.**
23      Q.  What information did this database

1   contain?  What were the columns or what have
2   you, rows?
3       **A.  There were two separate sheets.**
4   **For one year, you would have the candidates**
5   **that were not pursued, were not qualified,**
6   **didn't meet our requirements.  Another screen**
7   **would be the people who had tested and how far**
8   **they went, you would have their name, last**
9   **name, first name, middle initial -- this is**
10  **going off memory; I can't be a hundred percent**
11  **sure --**
12      Q.  Sure.
13      **A.  -- race, sex.  If this was the**
14  **sheet that people tested on, it would have**
15  **their test date, whether they qualified, not**
16  **qualified, interview date, qualified, not**
17  **qualified, background check, whether that was**
18  **qualified, not qualified, possibly had an**
19  **offer -- once again, this has been a long time**
20  **since I have seen this -- physical date,**
21  **qualify, not qualify at physical, and then**
22  **comments.**
23      Q.  Okay.  And who would input this

**15 (Pages 54 to 57)**

**Page 58**

1  information into the database?
2      **A.  People who worked in the**
3  **employment department.**
4      Q.  So not just you?
5      **A.  Correct.**
6      Q.  Who else?
7      **A.  What are you asking for?**
8      Q.  Were you the only person who
9  reviewed applications?
10      **A.  No, I was not.**
11      Q.  Who else reviewed applications
12  during the time that you worked in 2001, 2002?
13      **A.  Some of my co-workers did.**
14      Q.  Who?  What positions did these
15  co-workers hold?
16      **A.  Their title -- I mean, they were**
17  **human resource representatives.  Whether they**
18  **were assistant or associate at the time, I**
19  **cannot recall.**
20      Q.  How many other employees?
21      **A.  Possibly three.  And then we also**
22  **had some temporary employees from Palmer Temps**
23  **who also would review applications.  I can't**

**Page 59**

1  **give you a specific number how many other**
2  **people were involved.  We were reviewing**
3  **hundreds of applications.**
4      Q.  How many other assistant HR reps
5  or associate HR reps were employed with you
6  during this 2001, 2002 time frame?
7      **A.  As we talked about earlier, Tracy**
8  **was there when I came in, I'm not sure what her**
9  **title was, and then she left.  Two that I can**
10  **recall.**
11      Q.  Two.  What are their names?
12      **A.  Mindy Markey and Amy Hall.**
13      Q.  So Ms. Markey and Ms. Hall also
14  reviewed applications?
15      **A.  Correct.**
16      Q.  Screened applications.  I'm sorry.
17      **A.  Correct.**
18      Q.  And they also entered or inputted
19  information from the tear-off sheets into this
20  Excel program?
21      **A.  Correct.**
22      Q.  And updated the Excel program with
23  the results of the candidacy of the applicants?

**Page 60**

1      **A.  Correct.**
2      Q.  And in addition, you had on
3  occasion some employees from Palmer Temps who
4  would also perform the screening, as well as
5  the inputting of the information into the Excel
6  program?
7      **A.  Correct.**
8      MS. PRYOR:  Can I be clear for the
9  record?  Are these employees of Palmer Temps or
10  temporary employees?
11      MR. JOHNSON:  Palmer Temps' temps.
12      THE WITNESS:  Temps that were working
13  at AK Steel that we -- Palmer Temps provided us
14  their resumes.
15      MR. JOHNSON:  I have been trying to
16  avoid saying Palmer Temps' temps.  Maybe I should
17  say Palmer group temps.  Maybe that would be more
18  acceptable.
19      Q.  When would the information from
20  the tear-off sheets be inputted into this Excel
21  program, at what stage of the application
22  process, to be more exact?
23      **A.  If someone was screened out due to**

**Page 61**

1  **employment history, conviction, didn't have a**
2  **valid driver's license, we would input that at**
3  **that time into the database, and then we could**
4  **record the information that was entailed in**
5  **that tear sheet on there, and then we would**
6  **tear off the tear sheet.**
7      Q.  And store the tear sheet in a
8  separate file away from the applications?
9      **A.  Correct.**
10      Q.  So you would perform the screening
11  before tearing off the tear-off sheets?
12      **A.  Yes.**
13      Q.  The person -- if the candidate
14  wasn't disqualified during that initial
15  screening, then the tear-off sheet would stay
16  on the application?
17      **A.  Until they were scheduled for a**
18  **test.**
19      Q.  Yes.  Is that true?
20      **A.  Yes.  The tear sheet stayed on the**
21  **application until we input them into the**
22  **database, because we had to track that**
23  **information.  Half the time you couldn't read**

**16 (Pages 58 to 61)**

1 the names and information on the applicant tear
2 sheet.
3      Q.   But if a candidate passed a test,
4 you wouldn't input the information from the
5 tear-off sheet at that time, would you?
6      A.   No, it was prior to.
7      Q.   Prior to the test?
8      A.   Uh-huh.
9      Q.   So everybody's information on a
10 tear-off sheet --
11     A.   I'm speaking for myself.
12     Q.   For yourself, all candidates'
13 information on the tear-off sheet would be
14 inputted after the initial screening, whether
15 you were disqualified or not?
16     A.   The people who were disqualified
17 from the initial screening, they would be put
18 into the database of people who we were not
19 pursuing.  The tear sheet information would be
20 inputted and then tore off at that time.
21         The people who we may have
22 follow-up questions for or we want to just call
23 and schedule a test, after we confirmed they

1 were going to take a test, then at that time we
2 would input -- I would input the information --
3 I'm just speaking for myself again -- into the
4 database.
5      Q.   Okay.  Great.  Great.  You said
6 you received on average about one hundred
7 applications per week from the OBES.  Were you
8 talking about just you, or AK Steel's entire
9 Middletown facility?
10     A.   Talking about AK Steel's
11 Middletown facility.  And that could be give or
12 take, the hundred.  I mean, it depended on the
13 weeks.  I can't say for sure a hundred each
14 time were in the stack.
15     Q.   What if you received four hundred
16 applications one week from the OBES?
17     A.   What if I did?
18     Q.   Yeah.  What would you do at that
19 point?  Would you disseminate them among --
20     A.   I had -- I would keep a box in my
21 office on the floor by my desk, and I had them
22 all stacked in there in the order in which they
23 applied to kind of do first in/first out.  And

1 then as people had time, they would come in and
2 get them and work on them.
3      Q.   Applicant log, or applicant log
4 database, do you know what that is when I say
5 applicant log?
6      A.   If you could tell me, I would
7 appreciate it.
8      Q.   It's probably what you already
9 maintain.  Let me strike that and just ask you.
10         The affirmative action plan reporting
11 obligations, these were federal requirements,
12 correct?
13     A.   Correct.
14     Q.   Why did you have to have these
15 particular -- the plan and the obligations,
16 what was the reason for them?
17     A.   What was the reason for the
18 affirmative action plan?
19     Q.   Yes.
20     A.   I can't answer that specifically.
21     Q.   Why did you have to maintain the
22 plan?
23     A.   I was told to.  We were told to.

1 The company was -- I mean --
2      Q.   The company was told to?  Do you
3 know?
4      A.   That's outside of what I dealt
5 with.
6      Q.   So you don't know why you had to
7 maintain a plan, you just knew you had to
8 conform to a plan and had reporting
9 obligations?
10     A.   Correct.
11     Q.   Do you know -- strike that.
12         AK Steel is currently hiring laborer
13 employees again, correct?
14     A.   Uh-huh.  That's correct.
15     Q.   Are you still utilizing the test?
16     A.   I do not know anything about the
17 current process.
18     Q.   Okay.  Who performed the
19 background checks if the person passed the
20 test?
21     A.   I believe it was Advanced
22 Background -- I can't recall their entire name,
23 but I know it was Advanced Background Check.

**17 (Pages 62 to 65)**

Page 66

1  something of that nature.
2      Q.  They performed the background
3  checks until 2004 or 2003?
4      A.  I believe so.
5      Q.  Do you know what they looked for
6  in performing these background checks, this
7  particular organization?
8      A.  The information we submitted that
9  we wanted them to verify.
10     Q.  Which is?
11     A.  Social Security number, employment
12 history, county criminal reports, MVR reports,
13 motor vehicle record reports.  I believe that
14 is all.
15     Q.  And how were the results of these
16 background checks reported to you?
17     A.  During what time frame?
18     Q.  2001, 2002.
19     A.  I believe at that time, you could
20 go onto their web page -- boy, I haven't
21 thought about this stuff in a long time -- and
22 you could check to see if they were complete
23 with the background.  When it was complete, you

Page 67

1  could access it from their website, I believe.
2      Q.  And you said that you recorded the
3  results of the background checks onto this
4  Excel database, correct?
5      A.  We would -- if they were screened
6  out because of their background check, we would
7  put -- I believe we would put NQ in that
8  column.  If they were -- if their background
9  check verified what they had on their
10 application, then we would put qualified, Q.
11     Q.  But would you note the reason why
12 they failed the background check?
13     A.  No, not onto that system.
14     Q.  Would you record that information,
15 that is the reason why they failed the
16 background check, in any other location?
17     A.  On the actual -- we would print
18 out the background check.  We could access it
19 online and print it out, and if we were
20 reviewing it and you saw someone had had a
21 conviction and they hadn't indicated it on the
22 application, falsification, we would circle it,
23 and then --

Page 68

1      Q.  Circle what?
2      A.  I apologize.  If I got to county
3  criminal report and it showed there was a
4  conviction that he had -- someone did not
5  disclose on the application, you would circle
6  the conviction, write falsification out by the
7  side, or just no background, and my initials,
8  is how I would handle it.
9      Q.  So on the actual background report
10 itself, you would circle this information and
11 make the notations or the notes regarding the
12 failure?
13     A.  On the actual background check
14 report.
15     Q.  Would you make this information
16 with respect to on the application?
17     A.  Physically write it on the
18 application?
19     Q.  Right.
20     A.  No.
21     Q.  You would only enter in the
22 database NQ?
23     A.  Correct.

Page 69

1      Q.  Now, what did you do with the
2  background check reports of those individuals
3  who failed the check?
4      A.  Put it in their application.
5      Q.  So the background check reports
6  would be attached to the applications?
7      A.  It would be inside their
8  application.
9      Q.  Inside the application?
10     A.  (Witness nodding head up and
11 down.)
12     Q.  How is it inside the application?
13     A.  It opens.
14     Q.  Okay.
15     A.  The application opens, and we put
16 it inside.
17     Q.  We received copies, so -- I was
18 like, okay.  This was your practice?
19     A.  My practice, correct.
20     Q.  What did the other individuals who
21 reviewed the background check reports do?  What
22 did they do with them if someone failed a
23 check?

**18 (Pages 66 to 69)**

Page 70

1      A.  Generally, they all went inside
2  the application of the individual, and then it
3  was filed away.
4      Q.  That's how you were trained --
5      A.  Correct.
6      Q.  -- by Tracy White?
7      A.  Correct.
8      Q.  Then if a person passed the
9  background check, then you said you would call
10  them in for an interview?  Actually, I'm
11  sorry --
12      A.  No.
13      Q.  -- I skipped a test.  The
14  interview.  Yes.  After -- if they passed the
15  test, they would be interviewed?
16      A.  Correct.
17      Q.  But that's after another screening
18  by Ms. Short, according to you, correct?
19      A.  A review.
20      Q.  A review.  Sorry.  And you may
21  have already answered this question, but for
22  what criteria was Ms. Short reviewing the
23  applications?

Page 71

1      A.  I do not know.
2      Q.  Did she ever state to you that
3  some applicants couldn't be interviewed?
4      A.  Yes, she did.
5      Q.  Was this an occasional, often?
6      A.  Occasional.
7      Q.  Occasional.  You don't remember
8  any specific instances, I'm sure.
9      A.  No.
10      Q.  Okay.  Did you perform the
11  interviews of candidates?
12      A.  I did, as well as other
13  co-workers.
14      Q.  Co-workers.  Managers of
15  operations and such?
16      A.  Occasionally managers of
17  operations would attend.
18      Q.  Who else would attend on occasion?
19      A.  On occasion, we could have two
20  human resource representatives performing the
21  interview.
22      Q.  Okay.  You had a scoring process;
23  you had an interview form, correct?

Page 72

1      A.  Correct.
2      Q.  And each of the interviewers would
3  score the candidate --
4      A.  Correct.
5      Q.  -- upon particular criteria?
6      A.  That is correct.
7      Q.  This is a standard form you used
8  throughout this period, correct?
9      A.  Yes.
10      Q.  And they had to score a three or
11  above --
12      A.  Yes.
13      Q.  -- overall?
14      A.  I believe that is correct.
15      Q.  Okay.
16      A.  And I believe it's indicated on
17  the actual form, it says --
18      Q.  What the grading criteria is?
19      A.  Correct.
20      Q.  Or what the score should be.  Then
21  if they passed, the score, then you would
22  perform the background check at that time?
23      A.  Correct.

Page 73

1      Q.  Then if they passed the background
2  check, that's when the physical comes in?
3      A.  An offer contingent upon passing
4  the physical.
5      Q.  Excellent.  I am going to ask a
6  few questions now about specific candidates.
7      A.  Okay.
8      Q.  Before we get to that, without
9  revealing the content of anything you discussed
10  with your attorneys, what did you do to prepare
11  for this deposition, if anything?
12      A.  Reviewed the applications and
13  documents.
14      Q.  Of the plaintiffs in this case?
15      A.  Correct.
16      Q.  When did you perform this review?
17      A.  Yesterday.
18      Q.  For how long?
19      A.  Approximately three hours.
20      Q.  Okay.
21      A.  Three and a half.
22      Q.  Great.  So you should know about
23  this guy named Edward James Lewis then,

Page 74

1  correct?
2  **A.  If I could see the application, I**
3  **would appreciate it.**
4  Q.  Sure.  Sure.  I don't have a
5  picture though.
6  MS. PRYOR:  You probably never met
7  him.
8  MR. JOHNSON:  Right.
9  (Thereupon, Plaintiffs' Exhibits 2
10  and 3 were marked for purposes of identification.)
11  MS. PRYOR:  Do you have the
12  application that AK Steel produced in this matter?
13  Is this the one you produced, which is not AK's
14  copy?
15  MS. DONAHUE:  This is the one from
16  his deposition.
17  MS. PRYOR:  I understand.  AK Steel's
18  application has notations on it.
19  MR. JOHNSON:  Well, I'm not sure.  If
20  it is within the materials that were produced,
21  then we should have it.  I haven't checked.
22  MS. PRYOR:  I'm just thinking that
23  might -- I know the one she looked at has

Page 75

1  notations on it, because it was AK Steel's
2  application.
3  MR. JOHNSON:  Okay.
4  Q.  Have you had an opportunity to
5  review Exhibits 2 and 3?
6  **A.  Yes, I have looked at it.  I did**
7  **not look at 3.  Okay.**
8  Q.  Okay.  Taking a look at Exhibits 2
9  and 3, application from Edward Lewis in April
10  of 2001, do you recall anything about this
11  candidacy from Mr. Lewis?
12  **A.  Anything?**
13  Q.  Yeah.  Specifically, do you know
14  why he was rejected for employment with AK
15  Steel based upon this application?
16  **A.  I cannot recall.**
17  Q.  Just reviewing the application,
18  though, is there anything on this application
19  that would result in his disqualification from
20  being allowed to take the test?
21  MS. PRYOR:  I have got the other one,
22  if you want.
23  MR. JOHNSON:  Sure.

Page 76

1  MS. PRYOR:  Do you want to make a
2  copy of it?
3  MS. DONAHUE:  I will take it and have
4  a copy made.
5  MR. JOHNSON:  Might as well pause.
6  (Thereupon, an off-the-record
7  discussion was held.)
8  (Thereupon, Plaintiffs' Exhibit 4 was
9  marked for purposes of identification.)
10  Q.  Review that one for me, please.
11  **A.  (Complies with request.)**
12  Q.  Let me just ask the question
13  again, Ms. Morris -- have you had an
14  opportunity to review it?
15  **A.  Yes, I have.**
16  Q.  Based upon your review of this
17  application, what on here would disqualify
18  Mr. Lewis from employment with AK Steel?
19  **A.  There is -- in reviewing it,**
20  **there's nothing that we would have initially**
21  **disqualified him for.**
22  Q.  So he should have been a person
23  who should have taken the test for AK Steel,

Page 77

1  correct?
2  **A.  Well, there's a notation here why**
3  **he was not.  That's my handwriting.**
4  Q.  That's your handwriting?
5  **A.  It's -- WD is withdrew**
6  **application, the date, and the reason why,**
7  **phone disconnected.**
8  Q.  Where is WD?  I'm sorry.
9  MS. PRYOR:  Probably where the staple
10  is.
11  THE WITNESS:  (Indicating.)
12  Q.  That's WD?
13  **A.  Withdrew application, 8-6-2001,**
14  **phone number disconnected.**
15  Q.  When you say withdrew application,
16  that means you took his application out of the
17  process?
18  **A.  That is correct.**
19  Q.  Phone number disconnected, what
20  does that refer to?
21  **A.  The phone number that's listed on**
22  **his application, (513) 422-8651, was**
23  **disconnected when I attempted to contact him.**

**20 (Pages 74 to 77)**

**Page 78**

1    Q.   For a test?

2    **A.   I mean, we might have asked some**

3    **questions.  He has NA here, have you ever been**

4    **convicted of a crime other than a minor traffic**

5    **violation.  I would have said yes or no.  I**

6    **mean, there may have been a couple follow-up**

7    **questions.  But, you know, by reviewing his**

8    **employment history, he has good experience,**

9    **so --**

10    Q.   Okay.  So that would be the reason

11   based upon your notes on the application here

12   as to why he didn't proceed through the

13   process?

14    **A.   Correct, tried to contact him and**

15   **his phone number was disconnected.**

16    Q.   Okay.  If someone put NA in this

17   section here regarding conviction of a crime,

18   did you always try to call such a person?

19    **A.   It was my practice to do so.**

20    Q.   Your practice to do so.  Okay.  Do

21   you remember or know whether Mr. Lewis ever

22   made an application or applied in November of

23   2001?

**Page 79**

1    **A.   I'm not going to be able to recall**

2    **off the top of my head.  If we don't have an**

3    **application for him, then I would say no.**

4    Q.   But if you would have received an

5    application, would that have been recorded in

6    the Excel database at some point?

7    **A.   Yes, it would have.**

8    Q.   So all applications were recorded

9    in the database?

10    **A.   Applications that we received from**

11   **the OBES, yes.**

12    Q.   So under a notation for Mr. Lewis

13   in the Excel database, you would have noted

14   that he failed or was disqualified during the

15   initial screening, correct?

16    **A.   I would have made that notation**

17   **right there.**

18    Q.   In the database?

19    **A.   Correct.  Now, whether withdrew is**

20   **written out or not, I can't say, but the**

21   **general content of the information would be**

22   **captured in that.**

23    Q.   And if he would have made a

**Page 80**

1    subsequent application in November of 2001,

2    where would you have recorded that information?

3    Would it have been on the same line?

4    **A.   No, separate line.**

5    Q.   Separate line.  Excellent.  So you

6    may have multiple entries for one particular

7    candidate --

8    **A.   Correct.**

9    Q.   -- along with the Social Security

10   number on their particular application?

11    **A.   Social Security number?**

12    Q.   Right.  Like Mr. Lewis in the

13   Excel database -- his Social Security number is

14   on his application, correct?

15    **A.   Correct, right here.**

16    Q.   Right.  And so did you input that

17   information into the Excel database?

18    **A.   I think so.**

19    Q.   Right.

20    **A.   But I'm not a hundred percent**

21   **sure.**

22    Q.   Okay.  But if you did, each time

23   Edward Lewis made an application --

**Page 81**

1    **A.   We would --**

2    Q.   -- you would put his Social

3    Security number --

4    **A.   The same information as --**

5    Q.   So you could search by his Social

6    Security number?

7    **A.   Correct.  We could verify that it**

8    **was the same.  If one person applied three**

9    **times, you would be able to look at their**

10   **Social Security number to make sure it was the**

11   **same person.**

12    Q.   Exactly.

13    **A.   Whether it was on the data -- I**

14   **can't recall whether the Social Security number**

15   **was a category in the database or not, but we**

16   **would have had their application on file that**

17   **we could have checked.**

18    Q.   I mean, you may understand someone

19   could be James Lewis instead of Edward Lewis --

20    **A.   Exactly.**

21    Q.   -- and how it is inputted into the

22   database.

23         Were you once known as Jessica

**21 (Pages 78 to 81)**

Page 82

1 Hicks?
2       **A.  Yes, I was.**
3              MR. JOHNSON:  That's something I
4 meant to ask.
5              MS. DONAHUE:  Important question.
6       Q.  When did you become Jessica
7 Morris?
8       **A.  June 3rd of last year.**
9       Q.  Of last year?
10      **A.  Correct.**
11      Q.  Great.  Marriage?
12      **A.  Yes.**
13      Q.  Congratulations.  I just recently
14 celebrated my third anniversary.
15      **A.  Congratulations to you.**
16      Q.  That's great.
17      **A.  We just had our one year.**
18             MR. JOHNSON:  Would you like to take
19 lunch at this point?
20             MS. BISSELBERG:  If we are going to,
21 I'd just as soon do it now.  It's noon,
22 so --
23             MR. JOHNSON:  I mean, you can see

Page 83

1 with Mr. Lewis I think we are set, so it won't
2 take too much longer, but we may have another hour
3 or two.  Let's just take lunch and come back at 1.
4             MS. BISSELBERG:  Okay.
5             (Lunch recess taken.)
6             MR. JOHNSON:  Back on the record.
7       Q.  How are you, Ms. Morris?
8       **A.  I'm okay.  How are you?**
9       Q.  Doing well, thank you.  Let's talk
10 next about Shawn Pryor.
11      **A.  Okay.**
12             MR. JOHNSON:  Let me introduce two
13 exhibits here.  Mark these, please.  I think we
14 are up to 5.
15             (Thereupon, Plaintiffs' Exhibits 5
16 and 6 were marked for purposes of identification.)
17      Q.  Let me know when you have had an
18 opportunity to review both of those.
19      **A.  I have had an opportunity.**
20      Q.  Exhibit 5, Mr. Pryor's, Shawn
21 Pryor's, application for employment.  On the
22 bottom here on page one of Exhibit 5, it notes
23 that he is applying for a professional and a

Page 84

1 technical position.  Were you involved in the
2 hiring process for professional and technical
3 employees?
4       **A.  Professional, I assisted.**
5 **Technical, depending on what you mean by**
6 **technical.**
7       Q.  Whatever technical meant right
8 here for AK Steel.
9       **A.  There could be electronic**
10 **repairmen, so it depended on what.  But any**
11 **like broad hiring in general at AK, I mean, I**
12 **assisted with the salaried hiring, but my**
13 **function, my sole function, was the hourly.**
14      Q.  Okay.  Did the hiring process for
15 salaried individuals differ from the hiring
16 process for hourly individuals?
17      **A.  Yes, it did.**
18      Q.  How so?
19      **A.  They did not go through the OBES.**
20 **They submitted a resume, if I can remember**
21 **correctly.  They would submit a resume for**
22 **consideration, and depending on the position**
23 **that was vacant at the time, there would have**

Page 85

1 **been some type of advertisement for the vacant**
2 **salaried positions.  They would see if the**
3 **individuals met the requirements for that**
4 **vacant position, and then contact them based**
5 **off their resume, not application.**
6       Q.  Okay.  Well, would those
7 individuals who applied for a professional or
8 technical management position, would they also
9 submit an application in addition to their
10 resume?
11      **A.  Not in the beginning process.  In**
12 **the beginning process, it was they would submit**
13 **their resume.  Once they got to the stage where**
14 **you would conduct a phone screen, in general,**
15 **like employment, get the resume, if you feel**
16 **they meet the requirements for that position**
17 **that's vacant, you would contact them, talk**
18 **about their resume, get salary requirements,**
19 **that type information.**
20             **And then once you determined that**
21 **you thought they could be a candidate, you**
22 **would have them come in for a plant tour, and**
23 **they would meet with the different management**

1  **representatives, operations, maintenance,**
2  **depending on the position available.**
3      **At the end of that, or beginning,**
4  **we would have them fill out an application.  So**
5  **it's actually once they were on AK Steel**
6  **property, they would submit an application.**
7      Q.  Would they have to take a test at
8  any point?
9      **A.  No.**
10      Q.  Not for professional, technical,
11  or management positions?
12      **A.  Depending on what you mean by**
13  **technical, but for a salaried position, no.**
14      Q.  Upon reviewing Mr. Pryor's
15  application here, do you know why he would have
16  been rejected for employment?
17      **A.  Lack of experience.**
18      Q.  Lack of experience.  For which
19  position?
20      **A.  Laborer.**
21      Q.  Laborer.  When you say lack of
22  experience, for the record, what type of
23  experience?

1      **A.  Manufacturing or labor experience.**
2      Q.  What about for professional or
3  technical positions?
4      **A.  I would not have paid any**
5  **attention to what was down here.  If I had an**
6  **application --**
7      MS. PRYOR:  When you say down here,
8  are you talking about the bottom of the first
9  page?
10      THE WITNESS:  I'm talking about the
11  tear sheet.  Because if I received an application,
12  I took it as they were applying for a laborer
13  position, and so I would not have paid attention
14  to the information down there.
15      Q.  If you turn to what's labeled
16  Bates number 142, it's the third page --
17      **A.  Correct.**
18      Q.  -- where Mr. Pryor here on the
19  application at the top indicates that he is
20  applying for a technical or professional
21  position.
22      **A.  Okay.**
23      Q.  Upon reviewing that information,

1  what would you have done with the application?
2      **A.  For my process involving the**
3  **hourly hiring, I would have -- he didn't meet**
4  **the requirements for hourly, so he would not**
5  **have been considered further.**
6      **There's a process you go through**
7  **for salaried, and submitting an application was**
8  **not part of it.  If he had relevant experience**
9  **that I thought could be considered for a**
10  **management position, I would refer it on.**
11      Q.  Refer it on.  What about for a
12  technical or professional position, if he had
13  relevant experience?
14      **A.  In his case, maintained and**
15  **serviced the computer network, our technical**
16  **information systems is IBM.  We don't even**
17  **handle that.  So, I mean, there's nothing that**
18  **he would have been qualified for.**
19      Q.  So you are saying that you would
20  have reviewed his qualifications for technical
21  and professional positions?
22      **A.  I would review them if I thought,**
23  **you know, they have been managing at Fraser**

1  **Paper, a heavy manufacturing paper environment,**
2  **they have been a manager there and we have a**
3  **position that I'm aware of, I might refer it on**
4  **to the appropriate people, then they may**
5  **contact them and ask them to send a resume.**
6      Q.  But you didn't refer Mr. Pryor for
7  a technical or professional --
8      **A.  No, I did not.**
9      Q.  -- based upon what you saw on his
10  resume?
11      **A.  If I was the one who reviewed it.**
12      Q.  Okay.
13      **A.  I can't tell you for sure I was**
14  **the one who reviewed his resume -- or**
15  **application.  I apologize.**
16      MR. JOHNSON:  I said resume too.  My
17  apologies.  Let's mark this one, please.
18      (Thereupon, Plaintiffs' Exhibit 7 was
19  marked for purposes of identification.)
20      Q.  I'll show you what has been marked
21  as Exhibit 7, if you would review that, please.
22      **A.  Okay.**
23      Q.  Mr. Pryor's application indicates

Page 90

1  that he submitted a resume along with the
2  application. Would you have reviewed the
3  resume in addition to his application in order
4  to evaluate his candidacy?
5      A. I usually did not, and I can't say
6  that on some occasion if they had really good
7  management experience, I wouldn't have referred
8  it on and someone looked at it. But I
9  typically did not look at their resume. We
10  were reviewing hundreds of applications.
11      Q. Okay.
12      A. As you can see on the face,
13  there's four positions listed for your
14  employment history. He only had three, all of
15  which were not relevant to anything to do with
16  AK Steel, manufacturing, management.
17      Q. Technical or professional. So the
18  information systems, computer systems, at AK
19  Steel, did you have anyone -- did you have any
20  positions or any AK Steel employees employed in
21  such positions?
22      A. No, it's contracted out through
23  IBM.

Page 91

1      Q. Okay. So IBM maintained -- did
2  they maintain personnel on site?
3      A. Yes.
4      Q. How long has that been in effect,
5  this arrangement?
6      A. I do not know. I know since 2001,
7  since I have been an employee at AK Steel.
8      Q. Is it still the case?
9      A. Yes. Uh-huh. Yes, it is.
10      Q. Again, he was rejected for a
11  laborer position, because he didn't have the
12  requisite experience?
13      A. Correct.
14          MR. JOHNSON: Let's look next at
15  Ronald Sloan.
16          (Thereupon, Plaintiffs' Exhibit 8 was
17  marked for purposes of identification.)
18          THE WITNESS: Okay.
19      Q. Okay. First, do you recall
20  anything about the candidacy of Ronald Sloan in
21  August 2001?
22      A. I recall the candidacy of
23  Mr. Sloan, not specifically the date. I mean,

Page 92

1  he applied then, but we were so -- we had so
2  many applicants that it could have been further
3  down the line when he actually went through our
4  process.
5      Q. Okay.
6      A. So I don't know exactly when he
7  did, but he applied in August of 2001. He went
8  through our preemployment test and qualified,
9  went through our interview process, and
10  actually he has experience that would qualify
11  for electronic repairman, which is still
12  considered -- it's an hourly position, it's a
13  member -- it would still be a member of the
14  bargaining unit.
15          So we were considering him for the
16  electronic repair position, because his US Navy
17  experience would qualify him for that. You had
18  to have two years of an associate's degree or
19  two years relevant, and people who have Navy,
20  they have relevant schooling experience.
21      Q. Okay.
22      A. He qualified at the interview
23  process and was submitted for background, and

Page 93

1  the background revealed that he had a
2  conviction that he did not disclose on his
3  application.
4      Q. What conviction was that?
5      A. I can't remember what the
6  conviction was.
7      Q. Would that conviction have been
8  recorded anywhere?
9      A. Yes, on the background report.
10      Q. Background report. So that should
11  be in his application?
12      A. Correct. It would have been
13  falsification, because he didn't disclose it on
14  his application.
15      Q. You would have been the one who
16  reviewed Mr. Sloan's candidacy, correct?
17      A. I can't say for sure I was the one
18  who looked at his application. I was the one
19  who interviewed him. And I also reviewed his
20  background.
21      Q. Okay. So his rejection, based
22  upon the background report, would be recorded
23  also in your Excel database file?

**24 (Pages 90 to 93)**

Page 94

1  A.  Correct.
2  Q.  And as you have already stated
3  there should be a background report in his
4  application?
5  A.  Correct.
6  Q.  But you can't remember what the
7  conviction is about --
8  A.  No, I cannot.
9  Q.  -- at this time?  Have you
10  reviewed his background report any time
11  recently?
12  A.  Yes.
13  Q.  Yesterday?
14  A.  Yes.
15  Q.  Imagine that.  Do you remember
16  whether it was a felony or misdemeanor
17  conviction?
18  A.  I want to say it was a
19  misdemeanor, but I can't remember for sure.
20  Q.  A misdemeanor?
21  A.  But like I said again, I'm not a
22  hundred percent positive.
23  Q.  Do you remember informing

Page 95

1  Mr. Sloan at his interview that he needed to
2  take an electronics exam?
3  A.  I don't remember informing him,
4  but it was practice that I would have had --
5  the manager of electrical maintenance and
6  controls would have been in the interview with
7  me, I believe it was Chris Sizemore, and he
8  would have the candidates take a test just to
9  get a feel for their knowledge in electronics.
10  Q.  When typically did such candidates
11  take that exam?
12  A.  After the interview.
13  Q.  After the interview.  So the test
14  would be administered typically right after the
15  interview?
16  A.  Correct.
17  Q.  How long was the test, or how long
18  were people given to take the test?
19  A.  I don't think there was a time
20  limit.  Once again, I mean, I don't remember
21  really.
22  Q.  Do you know whether Mr. Sloan took
23  the test?

Page 96

1  A.  I want to say he did not.
2  Q.  But upon conducting the background
3  check of Mr. Sloan, for what position was he
4  still in candidacy, or for which was he still
5  in candidacy?
6  A.  If he no longer wanted to be
7  considered for electronic repairman, if he
8  didn't take the test, then it would have been
9  for the laborer position.
10  Q.  Do you know which position?
11  A.  I can't recall for sure one way or
12  the other.
13  Q.  But it was definitely one or the
14  other?
15  A.  Correct.
16  MR. JOHNSON:  Let me put this into
17  evidence.
18  (Thereupon, Plaintiffs' Exhibit 9 was
19  marked for purposes of identification.)
20  Q.  Here, this is an applicant survey.
21  At what point during the process did candidates
22  complete this applicant survey?
23  A.  At the time they completed the

Page 97

1  application.
2  Q.  So that was at the OBES or at home
3  or what have you?
4  A.  Correct.
5  Q.  So these applicant surveys would
6  be forwarded along with applications by OBES to
7  your office?
8  A.  Correct.
9  Q.  What's the purpose of the
10  applicant survey?
11  A.  It has a series of questions
12  listed that we were interested in the answers.
13  Q.  Right.  But isn't it information
14  contained within the application?
15  A.  I do not believe do you have a
16  valid driver's license is contained within the
17  application or reliable transportation, the
18  rotating shifts information.
19  Q.  So these were basically knock-out
20  questions?
21  A.  I mean, it's a general -- it gives
22  you a brief look at some relevant information
23  we needed.

**25 (Pages 94 to 97)**

**Page 98**

1    Q.   For example, if someone answered
2  no to valid driver's license or reliable
3  transportation, would that have excluded the
4  person from further consideration for a
5  candidate for employment?
6    **A.   Yes.**
7    Q.   So, in effect, these questions are
8  knock-out questions.  Any negative answer one
9  way or affirmative answer the other way would
10  have disqualified a candidate?
11    **A.   These questions could be used to**
12  **disqualify a candidate, yes.**
13    Q.   Did you input the information on
14  these applicant surveys into the Excel
15  database?
16    **A.   No.  Let me --**
17    Q.   Sure.
18    **A.   If the reason we weren't pursuing**
19  **a person was because they did not have a high**
20  **school diploma or GED, we would have indicated**
21  **that.  But we didn't go through and write all**
22  **of this in the database.**
23    Q.   So if a person didn't have

**Page 99**

1  reliable transportation, then in that column
2  that indicates NQ at the initial screening, you
3  would have said no reliable transportation?
4    **A.   Correct.**
5    Q.   Was that the general practice also
6  among other HR reps?
7    **A.   It wasn't necessarily just based**
8  **off of this.  It could have been anything that**
9  **we gathered from their application, or we would**
10  **just put a general comment why they weren't**
11  **being pursued.**
12    Q.   Phone disconnection or something
13  like that?
14    **A.   Correct.**
15    Q.   But this is the general practice
16  also among other HR reps?
17    **A.   Correct.**
18    Q.   Looking at question number seven
19  here on Mr. Sloan's survey, it asks have you
20  ever been convicted of a crime other than a
21  minor traffic violation.  He answered no.  His
22  criminal conviction, if -- strike that.
23    For his disqualification because

**Page 100**

1  of the criminal conviction, it must have been
2  according to this form something other than a
3  minor traffic violation?
4    **A.   Correct.**
5    Q.   This policy about
6  misdemeanors/felonies about -- which would have
7  disqualified a person, was it applied
8  consistently by individuals who reviewed
9  applications or individuals who reviewed
10  background checks?
11    **A.   I can't speak for how someone else**
12  **handled it, but, in general -- I mean, for**
13  **myself, yes.  And if I had a question with one,**
14  **I would consult my manager.**
15    Q.   Who would be able to testify about
16  how those other people handled such questions,
17  criminal convictions, misdemeanors, felonies?
18    **A.   If it was a felony, we would not**
19  **consider the individual.  The misdemeanor**
20  **depended on what the offense was that they were**
21  **convicted of.**
22    Q.   Is Ms. Short the person who
23  generally supervised that process?

**Page 101**

1    **A.   She was my manager, but there may**
2  **have been a misdemeanor for drugs that I would**
3  **have disqualified for and she might not**
4  **necessarily have seen it.  I mean, to me, that**
5  **is pretty clear-cut.**
6    MR. JOHNSON:  Okay.  Let's mark this
7  one, please.
8    (Thereupon, Plaintiffs' Exhibit 10
9  was marked for purposes of identification.)
10    Q.   Reviewing Exhibit 10 here, which
11  is an applicant reference and background check
12  waiver and release by Ronald Sloan.  What
13  exactly is this form?
14    **A.   It's a reference and background**
15  **waiver and release form.**
16    Q.   And at what point did an applicant
17  complete this form?
18    **A.   At the time they completed the**
19  **application.**
20    Q.   So this form would have been sent
21  along with the application and the applicant
22  survey that was submitted by OBES?
23    **A.   Correct.**

**26 (Pages 98 to 101)**

**Page 102**

1    Q.   Would this form be filed away with
2  the application?
3    **A.   Yes.**
4    Q.   Along with the applicant survey,
5  that also would be filed along with the
6  application of the candidate?
7    **A.   Yes.**
8    Q.   Looking at this notation down at
9  the bottom under the yes/no notation -- strike
10  that.
11        You wouldn't know about that,
12  would you?
13    **A.   About what?**
14    Q.   The notation about P & G policy.
15    **A.   No, I did not write that.**
16        MR. JOHNSON: Okay.  Michael Miller.
17  I have a couple applications for Mr. Miller here.
18        (Thereupon, Plaintiffs' Exhibits 11,
19  12, 13, and 14 were marked for purposes of
20  identification.)
21    Q.   What I have placed before you are
22  several exhibits regarding applications or
23  candidacies for Michael Miller.  First, do you

**Page 103**

1  remember anything about Mr. Miller's candidacy
2  for employment?
3    **A.   Yes, I do.  As you can see,**
4  **there's two applications, so he had submitted**
5  **two within, it looks like, a month.  One has a**
6  **notation that's my handwriting.  It says**
7  **duplicate application.  Since there's two at**
8  **the same time frame, I mean, this would have**
9  **been entered into the system.  This is the one**
10  **that I worked off of.**
11        MS. PRYOR:  Which exhibit number are
12  you referring to?
13        THE WITNESS:  Exhibit 11 is the one
14  that states duplicate application.  Exhibit 13 is
15  the one we would have processed, the more recent
16  of the two.
17        He went through our testing procedure
18  and qualified, interview process, also qualified
19  through that process, and then was submitted for
20  background check.  And at the time of the
21  background check, due to his MVR report, he was
22  not processed through.
23    Q.   And what exactly was wrong with

**Page 104**

1  his MVR report?
2    **A.   He had eight points on his**
3  **driver's license.  He had gotten pulled over**
4  **for driving with a suspended license.  His**
5  **license had been suspended, then he got pulled**
6  **over for driving with a suspended license.  And**
7  **with that information, as well as the eight**
8  **points, we did not process him further.  That's**
9  **a concern of reliable transportation.**
10    Q.   So the eight points -- what's the
11  typical number of points?  What's the maximum
12  number of points that a person can have?
13    **A.   I cannot remember.**
14    Q.   But if a person has -- strike
15  that.
16        So a certain number of points, of
17  course, would result in a suspended license?
18    **A.   Correct.**
19    Q.   But you don't know what number of
20  points would entail a suspension?
21    **A.   A suspension?**
22    Q.   Yes.
23    **A.   No.**

**Page 105**

1    Q.   Who made the determination that
2  the points -- the motor vehicle report
3  disqualified him as a candidate?
4    **A.   It was a concern to me, but I**
5  **forwarded it on to my manager, Phyllis Short,**
6  **and she made the final determination.**
7    Q.   Were there any other employees who
8  were disqualified, or candidates, I'm sorry,
9  who were disqualified because of motor vehicle
10  reports or --
11    **A.   Yes.**
12    Q.   -- the results reported on that?
13  Let me go back to Mr. Miller for a second.  Did
14  you note in the Excel file that his MVR report
15  resulted in his disqualification?
16    **A.   No, all it would have said is NQ**
17  **at background.**
18    Q.   Okay.  Would the MVR report have
19  been included within his or inserted within his
20  application?
21    **A.   Yes.**
22    Q.   Have you reviewed the MVR report
23  recently?

**27 (Pages 102 to 105)**

1    **A.  Yes.**
2    Q.  Yesterday?
3    **A.  Yes.**
4    Q.  Okay.  Would a suspension of a
5  license be deemed as a minor traffic violation?
6    **A.  I'm not sure.**
7    Q.  Did you deem it as a minor traffic
8  violation?
9    **A.  Do you have a valid driver's**
10  **license?  If it's suspended, the answer would**
11  **be no.**
12    Q.  But if he had one at the time he
13  applied --
14    **A.  If he had a license at the time he**
15  **applied?**
16    Q.  Right.  And I'm asking not about
17  the question about number five, more so the
18  question about number seven, have you ever been
19  convicted of a crime other than a minor traffic
20  violation.
21    **A.  I mean, we wouldn't consider that**
22  **like a misdemeanor or something, having a**
23  **suspended license.**

1    Q.  Right.  Okay.
2    **A.  That goes in the MVR report.**
3  **That's not your criminal background.**
4    Q.  It's not a criminal conviction or
5  anything?
6    **A.  Correct.**
7    Q.  Okay.  Did you or anyone at AK
8  Steel ever keep a tally or record the
9  individuals who were disqualified because of
10  their MVR report?
11    **A.  Did we keep track of how many --**
12    Q.  Yeah.
13    **A.  No.**
14    Q.  You just inserted the MVR reports
15  into the applications?
16    **A.  Correct.**
17    Q.  And you noted on the background
18  check NQ or DQ?
19    **A.  I would have actually wrote**
20  **physically on the background check no, but in**
21  **the database it would say NQ, I believe is what**
22  **the database would reveal.**
23    MR. JOHNSON:  Off the record.

1    (Thereupon, an off-the-record
2  discussion was held.)
3    MR. JOHNSON:  Back on the record.
4    Q.  Are there any other reasons why
5  Mr. Miller's candidacy was rejected at that
6  time?
7    **A.  No.**
8    Q.  Did you ever inform Mr. Miller
9  that he was disqualified from employment
10  because of the MVR report?
11    **A.  No.**
12    Q.  Why not?
13    **A.  We had a lot of people in the**
14  **process.  If they were not qualified on the**
15  **background report, that's where they ended in**
16  **the process.  They were told in the interview**
17  **that if we have further consideration, we will**
18  **be in contact with you.**
19    Q.  Was this a general practice --
20    **A.  Yes.**
21    Q.  -- that if they are being
22  considered further, they will be contacted?
23    **A.  They will be contacted.**

1    Q.  Okay.  Was it a general practice
2  not to call individuals if they were
3  disqualified during the application process?
4    **A.  Yes.**
5    Q.  Do you know whether Mr. Miller
6  took an electronics test?
7    **A.  He could have.  I can't say for**
8  **sure.**
9    Q.  For what position were you
10  considering Mr. Miller when you had the
11  background check performed?
12    **A.  Laborer.**
13    Q.  Laborer.  Why were you considering
14  him for a laborer position at that point in
15  time?
16    **A.  He was missing some of the**
17  **relevant classes that was needed in order to be**
18  **considered for the electronic repairman**
19  **position.**
20    MR. JOHNSON:  Let's take a look at
21  that.  I wasn't going to do this, but we might as
22  well.
23    (Thereupon, Plaintiffs' Exhibit 15

1  was marked for purposes of identification.)
2      Q.   First, did a candidate for
3  employment for the electronic repairman or any
4  electronic position, did such candidate have to
5  have certain course work?
6      **A.   Yes.**
7      Q.   Were these requirements ever
8  written down anywhere, noted anywhere?
9      **A.   I don't recall.  I believe they**
10 **were, but I can't say a hundred percent.**
11     Q.   How would a candidate know they
12 would have to have certain course work to be
13 employed in electronics at AK Steel?
14     **A.   I would have informed them if it**
15 **was a candidate I was talking to and they were**
16 **interested in the electronic repair position.**
17 **And if we would have advertised, it would also**
18 **be indicated in the advertisement.**
19     Q.   How do you know it would be
20 indicated in the advertisement?
21     **A.   Because it was a requirement.  In**
22 **order to hire an electronic repairman off the**
23 **street, they had to meet that requirement.**

1      Q.   Were you involved in placing
2  advertisements?
3      **A.   No, I was not.**
4      Q.   Did you ever review advertisements
5  to see whether they listed such course work and
6  requirements?
7      **A.   I think they indicated -- it's**
8  **a -- it's a union environment.  There's a**
9  **process within the plant in order to post a**
10 **job, and people bid for those jobs.  To hire**
11 **someone straight into an electronic repairman**
12 **position, they had to have that requirement.**
13 **So we would have never considered someone right**
14 **into that position without having that**
15 **requirement beforehand.  So it would have had**
16 **to have been in the advertisement.**
17     Q.   Well, reviewing Mr. Miller's --
18 what is marked as Exhibit 15, Mr. Miller's
19 transcript from Sinclair Community College, you
20 said that Mr. Miller lacked certain course work
21 for an electronic repairman or any electronics
22 position with AK Steel.  In reviewing his
23 transcript, what course work did he lack?

1      **A.   I cannot tell you that.  Chris**
2  **Sizemore, the section manager of that**
3  **department, would have been the one to make**
4  **that determination.**
5      Q.   Who would have informed Mr. Miller
6  that he lacked that particular course work?
7      **A.   Chris or myself could have.  I**
8  **can't tell you if we did or not.  We might have**
9  **told him in the interview, but I can't**
10 **remember.  I mean, that was quite some time**
11 **ago.**
12     Q.   Are there any -- strike that.
13         Was there a position called technical
14 repair person?
15     **A.   Electronic repair, technical**
16 **repair, it's the same.**
17     Q.   It's the same?
18     **A.   TR, ER, yeah.  Correct.**
19     Q.   Is there a department called a
20 technical repair department?
21     **A.   It's called EM and C, and that's**
22 **the tech repairs and electronic repairmen.  It**
23 **depends on how long you have been with the**

1  **company what you are going to call it, if you**
2  **are going to call it an ER or TR position.**
3      Q.   EMC?
4      **A.   Electrical maintenance and**
5  **control.**
6      Q.   Did anyone who sought candidacy
7  within EMC have to take a test?
8      **A.   For the electronic repairmen, tech**
9  **repair position, if we were hiring them off the**
10 **street, yes.**
11     Q.   If they were promoted from within,
12 they didn't have to take the test?
13     **A.   I cannot say one way or the other**
14 **on that.  I wasn't involved in that.  When it**
15 **was from within the plant, I don't know.**
16     Q.   In your experience now as a labor
17 relations representative, does an individual
18 who is seeking promotion to EMC have to take a
19 test or specifically to an electronic repairman
20 position?
21     **A.   Currently?  I don't know that**
22 **either.  We just got a new contract, and the**
23 **maintenance programs and all of that stuff is**

Page 114

1  still being worked out.  So I'm not sure what
2  their requirements are at this time.
3     Q.  Okay.
4     A.  But you do have to have the
5  two-year or equivalent.  And I was referring to
6  a two-year degree.
7     Q.  Two-year degree?
8     A.  Or equivalent of that.  It's the
9  associate degree, electrical engineering, or,
10  you know, relative -- if you were in the Navy,
11  they go to electronics school.  There's
12  different things that could also qualify.
13     Q.  But you can't tell me sitting here
14  today from looking at Mr. Miller's transcript
15  whether he met that qualification for two
16  years, associate's degree?
17     A.  Correct, that wouldn't have been
18  something I would have been able to do not
19  being part of that department.
20     Q.  Would you have informed him that
21  he didn't have such course work?
22     A.  I told you earlier, I can't
23  remember whether I did or not.

Page 115

1     Q.  Have you heard of a person named
2  Vivian Bert?
3     A.  Yes, I have.
4     Q.  Okay.
5     A.  The Bert case.
6     Q.  Exactly.  Do you recall anything
7  about the candidacy of Vivian Bert?
8     A.  Yes, I do.
9     Q.  What do you recall?
10     A.  She was a previous Armco employee.
11     Q.  And does that bear any
12  significance?
13     A.  She would not have been considered
14  further.
15     Q.  Why not?
16     A.  We did not consider people who had
17  previously been employed by AK Steel or Armco.
18     Q.  What if the person was laid off?
19     A.  We did not pursue people who had
20  been previously employed by AK Steel or Armco.
21     Q.  Why not?
22     A.  It was our -- one of our screening
23  criteria.

Page 116

1     Q.  So even if a person had been laid
2  off because of an economic recession, if they
3  reapplied, they were not subject to being
4  reemployed by AK Steel?
5     A.  No.
6     Q.  Who created that policy?
7     A.  I cannot answer that.
8     Q.  You don't know why --
9     A.  No.
10     Q.  -- they implemented that policy?
11     A.  No, I do not.
12     Q.  Do you know who would know?
13     A.  Possibly Phyllis Short, the
14  manager at that time, but, I mean, I can't say
15  that she would.  I don't know.
16     MR. JOHNSON:  Let's mark this.
17     (Thereupon, Plaintiffs' Exhibit 16
18  was marked for purposes of identification.)
19     THE WITNESS:  There were some
20  instances where if someone was a summer worker at
21  AK Steel or Armco, we would consider them.  That's
22  different than working there as a bargaining unit
23  employee.

Page 117

1     In college, if they were a college
2  student and their parent worked at the company,
3  they could apply for a summer worker position
4  during the time they were out of college, and if
5  they did that, then we would consider them for
6  employment.
7     Q.  What about individuals who were
8  employed in a clerical position with AK Steel,
9  were they subject to this policy?
10     A.  No, just the summer workers was
11  the exception.
12     Q.  Let me rephrase.  That was a bad
13  question.
14     What about individuals who were
15  employed in a clerical position by AK Steel, if
16  they left employment for whatever reason, are they
17  or were they eligible to be reemployed as a
18  laborer?
19     A.  No.  The only ones -- the summer
20  workers were the only exception.
21     Q.  The only exception.  Okay.  If you
22  will review that for me, please, Exhibit 16.
23     A.  Okay.

**Page 118**

1    Q.    This is an application, May 23,
2  2001, from Vivian Bert.  Upon reviewing this
3  application, does it indicate anywhere that
4  she was -- previously employed, yes, by AK
5  Steel.  Here on the cover, correct?
6    **A.    Correct.**
7    Q.    And you are saying that that would
8  have been an automatic disqualifier upon seeing
9  the cover of this application?
10    **A.    Correct.**
11    Q.    And would you have just inputted
12  the information within the Excel file and filed
13  this away in the vertical file?
14    **A.    Correct.  Maybe I personally**
15  **didn't do it, but an HR representative would**
16  **have.**
17    Q.    Who informed you about this
18  requirement?  Was it Ms. White?
19    **A.    Probably.**
20    Q.    Is this requirement written down
21  anywhere?
22    **A.    Not that I recall.**
23    Q.    Do you know whether Ms. Bert

**Page 119**

1  submitted any other applications for
2  employment?
3    **A.    No, I believe she did not.**
4    Q.    Are you saying that you don't know
5  whether she did, or are you saying she
6  definitely did not submit any other
7  applications?
8    **A.    I'm saying if this is the**
9  **application you have for her, I don't believe**
10  **we have anymore.  I mean, I was part of the**
11  **process in producing these applications for**
12  **this case.  I looked for them personally.**
13    Q.    And this is the only one that you
14  turned up?
15    **A.    Correct.**
16    Q.    So if she states that she applied
17  in August of 1999 and April of 2002 and May of
18  2002, you are saying you have no record of such
19  applications?
20    **A.    Correct.**
21    Q.    Where would you check to ascertain
22  whether she had submitted such applications?
23    **A.    Looked in the database.**

**Page 120**

1    Q.    In the database.  Would you have
2  checked the files themselves?
3    **A.    For this case I did.**
4    Q.    But you didn't check with the
5  OBES, correct?
6    **A.    No.**
7    Q.    Do you know whether anyone has
8  checked with the OBES during the conduct of
9  this litigation to ascertain whether they kept
10  files of applications?
11    **A.    I don't know that.**
12    MR. JOHNSON:  Let me introduce this.
13    Q.    Let's go back to Exhibit 16 first.
14  Do you see these hand marks up here in the
15  right-hand corner around the AK Steel emblem?
16  Do you know what those indicate?  What are
17  those?
18    **A.    No.  The checkmark, when we would**
19  **check them in the database -- after we would go**
20  **through and check them, we would put a check.**
21  **But the -- I'm not sure.**
22    Q.    That's not your handwriting?
23    **A.    No, it is not.  I mean, I don't**

**Page 121**

1  **know if the check is, but those two M's, it**
2  **looks like it's M's, is not.**
3    Q.    Do you recall whether you were the
4  one who reviewed this application for Ms. Bert?
5    **A.    I do not recall.**
6    Q.    Do you know whether this policy
7  regarding previous employment with AK Steel as
8  a disqualifier, do you know whether that policy
9  was communicated to the other individuals who
10  reviewed applications?
11    **A.    It wasn't like a written policy, a**
12  **company policy.  I mean, it was just --**
13    Q.    A practice?
14    **A.    -- part of our screening practice.**
15  **Correct.  Yes, it was.**
16    Q.    It was communicated to --
17    **A.    Yes.**
18    Q.    By whom?
19    **A.    It could have been myself or Tracy**
20  **White or Phyllis Short.**
21    MR. JOHNSON:  Mark that for me,
22  please.
23    (Thereupon, Plaintiffs' Exhibit 17

**31 (Pages 118 to 121)**

Page 122

1 was marked for purposes of identification.)
2    Q.  Do you recognize what's been
3 marked as Exhibit 17?
4        **A.  Yes, this is the OBES's form.**
5    Q.   And this is the form you testified
6 about earlier that the OBES gave to applicants,
7 correct?
8        **A.  Correct.**
9    Q.   Was this form only given to AK
10 Steel applicants?
11       **A.  I do not know.**
12    Q.   But they were definitely given to
13 all AK Steel applicants to your knowledge?
14       **A.  Yes, they were.  It was included**
15 **in the application.**
16    Q.   So the applications you received
17 also had this form?
18       **A.  No, it was included in -- we would**
19 **stuff the applications.  The Bureau would give**
20 **us this form to put in there for their use.**
21 **And they hardly ever saw it, because it was for**
22 **them.  They would take it out.  On occasions**
23 **they would forget to take some out, and we**

Page 123

1 **would pull them and put them in a folder, and**
2 **the next time someone came to drop off**
3 **applications, or if I went and picked them up,**
4 **I would give her a folder of this information.**
5 **It wasn't our form.**
6    Q.   Do you know why OBES wanted this
7 application filled out by candidates?
8        **A.  I have no idea.**
9    Q.   Did you produce -- did AK Steel
10 produce this form to us during litigation?
11       MS. DONAHUE:  I'm sorry.
12       MS. PRYOR:  It has got your stamp on
13 it.
14       MS. DONAHUE:  All right.
15       MR. JOHNSON:  I will withdraw that
16 question.
17    Q.   Do you know Donald Edwards?
18       **A.  Personally, no.**
19    Q.   Do you know about Donald Edwards'
20 candidacy for employment?
21       **A.  Yes.**
22    Q.   What do you recall about
23 Mr. Edwards' employment?

Page 124

1        **A.  That he did not have enough**
2 **experience.**
3    Q.   Do you recall when he applied?
4        **A.  If memory serves me correct, I**
5 **want to say in '99 and 2000.**
6    Q.   How did you get this recollection
7 about his candidacy if you weren't employed by
8 AK Steel until 2001?
9        **A.  I reviewed them.**
10    Q.   Reviewed --
11       **A.  The applications.**
12       MR. JOHNSON:  We need a break.
13       (Recess taken.)
14       MR. JOHNSON:  Back on the record.
15    Q.   Let me follow up with one thing
16 about Ms. Bert.
17       **A.  Okay.**
18    Q.   When you noted that she was
19 disqualified because of previous employment,
20 would that exact notation have been entered
21 into the Excel database?
22       **A.  What exact?**
23    Q.   Disqualified because of --

Page 125

1        **A.  It wouldn't say disqualified.**
2    Q.   Would it say previous employment?
3        **A.  Previous AK/Armco employee.  I**
4 **mean, there's variations of what it would say.**
5    Q.   But it would not have just been a
6 notation saying NQ or DQ?
7        **A.  No.**
8    Q.   There would have been a reason --
9        **A.  Correct.**
10    Q.   -- entered into the database?
11       **A.  Correct.**
12       MR. JOHNSON:  Let me have
13 Mr. Freeman, please.  Thank you.
14       (Thereupon, Plaintiffs' Exhibit 18
15 was marked for purposes of identification.)
16    Q.   I have an exhibit here,
17 Exhibit 18.  It's an application from Thaddeus
18 Freeman dated July 13, 2000.  Do you recall
19 anything about the candidacy of Mr. Freeman for
20 employment?
21       **A.  This was prior to my employment**
22 **with AK Steel.**
23    Q.   Right.  Right.  So do you know

**32 (Pages 122 to 125)**

1 anything about his candidacy for employment?
2 **A.  I do.  I believe he took our**
3 **preemployment test in '99.  I'm not sure**
4 **exactly when in '99.  He reapplied in July, and**
5 **if you can see the written notation, it says**
6 **withdrew, never submitted retest request.  He**
7 **was told the retest requirements when he**
8 **submitted this application, not literally at**
9 **the time he submitted the application, but once**
10 **it was processed, someone contacted him, told**
11 **him the requirements, and he never submitted a**
12 **letter.**
13 Q.  How do you know all of these
14 actions occurred, that someone contacted him to
15 submit this retest request?
16 **A.  Reviewing our records.**
17 Q.  What records?
18 **A.  The employment records.**
19 Q.  Something other than this
20 application here?
21 **A.  There's a written note right here,**
22 **withdrew, never submitted retest request.**
23 Q.  Right.

1 **A.  And that information would have**
2 **also been put into the database.**
3 Q.  Okay.  Do you know, when was the
4 previous occasion on which he failed the test
5 before this application date?
6 **A.  I had stated I thought it was in**
7 **'99.**
8 Q.  '99?  But it would have been
9 before July 13th, 1999?
10 MS. PRYOR:  Afterward.
11 THE WITNESS:  Not necessarily.  This
12 is when he applied.  I mean, you have to wait a
13 year to take the test.
14 Q.  Right.
15 **A.  But if he was within a couple**
16 **months, we would have said you are eligible to**
17 **retest at this time.  You can submit a letter**
18 **requesting a retest.  And he never sent the**
19 **letter.**
20 Q.  You didn't talk to anyone else in
21 HR about the reasons why he was not considered
22 further for employment?
23 **A.  It states right here that we**

1 **withdrew his application because he never**
2 **submitted the retest request.**
3 Q.  That's the only thing you reviewed
4 in coming to this conclusion?
5 **A.  Well, it's written on the**
6 **application.**
7 Q.  But that's the only thing you are
8 relying upon to come to this conclusion,
9 correct?
10 **A.  Correct.**
11 Q.  You didn't talk to anyone else?
12 **A.  No.**
13 Q.  Is that your handwriting -- strike
14 that.  You weren't there at the time.
15 Do you recognize this handwriting?
16 **A.  Yes, I do.**
17 Q.  Whose handwriting is this?
18 **A.  Tracy White.**
19 Q.  But you didn't talk to Tracy White
20 about this, correct?
21 **A.  No, I did not.**
22 Q.  Do you have any or do you recall
23 seeing any other applications for Mr. Freeman

1 for employment?
2 **A.  The '99.**
3 MR. JOHNSON:  Let me go ahead and
4 submit that into evidence here real quick.
5 (Thereupon, Plaintiffs' Exhibit 19
6 was marked for purposes of identification.)
7 Q.  If you will review that for me,
8 please.
9 **A.  (Complies with request.)**
10 Q.  Is this the application that's
11 marked as Exhibit 19, October 20th, 1999, the
12 application of Thaddeus Freeman, did this
13 application result in his test or result in him
14 being considered or requested to take a test?
15 **A.  The records reveal that it did,**
16 **yes.**
17 Q.  Okay.  In reviewing this
18 application, why did Mr. Freeman make it past
19 the initial screening process?
20 **A.  I cannot answer that question.**
21 Q.  Well, if you will look at the
22 application now, if you were reviewing this
23 application in 2001, 2002, would Mr. Freeman

1 have made it past the screening process?
2          MS. PRYOR:  Objection, calls for
3 speculation.
4          THE WITNESS:  No.
5          MR. JOHNSON:  You can answer.
6          MS. PRYOR:  You can answer.
7          THE WITNESS:  No.
8     Q.  Why not?
9     **A.  No experience.**
10    Q.  Do you think someone may have --
11 strike that.
12        So you don't know why Mr. Freeman
13 made it --
14    **A.  I have no idea.**
15    Q.  -- to the process of taking a
16 test?
17    **A.  No.**
18    Q.  Were you involved in the
19 production of these applications in this case?
20    **A.  Yes, I was.**
21    Q.  Were all of the items that were
22 contained within the applications produced to
23 plaintiffs in this case, such as background

1 reports?
2     **A.  Who would be the plaintiffs?**
3     Q.  Plaintiffs' counsel.  I'm sorry.
4     **A.  I didn't personally send them to**
5 **you, so that would not be a question for**
6 **myself.  I submitted everything I had on that**
7 **particular person to my manager.**
8     Q.  What about all of the application
9 files?  Were you involved in the process of
10 gathering those files for production?
11    **A.  Which files?**
12    Q.  Applications.
13    **A.  Every application, or are you**
14 **referring to specific applications?**
15    Q.  Every application.  You testified
16 that in employment, you have every application
17 for all of the years that were stored and
18 filed --
19    **A.  Correct.**
20    Q.  -- within the building, correct?
21    **A.  Correct.**
22    Q.  You do know, or maybe you don't
23 know, that all of those files were produced and

1 copied to plaintiffs' counsel?
2     **A.  I knew they were copied.  I didn't**
3 **know for whom.**
4     Q.  Were you involved in that process
5 at all?
6     **A.  Yes, I was.**
7     Q.  Were all of the materials within a
8 particular application copied for plaintiffs'
9 counsel?
10    **A.  They would physically come take**
11 **them from the file.  They would take everything**
12 **we have in the file, so it all would have been**
13 **included, yes.**
14    Q.  So all background check reports,
15 if they would have been in there, everything?
16    **A.  Yes, that's correct.**
17    Q.  Okay.  And the same for your
18 individual -- when you looked at the individual
19 plaintiffs' files, would you have copied
20 everything in those files and produced them?
21    **A.  That is correct.**
22    Q.  Those would have also been labeled
23 with a Bates number?

1          MS. PRYOR:  I don't think she was
2 involved in Bates numbering.
3          MR. JOHNSON:  She wasn't involved in
4 that.  Okay.  Strike that question then.
5          THE WITNESS:  I don't even know what
6 that is.
7          MS. DONAHUE:  You don't want to know.
8     Q.  Do you recall that Mary Harris
9 applied for employment with AK Steel --
10    **A.  Yes.**
11    Q.  -- in the 2001 time frame,
12 thereabouts?
13    **A.  Sounds accurate.**
14    Q.  Do you recall anything about
15 Ms. Harris' candidacy for employment?
16    **A.  Lack of experience.**
17    Q.  Lack of experience?
18    **A.  (Witness nodding head up and**
19 **down.)**
20        And, again, this is a review of
21 our records indicates that.  I can't personally
22 say I was the one who reviewed her application
23 at the time she submitted it.

**34 (Pages 130 to 133)**

1    Q.  So in other words, you can't
2  testify today that another HR person may have
3  reviewed her file and rejected her for some
4  other reason?
5    **A.  I can testify the reason that she**
6  **was rejected was due to her lack of experience.**
7  **I can't testify that I was the one that made**
8  **that call.  I could have, but I can't tell you**
9  **for sure.  I mean, I looked at hundreds of**
10 **applications.**
11   Q.  How do you know someone else made
12 that call?
13     MS. PRYOR:  Objection.  I don't think
14 she testified that someone made that call.  She
15 said someone, either her or someone else.
16     MR. JOHNSON:  Right.  Right.
17   Q.  Well, if someone else made that
18 call, how do you know they made that call?
19   **A.  It was inputted into our system.**
20   Q.  So you have reviewed your system,
21 and in your system it says that Mary Harris was
22 rejected because of lack of experience?
23   **A.  I did not review the system.**

1    MR. JOHNSON:  Well, let me just put
2  this into evidence then.
3    (Thereupon, Plaintiffs' Exhibit 20
4  was marked for purposes of identification.)
5    MS. PRYOR:  I'm going to note for the
6  record this also looks to be the one -- the
7  application that plaintiffs' produced.
8    Q.  Upon reviewing this application,
9  you testified a few minutes ago that Ms. Harris
10 was rejected because of lack of experience,
11 right?
12   **A.  Correct.**
13   Q.  And you testified with respect to
14 that conclusion based upon your review of her
15 application?
16   **A.  Not her application.  That's the**
17 **reason she was screened out was her lack of**
18 **experience.**
19   Q.  Now, if you don't remember whether
20 or not you reviewed her application back in
21 2001, how do you know that she was screened out
22 because of lack of experience?
23   **A.  That information was input into**

1  **the database.  I did not review the database**
2  **before coming here today, but when producing**
3  **these documents, you know, we tracked what --**
4  **where they fell in the process, and she fell**
5  **out -- she was screened out because of her lack**
6  **of experience.**
7    Q.  Are you saying that you have
8  reviewed the database sometime in the past and
9  saw that she was rejected because of lack of
10 experience?
11   **A.  At the time we created these**
12 **documents.**
13     MS. PRYOR:  Produced.
14     THE WITNESS:  Produced.  Copied.
15     MS. PRYOR:  Not created.
16     MR. JOHNSON:  That will work.
17     THE WITNESS:  Made copies of
18 the -- I didn't magically come up with the
19 application.
20   Q.  This is not your handwriting?
21   **A.  No.**
22   Q.  So if I understand correctly, the
23 database would contain a notation that

1  Ms. Harris was rejected in 2001 because of lack
2  of experience?
3    **A.  It could say no experience, lack**
4  **of experience.  I'm not -- I can't recall**
5  **exactly the wording, but it was something to**
6  **that effect, yes.**
7    Q.  And would such a notation be
8  consistent with what you see today on this
9  application?
10   **A.  Looking at her application, she**
11 **does have light experience.  The assembler and**
12 **the lab technician, it would be considered**
13 **light.**
14   Q.  Would that have been sufficient?
15   **A.  Could be.  Could be this was one**
16 **that was questionable, but we had so many**
17 **applications at the time, we could focus more**
18 **on the more substantial manufacturing**
19 **experience.  Again, I can't say.  I don't know**
20 **if I was the one looking at this, so I'm not**
21 **sure what was the person's mindset, process.**
22   Q.  Right.  But if it was
23 questionable, what notation would have been

**35 (Pages 134 to 137)**

**Page 138**

1  made in the database?

2    **A. If it was questionable, we**
3  **wouldn't have made -- I mean, when I say it was**
4  **questionable, I said someone could look at this**
5  **and think, you know, we could contact her and**
6  **get more information to see really what did she**
7  **do. But, I mean, from review of the records,**
8  **it seems that they took this as she didn't have**
9  **relevant manufacturing experience, and that's**
10  **all I can tell you.**

11    MR. JOHNSON: Okay. Let me have you
12  mark this, please.

13    (Thereupon, Plaintiffs' Exhibit 21
14  was marked for purposes of identification.)

15    MR. JOHNSON: Why don't you mark this
16  one for me too, please.

17    (Thereupon, Plaintiffs' Exhibit 22
18  was marked for purposes of identification.)

19    Q. I have just handed to you Exhibits
20  21 and 22 regarding Ms. Harris' candidacy.

21    **A. Uh-huh.**

22    Q. Do you recall whether these,
23  Exhibits 21 and 22, which respectively indicate

**Page 139**

1  Ms. Harris' applicant survey in May 15, 2001,
2  as well as her resume -- do you know whether
3  these documents were contained with the
4  application?

5    **A. I know the application survey**
6  **would have been. Again, I'm not sure if I'm**
7  **the one that reviewed it, but it would have**
8  **been in there. The resume, I can't say one way**
9  **or the other.**

10    Q. Do you know whether other HR reps
11  would have reviewed her resume?

12    **A. I'm not sure.**

13    Q. It's possible, you just don't
14  know?

15    **A. Correct.**

16    Q. You may or may not have, you just
17  don't --

18    **A. Due to the high volume, I usually**
19  **did not. We didn't require a resume. All we**
20  **needed was an application.**

21    Q. Take another look at her applicant
22  survey and her resume. Would you make a
23  determination as to whether Ms. Harris would

**Page 140**

1  have met the manufacturing or experience
2  requirement for candidacy for a laborer
3  position?

4    MS. PRYOR: Are you asking whether
5  she would meet the manufacturing experience
6  requirement, or whether she would have been
7  qualified to move on in the process?

8    MR. JOHNSON: Qualified to move on in
9  the process.

10    THE WITNESS: I can't say whether she
11  would have been qualified to move on in the
12  process, because I would have had some questions
13  in regards to these temporary positions, and the
14  two jobs at the top that she was working, present
15  job, floral design, and there's some gaps, 8-'96
16  to January of '97, what she did in between that
17  time frame. So I would have had some general
18  questions to ask her, so I can't say one way or
19  the other if she would have moved on in the
20  process.

21    Q. If the notation in the database
22  represented that she was disqualified because
23  of experience, lack of experience, no

**Page 141**

1  experience --

2    **A. Uh-huh.**

3    Q. -- then that would indicate that
4  there is some problem with her work experience,
5  correct?

6    **A. Correct.**

7    Q. And would that refer to the
8  two-year manufacturing or labor requirement --

9    **A. Yes.**

10    Q. -- when you say experience?

11    **A. Yes.**

12    Q. Okay. So in reviewing the
13  applicant survey, Exhibit 21, and the resume,
14  Exhibit 22, do you think that Ms. Harris would
15  have met the experience requirement at that
16  time?

17    **A. She could have, yes.**

18    MS. PRYOR: Are you looking at the
19  resume?

20    THE WITNESS: Yes.

21    Q. What in her resume indicates that
22  she met the experience requirement?

23    **A. The GE Aircraft Engines**

**Page 142**

1  employment.
2      Q.   Looking at the applicant survey,
3  Exhibit 21, she mentions GE Aircraft Engines,
4  eight years of experience.  Would that have
5  indicated that she met the experience
6  requirement?
7      **A.   Speculating here, I can't say one**
8  **way or the other.**
9      Q.   Sure.
10     **A.   Looking at the face of this, could**
11 **or could not have, because this could have**
12 **been -- I mean, it depends on how long ago.  If**
13 **she worked there from '70 to '78 and hasn't**
14 **been back in a manufacturing experience since,**
15 **been a real estate agent or whatever it could**
16 **be, that could be questionable.**
17     Q.   So are you telling me that the
18 period of time in which individuals obtained
19 manufacturing experience also was a criteria or
20 requirement for employment?
21     **A.   It's something I would take into**
22 **consideration.**
23     Q.   But not necessarily other HR reps?

**Page 143**

1      **A.   I can't speak for others.**
2      Q.   Ms. White didn't instruct you that
3  you needed to have a relevant time frame on
4  which to consider people for manufacturing
5  experience?
6      **A.   Not that I recall.**
7      Q.   Okay.  If I understand correctly,
8  would you have called Ms. Harris upon reviewing
9  the notation such as this that was
10 questionable?
11         MS. PRYOR:  Objection, calls for
12 speculation.
13         MR. JOHNSON:  You can answer.
14         THE WITNESS:  I could have.
15     Q.   You would have?
16     **A.   Could have.**
17     Q.   Could have.  But would you have
18 done so?
19     **A.   I can't say one way or the other.**
20 **Like I said, we were in a -- there were lots of**
21 **applications.  I mean, I could have seen it was**
22 **light experience and gone on to the next**
23 **application.  We were reviewing hundreds.**

**Page 144**

1      Q.   But if you reviewed the applicant
2  survey and saw GE Aircraft Engines, eight
3  years, do you think that would have compelled
4  you or is something that would have compelled
5  you to call Ms. Harris?
6      **A.   Could have.  Again, I can't tell**
7  **you what I would have done.**
8      Q.   Okay.  You don't remember one way
9  or the other?
10     **A.   No, I don't.  It was 2001.**
11     Q.   Right.  Right.  I understand.  Are
12 you aware of any other applications from
13 Ms. Harris other than this May 2001
14 application?
15     **A.   No, I am not.**
16     Q.   Do you know whether she had or
17 whether she applied on any other occasions
18 other than this May 2001?
19     **A.   Not other than this one, no.**
20     Q.   Do you know whether your files
21 contain any other -- strike that.
22         Did you check your database to see
23 whether she applied on any other occasion other

**Page 145**

1  than this May 2001?
2      **A.   Yes, I did.**
3      Q.   And what were your results?
4      **A.   No.**
5      Q.   No applications?
6      **A.   Correct.**
7      Q.   Roderique Russell.  You recall
8  Mr. Russell's candidacy, correct?
9      **A.   Correct.**
10     Q.   Do you know on how many occasions
11 Mr. Russell applied for employment with AK
12 Steel?
13     **A.   I'm just aware of the one.**
14     Q.   When was that occasion?
15     **A.   I believe it was 2000.**
16         MR. JOHNSON:  I will give you this
17 here then.
18         (Thereupon, Plaintiffs' Exhibits 23
19 and 24 were marked for purposes of
20 identification.)
21     Q.   Have you ever seen this
22 application from Mr. Russell, the one that's
23 marked as Exhibit 23?  It's a July 21, 2000,

**37 (Pages 142 to 145)**

1  application.
2  **A.  Yes.**
3  Q.  This is an application that was
4  maintained in AK Steel's files?
5  **A.  Yes.**
6  Q.  Are there any other applications
7  from Mr. Russell --
8  **A.  No.**
9  Q.  -- that are maintained by AK
10  Steel?
11  **A.  No.**
12  Q.  Nothing else contained within your
13  files?
14  **A.  No.**
15  Q.  Now, do you know why Mr. Russell's
16  candidacy was rejected before -- based upon
17  this application?
18  **A.  From the review of our records, it**
19  **revealed that he was interviewed, and then we**
20  **were on a hiring freeze.  And once the hiring**
21  **freeze was lifted, it was revealed that -- we**
22  **came upon a group of individuals that had kind**
23  **of gotten stuck in limbo in between the hiring**

1  **freeze and the release of the hiring freeze.**
2  **I personally tried to contact**
3  **those individuals.  There were a handful of**
4  **them.  I can't say how many.  And I tried to**
5  **contact him to set him up for another**
6  **interview, because he had interviewed**
7  **previously and passed our preemployment test.**
8  **And I can't say for sure if I actually spoke**
9  **with him.  On a couple of occasions I tried to**
10  **contact him.  So I sent him a letter asking him**
11  **to contact me so we could schedule a time for**
12  **him to come back in for an interview.**
13  **He never called in regards to that**
14  **letter, so I contacted him again, in which he**
15  **answered.  We set up an interview.  Dates -- I**
16  **cannot tell you the dates in which this**
17  **occurred.  I believe it was sometime in 2002.**
18  **I think I sent the letter in 2002.**
19  **The day on which the interview was**
20  **to take place, he called and said he was not**
21  **going to be able to make it, and that he would**
22  **like to schedule it next week, and he would be**
23  **in contact with me, and I never heard from him**

1  **again.**
2  Q.  So let me see if I can unbungle
3  this somewhat.  Although Mr. Russell submitted
4  his application on July 21, 2000, when did he
5  take the test based upon this application?
6  **A.  I believe it was sometime**
7  **thereafter.**
8  Q.  In the year 2000?
9  **A.  Correct.**
10  Q.  Okay.  And when did he -- when was
11  he interviewed?
12  **A.  After the test in 2000.**
13  Q.  In 2000.  Those particular steps,
14  would they have been recorded in the database?
15  **A.  Correct.  I believe this was in a**
16  **time frame I wasn't there.**
17  Q.  Right.  But according --
18  **A.  But our general practice, yes,**
19  **would be to input the information.**
20  Q.  Right.  So it should be in the
21  database according to your general practice?
22  **A.  Correct.**
23  Q.  But then you said, I guess, in

1  early 2001, there was a hiring freeze?
2  **A.  Actually, I think it started the**
3  **end of 2000, carried on to the beginning of**
4  **2001.**
5  Q.  Okay.  And then the hiring freeze
6  was lifted in -- lifted when?  I'm sorry.
7  **A.  Specifically, it was sometime in**
8  **February or March.**
9  Q.  Of 2001?
10  **A.  I believe so.**
11  Q.  You testified at some point you
12  discovered there was a group of applicants who
13  somehow had fallen through the cracks?
14  **A.  Correct.**
15  Q.  When did -- when was this
16  discovery made?
17  **A.  If I sent the letter in 2002, it**
18  **would have been sometime in 2002.**
19  Q.  What prompted the discovery?
20  **A.  If I remember correctly, they were**
21  **in Tracy White's old office.**
22  Q.  Okay.
23  **A.  That's if I remember correctly.**

Page 150

1 **We are going back a ways here.**
2     Q.  A stack of applications in her old
3 office?
4     **A.  Correct.**
5     Q.  Okay.  So you are saying -- was
6 Ms. White still employed in that position, or
7 was that office vacant?
8     **A.  It used to be her office, and**
9 **there was no one in there.**
10     Q.  And, what, you were just cleaning
11 out her office or conducting a search?
12     **A.  I was going through her office**
13 **kind of cleaning it out, yes.**
14     Q.  Did they have the interview
15 scoring sheets with the applications?
16     **A.  Yes.**
17     Q.  Why did you need to reinterview
18 candidates?
19     **A.  There had been a gap in time, and**
20 **so we needed to sit down with them, see if they**
21 **are still interested, see what had changed in**
22 **their employment history.  We were going to**
23 **have them fill out another application to**

Page 151

1 **update their information.**
2     Q.  At what point would you have had
3 these candidates fill out another application?
4     **A.  Once they came in.**
5     Q.  For the interview?
6     **A.  Uh-huh.**
7     Q.  Okay.  Do you know whether
8 Mr. Russell took the qualifying test from the
9 laborer position sometime in September of 2001?
10     MS. PRYOR:  2001?
11     MR. JOHNSON:  Yes.
12     THE WITNESS:  No.
13     Q.  You don't know?
14     **A.  I don't recall that he did.**
15     Q.  You just have records that he took
16 it in 2000?
17     **A.  In 2000 and qualified in 2000, so**
18 **there would be no need for him to take it**
19 **again.**
20     Q.  If you pass a test once, you say
21 it lasts for one year?  Did you say that
22 earlier?
23     **A.  No.  If you pass the test, you**

Page 152

1 **pass the test.**
2     Q.  You never have to take it again?
3     **A.  If you do not qualify on the test,**
4 **that's where the one year you are referring**
5 **to --**
6     Q.  Okay.
7     **A.  You have to wait a year before you**
8 **can retest.**
9     **(Thereupon, Plaintiffs' Exhibit 25**
10 **was marked for purposes of identification.)**
11     Q.  Look at that for me, please.  I
12 have tendered to you Exhibit 25.  Do you
13 recognize this exhibit?
14     **A.  Yes, I do.**
15     Q.  And will you identify it for the
16 record, please?
17     **A.  It's a letter I sent Mr. Russell**
18 **on September 12, 2002, asking for him to**
19 **contact me.**
20     Q.  Is that your signature?
21     **A.  Yes, it is.  It was.**
22     Q.  It was.  Looking up top, the date,
23 11-11-2002, what exactly is that notation at

Page 153

1 the top there?
2     **A.  It's a fax.  I can't tell you**
3 **from -- I can just tell you what it says,**
4 **11-11-02, the time, 937, AK Steel, page two of**
5 **two.**
6     Q.  Why would this document have a fax
7 number on it?
8     **A.  I have no idea.**
9     Q.  Do you remember faxing this
10 document to anyone at any time?
11     **A.  I can't say one way or the other.**
12 **I don't remember.**
13     Q.  Is 937 the area code for that
14 location, for that area, Middletown?
15     **A.  I believe Middletown is 513.**
16     Q.  What's 937?  Do you recognize that
17 exchange?
18     **A.  937 would be -- I know Franklin is**
19 **937.  Miamisburg is 937.  I can't identify**
20 **every city that holds the 937 area code.**
21     Q.  Okay.  But that is an area code?
22     **A.  Correct.**
23     Q.  It's not an exchange?

**39 (Pages 150 to 153)**

Page 154

1    A.  It's an area code.
2    Q.  And you are saying that
3  Mr. Russell never called you back when he
4  called to cancel an interview?
5    A.  He never called once he received
6  this letter.  I had to attempt to call him
7  again.
8    Q.  And you reached him?
9    A.  And I reached him.  And we
10  scheduled an interview, and he cancelled and
11  was supposed to call me a week later to
12  reschedule, which he did not do.
13    Q.  Did he tell you why he cancelled
14  the interview?
15    A.  I cannot recall.
16    Q.  Would the cancellation have been
17  noted in the Excel file?
18    A.  It should have been.
19    Q.  Do you know whether it was?
20    A.  I do not.
21    Q.  Have you reviewed the Excel file
22  to find out whether or not it was?
23    A.  No, I did not.

Page 155

1    Q.  These events about the
2  cancellation, is this something that you just
3  remember with respect to Mr. Russell?
4    A.  Yes.  I sent the letter.
5    Q.  Right.  But the events afterwards
6  about you calling him to schedule an interview,
7  actually setting up an interview, him
8  calling -- Mr. Russell calling to cancel the
9  interview, how do you remember all of these
10  details?
11    A.  There was a note that I had kept
12  track of the information.
13    Q.  A note that was created when?
14    A.  I don't know.
15    Q.  Was it -- is that note still in
16  existence?
17    A.  I believe so.
18    Q.  Where?
19    A.  I don't have it.
20    Q.  Who has it?
21    MS. PRYOR:  I think it's for the
22  attorneys.  It's a note for the attorneys.  Is
23  that what you are talking about?

Page 156

1    THE WITNESS:  Yes.
2    MS. PRYOR:  So I object to it.
3    Q.  When did you remember that all of
4  this -- all of these events occurred with
5  respect to Mr. Russell?
6    A.  I remember it just from my
7  interaction with him, from talking to him,
8  sending the letter, and talking to him and him
9  canceling the interview.
10    Q.  Right.  But when did -- when
11  did --
12    A.  After we started talking about it,
13  seeing the letter, seeing the application, the
14  group of people that we discovered, because I
15  followed up with each and every one of them to
16  get them back in for the interview the same way
17  I tried to with him.
18    Q.  Was this a year ago that you
19  remembered all of this?
20    A.  It was yesterday.
21    Q.  It was yesterday.
22    MS. PRYOR:  I don't think she
23  testified that she ever forgot it.

Page 157

1    MR. JOHNSON:  I'm sorry?
2    MS. PRYOR:  I don't think she
3  testified that she ever forgot it.  You are
4  acting --
5    THE WITNESS:  I just haven't thought
6  about it since this took place.  I mean, I don't
7  dwell on each person that doesn't call us back or
8  come in for an interview.  I move on.  And I
9  hadn't thought about it until my preparation
10  yesterday.  Going through the documents, I
11  remembered it.
12    Q.  You remembered all of this stuff
13  about Mr. Russell?
14    A.  Well, the letter indicates the two
15  times I tried to contact him.
16    Q.  I'm talking about all of the stuff
17  subsequent to that.
18    A.  Yes, I do.
19    Q.  Did Mr. Russell call you about the
20  cancellation of the interview?
21    A.  Yes, he did.
22    Q.  Mr. Russell specifically?
23    A.  Yes, he did.  He said it was

**40 (Pages 154 to 157)**

1  **Mr. Russell.  I can't confirm whether it was or**
2  **was not.**
3      Q.   Are there any contemporaneous
4  phone logs or what have you of this
5  conversation you had with Mr. Russell?
6      **A.   No.**
7      Q.   As you have stated, there's no
8  notation anywhere in the database that any of
9  these events occurred, correct?
10     **A.   Could be.  I don't recall.  I**
11 **mean, what exactly I input into the system, I**
12 **don't know, if I was the one that inputted it.**
13     Q.   Based upon your prior testimony,
14 you would have inputted something in the system
15 about Mr. Russell's candidacy, correct?
16     **A.   Me personally?**
17     Q.   Yes.
18     **A.   It depends.  I mean, he was in the**
19 **process prior to me, so I wouldn't have input**
20 **any of that, because I wasn't even there at**
21 **that time.**
22     Q.   Right.  But with respect to
23 rejecting Mr. Russell after he cancelled the

1  interview, based upon your general practice or
2  typical practice, you would have recorded that
3  somewhere contemporaneous with the rejection?
4      MS. PRYOR:  Objection.  I don't think
5  she testified they rejected anybody.
6      MR. JOHNSON:  Disqualified.
7      THE WITNESS:  Or disqualified.  He
8  never called to schedule the interview.  So at
9  that point, I mean, I don't know what else we are
10 supposed to do to try to get in contact with him.
11     So he fell out of the process due to
12 his own actions, and we would have recorded that
13 appropriately.  Exactly what we input, I cannot
14 testify to what that was.
15     Q.   But there would have been a
16 recording at that time?
17     **A.   Of some sort, yes, that is**
18 **correct.**
19     Q.   In the Excel database?
20     **A.   Correct.**
21     Q.   But you haven't checked the
22 database?
23     **A.   No, I have not.**

1      MR. JOHNSON:  Let's take a few
2  moments.
3      (Recess taken.)
4      MR. JOHNSON:  Back on the record.
5      Q.   Just a few more questions.
6      **A.   Okay.**
7      Q.   Looking back at Exhibit 25, this
8  letter that you sent to Mr. Russell, did you
9  create or keep a list of the individuals who
10 fell through the cracks that you were trying to
11 call back in for interviews?
12     **A.   Not that I recall.**
13     Q.   Would you have noted these
14 callbacks in the Excel database or in any other
15 location?
16     **A.   I mean, I could have.  I can't say**
17 **one way or the other.**
18     Q.   Would you have sent individuals to
19 all -- I mean, sent letters to all individuals
20 who you were not able to reach via telephone
21 call?
22     **A.   If we were unable to reach them.**
23 **But if my memory serves me correct, I think the**

1  **majority of them called me back.**
2      Q.   During this time frame, 2001-2002,
3  were there any discussions within the human
4  resources department about specifically hiring
5  more minorities or women for the laborer
6  workforce?
7      **A.   I can't say for sure, but there**
8  **might have been.**
9      Q.   Do you remember anything about
10 such conversations?
11     **A.   Specifically in that time frame, I**
12 **can't say one way or the other.  We always**
13 **wanted to recruit minorities and females.**
14     Q.   Why did you have that goal or that
15 objective?
16     **A.   Well, we wanted a -- what's the**
17 **word I'm looking for -- diverse workforce.**
18     Q.   Were there any discussions that
19 you did not have a diverse workforce during
20 that time frame?
21     **A.   No, there were not.**
22     Q.   What was the impetus behind
23 achieving a more diverse workforce?

**41 (Pages 158 to 161)**

**Page 162**

1  MS. PRYOR:  Are you asking -- I don't
2  think she testified it was a new thing.
3  MR. JOHNSON:  Uh-huh.
4  MS. PRYOR:  Are you asking?
5  MR. JOHNSON:  No.
6  Q.  What initiated this goal or this
7  objective, if you know?
8  **A.  As Pat said, I don't think it was**
9  **a new objective, and I don't even recall if**
10  **that took place in that specific time frame.**
11  **But, I mean, everyone benefits from a diverse**
12  **workforce.**
13  Q.  In your estimation, was the
14  workforce diverse in 2001 and 2002?
15  **A.  I can't say one way or the other.**
16  **I don't know.  I can't tell you who was out**
17  **there working.  I don't know that.  I just know**
18  **the people I interact with.**
19  Q.  Do you know how many
20  African-Americans were employed with AK
21  Steel --
22  **A.  No, I do not.**
23  Q.  -- at the Middletown facility?

**Page 163**

1  **A.  No, I do not.**
2  Q.  Do you know how many are employed
3  now?
4  **A.  No, I do not.**
5  MR. JOHNSON:  I think that's it,
6  unless you have any other questions.
7  MS. PRYOR:  Nope, that's it for me.
8  MR. JOHNSON:  Off the record.
9  (Thereupon, the deposition was
10  concluded at 3:22 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23

**Page 164**

1  I, JESSICA MORRIS, do hereby certify that
2  the foregoing is a true and accurate transcription
3  of my testimony.
4
5
6  _____
7
8  Dated _____
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

**Page 165**

1  STATE OF OHIO          )
2  COUNTY OF MONTGOMERY )  SS: CERTIFICATE
3  I, Karen M. Rudd, a Notary
4  Public within and for the State of Ohio, duly
5  commissioned and qualified,
6  DO HEREBY CERTIFY that the
7  above-named JESSICA MORRIS, was by me first duly
8  sworn to testify the truth, the whole truth and
9  nothing but the truth.
10  Said testimony was reduced to
11  writing by me stenographically in the presence
12  of the witness and thereafter reduced to
13  typewriting.
14  I FURTHER CERTIFY that I am not a
15  relative or Attorney of either party, in any
16  manner interested in the event of this action,
17  nor am I, or the court reporting firm with which
18  I am affiliated, under a contract as defined in
19  Civil Rule 28(D).
20
21
22
23

**42 (Pages 162 to 165)**

**Page 166**

1        IN WITNESS WHEREOF, I have hereunto set

2   my hand and seal of office at Dayton, Ohio, on

3   this _ _ _ _ day of _ _ _ _ _ _ _ _, 2007.

4

5        _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

     KAREN M. RUDD

6     NOTARY PUBLIC, STATE OF OHIO

     My commission expires 5-21-2012

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23