**Page 1**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

FOR THE WESTERN DIVISION


VIVIAN BERT, et al.,          :  CASE NO. 1:02CV00467

      Plaintiffs,          :  Judge Beckwith

v.                            :

AK STEEL CORPORATION,         :

      Defendant.          :

_____

      Deposition of ALLEN ROBERTS, taken on

Thursday, August 16, 2007, commencing at 9:05

a.m., at the offices of Taft, Stettinius &

Hollister LLP, 425 Walnut Street, Suite 1800,

Cincinnati, Ohio, before Susan M. Barhorst, Notary

Public.


AROUND-THE-CLOCK REPORTING SERVICES
P. O. BOX 11008
CINCINNATI, OHIO 45211
513-481-5200

**Page 2**

1  APPEARANCES:
2  On behalf of Plaintiffs:
3    Susan Donahue, Esq.
      Wiggins, Childs, Quinn & Pantazis, PC
4    The Kress Building
      301 19th Street North
5    Birmingham, Alabama 35203
6  On behalf of Defendant AK Steel Corporation:
7    Patricia A. Pryor, Esq.
      Taft, Stettinius & Hollister LLP
8    425 Walnut Street, Suite 1800
      Cincinnati, Ohio 45202-3957
9
   Also present:
10
     Stephanie Bisselberg
11
12  Cross-Examination
13    by Ms. Pryor          3
14                  * * *
15  ROBERTS' DEPOSITION EXHIBITS   MARKED/IDENTIFIED
16    1              46
17    2              182
18
19
20
21
22
23
24

**Page 3**

1            ALLEN ROBERTS
2  being first duly sworn, testified as follows:
3            CROSS-EXAMINATION
4  BY MS. PRYOR:
5    Q.   Mr. Roberts, my name's Pat Pryor.  I
6  represent AK Steel in the lawsuit you filed against
7  them.  And I know you've had your deposition taken
8  before, but I'll kind of go over some of the ground
9  rules for you once more.
10       You need to answer out loud.  No
11  nodding, shaking of the head, so the court reporter
12  can take it down a little bit easier.  We're going
13  to try to stay away from "ah-huh's" and "na-huh's,"
14  again, so the court reporter can take it down.
15       If you don't understand a question I
16  ask, please ask me to rephrase it.  If you don't
17  hear a question I ask, please ask me to repeat it.
18  It is important that you're answering whatever I'm
19  asking.  If you need to take a break at any time,
20  we can do that, okay?
21    A.   Okay.
22    Q.   Is there any reason that you cannot
23  truthfully and completely testify today?
24    A.   No, there's no reason.

**Page 4**

1    Q.   Have you taken any drugs, alcohol or
2  medication today?
3    A.   **No, just my high blood pressure**
4  **medicine.**
5    Q.   Okay.  And what is that?
6    A.   **Glycinaprin.**
7    Q.   And you take it every day?
8    A.   **Every day.**
9    Q.   Took the normal amount today?
10    A.   **Yes.**
11    Q.   Is there any medication that you
12  normally take that you did not take today?
13    A.   **No.**
14    Q.   Have you ever filed for bankruptcy?
15    A.   **No.**
16    Q.   Have you ever been convicted of a
17  crime?
18    A.   **No.**
19    Q.   Have you ever pled guilty to a crime?
20    A.   **You mean like -- hold on a second.**
21  **Rephrase that.**
22    Q.   Yeah.  Have you ever been arrested and
23  either pled guilty, pled no contest or been
24  convicted of a criminal --

**Page 5**

1    A.   **Oh, yes.**
2    Q.   -- offense?  What was that?
3    A.   **Domestic violence.**
4    Q.   When was that?
5    A.   **1987, somewhere in that neighborhood.**
6    Q.   And were you convicted?  Did you plead
7  guilty?
8    A.   **No contest.**
9    Q.   Where do you currently live?
10    A.   **At 4916 Oaks Court, Middletown, Ohio.**
11    Q.   And how long have you lived there?
12    A.   **See, I guess since '97, 1997.**
13    Q.   Is that a house?
14    A.   **Yes.**
15    Q.   Do you own it?
16    A.   **Yes.**
17    Q.   And who lives there with you?
18    A.   **My wife and children.**
19    Q.   And how many children do you have?
20    A.   **Two.**
21    Q.   What are their ages?
22    A.   **19 and 16.**
23    Q.   Okay.  How long have you been married?
24    A.   **21 years.**

**Page 6**

1    Q.    Probably the most important question
2 you're going to be asked.
3        What's your education?
4    **A.    Two and a half years of college, high**
5 **school, plus high school.**
6    Q.    What high school did you go to?
7    **A.    Middletown High School.**
8    Q.    Middletown?
9    **A.    Middletown.**
10    Q.    You graduated?
11    **A.    Yes.**
12    Q.    What year?
13    **A.    1982.**
14    Q.    And where did you go -- did you go
15 immediately to college?
16    **A.    No.**
17    Q.    When did you go to college?
18    **A.    I would say -- if I can remember, I**
19 **think it's 1984 through '86.**
20    Q.    Did you go full time?
21    **A.    Yes.**
22    Q.    And what college did you go to?
23    **A.    Miami University.**
24    Q.    Which campus?

**Page 7**

1    **A.    Middletown.**
2    Q.    Did you graduate?
3    **A.    No.**
4    Q.    Did you receive any kind of degree or
5 certificate?
6    **A.    No.**
7    Q.    What were you studying?
8    **A.    Pre-med, actually.**
9    Q.    And why did you stop going?
10    **A.    Got married.**
11    Q.    Okay.  Any other education or training
12 or courses you've taken?
13    **A.    Just training through AK Steel, Armco**
14 **at the time, apprenticeship program, maintenance.**
15 **It was a five-year apprenticeship program, five**
16 **year, yes.**
17    Q.    And when did you do that?
18    **A.    Had to be '98, '99.  I want to say**
19 **either '89 or '90, for a five-year period.**
20    Q.    Were you assigned to a particular
21 department during that time or --
22    **A.    Yes.**
23    Q.    Do you know what department?
24    **A.    When I went into the program?**

**Page 8**

1    Q.    Mm-hmm.
2    **A.    Yes.  I got assigned to -- what was**
3 **that?  Power department when I first went in.  It's**
4 **called power.**
5    Q.    Did the department change during that
6 five-year apprenticeship?
7    **A.    Did I change to different departments,**
8 **yeah.  I transferred out of there and went to**
9 **caster maintenance, caster.**
10    Q.    C-A-S-T-E-R?
11    **A.    Yes.**
12    Q.    Was that at the end of the apprentice
13 program that you went to caster or during?
14    **A.    During.**
15    Q.    Okay.
16    **A.    Hold on a second.  Let me rephrase**
17 **that.  Well, see the schooling was over, but the**
18 **apprenticeship program hadn't finished yet.**
19    Q.    Okay.  Is the schooling part five
20 years --
21    **A.    No.**
22    Q.    -- or just the apprenticeship?
23    **A.    Apprenticeship is five years;**
24 **schooling part is two.**

**Page 9**

1    Q.    And what's the difference between the
2 schooling and --
3    **A.    It's hours accumulated for the**
4 **five-year program, on-the-job training, basically.**
5    Q.    So when you're in what you call
6 "schooling," you're actually still performing the
7 job --
8    **A.    Correct.**
9    Q.    -- training for the job?  Are you
10 sitting in the classroom at all?
11    **A.    Yes, one day a week.**
12    Q.    One day a week?
13    **A.    (Witness nodded.)**
14    Q.    Once you've completed the schooling
15 period, do you still do the classroom hours?
16    **A.    No.**
17    Q.    You were terminated from AK Steel in
18 2002; is that correct?
19    **A.    Yeah, something like that, yeah.**
20    Q.    What have you done since then?
21    **A.    Work for myself.**
22    Q.    You work for yourself?
23    **A.    Yes.**
24    Q.    Doing what?

Page 10

1    A.    I work for AKR Enterprises. That's
2  the name of my company. We do deliveries.
3    Q.    What kind of deliveries?
4    A.    Appliances.
5    Q.    Appliances? Who do you deliver for?
6    A.    We deliver for Sears and hhgregg. Now
7  I'm delivering for Towne Air Freight.
8    Q.    You said that's your own company?
9    A.    Yes.
10   Q.    You own it?
11   A.    Yes.
12   Q.    Is it incorporated or --
13   A.    No, sole -- sole proprietorship.
14   Q.    Do you have any employees?
15   A.    No.
16   Q.    Do you have anyone that works with
17  you?
18   A.    No, not at this moment, no.
19   Q.    Have you ever?
20   A.    No.
21   Q.    You never had anyone that worked for
22  you?
23   A.    No, no. Just contractors, no
24  employees.

Page 11

1    Q.    Well, what contractors do you have
2  that have worked with you?
3    A.    Edward Lewis was one.
4    Q.    When did he work for you?
5    A.    I can't remember the exact dates, but
6  I would say about a year ago.
7    Q.    How long did he work for you?
8    A.    Several months, maybe six or seven
9  months.
10   Q.    When he works for you, does that mean
11  he works every day for you or do you call him when
12  you need him? How does that work?
13   A.    Well, we were -- he was contracted to
14  do so much per week. And I let him knew (sic) the
15  day before -- you know, if we need him the next
16  day.
17   Q.    Did you have a written contract with
18  him?
19   A.    No.
20   Q.    Did you have workers' comp insurance
21  for him?
22   A.    No. He was contractor. He had his
23  own supposedly.
24   Q.    Did you require that he have his own?

Page 12

1    A.    No, I didn't.
2    Q.    How do you know he had his own?
3    A.    I did. I -- he said he did.
4    Q.    He told you he had his own --
5    A.    Yes.
6    Q.    -- insurance?
7    A.    Yes.
8    Q.    Why did he stop working for you?
9    A.    I stopped working for Sears, so when
10  I -- when I left Sears to go to hhgregg, I didn't
11  take him with me.
12   Q.    Why not?
13   A.    We just had a disagreement.
14   Q.    About what?
15   A.    Just different things, pay and -- and
16  I was -- you know, I had surgery, too, so I was off
17  for a long period of time.
18   Q.    You had surgery?
19   A.    Yes.
20   Q.    And what did you having surgery and
21  being off for a period of time have to do with
22  Mr. Lewis?
23   A.    Nothing. When I went back to work, he
24  was actually doing something else at the time, so I

Page 13

1  found somebody else to help me.
2    Q.    When you had surgery and were off, was
3  anyone doing the work?
4    A.    No.
5    Q.    Did he complain to you that you needed
6  workers' comp insurance on him?
7    A.    No.
8    Q.    Did he complain to you about an injury
9  on the job?
10   A.    Yes.
11   Q.    What did he say about that?
12   A.    He told me that he had hurt his knee
13  on -- I can't remember the exact dates, the date of
14  the incident, but he told me that he hurt his knee
15  and this was -- in general, it was like a -- just
16  say it was Monday. No. Say it was on Tuesday,
17  like on a Tuesday. Just talking in general 'cause
18  I don't know the exact date.
19        And he supposedly went to Urgent Care
20  to have it looked at. So I scheduled him off the
21  next day because he only worked six days a week
22  anyway. So he was scheduled off the next day, but
23  came back to work on that Thursday.
24        So let's say he had -- he supposedly

**Page 14**

1  got injured on a Tuesday. He was off on Wednesday.
2  He came back to work on Thursday. So I didn't know
3  what his injury was --
4    Q. Okay. Did he --
5    A. -- to --
6    Q. I'm sorry.
7    A. Go ahead.
8    Q. Did he complain about it anymore?
9    A. No.
10   Q. Did you believe that he had been
11 injured working?
12   A. No.
13   Q. Why not?
14   A. Because he wanted to go to -- pick up
15 one of his female friends that was located in
16 Michigan.
17   Q. Has he filed any type of claim against
18 you because of that injury?
19   A. Not against me, no.
20   Q. Has he filed any claim against the
21 company?
22   A. No.
23   Q. Did he file a claim against somebody
24 else?

**Page 15**

1    A. I think he filed a claim against
2  workers' comp.
3    Q. Did he stop working for you shortly
4  after that?
5    A. Yeah.
6    Q. Did it have anything to do with the
7  injury?
8    A. No.
9    Q. Had you had surgery at this point?
10   A. That was after, somewhere. A little
11 bit after that.
12   Q. When did you have surgery?
13   A. I can't remember the exact dates. I
14 don't know exact dates at this time. I can't
15 remember.
16   Q. Do you remember what year it was?
17   A. It was about a year ago.
18   Q. So 2006?
19   A. Yes, sometime in 2006.
20   Q. Summer of 2006?
21   A. Probably.
22   Q. What kind of surgery did you have?
23   A. I had a -- I can't think of the proper
24 name. But they had to remove so much of my small

**Page 16**

1  intestine. There's a name for it, but I just can't
2  recall the name.
3    Q. Is that a necessary surgery or an
4  elective surgery?
5    A. Necessary.
6    Q. And how long were you out for that?
7    A. Several weeks.
8    Q. And during that time, your company did
9  not operate?
10   A. No.
11   Q. Mr. Lewis did not do any work for you
12 during that time?
13   A. No. We finished up with Sears
14 basically -- another thing, Sears didn't want
15 Edward Lewis anymore to work for us -- to work for
16 them. So that was another issue, too.
17   Q. Why didn't they want him to work for
18 them anymore?
19   A. Because like the incident that
20 happened, that was one of the incidents that came
21 up -- that came up to that. When he supposedly got
22 hurt, he brought the -- he didn't finish the load
23 that day. He brought it back.
24        And the next day when -- he wanted to

**Page 17**

1  go to Michigan, so I scheduled him off that next
2  particular day. But they frown very badly when you
3  don't finish what you started on a particular day
4  and he had done -- he had done that once before
5  where he didn't finish a load for whatever reason
6  it was. He didn't get injured. He said something
7  happened to the truck or something like that.
8    Q. Any other reason that Sears didn't
9  want him anymore?
10   A. No. To my knowledge, no. It was more
11 just not completing the work that -- the task that
12 was assigned to him.
13   Q. So prior to you leaving for surgery,
14 you and Edward Lewis had parted ways, in terms of
15 business operations?
16   A. Yeah. I want to say yeah.
17   Q. And it was because of the issue with
18 Sears?
19   A. Yes.
20   Q. Was there any other reason why you
21 parted ways?
22   A. No. That was it, besides --
23   Q. Was there anything --
24   A. -- you know, no.

**5 (Pages 14 to 17)**

**Page 18**

1    Q.    Besides what?
2    A.    **No, there was no other reason besides**
3    **the Sears incident.**
4    Q.    Has anyone else ever contracted with
5    you or worked for you?
6    A.    **Yeah. I mean, yes.**
7    Q.    How many other people have worked for
8    you or contracted with you?
9    A.    **Four, three, three or four.**
10    Q.    Are these all at the same time or over
11    different periods?
12    A.    **No, over periods of different time.**
13    Q.    Have you ever had more than one person
14    working with you at all?
15    A.    **No.**
16    Q.    What are the names of the other three
17    or four people that worked for you?
18    A.    **Let's see. Guy named Miles Silas.**
19    Q.    Silas?
20    A.    **Silas? See, what is his first name?**
21    **We call him Punny, Punny Jackson. That's what I**
22    **call him. I can't think of his first name. See,**
23    **who else? Garren McClure. A guy named Monty Mays.**
24    Q.    Anyone else?

**Page 19**

1    A.    **Not that I can remember at this time.**
2    Q.    These individuals were each
3    contractors with you?
4    A.    **Yes.**
5    Q.    And how did you -- were they friends
6    before that? Were they acquaintances before? How
7    did you --
8    A.    **They're friends now, friends then.**
9    Q.    Okay. How did it hook up where --
10    A.    **Oh, I -- you know --**
11    Q.    -- you said --
12    A.    **-- I contacted them.**
13    Q.    And what are the race of these
14    individuals?
15    A.    **They're all black.**
16    Q.    And Mr. Lewis is black?
17    A.    **Yes, yes.**
18    Q.    Did you ever contact any white people
19    to work with you?
20    A.    **Yes, I did. But I can't --**
21    Q.    But they didn't work with you?
22    A.    **No.**
23    Q.    Do you know why?
24    A.    **No.**

**Page 20**

1    Q.    Who was it that you contacted?
2    A.    **I can't remember the guy's name, some**
3    **people that were told to me about -- by the**
4    **contractors that worked at Sears at the time. Some**
5    **other contractors gave me some names.**
6    Q.    So these are not individuals that you
7    knew?
8    A.    **No, I didn't know them.**
9    Q.    And did you contact those individuals?
10    A.    **I contacted one. I can't remember his**
11    **name, but --**
12    Q.    And did he say anything to you?
13    A.    **No. I'm not going to -- I mean, just**
14    **didn't work out. I didn't -- I didn't like him or**
15    **I can't remember.**
16    Q.    Okay. How long have you had that
17    business?
18    A.    **1990. Can't remember exact dates.**
19    Q.    So even while you were employed at AK
20    Steel --
21    A.    **Yes.**
22    Q.    -- you ran this business? What church
23    do you go to?
24    A.    **Tristone Baptist.**

**Page 21**

1    Q.    Where is that at?
2    A.    **It's in Middletown, Ohio.**
3    Q.    What's the name of the pastor there?
4    A.    **They just switched up recently. I**
5    **don't know his name.**
6    Q.    And you had filed another lawsuit
7    against AK Steel back in 2002, correct?
8    A.    **Yes.**
9    Q.    And in that lawsuit, you alleged race
10    discrimination, retaliation relating to your
11    termination and you were disciplined for some other
12    actions that occurred while you were at AK Steel,
13    correct?
14    A.    **I don't think -- I don't know if**
15    **that's correct or not.**
16    Q.    Do you remember what you filed that
17    lawsuit about?
18    A.    **I thought it was dealing with race**
19    **discrimination.**
20    Q.    It was about race discrimination?
21    A.    **I thought, yeah. I'm pretty sure.**
22    Q.    Okay. You don't remember the
23    retaliation part of it?
24    A.    **I don't know if that was included in**

**6 (Pages 18 to 21)**

Page 22

1 that particular lawsuit or not.
2     Q.   Did you file another lawsuit that
3 involved retaliation?
4     A.   Yes, I thought I filed an individual
5 lawsuit.
6     Q.   Okay.  And that's what I was asking
7 you about, the individual lawsuit that --
8     A.   The individual --
9     Q.   -- you filed.
10     A.   Are you asking me about the individual
11 lawsuit?
12     Q.   Yeah.  Not this lawsuit here.
13 We're --
14     A.   Okay.
15     Q.   -- talking about the other lawsuit
16 that you filed againt AK Steel --
17     A.   Correct.
18     Q.   -- back in 2002, alleged both race
19 discrimination and retaliation, correct?
20     A.   I can't remember how it was worded,
21 but, yes, I did file one.
22     Q.   Do you remember what you were claiming
23 was discrimination and what was retaliation?
24     A.   What was discrimination?  I can't

Page 23

1 without looking at -- I can't remember exactly how
2 that was worded by the attorneys.
3     Q.   Okay.  Do you remember what happened
4 with that lawsuit?
5     A.   Oh, that it was thrown out.
6     Q.   The court threw it out?
7     A.   Yes.
8     Q.   It lacked merit?
9     A.   I don't know exactly -- remember the
10 merits of why she did it.
11     Q.   Did you file an appeal on that?
12     A.   Yes, I did.
13     Q.   And you did you drop that appeal?
14     A.   Yes.
15     Q.   Why did you drop the appeal?
16     A.   'Cause I didn't have the money to
17 pursue it.
18     Q.   You started working at AK Steel -- at
19 the time it was called Armco, correct?
20     A.   Correct, yes.
21     Q.   That was, what, roughly 1988?
22     A.   Yes, it was April 1988.
23     Q.   And you never took the AK Steel
24 employment test that's being challenged in this

Page 24

1 lawsuit, did you?
2     A.   No, I don't think so.
3     Q.   Have you ever seen the AK Steel
4 pre-employment test?
5     A.   I saw portions of it.
6     Q.   Where did you see portions of it at?
7     A.   I think it was -- not portions,
8 sample, I would say.  Not portions of the test
9 itself.  It was a pre-employment testing test,
10 supposedly, that was given to applicants.
11     Q.   What did you see?
12     A.   A pre-employment test --
13     Q.   You saw --
14     A.   -- a sample.  It was a sample.  It
15 wasn't a test itself.  It was a sample supposedly
16 given to -- by -- given to applicants at AK Steel.
17     Q.   It wasn't the test?
18     A.   It wasn't the test, no, no.  It was
19 like a sample, like a -- an example of what these
20 guys are being tested for.
21     Q.   Where did you see that at?
22     A.   Individual from Ashland, Kentucky had
23 it.
24     Q.   And who was that?

Page 25

1     A.   What was his name?  He works in the --
2 I can't think of his name, remember it.
3         MS. DONAHUE:  Just -- just go by your
4 memory.
5     A.   I can't remember at this moment.
6         MS. DONAHUE:  Well, that's fine, then
7 you can't remember.
8 BY MS. PRYOR:
9     Q.   You don't remember his name?
10     A.   No.
11     Q.   Was it Rodney Cosby?
12     A.   Yes.
13     Q.   How many pages was this sample?
14     A.   Just a couple.
15     Q.   Was it your understanding those pages
16 actually came from the test or was this examples of
17 similar type questions?
18     A.   Examples of similar type questions.
19     Q.   Do you remember what any of the
20 questions were?
21     A.   No.
22     Q.   Do you have a copy of that?
23     A.   No.
24     Q.   And when did he show that to you?

**7 (Pages 22 to 25)**

Page 26

1    A.   I can't remember the dates, several
2 years ago.
3    Q.   And why did he show it to you?
4    A.   I don't know.  It just came up in
5 conversation.
6    Q.   Were you --
7    A.   No --
8    Q.   -- still employed at AK Steel at the
9 time?
10    A.   I can't remember.
11    Q.   How do you know Mr. Cosby?
12    A.   I know him through -- through AK
13 Steel.
14    Q.   And how did you meet him?  He works in
15 Ashland?
16    A.   He works in Ashland.
17    Q.   Did you ever work in Ashland?
18    A.   No.
19    Q.   How did you meet him through AK --
20    A.   Oh, I --
21    Q.   -- Steel?
22    A.   -- I searched people out.  I searched
23 people out.  I worked for the -- when I worked at
24 AK Steel, I was in the -- on the civil rights

Page 27

1 board.  So I was just trying to get to know other
2 people at other plants.
3    Q.   And why did you search out Mr. Cosby?
4    A.   Because he was black and he worked at
5 Ashland and I wanted to talk to black people that
6 worked at Ashland so I could get a feel for what
7 they thought was going on in Ashland --
8    Q.   Why did --
9    A.   -- from their perspective.
10    Q.   Why did you want to get a feel for
11 what was going on at Ashland?
12    A.   Because I wanted to see if the same
13 thing was going on in Middletown, Ohio.
14    Q.   What "same thing"?
15    A.   The lack of hiring minorities.
16    Q.   So you searched out black employees at
17 Ashland?
18    A.   Right, when I was on the civil rights
19 board at AK Steel.
20    Q.   And the civil rights board at AK
21 Steel, was that a Middletown --
22    A.   Yes --
23    Q.   -- organization?
24    A.   -- for the union.

Page 28

1    Q.   What did it matter what was going on
2 at Ashland?
3    A.   Because I wanted to see what was going
4 on in Ashland.  Like I said earlier, I wanted to
5 see whether they were having the same issues that
6 we were having in Middletown.
7    Q.   For what purpose?
8    A.   For what purpose?
9    Q.   Mm-hmm.
10    A.   Just to see.  I wanted to see if the
11 same thing was going on at Ashland as the same
12 thing going on at Middletown.
13    Q.   Did that affect you in any way, what
14 was going on in Ashland?
15    A.   Did it affect me?
16    Q.   Mm-hmm.
17    A.   Rephrase that.
18    Q.   I guess what business was it of yours
19 what was going on at Ashland?  How would that --
20 what was going on at Ashland have any impact on
21 you?
22    A.   I don't -- I don't -- I'm not
23 answering that question.  I mean --
24    Q.   Did it have any impact on you what was

Page 29

1 going on in Ashland?
2        MS. DONAHUE:  Object to the form as
3 vague and asked and answered.
4        MS. PRYOR:  You can still answer.
5    A.   Like I said, I don't understand what
6 you're saying.
7    Q.   Okay.  Before you contacted Mr. Cosby,
8 you had no idea what was going on in Ashland,
9 correct?
10    A.   I had idea (sic).
11    Q.   And how did you have an idea?
12    A.   Just the way that -- the way things
13 were going on in Middletown, I just figured the
14 same thing was going on in Ashland because they
15 have less blacks working.  They have less blacks in
16 the neighborhood at Ashland, the surrounding area.
17 I just took it for granted that I knew, but I
18 wanted to confirm.
19    Q.   And what did Mr. Cosby tell you?
20    A.   He basically told me that -- basically
21 what I thought was true.  That they didn't hire
22 that many blacks down there at the time, didn't
23 have that many blacks working at the plant.
24        And I guess he was working on --

**8 (Pages 26 to 29)**

Page 30

1  working with somebody -- you know, about their
2  hiring practices, who he talked to or whatever.  So
3  basically I was talking to the right person.  He
4  had something to do with the union as well.
5      Q.   Who was he working with?
6      A.   I don't know.
7      Q.   Was it someone at AK Steel?
8      A.   I -- like I said, I don't know.  I
9  don't have the slightest idea.  I just knew he was
10  a part of the union.  Whatever he did down there or
11  does have something to do with the union and job
12  fairs and stuff like that that he was having.
13      Q.   And how did you get his name to begin
14  with?
15      A.   I called the union and I asked them
16  for a minority -- I wanted to talk to a minority.
17  I told them that I was a minority from Middletown,
18  Ohio, and I wanted to talk to a minority that worked
19  at Ashland, and if they had anybody on their board
20  or within the union that was black.  And they said,
21  yeah, we have Rodney Cosby, so he gave me his
22  number.
23      Q.   And once he told you that, what did
24  you do about it?

Page 31

1      A.   Once he told me what?
2      Q.   Once Mr. Cosby told you that they
3  didn't have many blacks, what did you do?
4      A.   I just gathered that information, it
5  was information from him, as far as contact and
6  told him I'd be in -- I'd be in contact with him.
7      Q.   And did you get in contact with him
8  again?
9      A.   Yes.
10      Q.   About what?
11      A.   About -- I've contacted him several
12  times.  See, I want to call him back.  Let me see.
13  Well, at this particular time, I would say I was
14  instructed by my attorney to do so.
15      Q.   And what time was that?
16      A.   When I contacted him the second time.
17      Q.   Second time?  When did you get an
18  attorney?
19      A.   After I filed my charges against the
20  company.
21      Q.   After you filed your charges?
22      A.   Yeah.
23      Q.   You did not have an attorney when you
24  filed your charges?

Page 32

1      A.   Which charges?
2      Q.   You tell me.  When did you get the
3  attorney?
4      A.   I got the --
5          MS. DONAHUE:  Well, excuse me.  This
6  is -- this is vague.
7      A.   Very.
8          MS. DONAHUE:  Object.
9          MS. PRYOR:  The question is, when did
10  he get an attorney?  What's vague about that?
11          MS. DONAHUE:  He answered.
12          MS. PRYOR:  I'm looking to pin it down
13  a little bit more.
14          MS. DONAHUE:  Okay.  And we'll just
15  ask --
16  BY MS. PRYOR:
17      Q.   When did you get an attorney?
18          MS. DONAHUE:  -- for a specific
19  question, instead of a vague one.
20      A.   I'm thinking.
21          MS. DONAHUE:   Yeah, that's fine,
22  mm-hmm.
23      A.   After the filings with -- charges were
24  filed at the OCRC, Ohio Civil Rights Commission.

Page 33

1      Q.   You filed charges at the Ohio Civil
2  Rights Commission?
3      A.   Yes.
4      Q.   Do you know when that was?
5      A.   '99, sometime.
6      Q.   Okay.  And at that time, you did not
7  have an attorney?
8      A.   No.
9      Q.   Okay.
10      A.   When I filed them, no.
11      Q.   When you said "them," how many we
12  talking about?
13      A.   I filed one.
14      Q.   Okay.  So when you filed the charge --
15      A.   The initial --
16      Q.   -- the initial charge with the OCRC --
17  OCRC in 1999, you did not have an attorney?
18      A.   No.
19      Q.   How long after that did you get an
20  attorney?
21      A.   Well, I guess when the charges jumped
22  over to the EEOC, they were transferred.
23      Q.   Did you get an attorney before you
24  filed another charge?

**Page 34**

1    **A.    Yeah, I was instructed by an attorney**
2  **after that point.**
3    Q.    And the initial time that you
4  contacted Mr. Cosby, you did not have an attorney
5  at that time?
6    **A.    Yes.**
7    Q.    Yes, you --
8    **A.    No.  Initial, no.**
9    Q.    The second time you contacted him --
10    **A.    Yeah.**
11    Q.    -- you did have an attorney?
12    **A.    Yeah.**
13    Q.    And you contacted him on the advice of
14  your attorney?
15    **A.    Yeah.  Well, told me -- yes.**
16    Q.    And what did you and Mr. Cosby talk
17  about?
18        MS. DONAHUE:  Just a second.  Anything
19  that you -- any of your conversations that you had
20  with Mr. Cosby at the instructions of your attorney
21  are protected under work-product doctrine and I'm
22  going to instruct you not to answer about the
23  content of those conversations.
24        MS. PRYOR:  The content of those

**Page 35**

1  conversations with Mr. Cosby are not protected.
2        MS. DONAHUE:  If he did it on the
3  instruction of his attorney, they're part of the
4  work-product --
5        MS. PRYOR:  Only whatever the --
6        MS. DONAHUE:  -- doctrine.
7        MS. PRYOR:  -- the attorney instructed
8  him.
9        MS. DONAHUE:  That's right.  And
10  that's what he's -- that's what he's testifying he
11  did.
12  BY MS. PRYOR:
13    Q.    And what conversation did you have
14  with Mr. Cosby in -- what year was it when you had
15  the next conversation with Mr. Cosby?
16    **A.    I can't remember.**
17        MS. DONAHUE:  Again, if -- if you
18  contacted and talked to Mr. Cosby on the
19  instructions of your attorney, that conversation
20  is -- is part -- is privileged and I'm instructing
21  you not to answer about the content of that
22  conversation.
23  BY MS. PRYOR:
24    Q.    Did you talk to Mr. Cosby about

**Page 36**

1  anything, other than what your attorney instructed
2  you to talk to him about?
3    **A.    No.**
4    Q.    Have you had any other conversations
5  with Mr. Cosby?
6    **A.    Yes.**
7    Q.    And when were those?
8    **A.    I can't remember the dates.  We've**
9  **talked a lot.**
10    Q.    You've talked a lot?
11    **A.    Yes.**
12    Q.    What did Mr. Cosby tell you?
13        MS. PRYOR:  Mr. Cosby is not
14  represented by counsel and he is not instructed by
15  attorneys to do anything.
16        MS. DONAHUE:  Yes, but the content of
17  what Mr. Cosby said in response to what he was
18  talking to would also reveal the -- the content of
19  that conversation and by implication it's also
20  protected and I instruct him not to answer.
21        MS. PRYOR:  What he's been instructed
22  by the attorneys to do may be protected.
23        MS. DONAHUE:  By the work product --
24  yes.

**Page 37**

1        MS. PRYOR:  What Mr. Cosby tells him
2  is not protected.
3        MS. DONAHUE:  No, I disagree with
4  that.  I think what Mr. Cosby told him -- anything
5  about the conversation is protected.  It's
6  initiated by the attorney instructions and it -- it
7  would imply the mental impressions of the attorney,
8  what the attorney wanted to get out of the
9  conversation, whatever.  It's protected by the
10  work-product doctrine.
11        MS. PRYOR:  We'll get back to
12  that.
13  BY MS. PRYOR:
14    Q.    Mr. Cosby ever contact you?
15    **A.    Yes.**
16    Q.    What did Mr. Cosby tell you when he
17  contacted you?
18    **A.    Well, once again, it's in -- it's in**
19  **reference to what I asked him.**
20    Q.    He only contacted you in reference to
21  what you asked him?
22    **A.    Correct, getting back to me with**
23  **information.**
24        MS. PRYOR:  We'll come back to that.

**10 (Pages 34 to 37)**

**Page 38**

1  BY MS. PRYOR:
2      Q.   Have you ever talked to Mr. Cosby in
3  any other context?
4          MS. DONAHUE:  Vague, objection.
5      **A.   In reference to what?**
6      Q.   Anything outside of whatever your
7  attorneys, I guess, instructed you to do.
8      **A.   No, not to my knowledge.**
9      Q.   Okay.
10     **A.   Only what I can remember at this time,**
11 **no, I can't recall.**
12     Q.   Do you have any personal knowledge
13 about what was going on in Ashland?
14     **A.   Vague. I don't understand. Rephrase.**
15     Q.   Have you ever been to Ashland?
16     **A.   Yes, I've been -- no.  In that**
17 **timeframe, no.**
18     Q.   Have you been to Ashland in some other
19 timeframe?
20     **A.   Yeah, recently.**
21     Q.   Okay.  When was that?
22     **A.   Last week.**
23     Q.   What was that for?
24     **A.   That was in reference to my job.**

**Page 39**

1      Q.   Have you been there any other time?
2      **A.   No.**
3      Q.   Okay.  Have you ever been to AK Steel
4  in Ashland?
5      **A.   No.**
6      Q.   Have you ever talked to anyone other
7  than Mr. Cosby from Ashland, AK Steel Ashland?
8      **A.   Yes, but I can't remember his name.**
9      Q.   Why did you talk to him?
10     **A.   Just to get a feel.**
11     Q.   For what?
12     **A.   Basically I was doing the same thing.**
13         MS. DONAHUE:  On the instructions
14 of --
15         THE WITNESS:  Yes.
16         MS. DONAHUE:  -- your attorney?  Then
17 I'm instructing you not to answer.
18 BY MS. PRYOR:
19     Q.   What individuals did you talk to?
20     **A.   I'm not going to say.**
21         MS. DONAHUE:  Well, you have to say
22 who you -- who you --
23     **A.   I can't remember his name actually,**
24 **but I thought it was just one of the --**

**Page 40**

1          MS. DONAHUE:  No, you --
2  BY MS. PRYOR:
3      Q.   What was his race?
4      **A.   It's black.**
5          MS. DONAHUE:  She's entitled to know
6  who you talked to --
7      **A.   Oh, no, I --**
8          MS. DONAHUE:  -- which is not the
9  content.
10     **A.   -- can't remember exactly his name.  I**
11 **don't remember his name.**
12     Q.   How many times did you talk to that
13 individual?
14     **A.   Once.**
15     Q.   And when -- when was that?
16     **A.   In the timeframe I was talking to**
17 **Rodney, after, when I first initially talked to**
18 **Rodney, somewhere shortly after that, maybe within**
19 **that same month.**
20     Q.   Okay.  The first time you talked to
21 Rodney?
22     **A.   Within the same month.**
23     Q.   Okay.  And that was before you filed
24 an EEOC charge, correct?

**Page 41**

1      **A.   I'm not sure on that.  I can't**
2  **remember at this moment.**
3      Q.   But that was before you talked to your
4  attorney, correct?  Your first conversation with
5  Rodney Cosby was before you had consulted an
6  attorney?
7      **A.   No.  My first conversation with Rodney**
8  **Cosby?**
9      Q.   That's what you testified a few
10 minutes ago.
11     **A.   I'm confused.  Rephrase.**
12     Q.   You testified a few minutes ago that
13 your first conversation with Rodney Cosby was
14 before you ever consulted an attorney.  Then you
15 testified that you talked to this other individual
16 shortly thereafter; is that correct?
17     **A.   I'm trying to get the timeframe down,**
18 **when did I talk to Rodney the first time.  Think**
19 **that's correct.**
20     Q.   Okay.
21     **A.   I talked to Rodney prior to having an**
22 **attorney.**
23     Q.   Okay.  And you talked to this other
24 individual shortly thereafter, correct?

Page 42

1  A.   Correct, before I had attorney (sic).
2  Q.   And what was the conversation with
3  this other individual?
4  A.   Basically I wanted to get his feel of
5  what was going on in the plant at Ashland.
6  Q.   And what did he tell you?
7  A.   He basically told me that -- you know,
8  how they were treated and that's -- that's
9  basically why I called.  I called -- I basically
10 wanted to talk to anybody besides Rodney 'cause
11 when I -- when I initially called the union, they
12 gave me two telephone numbers that I could find
13 out, if I could remember correctly.  And I talked
14 to two individuals.  One was Rodney and the other
15 another guy.
16     I can't remember exactly what the
17 other guy's name was.  But the other guy was a
18 worker.  So it was -- Rodney is a worker as well,
19 but this guy worked in the plant on a consistent
20 basis.  It had nothing to do with the union.
21     So he explained to me -- you know,
22 questions that I asked -- you know, how has he been
23 treated or -- you know, what was the atmosphere
24 within the plant.  And basically he told me -- you

Page 43

1  know, what I asked him.
2  Q.   And what did he say?
3  A.   He just basically said -- you know,
4  there was -- you know, when I asked him about -- as
5  far as minorities, he said there wasn't that many.
6  You know, basically the double standard rule
7  applied as it did in Middletown with us, double
8  jeopardy, things that we do as a minority would get
9  you in trouble faster than what a white employee
10 would do and not get in trouble for, things of that
11 nature.
12 Q.   Did he offer any information about the
13 hiring?
14 A.   Yeah.  When I asked him, did they hire
15 many blacks, he said no.
16 Q.   Did he have any role in hiring --
17 A.   No, only what he saw.
18 Q.   And what he saw, in terms of who he
19 saw in the plant?
20 A.   Yes.
21 Q.   Did he know who was applying?
22 A.   Friends of his.  He told me he knew
23 people that applied as well as we did in
24 Middletown.  It was the same process.

Page 44

1  Q.   Did he give you any names of people
2  who had applied?
3  A.   Didn't ask.
4  Q.   Did you have any other conversation
5  with this person?
6  A.   No.
7  Q.   Okay.  Did you have any other
8  conversations with anyone else from AK Steel in
9  Ashland?
10 A.   Besides union officials, union
11 officials.
12 Q.   When did you have conversations with
13 them?
14 A.   In initial (sic) when I was trying to
15 get ahold of Rodney.
16 Q.   Any other conversations with them?
17 A.   No.
18 Q.   And you were a member of the union at
19 AK Steel Middletown works, correct?
20 A.   Correct.
21 Q.   The sample questions that you saw,
22 Mr. Cosby showed you, when did he show you those?
23 A.   Can't remember.
24 Q.   And what did you ask him about it?

Page 45

1     MS. DONAHUE:  Excuse me.  If this is
2  something that you did on the instructions of your
3  attorney, it's protected by the attorney-client
4  privilege.
5     THE WITNESS:  It was.
6  BY MS. PRYOR:
7  Q.   Have you ever seen test results?
8  A.   No.
9  Q.   Do you know anything about the manner
10 in which the test is administered?
11 A.   No.  Only what I know if I ask people.
12 Q.   And what have they told you?
13 A.   Just that they came in and took a test
14 and somebody -- you know, they were in a room, took
15 a test and -- and -- and they told they were
16 (sic) -- would be contacted or let them know what
17 the results were.
18 Q.   These are people at Middletown or
19 Ashland?
20 A.   People at Middletown.
21 Q.   Did they tell you anything else about
22 the way the test was administered?
23 A.   No, basically just said several hours
24 to do it.

**12 (Pages 42 to 45)**

Page 46

1  Q.  The test took several hours?
2  A.  Yes.
3  Q.  And do you know anything about the
4  manner in which the test is scored?
5  A.  No.
6  Q.  Do you know what the percentage for a
7  pass is?
8  A.  No.
9  Q.  And I apologize if I already asked you
10  this.  But have you ever been present when a test
11  was given?
12  A.  No.
13  Q.  Mr. Roberts, you've been handed what's
14  been marked as Exhibit Number 1.
15      MS. DONAHUE:  Okay.  Look at it all
16  the way through.
17      THE WITNESS:  Yeah.
18      MS. DONAHUE:  It says here Social
19  Security number on it.  Could we redact it, take
20  that off?
21      MS. PRYOR:  Yeah, it gets redacted
22  when it goes -- before it gets filed.  Is that what
23  you're worried about?
24      MS. DONAHUE:  Mm-hmm.

Page 47

1      MS. PRYOR:  Yeah.  I don't believe the
2  court will accept documents with that on it --
3      MS. DONAHUE:  Yeah, I just --
4      MS. PRYOR:  -- any longer.
5      MS. DONAHUE:  -- was pointing it out
6  in case --
7      THE WITNESS:  I got to take a look at
8  this for a second.  Hold on.
9      MS. PRYOR:  You want to take a break
10  while you look at that?
11      THE WITNESS:  Yeah, if you don't mind.
12      (Off the record:  9:49 a.m. - 10:11 a.m.)
13  BY MS. PRYOR:
14  Q.  Mr. Roberts, have you had plenty of
15  time to look at Exhibit Number 1?
16  A.  Yes, I did.
17  Q.  Do you recognize Exhibit Number 1?
18  A.  Yes.  Well --
19  Q.  And what is it?
20  A.  It's my work history, I guess.
21  Q.  At AK Steel?
22  A.  Yes.
23  Q.  And on the last page of Exhibit Number
24  1, is that your discipline history?

Page 48

1  A.  I haven't seen this before, this
2  particular --
3  Q.  What have you seen before?
4  A.  I don't remember seeing this document,
5  this -- in the way it's put down here.
6  Q.  Exhibit Number 1, you haven't seen
7  before?
8  A.  No, no, no.  This is a 1250.  They
9  call it 1250 from AK Steel.  My employment -- this
10  is my employment and it normally stops right here,
11  there is --
12  Q.  At the bottom of the second page,
13  you're saying?
14  A.  On the bottom of the -- yeah.
15  Q.  You've never seen the third page
16  before?
17  A.  No.  It's only -- it's normally only
18  just in one page or something of that nature.  It
19  never -- like a separate -- this is your discipline
20  on one separate page.  I've never seen it like
21  that.  It's always been within -- when I seen it.
22  Q.  When you've seen it, it was -- the
23  discipline was there.  It was just interspersed --
24  A.  Yes.

Page 49

1  Q.  -- among the other part?
2  A.  Correct.
3  Q.  Okay.  Does that accurately reflect
4  your discipline history at AK Steel?
5  A.  I'd have to say yes, to -- to a
6  certain degree.
7  Q.  What do you mean "to a certain
8  degree"?
9  A.  I don't know if all this is true.  I
10  mean, I can't remember exactly if it happened
11  exactly like this.  I don't think everything on
12  here is accurate.
13  Q.  What's not accurate?
14  A.  Like the one day, 2/6/90, one day
15  tardiness, I don't remember seeing those on my
16  1250.  Actually both of them, actually.
17  Q.  The 2/6/90 and the 12/11/89?
18  A.  Yes.
19  Q.  Are you denying that you received a
20  one-day suspension?
21  A.  I'm not saying that.  I'm just saying
22  I don't remember seeing that on my 1250.
23  Q.  Okay.  Let's -- apart from whether
24  you've seen the 1250 or not, did --

Page 50

1    A.   I can't remember.
2    Q.   -- you ever actually see this
3 discipline?
4    A.   I can't remember.
5    Q.   Okay.  You don't remember one way or
6 the other whether you received a one-day
7 suspension --
8    A.   Exactly.  Without --
9    Q.   -- for tardiness?
10    A.   -- documents that I have of my own, my
11 own 1250, I have a copy of my 1250, but I don't
12 have it with me.  That would reflect my mental
13 state of what I remember.  Right here I -- I can't
14 agree to that.
15    Q.   Okay.  Anything else that you can't
16 agree with?
17    A.   7/6/90, poor work performance, absent
18 from work area.  I don't remember seeing absent
19 from work area in that particular line of -- on my
20 1250.
21    Q.   Do you remember being disciplined for
22 three days?
23    A.   It wasn't -- I do remember being
24 disciplined for three days, but it wasn't like

Page 51

1 this.
2    Q.   What was it like?
3    A.   It might have been poor work
4 performance, but not absent from my work area.
5 This is inaccurate.
6    Q.   Okay.  What else?  Anything else that
7 you think is inaccurate?
8    A.   I never seen the five -- the --
9    Q.   You have to speak up.  This is --
10    A.   Okay.  Basically what I'm saying is
11 when I look at this document, if my memory serves
12 me correctly, from what I saw back when -- at the
13 time of the incident compared to now, the wording
14 of how this is put on paper is changed.
15        I don't remember seeing -- to give you
16 an example, another example of this particular
17 page, five days per arbitration award, that wasn't
18 on my 1250, either.  9/1/99, that was not on my
19 1250.
20    Q.   Okay.  Did you receive five day's
21 suspension?
22    A.   Yes, I did.
23    Q.   Okay.
24    A.   Five days subject to discharge --

Page 52

1    Q.   Okay.
2    A.   -- on that particular incident --
3    Q.   Okay.
4    A.   -- which was transferred into -- I
5 guess what you're seeing here.  But what you're --
6 what I'm saying is, are your -- you want me to just
7 agree with what you -- what I'm looking at?  Is
8 that what you're saying?  Or do you want me to
9 agree with something that I know that was given to
10 me in a meeting when I saw it?
11    Q.   Okay.
12    A.   Now, this is something totally new.
13    Q.   What was given to you in a meeting?
14    A.   1250.  I had a copy of my 1250.
15    Q.   Okay.  You got a copy of your 1250?
16    A.   Yes.
17    Q.   You've got it still at home?
18    A.   Yeah.
19    Q.   How many copies do you have?
20    A.   I don't know, one, maybe.
21    Q.   Okay.
22    A.   I got a copy of my 1250.  I mean, I
23 know that this is not the accurate 1250 that --
24 that I have.

Page 53

1    Q.   And the 1250 that you have would be
2 accurate?
3    A.   It probably would be pretty much
4 accurate, yeah.  It's not this.  It's not saying
5 the wording, how you worded it here, no.  It's
6 not --
7    Q.   Okay.
8    A.   I don't think it's the same.
9    Q.   Okay.  And you have it at home and you
10 can produce it, then?
11        MS. PRYOR:  Susan, we'll make a formal
12 request for this, but if he has that now, we'd like
13 that 1250.
14        MS. DONAHUE:  Okay.
15 BY MS. PRYOR:
16    Q.   Forgetting about what is on the 12 --
17 whether it -- how it's worded here.  Let's just go
18 through it this way.  On September 17th, 2002 --
19    A.   Back page, correct?
20    Q.   This is the back page.  You can look
21 at it if you want or you can recall from your
22 memory.
23        Were you terminated for conduct
24 unbecoming an AK Steel employee, failure to perform

1 job duties and falsifying information in company
2 investigation?
3    **A.  No, not to my knowledge.**
4    Q.  What were you terminated for?
5    **A.  They terminiated me because they said**
6 **I was asleep.  That's what they said.  I never saw**
7 **the -- I never saw the reason why they said I was**
8 **fired at that particular moment.**
9    Q.  Did you go through the arbitration?
10    **A.  Yeah.**
11    Q.  Okay.  Did you hear what they said at
12 the arbitration?
13    **A.  Yeah.**
14    Q.  What did they say there?
15    **A.  Basically -- you know, I guess -- I**
16 **mean, yeah.  I guess you're correct on -- on why I**
17 **was fired.**
18    Q.  Okay.
19    **A.  I guess those were the --**
20    Q.  The reasons?
21    **A.  -- reasons.  Yeah, those are the**
22 **reasons, I guess, yeah.**
23    Q.  Okay.  And on July 9th, 2002, did
24 you -- assuming if there's days listed there, that

1 would -- it says "tardiness."  That was some kind
2 of warning for tardiness?
3    **A.  I guess.  I --**
4    Q.  Do you have any reason to dispute that
5 you received some signed kind of -- what did "WN"
6 mean?  Is that warning?
7    **A.  I don't know.  I guess.  I'm not sure.**
8    Q.  You don't know?
9    MS. DONAHUE:  Don't -- don't guess.
10 If you don't --
11    **A.  I don't know.**
12    Q.  You don't know?  Do you remember
13 receiving some kind of discipline for tardiness?
14    **A.  I didn't.**
15    Q.  You didn't receive any discipline for
16 tardiness?
17    **A.  Not to my knowledge.**
18    Q.  Ever?
19    **A.  No, I'm not saying that.  I'm talking**
20 **about this particular date.**
21    Q.  July 9th, 2002?
22    **A.  I don't think I received it.**
23    Q.  What about July 24th, 2001?
24    **A.  July 24th, you said?**

1    Q.  Mm-hmm.  Did you receive a suspension
2 that was converted to a 10-day suspension for poor
3 work performance, GSO number three and
4 insubordination?
5    **A.  Well, I guess I did.  I mean, like I**
6 **said, I don't remember seeing it in this format.**
7    Q.  I'm not asking if you've seen this
8 format.  I'm asking if you received that suspension
9 for --
10    **A.  Oh, I --**
11    Q.  -- 10 days?
12    **A.  -- received a suspension.  Yeah, I was**
13 **in the -- yeah, of some sort, yeah, then.**
14    Q.  Okay.  And on July -- let's -- July
15 12th, did you receive a --
16    **A.  Same.**
17    Q.  Same thing?
18    **A.  That's the same.**
19    Q.  Same events?
20    **A.  Same event.**
21    Q.  On September 1st, 1999, did you
22 receive a five-day suspension, subject to
23 discharge, that was converted to a five-day
24 suspension per an arbitration award?

1    **A.  I guess so, yes.**
2    Q.  On January 8th, 1999, did you receive
3 three days' suspension for sleeping during working
4 hours?
5    **A.  I guess so.  I don't remember**
6 **correctly, but, yeah, I guess I did.**
7    Q.  And on January 29th, 1998, did you
8 receive a one-day suspension for excessive
9 absenteeism?
10    **A.  I guess I did.**
11    Q.  And on January 27th, 1998, did you
12 receive a written warning for being off without
13 reporting?
14    **A.  I can't remember that one, but maybe I**
15 **did.  I'm not -- I'm not -- at this time, I can't**
16 **remember.**
17    Q.  And on December 17th, 1996, did you
18 receive a three-day suspension for reporting in
19 late, tardiness?
20    **A.  I can't remember, but maybe so at this**
21 **time.**
22    Q.  October 10th, 1996, did you receive a
23 one-day suspension, being off without just cause,
24 being off without permission?

Page 58

1  A.  Yes, I did.  I think so.
2  Q.  And on February 20th, 1996, did you
3  receive a written warning for tardiness, quitting
4  early or off without reporting?
5  A.  Can't remember.  Maybe so.  I'm not
6  sure at this time.
7  Q.  And on September 17th, 1990, did you
8  receive a five-day suspension for leaving the plant
9  without permission?
10  A.  Maybe so.
11  Q.  And on July 6th, 1990, did you receive
12  a three-day suspension for poor work performance
13  and absence from your work area?
14  A.  I can't -- I don't think -- I don't
15  know if that's accurate -- accurate completely.
16  Q.  What do you think is inaccurate?
17  A.  Poor work performance I thought was
18  maybe the absent -- but not absent from work area.
19  Q.  On March 15th, 1990, did you receive a
20  two-day suspension for being absent from your work
21  area and leaving the plant without permission?
22  A.  Like I said, it was one of the two.  I
23  can't remember which one.
24  Q.  On February 6th, 1990, did you receive

Page 59

1  a one-day suspension for tardiness?
2  A.  I can't remember that accurately, what
3  that -- what it was.
4  Q.  On December 11th, 1989, did you
5  receive a one-day suspension for tardiness?
6  A.  Same thing, I can't remember.
7  Q.  And on December 5th, 1989, did you
8  receive a suspension for being absent from the work
9  area and leaving the plant without permission?
10  A.  Like I said, I can't remember.  I
11  don't -- and I don't remember seeing that on my
12  work area.  Only thing that I can kind of vaguely
13  remember is that I was docked an hour and a half is
14  what you see there.  That's why I can remember
15  that.  But that was not a --
16  Q.  Okay.
17  A.  -- written -- I don't remember it
18  being a written write-up or anything like that.  I
19  just got docked an hour and a half.
20  Q.  That was because you'd been absent
21  from your work area?
22  A.  That's what they said.
23  Q.  And on September 18th, 1989, were you
24  given a warning for excessive absenteeism?

Page 60

1  A.  Can't remember.
2  Q.  Can't remember one way or the other?
3  A.  I can't remember if I was or not.
4  Q.  And on February 13th, 1989, did you
5  receive a warning for excessive absenteeism?
6  A.  I may have.  I can't remember.
7  Q.  You had a previous deposition in your
8  individual lawsuit, correct?
9  A.  Correct.
10  Q.  Did you answer questions honestly and
11  truthfully at that time?
12  A.  Yes, I did.
13  Q.  According to Exhibit Number 1, if I'm
14  looking at the first page correctly, you went into
15  the caster department in 1995; is that correct?
16  A.  I can't remember exact dates, but
17  somewhere in that neighborhood.
18  Q.  Okay.  And that's the steel making
19  department; is that another name?
20  A.  That's caster maintenance basically,
21  steel making, caster maintenance.
22  Q.  Okay.  And you were there till roughly
23  2001, July 2001?
24  A.  Hold on a second.  Yeah, rephrase it,

Page 61

1  please.
2  Q.  Yeah.  Were you in caster maintenance
3  from roughly September 1995 through July of 2001?
4  A.  Roughly, yes.
5  Q.  And what area did you cover then in
6  that maintenance position?
7  A.  In steel making?
8  Q.  Mm-hmm.
9  A.  I covered caster maintenance and BOF
10  maintenance, basic oxygen -- oxygen furnace is what
11  that stands for.
12  Q.  And what did you do?
13  A.  Crew chief.
14  Q.  What does that mean?
15  A.  I delegated work out to individuals on
16  my crew, each -- we had 24-hour coverage, so we had
17  crew chief on every turn.  And I was a crew
18  chief -- one of the crew chiefs in the caster
19  maintenance department, so I delegated work that
20  needed to be done and that was given to me by upper
21  management.
22  Q.  How many crew chiefs were there in the
23  caster maintenance?
24  A.  Four.

**16 (Pages 58 to 61)**

Page 62

1  Q.  Four?  How big was the caster
2  maintenance group?
3     A.  Numbers-wise?
4     Q.  Yeah, roughly.
5     A.  60-something, maybe, total, something
6  like that.
7     Q.  And that's covering three shifts?
8     A.  That's covering all three shifts.  No,
9  we're talking -- when I say that, I'm talking about
10  the entire caster department, yeah.  You know,
11  everybody, something -- somewhere around that
12  number, yeah.
13     Q.  The 60 number roughly, and I
14  understand it's an estimate, that covers the
15  maintenance people?
16     A.  Maintenance people, anything that
17  does -- yeah, with maintenance production -- not
18  production, but maintenance.  In the maintenance
19  department, we have a production -- you know, we
20  work beside -- right along with production.  But I
21  think it's between -- I -- I would say between 40
22  and 55, or something like that.
23     Q.  Okay.
24     A.  I can't remember the exact number of

Page 63

1  people we had in the caster department.
2     Q.  But that would cover the three shifts?
3     A.  That would cover the three shifts.
4     Q.  Roughly that would make what, 20
5  people on a shift?
6     A.  No.
7     Q.  No?
8     A.  No, no.  Each shift had -- 'cause we
9  had to work three to eleven's, midnights and days.
10  So basically it broke down.  And like I said, there
11  was a lot of other things going on in caster
12  maintenance which made up the other people, but we
13  had probably four or five per turn besides me as a
14  crew chief.
15        So each turn had maybe five people on
16  it, maybe, maintenance guys on each turn, so -- and
17  the rest of the guys made up the caster maintenance
18  of all the different other things, parts,
19  inspectors and all that.  You know, bosses and
20  whatever you want to call them, step ups and --
21  'cause all those were included in that 40-
22  something.
23     Q.  Okay.  And were you assigned to a
24  particular shift or did it rotate?

Page 64

1     A.  It rotated.
2     Q.  How big of an area did you cover?  Is
3  it --
4     A.  Big area.
5     Q.  -- big area of this room or is it --
6     A.  Oh, it's very big.
7     Q.  -- several buildings or --
8     A.  Well, the caster maintenance
9  department was covered -- you know, quarter mile
10  maybe, different buildings, all within walking
11  distance, basically.
12     Q.  Okay.
13     A.  But they were all -- it wasn't all
14  under one roof, if that's what you're asking.
15     Q.  Okay.  And did the four or five people
16  per turn, did they all work together on a project
17  or did they --
18     A.  Separate --
19     Q.  -- take turns?
20     A.  -- they did separate things.
21     Q.  And were you the one that assigned
22  what the individuals did?
23     A.  Yes.
24     Q.  Do you know an Emmy Lankster?

Page 65

1     A.  Yes.
2     Q.  Was he a crew chief as well?
3     A.  Yes.
4     Q.  Is he African-American?
5     A.  Yes.
6     Q.  Do you know an Andrew Smith?
7     A.  Yes.
8     Q.  Was he also a crew chief?
9     A.  Yes.
10     Q.  Was he African-American?
11     A.  Yes.
12     Q.  Do you know a James Coleman?
13     A.  Yes.
14     Q.  Did he work on the caster maintenance?
15     A.  Well, partially, sometimes.  He -- he
16  transferred into one of the inspector jobs, stuff
17  like that and he stopped being a crew chief.
18     Q.  Okay.  And he's African-American?
19     A.  Yes.
20     Q.  He still works in that general area?
21     A.  Worked in the general area, but he --
22  you know, he's an inspector.  I think he went to
23  inspecting, which didn't have anything to do with
24  repair work.  He found work that was broken and

17 (Pages 62 to 65)

Page 66

1 went to the system and it would come back to us to
2 fix.
3    Q.    Okay.  What about James Hill --
4    A.    James Hill --
5    Q.    -- did he work in --
6    A.    Okay.
7    Q.    Did James Hill work in caster
8 maintenance?
9    A.    Yeah, briefly, then he transferred
10 over to BOF maintenance.
11    Q.    Okay.  And what race was he?
12    A.    He was also black.
13    Q.    Do you know a Mr. Young?
14    A.    No.
15    Q.    Young, I'm not sure what his first
16 name was.
17    A.    Donny Young, but he worked in milling.
18    Q.    M. Young?
19    A.    M. Young?  M. Young?  Can't remember
20 at this moment.
21    Q.    Do you remember a Keith Gregory?
22    A.    Keith Gregory, yes.
23    Q.    And did he work in caster maintenance?
24    A.    Yes.

Page 67

1    Q.    And what race was he?
2    A.    He's black.
3    Q.    What about a Bobby Wise?
4    A.    Bobby Wise, black.
5    Q.    Did he work in caster maintenance?
6    A.    He worked in BOF maintenance.
7    Q.    BOF maintenance?  And what about Arlen
8 Fuller?
9    A.    Yeah, Stacy.
10    Q.    Stacy Fuller?
11    A.    Yeah.
12    Q.    Did she work in caster maintenance?
13    A.    He.
14    Q.    He worked in caster maintenance?
15    A.    He worked in BOF maintenance.
16    Q.    BOF maintenance?  And what race is he?
17    A.    Black.
18    Q.    And BOF maintenance, are those
19 separate buildings?
20    A.    Yes.
21    Q.    Okay.
22    A.    All under -- well, they connect --
23 they connect, but they're not -- you don't walk
24 outside.

Page 68

1    Q.    Okay.  They're connecting buildings?
2    A.    Connecting buildings.
3    Q.    Did you cover BOF maintenance as well?
4    A.    Only when I worked overtime.
5    Q.    Okay.
6    A.    I was crew chief on the B -- on the
7 caster side, but we were one department,
8 BOF/caster.
9    Q.    Okay.
10    A.    So when the overtime came, I could
11 work on the BOF side, if they asked me.
12    Q.    Okay.  What about a Marilyn
13 Meredith -- Meredith?
14    A.    Meredith.
15    Q.    Meredith?
16    A.    She's black as well.
17    Q.    Did she work in caster maintenance?
18    A.    BOF.
19    Q.    BOF maintenance?  What about a Ricky
20 Meredith?
21    A.    Her brother.
22    Q.    Was he --
23    A.    BOF.
24    Q.    Was he African-American as well?

Page 69

1    A.    Yes.
2    Q.    Any other individuals who were
3 African-American, worked in the -- either caster
4 maintenance or BOF maintenance?
5    A.    Just about covered them all.  Jock,
6 Jock Wilson.
7    Q.    Jock Wilson?
8    A.    Yeah.
9    Q.    And which -- did he work in caster?
10    A.    He worked in BOF.
11    Q.    BOF maintenance?  Anyone else?
12    A.    I can't remember at this time no more.
13    Q.    And how did you get the crew chief
14 position?  Is that something you bid on?
15    A.    No.
16    Q.    No?  How did you get the crew chief
17 position?
18    A.    They -- it was like you're it.  When I
19 took the crew chief job in the BOF, I transferred
20 into the BOF -- excuse me, caster.  When I
21 transferred into the caster, was there maybe a
22 couple days or so and they walked in a room and
23 told me you're a crew chief.
24    Q.    Okay.

**18 (Pages 66 to 69)**

Page 70

1    A.    End of discussion.  I walked away.
2    Q.    Okay.
3    A.    And they -- that was it.  That's how I
4  got the job.  There was no journeymen, I guess, on
5  turn or we had a lot of apprentices at the time and
6  I was a journeyman, so -- no other journeyman
7  wanted it within the plant -- within the
8  department.  They didn't want to -- or not
9  transfer, but they didn't want to stop doing what
10  they were doing.  So it kind of like went down
11  the -- it fell down to the bottom line and I was
12  the bottom line.
13    Q.    They went down the seniority list?
14    A.    Yes.
15    Q.    And you were at the bottom of the
16  seniority list?
17    A.    Yes, so I didn't have no choice.
18    Q.    A lot of people in the maintenance
19  department had more seniority than you did?
20    A.    Everybody had more seniority than I
21  did --
22    Q.    Okay.
23    A.    -- except the apprentices.
24  Journeyman-wise, I was the youngest one.

Page 71

1    Q.    Okay.  The last few years that you
2  worked in caster maintenance, would it be fair to
3  say that most of the people who also worked in
4  caster maintenance or BOF maintenance had been
5  employed by AK Steel for five years or so?
6    A.    Yes, except --
7    Q.    Okay.  Are you aware --
8    A.    -- for the apprentices --
9    Q.    Okay.  Are you aware of any --
10    A.    -- on both sides.
11    Q.    Were you aware of anyone who was hired
12  the last three years who were there who were
13  working in caster maintenance or BOF maintenance?
14    A.    The apprentices.
15    Q.    Do you remember any of them?
16    A.    I can't remember their names, but all
17  of them was white.
18    Q.    Do you remember how many there were?
19    A.    Had to be at least -- maybe three on
20  our side and four on the other side.
21    Q.    Do you remember when they were hired?
22    A.    I would have to say between -- I would
23  have to say between '90 and 2000, the time I left
24  'cause I was over there -- excuse me.  Hold on a

Page 72

1  second.  I can tell you more accurately.  '95, I
2  came in '95.  Okay.  I'm sorry.
3        MS. DONAHUE:  Don't whisper your
4  answer.
5    A.    So I would have to say between '97 --
6  you know, maybe -- or maybe '96, '96 to the time I
7  left the caster.
8    Q.    So sometime between '96 and 2001?
9    A.    Yeah.
10    Q.    Roughly three -- three individuals on
11  one side and four individuals on the other side?
12    A.    Give or take apprentices.
13    Q.    You don't know any of their particular
14  dates for --
15    A.    No.  Dates on when they hired in or --
16    Q.    Yeah.  Do you know any of their names?
17    A.    No, I can't remember, no.
18    Q.    Is it possible some of them would have
19  been hired in at AK Steel, transferred over and
20  started as an apprentice later?  In other words,
21  they were -- maybe had five, 10 years' experience
22  at AK Steel somewhere else, and then transferred
23  in?
24    A.    No, these guys were extremely young,

Page 73

1  younger than me.  And I -- I could basically talk
2  to them when they hired in -- when they hired in at
3  the plant.  I may have looked at the seniority list
4  as well after -- after they got into the plant.
5  They were hired in beginning of the plant -- you
6  know, less than five years.
7    Q.    So they only had about five years --
8  at most, five years' experience at AK Steel?
9    A.    If that.
10    Q.    Okay.
11    A.    We called them Greenhorns, so they
12  probably was fresh.  You know, we had to keep our
13  eye on them to rotate.
14    Q.    You were -- in terms of over them
15  or --
16    A.    Yes.
17    Q.    -- at a higher level than they were?
18    A.    Well, yeah.  I was their boss.
19    Q.    Okay.
20    A.    They answered to me and I answered
21  to -- to the company.
22    Q.    Okay.  And you were not physically
23  present at the AK Steel plant between September 1,
24  1999 and November 2nd, 2000, correct?

**19 (Pages 70 to 73)**

Page 74

1    A.   I don't remember.
2    Q.   That was when you were on the
3  suspension?
4    A.   No, right, exactly.
5    Q.   And that suspension, then, was later
6  converted to a five-day suspension --
7    A.   Correct.
8    Q.   -- and you were reinstated?
9    A.   Correct.
10   Q.   In July 2001, you were moved into the
11  maintenance and annealing; is that correct?
12   A.   Correct, something -- yeah, somewhere
13  around there date-wise, yes.
14   Q.   And what is the annealing area?
15   A.   Annealing is another processing center
16  of how they process the metal for different
17  supplies that we supply to that wanted the metal
18  annealed.  Basically you heat it up, let it cool
19  down and ran it through a press of some sort.
20   Q.   Is that separate buildings from the
21  BOF and the caster --
22   A.   Yes.
23   Q.   How many buildings does it encompass,
24  or how big of an area does it encompass?

Page 75

1    A.   It was a pretty big area.  About -- I
2  give it -- well, I don't know.  Took me a long time
3  to walk it, so -- I would say it encompassed maybe
4  about a football field and a half.
5    Q.   Okay.
6    A.   It's a pretty wide area.  I -- I would
7  say it's -- you know, it might have been a
8  quarter -- quarter mile.  It stretched out pretty
9  far.  Took a long time to talk one end to the
10  other.
11   Q.   And roughly how many people were in
12  maintenance and annealing?
13   A.   30-something, 40, small area.
14   Q.   Smaller group?
15   A.   Smaller group of people.
16   Q.   And you were no longer a crew chief,
17  correct?
18   A.   No.
19   Q.   Was there a James Culbert in
20  annealing?
21   A.   He was -- as in the caster, BOF,
22  basically that, slash, he was in that area, part of
23  annealing, but I can't say what the pronunciation
24  of his department, that it was a part of --

Page 76

1    Q.   Okay.
2    A.   -- annealing.
3    Q.   Okay.  Is he African-American?
4    A.   Yes.
5    Q.   What about Albert Meyers?
6    A.   Yes.
7    Q.   Is he African-American?
8    A.   Also African-American.
9    Q.   And he worked in annealing
10  maintenance?
11   A.   Where did Albert work at?  I don't
12  quite remember where Albert worked at.  Maybe he
13  did work in annealing maintenance.  I think he
14  transferred out, went somewhere else.  He might
15  have been there when I first got there in '81
16  somewhere.  I can't remember.
17   Q.   What about a Valani Thomas?
18   A.   Valani Thomas?  I don't remember that
19  name.  Some people are called by nickname, just
20  don't know their name.
21   Q.   Did you know all the people in
22  annealing --
23   A.   No.
24   Q.   -- maintenance?

Page 77

1    A.   No, I didn't know, no.
2    Q.   Did you know all the people in the
3  caster maintenance?
4    A.   I worked there so long, yeah.  Pretty
5  much I knew them.
6    Q.   What about BOF maintenance?
7    A.   Yeah, I knew of them.  You know, I was
8  there for a long time, so I --
9    Q.   How many people did you actually work
10  with in the annealing area?  Was it, again, small,
11  three or four on a shift?
12   A.   Yeah.
13   Q.   And, again, during that shift, would
14  each of the individuals kind of be assigned out to
15  do their own thing?
16   A.   Yeah.  Once again, apprentices.  I was
17  a journeyman, so --
18   Q.   What did you do as a journeyman?
19   A.   Journeyman, like I said, we -- we --
20  you know, I finished our program and we knew pretty
21  much how to do whatever needed to be done.
22  Apprentices just supposed to work by themselves,
23  but since -- you know, department was small, didn't
24  have enough people to cover the area, they had

20 (Pages 74 to 77)

Page 78

1  apprentices doing journeyman work.
2      Q.  So as a journeman, you'd certainly be
3  off on your own --
4      A.  Yeah.
5      Q.  -- doing your own thing?
6      A.  They'd give me my work and go do it.
7      Q.  And what -- were you fixing machines,
8  is that essentially what you're doing?
9      A.  Machines, cranes, doing preventive
10  maintenance work.
11      Q.  And the production employees during
12  that time, were they --
13      A.  They'd be working on whatever they're
14  working.
15      Q.  Okay.
16      A.  It's always something to do.  There's
17  always something to do, things broken or needed to
18  be -- you know, be looked at.  We also worked on
19  breakdowns.
20      Q.  Okay.
21      A.  When the production equipment stopped
22  working, we had to go over there and fix it.
23      Q.  Okay.  So the production employees
24  would be doing something else while you were

Page 79

1  working on a different --
2      A.  Completely.
3      Q.  -- another machine?
4      A.  Right.  I could be right next to them
5  doing something different, yeah.
6      Q.  Okay.  Did you know all the production
7  employees in annealing?
8      A.  No.
9      Q.  Did you know all the production
10  employees in caster?
11      A.  Yeah, pretty much.  Didn't know them
12  personally.  But I knew of them, they knew of me.
13      Q.  Okay.  You did not report to anyone in
14  production, correct?
15      A.  No, and annealing.
16      Q.  Did you report to anyone in production
17  and annealing?
18      A.  No.  I said in annealing, your asking
19  me.
20      Q.  Did you report to anyone in production
21  in caster?
22      A.  Yeah, when I was crew chief.  Yeah, I
23  would have to report to the production supervisor
24  on turn.

Page 80

1      Q.  Okay.
2      A.  And when we were working turning
3  shift, he was basically the boss and -- you know,
4  if he asked me to do nothing (sic), I did it, you
5  know.
6      Q.  Okay.
7      A.  There was always a supervisor on turn
8  from AK Steel.  We were just crew chiefs --
9      Q.  Okay.
10      A.  -- for production and basically we
11  answer to them.
12      Q.  You said -- you mentioned you were on
13  the civil rights committee?
14      A.  Correct.
15      Q.  And is that a union committee?  Is it
16  a --
17      A.  Union committee.
18      Q.  Is there anyone that's not in the
19  union on that committee?
20      A.  Not to my knowledge.
21      Q.  And does the committee have anything
22  to do with hiring?
23      A.  No.
24      Q.  Did you ever have any role in the

Page 81

1  hiring process?
2      A.  No, I didn't.
3      Q.  Do you know what the hiring process
4  was?
5      A.  From when I was hired, basically just
6  only from the knowledge I have from when I was
7  hired.
8      Q.  And how about -- do you know what the
9  hiring process was after AK Steel -- it became AK
10  Steel, as opposed to Armco?
11      A.  Only from what I could see.
12      Q.  And what is that?
13      A.  Basically he would fill the
14  application in because at that particular time, AK
15  was hiring at a high rate and how would we know
16  that, just to -- we would see the white dots coming
17  through the plant.  Every new employee was taken on
18  a tour of AK Steel.  So periodically we would see a
19  group come in and all of them would have white dots
20  with a yellow hat on.
21      Q.  They would have a white what?
22      A.  They would have a -- a work hat, a
23  hard hat, but they would put a white dot on their
24  head, just to let you know that they were

**21 (Pages 78 to 81)**

Page 82

1  Greenhorns and take care of them, watch out for
2  them. Don't let them get in harm's way. So that's
3  how we knew when a new group of people would come
4  into the plant or had been hired.
5     Q. Okay. And how long would they --
6  would they be kind of marked as the new hire
7  that --
8     A. Till that dot -- it wore off their
9  head.
10    Q. Okay.
11    A. They didn't take it off. It just kind
12  of like went away. You know what I mean?
13    Q. Mm-hmm.
14    A. Just taking your hat off, on. No one
15  would actually take that off their head. It would
16  wear off. So basically it took several months --
17  you know what I mean? -- before it would wear off.
18  It wasn't a permanent paint, is what I'm saying.
19    Q. Anything else you know about the
20  hiring process?
21    A. Well, like I said, only thing -- those
22  people were -- were applying for jobs through the
23  unemployment offices, Dayton, Cincinnati,
24  Middletown, Hamilton, Palmer temps. See, those

Page 83

1  satellite -- there was a little satellite
2  employment office by -- off of University Boulevard
3  near O'Dillman's. They were applying there. And,
4  like I said, basically you turn your application
5  in, and then some people I -- I -- that I know were
6  called for a -- take some type of test.
7       And they went in to take the test and
8  AK said they would get back with them and they
9  never did. AK never did call them back to let them
10  know either way if they failed or passed the test.
11    Q. And how do you know this, this
12  process?
13    A. Because I asked people.
14    Q. Okay. And who did you ask?
15    A. I don't know, about a hundred people,
16  as many people as I could that I knew took the test
17  or had applied.
18    Q. Okay. All of the individuals that you
19  asked, were they all African-American?
20    A. No.
21    Q. Okay. What white individual did you
22  ask?
23    A. I asked -- when I was working at the
24  plant, I asked the individuals, they coming in the

Page 84

1  door, some of the employees in the caster
2  maintenance department or -- yeah, I asked -- you
3  know, annealing, some of the guys that came in
4  there, I asked them -- I can't remember exactly
5  who, but I did ask them, did they take a test.
6  They did, most of them took a test.
7     Q. Anyone say they didn't take a test?
8     A. No, I can't remember them saying -- no
9  one said they did not take a test. I think
10  everybody took a test.
11    Q. When you were in annealing, did anyone
12  get hired and come straight into the maintenance
13  group that last year you were there?
14    A. I can't remember if anybody did or
15  not.
16    Q. How was the seniority when you were in
17  annealing?
18    A. I was up higher in seniority there.
19    Q. Was there anyone who had less than a
20  few years of seniority --
21    A. Yeah, there --
22    Q. -- in annealing?
23    A. -- was other apprentices,
24  apprentices.

Page 85

1     Q. Do you remember any of their names?
2     A. See, I can't remember. Could be -- I
3  know one guy was name Cobb, last name Cobb. I
4  can't remember his first name.
5     Q. Do you know when he was hired?
6     A. No. Every department -- I mean, they
7  was so short on people, they had -- everybody had a
8  lot of apprentices. There would be -- you know,
9  going through school and just been hired into the
10  plant because AK was hiring at -- like I said, at
11  an extreme rate.
12    Q. How many apprentices were in annealing
13  in 2001?
14    A. Probably about three. Like I said,
15  annealing was a smaller area. There might have
16  been -- you know, three or four on the other side.
17  But we didn't work -- it was a separation there.
18    Q. Okay.
19    A. There was no working overtime over
20  there.
21    Q. Okay. So you only worked in
22  annealing --
23    A. In annealing, that was it. They
24  didn't have the same privileges we had in caster.

22 (Pages 82 to 85)

**Page 86**

1    Q.   And while you were there, you think
2  there were about three apprentices?
3    A.   Yeah, I think there were about three
4  apprentices.
5    Q.   And do you know when any of them were
6  hired?
7    A.   No.  But I know they was all hired,
8  had less than five or six years.
9    Q.   And do you know when -- do you know
10 any of their names?
11   A.   No.
12   Q.   Okay.
13   A.   I can't remember.  I know them, but I
14 just can't remember their names at the time.
15   Q.   You mentioned that individuals when
16 they applied, they went through unemployment
17 offices or Palmer temps.  How did you know that?
18   A.   How did I know that?  Inquiring
19 information.  I went and took a look.
20   Q.   Went and took a look where?
21   A.   At the employment office in Dayton,
22 Ohio --
23   Q.   Okay.  What did you --
24   A.   -- job services.  I just went and

**Page 87**

1  looked to see if they were actually taking
2  applications and they were.
3    Q.   And they were?
4    A.   Yeah.
5    Q.   Did you talk to anyone at that time?
6    A.   No, I didn't talk to nobody.  I was
7  seeing if they were taking applications for AK.
8    Q.   Do you know what happened to the
9  applications once the bureau of unemployment took
10 them or if Palmer temps took them?
11   A.   To my knowledge, I thought they was
12 supposed to go to Hamilton, Ohio and Hamilton, Ohio
13 was supposed to come back to AK Steel.
14   Q.   You thought that the applications were
15 supposed to make their way to --
16   A.   Yeah.
17   Q.   -- Hamilton, Ohio?
18   A.   Yeah.  Somebody in Hamilton, Ohio told
19 me that --
20   Q.   Okay.
21   A.   -- at the unemployment office in
22 Hamilton.
23   Q.   Okay.  What else did that person tell
24 you?

**Page 88**

1    A.   They just told me that they were
2  basically shipped to -- that they -- all the
3  applicants (sic) were shipped to AK Steel, and then
4  they went through them.  They were basically a
5  middle -- they kind of weeded through them and had
6  found people that met AK Steel's criteria or AK
7  Steel gave them some type of criteria, which I
8  don't know what it was, and a little screening
9  process.  And they went -- applications then were
10 all shipped to AK Steel.
11   Q.   Okay.  So the bureau of unemployment
12 in Hamilton received all the applications?
13   A.   From all the other ones.
14   Q.   And they actually screened through
15 them?
16   A.   Exactly.  Supposedly --
17   Q.   Okay.
18   A.   -- supposedly sent them to AK Steel.
19   Q.   And have you ever seen those
20 applications actually go to Hamilton?
21   A.   Did I ever see them go to --
22   Q.   Yes.
23   A.   -- Hamilton?  No.
24   Q.   Did you understand how it worked if

**Page 89**

1  you applied at Palmer temps?
2    A.   No, I didn't, no.
3    Q.   Have you ever been to Palmer temps?
4    A.   I have been there, but not for AK
5  Steel purposes.
6    Q.   What were you there for?
7    A.   I had a resume typed up or something.
8    Q.   For what?
9    A.   A resume typed up.
10   Q.   They typed it up for you?
11   A.   I'm not sure if they typed it up or I
12 was inquiring information about that.
13   Q.   Okay.
14   A.   I didn't -- I don't think they did it
15 for me or nothing like that.
16   Q.   Have you ever talked to anyone from
17 Palmer temps?
18   A.   Just the -- you know, receptionist --
19   Q.   Okay.
20   A.   -- in reference to that.  That was
21 nothing to do with the application process or
22 anything like that.
23   Q.   And I apologize.  I think you might
24 have already answered, but I've forgotten it, so

**23 (Pages 86 to 89)**

**Page 90**

1  I'm going to ask you again.
2      Did you know anything about how Palmer
3  temps dealt with AK Steel or applicants for AK
4  Steel?
5      **A.  No.  I just know they were taking**
6  **applications.**
7      Q.  Okay.  Do you know all the employees
8  that work at AK Steel?
9      **A.  Black?**
10     Q.  Well, do you know all the black
11  employees that work at AK Steel?
12     **A.  Yeah, there's so many of them -- so**
13  **less of them, yeah, pretty much.**
14     Q.  Do you know all the other employees
15  that work --
16     **A.  No.**
17     Q.  -- at AK Steel?  Am I right that
18  they're -- when you were at AK Steel, there were
19  roughly about 220 African-American employees?
20     **A.  Give or take, yeah.**
21     Q.  Do you know how many employees total
22  there were at AK Steel?
23     **A.  At one point, we had 3,100 plus.**
24     Q.  When I ask you about AK Steel, I'm

**Page 91**

1  just talking about AK Steel, Middletown works.
2      **A.  Yes.  We're talking about Middletown.**
3  **We're talking Middletown.**
4      Q.  And you said that you did know roughly
5  most of the African-Americans?
6      **A.  Pretty much, yeah.**
7      Q.  And that was through your employment
8  interactions with them?
9      **A.  Yeah, yeah.  And going throughout the**
10  **plant -- you know, just -- you don't know somebody,**
11  **but you kind of -- you know, we've seen each other**
12  **before and might have a conversation.  You know,**
13  **I'm not saying I talked to everyone, but pretty**
14  **much everybody knows everybody.  There's so few.**
15     Q.  Do you know most people -- most
16  African-Americans in the Middletown community?
17     **A.  Yeah.  Lived there all my life.**
18     Q.  Okay.  Your nephew is Shawn Pryor?
19     **A.  Correct.**
20     Q.  I think he mentioned that it was a
21  relatively small community --
22     **A.  Relatively small.**
23     Q.  -- the African-American community?
24     **A.  Yeah.**

**Page 92**

1      Q.  What are your -- well, let me ask you,
2  do you know how many African-Americans applied at
3  AK Steel?
4      **A.  No.**
5      Q.  Do you know how many white applicants
6  applied?
7      **A.  A lot.**
8      Q.  Do you know how many people were hired
9  at AK Steel?
10     **A.  Yeah, pretty much, kinda.**
11     Q.  How many?
12     **A.  I would say -- you know, from 1988 to**
13  **when I hired in, to 1999, basically when I got**
14  **involved with the civil rights committee, I think**
15  **it was about 1,500.  And out of that 1,500 people,**
16  **AK -- like when I hired in, it was about 245, 50**
17  **blacks working at AK Steel, Armco.**
18     **And in 1999, when I started into the**
19  **process of -- you know, getting into the civil**
20  **rights and all that, there was 234.  But AK hired**
21  **1,500 people.**
22     Q.  Do you know how many employees they
23  had in 1988, AK Steel, total, at Middletown?
24     **A.  No, I don't.  Not off the top of my**

**Page 93**

1  head, no.  I just know that the minorities during
2  that 1,500 period -- 1,500 people period did not --
3  we went down.  We did not go up.
4      Q.  Do you know whether the whites went
5  down?
6      **A.  Oh, they didn't go down.  I mean --**
7      Q.  Are you speculating that?
8      **A.  I'm speculating.  Well, yeah, I'm**
9  **speculating because the number of employees, total**
10  **employees may have went down.  I'm speculating on**
11  **that.**
12     Q.  Okay.  When you say the number of
13  applicants, how do you know how many applicants
14  they had in 1988 to 19 --
15     **A.  No, I'm going by the people they**
16  **hired.**
17     Q.  Oh.  How many -- how do you know how
18  many people they hired?
19     **A.  Through the union.**
20     Q.  Someone at the union told you that?
21     **A.  Yeah.  Documents within the union**
22  **showed that each year, each month, every employee**
23  **that comes in that door is hired at AK Steel has to**
24  **go through the union.**

Page 94

1    Q.    Do you have those documents?
2    **A.    I only have one or two.**
3    Q.    When you say you may have one or two,
4  what --
5    **A.    I'm not sure of how many.**
6    Q.    When you say you have one or two
7  documents, does that mean it's a document for a
8  particular year or is it a document for a -- I'm
9  sorry.
10    MS. DONAHUE:  Go ahead.  Just looking
11  for an answer.  I'll object to the --
12  BY MS. PRYOR:
13    Q.    Is it a document for a particular
14  year?
15    **A.    It's all right.  A particular year.**
16    Q.    Okay.  I mean, it's not that you have
17  one or two copies of some massive list of --
18    **A.    No, no I'm talking about -- I'm**
19  **talking about -- I'm talking about a document that**
20  **states that in 1999, there was so many minorities**
21  **hired -- so many people hired and a breakdown**
22  **percentage.  Basically like -- you know, to give**
23  **you an example of what I'm saying, let's say in**
24  **2000 -- say 2001, give you an example.  They hired**

Page 95

1  **400 -- 420 people.**
2    Q.    This is just a --
3    **A.    I'm speculating.**
4    Q.    Yeah, you're not --
5    **A.    I'm not giving you an exact -- but**
6  **that's -- that paper would say 450, six blacks, two**
7  **females.**
8    Q.    So the union keeps some document that
9  says 450 people hired; six blacks; two females?
10    **A.    Correct.**
11    Q.    Do you know why they keep that?
12    **A.    Yeah, they're just trying to keep up**
13  **with number hired, number of people hired.**
14    Q.    What does it have to do with the race
15  or gender of those individuals?
16    **A.    I don't know.  I mean, I don't know.**
17  **I mean, it's just -- just -- I don't know.  I can't**
18  **answer that question.**
19    Q.    Okay.  And do you know how many
20  individuals applied during those times, during the
21  time you were there?
22    **A.    "Individuals" meaning like --**
23    Q.    Any individuals, all individuals,
24  white, blacks.

Page 96

1    **A.    No, I don't.  It was a lot, I know**
2  **that --**
3    Q.    Okay.
4    **A.    -- because the way they were -- the**
5  **way AK Steel was promoting we're hiring.**
6    Q.    And do you know why any individuals
7  were not hired by AK Steel?
8    **A.    Just speculations.**
9    MS. DONAHUE:  Don't speculate.
10    THE WITNESS:  Okay.
11  BY MS. PRYOR:
12    Q.    You don't have any direct knowledge of
13  why any --
14    **A.    No.**
15    Q.    -- individual was hired or not hired?
16    **A.    No, I don't have any -- any --**
17    Q.    And do you know what criteria AK Steel
18  used to make its hiring decisions?
19    **A.    No, I don't.**
20    Q.    Did you ever -- did anyone at AK Steel
21  tell you anything about the hiring process?
22    **A.    No.**
23    Q.    Did anyone at AK Steel ever make any
24  comments to you about race and hiring?

Page 97

1    **A.    No.**
2    Q.    Did anyone at AK Steel ever say
3  anything related to hiring that you thought was
4  discriminatory?
5    MS. DONAHUE:  Object to the form, but
6  go ahead.
7    **A.    You talking about supervisors, you**
8  **talking about people in general or you talking**
9  **what?**
10    Q.    Let's start with supervisors.
11    **A.    No, not to my knowledge.**
12    Q.    All right.  Let's go to people in
13  general.
14    **A.    In general -- you know, just**
15  **overhearing conversation and stuff like that, I**
16  **thought was discriminatory personally.**
17    Q.    What was said?
18    **A.    You know, like I could be sitting in**
19  **the lunchroom and listen to -- and I can't -- I**
20  **can't recall names 'cause I can't remember -- I**
21  **just remember what they was saying.  Like we was**
22  **sitting over there and you'd be the only black in**
23  **the room.  And these guys are over here talking**
24  **about, yeah, man -- you know, my uncle got hired**

**25 (Pages 94 to 97)**

**Page 98**

1   and -- you know, last week they hired my brother,
2   too.
3           And let's just say the uncle already
4   worked there and -- you know, I talked to my uncle
5   and -- you know, we -- you know, they hired my
6   brother, and then they hired my cousin, you know.
7   And it's like -- it was more like nepotism in a
8   sense to me. It's like -- you know, they know
9   people and you would -- I would hear that a lot
10  or -- or his son got on. You know what I mean?
11      Q.   Mm-hmm.
12      A.   It was a lot of that -- you know,
13  going on. Supervisors' sons would get hired and --
14  and, you know, then all of a sudden, periodically
15  you would see a black person come in and -- which
16  is very rare, so -- a new hire that was black.
17      Q.   Okay. Anything else that was ever
18  said related to hiring that you thought was
19  discriminatory?
20      A.   No, just -- just common -- and I don't
21  think -- you know, it depends on how you want to
22  look at that, how I -- you know, when you overhear
23  conversation about people getting hired. It's just
24  more of a -- it's not really -- I ain't saying it

**Page 99**

1   was racist, but it was just startling, I guess.
2       Q.   The lunchroom, is there a lunchroom
3   for each department, group?
4       A.   Yeah, lunchrooms.
5       Q.   How big is a lunchroom?
6       A.   It could be -- you know, could be
7   twice as big as this room or it could be this size
8   or it could be smaller.
9       Q.   Okay. How many people are in the
10  lunchroom at a time?
11      A.   Depends on how many chairs are in
12  there. I mean, it could be like it -- in that --
13  you know, it could be -- it could 12 or 13 people
14  in there because the lunchrooms had benches, most
15  of them, that would run around the room, so you
16  could have as many --
17      Q.   How many were normally in there?
18      A.   Eight, nine, 10. During lunchtime?
19  You know, because normally we ate at the same time
20  in the production -- sometime production guys would
21  come over, eat with us, whatever. So it could --
22  between eight and 13 people. Depends on how much
23  room was in there and what we were doing.
24      Q.   Okay. Did you ever eat lunch with an

**Page 100**

1   African-American?
2       A.   Yeah.
3       Q.   To your knowledge, was there anything
4   hostile about the application process at AK Steel?
5       A.   Hostile?
6       Q.   Mm-hmm.
7       A.   What do you mean?
8       Q.   Asking if you've ever heard there's
9   anything hostile about the application process?
10      A.   Oh, well, you know, I -- I thought it
11  was hostile. I mean, as far as on the front of the
12  application, you asked if I was black or white. So
13  you knew before I walked in the door what color I
14  was or what race I was.
15      Q.   You talking about the Armco
16  application or are you --
17      A.   I'm talking about the AK Steel
18  application.
19      Q.   Did you complete the AK Steel
20  application?
21      A.   No, I -- like I said, I picked -- I
22  picked one up when I was at the -- at one of the
23  unemployment offices. Matter of fact, I kept a
24  couple -- you know, just to look at them. Matter

**Page 101**

1   of fact, I passed some out to the people -- you
2   know, say, hey -- you know, they're hiring. Go try
3   to get you a job.
4       Q.   Who did you pass applications out to?
5       A.   Let's see. Let me think. What did
6   I -- I might have gave one to my -- I only did that
7   once, that I do remember, and that was William
8   King.
9       Q.   You gave an application to William
10  King?
11      A.   Yeah. That was the only one. I do
12  remember that, actually gave an application to,
13  which is my brother.
14      Q.   That's your brother?
15      A.   Yeah.
16      Q.   Why different last names?
17      A.   Different fathers.
18      Q.   How many brothers do you have?
19      A.   Four. Well, three, three.
20      Q.   Who are they?
21      A.   William King, Bruce Roberts, four of
22  us, and me. And Chris, Christopher Roberts, Bruce
23  Roberts, me, and William King.
24      Q.   Okay. Was there ever another one that

**26 (Pages 98 to 101)**

**Page 102**

1  passed away or --
2     **A.  No, no.**
3     Q.  Getting the four and three confused.
4       Did you ever pass out an application
5  to anyone else besides William King?
6     **A.  No, not to my knowledge.**
7     Q.  After you gave the application to
8  Mr. King, do you know what he did with it?
9     **A.  No, I just told him to turn it in.**
10 **You know, I didn't -- I just told him to turn it**
11 **(sic). And I told him -- you know, look, there's**
12 **one over here. You know, you could turn it in at**
13 **the unemployment office. I thought it was**
14 **unemployment office by the -- off of University.**
15 **He lived in that area. I said just whenever you**
16 **get that done, just turn it in there and they'll --**
17 **you know, they're hiring. So, hey, you know, you**
18 **might as well try to get a job.**
19    Q.  Did you ever have anyone else apply or
20 offer guidance or encouragement to anyone else so
21 far?
22    **A.  No, I just -- you know, no. If I did,**
23 **in general talking -- you know, as far as**
24 **individual, no, just --**

**Page 103**

1     Q.  Did you ever submit an application on
2  behalf of anyone else?
3     **A.  No, I didn't, no.**
4     Q.  No one ever gave you an application --
5     **A.  No.**
6     Q.  -- and you took it into AK?
7     **A.  No, no, I didn't. I didn't know**
8  **anybody of that nature. You know what I mean? I**
9  **didn't know anybody of that statute (sic) to go**
10 **talk to or -- you know.**
11    Q.  Do you know whether AK Steel treated
12 any African-American applicants different than any
13 white applicants?
14    **A.  Well, I think it was obvious that they**
15 **did.**
16    Q.  And why is that?
17    **A.  Because they didn't hire any.**
18    Q.  And how does that mean that they
19 treated them differently?
20    **A.  Well, I mean -- you know, I know they**
21 **were applying and in -- and why would I say that --**
22 **you know, when -- when you're taking applications**
23 **at Cincinnati unemployment office and there's a lot**
24 **of black people unemployed and you got a job up**

**Page 104**

1  there that you broadcast and it pays $50,000, I
2  think you're going to apply for it.
3       Same thing that was going on in
4  Dayton, Ohio and Middletown, Hamilton. So for AK
5  Steel to say that black people didn't apply was
6  ludicrous to me.
7     Q.  But you didn't know how many were
8  applying?
9     **A.  No. I just know that they was -- you**
10 **know, a big stack there. You know what I mean? A**
11 **big stack of applications every time I went. I**
12 **went up there a couple times and they were taking**
13 **applications for awhile, so -- and you walk in the**
14 **room and the place is full of black people looking**
15 **for a job. So I just took it for granted that they**
16 **were filling those applications out.**
17    Q.  But that's speculation on your
18 point -- part?
19    **A.  Pretty much. I guess it would be**
20 **speculation.**
21    Q.  Any other reason to believe that AK
22 Steel treated African-American applicants
23 differently from white applicants?
24    **A.  And I was also told by a ex-human**

**Page 105**

1  resource person that AK Steel would keep the race
2  card on the bottom of their application, so they
3  would know who they were talking to before they
4  talked to them.
5     Q.  Who told you that?
6     **A.  James was his name, James Robert**
7  **Coleman.**
8     Q.  James Robert Coleman?
9     **A.  He was their ex-human resource person**
10 **that worked at AK Steel.**
11    Q.  Do you know when he worked there?
12    **A.  For years, so I would say up to**
13 **probably -- I need to go get me -- I can't say**
14 **exactly when, but I would say up to -- I'd say up**
15 **to 2000 -- you know, '99, somewhere in that area,**
16 **up to that point. So he'd probably been there 20**
17 **years.**
18    Q.  And what race was he?
19    **A.  Black.**
20    Q.  And did he have any role in the hiring
21 process?
22    **A.  Yes, he was human resource.**
23    Q.  Did he make the hiring decisions?
24    **A.  I'm not sure if he made them or -- I**

**27 (Pages 102 to 105)**

1  just know what he told me.
2     Q.   Okay.  And he told you that they --
3  you say they kept the race card?
4     **A.   That they had perforated --**
5     Q.   The perforated --
6     **A.   -- tear off --**
7     Q.   -- the bottom -- the bottom of the
8  application?
9     **A.   Exactly.  And they would keep it until**
10  **the -- until the entire process that a person was**
11  **hired and they would tear it off at the end.**
12     Q.   Do you know what they've done since he
13  left?
14     **A.   To my knowledge, they haven't done**
15  **anything, as far as changing the perforated tear**
16  **offs or -- what do you mean?**
17     Q.   I'm asking when they tear it off since
18  you left?
19     **A.   No, I don't.**
20     Q.   And did he say why they kept it on
21  there?
22     **A.   Yeah.  He said so they would know who**
23  **they were talking to.**
24     Q.   Is that all he said?

1     **A.   Yeah, what race they were, black or**
2  **white.**
3     Q.   Did he say anything else about it?
4     **A.   No.**
5     Q.   Did he say why they wanted to know
6  what race they were talking to?
7     **A.   No.  He basically didn't.  He just --**
8  **it was just evident.  Basically, to me -- you know,**
9  **when -- you know, as we -- as we talked -- you**
10  **know, he -- they just didn't hire.  They just**
11  **didn't hire them.**
12     **And they knew who they were talking**
13  **to, as far as a interview is concerned.  It's based**
14  **on the interview.  He wanted to -- they wanted to**
15  **know if they were talking to a black guy or they**
16  **wanted to talk to a white guy or whatever race they**
17  **were, they wanted to know, is what he said.**
18     Q.   For the interview?
19     **A.   They wanted to know, yes.  They wanted**
20  **to know who was walking through that door before**
21  **they walked through it.**
22     Q.   And they would know when they walked
23  through --
24     **A.   They know on an individual basis --**

1  ask the question again.
2     Q.   Yeah.  You -- did he tell you they
3  wanted to know for the interview what race they
4  were going to be?
5     **A.   Correct.**
6     Q.   Okay.
7     MS. DONAHUE:   Did you finish that
8  answer?  I think you were interrupted.
9     **A.   Yeah, I mean, like I say, he told me**
10  **that basically they wanted to know -- they wanted**
11  **to know who they were interviewing, if they were**
12  **either black, white, female or -- you know,**
13  **basically check female up top on the regular**
14  **application.  But at the bottom, it would tell you**
15  **your race, Asian or Indian or black or white, you**
16  **knew.  That's what they wanted to know.**
17     Q.   And he did not say why they wanted to
18  know that?
19     **A.   No.**
20     Q.   Okay.
21     MS. DONAHUE:  Do you want to take a
22  break?
23     THE WITNESS:  No, I'm good for awhile.
24  BY MS. PRYOR:

1     Q.   Do you know whether AK Steel ever
2  hired any white applicants who had six points or
3  more on their driver's license?
4     **A.   I don't know.**
5     Q.   Do you know whether AK Steel hired any
6  white applicants who had a background check that
7  revealed a criminal record?
8     **A.   I can't say that I do, no.**
9     Q.   Do you know whether AK Steel hired any
10  white applicants whose phone was disconnected when
11  they tried to call them?
12     **A.   Don't know that, either.**
13     Q.   And do you know whether AK Steel hired
14  any white applicants at Middletown works who had
15  less than two years' manufacturing experience?
16     **A.   Oh, yes.**
17     Q.   Do you know the names of any of those
18  individuals?
19     **A.   What was his name?  Several of those.**
20  **Several of those.  I said several of those.  I**
21  **can't -- I can't recall their names right now, but**
22  **I do know that they hired people throughout --**
23  **straight out of different backgrounds.  They had**
24  **nothing to do with manufacturing.**

**28 (Pages 106 to 109)**

**Page 110**

1    Q.    Do you know what backgrounds they
2  were?
3    A.    Working at lawn care.  One
4  individual -- I mean, he said he was lawn care
5  background.  They even had some type of process
6  where they were at one point, they were basically
7  straight out of high school from a -- they were
8  going through the Butler County -- Butler County
9  workplace, which is off of Route 4, going into
10  Hamilton.  I can't think of the name of it.  Butler
11  Tech.  They had some type of school-to-work program
12  where they went through a -- some type of little
13  class and some of those guys were hired into AK
14  Steel right out of high school.  So they had no
15  experience whatsoever.  I say 18, 19.  You know
16  what I mean?
17    Q.    And how do you know that?
18    A.    I heard that through a guy named Simon
19  Brooks.  He was -- at the particular time, he was
20  a -- he was on the civil rights board before he
21  retired from AK, Armco or -- and inquired
22  information some -- at some point from somewhere.
23  I seen that document.  It was like a -- you know,
24  some type of a flyer or something like that.

**Page 111**

1    Q.    Some prior -- talking about the
2  school-to-work program?
3    A.    Right, at AK Steel.
4    Q.    I assume that program was open to
5  all --
6    A.    It was --
7    Q.    -- races?
8    A.    -- open to -- no, it was --
9          MS. DONAHUE:  Go ahead.  You're just
10  kind of interrupting a bit.  That's all right.
11    A.    It -- it was set up through certain --
12  I don't know what entities set that up.  It was not
13  open to just anybody.
14    Q.    Do you know how people got into that
15  program?
16    A.    I'm not sure.  Most of them, I know,
17  were white.  I know that.
18    Q.    You don't know how people got into the
19  program?
20    A.    No, I don't.  I just know that -- from
21  what Simon Brooks told me -- you know, I didn't
22  inquire too much.  I just -- you know, kept it in
23  the back of my mind.
24    Q.    What else did Simon Brooks tell you

**Page 112**

1  about?
2    A.    About that, about that program?  That
3  was about it.  It was some -- you know, they --
4  they went through the course, finished the course
5  and some of them might -- may have been hired in
6  and they use that as, I guess, their background
7  experience.
8          A lot of people who came into the
9  plant did not have background experience in
10  manufacturing.  I know that for a fact.  You can
11  probably ask just about any of them.  They
12  didn't -- there wasn't -- when you say -- a lot of
13  people came and I kind of asked them what they did
14  and the younger guys, just in general
15  conversations, and a lot of the guys, none of them
16  worked in a manufacturing plant.
17          They -- you know, out of high school a
18  couple years or worked at any other place that
19  wasn't manufacturing.  They didn't work in a --
20  when you say "manufacturing," I'm trying to say
21  they didn't work at a plant like automotive or
22  something big.
23    Q.    Okay.  Did they work at some other
24  labor job?

**Page 113**

1    A.    Some of them didn't, no.  Some of
2  them, like I say, labor job work, you worked in
3  lawn care, labor, so -- but it's not -- but, see,
4  you know, the opening job at AK Steel was pushing a
5  broom, so it really didn't --
6    Q.    And do you know any of these
7  individuals who you claim did not have
8  manufacturing experience?
9    A.    Not off the top of my head, no.  I
10  can't remember at this time.
11    Q.    Do you have any documents that would
12  tell you who these individuals are?
13    A.    At this time, I can't remember if I do
14  or not.
15    Q.    And did you look at the resumes or
16  applications of any of these individuals?
17    A.    No.
18    Q.    And do you know what these individuals
19  told AK Steel when they were hired?
20    A.    No, I don't.
21    Q.    And do you know anything about their
22  background, other than what they've told you?
23    A.    No, not that I can remember at this
24  time, no.

**Page 114**

1   Q.   And what year we talking about that
2   you talked to individuals?  Let me back up.
3       When did you talk to Simon Brooks?
4   **A.   Simon Brooks, when I first got started**
5   **in civil rights.**
6   Q.   So '99, '98?
7   **A.   '99, '98, yeah.**
8   Q.   What about the individuals who you
9   talked to that you believe were hired and did not
10  have manufacturing experience, when did you talk to
11  them?
12  **A.   I mean, that -- that was periodically**
13  **throughout the -- my career at AK Steel.  I mean --**
14  **well, see, AK was at a -- you know, one point**
15  **Armco you know, it was in a hiring freeze.  So**
16  **they didn't really start hiring again until 2000.**
17  **They started hiring basically -- they hired our**
18  **group in '88, and then they went on a freeze,**
19  **really.  They hired sporadically throughout the**
20  **plant.**
21  Q.   They didn't start hiring till 2000?
22  **A.   I ain't saying that.  I'm not going to**
23  **say that in particular.  I'm talking about heavy,**
24  **heavily '89, '99.  You know, '88 because it --**

**Page 115**

1   **right when I hired in.  They might have start**
2   **hiring at in '88, but I'm not sure.  I can't say.**
3   **I can't say for sure.  I just know at one point**
4   **they started hiring heavier.**
5   Q.   But you don't know when that was?
6   **A.   No, I don't.**
7   Q.   You don't know when AK Steel hired
8   heavier, when they had freezes?
9   **A.   It was prior to -- there were the**
10  **freezes prior to '88 or -- you know, when I hired**
11  **in, I guess they started lightening up on the --**
12  **you know, on the -- you know, the hiring freeze.**
13  **I was basically one of the first**
14  **groups to come in in 1988.  So I could say 1988,**
15  **they started lightening up on the freeze and I got**
16  **hired in, and then they started hiring.  But then**
17  **when AK took over, they took off hiring, took off**
18  **like a jet.**
19  Q.   Do you know when AK took over?
20  **A.   Let me -- let's see.  I -- I want to**
21  **say '92.  I'm not sure on that date.**
22  Q.   Okay.  Do you know whether AK Steel --
23  I'm not talking about Armco.  I'm talking about AK
24  Steel -- hired any white applicants who had

**Page 116**

1   previously worked at Armco or AK Steel?
2   **A.   No, I don't.  I don't.  And I don't**
3   **understand that question.  You mean rehired them?**
4   Q.   Mm-hmm.
5   **A.   I don't know.**
6   Q.   Do you know whether AK Steel hired a
7   any white applicants who lied or falsified their
8   employment applications?
9   **A.   I've heard rumors.  I don't know.**
10  Q.   What rumors have you heard?
11  **A.   I heard -- you know, a couple**
12  **employees, through the union, that they had**
13  **falsified applications, falsified stuff on their**
14  **applications and AK fired them for falsification.**
15  Q.   Do you know who those employees were?
16  **A.   No, I don't.**
17  Q.   Do you know what race they were?
18  **A.   Some of them were white.**
19  Q.   Do you know whether AK Steel hired any
20  white applicants who did not have a high school
21  diploma or a GED?
22  **A.   Not to my knowledge, no.**
23      MS. DONAHUE:  Just a second.  You
24  don't know or they didn't?

**Page 117**

1       THE WITNESS:  Not to my knowledge.  I
2   don't know if they did or not.
3       MS. DONAHUE:  Okay.
4   BY MS. PRYOR:
5   Q.   Do you know anyone who AK Steel hired
6   who failed the pre-employment test?  I may have
7   asked you that already.
8   **A.   Yeah, I don't know if they did or not.**
9   **I don't know if they hired anybody who failed the**
10  **test.**
11  Q.   I may have asked you this and I
12  apologize if I did.  But did you ever go with
13  anyone to apply at AK Steel?
14  **A.   No.**
15  Q.   Did you ever make or keep copies of
16  applications that individuals submitted?
17  **A.   No, not to my knowledge --**
18  Q.   Did anyone --
19  **A.   -- at this time.**
20  Q.   Did anyone ever give you a copy of
21  their application and tell you they submitted this?
22  **A.   On that question --**
23      MS. DONAHUE:  Well, is it something
24  that was done on the instructions of an attorney?

**Page 118**

1     THE WITNESS:  Yes.
2     MS. DONAHUE:  Then I'm instructing you
3  not to answer.
4     MS. PRYOR:  What's your basis for that
5  instruction?
6     MS. DONAHUE:  It's -- it's by -- I
7  believe it's protected by the work-product
8  doctrine.  Now, you know, I don't want to -- I want
9  to -- yeah, protect the -- protect the work product
10  of attorneys.
11     MS. PRYOR:  Is he an attorney?
12     MS. DONAHUE:  No, but if an attorney
13  instructed him to do something, he's asking on
14  behalf of the attorney and what he's doing would
15  reveal the mental impression of the attorney.
16     But I'll call Bob and Rusty and see if
17  they want to take a hard position on that.  That's
18  just the way I've -- you know, had things done in
19  the past.
20     MS. PRYOR:  My understanding is that
21  if you had instructed someone to do this,
22  something, absolutely I can't ask them what you've
23  instructed them to do.  However, I can ask what he
24  did.  And I'm not asking --

**Page 119**

1     MS. DONAHUE:  I know.
2     MS. PRYOR:  I just -- to tell him my
3  attorney instructed me to do this, that's his
4  business and that -- you know, I'm not asking what
5  his attorneys instructed him to do.
6     MS. DONAHUE:  Right.
7     MS. PRYOR:  I'm asking him what he
8  actually did --
9     MS. DONAHUE:  I think --
10     MS. PRYOR:  -- And what he actually
11  did is not protected.
12     MS. DONAHUE:  Well, if he did it on
13  the instructions of an attorney, it implies the
14  mental impressions of that attorney because the
15  attorney told him to do it.
16     MS. PRYOR:  Only if he tells me
17  that --
18     THE WITNESS:  I'm telling you the
19  attorneys --
20     MS. PRYOR:  -- telling me what his
21  attorneys instructed him to do.
22     THE WITNESS:  Well, I mean, I --
23     MS. DONAHUE:  He's not waiving that.
24     MS. PRYOR:  He just told me that his

**Page 120**

1  attorneys instructed him to get applications from
2  employees.
3     MS. DONAHUE:  Well, then, he's not
4  waiving it.  He's telling you that he -- whatever
5  he did about these applications was done on the
6  instructions --
7     MS. PRYOR:  He's also told me that his
8  attorney instructed him to go talk to Rodney Cosby.
9     MS. DONAHUE:  But -- and I'm saying --
10  but I -- you know, I will -- let me -- let me have
11  some time to talk to the attorneys who are involved
12  and see if --
13     MS. PRYOR:  If not, we're going to
14  have to call the court after that.  It's absolutely
15  wrong.
16     MS. DONAHUE:  All right.  I -- we
17  might disagree about that.  But I'll see if that's
18  really the position that these attorneys want --
19  want to be taken here.  I'll call them at noon, at
20  lunch or right now, if you want me to take a break?
21     MS. PRYOR:  Well, let's finish up a
22  little bit here, then we can do that.
23  BY MS. PRYOR:
24     Q.  So you did take copies of applications

**Page 121**

1  from individuals?
2     MS. DONAHUE:  Well, let's just stop
3  this --
4     MS. PRYOR:  You obviously did or you
5  wouldn't --
6     MS. DONAHUE:  -- line of questioning.
7     MS. PRYOR:  -- be against --
8     MS. DONAHUE:  No, we're not going to
9  be -- you know --
10     MS. PRYOR:  Okay.
11     MS. DONAHUE:  -- by his facial
12  expression what obviously his answer is.  No,
13  that's not how depositions work.  And, as I said, I
14  will call --
15     MS. PRYOR:  That's fine.
16     MS. DONAHUE:  -- attorneys involved
17  and see what position they think is the right
18  position to take on this.
19     MS. PRYOR:  That's fine.  And if it's
20  the wrong one, we'll call the court.
21  BY MS. PRYOR:
22     Q.  Do you know who at AK Steel made the
23  hiring decisions at issue here?
24     **A.  To my knowledge, I think it was**

**31 (Pages 118 to 121)**

Page 122

1  Dick -- Mike Leeman and I can't spell Dick's last
2  name, Bohm or Blame or -- I always say it was Blam
3  or something like that, Dick Blam. He was -- Dick
4  Blam was basically what we call -- we called him
5  old school. He was there from way back and they
6  brought him -- I -- I was under the impression that
7  they brought him back as a -- he had already
8  retired, and when AK started hiring heavily, Dick
9  Blam, or whatever his name -- how you pronounce his
10  last name, I don't know.
11      They brought him back as a liaison or
12  whatever, however he was -- what his title was.
13  Well, only thing that I was told -- I had gathered
14  information that he was basically helping Mike
15  Leeman in the hiring practices and -- of AK Steel.
16      Q.   And what timeframe are you talking
17  about here?
18      A.   It had to be -- you know, from the '99
19  on for awhile. I don't know how far into 2000, but
20  he was there for quite some time.
21      Q.   You don't know how long Dick Beam --
22  Beam or whatever his name was, was there?
23      A.   You mean after he retired?
24      Q.   Mm-hmm.

Page 123

1      A.   No, but I know he was -- before he
2  retired, he was -- you know, head of human
3  resources. I ain't saying head of human resources,
4  but he was head of hiring.
5      Q.   That was back, the eighties?
6      A.   That was back -- I mean, he probably
7  was there 30 years, so -- you know what I mean?
8  Armco and -- yeah.
9      Q.   And do you know what position Mike
10  Leeman had?
11      A.   Mike Leeman, I think, took his job and
12  I don't know what that title is.
13      Q.   Do you know when that was?
14      A.   Whenever he retired. I can't -- I
15  can't say when he retired. I don't know.
16      Q.   And you think that Dick came back to
17  help him?
18      A.   Came back as a contractor or came back
19  as a consultant. That's the word I was looking
20  for. I think he brought him back as a consultant
21  to help him with hiring practices or --
22  periodically I've seen -- ride around in AK's
23  little jeeps that -- they're not, I don't think,
24  jeeps. I've seen Dick myself in those -- in AK

Page 124

1  vehicles.
2      Q.   Okay. And how do you know that either
3  of these individuals were involved in hiring?
4      A.   Mike Leeman -- well, 'cause, yeah, it
5  was just the rumor, the word -- the word in the
6  plant was that Mike Leeman was head of hiring, just
7  like Dick was. You know, Mike took his job.
8      Q.   So this was rumor that you heard?
9      A.   Rumor, yeah, 'cause most of the
10  guys -- some of the guys they hired in to the
11  plant -- you know, had to go see Mike. They saw
12  Mike, and then -- you know, from Mike you go, took
13  your physical.
14      Q.   Okay.
15      A.   If you took the physical, normally you
16  were hired, if you passed the physical.
17      Q.   What are you claiming in this lawsuit?
18      A.   What am I claiming in the --
19      Q.   This lawsuit.
20      A.   -- this lawsuit?
21      Q.   Mm-hmm.
22      A.   You know, claiming that AK lack the
23  hiring of minorities (sic).
24      Q.   AK what?

Page 125

1      A.   AK -- AK does not hire minorities at a
2  fair rate or --
3      Q.   Anything else?
4      A.   Also claiming that -- you know, that
5  they didn't allow me to work in a integrated
6  workplace free of racial discrimination.
7      Q.   And what do you mean by that?
8      A.   You know, just subject to disparity of
9  treatment.
10      MS. DONAHUE: You know, he's
11  already -- the court's already ruled on this claim
12  of his.
13      MS. PRYOR: I'm sorry. The court
14  ruled on his claim?
15      MS. DONAHUE: Yeah.
16      MS. PRYOR: What are we doing here,
17  then?
18      MS. DONAHUE: I don't know. You
19  called him for a deposition. The court ruled on
20  your -- he -- the court -- he ruled on his --
21  denied your motion for summary judgment on this
22  claim.
23      MS. PRYOR: That was a motion. It's
24  not a res judicata issue.

**32 (Pages 122 to 125)**

1      MS. DONAHUE:  No, it was a -- it was a
2  motion.
3      MS. PRYOR:  On res judicata?
4      MS. DONAHUE:  No, it was a motion on
5  the merits of the --
6      MS. PRYOR:  No, it wasn't.
7      MS. DONAHUE:  Okay.
8  BY MS. PRYOR:
9      Q.   So what do you -- you said that you
10  were not allowed the right to work in an integrated
11  workplace free from discrimination?
12      **A.   Race discrimination.**
13      Q.   Okay.  And what do you mean by that?
14      **A.   I mean, you know, throughout my career**
15  **at AK Steel, I think I was -- you know, racially**
16  **discriminated against --**
17      Q.   Okay.
18      **A.   -- from day one.**
19      Q.   And what do you mean by that?
20      **A.   Well, I mean, to give you example,**
21  **this right here.  This documents you have left in**
22  **front of me (sic).**
23      Q.   Exhibit 1?
24      **A.   Exhibit 1.  Exhibit 1 is a prime**

1  **example of double jeopardy or -- I didn't think**
2  **that was jeopardy.  That's not the right word.**
3      Q.   Are you talking about the discipline?
4      **A.   Talking about the discipline.**
5      Q.   Okay.  You think the discipline was
6  racially discriminatory?
7      **A.   Oh, yeah.  No doubt.**
8      Q.   Anything else that you think was
9  racially discriminatory?
10      **A.   Training.  Not my maintenance**
11  **training.  That was equal, I would say, because we**
12  **all went to school and was trained and -- you know,**
13  **took our test and stuff like that to get past that.**
14      **But when I went into caster**
15  **maintenance, it was you're it.  And no one taught**
16  **me how to do my job.  But they taught the white**
17  **boys how to do their job.  And I didn't -- I had to**
18  **go to the other minorities, other -- Emmy Lanksters**
19  **and -- of that nature to -- you know, to learn how**
20  **to do my job, how to be a crew chief because the**
21  **supervisors would not tell me anything.**
22      **So I didn't even know how to -- you**
23  **know, I had responsibilities as a crew chief, which**
24  **I didn't know what they were 'cause they didn't**

1  tell me what they were.
2      Q.   Okay.
3      **A.   So and -- so basically they set me up**
4  **for failure, so when I walk in -- anything would go**
5  **wrong, they would get on me real heavily and I**
6  **would just say I just didn't know.  I didn't know**
7  **that.  You didn't -- no one explained to me how to**
8  **do my job.  What do you want me to do?  I'm doing**
9  **it the best way I know how.  The Swami system, no**
10  **one showed me how to pull information down off the**
11  **computers.  When something didn't go right or --**
12  **you know, they didn't give me enough work to do --**
13  **you know, for the crew to do that night, I never**
14  **was taught.**
15      Q.   So you don't believe you received
16  training?
17      **A.   I didn't receive training.**
18      Q.   Anything else besides the training and
19  discipline?
20      **A.   Well, I -- you know, I guess it's the**
21  **way they treated me in -- in general.**
22      Q.   Who is "they"?
23      **A.   All the supervisors and supervisors,**
24  **other employees -- I mean, 'cause I -- at one**

1  **point, I guess when I came back off of my -- I**
2  **guess my initial discharge, people were acting**
3  **funny towards me.**
4      Q.   After you were out for almost a year?
5      **A.   16 months.  I was out 16 months.**
6      Q.   16 months?
7      **A.   They didn't want to be around me or --**
8  **you know, I ate lunch most of the time by myself**
9  **from -- now, black and white 'cause they were**
10  **like -- you know, they wouldn't come out and say**
11  **it, but --**
12      Q.   After that long suspension in which
13  you were reinstated, black and whites kind of
14  avoided you?
15      **A.   I didn't say the blacks avoided me.**
16  **We -- we all sat to eating (sic) lunch together and**
17  **all that, but it was more like a -- especially when**
18  **I came back to work after 16 months.  You know, it**
19  **got worse.  It got worse.  I mean, AK was like**
20  **gunning.  It was like -- 'cause when I came back to**
21  **work, they wouldn't allow me to go to BOF to work.**
22  **They said, no, no.  You working (sic) in the caster**
23  **side.  And they would skip me for overtime on a**
24  **consistent basis every freakin' day.  They would**

**Page 130**

1  skip me.  I mean, it was my turn to be called and
2  they called somebody else, given the attitude,
3  because they said the arbitrator said, yadda,
4  yadda, yadda.  It was their interpretation.
5      So we have to go back to -- go back to
6  the table to -- you know, to resolve that issue.
7  But the supervisors were -- anything I did wrong,
8  anything they thought I did wrong, I was treated
9  differently, period.  I mean, after I filed the
10  charges against the company, things changed for me.
11      Q.   Okay.  Anything else that you thought
12  was discriminatory?
13      MS. DONAHUE:  Object to the form.
14      THE WITNESS:  Rephrase.
15  BY MS. PRYOR:
16      Q.   Yeah, anything else that you thought
17  was discriminatory at AK Steel?
18      MS. DONAHUE:  Well, you can answer as
19  far as how you understand what she's talking about.
20      THE WITNESS:  Towards me?
21      MS. PRYOR:  Yep.
22      MS. DONAHUE:  If you don't understand
23  what she's talking about, you need to ask her for
24  clarification.

**Page 131**

1      A.   I'm was thinking for a second.  So you
2  talking basically just towards me in general?
3      Q.   I'm asking why you filed this lawsuit,
4  what you filed this lawsuit about.
5      A.   Well, you know, again, another thing,
6  and this just popped into mind.  When they
7  transferred me over to north annealing.  I was
8  transferred into north annealing, I was standing
9  outside the door.  I walked -- walked in there.  I
10  knocked on the door, walked in the guy's office and
11  there were three supervisors sitting there, plus
12  the boss sitting behind the table and -- you know,
13  he told me to wait outside.  I went back outside,
14  pulled the door open, but I didn't shut the door.
15  They were on speaker phone talking to
16  somebody.  So I just got closer to the door so I
17  could see -- so I could hear their voice.  And it
18  was George Armor.  George Armor was basically
19  telling them what I had done to the company.  I had
20  filed charges against the company.  Anything that
21  Mr. Roberts does -- anything he does, you bring to
22  my attention.  I'll take care of it.
23      So I kind of eased away from the door
24  and -- you know, then all of a sudden I heard them

**Page 132**

1  yell, hey, Al, come on in.  You know, they told me
2  to have a seat and I looked at them and it's like,
3  I don't want to have a seat.
4      Q.   All the things you're telling me are
5  things I believe you alleged in the first lawsuit?
6      A.   Well, no.  I mean, but you're asking
7  me.
8      Q.   Is that -- are you bringing the same
9  claims again in this lawsuit?
10      A.   I'm -- no, no.  I'm not saying that.
11  You're asking me about racial discrimination.  To
12  me, that's racial.
13      Q.   What are you alleging in this lawsuit
14  that's racial discrimination?
15      MS. DONAHUE:  He's answering.
16      A.   I'm answering the question.
17      Q.   Okay.
18      A.   Work in a place free of racial
19  discrimination and that's part of racial
20  discrimination.  I don't care how you want to look
21  at it.
22      Q.   Okay.  So it is including the things
23  that you brought in the previous lawsuit?
24      A.   Why, that was an incident.

**Page 133**

1      Q.   Okay.  So --
2      A.   I mean, I was -- I was a marked person
3  in -- for -- for whatever reason and other
4  minorities the same way.  It's not just me.  I
5  mean --
6      Q.   Let me back up.  Do you have any --
7  any evidence of this?  You claim that you were not
8  in a workplace free from racial discrimination.
9      Do you have any evidence of racial
10  discrimination, other than what was brought in your
11  previous lawsuit?
12      A.   Against me or --
13      Q.   Yes, against you.
14      A.   I mean, I don't understand.
15      Q.   Sure.
16      A.   Rephrase that.
17      Q.   Are you aware of any other incidents,
18  facts, evidence of racial discrimination against
19  you, other than what you already alleged and
20  brought in the previous lawsuit?
21      A.   I didn't bring up -- okay.  Like the
22  training and things of that nature -- in my
23  previous lawsuit?  I can't remember.  I can't -- I
24  can't say I can remember at this moment.

**34 (Pages 130 to 133)**

Page 134

1    Q.    The training, that was when you became
2 a crew chief?
3    **A.    True.**
4    Q.    Anything else?
5    **A.    I can't remember exactly. I'm -- I**
6 **don't understand what you're saying. You're**
7 **saying -- clarify that one more time.**
8    Q.    You brought a previous lawsuit,
9 correct?
10    **A.    Correct.**
11    Q.    And you alleged race discrimination
12 and retaliation and you alleged a bunch of
13 disciplines, overtime, failure to be promoted,
14 being transferred to places as discrimination in
15 that lawsuit. Do you recall that?
16    **A.    Yes, I do recall that, yes.**
17    Q.    Okay. And that case has been
18 dismissed, correct?
19    **A.    Correct.**
20    Q.    Okay. What I'm asking for here is,
21 what is different in this lawsuit?
22        MS. DONAHUE: Object to the form,
23 insofar as that calls for a legal analysis and
24 legal conclusions, but you can answer as best as

Page 135

1 you can.
2    **A.    Yeah, well, I can't answer that. I**
3 **mean, to my knowledge, I can't think of what -- I**
4 **can't think of what you're actually asking, answer**
5 **that.**
6    Q.    I'm asking for what actions AK Steel
7 took that was -- that you're claiming in this
8 lawsuit that you were not claiming in the previous
9 lawsuit?
10    **A.    As far as not being treated fairly**
11 **throughout my career at AK Steel.**
12    Q.    I believe that's what you brought in
13 the previous lawsuit.
14    **A.    No, I bought -- you know, I was**
15 **talking about individuals, things that happened to**
16 **me in that lawsuit, like I was not promoted. That**
17 **was not what -- I'm saying -- what I'm saying,**
18 **treated differently throughout my career. I'm not**
19 **saying that. I brought up individual things in my**
20 **personal lawsuit.**
21    Q.    Okay. So what --
22    **A.    Like, for instance, you know, why I**
23 **was fired, I brought that up. I brought up -- you**
24 **know --**

Page 136

1    Q.    So what are you bringing up here?
2        MS. DONAHUE: Let him finish
3 answering.
4        MS. PRYOR: I know what he brought in
5 the court suit.
6        MS. DONAHUE: Well, wait. You keep
7 interrupting him and he doesn't get to finish
8 answering before you interrupt him.
9        MS. PRYOR: You can re-ask him later
10 if you want to follow-up on it.
11        MS. DONAHUE: No, no. That's not fair
12 for you to interrupt him and not let him have a
13 complete answer. You cut off his thinking and his
14 answers and I object to that.
15        MS. PRYOR: That's fine.
16        MS. DONAHUE: I want you to be able to
17 answer completely.
18        MS. PRYOR: And, ma'am, you can write
19 that down and you can ask him at the end what his
20 answer was. Right now I'm asking the deposition
21 (sic) and I'm taking the deposition.
22        MS. DONAHUE: But you don't get to
23 interrupt him or harass him and interrupt his
24 answers --

Page 137

1        MS. PRYOR: I'm not --
2        MS. DONAHUE: -- And that's what
3 you're doing. Yes, you are. That's what I'm
4 saying. You're interrupting his answers and I
5 would appreciate it if you would not do so. So
6 answer completely and if she interrupts you, I'll
7 object and you can finish your answer.
8 BY MS. PRYOR:
9    Q.    Sir, what -- I understand what you
10 brought in your previous lawsuit. And all I'm
11 really trying to do here is not take all of your
12 day and all of our day, have to go into another
13 day. That's the only reason I'm interrupting
14 'cause I think you're going on about things that we
15 want to narrow down into.
16        What are you alleging in this
17 lawsuit -- and I understand the previous lawsuit.
18 I'm thinking your testimony on the previous lawsuit
19 was on specific incidents?
20    **A.    Correct.**
21    Q.    And now I think you said that you
22 had -- how you were treated at AK Steel. How were
23 you treated at AK Steel that you're alleging here?
24    **A.    And that's what I'm trying to say. My**

**35 (Pages 134 to 137)**

1    treatment -- after I filed the lawsuit, after I
2    filed charges against -- the company changed. When
3    I filed charges against the company, the treatment
4    from me changed throughout the rest of my career at
5    AK Steel. I was -- I mean, that's what -- that's
6    what I'm alleging. I'm alleging that when I filed
7    the charges against the company from the OCRC, and
8    the attitude towards me changed --
9        Q.    Okay.
10       A.    -- throughout the rest of my career,
11   period. Not just -- you know, in my personal
12   lawsuit. I filed individual claims on certain,
13   different things. But through -- I mean, the
14   entire time became hostile from that point on.
15       Q.    And how did it become hostile?
16       A.    It became hostile on -- on just
17   anything that I've done, anything that they thought
18   I did. I mean, it was a -- whatever they thought I
19   did, it is wrong. They threw it in my face or they
20   pulled me in the office -- you know, gave me
21   lectures -- you know, on numerous occasions on -- I
22   didn't do this right; I didn't do that right.
23           There was a lot of different times
24   that -- that I had conversation with bosses I just

1    didn't write down or no ADO's that just were more
2    of a conversation type.
3        Q.    You're talking about conversation that
4    you had with bosses that did not result in formal
5    discipline?
6        A.    Exactly. It was more than just --
7    anytime I went in the office, I didn't get wrote
8    up. I got yelled at for something I didn't do
9    right, but I thought I did right as crew chief
10   or -- you know, that was more of the -- the biggest
11   part was crew chief.
12           So I was ridiculed constantly
13   throughout my career at AK Steel after I filed
14   charges against the company. Everything I did,
15   anything I did was wrong.
16       Q.    Okay.
17       A.    It didn't seem like it was right to
18   them. And then when my white counterpart did the
19   same thing that I did, they didn't say anything to
20   him. So --
21       Q.    Did -- I'm sorry.
22       A.    I mean, so -- and with that in mind,
23   to me, it was hostile. It was a hostile work
24   environment free of racial discrimination (sic).

1    There wasn't a lot of blacks there, anyway, to work
2    with wherever I went.
3            You know, in the caster maintenance,
4    those guys were old timers. I was a new guy. When
5    you came down with that list of people, those
6    people been there for several years, 25, 20 years
7    or more. Every black that you named, that you came
8    out with, there is no young blacks working at AK at
9    the time when I hired in. I was the only one. And
10   I came in with a group of James Culbert. Me and
11   James Culbert came in a group of 50. The rest of
12   them were black -- were white.
13       Q.    Okay. James Culbert was an
14   African-American that was hired in with --
15       A.    He was hired in with me on the -- on
16   that particular day.
17       Q.    Okay. Do -- anything else that you
18   believe was racial discrimination?
19       A.    Well, I -- I kind of understand where
20   you going (sic), but it's more like what you --
21   well, I think you understand that when you have
22   the -- when you have the top of the food chain
23   after you, it doesn't matter what you do.
24           And when I say that, when I say "top

1    of the food chain," I mean human resources. When
2    human resources got on my back and they never got
3    off my back, I can't say -- everything was hostile
4    to me, my -- my actions, anything -- I tried to do
5    everything correct and nothing was correct. You
6    know what I mean?
7            It's like -- you know, when you come
8    up with these tardies that you said I did and --
9    and, in particular, the one that -- the last
10   tardiness that you saw, warning for tardiness. You
11   know, when you -- when you sit there and -- and
12   someone's told you to -- I tell you what, he don't
13   seem like he was tardy to me. You know what I
14   mean?
15           And all of a sudden, they call me in
16   the office. And you know what? Mr. Roberts, we
17   went over your file. We pulled up every day that
18   you clocked in and we found there was 16
19   discrepancies. I said excuse me? Out of the blue.
20   Like this is hostile to me.
21       Q.    And --
22       A.    And then we're talking north
23   annealing, okay?
24       Q.    HR became hostile, you believe, after

**Page 142**

1  you filed the charges?
2      **A.   There's no doubt in my mind.**
3      Q.   Do you believe it was because you
4  filed the charges?
5      **A.   I know it was.  I thought it was.**
6      Q.   Okay.
7      **A.   Yeah.  So when HR became -- and I -- I**
8  **mean, I have to say this.  When HR became hostile**
9  **towards me -- you know, and it didn't matter what I**
10 **did.**
11     Q.   Okay.  And what damages do you claim
12 to have suffered as a result of the alleged hiring
13 discrimination?
14     **A.   As far as hiring is concerned?**
15     Q.   Mm-hmm.
16     **A.   You mean damages to me?**
17     Q.   Yeah.  Did you suffer any damages as a
18 result of the alleged hiring?
19     **A.   I lost my job -- you know, I thought,**
20 **in reference to the hiring process.**
21     Q.   Did you lose it in reference to the
22 hiring process or because you filed a charge about
23 the hiring process?
24     **A.   Well, I guess in the -- in reference**

**Page 143**

1  **to the process of filing the charges against the**
2  **hiring, in reference to that.**
3      Q.   Have you been harmed in any other way
4  because of the alleged hiring discrimination that
5  you claimed occurred at AK Steel?
6      **A.   I can't say at this time that I -- I**
7  **mean, I can't -- I don't think I have.  I mean, as**
8  **far as hiring is concerned?**
9      Q.   Yes, as far as the hiring is
10 concerned.
11     **A.   I don't think that I've personally**
12 **been harmed because I -- you know, I was working at**
13 **the time.**
14     Q.   Sure.  Okay.  And who is Vivian Bert?
15     **A.   She's my sister.**
16     Q.   Do you know whether she applied at AK
17 Steel?
18     **A.   Yeah, she applied.**
19     Q.   Do you know how many times she
20 applied?
21     **A.   Couple times, I think she told me,**
22 **maybe.**
23     Q.   Do you know about her application
24 other than her telling you?

**Page 144**

1      **A.   Other than -- you know, I'm instructed**
2  **by my attorney.**
3      Q.   I'm asking whether you know about
4  these -- other than what your attorneys have told
5  you and what your sister has told you, do you know
6  anything else about Vivian Bert's application to AK
7  Steel?
8      **A.   About her application?**
9      Q.   Yes.
10     **A.   Well --**
11         MS. DONAHUE:  Well, if it's something
12 that your attorneys have told you, then it's --
13 it's privileged information.
14 BY MS. PRYOR:
15     Q.   I'm not asking for what your attorneys
16 told you.  I'm asking whether you know anything
17 else about her application?
18         MS. DONAHUE:  If -- if you were
19 talking --
20         THE WITNESS:  Hold on a second.  Let
21 me ask you a question.  Let's take a break 'cause I
22 need to ask her a question.
23         MS. DONAHUE:  Okay.  Well, there's a
24 question on the table.

**Page 145**

1          MS. PRYOR:  All right.  That's fine.
2  Take a break.
3          MS. DONAHUE:  Do you want to take a
4  lunch break now?
5          (Off-the-record discussion.)
6      (Off the record:  11:45 a.m. - 12:43 p.m.)
7          MS. DONAHUE:  Okay.  Before the break,
8  I said I would call the attorneys with regard to
9  this work-product doctrine issue.  And we are -- we
10 are making our position that the work-product
11 doctrine belongs to both the client and the
12 attorney.  None of the attorneys are waiving their
13 privilege in that regard.
14         And so -- so anything that a client
15 does at the instructions of the attorney is covered
16 by the work-product doctrine, as far as we're
17 concerned.  When a client speaks to a third party
18 at the instructions of an attorney, there's a test
19 to -- to see if that privilege has been waived and
20 the test is whether there's a substantial danger
21 that something will be revealed to the opposing
22 party and we don't feel that that test has been met
23 here in that deposition.  So he's instructed not to
24 answer anything that he did at the instructions of

**Page 146**

1  his attorneys.
2        MS. PRYOR:  I'm assuming that nothing
3  he did at the instruction of his attorneys is being
4  used in this case?
5        MS. DONAHUE:  No, not at all.  Work --
6  the work-product doctrine is to -- is to protect
7  the mental impressions, the strategies of the
8  attorneys.  And -- and things that clients do at
9  the instruction of their attorneys are -- reveal
10  the strategies of the attorneys.
11        MS. PRYOR:  And my point is just that
12  he's not going to get up at trial and testify about
13  what he did at instruction of attorneys.
14        MS. DONAHUE:  I have no idea
15  whether --
16        MS. PRYOR:  Because if he does, then
17  that will be -- we will strenuously object there to
18  the fact that we were not allowed to depose him on
19  that.
20        MS. DONAHUE:  We'll cross that bridge
21  further on along.
22        MS. PRYOR:  Here's what I want to do.
23  I don't want to be here forever.  I don't want to
24  take up two days, if we don't have to.  I would

**Page 147**

1  suggest that we table this --
2        MS. DONAHUE:  Okay.
3        MS. PRYOR:  -- these issues, we hold
4  the deposition open until such time as we address
5  those issues with the court, if need be, and we
6  finish what we can today.
7        MS. DONAHUE:  All right.  That's fine.
8        MS. PRYOR:  Does that make sense?
9        MS. DONAHUE:  That's fine.
10        MS. PRYOR:  Okay.
11        MS. DONAHUE:  Oh, and then I think you
12  wanted to make a clarification of your testimony
13  after he thought about it, okay?
14        MS. PRYOR:  I'll ask him later if I
15  want to get that clarification on there or if you
16  want to ask him later, during the deposition at
17  another time --
18        MS. DONAHUE:  Oh, you don't want him
19  to do that now?
20        MS. PRYOR:  No.
21        MS. DONAHUE:  Okay.  We can do it
22  later.
23  BY MS. PRYOR:
24        Q.  Okay.  Mr. Roberts, I think we were

**Page 148**

1  talking about Vivian Bert before we took a break;
2  is that right?
3        A.  Correct.
4        Q.  She's your sister?
5        A.  Correct.
6        Q.  Okay.  And do you know anything about
7  her application?
8        A.  I -- I can't answer that.  I can't
9  answer that.  I mean, it's -- what do you mean?
10  What are you asking me?
11        Q.  Let me ask you a different question.
12        When she applied, did she tell you
13  that she applied at that time?
14        A.  She didn't basically tell me she
15  applied there.  I just knew that she applied.
16        Q.  Okay.  How did you find out she
17  applied?
18        A.  I guess she basically told me.  I just
19  don't know exactly when, if that's what you're
20  asking.
21        Q.  Did she ask -- tell you -- do you
22  think she told you right away or did she tell you
23  months later, years later?
24        A.  It was -- it was -- it was shortly

**Page 149**

1  after, thereafter.
2        Q.  And do you know how many times she
3  applied?
4        A.  No, not really.
5        Q.  Okay.
6        A.  I think she may have said she applied
7  a couple times.
8        Q.  Couple times?
9        A.  Couple times, three times.  I don't
10  really know.
11        Q.  Do you know when any of those
12  applications were?
13        A.  No, I don't know -- the dates of them?
14        Q.  Mm-hmm, yes.
15        A.  No.
16        Q.  Do you know where she applied?
17        A.  No, I don't.
18        Q.  Do you know what happened with her
19  applications?
20        A.  No, I don't.
21        Q.  Do you know anything about her
22  qualifications?
23        A.  Other than -- other than she worked
24  for AK Steel or Armco at the time.

**Page 150**

1    Q.    She previously worked for Armco?
2    **A.    Yes, she did.**
3    Q.    Okay.  Do you know anything else about
4  her qualifications?
5    **A.    No.**
6    Q.    Do you know how long she worked for
7  Armco?
8    **A.    No.  More than -- you know, more**
9  **than -- I think it was a long -- it was a pretty**
10  **long time.  I'm not sure.  I can't say.**
11    Q.    Okay.  Did you encourage her to apply
12  to AK Steel?
13    **A.    Did I encourage her to apply?  Yeah, I**
14  **told her they were -- I told her that they were**
15  **rehiring.  They were hiring people.**
16    Q.    Do you know when you told her that?
17    **A.    No.**
18    Q.    Did you tell her that on more than one
19  occasion?
20    **A.    Not to my knowledge.  I can't remember**
21  **at this time.**
22    Q.    Have you had a -- any conversations
23  with her about your employment at AK Steel?
24    **A.    No.**

**Page 151**

1    Q.    Did you ask her to join your lawsuit
2  against AK Steel?
3    MS. DONAHUE:  I'm going to instruct
4  him not to answer that question, if it involves
5  anything the attorneys told you.
6    MS. PRYOR:  Are you suggesting the
7  attorney told him to?
8    MS. DONAHUE:  I'm instructing him not
9  to answer.  I'm not suggesting anything.
10    **A.    I'm going to go by the advice of my**
11  **attorney.**
12    MS. PRYOR:  Let me ask you, just to
13  clarify, your instruction is not to answer if an
14  attorney told him to do that, correct?
15    MS. DONAHUE:  If he's acting -- if he
16  is acting on the instruction of his attorneys --
17    MS. PRYOR:  Okay.
18    MS. DONAHUE:  -- then he is not to
19  answer.
20    MS. PRYOR:  So if he asks her to join
21  the lawsuit not from the instruction of the
22  attorneys, he should answer, correct?
23    MS. DONAHUE:  That's right.
24  BY MS. PRYOR:

**Page 152**

1    Q.    Okay.  Can you answer the question?
2    **A.    Can I answer that question?**
3    Q.    Yeah.
4    **A.    I'm going to follow the advice of my**
5  **attorney.**
6    MS. DONAHUE:  Okay.  That's it.
7    MS. PRYOR:  Okay.
8    MS. DONAHUE:  And I don't think
9  there's any implication one way or the other at
10  that point.  I mean, you're not --
11    MS. PRYOR:  Okay.
12    MS. DONAHUE:  The inference is also
13  protected, I think.
14    MS. PRYOR:  Okay.
15    MS. DONAHUE:  I mean, you know, that
16  would just be a way of getting around the privilege
17  and that's --
18    MS. PRYOR:  That's why it's not a
19  privilege there.
20  BY MS. PRYOR:
21    Q.    How do you know Mary Harris?
22    **A.    Mary Harris?  On a personal basis, I**
23  **really don't know Mary Harris.**
24    Q.    Okay.  When was the first time you had

**Page 153**

1  a conversation with Mary Harris?
2    **A.    Once again, I can't answer the**
3  **question.**
4    Q.    Why can't you answer that question?
5    MS. DONAHUE:  If it was in the
6  presence of your attorneys or if it was at the
7  instruction of your attorneys, that's privileged
8  information.
9    THE WITNESS:  Yeah.
10    MS. DONAHUE:  I instruct you not to
11  answer.
12    MS. PRYOR:  I'm not asking him the
13  content.  I asked when.  Maybe I didn't.
14  BY MS. PRYOR:
15    Q.    When did you have a conversation with
16  Ms. Harris?
17    **A.    Any conversation I had, if I did -- if**
18  **I did have a conversation with her, it was in**
19  **reference to what I was told to do.**
20    Q.    Okay.  By your attorney?
21    **A.    Strictly by my attorneys, correct.**
22    Q.    You've had no conversation with Mary
23  Harris that did not involve an instruction from
24  your attorneys?

**39 (Pages 150 to 153)**

**Page 154**

1    A.   No.

2    Q.   Have you had any conversation with

3  Mary Harris in the presence of others?

4    A.   In the presence of others?

5    Q.   Yes.

6    A.   I mean, whatever my attorneys told me

7  to do. Under the instruction of my attorneys,

8  maybe, yes.

9    Q.   Okay. Who --

10    A.   I --

11    Q.   -- else was present?

12    A.   That's --

13         MS. DONAHUE: Well, I mean, you can

14  answer if somebody else was present. I don't know.

15  And unless these were also people that -- you know,

16  you were contacting at the instruction of your

17  attorneys.

18         THE WITNESS: Exactly.

19         MS. DONAHUE: Okay.

20         THE WITNESS: I mean --

21         MS. DONAHUE: All right.

22         THE WITNESS: -- I can't answer that

23  question.

24         MS. PRYOR: I think I'm entitled to

**Page 155**

1

2         MS. DONAHUE: No, he -- if he's

3  talking to these people on the instruction of his

4  attorney, it's privileged information.

5  BY MS. PRYOR:

6    Q.   Okay. How do you know Roderique

7  Russell?

8    A.   Grew up with him.

9    Q.   Do you know anything -- do you know

10  whether he applied at AK Steel?

11    A.   Yes, he -- yes, he did evidently.

12  That's what he told me, anyway.

13    Q.   When did he tell you that?

14    A.   I don't know exactly when he told me,

15  but he had told me that he had applied several

16  times over the years.

17    Q.   Do you know when he applied?

18    A.   No, I don't.

19    Q.   When you talked to Mary Harris, was

20  that before or after she applied?

21    A.   To my recollection, I can't remember

22  at this time.

23    Q.   Did you ever talk to Roderique Russell

24  about AK Steel?

**Page 156**

1    A.   I'm not going to answer that. It was

2  in reference to what my lawyers told me to do.

3    Q.   So the only time you talked to him was

4  in reference to what your lawyers told you to do

5    A.   No, I --

6    Q.   -- about AK Steel?

7    A.   -- talked to him on a personal basis.

8    Q.   Let me finish my question.

9         Did you only have conversations with

10  Mr. Russell about AK Steel in reference to what

11  your attorneys instructed you to do?

12    A.   No.

13    Q.   Okay. What other conversations have

14  you had with Mr. Russell about AK Steel?

15    A.   You said that -- you're twisting

16  words. Rephrase, please.

17    Q.   Sure. Have you had any conversations

18  with Mr. Russell about AK Steel that were not at

19  the instruction of your attorney?

20         MS. DONAHUE: Or in the presence of

21  your attorney.

22    A.   Have I had a conversation with

23  Roderique Russell that my attorneys told me not to

24  have or didn't tell me to have?

**Page 157**

1    Q.   Yes, that they did not instruct you to

2  go do.

3    A.   I have to say yes.

4    Q.   Okay. What were those conversations

5  about?

6    A.   I don't know. That's what I'm saying.

7  I mean, I know him on a personal basis. So if

8  we're having a conversation, it might come up

9  general -- in general about what's going on. Other

10  than that --

11    Q.   What would you have said?

12    A.   Oh, just tell him what was -- you

13  know, I might give him a update of what I thought I

14  knew at the time.

15    Q.   What was that?

16    A.   I can't tell you what I -- I mean,

17  what do you mean?

18    Q.   If your attorney --

19    A.   Rephrase.

20    Q.   -- did not instruct you to tell him

21  that, then, yes, you can tell me. What did you

22  tell him when -- when you had these conversations

23  with him that were not at the instruction of your

24  attorney?

**40 (Pages 154 to 157)**

**Page 158**

1    **A.   Well, I mean, okay.  An example, you**
2 **know, he -- he may have asked me a question like --**
3 **you know, what's going on?  I'm like, well,**
4 **basically I don't know anything at the moment.  I**
5 **haven't heard anything, so basically that's where**
6 **our conversation was stopped, on AK Steel.**
7    Q.   Okay.
8    **A.   It never would go into a long,**
9 **detailed yadda, yadda, yadda, or whatever.**
10    Q.   Okay.  And when he asked what was
11 going on, what was going on with the lawsuit?
12    **A.   Exactly --**
13    Q.   Okay.
14    **A.   -- or what he thought I knew what was**
15 **going on with the lawsuit, had I heard anything.**
16    Q.   Do you know how many times you've had
17 conversations like that with him?
18    **A.   No, I don't.**
19    Q.   Did you ever encourage him to apply at
20 AK Steel?
21    **A.   Once again, I may have to go by what**
22 **my attorneys told me to do.**
23    Q.   Okay.  Just so I'm clear on the
24 instruction, it's --

**Page 159**

1    MS. DONAHUE:  That's enough.
2    MS. PRYOR:  No --
3    MS. DONAHUE:  No.
4    MS. PRYOR:  No, it is not.  I'm not
5 clear here what we're instructing him to do.
6 You --
7    MS. DONAHUE:  I'm instructing him --
8    MS. PRYOR:  Ma'am, let me finish,
9 please.
10    MS. DONAHUE:  I do not want you to ask
11 him another question as a follow-up to a question
12 I've already told him not to answer.
13    MS. PRYOR:  It's not a follow-up to
14 the question.  I just asked him whether he's ever
15 encouraged Roderique Russell to apply.  He's saying
16 he can't answer it.  My question, again, is just
17 that we're clear on this instruction, that it is,
18 if he has been told -- instructed by counsel to
19 tell him that, then he's not to answer.  If he's
20 been instructed -- if he was not instructed by
21 counsel to encourage him to apply, then --
22    MS. DONAHUE:  I am not going to allow
23 that question and I'm going to instruct him not to
24 answer.

**Page 160**

1    MS. PRYOR:  On what basis?
2    MS. DONAHUE:  On the basis that you're
3 harassing him and it's also -- I've given this
4 instruction not to answer.  We've gone over it
5 several times and you --
6    MS. PRYOR:  I'm trying to --
7    MS. DONAHUE:  The instruction is that
8 he is not to answer -- and I'm not going to say it
9 again.  And we can have him read back -- would you
10 read back where I explained what he --
11    MS. PRYOR:  You didn't instruct him on
12 this question.
13    MS. DONAHUE:  I instruct him to answer
14 all the questions that relate to things he might
15 have done at the request of his attorney.  And
16 that's the instruction and it's ongoing and -- you
17 know, I think you're trying to get around it by --
18 and I -- I don't -- I object to it.
19    MS. PRYOR:  I just want to make sure
20 he's clear on it.
21    MS. DONAHUE:  I --
22    MS. PRYOR:  And can we just have -- if
23 that's why you're not going to answer a question,
24 because of that instruction, you did something

**Page 161**

1 because your attorneys instructed you to do it,
2 then let's call that attorney instruction.
3    MS. DONAHUE:  That's exactly what he
4 was attempting to do.
5    MS. PRYOR:  No.
6    THE WITNESS:  Attorney instructions,
7 then.
8    MS. PRYOR:  Okay.  That's fine, okay?
9 But saying I can't answer it doesn't tell me that.
10 And that's why I just want to be clear on, okay?
11    MS. DONAHUE:  What do you mean?
12    MS. PRYOR:  If he's going -- based on
13 your instruction not to answer it, based on what
14 you just instructed that instruction was, and I'd
15 like him to say attorney instructions, that we know
16 that that's why he's not answering questions.
17    MS. DONAHUE:  Well, obviously that's
18 why.  He just said it.
19    MS. PRYOR:  I'm saying if it's in
20 reference --
21    MS. BISSELBERG:  There could be other
22 reasons that he could not answer questions.  For
23 example, he maybe does not remember.  And if
24 that's --

**41 (Pages 158 to 161)**

1      MS. DONAHUE:  Well, that's not --
2      MS. BISSELBERG:  -- true --
3      MS. DONAHUE:  -- what I said.
4      MS. PRYOR:  Well, that's why I'm
5  trying to be clear, so we don't have to have this
6  conversation 20 times.
7      MS. DONAHUE:  That's fine.
8  BY MS. PRYOR:
9      Q.   If that's the reason you cannot answer
10 questions, please say "attorney instructions," so
11 we all know why you're not answering questions.
12     MS. DONAHUE:  I think that's what he's
13 been doing, but go ahead and --
14     **A.   I understand.**
15     MS. DONAHUE:  -- continue.
16     **A.   I'll answer it that way, so it'll**
17 **clarify.**
18     MS. PRYOR:  Thank you.
19     MS. BISSELBERG:  Thank you.
20     MS. PRYOR:  I appreciate that.
21 BY MS. PRYOR:
22     Q.   Okay.  And just so we're clear on the
23 record, did you instruct -- or did you encourage
24 Roderique Russell to apply?

1      **A.   Attorney instructions.**
2      Q.   Thank you.  Do you know Michael
3  Miller?
4      **A.   I have to say attorney instructions.**
5      Q.   You don't know him outside this
6  lawsuit?
7      **A.   No.**
8      Q.   Okay.  Did you ever encourage him to
9  apply?
10     **A.   Attorney instruction.**
11     Q.   Do you know anything about his
12 qualifications?
13     **A.   Attorney instructions.**
14     Q.   Do you know Edward Lewis?
15     **A.   Attorney instructions.**
16     Q.   You don't know Edward Lewis outside
17 this lawsuit?
18     **A.   Yes, I do.**
19     Q.   Okay.  So do you know Edward Lewis?
20     **A.   Yes, I do.**
21     Q.   Okay.
22     **A.   I do know Edward Lewis.  Yes, I do.**
23     Q.   Okay.  When did you meet Edward Lewis?
24     **A.   Excuse me.  20 years ago, 30 years**

1  ago.
2      Q.   Okay.
3      **A.   All my life.**
4      Q.   You've known him all your life?
5      **A.   All my life.**
6      Q.   All right.  Have you ever had any
7  conversations with him about AK Steel?
8      **A.   I have to say attorney instruction on**
9  **that question.**
10     Q.   Did you have any conversation with him
11 prior to filing your charge with the EEOC?
12     **A.   No.**
13     Q.   Did you have any instructions (sic)
14 with him prior to obtaining attorneys about AK
15 Steel?
16     **A.   Attorney instruction.**
17     Q.   Did you have any conversation prior to
18 you obtaining an attorney?
19     **A.   Oh.**
20     Q.   Let's not start using this thing just
21 to use this thing.
22     **A.   Yeah, you're talking about prior --**
23 **you just ask the same question, you twisted it**
24 **around because basically you're saying if I -- you**

1  asking me -- I'm thinking that you're asking me
2  when I filed my OCRC charge, did I talk to Edward
3  Lewis?  Is that what you're asking me?
4      Q.   Yes.
5      **A.   No.**
6      MS. DONAHUE:  About AK Steel.
7      THE WITNESS:  About AK Steel.
8  BY MS. PRYOR:
9      Q.   Did you talk to him after you filed
10 your OCRC charge before you obtained attorneys
11 about AK Steel?
12     **A.   No, not to my knowledge.**
13     Q.   Okay.  Did he ever tell you about his
14 application to AK Steel?
15     **A.   Now I have to say attorney privilege**
16 **or whatever, what's --**
17     MS. DONAHUE:  Instruction.
18 BY MS. PRYOR:
19     Q.   Did you ever encourage him to apply at
20 AK Steel?
21     **A.   Attorney privilege.**
22     Q.   Attorney instruction?
23     **A.   Yeah, attorney instructions.**
24     Q.   Do you know a Donald Edwards?

**Page 166**

1  A.  Yes, all my life.
2  Q.  Okay.  Going back to Edward Lewis, do
3  you know his qualifications?
4  A.  No.
5  Q.  He's worked for you, has he not?
6  A.  Correct.  "Qualifications"?  Clarify.
7  Q.  Yeah.  Do you know what kind of
8  qualifications he would have to be an employee?
9  A.  Mechanical background.
10 Q.  What is that mechanical background in?
11 A.  Automobiles.
12 Q.  What does he do with automobiles?
13 A.  Repair, repair work.
14 Q.  Repair work?
15 A.  Yeah.
16 Q.  And who did he do that for?
17 A.  Himself.
18 Q.  Has he ever done your car?
19 A.  Yes, several times.
20 Q.  Does he own a business or does he just
21 do it for friends?
22 A.  I guess -- he said he owned a
23 business, I think.  It was in -- you know, but he
24 didn't have an establishment, if that's what you're

**Page 167**

1  asking.
2  Q.  Do you know anything else about his
3  qualifications?
4  A.  No, not really.  I just know that
5  background from knowing him all my life.  That's
6  all he ever -- ever done, that I know of.
7  Q.  Have you ever talked to Donald Edwards
8  about his application?
9  A.  No.
10 Q.  Do you know if he applied?
11 A.  I have to go with attorney privilege
12 on that one.
13 Q.  Attorney instruction?
14    MS. DONAHUE:  Instruction.
15 A.  Instruction.
16 Q.  Does that mean you don't know whether
17 he applied or you only found out about it through
18 attorney-client privileged conversation?
19    MS. DONAHUE:  I object.
20 Q.  I'm confused on how you can answer
21 that attorney instruction.
22    MS. DONAHUE:  He's saying it's part of
23 work-product doctrine and that might be a better
24 way to -- to indicate what privilege he's asserting

**Page 168**

1  it, but attorney-work product doctrine.  And that
2  doctrine is giving rise to the instruction not to
3  answer.
4  BY MS. PRYOR:
5  Q.  Did you ever encourage Don Edwards to
6  apply?
7  A.  Attorney instructions.
8  Q.  Do you know whether Donald Edwards
9  applied prior to 1999?
10 A.  I'm going to have to say that's
11 attorney instructions.
12 Q.  Did you know prior to 1999 whether
13 Donald Edwards applied --
14 A.  No, I didn't.
15 Q.  Do you know anything about Donald
16 Edwards' qualifications?
17 A.  No.
18 Q.  Do you know Shawn Pryor?
19 A.  Yes.
20 Q.  He is your nephew?
21 A.  Yes.
22 Q.  And did you ever encourage him to
23 apply?
24 A.  Attorney instructions.

**Page 169**

1  Q.  Do you know anything about his
2  qualifications?
3  A.  Kind of.
4  Q.  What are his qualifications?
5  A.  No, I just know his educational
6  background.  What's that mean, "qualifications"?
7  Q.  Covers it.  What do you know about his
8  education?
9  A.  He -- he's been to college and got a
10 degree in -- I'm not sure.  All I know is something
11 with computers and English, I think.
12 Q.  Do you know whether AK Steel ever
13 hired computer tech people in 2001 or 2002?
14 A.  Not to my knowledge.
15 Q.  Okay.  Do you know whether they hired
16 any kind of computer people during that timeframe?
17 A.  I can't say that I do or not.  I know
18 they're there, but I don't know if they hired them
19 to subcontract.
20 Q.  Okay.  Did you encourage Shawn Pryor
21 to apply to AK Steel?
22    MS. DONAHUE:  Object to the form,
23 asked and answered.  Go ahead.
24 A.  Attorney request.

**43 (Pages 166 to 169)**

**Page 170**

1    Q.   Attorney instruction?
2    **A.   Attorney instruction, sorry.**
3    Q.   How do you know Thaddeus Freeman?
4    **A.   He's my cousin.**
5    Q.   And do you know -- did he ever tell
6  you that he applied to AK Steel?
7    **A.   I'd have to say attorney instruction**
8  **on that.**
9    Q.   He never told you prior to 1999 that
10  he applied?
11    **A.   No.**
12    Q.   Never?
13    **A.   Not to my knowledge. I can't remember**
14  **at this moment.**
15    Q.   Did you ever have any conversations
16  with him before you hired an attorney about AK
17  Steel?
18    **A.   Not to my knowledge. I can't remember**
19  **at this moment.**
20    Q.   Is there anything that would help you
21  recall that?
22    **A.   I can't think of anything right at**
23  **this moment.**
24    Q.   Does your wife work?

**Page 171**

1    **A.   Yes.**
2    Q.   What does she do?
3    **A.   She's a school teacher.**
4    Q.   Where at?
5    **A.   Middletown.**
6    Q.   What grade does she teach?
7    **A.   Seventh, Language Arts.**
8    Q.   How long has she done that?
9    **A.   Four years.**
10    Q.   What did she do before that?
11    **A.   Going to school.**
12    Q.   She was going to school before that?
13    **A.   Yeah.**
14    Q.   Well, during your marriage, has she
15  held any other jobs?
16    **A.   Yeah. She worked for Rogers Jewelers,**
17  **Federated Department Store.**
18    Q.   Did you ever encourage Thaddeus
19  Freeman to apply at AK Steel?
20    **A.   Attorney instruction.**
21    Q.   Do you know Ronald Sloan?
22    **A.   Yes, I do.**
23    Q.   How do you know him?
24    **A.   Known him all my life.**

**Page 172**

1    Q.   Do you know anything about his
2  qualifications?
3    **A.   No.**
4    Q.   Do you know anything about Thaddeus
5  Freeman's qualifications?
6    **A.   Other than what he did, no. I mean --**
7    Q.   What do you mean, "what he did"?
8    **A.   What he does. I mean, he's a meat**
9  **cutter.**
10    Q.   He's a meat cutter?
11    **A.   Yeah, I do -- I do know that.**
12    Q.   Okay.
13    **A.   Ron Sloan, I really don't know. I**
14  **know him -- I don't know him on that type of level.**
15  **I know him from a personal standpoint, just in**
16  **general.**
17    Q.   Okay.
18    **A.   I never asked him about his personal**
19  **qualifications.**
20    Q.   Do you know if he ever applied to AK
21  Steel?
22    **A.   That's a attorney instruction.**
23    Q.   Did you encourage him to apply at AK
24  Steel?

**Page 173**

1    **A.   Attorney instructions.**
2    Q.   Did you have any conversations with
3  him about AK Steel prior to 2000?
4    **A.   Attorney instructions.**
5    Q.   Did you have conversation with him
6  prior to 1999 about AK Steel?
7    **A.   I can't remember at this time.**
8    Q.   Do you know Darrell Carter?
9    **A.   Attorney instruction.**
10    Q.   Do you know him in any way outside
11  this lawsuit?
12    **A.   No.**
13    Q.   Do you know Darlene Carter outside --
14    **A.   Attorney instruction.**
15    Q.   -- of this lawsuit? Try to let me
16  finish the question.
17    **A.   Okay.**
18    Q.   I'll try to do the same thing with
19  you. Try to get your -- get this done.
20    Do you know Marnie Carter outside
21  this, this lawsuit?
22    **A.   No.**
23    Q.   Do you know Timothy Oliphant outside
24  of this lawsuit?

**44 (Pages 170 to 173)**

**Page 174**

1  A.  No.
2  Q.  Do you know Tiffany Jackson outside of
3  this lawsuit?
4  A.  No.
5  Q.  Have you ever talked to anyone else at
6  Ashland, other than the individuals we talked about
7  earlier?  I mean, Mr. Cosby and I think there was
8  one other gentleman whose name you did not recall.
9  A.  And the union?
10  Q.  Yes.
11  A.  To my recollection, I can't remember
12  at this moment.
13  Q.  Do you know anyone else at Ashland who
14  applied and was not hired?
15  A.  Attorney privilege, attorney
16  instruction.
17  Q.  Do you know anything about who had --
18  do you know anything -- how many people had applied
19  at Ashland?
20  A.  Clarify.
21  Q.  Yeah.  Do you know how many people had
22  applied for a job at Ashland, other than what your
23  attorneys have told you?
24  A.  Black and white?

**Page 175**

1  Q.  Yes.
2  A.  No.
3  Q.  Do you know how many blacks applied,
4  other than what your attorney --
5  A.  Attorney instruction.
6  Q.  Other than what your attorneys have
7  told you, do you know that?
8  A.  Attorney instruction.
9  Q.  I'm just trying to follow what you're
10  saying.
11  A.  I'm just saying that you asked me a
12  question, did I know how many blacks --
13  Q.  Other than --
14  A.  -- applied.
15  Q.  -- what your attorneys have told you.
16  A.  Other than what my attorneys have told
17  me, and I'm telling you that it's attorney
18  instruction on that question.
19  Q.  When did you find that information
20  out?
21  A.  I have to say attorney instruction.
22  Q.  I don't think the timing of that is
23  privileged in any respect, even under your theory.
24  MS. DONAHUE:  Well, I would say it

**Page 176**

1  does.  So I'm instructing --
2  MS. PRYOR:  It does what?
3  MS. DONAHUE:  The -- it is protected,
4  the timing of it
5  MS. PRYOR:  The timing?
6  MS. DONAHUE:  Yeah, if it tends to
7  show the strategy, the tactics, or other mental
8  impressions of his attorney to know the timing of
9  that and so I think that is protected.  I'm
10  instructing him not to answer.
11  BY MS. PRYOR:
12  Q.  Do you have any direct knowledge of --
13  of the hiring at Ashland?
14  A.  No, I don't.
15  Q.  You don't have any direct knowledge of
16  who applied or when they applied?
17  A.  Attorney instruction.
18  Q.  Were you ever with anyone who applied
19  in Ashland?
20  A.  No.
21  Q.  Were you ever at AK Ashland when they
22  received applications?
23  A.  No.
24  Q.  Do you know Kay Jackson?

**Page 177**

1  A.  Attorney instruction.
2  Q.  Outside of this lawsuit, do you know
3  Kay Jackson?
4  A.  No.
5  Q.  Do you know Dwight Lewis outside of
6  this lawsuit?
7  A.  No.
8  Q.  Do you know anything about any other
9  African-American's application to AK Steel, other
10  than what we've talked about today?
11  A.  Ashland, Middletown?
12  Q.  Ashland or Middletown.
13  A.  Rephrase one more time, please.
14  Q.  Yeah.  Do you know about any other
15  African-American's application to AK Steel, other
16  than what we've talked about today?
17  A.  Attorney instructions.
18  Q.  Did you know about it prior to
19  obtaining an attorney?
20  A.  I'm going to have to say -- I would
21  have to say no.
22  Q.  Prior to getting the attorneys
23  involved, did you have any meeting with other
24  African-Americans about AK Steel?

**45 (Pages 174 to 177)**

**Page 178**

1  A.  No.

2  Q.  Prior to getting your attorneys

3  involved, did you have any conversations with any

4  other African-Americans about possibly suing AK

5  Steel?

6  A.  Attorney instructions.

7  Q.  Prior to getting an attorney, did you

8  have any conversations with any African-American

9  about suing?

10  A.  At this time, I can't remember the --

11  I can't remember. I can't -- I can't remember.

12  MS. DONAHUE: Let her finish.

13  A.  At this time, I can't remember if I

14  did or not.

15  Q.  I've heard testimony from others about

16  a flyer that went out to a lot of the

17  African-Americans in Middletown suggesting that

18  they come to a meeting in which you were present.

19  Do you know about that meeting?

20  A.  Meeting or flyers?

21  Q.  There was a flyer that was sent out.

22  Do you know anything about flyers sent out to

23  African-Americans?

24  A.  Not to my knowledge.

**Page 179**

1  Q.  Do you know anything about flyers sent

2  out in reference to a meeting, come see what AK

3  Steel is doing?

4  A.  Not to my knowledge.

5  Q.  Do you recall being at a meeting such

6  as that?

7  A.  That's attorney instructions.

8  Q.  Do you have any witnesses or

9  individuals who support any of your claims?

10  A.  Attorney instructions.

11  MS. DONAHUE: Well, I don't know about

12  that.

13  MS. PRYOR: Mm-hmm.

14  THE WITNESS: Okay. Rephrase the

15  question, please.

16  BY MS. PRYOR:

17  Q.  Do you have any witnesses or other

18  individuals who support any of your claims?

19  A.  Claims in reference to?

20  Q.  The claims that we're here about for

21  this lawsuit.

22  MS. DONAHUE: Well, you've talked

23  about other claims that are -- claims here in this

24  lawsuit. I think it's a fair clarification.

**Page 180**

1  A.  Yes, I mean -- name-wise?

2  Q.  Yeah.

3  A.  All right. I can't recall at this

4  time. I can -- there's a ton of people that I know

5  that would probably come forward and say whatever,

6  but I've never -- I've never -- I don't remember

7  asking.

8  Q.  You mean there were a ton of people

9  that would come forward and say whatever?

10  A.  Say whatever, no. I mean, you're

11  asking -- see, you're asking a vague question to

12  me. To me, I think that's a vague question --

13  Q.  Okay.

14  A.  -- in reference to a specific event or

15  you're talking about in general?

16  Q.  Whatever you're claiming against AK

17  Steel in this lawsuit, who is going to stand up in

18  court and support your claims? Who has information

19  that would support your claims?

20  A.  The plaintiffs.

21  Q.  Anyone besides the plaintiffs?

22  A.  The City of Middletown.

23  Q.  Who at the City of Middletown?

24  A.  I'm just talking about all the

**Page 181**

1  minorities that live in that town.

2  Q.  What would they be able to say?

3  A.  They would probably tell you basically

4  that -- you know, AK Steel is a company that

5  doesn't hire minorities. It's the feel of the

6  city. To give you -- AK Steel is a place where

7  minorities -- minorities -- here's a -- okay. Let

8  me give you a example.

9  If you get hired at AK Steel back in

10  1990 when -- before all this got started, it was

11  like hitting the lotto. You did something. Wow.

12  That was unforeseen 'cause they did not hire

13  blacks.

14  So now with that in question, you can

15  go into the City of Middletown and you can stop and

16  ask 10 people that are of age, okay? Let's say 25

17  on up, majority rules, half of them probably

18  applied at AK Steel at one point or the other.

19  Q.  Is this speculation or do you know?

20  A.  It's not speculation.

21  Q.  How do you know that --

22  A.  Because I've asked them.

23  Q.  Okay. Which individuals?

24  A.  I can't tell you. I don't know.

**46 (Pages 178 to 181)**

**Page 182**

1 There's just so many people. I -- I -- you know, I
2 mean, I wasn't prepared for that. I can't remember
3 at this time.
4    Q. Can you name me a few?
5    **A. Not at this time. I can give you an**
6 **accurate -- do you want me to -- let me ask you**
7 **this question. Let me say this. You want a list?**
8    Q. I'm asking a question --
9    **A. I don't have a list on --**
10    Q. I'm asking you a question.
11    **A. Would you like me to produce you a**
12 **list?**
13    Q. Sir, you're here for a deposition in a
14 lawsuit that you filed against AK Steel.
15    **A. Exactly.**
16    Q. I'm asking you what individuals or
17 witnesses you have that support your claims that
18 have information that support your claims against
19 AK Steel?
20    **A. At this time, I can't say. I -- I --**
21 **you know.**
22    Q. You've been handed what's been marked
23 as Exhibit 2. Have you seen this document before?
24       MS. DONAHUE: Look all the way through

**Page 183**

1 it.
2    **A. No, I haven't seen this before.**
3    Q. In this document, which your
4 attorney's provided to us, it provides the name and
5 address, telephone number of individuals likely to
6 have information relevant to dispute facts in this
7 matter. Next to your name, if you'll look on page
8 10 --
9    **A. Mm-hmm.**
10    Q. -- it says "None," correct?
11    **A. Page 10?**
12    Q. Mm-hmm, "None at this time."
13    **A. I did not fill out the document**
14 **they -- that they produced.**
15    Q. I understand that. I'm asking you to
16 look at page 10.
17    **A. I did look at page 10.**
18    Q. And it says, "None at this time" for
19 your name, correct?
20    **A. Correct.**
21    Q. Okay. Are there any other -- are
22 there any individuals at this time that you believe
23 have information relevant to the facts in this
24 lawsuit?

**Page 184**

1    **A. At this time, I can't -- I need to**
2 **take a break on this.**
3       MS. DONAHUE: No, you have to answer
4 it. We can't take breaks --
5       THE WITNESS: Okay.
6       MS. DONAHUE: -- when there's
7 questions on the table.
8    **A. All right. Well, I --**
9    Q. None?
10    **A. Can I see that?**
11    Q. Yeah, just one second. Any others at
12 this time?
13    **A. Hold on. Just let me think for a**
14 **second, please.**
15    Q. We need to take a --
16    **A. Simon Brooks, I mean --**
17    Q. Okay. Anyone else?
18    **A. Robert Coleman.**
19    Q. Anyone else?
20    **A. Michael Bailey.**
21    Q. Anyone else?
22    **A. James Culbert.**
23    Q. Anyone else?
24    **A. Reverend Theis, Greg Theis.**

**Page 185**

1       MS. PRYOR: Let's take a break.
2       MS. DONAHUE: You can now continue
3 with this list after the break. I'm not certain
4 he's finished.
5       MS. PRYOR: That's okay.
6       THE WITNESS: I'm not.
7       MS. DONAHUE: He's not finished.
8       MS. PRYOR: That's fine. We'll take a
9 break.
10       THE WITNESS: Okay.
11    (Off the record: 1:21 p.m. - 1:26 p.m.)
12       MS. PRYOR: I apologize for the
13 interruption.
14 BY MS. PRYOR:
15    Q. What does Simon Brooks know in
16 relation to your --
17       MS. DONAHUE: Wait a second. He
18 wasn't finished with his answer.
19       MS. PRYOR: That's fine. If he wants
20 to answer or you want to follow-up with an answer
21 later, I will ask you later.
22       MS. DONAHUE: You're interrupting his
23 answer.
24       MS. PRYOR: Ma'am, you are free to ask

**Page 186**

1 him later if you want.
2         MS. DONAHUE: Well --
3         MS. PRYOR: This is my chance to get
4 information. It does not matter what you --
5         MS. DONAHUE: It doesn't matter if you
6 interrupt his answer with a break?
7         MS. PRYOR: No, it doesn't.
8         MS. DONAHUE: It doesn't? Yes, I
9 think it does. I'll ask him later.
10        MS. PRYOR: That's fine.
11 BY MS. PRYOR:
12    Q.    You mentioned Simon Brooks. What does
13 he know in reference to your claims?
14    **A.    He was civil rights at the time.**
15    Q.    What is civil rights?
16    **A.    He was on the civil rights board --**
17    Q.    That's --
18    **A.    -- prior to me even getting on the**
19 **board.**
20    Q.    Okay. And he was an AK employee?
21    **A.    He was an AK employee.**
22    Q.    Was he a union member?
23    **A.    Yes, he was.**
24    Q.    My understanding is that civil rights

**Page 187**

1 board is actually joint with management and
2 union --
3    **A.    Yes.**
4    Q.    -- is that correct?
5    **A.    I assume, yeah.**
6    Q.    Okay. What does he know -- when did
7 he leave AK, do you know?
8    **A.    He retired. I'm not sure. I would**
9 **say -- you know, 2001, 2003, somewhere, be 2003,**
10 **three to four.**
11    Q.    Okay. And what do you believe he
12 knows?
13    **A.    He knows a lot.**
14    Q.    About --
15    **A.    I mean --**
16    Q.    Let me --
17    **A.    Clarify.**
18    Q.    What does he know about your claims
19 against AK Steel that you're pursuing in this
20 lawsuit?
21    **A.    Lack of hiring, he knows more, the**
22 **numbers probably --**
23    Q.    You say "probably."
24    **A.    -- minorities.**

**Page 188**

1    Q.    Do you know if he knows the numbers?
2         MS. DONAHUE: Calls for speculation.
3 Answer.
4    **A.    Yeah.**
5         MS. DONAHUE: Object to the form of
6 the question. Go ahead.
7    **A.    Has he -- has he seen documents, no.**
8 **Far as what he knows, I think -- I don't know if he**
9 **has or not, far as documents that he may have seen**
10 **or -- or that he knows about. But I'm just saying**
11 **he was on the civil rights board and he was trying**
12 **to get minorities hired. That was -- that was the**
13 **basis of -- you know, of me really getting into the**
14 **civil rights area was that.**
15    Q.    Was what?
16    **A.    Conversations with him.**
17    Q.    Conversation with him? What did he
18 tell you that got you involved?
19    **A.    What got me involved was I know him on**
20 **a personal basis, of course, Simon Brooks, okay?**
21    Q.    Mm-hmm.
22    **A.    But we were having a conversation**
23 **and -- about the lack of hiring. I always thought**
24 **it was an issue at AK Steel on a personal basis**

**Page 189**

1 **'cause I just didn't see a lot of us out there,**
2 **besides the ones that were already there, new**
3 **people coming in with the white dots.**
4         **So I -- I went to Simon 'cause I knew**
5 **he was on the civil rights board. So I went to**
6 **him, asked him a question. I said, hey -- you**
7 **know, what's going on with the hiring of**
8 **minorities? Now, we're talking prior to 1999 --**
9    Q.    Mm-hmm.
10    **A.    -- okay? And he says, well, I'm**
11 **working on it, you know. And I said, okay. You**
12 **know, just wanted to know. He said, well, you**
13 **know, I have a meeting with Dick Wardrup. Dick**
14 **Wardrup, of course, you know was the CEO of AK**
15 **Steel at the time. And he comes back and he tells**
16 **me that Dick Wardrup told him that he was informed**
17 **by his people that we, as blacks, were not applying**
18 **for the jobs.**
19         **And Simon Brooks asked me at the time,**
20 **hey, do you know anybody that -- that needs a job?**
21 **And I'm like, what? You know, like I said, yeah, I**
22 **know plenty of people. He said -- well, you know,**
23 **make sure -- you know, clean people, good people.**
24 **I mean, basically wasn't a criminal or strung out**

**48 (Pages 186 to 189)**

1  on drugs or -- you know, good people that -- that
2  may be could pass a -- you know, a urinalysis and
3  things of that nature.
4      Q.   Mm-hmm.
5      A.   So, anyway, I brought him a list of
6  people that I thought that needed a job.  Now, I'm
7  not on civil rights board.  I'm -- none of the
8  above that we talking about to this day.  And I
9  gave him a list of people.  AK Steel called them
10  all and set them up for tests.
11          And -- and I thought -- you know, at
12  this particular junction of time, that things were
13  changing.  I thought it was going to be -- you
14  know, a little bit of a change here because, wow,
15  they called everybody that we gave them on the list
16  'cause Simon took that list to Dick Wardrup.  Dick
17  Wardrup moved it on to whoever he moved it on to
18  and all these people were tested.  But no one was
19  hired.
20      Q.   Okay.  This list, where did you come
21  up with this list?
22      A.   I made it up.  I came up with the
23  people.  I asked people that needed -- that wanted
24  a job.  I was working at -- like I said, in that

1  timeframe, I was basically just an hourly employee.
2  I wasn't no civil rights board.  I wasn't pursuing
3  civil rights.  He just asked me, did I know some
4  people that needed a job.  That's all that was.  I
5  --
6      Q.   The list of people that you provided
7  him were people that you knew --
8      A.   Correct.
9      Q.   -- correct?  They were people that
10  were not at AK Steel currently?
11      A.   Currently, correct.
12      Q.   These are people that had not applied
13  at --
14      A.   I don't know --
15      Q.   -- to AK Steel?
16      A.   -- if they had or not.
17      Q.   Okay.
18      A.   I never -- I never asked a question
19  like that.
20      Q.   Did you ever talk to people before you
21  put them on the list?
22      A.   Oh, I talked to them, asked them,
23  would they be -- would you -- are you needing a
24  job?  You know, would you like that job?  Yeah.

1      Q.   Okay.  You put them on the list.  How
2  do you know that they were all called?
3      A.   'Cause most of them, people I know and
4  they took the test.  They said they took the test.
5  They said they did.  So I just took it for granted
6  that they did.
7      Q.   Everyone on this list you talked to
8  afterwards?
9      A.   Pretty much, but I -- to my knowledge,
10  'cause I wasn't there a very long time ago.
11      Q.   And the only reason you believe they
12  were called back or took the test is because what
13  you heard from them?
14      A.   Correct.
15      Q.   And who are these people?
16      A.   I have to look at the list.
17      Q.   Do you have the list?
18      A.   I think I might still have a list.
19      Q.   Can you think of any of the names
20  sitting here today?
21      A.   Let's see.  Man, I don't -- trying to
22  remember.  I can't -- I can't remember.  The
23  only -- that was such a long time ago.  These
24  people are -- I mean, these people just didn't have

1  a job.  These people live in Middletown.
2      Q.   These were unemployed individuals?
3      A.   Yeah, that needed a job.  I mean --
4      Q.   Any of the plaintiffs in this lawsuit
5  on that list?
6      A.   I can't remember if they are or not.
7  I haven't looked at that list in a long time.  I
8  don't remember at this time.
9      Q.   Anything else that Simon Brooks knows?
10      A.   Not to my knowledge.  I mean, I don't
11  know what he knows.  Like I said, he was on civil
12  rights.  He was the president of the civil rights
13  board.
14      Q.   Okay.  What about Robert Coleman?  We
15  have talked about him a little bit earlier.  Does
16  he know anything else other than what you've
17  testified about earlier?
18      A.   Well, I'm pretty sure he knows more
19  than what we talked about earlier.
20      Q.   Do you know of anything else that he
21  knows?
22      A.   In reference to --
23      Q.   Your claims in this lawsuit.
24      A.   Other than that they -- how minorities

1 are hired -- were hired in his timeframe, I think
2 he might know that information.
3    Q.   And I'm asking what -- if he's ever
4 told you anything else that you know he knows?
5    **A.   Besides after the -- you know, what**
6 **he's -- besides what I've told you?**
7    Q.   Besides what you've already talked
8 about.
9    **A.   At this time, I can't remember --**
10   Q.   Okay.
11   **A.   -- if there's anything else.**
12   Q.   What about Michael Bailey, why did you
13 list him?
14   **A.   Michael Bailey was president of the**
15 **union at one point and he was also working on**
16 **getting more minorities hired.  So he had insight**
17 **to upper management -- you know, that he was**
18 **working with.**
19   Q.   What did he tell you he was doing?
20   **A.   I think he was trying to get more**
21 **blacks hired.**
22   Q.   Did he tell you how he was doing that?
23   **A.   No, he didn't.  Just said he was**
24 **hiring.**

1    Q.   Did he tell you anything that
2 management said to him about that?
3    **A.   No, not to my knowledge.  I can't**
4 **remember nothing.**
5    Q.   What about James Culbert, why did you
6 give me his name?
7    **A.   Culbert may have gave me somebody**
8 **that -- that was looking for a job.  I might have**
9 **stuck it on a list.  He also knows in reference to**
10 **how many minorities that he's seen in the plant,**
11 **new hires.**
12   Q.   Do you remember the name of the
13 individuals he may have given you?
14   **A.   No, I don't.**
15   Q.   Anything else that you think James
16 Culbert might know?
17   **A.   He probably could give you an insight**
18 **on that integrated workplace.**
19   Q.   What do you mean, "an insight on
20 that"?
21   **A.   Because he lives there.  He lives**
22 **right through the same thing that I lived through**
23 **about the integrated workplace portion of this**
24 **lawsuit that I have filed.**

1    Q.   Has he ever talked to you about that?
2    **A.   We've talked about it.**
3    Q.   What does he say?
4    **A.   About -- you know, how we're treated.**
5    Q.   And you already talked -- told me
6 about how you were treated?
7    **A.   I told you how we were treated,**
8 **correct.  But, like I said, I think that's part of**
9 **the integrated workplace portion of this lawsuit.**
10 **I think that he -- he's -- he's a good -- him and**
11 **every other black that you brought up earlier will**
12 **also be witnesses to me on the integrated**
13 **workplace.**
14   Q.   And I'm not asking about what they may
15 have experienced their self, but as related to your
16 claims, what would they know in terms of how you've
17 been treated?
18   **A.   Well, we basically all get treated**
19 **about the same.  So they would probably give you**
20 **about the same type of input that you would hear**
21 **coming out my mouth, you'll probably hear coming**
22 **out of their mouth.**
23   Q.   I don't want "probably."  Has he told
24 you anything about an integrated workforce?

1    **A.   Has he told about it?**
2    Q.   Yeah.  Has he ever -- have you ever
3 had any conversation with him about this integrated
4 workforce idea?
5    **A.   Yeah, we've talked about it.**
6    Q.   What did he say?
7    **A.   I mean, I don't know.  He filed a**
8 **lawsuit against it -- about it --**
9    Q.   Okay.  What --
10   **A.   -- for being discriminated against.**
11   Q.   What was his -- what did he --
12   **A.   I'm not sure.  He did never told me**
13 **(sic).  I just know he filed a lawsuit for**
14 **discrimination against AK Steel.**
15   Q.   Do you know whatever happened with
16 that lawsuit?
17   **A.   They settled it.**
18   Q.   Do you know how much?
19   **A.   No, I don't.**
20   Q.   How do you know they settled it?
21   **A.   He told me they settled it.  I asked**
22 **him, so he said it's settled, can't talk about it,**
23 **end of discussion.**
24   Q.   Anything else he told you?

**50 (Pages 194 to 197)**

**Page 198**

1    A.    In reference to his lawsuit, nothing.
2    Q.    No, in reference to this idea of an
3  integrated workforce.
4    A.    I think it's a vague question that
5  you're asking.
6    Q.    Have you and him had any other
7  conversations about the lack of an integrated
8  workforce?
9    A.    We've had several conversations, lack
10  of integrated workforce.
11    Q.    What else have you guys talked about?
12    A.    You know, the lack of minorities in
13  the plant, the way we're treated, the lack of
14  supervisors, the lack of black supervisors.
15    So, I mean -- you know, you could
16  twist it any way you want to take it or however you
17  want to shell it out to me.  The bottom line is
18  they do not hire black supervisors at AK Steel at
19  the time.  We had very, very, very, very little
20  minority supervisors.  We had very, very little
21  minorities, period.
22    We had a lot of white people.  So we
23  were subject to racism on a daily basis, a KKK, in
24  the locker rooms, whatever you want to call it, KKK

**Page 199**

1  on the busses.
2    Q.    Okay.  Let's back up.
3    A.    I mean, that's --
4    Q.    When did you see KKK?
5    A.    I seen KKK personally.  I -- I mean, I
6  brought it to human resources' attention about KKK.
7  I mean -- I mean, in one -- in one particular
8  incident where a guy left a business card and he
9  took tape and stuck it to one of the bus windows.
10  So he was broadcasting AK -- KKK.  And one of the
11  white individuals -- I can't recall his name --
12  brought it to my attention 'cause he thought it was
13  funny.
14    Q.    Where was this?
15    A.    This happened -- mobile maintenance
16  area, so --
17    Q.    Pre 1995?
18    A.    Pre 1995.  Any --
19    Q.    Any other time you saw KKK?
20    A.    I seen KKK all my life, entire career
21  at AK Steel, in bathrooms, on the walls.  Probably
22  can go in there now and see the same thing if you
23  go look for it.  It's on -- it's in the stalls.
24  They don't take care of it.  You tell them about

**Page 200**

1  it, they don't do nothing about it.
2    So we live with that.  This is what
3  I'm talking about, integrated workplace.
4  Regardless of how you want to look at it, if there
5  were more minorities in AK Steel and there was a
6  balance of minorities -- I'm not saying 1,500 to
7  1,500.  I'm just -- a -- a number that's better
8  than what it was or a number of superiors that were
9  black, more so than what we had.  We had none,
10  zero.  So when you go tell somebody about -- that I
11  saw in my department --
12    Q.    Okay.
13    A.    -- just clarify.
14    Q.    Thank you.
15    A.    Sure.  But when you would go talk to a
16  supervisor and say, hey -- you know, you need to
17  clean that bathroom.  You got some stuff on the
18  wall that doesn't make sense.  And I'm a crew chief
19  and I go tell somebody about it, it's not my job to
20  go paint it.
21    Q.    But when did you see KKK written on
22  the bathroom stall?
23    A.    I seen KKK through the last day I was
24  working there in annealing.

**Page 201**

1    Q.    Where was it at?
2    A.    In -- I can -- I can show you.  I
3  mean, it's in bathrooms.  Go look.  Go take -- I
4  mean --
5    Q.    To the bathroom?
6    A.    It's in bathrooms.  And that's -- I
7  been gone for years.
8    Q.    How many bathrooms did you see it in?
9    A.    I've seen it in several bathrooms, in
10  annealing, caster maintenance, hot strip.
11    Q.    And what is it, just KKK?
12    A.    It'll say KKK.  It'll have little --
13  you know, KKK -- you know, KKK signs written.
14    Q.    Is there other graffiti drawn --
15    A.    Other graffiti, of course.  Other
16  graffiti.
17    Q.    Okay.
18    A.    Some things people just scratch out
19  'cause they don't want to see it.  You know what I
20  mean?
21    Q.    They're nasty men's bathrooms?
22    A.    Nasty men's bathrooms.  So but then
23  when you see that -- you know, it just seems like
24  that will stay there.  You know what I mean?

**51 (Pages 198 to 201)**

Page 202

1  Normally scratch it out or -- and I'm not saying
2  that happens all the time.  Don't get me wrong.
3  Sometime I scratch them out and I saw them.  I just
4  scratch them out with a pen 'cause I didn't want to
5  look at that.  You know what I mean?  But that's
6  just the way it was.  And then when we had the
7  incident with the business card --
8      Q.   The business card, explain that to me.
9  There was a business card?
10     A.   It's a business card.  We're not
11  talking -- you know, paper.  We're talking about
12  somebody's business card.  It looked like a
13  business card.  It had a name and telephone
14  number -- not a number, no name.  But it was a KKK
15  calling card 'cause on the back of it, it had a
16  telephone number for them to call.  And I went
17  completely off on that one because it was more
18  like, wow, somebody is truly broadcasting -- you
19  know.
20     Q.   And that was pre 1995?
21     A.   That was pre 1995, correct.
22     Q.   Okay.
23     A.   And that was documented.  A -- Simon
24  Brooks knows all about that.  I called the civil

Page 203

1  rights board.  I told them about it.  They brought
2  in whoever.  Like I said, I had nothing to do with
3  it at the time.  Only thing I did was witness it.
4      Q.   Okay.  Anything else that Michael
5  Bailey or James Culbert knows?
6      A.   Culbert, like I -- that's -- that's --
7  he knows -- he knows basically probably some of the
8  KKK things that's happened on -- over the years and
9  present time 'cause he still works there.  I don't
10  know if they're -- you know, I don't talk to him
11  now about that or anything else.
12     Q.   And Reverend Titus?
13     A.   Reverend Titus.
14     Q.   Who is that?
15     A.   He's a reverend.  He's a reverend in
16  Middletown, Ohio.
17     Q.   Does he work at AK Steel?
18     A.   No, he doesn't.
19     Q.   What does he know in support of your
20  claims?
21     A.   You know, he has worked on
22  Middletown -- the Middletown -- it's not the
23  school, but where -- it's the -- the other one.
24  He's on the city council.

Page 204

1      Q.   Okay.
2      A.   And I think he's -- you know, inquired
3  (sic) information about lack of hiring and -- and
4  trying to get more minorities -- minorities hired
5  himself.
6      Q.   Okay.  And how do you know -- why do
7  you think that?
8      A.   Well, you know, just having
9  conversations with him.  He's had conversation with
10  other people, he's told me, in reference to trying
11  to get people hired at AK Steel.  See, it's just
12  like -- you know, you have to understand -- you
13  have to understand -- well, you don't.  I mean,
14  it's hard -- it's not hard to understand.  The bottom
15  line is they just don't hire black people.
16     Q.   What has he told you about his
17  efforts?
18     A.   That he's had conversations.  I don't
19  know who he has conversation with.
20     Q.   Do you know who -- do you know what
21  they said to him?
22     A.   No, I don't.  I just know that he's
23  been diligently doing his job trying to -- well, he
24  was on city council, trying to get minorities --

Page 205

1  minorities hired.
2           Vivian Washington, which is a NAACP
3  president of Middletown branch of NAACP, he also is
4  a witness.  He has been trying to get on -- so they
5  get blacks hired.  He has talked to different
6  people within AK Steel.  I can't call (sic) their
7  names.  You have to ask him on that.  But I know
8  he's told me he's talked to people.
9      Q.   And what has he said that they said?
10     A.   He didn't -- he didn't -- he just --
11  you know, didn't really -- they hem-hawed around.
12  They really didn't give an answer on why they're
13  not hiring blacks or -- or anything of that nature.
14     Q.   Any other witnesses?
15     A.   I -- I'm going to have to go with
16  Brian Dailey.  He's a president of the AEIF, the
17  union in Middletown, Ohio.
18     Q.   And what does he know?
19     A.   He also has been just trying to make
20  sure -- he's also -- he also has a -- trying to get
21  blacks hired within the plant.
22     Q.   And how do you know that?
23     A.   Have -- without -- having
24  conversations with him when I was going through --

**52 (Pages 202 to 205)**

**Page 206**

1   he was the treasurer at the time.
2       Q.   At what time?
3       A.   When I was working at AK.
4       Q.   And what did he tell you?
5       A.   You know, basically they weren't
6   hiring blacks. You know, I went to him to
7   basically get some information that I acquired
8   through the union. I asked him -- you know, how to
9   go about getting it done when I was on the civil
10  rights board.
11          So when I was on the civil rights
12  board, this is where this information was coming
13  from. So I went to Brian because he basically
14  steered me through how to get the information from
15  the union the proper way.
16      Q.   And what did he say about trying to
17  get blacks hired?
18      A.   He just said it just wasn't -- he just
19  wasn't doing it. AK just didn't do it. We -- you
20  know, we've -- they've had conversations about it
21  before, I guess at meetings. I'm not saying when
22  or where, but -- you know, and on the hiring of
23  minorities to -- to raise the numbers. And I'm not
24  sure on what -- outcome of their conversations

**Page 207**

1   were, but he has told me that.
2       Q.   Anyone else?
3       A.   Hold on a second. I have to go with
4   Dick Bowman, Michael Leeman and George Armor.
5       Q.   Okay. We've talked about Dick and
6   Mike already, correct?
7       A.   We didn't talk to them in general, as
8   far as the hiring is concerned. Dick we did. We
9   did talk about Dick. We talked about his being
10  back as a consultant, I think.
11      Q.   Mm-hmm.
12      A.   And he was also AK's hiring process in
13  the past.
14      Q.   "The past" meaning pre --
15      A.   We talked about it.
16      Q.   -- 1997, 1998?
17      A.   Yeah, and then he came back as a
18  consultant in 2000 or something --
19      Q.   We talked --
20      A.   -- like that.
21      Q.   -- about that?
22      A.   We talked about that. And Mike Leeman
23  is present time. You know what I mean?
24      Q.   What does George Armor have to --

**Page 208**

1       A.   And George Armor -- you know, in
2   reference to the integrated workplace.
3       Q.   What does he know about it?
4       A.   He knows about how he treated me.
5       Q.   And how did he treat you?
6       A.   Differently. Like I told you, he's
7   the guy who -- you know, that -- that was after me,
8   as far as upper management. There's no higher, to
9   me.
10      Q.   That's the guy you said -- I think you
11  said he was from HR?
12      A.   HR, human resources or industrial
13  relations.
14      Q.   Is this the one you were referring to
15  earlier, after you filed the charges --
16      A.   Yes.
17      Q.   -- he was out to get you?
18      A.   He was out, yes. Couldn't stand me.
19      Q.   All right. Okay. Anyone else?
20      A.   And Rodney Cosby.
21      Q.   And we've talked about him already.
22      A.   We talked about Rodney Cosby.
23      Q.   Is there anything else that he knows?
24      A.   I don't really know what Rodney knows,

**Page 209**

1   as far as what he knows. He knows more than -- you
2   know.
3       Q.   Anything else that he's told you he
4   knows?
5       A.   At this time, I can't remember.
6       Q.   Okay. Anyone else?
7       A.   I think at this time, I can't remember
8   anybody else.
9       Q.   Okay. Do you have any documents? I
10  understand Exhibit 2, it says "none." Again, the
11  last page. Are there any documents that support
12  your claims that you have not identified?
13      A.   I have to go with attorney
14  instructions.
15      Q.   Talk to your attorney about it. But
16  I'm fairly certain the court requires you to
17  identify to us documents that support your claim.
18  They're required under Exhibit Number 2.
19          MS. DONAHUE:  Just to be completely --
20  you know, I didn't have a chance to find out more
21  about this. But I did find in the file a redacted
22  log. I don't know if it was produced to you or
23  not, so --
24          MS. PRYOR:  A redacted log of what?

**53 (Pages 206 to 209)**

1    MS. DONAHUE:  Of -- of documents that
2  had already been -- had already been requested or
3  perhaps this redacted log or this privilege log was
4  given to you at one point, I don't know.
5    MS. PRYOR:  A log of --
6    MS. DONAHUE:  Of documents that he has
7  that are -- that are being -- being withheld
8  because they are privileged documents for the work-
9  product doctrine.  That's never been produced to
10  you, this log?
11    MS. PRYOR:  First I'm hearing of it.
12  Not guaranteeing --
13    MS. DONAHUE:  Well, I --
14    MS. PRYOR:  -- it hasn't been, but --
15    MS. DONAHUE:  -- mean, I just found it
16  in the file and I just didn't know anything more
17  about it than that.
18    MS. PRYOR:  Here's my thing.  Exhibit
19  Number 2 says "none," okay?  I think it's probably
20  near the end of the thing where it talks about the
21  documents you have.
22    MS. DONAHUE:  Mm-hmm.
23    MS. PRYOR:  And it's -- you're
24  claiming privilege on some document, obviously --

1  you know, you're not going to use it for purposes
2  of litigation, in terms of showing it as evidence.
3  BY MS. PRYOR:
4    Q.   Are there any other documents that you
5  have that support your claims?
6    A.   I have to go with attorney
7  instruction.
8    MS. PRYOR:  Well, I would assume that
9  we would get updated initial disclosures, if there
10  are.
11    MS. DONAHUE:  Yeah, absolutely.  I
12  mean, I just --
13    MS. PRYOR:  And --
14    MS. DONAHUE:  Right.
15    MS. PRYOR:  -- soon, if there are.
16    MS. DONAHUE:  Yeah, yeah.
17    THE WITNESS:  I never got that, did I?
18    MS. DONAHUE:  We'll talk about that
19  and see if -- I think it's already been reviewed
20  and that's why there's a log.
21  BY MS. PRYOR:
22    Q.   Earlier you said something, you had
23  something to clarify.  What was that?
24    A.   The integrated workplace question that

1  you asked me earlier.
2    Q.   Mm-hmm.
3    A.   I don't -- you know, when you asked me
4  about whether the type of discrimination that was
5  the size, what was in my prior lawsuit.
6    Q.   Mm-hmm.
7    A.   You know, and then you asked me -- you
8  know, what other things about this integrated
9  workplace are you alleging.  And I have to -- you
10  know, to clarify that, I'm alleging that with the
11  lack of minorities within the plant on the hourly
12  basis, I'm also acknowledging that -- saying that
13  without the lack of minority supervisors within the
14  plant --
15    Q.   Again, when you're talking about "the
16  plant," you're talking about your work area?
17    A.   I'm talking about -- I'm talking about
18  AK Steel, Middletown, Ohio, in my area or the areas
19  that I transferred to, the areas that I worked
20  in --
21    Q.   Okay.
22    A.   -- okay?  And with the lack of
23  minorities that were hourly, lack of supervisors
24  that were salary, I feel like that's -- you know,

1  didn't allow me to work in a place that was
2  integrated of racial -- free of discrimination
3  because we didn't have a balance.  We didn't
4  have -- there was no balance of minorities on
5  either side, upper management or -- upper
6  management, front line supervisors, you name it.
7    So with all that in mind, if there was
8  a balance in my mind, I feel if there was a balance
9  of supervisors, a balance of minorities in the
10  plant, we probably wouldn't be having this
11  conversation today.  And I probably would -- would
12  probably still be working at AK Steel.
13    Q.   Meaning you wouldn't have gotten
14  terminated?
15    A.   I probably wouldn't have.
16    Q.   You wouldn't have gotten the
17  discipline that you previously --
18    A.   I probably wouldn't have.
19    Q.   And that's your belief and
20  speculation?
21    A.   That's my belief and speculation,
22  based on the fact that other -- other individuals
23  at AK Steel would do the same thing and don't get
24  disciplined for it.

**Page 214**

1    Q.  Okay.
2    **A.  So that's the basis of the --**
3    Q.  Okay.  Thank you.  Have you ever
4  e-mailed Rodney Cosby?
5    **A.  I can't remember if I have or not at**
6  **this time.**
7    Q.  Do you have e-mail?
8    **A.  Yes, I do.**
9    Q.  Do you use e-mail?
10    **A.  Yes, I do.**
11    Q.  Do you have any e-mail between you and
12  other plaintiffs that did not involve attorneys?
13    **A.  At this time, I can't remember if I**
14  **do.**
15    Q.  Do you have any notes, letters or
16  other documents relating to the other plaintiffs
17  that you received not from counsel?
18    **A.  Clarify.**
19    Q.  Have you ever received any notes,
20  letters or other documents related to any of the
21  plaintiffs?  And I'm not asking for documents that
22  your attorneys may have shown you or provided you
23    **A.  I have to say attorney instructions on**
24  **that.**

**Page 215**

1    Q.  You've not received anything from
2  other plaintiffs, other than what your attorneys
3  have instructed you to obtain?
4    MS. DONAHUE:  Did you say "obtain"?
5    MS. PRYOR:  Yeah.
6    THE WITNESS:  Yeah, she said "obtain."
7    MS. PRYOR:  Yes.
8    MS. DONAHUE:  Okay.  Go ahead.
9    **A.  Yeah, I -- I mean -- I'd have to say**
10  **no.**
11    MS. PRYOR:  Okay.  Why don't we take a
12  short break.
13    (Off the record:  1:55 p.m. - 2:01 p.m.)
14    MS. PRYOR:  I have nothing further at
15  this time, subject to our earlier discussion.
16    MS. DONAHUE:  All right.  I have no
17  questions.
18    (Deposition concluded at 2:01 p.m.)
19
20
       _____
21       Allen Roberts
22
23
24

**Page 216**

1       C E R T I F I C A T E
2
3  STATE OF OHIO     :
4           : SS
5  COUNTY OF HAMILTON  :
6
7    I, Susan M. Barhorst, a Notary Public in
8  and for the State of Ohio, duly commissioned and
9  qualified, do hereby certify that prior to the
10  giving of this deposition the within-named ALLEN
11  ROBERTS was by me first duly sworn to testify the
12  truth, the whole truth, and nothing but the truth;
13  that the foregoing pages constitute a true,
14  correct, and complete transcript of the testimony
15  of said deponent, which was recorded in stenotypy
16  by me, and on the 12th day of September 2007 was
17  submitted to counsel for deponent's signature.
18    I further certify the within deposition was
19  duly taken before me at the time and place stated,
20  pursuant to the Federal Rules of Civil Procedure;
21  that I am not counsel, attorney, relative or
22  employee of any of the parties hereto, or their
23  counsel, or financially or in any way interested in
24  the within action, and that I was at the time of

**Page 217**

1  taking said deposition a Notary Public in and for
2  the State of Ohio.
3    IN WITNESS WHEREOF, I have hereunto set my
4  hand and notarial seal at Cincinnati, Ohio, this
5  12th day of September 2007.
6
7
8
       Susan M. Barhorst, Notary Public
9       in and for the State of Ohio.
       My commission expires
10      February 18, 2009
11
12
13
14
15
16
17
18
19
20
21
22
23
24