**Page 1**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

FOR THE WESTERN DIVISION

VIVIAN BERT, et al.,     : CASE NO. 1:02CV00467

    Plaintiffs,     : Judge Beckwith

v.     :

AK STEEL CORPORATION,     :

    Defendant.     :

_____

    Deposition of MARNIE B. CARTER, taken on Wednesday, August 15, 2007, commencing at 9:08 a.m., at the offices of Taft, Stettinius & Hollister LLP, 425 Walnut Street, Suite 1800, Cincinnati, Ohio, before Susan M. Barhorst, Notary Public.

AROUND-THE-CLOCK REPORTING SERVICES
P. O. BOX 11008
CINCINNATI, OHIO 45211
513-481-5200

Page 2

```
 1  APPEARANCES:
 2  On behalf of Plaintiffs:
 3     Susan Donahue, Esq.
        Wiggins, Childs, Quinn & Pantazis, PC
 4     The Kress Building
        301 19th Street North
 5     Birmingham, Alabama 35203
 6  On behalf of Defendant AK Steel Corporation:
 7     Patricia A. Pryor, Esq.
        Taft, Stettinius & Hollister LLP
 8     425 Walnut Street, Suite 1800
        Cincinnati, Ohio 45202-3957
 9
10  Cross-Examination
11     by Ms. Pryor           3
12                * * *
13  CARTER DEPOSITION EXHIBITS    MARKED/IDENTIFIED
14     1              20
15     2              36
16     3              55
17     4              62
18     5              67
```

Page 3

```
 1            MARNIE B. CARTER
 2  being first duly sworn, testified as follows:
 3            CROSS-EXAMINATION
 4  BY MS. PRYOR:
 5     Q.  Mrs. Carter, my name is Patty Pryor
 6  and I represent AK Steel in a lawsuit you filed
 7  against them. Can you state your full name for the
 8  record?
 9     A.  Marnie Bonita Carter.
10     Q.  And have you ever testified under oath
11  before?
12     A.  No.
13     Q.  Have you ever been involved in civil
14  litigation before?
15     A.  No.
16     Q.  Let me give you a few ground rules.
17  You need to answer out loud verbally so the court
18  reporter can hear you. Nodding of the head,
19  shaking of the head, "ah-huh's" and "na-huh's" are
20  very hard to take down.
21     A.  Okay.
22     Q.  Try to answer verbally. So far we're
23  doing good. If you don't hear a question, ask me
24  to repeat it. If you don't understand a question,
```

Page 4

```
 1  ask me to rephrase it or just tell me you don't
 2  understand, okay?
 3     A.  Okay.
 4     Q.  Is there any reason you can't testify
 5  today?
 6     A.  No.
 7     Q.  Okay. Have you taken any alcohol or
 8  drugs this morning?
 9     A.  No.
10     Q.  Is there any medication that you
11  normally take that you have not taken today?
12     A.  No.
13     Q.  And there was no medication that you
14  did take today?
15     A.  No.
16     Q.  Okay. Have you ever filed for
17  bankruptcy?
18     A.  No.
19     Q.  Have you ever been convicted of a
20  crime?
21     A.  No.
22     Q.  Why did you file this lawsuit against
23  AK Steel?
24     A.  I felt discriminated against when I
```

Page 5

```
 1  put my application in and found out I didn't pass
 2  the test when I thought I was qualified for the
 3  job.
 4     Q.  Why do you think that was
 5  discrimination?
 6         MS. DONAHUE: Object to the form.
 7  Calls for a legal conclusion. Go ahead and answer.
 8     A.  I'm sorry. What was that again?
 9     Q.  Why did you think you were -- why did
10  you think it was because of discrimination that you
11  were not hired?
12     A.  Because there was a few of us that had
13  taken the test and we all failed the test, we were
14  told. And we were all qualified and I knew some
15  that passed that weren't, I don't believe.
16     Q.  Who are the few of you that took the
17  test and failed the test?
18     A.  Well, I'm not sure of all the names,
19  but I know my mother, Darlene Carter, and my uncle,
20  Darrell Carter. There was a few other people I
21  didn't -- I can't really remember their name. It's
22  been so many years ago. Then I worked with a lot
23  of people from Ironton Iron that passed and got
24  hired.
```

**Page 6**

1  Q. And who are those --
2  A. I can't think of their names now.
3  It's been like -- since 2000.
4  Q. You can't remember any of their names?
5  A. No. A lot of them had nicknames
6  and --
7  Q. Do you remember any of their
8  nicknames?
9  A. Well, one was Booger. There's so many
10 of them, I -- I can't think of any of them.
11 Q. And how did you hear that they had
12 passed the test?
13 A. I ran into them different times -- you
14 know, Wal-Mart or somewhere. I don't recall where,
15 but -- and were working there.
16 Q. They told you they were working there?
17 A. Mm-hmm.
18 Q. And what do you know about their
19 qualifications?
20 A. Well, I don't know all their
21 qualifications, but for me to have failed the test
22 and these are people that I talked to and had many
23 conversations with, I don't believe were passed.
24 Q. You don't believe these individuals

**Page 7**

1  passed the test?
2  A. I don't believe they would have.
3  Q. Do you know whether they passed or
4  not?
5  A. No, I don't. Well, evidently they did
6  because they're working there.
7  Q. And you don't know any of their names?
8  A. No, I can't recall, sorry.
9  Q. Is there anything that would help you
10 recall their names?
11 A. No. Unless I ran into them again -- I
12 mean, sometimes I'll run into them and I'll talk to
13 them, but don't want to ask -- you know, I forgot
14 your name. I'm sorry. I don't --
15 Q. And you don't know anyone other than
16 Darlene Carter and Darrell Carter who took the test
17 and failed the test?
18 A. Not by their names.
19 Q. The other individuals that you know
20 who took and failed the test, how do you know that
21 they failed the test?
22 A. There was a couple that I talked to.
23 Like I said, this has been so many years ago. I
24 don't know about recent -- you know, but I know

**Page 8**

1  there was -- there was quite a few.
2  Q. Where did you talk to them at?
3  A. I don't recall. Sorry.
4  Q. And what did they tell you?
5  A. Just the same thing that happened to
6  us, that they were told that they didn't pass the
7  tests.
8  Q. What were their races?
9  A. Black.
10 Q. What were the races of the individuals
11 who were hired?
12 A. The ones that told me they passed the
13 test, white.
14 Q. Any other reason that you can think
15 you were discriminated against?
16    MS. DONAHUE: Object to the form.
17 Calls for a legal conclusion.
18 A. Is there any other reason I think --
19 Q. Mm-hmm.
20 A. -- no. Just the fact that I think
21 because I'm black.
22 Q. Any -- any evidence or fact to support
23 that belief?
24 A. No, I don't have no facts.

**Page 9**

1  Q. What are you seeking to obtain in this
2  lawsuit?
3  A. Some kind of compensation for the way
4  I been treated.
5  Q. And what do you mean by the way you've
6  been treated?
7  A. By being discriminated against.
8  Q. And what do you think that
9  compensation is?
10 A. Whatever the law allows, whatever --
11 Q. How did you become part of this
12 lawsuit?
13 A. I believe my name was given to some
14 lawyers from someone from AK.
15 Q. Do you know who?
16 A. I'm thinking his name was -- his last
17 name's Cosby and I'm not sure if it's Rodney or --
18 I think it's Rodney Cosby. I don't know -- have
19 the first name correct.
20 Q. How did he get your name?
21 A. I'm not sure. I think my uncle gave
22 it to him, Darrell Carter. I think he got ahold of
23 my uncle, and then my uncle also told him about me
24 and my mother.

Page 10

1  Q. And did you ask for your name to be
2  given to the lawyers?
3  A. No, I didn't know anything about it.
4  Q. Have you had any conversations with
5  your uncle, Darrell Carter, or your mom, Darlene
6  Carter, about this case outside the presence of
7  your counsel?
8  A. No.
9  Q. Did you talk to them about whether you
10 wanted to join this lawsuit before you did?
11 A. No. That's been so many years ago as
12 well. When he gave my name and as long as -- as
13 well as my mother's name, we got the letters in the
14 mail, fine with me. I was glad.
15 Q. And the letters that you got in the
16 mail, who were those from?
17 A. Our lawyers.
18 Q. Is that the first contact you had from
19 them?
20 A. Yes.
21 Q. Do you know any of the other
22 plaintiffs in the lawsuit?
23 A. I know my mother, my uncle and I know
24 Kay Jackson.

Page 11

1  Q. How do you know Kay Jackson?
2  A. I've just known her for years. She
3  played softball with my mother when I was a kid. I
4  mean, I don't know her real well, but --
5  Q. Do you know anything about Kay
6  Jackson's qualifications?
7  A. No, I don't.
8  Q. Do you know anything about her
9  application to AK Steel?
10 A. No, I don't.
11 Q. Do you know why she was not hired by
12 AK Steel?
13 A. Supposedly the same reason we all
14 were. I'm not sure.
15 Q. When you say "supposedly" --
16 A. Discrimination.
17 Q. When you say "supposedly," how do you
18 know that?
19 A. Because she's in the lawsuit with us.
20 Q. Is that the only reason?
21 A. Yes.
22 Q. And what about Darlene Carter, do you
23 know anything about her qualifications?
24 A. Yes, I worked with her.

Page 12

1  Q. Where did you work with her at?
2  A. At Ironton Iron.
3  Q. What did you do with her?
4  A. Mainly general labor. She was a core
5  maker and --
6  Q. Did you say core maker?
7  A. Mm-hmm.
8  Q. What is that?
9  A. Processor. They make car parts.
10 Q. Mm-hmm.
11 A. I'm not real sure what they're for,
12 but --
13 Q. You said your mom was a core maker?
14 A. Yes.
15 Q. What does a core maker do?
16 A. Well, it was a machine. They make
17 cores. They were just parts that go in different
18 parts of cars.
19 Q. How did she make cores?
20 A. I'm not exactly sure 'cause I didn't
21 make them. I worked with her as the forklift
22 operator and general laborer.
23 Q. So you're not exactly sure what she
24 did?

Page 13

1  A. Yeah, but I'm not -- I don't know. I'm
2  not exactly sure how to explain it to you.
3  Q. She operate a machine?
4  A. Mm-hmm. That's what --
5  Q. She sit there and press buttons?
6  MS. DONAHUE: Let her -- finish your
7  answer.
8  THE WITNESS: Oh, I'm sorry.
9  MS. DONAHUE: No, just finish your
10 answer.
11 A. Yeah, she operated a machine. She
12 made cores.
13 Q. Okay. And when she operated the
14 machine, what did she do to operate it?
15 A. She had to put sand in it and she
16 pressed buttons.
17 Q. Did she do anything else?
18 A. She did general labor, too, which will
19 be whatever we had to do. It might be shoveling or
20 just general labor, whatever was needed.
21 Q. And what was your job at Intermet?
22 A. I did general labor and I drove a
23 forklift.
24 Q. When you say you "drove a forklift,"

Page 14

1  what did you do?
2  A. I had to stack crates, racks. When a
3  core maker was done with their -- if they were
4  filling up a rack or a skid, I would be there to
5  haul it away.
6  Q. Is that all you would do?
7  A. Yeah, I did general labor, too.
8  Q. What was general labor?
9  A. It's where you shovel or sweep, do
10 whatever they tell you to do. And we would be
11 maybe processing cores where you wouldn't make
12 them, but you'd be there to -- you wouldn't run a
13 machine, but you'd be there to help with the
14 stacking or --
15 Q. So you would stack the -- the cores
16 when they came off the machine?
17 A. Yeah, clean them.
18 Q. Did you inspect the cores?
19 A. Mm-hmm.
20 Q. What were you inspecting them for?
21 A. Just any kind of -- if a mold wasn't
22 right, if it didn't fit -- you know, or it had
23 holes or anything in them.
24 Q. Did you find defects in them?

Page 15

1  A. Sometimes.
2  Q. Did you ever --
3  A. Just throw them away.
4  Q. Did you ever miss a defect?
5  A. I'm not sure. I've never been told I
6  have.
7  Q. Anything else -- you know, about
8  Darlene Carter's qualifications?
9  A. Na-huh.
10 Q. Do you know about her application at
11 AK Steel?
12 A. We took the test together, but we were
13 told we failed the test.
14 Q. Were you told together that you failed
15 the test or were you told separately?
16 A. I -- I believe it was separately. You
17 had to call in, I believe, and talk to Susan
18 Lester.
19 Q. Did you apply together?
20 A. I'm pretty sure we did.
21 Q. What about Darrell Carter, what do you
22 know about his qualifications?
23 A. Not much. I didn't work in the same
24 department with him. He worked over in -- on the

Page 16

1  furnace.
2  Q. At Intermet you mean?
3  A. Mm-hmm. Yes, sorry.
4  Q. Do you know anything about his
5  application at AK Steel?
6  A. Same as me and my mother's. He took
7  the test and was told he failed.
8  Q. Did he take the test with you?
9  A. No, I don't think he took it with us.
10 I think he took it a few months later. I'm not
11 sure.
12 Q. And how do you know he took a test,
13 did he tell you that?
14 A. Yes.
15 Q. Do you know it any other way?
16 A. No.
17 Q. Okay. How do you know he failed the
18 test?
19 A. Well, he told us and he's in the
20 lawsuit with us.
21 Q. Is that the only way you know?
22 A. Mm-hmm, yes.
23 Q. Do you know any of the other
24 plaintiffs besides Kay Jackson, Darrell and

Page 17

1  Darlene?
2  MS. DONAHUE: Object to the form,
3  asked and answered. Go ahead.
4  A. No.
5  Q. How many meetings have you had with
6  your attorneys?
7  A. I think I've been to one with them,
8  and then I'm thinking we had two conference calls
9  and I know I missed one. So I'm not sure how many
10 there've been all together.
11 Q. So you were at one meeting and you've
12 had -- been on two conference calls?
13 A. I'm thinking it was two. I'm not
14 sure.
15 Q. And you think you --
16 A. I been at --
17 Q. I'm sorry.
18 A. -- at least two meetings, not
19 counting -- well, counting one before this one.
20 Q. Okay. "This one," meaning last night?
21 A. Yeah.
22 Q. Okay. And the meeting -- I'm sorry.
23 A. I'm sorry. Go ahead.
24 Q. And the meeting that you had with your

Page 18

1  attorneys, was that before the lawsuit was filed or
2  after?
3     A.  After.
4     Q.  And the conference calls you had with
5  your attorneys, was this before the lawsuits were
6  filed or after?
7     A.  After.
8     Q.  After?
9     A.  Mm-hmm.
10    Q.  Did you have any meetings or
11 conference calls with the attorneys prior to the
12 lawsuit being filed?
13    A.  No.
14    Q.  Are you aware of anyone who failed the
15 test and was hired by AK Steel?
16    A.  No.
17    Q.  Are you aware of anyone else who
18 failed the test and was not hired?
19        MS. DONAHUE:  Objection, asked and
20 answered.
21    A.  No.
22    Q.  You understand that you are seeking to
23 be a class representative in this case?
24    A.  Yes.

Page 19

1     Q.  What do you understand the role of
2  class representative to be?
3     A.  **I guess to be honest and tell -- tell**
4  **what happened to us.**
5     Q.  Anything else?
6     A.  **I'm not sure.  I mean, I don't --**
7     Q.  Have you talked to any of the other
8  plaintiffs about what's going on in this lawsuit
9  outside the presence of counsel?
10    A.  No.
11    Q.  Have you been aware of what's been
12 going on in this lawsuit?
13    A.  **Yeah, with what the attorneys told me.**
14    Q.  Do you know where settlement
15 negotiations stand?
16    A.  **Really, no.**
17    Q.  Do you know how much your attorneys
18 have spent in fees and expenses?
19    A.  No.
20    Q.  Do you understand that you have waived
21 your right to recover compensatory and punitive
22 damages?
23        MS. DONAHUE:  Object to the form.
24 Calls for a legal conclusion.

Page 20

1     A.  What is that?
2     Q.  Do you know -- understand that you
3  have waived your right to recover compensatory and
4  punitive damages?
5        MS. DONAHUE:  Object to the form.
6  Mischaracterizes the record of this lawsuit and
7  calls for a legal conclusion.  Go ahead.
8     A.  No.
9     Q.  You've been handed what's been marked
10 as Exhibit 1.  Have you seen this document before?
11    A.  Yes.
12    Q.  Do you know what year you saw it?
13    A.  **No, I don't remember.**
14    Q.  Was it recently?  Was it a long time
15 ago?
16    A.  **I'm not sure, but -- I'm not sure.**
17    Q.  Did you gather documents in response
18 to this?
19    A.  **I believe I did.**
20    Q.  What documents do you have that relate
21 to this lawsuit?
22    A.  **What do you mean?  I'm sorry.  What --**
23 **what documents do I have?**
24    Q.  Yes.

Page 21

1     A.  **Like something like this?**
2     Q.  No.  I'm asking what documents do you
3  have that you gathered.  You said you believe you
4  gathered documents in response to this document.
5  What documents were those?
6        MS. DONAHUE:  Just take your time to
7  look through the whole thing.
8     A.  **Okay.  I'm trying to see which ones.**
9  **I really don't remember which ones I have.  I**
10 **believe this is the one where we had to produce our**
11 **W-2's and the jobs that we've had since 2001.  I**
12 **really can't remember which other ones.**
13    Q.  Once you received this document, did
14 you immediately start saving or keeping your W-2's
15 and tax returns?
16    A.  **I already had them.**
17    Q.  Okay.  You keep your --
18    A.  Yes.
19    Q.  -- W-2's?
20    A.  Yeah.
21    Q.  Have you seen a copy of the complaint
22 that's been filed in this action?
23    A.  Yes.
24    Q.  Did you review it before it was filed?

6 (Pages 18 to 21)

Page 22

1  A. I don't remember.
2  Q. Okay. What's your current address?
3  A. 908 South Eighth Street, Ironton,
4  Ohio.
5  Q. And are you married?
6  A. No.
7  Q. Have you ever been married?
8  A. No.
9  Q. Do you live with anyone at 908 South
10 Eighth Street?
11 A. Yes. I live with my mother and my
12 grandparents.
13 Q. And who are you --
14 A. And, of course, my daughter and I have
15 a little sister.
16 Q. Who are your grandparents?
17 A. William and Mildred Carter.
18 Q. And do either of them work?
19 A. No.
20 Q. And you said that you --
21 A. They're both retired.
22 Q. Where did they retire from?
23 A. My grandfather retired from -- it was
24 Dayton Malleable. Well, it turned over to Ironton

Page 23

1 Iron and my grandmother retired from -- I can't
2 think of the name of the place now. It was a place
3 for mentally challenged people. I can't think of
4 the name of it.
5  Q. And you said that you live with
6 your -- you have a sister that lives with you?
7  A. Mm-hmm.
8  Q. Who's that?
9  A. Her name is Alexa Carter. She's 14.
10 Q. And you said you have a daughter?
11 A. Mm-hmm.
12 Q. Who's that?
13 A. McKenzie Carter.
14 Q. How old is she?
15 A. She's six.
16 Q. And what's your education? Did you
17 graduate high school?
18 A. Yes.
19 Q. What high school?
20 A. Ironton High School.
21 Q. What year was that?
22 A. '88, 1988.
23 Q. And did you attend any college?
24 A. No. I took a phlebotomy course.

Page 24

1 That's after Ironton Iron.
2  Q. A what -- a what course?
3  A. Phlebotomy.
4  Q. What is that?
5  A. Blood draw work.
6  Q. Okay. I thought you said lobotomy.
7     You took -- it was just one course?
8  A. Yes. Well, I got my certificate,
9 yeah.
10 Q. Have you done anything with that
11 certificate?
12 A. No. I'm a nurse aide. I -- I didn't
13 go into that.
14 Q. Okay. Any other degrees, courses or
15 training that you've received?
16 A. No.
17 Q. Okay. Let's just go through your
18 employment history. After you graduated high
19 school, where did you go to work?
20 A. Little Caesar's Pizza.
21 Q. What did you do there?
22 A. Made pizzas. I opened the store.
23 Q. How long did you work there?
24 A. I'd say about five years. I can't

Page 25

1 really remember.
2  Q. And did you start in 1988, the year
3 you graduated?
4  A. Yes.
5  Q. Why did you leave that position?
6  A. I went to Ironton Iron.
7  Q. And Ironton Iron is also called
8 Intermet?
9  A. And Ironton Iron.
10 Q. And do you know what year you started
11 at Intermet?
12 A. I'm thinking it was in '93. I'm not
13 sure.
14 Q. And how long did you work there?
15 A. Till 2000, I believe.
16 Q. And you've already told me what you
17 did there?
18 A. Mm-hmm, yes.
19 Q. And why did you leave Intermet?
20 A. It shut down.
21 Q. The plant shut down?
22 A. Yes.
23 Q. That was a union facility, correct?
24 A. Yes.

Page 26

1  Q. And do you know why they shut down?
2  A. No, I'm not sure.
3  Q. Where have you worked after Intermet?
4  A. Applied Cards.
5  Q. What is that?
6  A. It was a credit card company, like a
7 bill collector type thing.
8  Q. And what did you do there?
9  A. I call people and ask them to pay
10 their bill, make a payment on their credit cards.
11  Q. When did you start there?
12  A. Goodness. I'm not sure if it was 2002
13 or 2003.
14  Q. How long did you work there?
15  A. I don't even think it was a year
16 before it shut down. I'm not sure. I can't
17 remember. I'd have to --
18  Q. That place shut down as well?
19  A. Yes. The one I worked at shut down.
20 They had one in Huntington, too.
21  Q. What was your rate of pay there?
22  A. I believe it was 8.50 an hour.
23  Q. Did you receive any raises while you
24 were there?

Page 27

1  A. No.
2  Q. How many hours a week did you work?
3  A. I'd say -- I'm thinking it was around
4 30 a week.
5  Q. And did you receive any benefits
6 there?
7  A. No.
8  Q. And you left when it shut down?
9  A. Yes.
10  Q. Did you do anything in between? You
11 left Intermet in 2000 and you started at Applied
12 Card Services in 2002. Did you do anything in
13 between?
14  A. Well, I was pregnant in 2000 and I --
15 after Intermet shut down, that's when they -- it
16 was a thing called a trade allowance adjustment or
17 something, where they let us go to school and paid
18 us to go to school and paid for our schooling.
19 That's when I took the phlebotomy.
20  Q. Who paid you?
21  A. It was from Intermet. It was a thing
22 they had going on called TRA. I'm not really sure
23 what the letters stood for, but they paid you to go
24 to school if you wanted to and paid for your

Page 28

1 schooling. But before that, with me being
2 pregnant, I went ahead and collected my
3 unemployment and after that, that's when I went to
4 school.
5  Q. So you were not actively looking for
6 work during that period of time?
7  A. No, no. I was pregnant and staying
8 home.
9  Q. Okay. Where did you go to work after
10 Applied Card Systems?
11  A. I believe I went to Bryants nursing
12 home.
13  Q. And where is that located?
14  A. It's in Ironton.
15  Q. Do you know what year you started
16 there?
17  A. 2004, I think it was.
18  Q. Was there a break in time between when
19 you left Applied Cards system and starting at
20 Bryants nursing home?
21  A. I'm not sure. If there was, it wasn't
22 long.
23  Q. Could it have been a year?
24  A. I'm not sure. It didn't seem like

Page 29

1 it'd been that long to me.
2  Q. What did you do at Bryants nursing
3 home?
4  A. I'm a nurse aide.
5  Q. And how long did you work there?
6  A. I'm still employed there, but where I
7 was training in the beginning, after 120 days, we
8 had to get off the floor if you weren't state
9 tested yet. And that's when I went to Oakridge
10 after 120 days at Bryants.
11  Q. What do you mean you "had to get off
12 the floor"?
13  A. You couldn't be an aide anymore unless
14 you were state tested.
15  Q. And you're not state tested?
16  A. No.
17  Q. Why not?
18  A. Because she hasn't scheduled our test
19 yet, our employer.
20  Q. So did you leave the employment of
21 Bryants nursing home for a period?
22  A. Yes.
23  Q. Okay. What was your pay when you were
24 at Bryants the first time?

8 (Pages 26 to 29)

Page 30

1   A.   I think it was 8.10 an hour.
2   Q.   8.10?
3   A.   I'm thinking it was. I'm not sure.
4   Q.   Did you receive any raises that first
5 120 days?
6   A.   No.
7   Q.   Did you receive any benefits during
8 the first 120 days?
9   A.   No.
10  Q.   What were your hours?
11  A.   Well, the way we worked there is --
12 you work four days and you're off two, and then you
13 go back on the seventh day, so your days are
14 different. Some weeks it would be 30, 32; and then
15 the next week it would be 40. You know what I'm
16 saying?
17  Q.   Mm-hmm. Did they terminate you there
18 after 120 days?
19  A.   No.
20  Q.   Were you on a leave of absence?
21  A.   Something like that. It was -- we
22 just couldn't work anymore until we got our test.
23  Q.   So where -- did you go somewhere after
24 that?

Page 31

1   A.   I went to Oakridge Treatment Center.
2   Q.   What do you do there?
3   A.   It was a place for troubled kids.
4   Q.   What did you do?
5   A.   I was -- they had cottages and I was
6 like -- I was a mental health specialist, is what
7 they called us. But we just had to watch them --
8 you know, and take them to their schools and --
9 which they had schools on the facility for them and
10 just actually kind of baby-sit.
11  Q.   How much did you make there?
12  A.   I think that was $8 an hour.
13  Q.   Did you receive any raises?
14  A.   No, I don't think so.
15  Q.   How many hours did you work?
16  A.   Between 30 and 40 hours a week.
17  Q.   Did you receive any benefits?
18  A.   No.
19  Q.   And why did you leave there?
20  A.   Because I got my state test and passed
21 it and went back to Bryants.
22  Q.   Why did you go back to Bryants instead
23 of staying at Oakridge?
24  A.   'Cause it was right in town and I

Page 32

1 would have been making more money. I guess I liked
2 it better working with the old people than I did
3 with the bad children.
4   Q.   Where was Oakridge located?
5   A.   It was located on the outsides of
6 Ironton. It's -- you got to like go a little ways
7 out to get there.
8   Q.   How many times did you take the state
9 test?
10  A.   Once.
11  Q.   And what was that state test? Is that
12 a nurse aide test?
13  A.   Yes.
14  Q.   And are you certified now?
15  A.   Yes.
16  Q.   So did you work at Oakridge roughly
17 between August 2004 and the first of November 2004?
18  A.   That sounds about right 'cause I think
19 I got my state test in September. I don't know if
20 I stayed at Oakridge till November.
21  Q.   Okay.
22  A.   I'm not sure if -- I worked there.
23 It's around that time.
24  Q.   Okay. And you returned to Bryants

Page 33

1 nursing home?
2   A.   Yes.
3   Q.   Was that roughly November 2004?
4   A.   Between the end of September and maybe
5 the beginning of November.
6   Q.   Sometime in that time frame?
7   A.   I'm not sure if it's 2004 or 2005.
8   Q.   Okay.
9   A.   I'm thinking I got -- I know I worked
10 there 120 days. I might be getting my times that I
11 was certified and the times where I worked there
12 the first time. I'm thinking I went back there in
13 2005.
14  Q.   You think you went back to Bryants in
15 2005?
16  A.   I think I got state tested in 2005 --
17  Q.   Okay. And --
18  A.   -- which would make it 2005 that I
19 worked at Oakridge. I'm not sure.
20  Q.   Okay. How long did you work at
21 Oakridge?
22  A.   Just a few months.
23  Q.   Okay. And did you go from Bryants,
24 the first time, directly to Oakridge or was there a

Page 34

1  break in time?
2      A.  A week.  Pretty sure it was a week
3  'cause I think I went to the beach a week and when
4  I got back, I went to Oakridge.
5      Q.  Okay.  And when you went from Oakridge
6  back to Bryants, was there any break in time
7  between those?
8      A.  No, no.  I gave them two weeks'
9  notice, and then went back on my scheduled day to
10 Bryants.
11     Q.  Okay.  And back at Bryants, are you
12 still currently employed there?
13     A.  Yes.
14     Q.  Is your -- what's your job?
15     A.  I'm a nurse aide.
16     Q.  What is your pay?
17     A.  I'm 9.05.
18     Q.  Did you come back at 9.05 or is that a
19 subsequent raise?
20     A.  It was a raise.
21     Q.  When did you receive that raise?
22     A.  I believe when I went back, it was at
23 8.30 or 8.35, and then shortly after that, I got a
24 raise to 8.85.  And then here recently, I just got

Page 35

1  a 20 cent raise and that was probably about a month
2  ago.
3      Q.  And what are your hours there now?
4      A.  Same as I told you before.  We worked
5  for four days and have -- some days -- some weeks
6  we have 40 hours, maybe the next week it will be
7  32.
8      Q.  Okay.  Do you have any benefits?
9      A.  No.
10     Q.  Have you worked anywhere else?
11     A.  Nope.
12     Q.  Have you ever been terminated from an
13 employer?
14     A.  Nope --
15     Q.  Have you ever --
16     A.  -- no.
17     Q.  Have you ever been disciplined at any
18 employer?
19     A.  No.
20     Q.  Have you ever been involved in an
21 incident or accident at work?
22     A.  No.
23     Q.  Have you ever been involved in an
24 incident where there was damage to company

Page 36

1  property?
2      A.  No.
3      Q.  Have you ever had a safety infraction?
4      A.  No.
5      Q.  Have you ever sued anyone else?
6      A.  No.
7      Q.  Have you ever threatened to sue anyone
8  else?
9      A.  No.
10     Q.  How many times did you apply at AK
11 Steel?
12     A.  Once, I believe.
13     Q.  Just once?
14     A.  Yeah, I'm pretty sure it was just
15 once.
16     Q.  You've been handed what's been marked
17 as Exhibit Number 2.
18     A.  Okay.
19     Q.  Is this a copy of your application?
20     A.  It looks like it.  It's my
21 handwriting.  This is old.
22     Q.  Is that your signature on the last
23 page?
24     A.  Yes.

Page 37

1      Q.  And on the first page at the top,
2  there's a date, October 2nd, 2001.  Is that when
3  you applied?
4      A.  I'm not sure if that's when I applied
5  or when I took the test or what.
6      Q.  Is that your handwriting?
7      A.  No.
8      Q.  That's not your handwriting?
9      A.  This up here?
10     Q.  No.
11     A.  Oh, where?
12     Q.  I'm sorry.  Right next to your name --
13     A.  Oh, I'm sorry.
14     Q.  -- and the date.
15     A.  Yeah.
16     Q.  It says 10/02/01.  Is that your
17 handwriting?
18     A.  Yes.
19     Q.  Okay.  Is that the date that you
20 filled out this application?
21     A.  Yes.
22     Q.  How did you get the application?
23     A.  I don't remember if I got it -- I'm
24 thinking I got it at a job fair in Portsmouth.

**10 (Pages 34 to 37)**

Page 38

1  Q. How did you find out about the job
2 fair?
3  A. I don't remember and I can't
4 remember -- a few of us went down there. I can't
5 remember.
6  Q. You don't know who went with you?
7  A. I know my mother went with me, but I'm
8 thinking a couple other people went, but I can't
9 remember.
10  Q. Do you know who those might have been?
11  A. Na-huh.
12  Q. Did you know the people that went with
13 you?
14  A. Yeah, I just don't remember who they
15 were. I'm sure -- I mean, we all went in the car
16 together. I just can't remember who all went with
17 us. It's been 2001.
18  Q. Your mom --
19  A. I could say a cousin of mine, but I'm
20 not sure if it was her or which one. I'm not sure.
21  Q. Do you know other people who have
22 applied at AK Steel?
23  A. My mother and my uncle.
24  Q. You mentioned a cousin. Did she apply

Page 39

1 at AK Steel?
2  A. I'm not sure.
3  Q. What's her name?
4  A. I don't want to say because I don't
5 know who went with me. You know what I mean?
6  Q. I understand that. I'm just asking
7 for your cousin's name.
8  A. Her name is Ayanna Carter, but I'm not
9 sure if she applied. I'm not even sure if it was
10 her that went.
11  Q. How do you spell the first name?
12  A. A-Y-A-N-N-A.
13  Q. Okay. So you went to a job fair in
14 Portsmouth. What happened at the job fair?
15  A. Just went to different booths, getting
16 different applications and things and I'm thinking
17 that's where we met the Cosby -- I guess Rodney
18 Cosby. I'm not sure what his first name is.
19  Q. And what did he say?
20  A. I'm thinking he's the one that gave us
21 the applications.
22  Q. Did he tell you anything?
23  A. I don't recall, just put them in.
24  Q. Did you fill them out there and turn

Page 40

1 them in?
2  A. No. I -- no.
3  Q. Where was -- where in Portsmouth was
4 the job fair?
5  A. Oh, gosh. What building was that?
6 I'm thinking it was a lodge or something, maybe
7 like a Elk's hall or something. I'm not sure.
8  Q. Do you know whether Rodney Cosby was
9 employed by AK Steel?
10  A. You know, I didn't really know him.
11 I'd see my uncle talking to him more and he didn't
12 really say much -- you know, to me. They talked.
13 I just assumed he was or is.
14  Q. So did your uncle go with you to the
15 job fair?
16  A. I don't recall.
17  Q. I thought you just said you saw your
18 uncle talking to him?
19  A. I have seen him talking to him.
20  Q. Okay. But you're not talking about at
21 the job fair?
22  A. No.
23  Q. Okay. And do you remember anything
24 that Rodney Cosby said that day?

Page 41

1  A. (Witness nodded.)
2  Q. Is that a "no"?
3  A. No, I'm sorry.
4  Q. Did you talk to anyone else about AK
5 Steel that day?
6  A. I don't think so.
7  Q. So you took the application from
8 Mr. Cosby, and then what did you do?
9  A. Filled them out, took them back.
10  Q. Took it back where?
11  A. Over to AK, I believe.
12  Q. And where did you drop it off at AK?
13  A. I can't remember.
14  Q. Did you talk to anyone when you did
15 that?
16  A. I can't remember. I can't even
17 remember how we got our test dates, if Susan called
18 us or -- I -- I don't remember.
19  Q. Okay. Did anyone go with you when you
20 took the application back?
21  A. I don't remember. I -- I assume my
22 mother did. We probably took them back at the same
23 time.
24  Q. But you don't recall?

**11 (Pages 38 to 41)**

Page 42

1  A.  But this -- no, I don't.
2  Q.  Did you complete this at home, this
3  application?
4  A.  I probably did. I didn't complete it
5  at the job fair, I know that. I'd say more than
6  likely I did it at home, and then took it over.
7  Q.  Okay. And you filled it out honestly?
8  A.  Yes.
9  Q.  It references on the last page, who
10 is -- is that Willa Mae Royal?
11 A.  Willa Mae Royal, yes.
12 Q.  Who is that?
13 A.  She's a neighbor.
14 Q.  Why do you list her as a reference?
15 A.  Well, because we -- I've known her my
16 whole life she knows me.
17 Q.  Okay.
18 A.  It's a small town, so we basically --
19 you know, everybody especially if you live around
20 them --
21 Q.  What about your cousin?
22 A.  Yeah, that's the one I was telling you
23 about.
24 Q.  Why do you list her?

Page 43

1  A.  Because she goes -- because we're good
2  friends and she knows me well. But she goes so
3  many places with me, so I wasn't sure if she went.
4  Q.  Okay. What about Sue Birchfield?
5  A.  The same thing. She's a good friend.
6  She's --
7  Q.  Have you worked with any of these
8  individuals?
9  A.  No.
10 Q.  After you took the application back to
11 AK Steel, what happened next?
12 A.  I can't remember if Susan called us
13 for a test date or how we even found out about a
14 test date.
15 Q.  At some point, you went in to take a
16 test?
17 A.  Yes.
18 Q.  And I think you testified earlier that
19 you and your mom went and took the test at the same
20 time?
21 A.  Yes.
22 Q.  Did anyone else go with you to take
23 the test?
24 A.  No. I believe it was just me and her.

Page 44

1  I mean, there were other people there taking it.
2  Q.  Do you know how many people were there
3  taking it?
4  A.  I can't recall.
5  Q.  Okay.
6  A.  But they had a bunch of different
7  tables and maybe one person be sitting here; two
8  people at another table. I -- I can't recall.
9  Q.  Did you talk to anyone at the test?
10 A.  What do you mean, did I --
11 Q.  Did you have any conversation with
12 anyone when you were at the test?
13 A.  No, my mother.
14 Q.  What did you talk to her about?
15 A.  Just general conversation. Well, we
16 didn't talk during the test.
17 Q.  Sure.
18 A.  You know, you can't do that. But I'm
19 sure we didn't sit there in silence --
20 Q.  Okay.
21 A.  -- you know, and breaks or whatever.
22 Q.  Did you talk to anyone at AK Steel?
23 A.  I don't recall. I think just the test
24 giver. There was -- I don't think anyone was down

Page 45

1  there, but the one giving the test.
2  Q.  Do you know who that was?
3  A.  I'm not sure who -- who it was. I'm
4  not sure if it was Susan or someone else.
5  Q.  Do you know Susan Lester?
6  A.  I don't know her personally. I've --
7  I've talked to her on the phone and I've met her.
8  Q.  When did you meet her?
9  A.  I'm not sure. I just know I know what
10 she looks like. It might have been the day of the
11 test. I may have met her then.
12 Q.  Do you remember whoever was there the
13 day of the test, do you remember them saying
14 anything?
15 A.  Saying anything like?
16 Q.  Giving the instructions, telling you
17 anything.
18 A.  Oh, we got instructions to -- what to
19 do.
20 Q.  Okay. Anything else?
21 A.  And I'm not sure if we had time limits
22 on each part. It's just -- I can't really
23 remember.
24 Q.  Okay. So you took the test?

**12 (Pages 42 to 45)**

Page 46

1     **A.  Yes.**
2     Q.  Did you do any -- what was the next
3 thing that happened?
4     **A.  After the test?**
5     Q.  Mm-hmm.
6     **A.  Turned them in and left.**
7     Q.  Okay. Did you hear anything back from
8 AK Steel?
9     **A.  Well, I'm pretty sure we had -- I**
10 **called in. I remember that. I think we had to**
11 **call in in maybe a certain length of time, wait to**
12 **call in. And that's when we found out we didn't**
13 **pass.**
14     Q.  You said "we found out." Did --
15     **A.  Yeah, my mom called, too.**
16     Q.  Okay. Did you call separately? Did
17 you call together?
18     **A.  Separately.**
19     Q.  Okay. When you called, what were you
20 told?
21     **A.  That I didn't pass the test.**
22     Q.  Were you told anything else?
23     **A.  And I asked what my scores were and I**
24 **was told that they sent the test off to an**

Page 47

1 **independent place that just sent back pass or fail.**
2 **They don't tell you anything else.**
3     Q.  Do you have any reason to doubt that
4 that's true?
5     **A.  Well, yeah.**
6     Q.  What is that?
7     **A.  Because I don't believe I passed -- I**
8 **flunked the test.**
9     Q.  And what's that belief based on?
10     **A.  Because by taking it, I knew a lot of**
11 **it.**
12     Q.  You thought the test was easy?
13     **A.  And -- not easy.**
14     MS. DONAHUE: You're kind of
15 interrupting each other.
16     THE WITNESS: I'm sorry. I'm sorry.
17     MS. DONAHUE: No, it's not your fault.
18     MS. PRYOR: That's fine.
19     MS. DONAHUE: I just want you to have
20 time to give a complete answer.
21     THE WITNESS: Okay. I'm just
22 freezing.
23 BY MS. PRYOR:
24     Q.  That's okay. Did you find the test

Page 48

1 easy?
2     **A.  No, not really.**
3     Q.  Was it hard?
4     **A.  Medium.**
5     Q.  Okay. Throughout the application
6 process, was anyone hostile to you?
7     **A.  Not -- not hostile.**
8     Q.  Was the process itself hostile?
9     **A.  No.**
10     Q.  Okay. Did anyone tell you to go apply
11 at AK Steel?
12     **A.  Well, at the job fair when we got the**
13 **applications is why we went.**
14     Q.  Did Rodney Cosby tell you you should
15 definitely apply at AK Steel?
16     **A.  I'm not sure.**
17     Q.  Did you apply at other places when you
18 went to that job fair?
19     **A.  I'm not sure. There was so many**
20 **booths there, I can't remember.**
21     Q.  After you called -- did you talk to
22 Susan Lester when you called in, found out about
23 your test scores?
24     **A.  Yes.**

Page 49

1     Q.  After that conversation, had you heard
2 anything back from anyone at AK Steel?
3     **A.  I don't believe so.**
4     Q.  Have you talked to anyone at AK Steel?
5     **A.  No, after that conversation.**
6     Q.  And on the front of your application,
7 this is handwriting which I understand is not
8 yours. Up in the corner, it says, "Test Friday NQ
9 11/2/01."
10     November 2nd, 2001, does that sound
11 about when you would have taken the test?
12     **A.  Yeah, it may have been 'cause I**
13 **remember I had my daughter in 2000. I know she was**
14 **real little. I think she was one yet or barely**
15 **one.**
16     Q.  Okay. Were you ever interviewed by
17 anyone at AK Steel?
18     **A.  I'm not sure if I had an interview or**
19 **not. I think I just had a test date, and then -- I**
20 **don't think I -- I had an interview.**
21     Q.  Okay.
22     MS. PRYOR: Let's take a short break.
23     MS. DONAHUE: Okay.
24     (Off the record: 9:59 a.m. - 10:05 a.m.)

Page 50

1  BY MS. PRYOR:
2  Q. Ms. Carter, do you know why you were
3  not hired by AK Steel?
4  A. Do I know why I wasn't hired?
5  Q. Yes.
6  A. Discrimination is what I believe.
7  Q. Okay. And you've told me all the --
8  A. Because --
9  Q. -- reasons why you believe that?
10 A. Yes, ma'am.
11 Q. And do you know whether any white
12 applicant who had the same or less qualifications
13 than you was hired?
14     MS. DONAHUE: Object to the form,
15 asked and answered. Go ahead.
16 A. Because they're white is what I'm -- I
17 just believe I was discriminated against.
18 Q. Okay. But my question was, do you
19 know any white applicant who had the same
20 qualifications as you or less qualifications than
21 you who was -- actually was hired? Do you know --
22 A. Not by names.
23 Q. -- their names?
24 A. I -- I don't know their names.

Page 51

1  Q. Do you know them by any other way?
2  A. I know one nickname I told you --
3  Q. Okay.
4  A. -- but I see him sometimes. I could
5  get their names, but I just can't -- not right off
6  the top of my head, I can't think of their names.
7  It's been so many years since I worked with them.
8  Q. Are these the individuals we talked
9  about earlier?
10 A. And people that I haven't seen in
11 years.
12 Q. Are these the individuals we talked
13 about earlier?
14 A. Yes, I believe so.
15 Q. Are these the individuals that you
16 said you don't know anything about their
17 qualifications?
18 A. I said I've worked with them and I had
19 many conversations with them. I don't believe that
20 they have passed.
21 Q. You don't believe they've passed the
22 test?
23 A. Right.
24 Q. You don't know that, though, correct?

Page 52

1  A. I assume they did because they're
2  working in there.
3  Q. Okay. And do you know what their
4  qualifications outside of the test are?
5  A. No.
6  Q. Okay. Did anyone at AK Steel ever say
7  anything to you about your application?
8      MS. DONAHUE: Object to the form.
9  Asked and answered about three times.
10 A. What about my -- I don't know what you
11 mean.
12 Q. Did anyone at AK Steel ever talk to
13 you about your application?
14 A. I just had a test day.
15 Q. Other than -- anything else?
16 A. I don't believe so, no.
17 Q. Did anyone at AK Steel ever tell you
18 why you were not hired?
19 A. For not passing the test.
20 Q. Is that the only reason you've ever
21 been given?
22 A. Yes.
23 Q. Okay. Did anyone at AK Steel ever say
24 anything to you about your race?

Page 53

1  A. No, ma'am.
2  Q. Did anyone at AK Steel ever say
3  anything that you thought was discriminatory?
4  A. No, ma'am.
5  Q. Did anyone at AK Steel ever do or say
6  anything that you thought was hostile or offensive?
7  A. No.
8  Q. Did you ever hear from anyone else
9  that anyone at AK Steel ever did or said anything
10 that was discriminatory?
11 A. No.
12 Q. Did you ever hear from anyone else
13 that anyone at AK Steel ever did or said anything
14 that was hostile or offensive?
15 A. No, not that I can recall.
16 Q. And did anyone at AK Steel treat you
17 differently than a white applicant?
18 A. I don't know.
19     MS. DONAHUE: Object to the form.
20 Calls for speculation.
21 BY MS. PRYOR:
22 Q. I'm sorry. What was your answer?
23 A. I don't know.
24 Q. Do you have any other evidence to

Page 54

1  support your claim that you were treated
2  differently than white applicants?
3      A.   No.
4      Q.   Do you have any other facts or
5  evidence that support your claim that you were
6  discriminated against because of your race?
7          MS. DONAHUE:  Object to the form.
8  Calls for speculation.
9      A.   Any other --
10     Q.   Facts or evidence.
11         MS. DONAHUE:  Calls for a legal
12 conclusion.
13 BY MS. PRYOR:
14     Q.   Do you have any other facts or
15 evidence to support your claim that you were
16 discriminated against because of your race?
17         MS. DONAHUE:  Object to the form.
18         THE WITNESS:  God, one more time,
19 please.  I'm sorry.
20         MS. PRYOR:  It's hard when someone
21 keeps objecting.
22         THE WITNESS:  That's okay, but -- I'm
23 sorry.
24         MS. PRYOR:  Susan, I understand

Page 55

1  there's an objection to the question.  If --
2          MS. DONAHUE:  Okay.
3          MS. PRYOR:  We don't need to repeat it
4  every time.
5          MS. DONAHUE:  All right.  So please
6  listen and --
7          THE WITNESS:  Okay.
8          MS. DONAHUE:  -- just give your
9  answer.
10 BY MS. PRYOR:
11     Q.   Do you have any other facts or
12 evidence to support your claim that you were
13 discriminated against because of your race?
14     A.   I don't have any facts.
15     Q.   Do you have any evidence?
16     A.   No.
17     Q.   Okay.  And do you know who AK Steel
18 hired instead of you?
19     A.   No, I don't.
20     Q.   Okay.  Do you know who at AK Steel
21 made the decision not to hire you?
22     A.   I was just told by Susan Lester.  I
23 don't know who made the decision.
24     Q.   Ms. Carter, you've been handed what's

Page 56

1  been marked as Exhibit Number 3.  Have you seen
2  this document before?
3      A.   Yes.
4      Q.   Is that your signature at the bottom
5  of the first page?
6      A.   Yes.
7      Q.   And is that your signature on the last
8  page?
9      A.   Yes.
10     Q.   Did you create and type this document
11 or did someone send it to you?
12     A.   It was sent to me.
13     Q.   Okay.  And what did you do with it
14 when you got it?
15     A.   What, this, this front page or the
16 whole thing?
17     Q.   The whole document.
18     A.   Well, I imagine -- I don't remember.
19 I imagine I filled it out.  I got --
20     Q.   What was sent to you, the typed
21 documents?
22     A.   All of it.
23     Q.   All of it was sent to you?
24     A.   Mm-hmm.

Page 57

1      Q.   And did you fill in the part that's
2  handwritten?
3      A.   Yes, that's my handwriting.
4      Q.   Okay.  And the second and third pages,
5  was that already typed for you?
6      A.   Yes.
7      Q.   And did you sign it on -- it looks
8  like June the 14th, 2002?
9      A.   Yes.
10     Q.   And what did you do with the document
11 then?
12     A.   I imagine I mailed it back.
13     Q.   Mailed it back to who?
14     A.   My attorney.
15     Q.   Okay.  And do you know whether it was
16 ever filed with the EEOC?
17     A.   Yeah, it was filed.
18     Q.   Do you know what date it was filed?
19     A.   No, I don't.
20     Q.   It was your understanding that you
21 were going to mail it back to your attorneys and
22 they were going to file it?
23     A.   Yes.
24     Q.   Did you review the documents before

Page 58

1  you signed it?
2     A.   Yes.
3     Q.   On page 2, it said that you applied in
4  approximately January 2002.  Is that the
5  application that we just looked at?
6     A.   That's the only time I've applied, I'm
7  sure.  I think that's the only time I've ever
8  applied, so -- this right here?
9     Q.   Yes, exhibit --
10    A.   Yes.
11    Q.   So January 2002 actually ought to be
12 October 2001 on Exhibit Number 3?
13    A.   Well, I'm not sure.  I'm thinking this
14 is when I applied.  I'm thinking that January 2002
15 was when I had my test.
16    Q.   You don't think you had taken the test
17 until January 2002?
18    A.   I'm not sure.
19    Q.   Do you know when you took the test?
20    A.   I thought it was in January.
21    Q.   Any basis for that belief?
22    A.   No, just trying -- trying to remember,
23 thinking back.
24    Q.   How long --

Page 59

1     A.   It's just hard to remember.
2     Q.   How long --
3     A.   That was --
4     Q.   -- after you applied did you take the
5  test?
6     A.   I don't remember.
7     Q.   Was it several months?  Was it a
8  month?
9     A.   I haven't -- I do not remember.
10    Q.   No idea?
11    A.   No, that's -- that's been six years
12 ago.  I can't remember.
13    Q.   So if AK Steel's records say it was in
14 November of 2001, would you have any basis to
15 dispute that?
16    A.   Well, I'm sure my date -- the date
17 would be on the test.  I would have signed it --
18    Q.   Okay.
19    A.   -- so whenever the test is.  But it's
20 just hard to remember exact dates when it's been so
21 many years ago.
22    Q.   Why do you put in the statement of
23 facts that you have no felony convictions and are
24 drug free?

Page 60

1     A.   What are you saying?  Where?
2     Q.   Under Roman Numeral II, "Statement of
3  Facts" --
4     A.   Mm-hmm.
5     Q.   -- about middle of the paragraph, it
6  says on down, "In addition, I have no felony
7  convictions and am drug-free."
8     A.   Why did I put that?
9     Q.   Yeah.
10    A.   'Cause it's true.
11    Q.   Did you think that was important?
12    A.   Yeah, I think everything's important,
13 you know.
14         MS. DONAHUE:  Excuse me.  Where are
15 you looking?
16         MS. PRYOR:  I'm looking at the third
17 line down under "Statement of Facts."
18         MS. DONAHUE:  Oh, I see.  Thank you.
19 BY MS. PRYOR:
20    Q.   In this statement of facts, you say,
21 "A week later, they called me to schedule me for a
22 test."
23    A.   Okay.
24    Q.   So would it have been a week after you

Page 61

1  submitted the application?
2     A.   Where is that at?  Oh.  Now, what is
3  your question?
4     Q.   Yes.  Did you take the test a week --
5     A.   I don't know if it was a week later or
6  if I got scheduled a week later.  I can't remember
7  how long after I put in my application that I took
8  the test.
9     Q.   In this document, you state that you
10 found the test to be relatively challenging.  Is
11 that true?
12    A.   I thought it was medium.  I mean, I
13 don't think it was easy and I don't think it was
14 over hard.
15    Q.   Was it relatively challenging?
16    A.   But, yeah, you could call it that --
17    Q.   Okay.
18    A.   -- if you want to say --
19    Q.   Okay.  Have you ever received a notice
20 of right to sue from the EEOC?
21    A.   I didn't hear you.
22    Q.   Have you ever received a notice of
23 right to sue from the EEOC?
24    A.   I don't know.

Page 62

1  Q. Have you ever seen a psychologist or
2 therapist or a counselor?
3  A. No.
4  Q. Have you ever taken any medications
5 for emotions or nerves or depression?
6  A. No.
7  Q. Have we talked about everywhere that
8 you've worked since high school?
9  A. Yes.
10  Q. Have you applied anywhere else?
11  A. I don't recall. I don't think so.
12 I've worked someplace till it shut down or -- no.
13  Q. You don't recall applying anywhere
14 else?
15  A. I didn't get -- no.
16  Q. Okay. You keep any notes or diary?
17  A. No.
18  Q. Did you make any notes about your
19 application with AK Steel?
20  A. No.
21  Q. Have you made any notes about this
22 lawsuit?
23  A. No.
24  Q. You've been handed what's been marked

Page 63

1 as Exhibit 4. Have you ever seen this document
2 before?
3  A. Yes.
4  Q. And if you look at page 7, number nine
5 has your name next to it. You see it?
6  A. Yeah.
7  Q. Okay. There are three individuals
8 listed under there, A, B and C?
9  A. Okay.
10  Q. What does -- what information does
11 Darrell Carter have?
12  A. Excuse me?
13  Q. Yes. You've listed individuals. Did
14 you list these individuals as individuals that you
15 thought had knowledge about your claims?
16  A. Oh, that's just the same as we gotten
17 from our attorney about our lawsuit.
18  Q. His knowledge is just the information
19 you've just gotten from your attorneys?
20  A. Yes.
21  Q. And what about Darlene?
22  A. Same.
23  Q. Just the information she got from her
24 attorney?

Page 64

1  A. Yes.
2  Q. Okay. What about Susan Lester, why do
3 you list her?
4  A. Well, because she's the one that I
5 talked to.
6  Q. Okay. Are there any other individuals
7 who you believe have knowledge about your
8 application at AK Steel?
9  A. About my application?
10  Q. Mm-hmm.
11  A. (Witness nodded.)
12  Q. Is that a no?
13  A. Not that -- no, I'm not sure.
14  Q. Okay. Are there any other individuals
15 who have knowledge to support your claims?
16  A. Of discrimination?
17  Q. Mm-hmm.
18  A. Just the ones in this lawsuit. I
19 mean --
20  Q. What knowledge do they have?
21  A. What we get from our attorney.
22  Q. Do you have any copies of any written
23 communications between you and AK Steel?
24  A. No.

Page 65

1  Q. Did you keep copies of any documents
2 that you gave to AK Steel?
3  A. No.
4  Q. Have you ever received any documents
5 from AK Steel?
6  A. No.
7  Q. Do you have any documents that you've
8 used to seek employment?
9  A. No.
10  Q. Do you have a resume that you use?
11  A. Not anymore.
12  Q. When did you have one?
13  A. Years ago.
14  Q. How many years ago?
15  A. It's been way back before I even
16 started at Bryants health center.
17  Q. Did you use it to apply at Bryants
18 health center?
19  A. No, I didn't have to.
20  Q. When did you --
21  A. Just went and applied in person.
22  Q. When did you create the resume, was it
23 after you finished at Internet?
24  A. Yes, but didn't have but two jobs on

**17 (Pages 62 to 65)**

Page 66

1  it --
2  Q. Okay.
3  A. -- and I haven't done my school --
4  Q. Did you delete it?
5  A. No.
6  Q. What did you do with the resume?
7  A. I don't know where it is. It's
8  probably trashed.
9  Q. Have you ever looked for it?
10 A. No.
11 Q. After you got Exhibit Number 1, did
12 you ever look for it?
13     MS. DONAHUE: Object to the form,
14 asked and answered.
15 A. No.
16 Q. Okay. Do you have any notes or
17 letters or other written communications between you
18 and any of the other plaintiffs that did not
19 involve counsel?
20 A. No.
21 Q. Have you ever had any discussions with
22 any of the other plaintiffs outside the presence of
23 counsel regarding either AK Steel or this lawsuit?
24 A. No.

Page 67

1  Q. And do you know about the particular
2  applications of any of the other plaintiffs?
3  A. None.
4  Q. You've been handed what's been marked
5  as Exhibit Number 5. Have you seen this document
6  before?
7  A. Yes.
8  Q. And is that your signature on page 8?
9  A. Yes.
10 Q. And did you answer the questions that
11 were contained in this document?
12 A. I'm sure I did. I -- yes.
13 Q. Okay. And if you look on page 5 --
14 A. Okay.
15 Q. -- you're answering interrogatory
16 number two, which starts on page 4, which asks you
17 to identify all employees for whom you've worked
18 since January 1, 2001, including dates of
19 employment.
20 A. Where we at now, page 4?
21 Q. Page 4, the bottom of page 4,
22 interrogatory number two --
23 A. Okay.
24 Q. -- is the question and your answer is

Page 68

1  on page 5.
2     Are those dates accurate that you list
3  on page 5?
4  A. To the best of my recollection.
5  Q. Where did you come up with those
6  dates?
7     MS. DONAHUE: Object to the form,
8  asked and answered.
9  A. Just thinking back.
10 Q. You didn't refer to any --
11 A. I'm not really sure. I can't tell you
12 for certain that these are the exact dates, but to
13 the best of my recollection.
14 Q. Okay. And has your recollection
15 changed between the date you answered these and
16 today?
17 A. Well, I'm looking at the Bryants
18 Health Care. I'm thinking it is -- this is what
19 I'm looking at now seems right.
20 Q. Exhibit Number 5 seems right?
21 A. Yeah, as far as I can remember. I
22 don't -- I'm not going to say for sure.
23 Q. You did not look at any documents when
24 you created Exhibit Number 5 when you answered

Page 69

1  these --
2  A. No.
3  Q. -- questions?
4  A. No, I didn't.
5  Q. Did you do anything to ensure that
6  these answers were correct?
7  A. I'm thinking I -- I can't remember.
8  I'm sorry.
9  Q. You can't remember what you --
10 A. But this looks right to me.
11 Q. And this is different than what you
12 testified about earlier, correct?
13 A. I'm not sure.
14 Q. You don't know what you --
15 A. I'm thinking.
16 Q. -- testified earlier?
17     MS. DONAHUE: Let her finish her
18 answer before you ask another question, please.
19 A. I'm thinking that I'm -- I may have
20 said '05 for Bryants and I have '04 here and
21 Oakridge. I'm gettin' -- I'm not really sure.
22 Q. Is there anything that you could do to
23 find out when the actual dates are?
24 A. Sure.

18 (Pages 66 to 69)

Page 70

1  Q. And you did not do that when you
2  responded to these interrogatories, correct?
3  A. No.
4  Q. Okay.
5  A. I just used to the best of my
6  recollection. But now that I get to think about
7  it, I'm thinking it was '04 like I got here. I'm
8  not sure.
9  Q. Based on what you've got in Exhibit
10 Number 5 --
11 A. I may have the dates mixed up.
12 Q. Based on what you've got in Exhibit
13 Number 5, it looks like you were unemployed for
14 about a year and two months between Applied Card
15 Systems and Bryants Health Care; is that correct?
16 A. I'm not sure because when they did
17 shut down, I was -- I did get some unemployment,
18 but I didn't think it was long.
19 Q. When you got unemployment, did you
20 apply anywhere else during the time or did you just
21 get the unemployment?
22 A. I was just -- I was trying to get on
23 at Bryants.
24 Q. You were trying to get on at Bryants?

Page 71

1  A. Yes.
2  Q. And how long did it take you to get on
3  at Bryants?
4  A. I don't remember.
5  Q. Is that the only place that you
6  applied during that time?
7  A. Yes.
8  Q. Did you get unemployment through the
9  State of Ohio?
10 A. Kentucky.
11 Q. State of Kentucky?
12 A. (Witness nodded.)
13 Q. Are you required to do a job search in
14 order to get unemployment in Kentucky?
15 A. Yeah, we're supposed to.
16 Q. Did you do that?
17 A. No. They didn't really say anything
18 about it.
19 Q. Once the unemployment ran out, is that
20 when you applied to Bryants?
21 A. I think I got hired there before it
22 ran out.
23 Q. Do you remember how long you got
24 unemployment?

Page 72

1  A. No, I don't remember.
2  Q. Do you have records of your
3  unemployment earnings?
4  A. I had my W-2's.
5  Q. And where are those W-2's?
6  A. They're not here with me. They're at
7  home.
8  Q. Earlier you testified you had them.
9  Have you ever gathered them?
10 A. Yes.
11 Q. Have you ever provided them to your
12 attorney?
13 A. I'm not sure if I mailed them -- I'm
14 pretty sure I mailed them in.
15     MS. PRYOR: We need those W-2's.
16 BY MS. PRYOR:
17 Q. What are the documents that are
18 attached to Exhibit Number 5?
19 A. What are the documents?
20 Q. That are attached to it, yeah. After
21 page 8, there are some documents that -- looks like
22 they're called "Income Tax Summary Worksheet"?
23 A. Oh, okay, yeah.
24 Q. What are those? Where did you get

Page 73

1  them?
2  A. Where did I get these?
3  Q. Mm-hmm.
4  A. They were in my tax forms. You mean
5  where was I working?
6  Q. I'm just -- I've never seen these
7  documents, types of documents before. I'm trying
8  to understand --
9  A. Yeah, they --
10 Q. -- them.
11 A. I was -- they come with -- I go to H
12 and R Block, so these are just what I had, probably
13 for this year, that year.
14 Q. Why -- do you know why there are two
15 years on one document?
16 A. I think that what they do is go
17 from -- from '99 to 2000, just to show -- I think
18 this is all I have for that year, those two years.
19 I think it's something like the page next to last
20 and the last page where it shows the difference or
21 what you made that year and the year before. I'm
22 not real sure what this one is. I don't know.
23 Q. I'm confused 'cause I look at the
24 first page --

**Page 74**

1  A. I'm confused, too, because --
2  Q. -- 2000 and 1999. The next page has
3  2001 and 2000, but the 2000's don't match up all
4  the numbers, it doesn't look like for the two
5  different pages.
6      Did you tell me that you did keep --
7  you do have your W-2's?
8  A. Mm-hmm.
9  Q. Do you have your tax -- actual tax
10 returns?
11 A. I'm not sure.
12 Q. But you do have your W-2's since --
13 A. My tax --
14 Q. -- 2001?
15 A. -- returns?
16 Q. Mm-hmm.
17 A. Yeah, I'm pretty sure I have those.
18 Q. And you have your W-2's since 2001?
19 A. I'm pretty sure I do. But this
20 would -- evidently these here aren't good enough.
21 Is that what you're saying?
22 Q. I don't -- I don't understand them. I
23 don't know what they are and I believe I've asked
24 for W-2's as well.

**Page 75**

1      MS. PRYOR: If we could get those,
2  that'd be great. Other than that, I have no
3  further questions at this time.
4      MS. DONAHUE: Can we take a slight
5  break?
6      (Off the record: 10:31 a.m. - 10:32 a.m.)
7      MS. DONAHUE: We don't have any
8  questions.
9      (Deposition concluded at 10:32 a.m.)
10
11
12      _____
            Marnie D. Carter
13
14
15
16
17
18
19
20
21
22
23
24

**Page 76**

1              C E R T I F I C A T E
2
3  STATE OF OHIO         :
4                         : SS
5  COUNTY OF HAMILTON    :
6
7      I, Susan M. Barhorst, a Notary Public in
8  and for the State of Ohio, duly commissioned and
9  qualified, do hereby certify that prior to the
10 giving of this deposition the within-named MARNIE
11 CARTER was by me first duly sworn to testify the
12 truth, the whole truth, and nothing but the truth;
13 that the foregoing pages constitute a true,
14 correct, and complete transcript of the testimony
15 of said deponent, which was recorded in stenotypy
16 by me, and on the 4th day of September 2007 was
17 submitted to counsel for deponent's signature.
18     I further certify the within deposition was
19 duly taken before me at the time and place stated,
20 pursuant to the Federal Rules of Civil Procedure;
21 that I am not counsel, attorney, relative or
22 employee of any of the parties hereto, or their
23 counsel, or financially or in any way interested in
24 the within action, and that I was at the time of

**Page 77**

1  taking said deposition a Notary Public in and for
2  the State of Ohio.
3      IN WITNESS WHEREOF, I have hereunto set my
4  hand and notarial seal at Cincinnati, Ohio, this
5  4th day of September 2007.
6
7
8
        Susan M. Barhorst, Notary Public
9       in and for the State of Ohio.
        My commission expires
10      February 18, 2009
11
12
13
14
15
16
17
18
19
20
21
22
23
24