UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| VIVIAN BERT, et al., | : | Case No. 1:02CV467 |
| | : | |
| Plaintiffs, | : | Judge Beckwith |
| | : | |
| v. | : | **MOTION OF AK STEEL** |
| | : | **CORPORATION FOR SUMMARY** |
| AK STEEL CORPORATION, | : | **JUDGMENT ON THE CLAIMS OF** |
| | : | **THE ASHLAND PLAINTIFFS AND** |
| Defendant. | : | <u>**ASHLAND CLASS**</u> |
| | : | |

Pursuant to Federal Rule of Civil Procedure 56, Defendant AK Steel Corporation moves for summary judgment on the claims of the Ashland Plaintiffs -- named class representatives Darrell Carter, Darlene Denise Carter, Marnie Carter, Timothy Oliphant and Kay Jackson and the Ashland Class they represent. It is respectfully submitted that there are no genuine issues of material fact and that summary judgment is appropriate as a matter of law. A Memorandum in Support of this Motion is attached.

                                               Respectfully submitted,

                                              /s/ Gregory Parker Rogers
                                          Lawrence J. Barty (0016002)
                                          Gregory Parker Rogers (0042323)
                                          Patricia Anderson Pryor (0069545)
                                          Taft Stettinius & Hollister LLP
                                          425 Walnut Street, Suite 1800
                                          Cincinnati, Ohio  45202
                                          (513) 381-2838
                                          (513) 381-0205 (fax)

                                            Trial Attorneys for Defendant
                                          AK Steel Corporation

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| VIVIAN BERT, et al., | : | Case No. 1:02CV467 |
| | : | |
| Plaintiffs, | : | Judge Beckwith |
| | : | |
| v. | : | **MEMORANDUM OF AK STEEL** |
| | : | **CORPORATION IN SUPPORT OF** |
| AK STEEL CORPORATION, | : | **ITS MOTION FOR SUMMARY** |
| | : | **JUDGMENT ON THE CLAIMS OF** |
| Defendant. | : | **THE ASHLAND PLAINTIFFS AND** |
| | : | **ASHLAND CLASS** |
| | : | |

## I. INTRODUCTION

Defendant AK Steel Corporation ("AK Steel" or "the Company") respectfully submits that summary judgment is appropriate on the claims of the Ashland named plaintiffs, Darrell Carter, Darlene Denise Carter, Marnie Carter, Timothy Oliphant and Kay Jackson, and the Ashland class they represent.

The current version of the Ashland class claims is that AK Steel's pre-employment test has a disparate impact upon the hiring of African Americans into laborer positions at the Company's Ashland Works in violation of Title VII.[1]  Plaintiffs' claims fail because they did not exhaust their administrative remedies and, even if they had, there is no unlawful disparate impact.

---

[1] On June 8, 2006, the Ashland Plaintiffs relinquished any disparate treatment claim.  (Doc. # 81, p. 10)

{W1173379.1}    1

## II. FACTS

    A.    AK Steel.

AK Steel is an integrated steel manufacturer with a large manufacturing facility in Ashland, Kentucky. (Lester Dec. ¶ 2) (attached) The Company's goal is to lead the industry in safety, quality and productivity. (*Id.* at ¶ 3)

AK Steel's number one priority is safety. AK Steel is far and away the leader in the integrated steel industry in safety. (*Id.*) AK Steel believes that a top flight hourly workforce is a key component to further its safety, quality and productivity goals. Both managers and the hourly workforce must be knowledgeable and skilled and follow the Company's safety programs to achieve this enviable record. (*Id.*)

    B.    Due To Obligations Under Its Collective Bargaining Agreement, AK Steel Must Hire Individuals Who Are Capable Of Performing The Many Highly Demanding And Technical Positions Involved In The Production Of Steel.

AK Steel's Ashland Works hires directly into its laborer position. Laborers are assigned throughout the mill based upon production needs and other employees' exercise of seniority rights under the collective bargaining agreement with the union. (Lester Dec. ¶ 4) Accordingly, these entry level laborers must have a wide range of knowledge, skills and abilities to work in the many different areas to which they may be assigned or transferred. (*Id.*) These "laborer" jobs are the safety sensitive entry level job for every job in the mill. (*Id.*)

AK Steel, therefore, hires employees with the expectation that an individual must be able to succeed not only as an entry-level "laborer", but also in the many other safety sensitive, demanding skilled positions into which an individual may be assigned pursuant to the collective bargaining agreement. (Lester Dec. ¶ 5) The Company's hiring processes are designed to accommodate this reality. (*Id.*)

      C.      Resource Associates Develops And Validates A Pre-Employment Test To Assist AK Steel In Hiring Qualified Applicants.

In 1997 -- five years before this lawsuit was filed -- AK Steel hired Resource Associates, Inc. to develop a pre-employment test that would accurately predict future performance on the job and assist it in hiring the high-quality employees that its work environment required. (Gibson Dec. ¶ 3)

Resource Associates specializes in assisting employers with selection testing. (*Id.* at ¶ 2) Resource Associates' Executive Vice President, Dr. Lucy Gibson, is a licensed psychologist with a Ph.D. in Industrial Organizational Psychology and almost 20 years experience developing and validating employment selection tests. (*Id.* at ¶ 1)

In order to develop an appropriate test for AK Steel, Dr. Gibson and her staff conducted a job analysis. They conducted interviews with both entry level employees and managers at an AK Steel mill about the responsibilities, aptitudes and behaviors required of employees throughout the plant. (*Id.* at ¶ 4) They also toured the plant and observed the employees performing their jobs. (*Id.*) From this job analysis review, Dr. Gibson determined the knowledge, skills and abilities that were important for adequate job performance and selected a compilation of tests that would measure for these required abilities. (*Id.*)

The test she developed included (1) a pattern series test of abstract reasoning, because the job analysis revealed that employees must think logically in terms of cause and effect so they can properly diagnose production problems with either the product or the production equipment and can exercise good judgment in making decisions that might have a direct effect on their own lives and those of their co-workers, as well as on the product and company profitability; (2) a mechanical reasoning test, because the job analysis revealed that employees must independently troubleshoot mechanical and electrical problems with production machinery, perform

maintenance work involving complex interlocking and/or interrelated electronic circuits and tear down, repair and reassemble intricate equipment essential to the production process; (3) a math test for industry, because the job analysis revealed that employees must understand temperature, product measurements and equipment controls all of which are based on numerical scales, use numerically controlled machine tools and use addition, subtraction, division, multiplication and other mathematical functions in order to acquire the level of knowledge in chemistry, hydraulics and electronics necessary for adequate job performance; (4) a reading for production workers test, because the job analysis revealed that employees must read, study, understand and apply. AK Steel's Quality Standard Operating Procedures which detail the requirements and procedures for the different job positions, as well as Job Health and Safety Analyses, which detail proper protection and safety procedures, other written information pertaining to coil characteristics and the order of production and texts pertaining to principles of chemistry, hydraulics and electronics; (5) a 3-D visual spatial reasoning test and a form pattern comprehension test, because employees must attend to the spatial relationship between the employee, the product and the production equipment, conduct manual machine set-ups and take apart and reassemble intricate machinery and production equipment; and (6) an industrial personal style inventory. (Gibson Dec. ¶ 5)  The personal style inventory measured an employee's conscientiousness and attention to detail, motivation and work drive, emotional stability (maturity/levelheadedness), openness to experiences (due to the need to work in a variety of positions), extroversion (ability to communicate with and work in a cooperative team environment) and agreeableness (willingness to learn and work under high stress).  (*Id.*)

After developing the test based on the job analyses, Dr. Gibson conducted a concurrent validation study.  Resource Associates tested on-the-job employees to ensure the test correlated

with actual job performance. (Gibson Dec. ¶ 7) Dr. Gibson analyzed and compared the test scores with the actual on-the-job performance ratings for 76 employees. (*Id.*) Dr. Gibson determined that each of the aptitude tests demonstrated significant correlation with at least several of the criterion measures. (*Id.*) Dr. Gibson also analyzed the personality measures and determined that all dimensions were shown as valid predictors of at least one criterion measure. (*Id.*) Dr. Gibson concluded that each of the aptitude tests was shown to be a valid predictor of job performance and all of the personality measures also validated. (*Id.*)

In 1999, after AK Steel had been using Resource Associates' tests for two years, Dr. Gibson performed a predictive validation analysis. (*Id.* at ¶ 8) Dr. Gibson analyzed 189 applicants' actual pre-employment test scores with their on-the-job performance ratings. (*Id.*) The analysis confirmed the earlier concurrent study, revealing solid empirical evidence that the test scores were good predictors of future job performance. (*Id.*) Validity coefficients ranged from .23 to .36. (*Id.*) There was also a strong pattern of validity coefficients for the personality measures. (*Id.*) Dr. Gibson concluded that the test was valid and that in her professional opinion there were no alternative tests that would be as valid as the ones used that would have less adverse impact. (*Id.*)

    D. <u>AK Steel's Hiring Process At Ashland.</u>

During the relevant period certified by the Court (August 12, 2001-October 31, 2003), AK Steel utilized the validated pre-employment test at its Ashland Works as part of a rigorous hiring procedure designed to obtain a top-flight hourly workforce. Susan Lester, the human resource manager at Ashland Works, screened applications to ensure applicants had not been convicted of a crime, other than a minor traffic violation, and reviewed their work history to determine whether there were any red flags such as prior terminations that would preclude an applicant from further consideration. (Lester Dep. 50, 52-53) Applicants who had a criminal

record were not considered for employment. (Lester Dep. 64) Applicants were required to achieve a qualifying score on the written test developed by Resource Associates. Applicants who passed the test were then required to pass an interview, a background check, and, after receiving a conditional offer of employment, a physical examination. (Lester Dep. 68-71, 78, 80-85, 89, 117)

Only about ten percent of all applicants were eventually hired in the rigorous procedures used at Ashland Works. (Baker Report, Table 1.a) (attached) Between August 12, 2001 and December 31, 2003, AK Steel received over 1,000 applications at Ashland. (*Id.*) During this period, over 900 Caucasian applicants were not chosen for employment in Ashland. (*Id.*) The overwhelming number of applicants -- irrespective of race -- were not hired. (*Id.*)

        E.    AK Steel Hires More African-Americans Than Is Reasonably Expected From The Ashland Area.

AK Steel's Ashland Works is located in what is essentially the rural, agricultural hill country of eastern Kentucky. (Lester Dec. ¶ 2) Only 2.0% of the laborers available in the Ashland area are African Americans. (Baker Report, p. 9, Appx. C) AK Steel actively recruits African-American applicants for its Ashland Works. The Chair of the Ashland Works Civil Rights Committee, Rodney Cosby, identifies African-American applicants and supplies applications and resumes from these candidates directly to Susan Lester. (Cosby Dep. 32, 36-37; Lester Dep. 21) Lester and Cosby also attend job fairs where they can attract African-American candidates. (Lester Dep. 21; Cosby Dep. 40) Cosby travels to churches and neighborhoods to recruit African-Americans. (Cosby Dep. 33)

As a result of AK Steel's efforts to employ a diverse work force, AK Steel recruits and hires more African-Americans than would be reasonably expected from the applicable recruitment areas. It is undisputed that the Company hired at least 2.6% African-Americans

(versus the available 2.0% in the area) in Ashland. (Bradley Supp. Report p. 8, attached to Doc. # 71, p. 8 of 43)

    F. The Named Plaintiffs Applied And Did Not Qualify On The Pre-Employment Test.

Cosby recruited most of the named Plaintiffs to apply at AK Steel's Ashland Works. (After talking with Allen Roberts, Cosby also recruited most of them to file this lawsuit.) (Oliphant Dep. 9; Darrell Carter Dep. 8; Darlene Carter Dep. 7; Marnie Carter Dep. 10, 40; Jackson Dep. 25-26, 113-115, 120)

Cosby's neighbor is Plaintiff Kay Jackson. (Jackson Dep. 20) She applied at Cosby's suggestion. (Jackson Dep. 120) Jackson did not qualify on the pre-employment test for a laborer position. (Lester Dec. ¶ 7)

Jackson's cousins, Darrell Carter and Darlene Denise Carter, and Darlene's daughter Marnie Carter also applied. Both Darrell and Darlene Carter dropped out of school after the tenth grade. (Darrell Carter Dep. 28; Darlene Carter Dep. 13) They testified they were primarily C students. (Darrell Carter Dep. 28-30; Darlene Carter Dep. 46) Prior to applying at AK Steel, Darrell Carter had not worked, and instead received unemployment compensation, for a year and a half. (Darrell Carter Dep. 40) Darrell Carter falsified his application to AK Steel. He falsely stated that he had not been convicted of a crime, despite a previous conviction for felonious assault. (*Id*. at 6, 63) All three Carters did not qualify on the pre-employment test.[2]

Timothy Oliphant applied in April 2002. (Oliphant Dep. 58) He did not complete an application and instead turned in a resume to Rodney Cosby which falsely stated that he had

---

[2] All three Carters alleged in their EEOC charges and the Complaint that they applied at AK Steel months later than their actual applications. Darrell Carter admitted he did not apply in April 2002 as alleged in his charge and complaint; he applied in October 2001. (Darrell Carter Dep. 78-79) Darlene and Marnie Carter both admitted that they did not apply in January 2002 as alleged in their charges and complaint; they also applied in October 2001. (Darlene Carter Dep. 48-49; Marnie Carter Dep. 58)

{W1173379.1}    7

worked at his previous employer three years longer than he had. (Oliphant Dep. 60) Oliphant did not disclose that he had a criminal conviction for gross sexual imposition of a minor. (Oliphant Dep. 5) He did not qualify on the pre-employment test at AK Steel. (Oliphant Dep. 53; Lester Dec. ¶ 7) This was not the first time Oliphant had been disqualified from a job due to an exam. Oliphant, who also testified he was a C student, similarly failed the exam required by the Ohio state prison in Lucasville, Ohio. (Oliphant Dep. 17-18, 94)

### III.  ARGUMENT

A.  Plaintiffs' Claims Fail Because They Did Not Exhaust Their Administrative Remedies; They Do Not Possess A Notice Of Right To Sue.

Plaintiffs' Title VII claims fail as a matter of law because they have not complied with Title VII's jurisdictional requirements. None of the Ashland Plaintiffs have received a Notice of Right to Sue. (Darlene Carter Dep. 50; Marnie Carter Dep. 61; Jackson Dep. 93; Oliphant Dep. 41) The Sixth Circuit has held that a "right-to-sue letter" from the EEOC is "a necessary prerequisite to filing suit pursuant to Title VII…." *Puckett v. Tennessee Eastman Co.*, 889 F.2d 1481, 1488 (6th Cir. 1989). *See also Rivers v. Barberton Bd of Educ.*, 143 F.3d 1029, 1031-32 (6th Cir. 1998); *Jones v. Truck Drivers Local Union No. 299*, 748 F.2d 1083, 1086 (6th Cir. 1984), *cert. denied*, 493 U.S. 964 (1989). It is essential that a plaintiff possess a right-to-sue letter. None of the Ashland Plaintiffs possess a right-to-sue letter and therefore their claims and the Ashland Class claims must be dismissed. *See Perkins v. Silverstein*, 939 F.2d 463, 471 (7th Cir. 1991) (action is "subject to dismissal at any time prior to [plaintiff's] receipt of a right-to-sue letter….").

    B. Plaintiffs' Claims Additionally Fail Because They Have Not Established A Disparate Impact.

  Aside from the fact that after five years of litigation, Plaintiffs, who purport to be capable of representing a class, have not satisfied Title VII's necessary prerequisites to suit, their claims additionally fail because they cannot establish that the test had a disparate impact at Ashland during the relevant period.

  Plaintiffs have the burden to establish a prima facie case of discrimination. In a disparate impact case, plaintiffs must establish that the test in question selects applicants in a racial pattern significantly different from that of the pool of applicants. *Williams v. Ford Motor Co.*, 187 F.3d 533, 538 (6th Cir. 1999). If plaintiffs establish a prima facie case of disparate impact, the burden shifts to the employer which can either discredit the plaintiffs' statistics or proffer statistics of its own which show that no disparity exists. The employer may also produce evidence that the challenged employment practice is based on legitimate business reason such as job relatedness or business necessity. *Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1424 (9th Cir. 1990); *Williams*, 187 F.3d at 538. "[T]he ultimate burden of proving that discrimination against a protected group has been caused by a specific employment practice remains with the plaintiff *at all times*." *Williams*, 187 F.3d at 539 (quoting *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 659-60 (1989)) (emphasis in original).

  Plaintiff's expert, Dr. Bradley, has submitted three reports and a declaration in this case. None of Dr. Bradley's reports analyzes the impact of the test in Ashland.[3] Despite the fact that an alleged disparate impact relating to the test is the only claim before the Court, Plaintiffs have not presented evidence about the alleged lack of success on the test in Ashland. Plaintiffs cannot

---

[3] Dr. Bradley did not address Ashland in his declaration.

establish causation -- that the test caused any disparate impact. Their claim fails for this reason alone.

Instead of analyzing the test, Plaintiffs' expert analyzed the hiring process as a whole, providing "bottom line" statistics. Even if this were proper for a claim challenging a single aspect of the process, the test, Dr. Bradley's analysis is fatally flawed. In the first two reports, Dr. Bradley examined the period October 24, 2000 to November 18, 2002, a wholly different period than that relevant in this litigation--August 12, 2001 to October 31, 2003 -- as established by the Court. Dr. Bradley used this shorter period because it excluded from his analysis more than 75% of the African-Americans who were hired in Ashland during the relevant time period (he counts only two and ignores seven). (Baker Report at 8, 10-11; Bradley Supp. Report, attached to Doc. # 71, p. 8 of 43) He carved out a limited period of time in order to present numbers favorable to Plaintiffs' position. His first and second reports regarding Ashland are simply not reliable, as described fully in Dr. Baker's Reports.[4] (attached)

When confronted with the obvious flaws in his analysis, Dr. Bradley then, in his third (Rebuttal) report, used the data he ignored in his first two reports. But, rather than using the applicant rate supported by the data, Dr. Bradley created a fictional applicant rate to apply to the data in order to try to salvage a disparate impact claim. Dr. Bradley's conclusion -- after ignoring relevant data -- that 8.65% of applicants at Ashland were African-American is not supported by the evidence, particularly given that there is only a 2.0% African-American

---

[4] As Dr. Baker described, Dr. Bradley (a) analyzed the wrong time period, (b) failed to use one year's worth of data, (c) did not count as hired some of the Ashland applicants who were hired during the relevant time period, and (d) included as laborer applicants those who were hired into non-laborer jobs. (Baker Report at 8-11) (attached)

availability in the Ashland MSA.[5]  (Baker Report, p. 9; Baker Response to Bradley, p. 3-6) (attached)

When AK Steel's expert, Dr. Mary Baker used the correct data and actual applicant rate from the data (4.6%), she concluded that there was no disparate impact.  In fact, more African Americans were hired than would be expected statistically.  At Ashland, from August 12, 2001 to December 31, 2003, there were 1,080 applicants of known race, of which 49 were African-American.  (Baker Report, Table 1.a) (attached)  Assuming all other qualifications were equal, one would expect that 5.22 of the applicants hired would be African-American; in fact, nine African-American applicants were hired.  (*Id.*)

Moreover, even if the Court were to consider any of Dr. Bradley's analyses, which it should not, the alleged impact he created is less than three standard deviations.  (Bradley Report at 8; Bradley Supp. Report at p. 8; Bradley Rebuttal Report at p. 10, attached to Doc. # 71)  Such an impact even if based on accurate data, which it was not, is not sufficient under the circumstances of this case to establish a disparate impact.  As the Supreme Court has stated:

> [T]he plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group.  Our formulations, which have never been framed in terms of any rigid mathematical formula, have consistently stressed that statistical disparities must be sufficiently substantial that they raise such an inference of causation.

*Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994-95 (1988) (plurality).  Courts require ***more*** than two to three standard deviations to support a disparate impact claim.  *Hazelwood Sch.*

---

[5] Plaintiffs have spent over five years in this lawsuit accusing AK Steel of intentionally and otherwise, discriminating against African-Americans, creating a racially hostile application process and discouraging African-Americans from applying (Doc. # 45), yet Plaintiffs ironically rely upon an expert who believes that AK Steel so successfully recruited African-Americans that its African-American applicant rate was four times the available rate.

*Dist. v. U.S.*, 433 U.S. 299, 308, 312 n.17 (1977); *Coates v. Johnson & Johnson*, 756 F.2d 524, 547 (7th Cir. 1985). As one court stated: "[W]hen the observed results are within two or three standard deviations of the expected, there would be no reason, absent other factors, to doubt the proposition that the observed was the result of an unbiased selection from the known population." *Garrett v. R.J. Reynolds Industries, Inc.*, 81 F.R.D. 25, 33 (M.D.N.C. 1978). *See also Coates*, 756 F.2d at 547, n. 22 (warning against drawing conclusions from statistical significance at the two-to-three standard deviation level because of "the relatively low statistical significance."). Plaintiffs' expert, even after manipulating and ignoring significant amounts of data, could not create a statistical significance above three standard deviations. Even his flawed analysis is insufficient to support a claim under these circumstances.

Plaintiffs have not established a disparate impact. Regardless of whether Plaintiffs had complied with Title VII's prerequisites, summary judgment is appropriate.

### C. Even If Plaintiffs Could Establish A Disparate Impact, AK Steel Has Met Its Burden Of Showing A Legitimate Business Reason For The Test.

Even if Plaintiffs could establish a disparate impact, AK Steel's use of the professionally developed test does not violate Title VII. A test that disparately impacts African-Americans is not discriminatory where, as here, the test is job related. Summary judgment is appropriate when an employer shows "by professionally acceptable methods, [that the test is] predictive of or significantly correlated with important elements of work behavior which comprise or are relevant to the job or jobs for which the candidates are being evaluated." *Williams*, 187 F.3d at 539 (quoting *Black Law Enforcement Officers Ass'n v. City of Akron*, 824 F.2d 475, 480 (6th Cir. 1987)).

AK Steel has made this showing. AK Steel hired a professional well before this litigation was filed who went through a rigorous process and analysis, to develop and validate, both predictively and concurrently, the test challenged here.

In *Williams*, the Sixth Circuit determined under similar circumstances that summary judgment in favor of the employer was appropriate where the employer utilized a professional test developer and the court determined that despite the disparate impact on African-American applicants, the test was content valid and had criterion related validity. *Id.* at 542-47. As the case is here, applicants in *Williams* were not hired for a specific position because due to seniority rights the employees had to be able to rotate among numerous job classifications. *Id.* at 536. In *Williams*, human resources and supervisors determined which job activities and job requirements were important to determine what skills to assess by the test. *Id.* at 536-37. Here, Resource Associates involved members of human resources, managers, and employees actually performing the jobs, as well as its own analysis of the jobs being performed, to determine what job activities and requirements were important to determine what skills and abilities to test. (Gibson Dec. ¶ 4) Resource Associates then developed a test that correlated to those important skills, abilities and knowledge. (*Id.*) The court in *Williams* determined that a test under these circumstances was valid. *Id.* at 544.

The court in *Williams* also determined that the employer had produced evidence of criterion-related validity where the professional test developer analyzed the relationship between employee test scores and their job performance. *Id.* at 547. Here, Resource Associates twice analyzed the relationship between the test scores and job performance and determined that the test sufficiently correlated with performance. (Gibson Dec. ¶¶ 7, 8) Resource Associates' statistical analysis showed a correlation coefficient of .23 to .36. (*Id.*) It is undisputed that a

correlation coefficient in this range is statistically significant and sufficient to establish job relatedness. *Williams*, 187 F.3d at 546 (finding .30 correlation coefficient statistically significant).

Even if Plaintiffs could establish a disparate impact related to the test in Ashland during the relevant period, AK Steel has established the validity of the test. There is no alternative method to achieve AK Steel's legitimate business needs that has less impact. Summary judgment is appropriate.

> D.  Summary Judgment Is Appropriate On The Claims Of Darrell Carter And Timothy Oliphant For The Additional Reason That They Would Not Have Been Hired Regardless Of Their Performance On The Test.

Both Darrell Carter and Timothy Oliphant had criminal convictions that would have automatically disqualified them from employment at AK Steel regardless of whether they were able to pass the pre-employment test. (Darrell Carter Dep. 6, 63; Oliphant Dep. 5; Lester Dep. 64) Even had they passed the test, they would not have been hired absent a background check, which would have revealed their criminal history. (Lester Dec. ¶ 8) AK Steel did not hire applicants with criminal records. (Lester Dep. 64)

AK Steel also did not hire applicants who lied on their applications. (Lester Dep. 82, 93, 103; Lester Dec. ¶ 9) Carter lied on his application about his criminal history. (Darrell Carter Dep. 6, 63) Oliphant lied on his resume about his employment history. (Oliphant Dep. 60) Both of these individuals would have been disqualified from employment for these reasons. (Lester Dec. ¶ 9) Summary judgment is appropriate on their claims for these additional reasons.

## IV.  CONCLUSION

For each and all of the foregoing reasons, Defendant AK Steel Corporation respectfully requests that this Court grant its Motion for Summary Judgment and dismiss the claims of the Ashland class and the Ashland Plaintiffs.

Respectfully submitted,

 /s/ Gregory Parker Rogers
Lawrence J. Barty (0016002)
Gregory Parker Rogers (0042323)
Patricia Anderson Pryor (0069545)
Taft Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, Ohio  45202
(513) 381-2838
(513) 381-0205 (fax)

Trial Attorneys for Defendant
AK Steel Corporation

CERTIFICATE OF SERVICE

I hereby certify that the foregoing was electronically filed on January 14, 2008 using the Court's CM/ECF system, which will send notice of this filing to Susan Donahue, Robert Childs, Herman N. Johnson, Jr., Wiggins, Childs, Quinn & Pantazis, P.C., The Kress Building, 301 19th Street North, Birmingham, Alabama  35203; Paul H. Tobias, Tobias, Kraus & Torchia, 911 Mercantile Library Building, 414 Walnut Street, Cincinnati, Ohio 45202; and David Sanford, Sanford, Wittels & Heisler, L.L.P., 1666 Connecticut Avenue, N.W., Suite 310, Washington, D.C.  20009.

/s/ Gregory Parker Rogers