## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **VIVIAN BERT, et al.,** | ) | **CASE NO. C-1-02-467** |
| | ) | |
| **Plaintiffs,** | ) | **Judge Beckwith** |
| | ) | **Magistrate Judge Hogan** |
| **v.** | ) | |
| | ) | **PLAINTIFFS' OPPOSITION TO** |
| **AK STEEL CORPORATION,** | ) | **DEFENDANT'S MOTION FOR** |
| | ) | **SUMMARY JUDGMENT ON THE** |
| **Defendant.** | ) | **CLAIMS OF THE ASHLAND** |
| | ) | **PLAINTIFFS AND ASHLAND CLASS** |

Plaintiffs, through undersigned counsel, hereby submit this Opposition to Defendant's Motion for Summary Judgment On the Claims of the Ashland Plaintiffs and Ashland Class (Dkt. #158). The defendant's motion should be rejected for several reasons. First, the defendant errs in stating that plaintiffs Darlene Carter, Marnie Carter, Kay Jackson, and Timothy Oliphant were not issued right-to-sue notices from the Equal Employment Opportunity Commission. Those notice are attached hereto as Exhibit 34. Second, based upon information that plaintiffs received pursuant to a subpoena issued upon defendant's testing consultant, plaintiffs have ascertained that the Laborer qualifying test had an adverse impact upon African-American applicants at AK Steel Corporation's Ashland facility. Furthermore, there exists a disputable issue of fact as to the disparate impact of the total selection process at the Ashland facility. In addition, the defendant has not proffered any admissible evidence regarding its burden of proving a legitimate business necessity for using the Laborer qualifying test. Finally, plaintiffs Darrell Carter and Timothy Oliphant's claims are subject to the after-acquired evidence rule, which would afford them injunctive relief even if backpay relief is unavailable. Therefore, the defendant's motion for summary judgment should be DENIED.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The court's role is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *see also Poller v. Columbia Broad. Sys., Inc.*, 386 U.S. 464 (1962) (even if ". . . the weight of the evidence favors the moving party [that] does not authorize a court to grant summary judgment"). The party seeking summary judgment bears the responsibility of

demonstrating the "absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The court must view all evidence and any factual inferences in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Supreme Court has held that the court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 151, 120 S. Ct. 2097, 2110 (2000). The court should only give credence to the nonmovant's favorable evidence and evidence of the movant which is uncontradicted, unimpeached, *and* "comes from disinterested witnesses." *Id*. Moreover, the non-moving party's demonstration of a genuine issue of material fact is not a high bar:

> . . . the issue of material fact required by Rule 56(c) . . . to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or a judge to resolve the parties' differing versions of the truth at trial.

*First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 288 89 (1968).

If a jury would be able to return a verdict for the non-movant in light of the facts presented, the court must deny summary judgment. *See Anderson*, 477 U.S. at 249. In other words, summary judgment may be entered only where no reasonable trier of fact could find for the non-moving party. *Matsushita Elec. Indus.*, 475 U.S. at 587.

## STATEMENT OF FACTS

AK Steel is a corporation with steel plants in Middletown, Ohio and Ashland, Kentucky. The Middletown Works ("Middletown") is the largest facility within AK Steel and processes raw materials into finished coils of steel. Phyllis Short Dep., at 45 (deposition excerpts attached as Ex.

3).   The entry-level position at Middletown is the Laborer classification, which is also called
Employment Reserve and Production Employee.  *Id*. at 46-47.

The Ashland Works ("Ashland") contains a coke making facility, which produces coke from
coal, and a primary steel plant, which processes coke into steel.  Susan R. Lester Dep., at 7-8
(deposition excerpts attached as Ex. 35).  Ashland employs approximately 1,200 employees, and
entry-level positions are called Heat Relief Laborer at the coke making facility and Laborer at the
main facility.  *Id*. at 8-9.[1]

AK Steel uses a similar process to select individuals for Laborer vacancies at its Middletown
and Ashland facilities.  Of particular note for the dispute at bar, AK Steel administers the same
qualifying test to applicants for the Laborer positions.[2]  Subsequently, the completed exams are sent
to Resource Associates of Knoxville, Tennessee for scoring on a pass/fail basis.  Short Dep. at 27-30;
Lester Dep. at 68-71.  Those candidates who pass the exam proceed further in the AK Steel hiring
process.  Plaintiffs Darlene Carter, Marnie Carter, Darrell Carter, Kay Jackson, and Timothy
Oliphant all took the AK Steel test for Laborer positions and failed, and counsel for AK Steel has
represented, and offered to stipulate, that the Ashland class representatives were definitively not
hired because they failed the test.  *See* Ex. 30.

Plaintiffs' statistical expert, Dr. Edwin L. Bradley, conducted statistical analyses of AK
Steel's Laborer vacancy selection process and determined that the qualifying test used by
Middletown and Ashland has had an adverse impact against black applicants.  Specifically, Dr.

---

[1] Hereafter, plaintiffs will refer to entry-level positions at both Middletown and Ashland as
"Laborer" positions.

[2] Lester Dep. at 73-74 (Ex. 35).

3

Bradley concluded that the Middletown "hiring shortfall is explained by the fact that African-Americans were more likely than others to fail the written test and, as a result, to become eligible for hire." Edwin L. Bradley Rebuttal Expert Report Regarding Hiring Into Laborer Positions at the Middletown Works and Ashland Works of AK Steel, at 5 (attached as Ex. 2) (hereafter "Bradley Rebut. Rep."). As reflected in Dr. Bradley's declaration, limiting the statistical analysis of the Middletown testing results to the period of August 12, 2001, to December 31, 2003, yields a statistical significance of -2.63 standard deviations and an adverse impact ratio of 78.7%. *See* Ex. 14 at ¶ 7. Likewise, limiting the statistical analysis to the period of September 9, 2001, to December 31, 2003, yields a statistical significance of -2.84 standard deviations and an adverse impact ratio of 76.3%. *See id*. at ¶ 8.

The defendant purportedly did not maintain any data on the individual components of the Ashland hiring process for Laborer vacancies; thus, Dr. Bradley initially could not perform a statistical analysis of the testing process at Ashland. Bradley Rebut. Rep. at 11. Dr. Bradley surmised, however, that because the defendant used the same test at Middletown and Ashland, the results of the Middletown testing analysis should apply with equal force to Ashland testing. *Id*. The shortfall in testing at Ashland is initially reflected in an analysis of the total selection process at Ashland using the Baker data. The Baker data is missing racial information for 28.4% of the applicants. *Id*. at 8-9. This missing info yields a benchmark of 3.20% black applicants for Dr. Baker's analysis. *Id*. at 9. Dr. Bradley applied the 8.56% black applicant benchmark he found in the Ashland electronic data he received – which lacked racial information for only 6.4% of the applicants – to perform a statistical analysis on the Baker data. *Id*. at 9-10. For the 289 hires during the period covered by the Baker data for Ashland (January 1, 2000, to December 31, 2003), the

4

hiring of 12 black applicants for Laborer vacancies was 13 applicants fewer than the expected result of 25 individuals. *Id*. at 10. This difference resulted in a statistical significance of -2.81 standard deviations and a 46.3% adverse impact ratio. *Id*.

On January 19, 2007, this Court certified the following two subclasses in this case:

1.    All African-American applicants for labor positions at AK Steel's Middletown, Ohio plant who took and failed AK Steel's screening employment test within the 300-day period preceding July 9, 2002, and who allege that test has an impermissible disparate impact on African-American applicants.

2.    All African-American applicants for labor positions at AK Steel's Ashland, Kentucky plant who took and failed AK Steel's screening employment test within the 30-day period preceding Jun 8, 2002, and who allege that test has an impermissible disparate impact on African-American applicants.

Dkt. #96 at 12-13.

After waiting for several years, however, plaintiffs were finally able to retrieve Ashland testing information. As an initial matter, plaintiffs note that they requested from defendant, as early as October 17, 2002, all documents and information regarding the tests used by AK Steel to select candidates for employment. *See* Plaintiffs' First Request for Production of Documents, Requests Nos. 3, 6, 7, 9, 12, 15(s) (attached as Ex. 32). The defendant has repeatedly asserted that it did not have any data or information regarding the test results generated at the Ashland facility.

On August 29, 2007, the plaintiffs served a subpoena upon Resource Associates, the consulting firm AK Steel used to design and grade its Laborer qualifying tests. Remarkably, on October 5, 2007 – after the defendant had consistently failed to produce any information regarding the test results at Ashland -- Resource Associates, via defendant's counsel, served upon plaintiffs' counsel test results for Ashland applicants from 2001 through August 27, 2007 (which is two days

before the subpoena was served upon Resource Associates).  Of course, plaintiffs' counsel was

dumbfounded, as the defendant has effectively had control of the Ashland test results pursuant to

Rule 34, Federal Rules of Civil Procedure, such that they should have been produced years ago in

this litigation.[3]  Nevertheless, plaintiffs' counsel and plaintiffs' experts painstakingly took time to

compile the information contained in the thousands of pages of documents produced by Resource

Associates to create a database regarding Ashland test takers from August 12, 2001, to December

31, 2003.

Using this long sought-after data, the impact of using the test at Ashland was finally

analyzed.  First, using the EEOC's Four-Fifths rule,[4] the adverse impact of the defendant's use of

---

[3] Pursuant to Rule 34(a), Federal Rules of Civil Procedure, a party responding to a document request must produce responsive documents within its "possession, custody or control."  Documents are deemed within a party's possession, custody, or control when the party has actual possession, custody, or control of the documents or "has the legal right to obtain the documents on demand." *In re Bankers Trust Co.*, 61 F.3d 465, 469 (6th Cir. 1995) (citing *Resolution Trust Corp. v. Deloitte & Touche*, 145 F.R.D. 108, 110 (D. Colo.1992); *Weck v. Cross*, 88 F.R.D. 325, 327 (N.D. Ill.1980)); *see also General Env't. Science Corp. v. Horsfall*, 136 F.R.D. 130, 133 (N.D. Ohio 1991) ("In the context of Rule 34, 'control is defined not only as possession, but as the legal right to obtain the documents requested upon demand.'") (citation and alteration omitted).  There should be no dispute here that AK Steel has had the legal right to obtain the Ashland test results from Resource Associates.

[4]The EEOC's Uniform Guidelines provide as follows:

Adverse impact and the "four-fifths rule".  A selection rate for any race, sex, or ethnic group which is less than four-fifths (4/5) (or eighty percent) of the rate for the group with the highest rate will generally be regarded by the Federal enforcement agencies as evidence of adverse impact, while a greater than four-fifths rate will generally not be regarded by Federal enforcement agencies as evidence of adverse impact.  Smaller differences in selection rate may nevertheless constitute adverse impact, where they are significant in both statistical and practical terms or where a user's actions have discouraged applicants disproportionately on grounds of race, sex, or ethnic group.

29 C.F.R. § 1607.4(D).

the test at Ashland may be easily established.  As provided by the Uniform Guidelines, adverse impact is proved by examining the ratio of the selection rates between two groups.  The selection rate for the African-American test applicants at Ashland is calculated by dividing the number of successful African-American applicants by the total number of African-American applicants – that is, 15/48 – which produces a selection rate of .3125.  The selection rate for the non-black test takers is calculated via the same formula – that is, 695/1205 – which produces a selection rate of .5768. The division of the selection rates – .3125 / .5768 – yields an adverse impact ratio of .542, which is 54.2% and below the 80% bar of the Four-Fifths rule.  *See* Ex. 33 at ¶ 3.  When combined with the Middletown test-taker data, *see* Ex. 14 at ¶ 7, the adverse impact ratio for both AK Steel facilities from August 12, 2001, to December 31, 2003 is 72.9%, and the ratio for both facilities for the period September 9, 2001, to December 31, 2003 is 70.8%  Ex. 33 at ¶¶ 5, 6.

Furthermore, statistical analyses reveal that the Laborer qualifying test had an adverse impact upon African-American applicants at Ashland from August 12, 2001, to December 31, 2003.  Using the data compiled by plaintiffs and their expert, Dr. Bradley determined that the test resulted in 12 fewer African-American applicants passing the test than would be expected.  Ex. 33 at ¶ 3.  This shortfall is statistically significant at -3.62 standard deviations.  *Id.*.  This result would not change for the period September 9, 2001, to December 31, 2003.  *Id*. at ¶ 4.

In addition, Dr. Bradley combined the results from the Middletown analysis he conducted in his December 20, 2005, declaration and the present analysis of the Ashland facility.  For the period August 12, 2001, through December 31, 2003, using the test at both facilities resulted in a shortfall of 29 fewer African Americans passing the test than would be expected, which is statistically significant at -4.00 standard deviations. Ex. 33 at ¶ 5. For the period September 9, 2001,

through December 31, 2003, using the test at both facilities resulted in a shortfall of 30 fewer African Americans passing the test than would be expected, which is statistically significant at -4.21 standard deviations.  *Id.* at ¶ 6.

## DISCUSSION

### A.    Plaintiffs Were Issued Notices of Right to Sue

In its first argument on summary judgment, the defendant argues that the claims of Ashland plaintiffs Darlene Carter, Marnie Carter, Kay Jackson, and Timothy Oliphant should be dismissed because they purportedly did not "receive" or possess notices of right to sue from the EEOC pursuant to Title VII.  *Def.'s Mem.* at 8.  This contention is totally erroneous.  Attached hereto as Exhibit 34 are the notices of right to sue for the plaintiffs.  Therefore, the defendant's motion is due to be denied on this basis.

### B.    Plaintiffs Have Demonstrated the Adverse Impact of the Laborer Qualifying Test Upon African-American Applicants at Ashland

Discrimination occurs when an employer "uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin and fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity . . . ." 42 U.S.C. § 2000e-2(k)(1)(A)(I).  "[D]isparate impact analysis is intended to make sure that employers do not use 'neutral' decision-making mechanisms that in fact work to eliminate a greater portion of otherwise-qualified protected group members than they do members of other groups."  *Phillips v. Cohen*, 400 F.3d 388, 397 (6th Cir. 2005).   A plaintiff establishes a prima face case of disparate impact discrimination by:  (1) identifying a specific employment practice to be challenged; and (2) proffering a statistical analysis demonstrating that the challenged practice has

an adverse impact on a protected group. *Isabel v. City of Memphis*, 404 F.3d 404, 411 (6th Cir. 2005) (citations omitted).  If a plaintiff establishes a prima facie case of disparate impact discrimination, "the employer must show that the protocol in question has 'a manifest relationship to the employment'--the so-called 'business justification.'" *Isabel*, 404 F.3d at 411 (citation omitted).  " If the employer succeeds, the plaintiff must then show that other tests or selection protocols would serve the employer's interest without creating the undesirable discriminatory effect." *Id*. (citation omitted).

The defendant claims that plaintiffs have not satisfied their prima facie burden because they purportedly failed to demonstrate that the Laborer test has had an adverse impact upon African-American applicants. *Def.s' Mem.* at 9-10.  Unfortunately, AK Steel does not acknowledge that it continually failed to produce testing results for Ashland applicants in response to plaintiffs' First Request for Production of Documents.  *See* pp. 5-6 & n. 3, *supra*.  As an initial matter, in such a situation the statistical analysis finding the disparate impact of the Middletown test may serve as evidence of discriminatory impact at Ashland due to the defendant's failure to maintain adequate data to analyze.  *See U.S. v. City of Warren,* 138 F.3d 1083 (6th Cir. 1998).  As reflected in Dr. Bradley's declaration, limiting the statistical analysis of the Middletown testing results to the period of August 12, 2001, to December 31, 2003, yields a statistical significance of -2.63 standard deviations and an adverse impact ratio of 78.7%.  *See* Ex. 14 at ¶ 7.  Likewise, limiting the statistical analysis to the period of September 9, 2001, to December 31, 2003, for Middletown yields a statistical significance of -2.84 standard deviations and an adverse impact ration of 76.3%.  *See id*. at ¶ 8.

In *Warren*, the Sixth Circuit reviewed a district court's decision holding that the defendant's

recruiting practices for police and firefighter vacancies had a disparate impact on potential black applicants. 138 F.3d at 1083. The district court upheld a disparate impact claim regarding the police and firefighter vacancies because the U.S. had presented statistical evidence of the discriminatory effect of the city's recruiting practices regarding those positions. Contrarily, the district court denied the disparate impact claim as to other municipal vacancies because no statistical evidence was presented regarding the impact of the recruiting practices on those positions. Id. at 1089. The Sixth Circuit, noting that the district court had determined that the recruiting practices for all municipal positions were substantially similar, held that "[b]ecause the recruitment practices for all municipal positions were identical, . . . the district court clearly erred in holding that the United States did not meet its burden with regard to municipal positions other than police and firefighter positions." Id. at 1093.

City of Warren is applicable to this case because the Sixth Circuit ruled that if the typical statistical proof is unavailable – i.e., if a company fails to maintain the necessary records to analyze the statistical impact of a challenged employment practice – then plaintiffs may rely upon alternative statistics. City of Warren, 138 F.3d at 1093, 1094. In this instance, City of Warren sanctions the use of an alternative statistical analysis that demonstrates the effect of the challenged practice upon a similar population. Id. at 1093. That is exactly what plaintiffs have done here – they have relied upon the statistical analysis demonstrating that the challenged test had an impact upon African-American applicants at Middletown as an alternative analysis to show its effects upon the same class of individuals at Ashland. It would be unjust to allow the defendant to argue that its failure to maintain proper data on the Ashland hiring process precludes the plaintiffs from relying upon an alternative statistical analysis to sustain a testing class at Ashland. Therefore, the Middletown

statistical analyses demonstrates the adverse impact of the test upon African-American applicants at Ashland.

Fortunately, based upon plaintiffs' continuous efforts to secure information in October 2007 from Resource Associates, the consulting group that created and scored the tests for AK Steel's Middletown and Ashland facilities, the plaintiffs discovered that the defendant had misrepresented the existence of testing results for Ashland applicants. *See* pp. 5-6 & n. 3, *supra*. Indeed, Resource Associates continued to score Laborer qualifying tests for AK Steel through 2007. *Id*. Notwithstanding the extreme tardiness in receiving this information more than five years after requesting it from AK Steel, plaintiffs and their expert sifted through the thousands of pages of information to painstakingly create a database regarding the Ashland Laborer test takers from August 12, 2001, to December 31, 2003. Plaintiffs and their expert used this database to analyze the impact of the test upon African-American test-takers at Ashland.

As plaintiffs discussed previously, the adverse impact of the defendant's use of the test at Ashland may be easily established using the EEOC's Four-Fifths rule. As provided by the Uniform Guidelines, adverse impact is proved by examining the ratio of the selection rates between two groups.[5] The Sixth Circuit has approved the use of the Four-Fifths rule in determining the adverse

---

[5] The EEOC's Uniform Guidelines provide as follows:

Adverse impact and the "four-fifths rule". A selection rate for any race, sex, or ethnic group which is less than four-fifths (4/5) (or eighty percent) of the rate for the group with the highest rate will generally be regarded by the Federal enforcement agencies as evidence of adverse impact, while a greater than four-fifths rate will generally not be regarded by Federal enforcement agencies as evidence of adverse impact. Smaller differences in selection rate may nevertheless constitute adverse impact, where they are significant in both statistical and practical terms or where a user's actions have discouraged applicants disproportionately on grounds of race, sex, or ethnic group.

impact of a selection procedure, especially where there exists large samples of data, as here. *See Black v. City of Akron, Ohio*, 831 F.2d 131, 133-35 (6th Cir. 1987) (affirming denial of disparate impact claim based upon application of Four-Fifths rule); *Gonzalez v. Galvin*, 151 F.3d 526, 532 n. 8 (1998) (citing the Four-Fifths rule as a definition of adverse impact pursuant to the EEOC's Uniform Guidelines); *Isabel*, 404 F.3d at 412-13 & n. 1 (approving the use of the Four-Fifths rule and relevant statistical analyses to demonstrate adverse impact); *see also Police Officers for Equal Rights v. City of Columbus*, 644 F. Supp. 393, 407 (S.D. Ohio 1985) ("some courts suggest that violation of that [the Four-Fifths rule] alone is sufficient to establish a prima facie case of discrimination") (citing *Williams v. Vukovich*, 720 F.2d 909, 926 (6th Cir. 1983)), and *id*. at 432 n. 13( "A *prima facie* case may be established by use of any of a number of reasonable statistical measures, including the 80% rule of the EEOC and Uniform Guidelines."). As one district court has held, the Four-Fifths rule is "adequate and understandable," and the mathematics of the rule is "simple and straightforward and well within the Court's competence." *United Black Firefighters Assoc. v. City of Akron*, No. 5:90-CV-1678, 1994 WL 774510, *6 (N.D. Ohio Aug. 31, 1994).

Applying the Four-Fifths rule to this case demonstrates that the Laborer hiring test had an adverse impact on African-American applicants at the Ashland facility from August 12, 2001, to December 31, 2003. The selection rate for the African-American test applicants at Ashland is calculated by dividing the number of successful African-American applicants by the total number of African-American applicants – that is, 15/48 – which produces a selection rate of .3125. The selection rate for the non-black test takers is calculated via the same formula – that is, 695/1205 – which produces a selection rate of .5768. The division of the selection rates – .3125 / .5768 – yields

---

29 C.F.R. § 1607.4(D).

an adverse impact ratio of .542, which is 54.2% and below the 80% bar of the Four-Fifths rule. *See* Ex. 33 at ¶ 3. When combined with the Middletown test-taker data, *see* Ex. 14 at ¶ 7, the adverse impact ratio for both AK Steel facilities from August 12, 2001, to December 31, 2003 is 72.9%, and the ratio for both facilities for the period September 9, 2001, to December 31, 2003 is 70.8% Ex. 33 at ¶¶ 5, 6. Therefore, both periods for a combined analysis of Middletown and Ashland demonstrate an adverse impact pursuant to the Uniform Guidelines.

Furthermore, statistical analyses reveal that the Laborer qualifying test had an adverse impact upon African-American applicants at Ashland from August 12, 2001, to December 31, 2003. Using the data compiled by plaintiffs' and their expert, Dr. Bradley determined that the test resulted in 12 fewer African-American applicants passing the test than would be expected. Ex. 33 at ¶ 3. This shortfall is statistically significant at -3.62 standard deviations. *Id.*. This result would not change for the period September 9, 2001, to December 31, 2003. *Id.* at ¶ 4.

In addition, Dr. Bradley combined the results from the Middletown analysis he conducted in his December 20, 2005, declaration and the present analysis of the Ashland facility. For the period August 12, 2001, through December 31, 2003, using the test at both facilities resulted in a shortfall of 29 fewer African Americans passing the test than would be expected, which is statistically significant at -4.00 standard deviations. Ex. 33 at ¶ 5. For the period September 9, 2001, through December 31, 2003, using the test at both facilities resulted in a shortfall of 30 fewer African Americans passing the test than would be expected, which is statistically significant at -4.21 standard deviations. *Id.* at ¶ 6.

As Dr. Bradley noted in previous statements, statistical significance occurs at the 95% confidence level (no more than 5% probability that results are due to chance) when the difference

is 1.65 or more standard deviations, at the 99% confidence level (no more than 1% probability that results are due to chance) when the difference is 2.33 or more standard deviations, and at the 99.9% confidence level (no more than 0.1% probability that results are due to chance) when the difference is 3.09 or more standard deviations.  *See* Edwin L. Bradley Supplemental Expert Report Regarding Hiring Into Laborer Positions at the Middletown Works and Ashland Works of AK Steel, at 3-4 (attached as Ex. 1) (hereinafter "Bradley Suppl. Rep."); *c.f., Engineering Contractors Ass'n of South Florida v. Metropolitan Dade County*, 122 F.3d 895, 914 (11th Cir. 1997) ("Social scientists consider a finding of two standard deviations significant, meaning there is about one chance in 20 that the explanation for the deviation could be random and the deviation must be accounted for by some factor other than chance.") (citing *Peightal v. Metropolitan Dade County*, 26 F.3d 1545, 1556 n. 16 (11th Cir. 1994));  *Smith v. Xerox Corp.*, 196 F.3d 358, 365 (2[d] Cir. 1999) (identifying two standard deviations as the measure of statistically significant disparity).

Therefore, the defendant errs in stating that the Supreme Court requires that a statistical analysis demonstrate "more than two to three standard deviations" to support a Title VII violation. *Def.'s Mem.* at 11-12.  Unfortunately, the defendant has misinterpreted the oft-quoted rule from *Hazelwood Sch. Dist. v. U.S.*, 433 U.S. 299, 312 n.17 (1977), that statistical significance may be demonstrated by showing a disparity of more than two or three standard deviations.  The defendant interprets *Hazelwood* to require a standard deviation of more than 3 points, yet the "or" within the *Hazelwood* rule is not mere surplusage; that is, the Supreme Court understood that statistical significance may be demonstrated by a showing of more than 2 standard deviations or a showing of more than 3 standard deviations, i.e., any value greater than 2 satisfies the inquiry.  Notably, the Sixth Circuit has set forth this interpretation of the rule.  *See Alexander v. Local 496, Laborers' Intl.*

14

*Union of North America*, 177 F.3d 394, 421, n. 10 (6th Cir. 1999) ("Any standard deviation number smaller than -2.00 (e.g. -2.5) [or greater than 2.00, if expressed in positive numbers] constitutes a statistically significant underrepresentation, i.e., one where the probability that the resulting numbers occurred by chance is extremely small.") (citing *Hazelwood*, 433 U.S. at 309 n. 14).

Based on the preceding analyses, there should be no dispute that the disparate impact claims of the Ashland class should proceed to trial. Furthermore, the preceding analyses compel denial of the defendant's Motion to Decertify the Middletown Subclass (Dkt. #112). As plaintiffs argued in opposition to the defendant's Motion to Decertify the Middletown Subclass (Dkt. #121 at 14-17), one class may be maintained for African-American applicants who failed the same qualifying test used at the Ashland and Middletown facilities. As plaintiffs have argued previously, it is beyond dispute that a test used at multiple facilities of a company may be challenged on a class basis if it has a disparate impact against a protected group. *See, e.g., Williams v. Ford Motor Co.*, 187 F.3d 533, 535-36 (6th Cir. 1999) (in a class action covering seven Ford Motor Company plants in Ohio, the Sixth Circuit examined the validity of a pre-employment test used for the hiring of unskilled, hourly laborers); *Bacon v. Honda of America Mfg., Inc.*, 205 F.R.D. 466, 471-72, 477-78 (S.D. Ohio 2001) (finding commonality regarding a disparate impact claim challenging facially neutral criteria used at four Honda plants in central Ohio), *affm'd by*, 370 F.3d 565 (6th Cir. 2001); *Dothard v. Rawlinson*, 433 U.S. 321 (1977) (disparate impact claim upheld for neutral height and weight policy used for multiple prison facilities); *c.f.*, *General Telephone Company of the Southwest v. Falcon*, 457 U.S. 147, 159 n. 15 (1982) ("If petitioner used a biased testing procedure to evaluate both applicants for employment and incumbent employees, a class action on behalf of every applicant or employee who might have been prejudiced by the test would satisfy the commonality and typicality requirements

15

of Rule 23(a)."). As AK Steel uses the same test at both Middletown and Ashland,[6] and the Four-Fifths rule and statistical analyses demonstrate the adverse impact of the test at both facilities, a disparate impact class action may be properly maintained across both facilities.

Moreover, even if subclasses are maintained, there should be no dispute that Middletown class representatives Donald Edwards and James Greenwood may piggyback upon the charges of the Ashland class representatives. *See* Dkt. #121 at 11-14.

C.    **There Exists a Disputable Issue of Fact as to the Disparate Impact of the Total Selection Process at the Ashland Facility**

Even in the absence of the newly-discovered testing results regarding the Ashland facility for the liability period, plaintiffs should still withstand summary judgment on their adverse impact claim. As the defendant has conceded previously (Dkt. #73 at 12), if Ashland failed to retain adequate data regarding the test results the plaintiffs may maintain a challenge against the impact of the total hiring process at Ashland.[7] Plaintiffs' expert Dr. Bradley demonstrated the statistically significant impact of this total hiring process in his Rebuttal Report, which relied upon data produced by defendant's expert Dr. Baker. *See* Ex. 2 at 10-11. The Baker data is missing racial information for 28.4% of the applicants. *Id*. at 8-9. This missing info yields a benchmark of 3.20% black applicants for Dr. Baker's analysis. *Id*. at 9. Dr. Bradley applied the 8.56% black applicant

_____

[6]Lester at 73-74 (Ex. 35).

[7] 42 U.S.C. § 2000e-2(k)(1)(B)(i) provides as follows:

With respect to demonstrating that a particular employment practice causes a disparate impact . . . , the complaining party shall demonstrate that each particular challenged employment practice causes a disparate impact, except that if the complaining party can demonstrate to the court that the elements of a respondent's decisionmaking process are not capable of separation for analysis, the decisionmaking process may be analyzed as one employment practice.

benchmark he found in the Ashland electronic data he received – which lacked racial information for only 6.4% of the applicants – to perform a statistical analysis on the Baker data. *Id*. at 9-10. For the 289 hires during the period covered by the Baker data for Ashland (January 1, 2000, to December 31, 2003), the hiring of 12 black applicants for Laborer vacancies was 13 applicants fewer than the expected result of 25 individuals. *Id*. at 10. This difference resulted in a statistical significance of -2.81 standard deviations and a 46.3% adverse impact ratio. *Id*.

AK Steel contends that Dr. Bradley's analysis of the total hiring process at Ashland is flawed (*Def.'s Mem*. at 11-12), yet such arguments raise disputable issues of fact that should not be adjudicated on a summary judgment motion. Such disputed issues of fact should be adjudicated by a factfinder after observing the demeanor and testimony of the expert witnesses so as to assess their credibility on the analyses. Therefore, summary judgment is not warranted on this basis.

In addition, as plaintiffs noted earlier (*see* pp. 13-14, *supra*), the defendant errs in suggesting that a statistically significant impact is not demonstrated unless there is a shortfall of more than three standard deviations. Therefore, the defendant's arguments in this regard do not supports its motion for summary judgment. *See Def.s' Mem*. at 11-12.

### D.    The Defendant Cannot Proffer a Legitimate Business Necessity for Using Its Test Because Its Evidence of Purported Validation is Inadmissible

The defendant argues that it has met its burden of setting forth a legitimate business necessity for using its discriminatory test. *Def.'s Mem*. at 12-14. A defendant satisfies its burden of persuasion on the business necessity defense by setting forth evidence that a test has been validated pursuant to the EEOC's Uniform Guidelines. *See* 42 U.S.C. § 2000e-2(k)(1)(A)(I); *Isabel*, 404 F.3d at 413. Here, the defendant does not have any admissible evidence on its business necessity defense.

17

As Magistrate Judge Hogan ordered, AK Steel is prohibited from using the purported validation studies conducted by Resource Associates in 1997 and 1999 because it failed to timely produce those studies to plaintiffs.  Dkt. #135.[8]  Furthermore, the defendant may not circumvent Magistrate Judge Hogan's Order by relying upon a declaration from Dr. Lucy Gibson, an executive of Resource Associates.  The defendant has never timely produced any expert report from Dr. Gibson, and thus it may not at the summary judgment stage produce for the first time a declaration from Dr. Gibson based upon specialized knowledge falling within the purview of Rule 702, Federal Rules of Evidence, especially as the declaration does not conform to Rule 26(a)(2), Federal Rules of Civil Procedure, regarding expert disclosures.  Therefore, the defendant has failed to meet its business necessity burden, and summary judgment should be denied on this basis.

E.    **Summary Judgment Is Not Appropriate as to the Claims of Darrell Carter and Timothy Oliphant**

The defendant argues that the Court should grant summary judgment against Darrell Carter and Timothy Oliphant because they had criminal histories, Mr. Carter failed to list his criminal conviction on application, and Mr. Oliphant allegedly misrepresented his employment history, all of which purportedly would have prevented their hiring even if they would have passed the test.  The defendant's contentions do not warrant summary judgment.

---

[8] The defendant has objected to Magistrate Judge Hogan's Order.  Dkt. #144.  If the Court overrules Magistrate Judge Hogan's Order and permits the defendant to use its expert reports, then plaintiffs request, pursuant to Rule 56(f), Federal Rules of Civil Procedure, that they be allowed an opportunity to conduct discovery on the reports and produce a report of their own, and subsequently re-address this issue on summary judgment.  *See Ball v. Union Carbide Corp.*, 385 F.3d 713, 719 (6th Cir. 2004) ("It is well-established that the plaintiff must receive 'a full opportunity to conduct discovery' to be able to successfully defeat a motion for summary judgment.") (citations omitted).

As for the defendant's argument that Messrs. Carter and Oliphant would not have been hired because they had criminal histories, the Fed. R. Civ. P. 30(b)(6) deposition of defendant's corporate representative, Susan Lester, states otherwise. Mr. Carter pleaded guilty to a misdemeanor count of assault in 1981, and Mr. Oliphant was convicted in 1990. Carter Dep. at 6; Oliphant Dep. at 5. Ms. Lester testified that AK Steel only disqualified individuals who were convicted of a crime within five to seven years of applying at Ashland. Lester Dep. at 98-99 (Ex. 35). Therefore, Messrs. Carter's and Oliphant's convictions would not have disqualified them from consideration for a job at AK Steel.

As to Mr. Oliphant's supposed misrepresentation of his work history, he testified that the start date of a particular job was misprinted on his resume as 1986 rather than 1989, Oliphant Dep. at 60. Furthermore, the defendant never ascertained during Mr. Carter's deposition whether he erroneously answered the question on the application about prior criminal convictions. Carter Dep. at 63-64. As Ms. Lester testified that she gives applicants an opportunity to correct mistakes in their applications, Ex. 35 at 93, surely a minor typo as to a date would not have prevented consideration of Mr. Oliphant's candidacy, and Mr. Carter ostensibly would have been given an opportunity to address any inconsistencies between his answer and his criminal record. Indeed, because Ms. Lester testified that AK Steel only denied employment to individuals who were convicted of a crime within five to seven years of applying for a job, Mr. Carter's conviction in 1981 of misdemeanor assault may not have been located in a background check.

In any event, the defendant's contentions are forestalled by the after-acquired evidence rule. It is undisputed that AK Steel denied Messrs. Carter and Oliphant employment because they failed the test, not because of any other reason. If a defendant subsequently discovers during litigation

19

additional reasons why it may not have hired a plaintiff, then this after-acquired evidence affects the remedy available to the plaintiff, not the employer's liability for the discriminatory conduct. *McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 358-60 (1995). As the Supreme Court explained, the objectives of Title VII include deterrence as well as compensation for injuries, *id*. at 358, and "a private litigant who seeks redress . . . vindicates" both objectives. *Id*. Therefore,

> The objectives of the ADEA are furthered when even a single employee establishes that an employer has discriminated against him or her. The disclosure through litigation of incidents or practices that violate national policies respecting nondiscrimination in the work force is itself important, for the occurrence of violations may disclose patterns of noncompliance resulting from a misappreciation of the Act's operation or entrenched resistance to its commands, either of which can be of industry-wide significance.

*Id*. at 358-59; *c.f.*, Dkt. # 96 at 5-6 ("Net economic loss is not necessarily the primary qualification for an 'adequate' class representative in an employment discrimination case.").

Therefore, Messrs. Carter's and Oliphant's criminal histories, and their purported failure to accurately include certain information on their applications and/or resume, do not prohibit a finding that the defendant discriminated against them by subjecting them to a discriminatory test. Messrs. Carter's and Oliphant's mistakes may preclude them from receiving backpay relief, but a finding of liability on their behalf may entitle them to injunctive relief on behalf of the class, especially as the defendant was still using the test at Ashland as of 2007. For the foregoing reasons, the defendant's motion for summary judgment on this issue should be denied.

## CONCLUSION

WHEREFORE, PREMISES CONSIDERED, plaintiffs respectfully request that the Court DENY the defendant's Motion for Summary Judgment On the Claims of the Ashland Plaintiffs and Ashland Class.

Respectfully Submitted,

*/s/ Herman N. Johnson, Jr.*
Robert F. Childs, Jr. (ASB-2223-C-60R)
Herman N. Johnson, Jr.(ASB-3607-R50J)
**WIGGINS, CHILDS, QUINN & PANTAZIS**
The Kress Building
301 19th Street North
Birmingham, Alabama 35203
(205) 328-0640
(205) 254-1500 (facsimile)

Tobias, Kraus & Torchia, LLP
414 Walnut Street
Suite 911
Cincinnati, Ohio 45202
(513) 241-8137
(513) 241-7863 (facsimile)

ATTORNEYS FOR THE PLAINTIFFS

21

## <u>LIST OF EXHIBITS</u>

Ex. 1    Edwin L. Bradley Supplemental Expert Report Regarding Hiring Into Laborer Positions at the Middletown Works and Ashland Works of AK Steel

Ex. 2    Edwin L. Bradley Rebuttal Expert Report Regarding Hiring Into Laborer Positions at the Middletown Works and Ashland Works of AK Steel

Ex. 3    Phyllis Short Deposition Excerpts

Ex. 14    Declaration of Dr. Edwin L. Bradley, Jr. (December 20, 2005)

Ex. 30    8/1/01 G. Rogers Email to S. Donahue

Ex. 32    Plaintiffs' First Request for Production of Documents

Ex. 33    Declaration of Edwin L. Bradley, Jr. (March 5, 2008)

Ex. 34    Darlene Carter, Marnie Carter, Kay Jackson, and Timothy Oliphant EEOC Notices of Right-To-Sue

Ex. 35    Susan Lester Deposition Excerpts

## <u>CERTIFICATE OF SERVICE</u>

   I do hereby certify that on March 7, 2008, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:


Gregory Parker Rogers
Lawrence James Barty
Patricia Anderson Pryor
Taft, Stettinius & Hollister, LLP
1800 First Star Tower
425 Walnut Street
Cincinnati, OH 45202
Fax: (513) 381-0205


        */s/ Herman N. Johnson, Jr.*
        PLAINTIFFS' COUNSEL